**SEAN C. WAGNER** (*Pro Hac Vice* Forthcoming)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice* Forthcoming)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**W. KEITH WYATT (S.B.N.: 80859)**
wkwyatt@imwlaw.com
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA  90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. )<br><br>*Plaintiff,* )<br><br>vs. )<br><br>ARTUR ELIZAROV, UNISON )<br>AGREEMENT CORP., and SCOTT )<br>HOWELL )<br><br>*Defendant.* )<br> ) | Case No. _____<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **UNJUST ENRICHMENT**<br>3. **INJUNCTIVE RELIEF**<br>4. **DECLARATORY JUDGMENT** |

Plaintiff, Goldwater Bank, N.A. ("Goldwater"), by and through undersigned counsel, brings this action against Defendants Artur Elizarov ("Elizarov"), Unison Agreement Corp. ("Unison") and Scott Howell ("Howell") and alleges as follows:

- 1 -

## PARTIES

1.     Plaintiff Goldwater Bank, N.A. is a national association with its principal place of business in Phoenix, Arizona.

2.     Defendant Artur Elizarov, is an individual and resident of Riverside County, California.

3.     Defendant Unison Agreement Corp. is a corporation organized under the laws of the state of Delaware with its principal place of business in San Francisco, California.

4.     Defendant Scott Howell is an individual and resident of San Francisco County, California.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over Goldwater's claims pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Goldwater and Defendants and the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

6.     A large portion of the conduct giving rise to the claims against Defendants, as more fully described below, occurred in the Central District of California.

7.     In addition, the real property over which Plaintiff claims a security interest at issue in this action is located in Riverside County, California within the Central District of California.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## DEMAND FOR JURY TRIAL

9.     Plaintiff Goldwater hereby demands a trial by jury on all issues so triable.

## **BACKGROUND**

10.     On or around July 31, 2019, Goldwater, as lender, originated a mortgage loan to Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by certain real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").

11.     Elizarov is a real estate broker holding an active license from the California Department of Real Estate, and his license ID number is 01954357.

12.     The Goldwater Loan was memorialized in an Adjustable Rate Note (the "Note") and a Deed of Trust (the "Deed of Trust"), both dated July 31, 2019.  A true and accurate copy of the Note and Deed of Trust are attached and incorporated herein as **Exhibit A** and **Exhibit B**, respectively.

13.     The Deed of Trust created a valid and enforceable lien between Goldwater and Elizarov.

14.     On or around August 7, 2019, Elizarov entered into another deed of trust with Unison as trustee, which was also secured by the Subject Property (the "Unison Lien").

15.     Elizarov informed Unison of the Goldwater Loan and Goldwater's lien.

16.     Elizarov defaulted on the Goldwater Loan and is delinquent on the payment obligations as of April 1, 2020.

17.     At some point following the default, Elizarov decided to sell the Subject Property, and Elizarov communicated that intent to Goldwater in March 2021.

18.     On March 3, 2021, the escrow company for the pending sale, Escrow of the West, Inc., made contact with Goldwater regarding the payoff of Goldwater's lien on the Subject Property in connection with a pending sale of the Subject Property.

19. During the course of the escrow relationship, Escrow of the West, Inc., as escrow agent for Elizarov as seller and Howell as buyer of the Subject Property, learned that Goldwater's Deed of Trust was unrecorded.

20. On or about March 3, 2021 Escrow of the West informed Goldwater that its Deed of Trust on the Subject Property had never been recorded in the Riverside County Register of Deed's office.

21. Goldwater also learned in conversation with the escrow agent that the Subject Property was subject to two other liens in addition to Goldwater's, including a mechanic's lien in an amount of approximately $107,000 and the Unison Lien in the amount of $491,000.

22. Goldwater thereafter communicated with Elizarov regarding the disbursement of the proceeds of the pending sale, which would have been insufficient to pay off the Goldwater Loan, the Unison Lien, and the mechanic's lien in full.

23. Elizarov indicated that $675,000 of the proceeds would be transmitted to Goldwater following the sale of the Subject Property.

24. Upon information and belief, Howell and Unison had actual knowledge of Goldwater's Deed of Trust because the parties to the pending sale, including Elizarov, Howell and Unison, discussed the matter of Goldwater's unrecorded Deed of Trust and its impact on the pending sale.

25. Goldwater's unrecorded Deed of Trust is valid between Goldwater, Elizarov, and any other party with notice of the Deed of Trust.  Cal. Civ. Code § 1217.

26. Elizarov sold the Subject Property to Scott Howell by a Grant Deed that was executed on or around March 22, 2021 and recorded on or around March 29, 2021.  A true and accurate copy of the Grant Deed is attached and incorporated herein as **Exhibit C**.

- 4 -

27. Elizarov never informed Goldwater that the sale occurred and continued communicating with Goldwater after March 22, 2021 regarding what amount of the proceeds they would receive.

28. On or around March 29, 2021, Goldwater asked Elizarov about the status of the closing, and Elizarov denied that the sale occurred.

29. Elizarov has ceased responding to Goldwater's queries regarding the status of the $675,000 that was to be paid towards the Goldwater Loan following the sale of the Subject Property.

30. Upon information and belief, the proceeds from the sale of the Subject Property paid off the mechanic's lien and the Unison Lien in full.

31. Upon information and belief, Elizarov received and is wrongfully retaining the remaining proceeds of the sale of the Subject Property, including the $675,000 that Elizarov previously indicated would be paid to Goldwater.

32. To date, Goldwater has received none of the proceeds from the sale of the Subject Property.

33. Following the sale of the property, Goldwater also discovered a flyer advertising the Subject Property for sale identifies Artur Elizarov and his firm DreamHome Realty Group, Inc. as the realtor to be contacted about the property.  A true and accurate copy of this flyer is attached hereto as **Exhibit D**.

34. Because of Elizarov's status as a licensed real estate broker in the State of California and his role in marketing the Subject Property for sale, Elizarov cannot deny that he was aware of the validity of the Deed of Trust and Goldwater's right to the proceeds of the sale of the Subject Property.

35. Goldwater's status as a secured creditor with regard to Elizarov is now at risk, and Goldwater faces a significant likelihood that it will effectively become an unsecured creditor of Elizarov.

36.    If Goldwater is an unsecured creditor of Elizarov, there is a high risk that Goldwater will not be made whole, as the evidence of Elizarov's insolvency is well documented.

37.    At the time of the sale of the Subject Property, Elizarov was already almost a year behind in his payments on the Goldwater Loan, which is significant in light of the fact that he owned the Subject Property for less than two years.

38.    Additionally, on December 18, 2019, Elizarov was discharged from an IRS tax lien in the amount of $107,787.69.

39.    Elizarov's recent history of carrying significant debts suggests that the proceeds of the sale of the Subject Property will be wasted and disposed of prior to the entry of a final judgment in this matter.

40.    As a result of Elizarov's conduct, Goldwater Bank has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

## FIRST CAUSE OF ACTION

### (Breach of Contract, as to Elizarov)

41.    Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

42.    Goldwater had an agreement with Elizarov to make the Goldwater Loan in exchange for his obligations in the Note and the Deed of Trust.

43.    The Note and Deed of Trust is a valid and binding contract between the parties.

44.    Pursuant to the Note and Deed of Trust, Goldwater is entitled to the proceeds from a sale of the Subject Property.

45.    Elizarov breached the Note and Deed of Trust by failing to make all payments when due, including by failing to provide Goldwater with the proceeds of the sale of Subject Property.

46.     Rather than pay the proceeds from the sale of the Subject Property to Goldwater, Elizarov has wrongfully retained those proceeds in an amount of approximately $675,000.

47.     Elizarov agreed in the Note that in the event of a default and acceleration of the Goldwater Loan, Goldwater would be entitled to recover its costs and expenses incurred in enforcing the Note, including its reasonable attorney's fees. (Ex. A, Note, § 7(E)).

48.     As a direct and proximate result of Elizarov's breach, Goldwater has been directly and proximately damaged in an amount to be determined at trial.

49.     As a direct and proximate result of the foregoing acts and conduct, Goldwater has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe on Plaintiff

50.     Goldwater additionally seeks the entry of an order declaring that Elizarov holds, in constructive trust as trustee for the benefit of Goldwater, such amounts as were transferred to him personally in connection with the sale of the Subject Property, as well as an order directing Elizarov to disgorge and transfer any and all such amounts to Goldwater.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

51.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

52.     By engaging in the acts described above, Elizarov has and continues to benefit from his wrongdoing and has been unjustly enriched by reaping the benefits of his unlawful activities to the damage and irreparable harm of Goldwater.

53.     As a direct and proximate result of Elizarov's misconduct, Goldwater has been damaged in an amount to be proven at trial, but in excess of $675,000.

### THIRD CAUSE OF ACTION

### (Injunctive Relief, as to Elizarov)

54.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

55.     As of the date of filing of this Complaint, Goldwater faces significant exposure with regard to the Goldwater Loan, as Elizarov has sold the Subject Property and wrongfully retained the proceeds of the sale in an amount in excess of $675,000.

56.     Goldwater's status as a secured creditor of Elizarov has been threatened, and the likelihood of Goldwater being able to recover in full as an unsecured creditor is low.

57.     Goldwater justifiably fears that it will sustain significant losses and irreparable harm as a result of Elizarov's misappropriation of the proceeds of the sale of the Subject Property.

58.     Unless Elizarov's assets, including the proceeds of the sale of the Subject Property, are marshalled, accounted for, and preserved, Goldwater's security interest in the Goldwater Loan will not be adequately secured with respect to Elizarov.

59.     Goldwater is without a plain, speedy, or adequate remedy at law which would serve to immediately exonerate, indemnify, and save it harmless for its actual and anticipated losses, and Goldwater would be irreparably and permanently injured unless this Court grants immediate injunctive and equitable relief.

### FOURTH CAUSE OF ACTION

### (Declaratory Judgment, as to Unison and Elizarov)

60.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61.    There exists an actual, definite, and concrete controversy between Goldwater, Unison, and Elizarov related to the priority of Goldwater's security interest relative to the Unison Lien.

62.    Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

63.    Prior to the sale of the Subject Property to Howell, Elizarov and Unison both obtained actual knowledge of Goldwater's unrecorded Deed of Trust.

64.    Nevertheless, in the sale of the Subject Property, the Unison Lien was paid off in full as a lien with a higher priority than Goldwater's.

65.    For the reasons stated above, Goldwater requests an Order from this Court declaring that Goldwater's lien created by the Deed of Trust was first in priority over the Unison Lien.

66.    By reason of the foregoing, an actual and justifiable controversy exists between the parties as to the duties, rights and obligations of the agreement.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment, as to Scott Howell)

67.    Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

68.    There exists an actual, definite, and concrete controversy between Goldwater and Howell related to the validity of the Goldwater Loan and Goldwater's security interest in the Subject Property.

69.    Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

70.    Prior to the sale of the Subject Property from Elizarov to Howell, Howell obtained actual knowledge of Goldwater's Deed of Trust.

71.    By virtue of his knowledge, Goldwater's Deed of Trust is valid and binding as between Goldwater and Howell, and Goldwater's security interest in the Subject Property persists.  Cal Civ. Code § 1217.

72.    The Grant Deed between Elizarov and Howell does not indicate that title in the Subject Property is being transferred subject to Goldwater's security interest.

73.    By reason of the foregoing, an actual and justifiable controversy exists between the parties as to the duties, rights, and obligations of Goldwater's security interest.

74.    For the reasons stated above, Goldwater requests an Order from this Court declaring that the sale of the Subject Property from Elizarov to Howell transferred title subject to Goldwater's security interest in the Subject Property.

### PRAYER FOR RELIEF

**WHEREFORE**, Goldwater requests the Court order relief, as follows:

1.    Preliminary and permanent injunctive relief (i) enjoining Elizarov from alienating or disposing of the proceeds of the sale of the Subject Property and (ii) requiring Elizarov to make an accounting of his assets following the sale of the Subject Property;

2.    Actual, compensatory, consequential, and exemplary damages in an amount to be determined at trial for all losses and damages suffered as a result of the acts and transactions complained of herein;

3.    A constructive trust for the benefit of Goldwater over the proceeds received by Elizarov in connection with the sale of the Subject Property;

4.    All costs and expenses incurred by Goldwater Bank in enforcing its rights under the Note and Deed of Trust;

5.    A declaratory judgment that the Goldwater's security interest in the Subject Property had priority over the Unison Lien prior to the sale, or in the

alternative, that Howell's title in the Subject Property is subject to Goldwater's security interest established by the Deed of Trust.

Dated: April 6, 2021

_____/s/ Marie Maurice_____
W. Keith Wyatt, Esq.
Marie Maurice, Esq.


-AND-


**/s/ Sean C. Wagner**
Sean C. Wagner, *PHV materials forthcoming*
Derek M. Bast, *PHV materials forthcoming*
WAGNER HICKS PLLC
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
derek.bast@wagnerhicks.law

ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.

# EXHIBIT A

**LOAN #: 909216931**
**MIN: 1009209-4100147547-4**

# ADJUSTABLE RATE NOTE
### (LIBOR One-Year Index (As Published In The Wall Street Journal)-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.**

| | | |
|---|---|---|
| **July 31, 2019** | **Palm Springs,** | **California** |
| **[Date]** | **[City]** | **[State]** |

**291 W. Overlook Road, Palm Springs, CA 92264-8934**
**[Property Address]**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$686,250.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Goldwater Bank, N.A..**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.375 %.** The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **September 1, 2019.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2049,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **2525 E. Camelback Rd, Suite 1100**
**Phoenix, AZ 85016**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$3,842.80.** This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the **1st** day of **August, 2024** and on that day every **12th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.** The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE** percentage point(s) ( **3.000 %** ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR – Single Family – Fannie Mae UNIFORM INSTRUMENT** Form 3526 6/01 (rev. 6/16)
Ellie Mae, Inc. Page 1 of 3 F3526NOT 0816
F3526NOT (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.375 %**      or less than **5.375 %.**       Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO**          percentage point(s) ( **2.000 %**       ) from the rate of interest I have been paying for the preceding  **12**         month(s). My interest rate will never be greater than  **11.375 %. My interest rate will never be less than the start rate or 5.375 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  **15**           calendar day(s) after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR – Single Family – Fannie Mae UNIFORM INSTRUMENT Form 3526 6/01 (rev. 6/16)
Ellie Mae, Inc.                                                   Page 2 of 3                                                   F3526NOT  0816
                                                                                                                              F3526NOT (CLS)
                                                                                                                   07/31/2019 10:36 AM PST



**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



_____ (Seal)
**ARTUR ELIZAROV**

**Lender: Goldwater Bank, N.A.**
**NMLS ID: 452955**
**Loan Originator: Gregory Hill**
**NMLS ID: 247349**

[Sign Original Only]

# EXHIBIT B

When recorded, mail to:
**Goldwater Bank, N.A.**
**Attn: Final Document Department**
**P.O. Box 25064**
**Albuquerque, NM 87125**
**844-799-4653**

**Title Order No.: 0625-5974427**
**Escrow No.: 0625-5974427**
**LOAN #: 909216931**

———————————————————— [Space Above This Line For Recording Data] ————————————————————

# DEED OF TRUST

| MIN 1009209-4100147547-4 |
| --- |

**MERS PHONE #: 1-888-679-6377**

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated **July 31, 2019,**                    together with all Riders to this document.
**(B) "Borrower"** is   **ARTUR ELIZAROV, AN UNMARRIED MAN.**

Borrower's address is   **828 Westmount Drive, West Hollywood, CA 90069.**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is   **Goldwater Bank, N.A..**

Lender is   **a Corporation,**                                            organized and existing under the laws of
**The United States of America.**                    Lender's address is   **2525 E. Camelback Rd, Suite**
**1100, Phoenix, AZ 85016.**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3005 1/01**
Ellie Mae, Inc.                                        Page 1 of 13                                        CAEDEDL  0219
                                                                                                          CAEDEDL (CLS)
                                                                                                          07/31/2019 10:36 AM PST



**(D) "Trustee"** is **First American Title Company.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **July 31, 2019.** The Note states that Borrower owes Lender **SIX HUNDRED EIGHTY SIX THOUSAND TWO HUNDRED FIFTY AND NO/100\* \***
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* Dollars (U.S. **$686,250.00** )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2049.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- ☐ Balloon Rider
- ☐ 1-4 Family Rider
- ☐ V.A. Rider

- ☐ Condominium Rider
- ☐ Planned Unit Development Rider
- ☐ Biweekly Payment Rider

- ☐ Second Home Rider
- ☐ Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and



LOAN #: 909216931

all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **Riverside** [Name of Recording Jurisdiction]:

**LOT 8 OF BLOCK 7, PALM CANYON MESA TRACT, AS PER MAP RECORDED IN BOOK 12, PAGES 52 THROUGH 56, BOTH INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. APN #: 513-363-023-2**

which currently has the address of **291 W. Overlook Road, Palm Springs,**

[Street] [City]

California **92264-8934** ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice

Case 5:21-cv-00616-JWH-SP   Document 1   Filed 04/06/21   Page 20 of 39   Page ID #:20

**LOAN #: 909216931**

to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments
at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender
need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring
the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or
return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the
Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender
shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants
and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted
and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due
under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order
in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due
under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to
pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one
Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic
Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment
is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.
Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not
extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note,
until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and
other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold
payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5;
and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination
or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments,
if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly
furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow
Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Bor-
rower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing.
In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items
for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing
such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide
receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the
phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a
waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and
pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may
revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such
revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the
time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall
estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow
Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity
(including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall
apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower
for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender
pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is
made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower
any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on
the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3005 1/01**
Ellie Mae, Inc.                                  Page 4 of 13                              CAEDEDL  0219
                                                                                           CAEDEDL (CLS)
                                                                                    07/31/2019 10:36 AM PST

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water

from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration



period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3005 1/01**
Ellie Mae, Inc.   Page 8 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all



sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01**
Ellie Mae, Inc.                                                    Page 10 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **Form 3005 1/01**
Ellie Mae, Inc.                                                    Page 11 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____     4\31\2019      **(Seal)**
**ARTUR ELIZAROV**                                                    **DATE**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of CALIFORNIA**
**County of** LOS Angeles

On ___JULY 31.2019___, before me, Estela Noemy Moreno Aviles NOTARY PUBLIC (here insert name and title of the officer), personally appeared ARTUR ELIZAROV, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

_____(NOTARY)

(SEAL)

ESTELA NOEMY MORENO AVILES
Notary Public - California
Los Angeles County
Commission # 2293165
My Comm. Expires Jun 15, 2023



**LOAN #: 909216931**

**Lender: Goldwater Bank, N.A.**
**NMLS ID: 452955**
**Loan Originator: Gregory Hill**
**NMLS ID: 247349**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3005 1/01**
Ellie Mae, Inc.            Page 13 of 13                                          CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

LOAN #: 909216931
MIN: 1009209-4100147547-4

## ADJUSTABLE RATE RIDER

### (LIBOR One-Year Index (As Published In The Wall Street Journal-Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **31st** day of **July, 2019,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Goldwater Bank, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at: **291 W. Overlook Road, Palm Springs, CA 92264-8934.**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of **5.375 %.** The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the **1st** day of **August, 2024,** and on that day every **12th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated



LOAN #: 909216931

deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.**
The most recent Index value available as of the date 45 days before each Change
Date is called the "Current Index," provided that if the Current Index is less than zero,
then the Current Index will be deemed to be zero for purposes of calculating my inter-
est rate.

If the Index is no longer available, the Note Holder will choose a new index which
is based upon comparable information. The Note Holder will give me notice of this
choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by
adding **THREE**                                         percentage point(s) ( **3.000 %**                    )
(the "Margin") to the Current Index. The Note Holder will then round the result of this
addition to the nearest one-eighth of one percentage point (0.125%). Subject to the
limits stated in Section 4(D) below, this rounded amount will be my new interest rate
until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that
would be sufficient to repay the unpaid principal that I am expected to owe at the
Change Date in full on the maturity date at my new interest rate in substantially
equal payments. The result of this calculation will be the new amount of my monthly
payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
**7.375 %**      or less than  **5.375 %.**          Thereafter, my interest rate will never be increased
or decreased on any single Change Date by more than **TWO**

percentage point(s) ( **2.000 %**      ) from the rate
of interest I have been paying for the preceding **12**      month(s). My interest rate will
never be greater than **11.375 %. My interest rate will never be less than the start rate or 5.375
%.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the
amount of my new monthly payment beginning on the first monthly payment date after
the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest
rate and the amount of my monthly payment before the effective date of any change.
The notice will include information required by law to be given to me and also the title

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                                         Page 2 of 4                                         F3189RLU  0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                                Page 3 of 4                                F3189RLU  0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____  7/31/2019.  **(Seal)**
**ARTUR ELIZAROV**                                                      DATE

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                            Page 4 of 4                           F3189RLU  0816
                                                                                 F3189RLU (CLS)
                                                                        07/31/2019 10:36 AM PST



# EXHIBIT C

DOC # 2021-0196602
03/29/2021 04:55 PM Fees: $17.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY:**
Orange Coast Title

**AND WHEN RECORDED MAIL TO:**

Scott Howlett
44 Hartford
San Francisco, CA 94144

\*\*This document was electronically submitted
to the County of Riverside for recording\*\*
Receipted by: REGINA #080

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.:  210-2216078-10 | | Escrow No.:  02-035523-AC |
| --- | --- | --- |
| *APN 513-363-623* *TRA 011* | **GRANT DEED** | |

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $1,490.50**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X]  City of Palm Springs **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Artur Elizarov, a Single Man**

hereby GRANT(s) to:

**Scott Howlett, a Single Man**

the real property in the City of Palm Springs, County of Riverside, State of California,
described as:
Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56
both inclusive of Maps,  in the office of the County of said county.

Also Known as:  291 W. Overlook Road, Palm Springs, CA  92264
APN#: 513-363-023-2

**DATED: March 22, 2021**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

Title Order No.: 210-2216078-10
Escrow No.: 02-035523-AC

APN# 513-363-023-2

## Signature Page

Artur Elizarov

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _Florida_

COUNTY OF _Broward_

On _03/25/21_ before me, _Antonio Perez_ A Notary Public personally

appeared _Artur Elizarov_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____ (Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN

**ANTONIO PEREZ**
Commission # HH 079732
Expires January 12, 2025
Bonded Thru Budget Notary Services

# EXHIBIT D



$1,399,000

WWW.291OVERLOOK.COM

**Artur Elizarov**
DreamHome Realty Group Inc
art@dhr.company
323-326-7657

**CalBRE # 02020109**

Case 5:21-cv-00616-JAK-SP Document 1   Filed 04/06/21   Page 38 of 39   Page ID #:38

# FOR
# SALE

291 W OVERLOOK RD
PALM SPRINGS, CA 92264

**DREAMHOME**
REALTY GROUP, INC.

**3 beds / 4 baths / 2,400 SF**



**291 W OVERLOOK RD - PALM SPRINGS, CA**                    **$1,399,000**

Meticulously Remodeled With The Finest Of Modern Finishes. Located in The Mesa, a beautiful and historic neighborhood in South Palm Springs. At the base of the San Jacinto Mountains, it offers a front row view of the beautiful rock formations. A serene ambiance among multi-million dollar estates, this ultra modern home offers three separate master suites. The suites do not hare common walls. An entertainers delight with floor-to-ceiling glass overlooking a front-loaded heated pool, open floor plan, a front, side, and rear yard. All common spaces and suites have separate AC units.



**Artur Elizarov**
DreamHome Realty Group Inc
art@dhr.company
323-326-7657
DreamHome Realty Group Inc
**CalBRE # 02020109**



**DREAMHOME**
REALTY GROUP, INC.

The information contained herein has been obtained through sources deemed reliable but cannot be guaranteed for its accuracy. We recommend to the buyer that any information, which is of special interest, should be obtained through independent verification. ALL MEASUREMENTS ARE APPROXIMATE.