1                    UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

3

4     Goldwater Bank, N.A.,      )CASE NO. 5:21-cv-00616-JWH-SP
                                 )
5              Plaintiff,        )
                                 )
6         vs.                    )
                                 )
7     ARTUR ELIZAROV; UNISON     )
      AGREEMENT CORP.; SCOTT     )
8     HOWLETT; BANK OF THE WEST; )
      and ILYA ALEKSEYEFF,       )
9                                )
               Defendants.       )
10    _____  )

11

12

13                         --oOo--

14              DEPOSITION OF PETER J. HILL

15                 September 9, 2022

16            ***TAKEN VIA VIDEOCONFERENCE***

17                         --oOo--

18

19

20

21

22

23

24

25

                                              Page 1

Exhibit FFF - 1

```
 1              BE IT REMEMBERED THAT, pursuant to the Federal
 2     Rules of Civil Procedure, the deposition of PETER J.
 3     HILL, was taken before Maureen Kelly, OCSR No. 00-0364,
 4     WCSR No. 3401, on Friday, September 9, 2022, commencing
 5     at the hour of 9:59 a.m., the proceedings being reported
 6     via Zoom videoconference.
 7                              --oOo--
 8
 9                         APPEARANCES
10             (ALL APPEARING VIA VIDEOCONFERENCE)
11     Attorneys for Plaintiff Goldwater Bank, N.A.:
                   Joseph A. LeVota, Esq.
12                 HILBERT & SATTERLY, LLP
                   409 Camino Del Rio South, Suite 104
13                 San Diego, CA 92108
                   jlevota@hscallaw.com
14
       Pro Hac Vice Attorneys for Plaintiff Goldwater Bank,
15     N.A.:
                   Sean C. Wagner, Esq.
16                 Derek M. Bast, Esq.
                   WAGNER HICKS, PLLC
17                 831 East Morehead Street, Suite 860
                   Charlotte, NC 28202
18                 sean.wagner@wagnerhicks.law
                   derek.bast@wagnerhicks.law
19
       Attorneys for Defendant and Cross-Complainant SCOTT
20     HOWLETT and Defendant BANK OF THE WEST:
                   Jeremy T. Katz, Esq.
21                 Ryan C. Thomason, Esq.
                   HALL GRIFFIN LLP
22                 1851 East First Street, 10th Floor
                   Santa Ana, California 92705-4052
23                 jkatz@hallgriffin.com
                   rthomason@hallgriffin.com
24
25     (Continued on next page.)
```

                                                        Page  2

Exhibit FFF - 2

```
 1                 APPEARANCES (CONTINUED)
 2            (ALL APPEARING VIA VIDEOCONFERENCE)
 3    Attorneys for Defendant Artur Elizarov and Defendant
      Ilya Alekseyeff (in Pro Per):
 4            Ilya Alekseyeff, Esq.
              LOIA, INC. (APLC)
 5            8721 Santa Monica Blvd., #119
              West Hollywood, CA 90069
 6            ilya@loia.legal
 7    Attorneys for Defendant Unison Agreement Corp.:
              Nabil Bisharat, Esq.
 8            ORSUS GATE, LLP
              16 N. Marengo Ave., Suite 316
 9            Pasadena, CA 91101
              nbisharat@orsusgate.com
10
11
      Also Present: (None.)
12
                         --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
                                           Page  3
```

Exhibit FFF - 3

```
 1                      INDEX
 2   EXAMINATION BY:                       PAGE
 3   MR. THOMASON                       6, 178
     MR. ALEKSEYEFF                    83, 206
 4   MR. BISHARAT                160, 189, 224
     MR. WAGNER                            190
 5   MR. KATZ                              227
 6                    --oOo--
 7
                    EXHIBIT INDEX
 8
     EXHIBIT NO.   ITEM                    PAGE
 9
     Exhibit 41    Depo Notice              11
10   Exhibit 42    Unison Flyer             19
     Exhibit 43    Email Chain about 4 Unison Loans and   20
11                 litigation
     Exhibit 44    Email Chain Elizarov Selling Property  21
12   Exhibit 45    2021.0303 Email Chain with Unison      21
                   about Elizarov
13   Exhibit 46    2021.0308 Deed of Trust Email Chain     22
     Exhibit 47    2021.0310 Email Chain about Internal   23
14                 Notes
     Exhibit 48    2021.0324 Discussion between Hill      24
15                 and Teskey
     Exhibit 49    2021.0324 Email with Greg Hill re      25
16                 phone call
     Exhibit 50    2021.0324 Phone Call with Sharon       25
17                 Pfeifer
     Exhibit 51    2021.0325 Email Chain regarding        26
18                 Elizarov Loan
     Exhibit 52    2021.0325 Email Chain with Unison      27
19                 about Payoff
     Exhibit 53    2021.0326 Email Chain regarding        28
20                 unrecorded DOT
     Exhibit 54    2021.0326 Email from Pete requesting   28
21                 DOT
     Exhibit 55    2021.0329 Email with Unison about      29
22                 Elizarov Negotiations
     Exhibit 56    2021.0331 Email Chain about Unison     30
23                 Payoff
     Exhibit 57    2021.0331 Email Chain regarding        31
24                 Elizarov Closing
25   (Continued on next page.)
```

**Exhibit FFF - 4**

```
 1                        EXHIBIT INDEX
 2    EXHIBIT NO.   ITEM                              PAGE
 3    Exhibit 58    2021.0803 Elizarov Charge Off      32
      Exhibit 59    Elizarov D - verified amended      87
 4                  complaint, EFD 44
      Exhibit 60    Elizarov B - G. Hill messages      98
 5    Exhibit 61    Elizarov G - delinquency review    99
      Exhibit 62    Elizarov H - mortgage inspection  102
 6                  reports
      Exhibit 63    Elizarov J - Fannie Mae appraisal 105
 7    Exhibit 64    Elizarov O - tax lien release     106
      Exhibit 65    Exhibit W - Goldwater response to 106
 8                  RFA (54)
      Exhibit 66    Elizarov T - email communication re 112
 9                  closing instructions 2021.0326
      Exhibit 67    Elizarov U - email re late recording 130
10                  of deed 2021.0330
      Exhibit 68    Elizarov V - proof of delivery re DOT 141
11                  for recording 2021.0420
      Exhibit 69    Elizarov A - deed of trust, recorded 142
12                  4.20.21
      Exhibit 70    Exhibit D to complaint            215
13
                          --oOo--
14

15
16    INSTRUCTION not to Answer:           12, 13, 80, 212
17                          --oOo--
18
19    REQUEST for Production:                   (None.)
20                          --oOo--
21
22
23
24
25
                                               Page  5
```

```
 1    /////
 2                        PETER J. HILL,
 3    having been first duly sworn, was examined and testified
 4    as follows:
 5    /////
 6                        EXAMINATION
 7    BY MR. THOMASON:
 8         Q.   Good morning, Mr. Hill.  Thank you for
 9    joining us.  We do appreciate it.  If you could just
10    state and spell your name for the record?
11         A.   Peter Hill; P-E-T-E-R; Hill, H-I-L-L;
12    middle initial J.
13         Q.   Thank you.  My name is Ryan Thomason.  I am
14    an attorney that is representing both Scott Howlett and
15    Bank of the West.  When I refer to Howlett, I'm
16    referring to Defendant Scott Howlett, who purchased the
17    property at issue here that is named as a defendant in
18    the first-amended complaint.  Do you understand?
19         A.   Yes.
20         Q.   Okay.  And when I refer to Bank of the
21    West, I'm referring to Mr. Howlett's lender who is also
22    named as a defendant in the first-amended complaint.  Do
23    you understand?
24         A.   I do, yes.
25         Q.   I'm joined with counsel Jeremy Katz, who
```

Page 6

**Exhibit FFF - 6**

```
 1     Mae - Property Inspection Report."  Right?

 2          A.   Correct.

 3          Q.   So, again, can you explain to us if this

 4     loan was not a Fannie Mae loan, why would Goldwater's

 5     loan servicer order a Fannie Mae inspection report?

 6          A.   Fannie Mae is the gold standard, if you

 7     will, for all sorts of documentation relating to

 8     mortgage loans.  It's the accepted standard across the

 9     industry.  You comply with that standard so that your

10     documentation is proper should you sell that phone

11     through the secondary markets, being Fannie Mae, Freddie

12     Mac or maybe you have it placed in a Ginnie Mae

13     security.  And it's intended for conformity and the

14     industry standard is set my Fannie Mae.

15               We conduct all of our mortgage business to

16     Fannie Mae standards whether we sell it through to the

17     secondary market or retain it in our portfolio here in

18     the bank.

19          Q.   All right.  That makes sense.  And, again,

20     when it says here -- I'm going to direct you to page 2.

21     I will highlight it.  It says, "Loan Type: FNMA."  Is it

22     fair to say that you also don't know why Weststar would

23     have reported to National Field Representatives that

24     Mr. Elizarov's loan was in fact a Fannie Mae loan?

25          A.   I don't know why they --
```

Page 104

**Exhibit FFF - 7**

```
 1              Q.   All right.  I'm going to show you

 2       Exhibit 66, which I'm marking next.  It's a four-page

 3       document.

 4                            (EXHIBIT marked: Exhibit No. 66.)

 5       BY MR. ALEKSEYEFF:   (Continuing)

 6              Q.   I believe this is a duplicate of another

 7       exhibit that you saw earlier.  It's just a little easier

 8       for me to mark my own rather than rely on someone else's

 9       once in a while.  So if we have duplicates, I apologize.

10       I'm going to show you -- first of all, do you recognize

11       this chain of emails?

12              A.   Yes, I do.

13              Q.   And I'm going to direct you to page 2.  Do

14       you see a header from you dated March 25th, 2021, at

15       7:00 p.m. where you send an email to a number of

16       individuals?

17              A.   Yes.

18              Q.   And I'm going to go to page 3.  There is a

19       highlighted portion that says, "Customer is trying to

20       close without paying us."  Do you see that?

21              A.   I do.

22              Q.   Did you write that?

23              A.   I did.

24              Q.   Is "customer" a reference to Mr. Elizarov?

25              A.   It is.
```

Page 112

**Exhibit FFF - 8**

1       Q.    So essentially what you were saying in this

2   email to all of these people that you communicated with

3   on March 25th is that Mr. Elizarov was trying to close

4   this deal without paying Goldwater the balance due under

5   the note.  Right?

6       A.    Correct.

7       Q.    And as of March 25th at 7:00 p.m. when you

8   sent this email, did you believe this statement to be

9   true, that that's exactly what Mr. Elizarov was trying

10  to do?

11      A.    Yes.

12      Q.    So if you believed as of March 25th, 2021,

13  that Mr. Elizarov was trying to close the transaction

14  without paying Goldwater, why did Goldwater continue to

15  rely on Mr. Elizarov's promise to pay $675,000?

16      A.    I was hoping he would do what he told me he

17  would do.

18      Q.    All right.  Even though you believed that

19  he would not?

20      A.    Yes.

21      Q.    When you received -- and actually let me go

22  back.  Before March 25th was Mr. Elizarov actively

23  engaged in discussions with you?

24      A.    Yes.

25      Q.    Was Escrow of the West, specifically

Page 113

**Exhibit FFF - 9**

1    Ms. Andrea Cross, also actively engaged in

2    communications with you?

3            A.   Yes.

4            Q.   And then on March 25th, did you suddenly

5    get an email from Ms. Cross stating that Mr. Elizarov no

6    longer authorized her to speak to the bank and was no

7    longer authorizing any payments to be made to the bank

8    because though -- the deed of trust had not been

9    recorded?  Did that happen on March 25th?

10           A.   It did, yes.

11           Q.   And how did you interpret this sudden

12   change as far as Mr. Elizarov's intentions were

13   concerned?  Did you think that Mr. Elizarov had changed

14   his mind in trying to settle with the bank?

15           A.   Yes.

16           Q.   So you believed Mr. Elizarov had changed

17   his mind.  You expressed your belief explicitly to your

18   colleagues in an email, but, yet, Goldwater still

19   believed that Mr. Elizarov might come through and pay

20   the bank $675,000?

21           A.   I was hoping that he would keep his word

22   and do exactly that, yes.

23           Q.   Speaking of his word, did you ever send

24   Mr. Elizarov any sort of written loan modification

25   agreement or any agreement of any kind that Mr. Elizarov

                                              Page 114

**Exhibit FFF - 10**

```
 1    could sign where he promised to pay the bank $675,000 in

 2    exchange for a waiver of the balance of what he owed?

 3    Did you ever send him anything in writing?

 4            A.   By email.

 5            Q.   Did you send him an actual agreement that

 6    he could --

 7            A.   No.

 8            Q.   -- sign?

 9            A.   No.

10            Q.   Why?

11            A.   He had stopped talking.

12            Q.   Well, before when you -- when the two of

13    you were still talking, when you were discussing this

14    amount of $675,000, why didn't you send him a written

15    agreement that he could sign that discussed those terms?

16            A.   I sent him an email discussing those terms.

17    We had not reached a final agreement.  I was asking for

18    verification of the Unison payoff and most especially

19    asking for documentation and verification of the

20    contractor lien, which Mr. Elizarov never provided to

21    me.  And I wasn't prepared to document anything until

22    that -- those verifications had been complete.

23            Q.   So you said just a second ago that you had

24    not finalized this -- the terms.  Did you finalize the

25    terms at any point?
```

Page 115

**Exhibit FFF - 11**

1          A.    That's correct, yes.

2          Q.    So as of June 26th, Goldwater Bank had

3    located the original deed of trust with Mr. Elizarov's

4    original signature that was suitable for recording?

5          A.    Yes.

6                MR. LEVOTA:   Not June 20 -- did you just

7    say June?

8                MR. ALEKSEYEFF:   I'm sorry.  I did say

9    June.  I apologize.  I don't know what I was thinking.

10   BY MR. ALEKSEYEFF:   (Continuing)

11         Q.    March 26th?

12         A.    Correct, March 26th.

13         Q.    All right.

14               MR. ALEKSEYEFF:   Thank you so much for

15   correcting me.

16   BY MR. ALEKSEYEFF:   (Continuing)

17         Q.    And once you had the deed of trust on --

18   not you, but once Goldwater had access to the original

19   deed of trust as of March 26th, it looks like 8 o'clock

20   in the morning, why didn't Goldwater immediately record

21   that deed of trust?

22         A.    I wanted that deed of trust sent to me

23   because I was in contact with First American Title

24   Company about recording under their original issued

25   title insurance policy.

Veritext Legal Solutions
866 299-5127

**Exhibit FFF - 12**

1    Q.   All right.  And that was the title company

2    that when you contacted them said that they would not

3    record it for you; is that right?

4    A.   Ultimately they stated they would not.

5    Q.   Okay.  Was that the reason for the delay in

6    having it recorded, is that you had a hard time finding

7    a title company that would promptly record it for you?

8    A.   First American when I sent it to them took

9    as I recall two or three days to inform me that the

10   transaction on the sale had already occurred and that

11   they would not record it.  We did make other attempts to

12   do a recording directly with Riverside County, and we

13   just ran into a number of obstacles in being able to do

14   that on a timely basis.

15   Q.   But did you start making those efforts to

16   record the deed of trust with Mr. Elizarov's signature

17   as soon as the deed of trust was located on March 26th?

18   A.   Yes.

19   Q.   Give me one second please.

20   All right.  I'm going to now show you what

21   I'm going to mark as Exhibit 67.

22   (EXHIBIT marked: Exhibit 67.)

23   BY MR. ALEKSEYEFF:  (Continuing)

24   Q.   Can you see Exhibit 67, sir?

25   A.   I can, yes.

Page 130

1          Q.   All right.  Of 2020?

2          A.   Of 2020, right.

3          Q.   So after the date of your employment did

4    you become aware of a forbearance process that Goldwater

5    Bank may have designed or created for its residential

6    mortgage borrowers to deal with the quickly unraveling

7    pandemic caused by the COVID-19 virus?

8          A.   That forbearance process in fact was

9    established by Weststar Mortgage as servicer.

10         Q.   All right.  And you were -- or as you sit

11   here today, are you familiar with what that process

12   entailed?

13         A.   Yes.

14         Q.   And you previously testified that Fannie

15   Mae is a gold standard and that Goldwater tries to

16   follow that standard in its business dealings so that a

17   loan may potentially be sold on the secondary market

18   later on.  Is that still your testimony?

19         A.   It is, yes.

20         Q.   As far as you know, did Weststar -- or

21   actually let me take that back.

22              Was the forbearance process that Weststar

23   implemented track the forbearance process that Fannie

24   Mae had implemented?

25              MR. WAGNER:  Objection.  He doesn't know --

                                        Page 144

```
 1    you're asking him to talk about standards related to

 2    Fannie Mae and then standards that are applied by

 3    another company.

 4              MR. ALEKSEYEFF:  Derek, you don't need to

 5    editorialize.  If the witness doesn't know the answer,

 6    he can say I don't know, but I still need an answer.

 7              MR. WAGNER:  Will you repeat the question?

 8    BY MR. ALEKSEYEFF:  (Continuing)

 9         Q.   As far as -- as far as you know, did the

10    process -- forbearance process that Weststar implemented

11    on behalf of Goldwater essentially track or mirror the

12    same process that Fannie Mae used or implemented for its

13    loans?

14         A.   To my limited experience and knowledge with

15    that, it was intended to be consistent with Fannie

16    standards as well as guidance by the CARES Act.

17         Q.   Thank you.

18              You testified earlier that at some point

19    you spoke to Andrea Cross and specifically told her on

20    the phone that Goldwater Bank indeed had first priority

21    as a lender.  Was that your testimony?  Did I hear you

22    correctly?

23         A.   Yes.

24         Q.   And what phone number did you use when you

25    called her, as in what was your phone number, not hers?
```

Page 145

1   from some document to convince you this was a true

2   statement?  That is my question and that's what I would

3   like answered.

4          A.   I consulted with our counsel in preparation

5   of that paragraph 80.

6          Q.   All right.  So I have asked it three times

7   now, and I haven't gotten an answer.  We will just move

8   on.  I will cancel the screen share.

9          Even though Mr. Elizarov's loan was not a

10  Fannie Mae loan in the sense that Fannie Mae never

11  purchased it or invested in it, you testified earlier

12  that Goldwater Bank still treated it as if it were a

13  Fannie Mae loan and followed all of the Fannie Mae

14  guidelines.  Is that still true testimony?

15          MR. WAGNER:  Objection.  That

16  mischaracterizes prior testimony.

17          But you can answer.

18          THE WITNESS:  That loan was underwritten to

19  Fannie Mae standards, documented to Fannie Mae standards

20  and serviced to Fannie Mae standards, yes.

21  BY MR. ALEKSEYEFF:  (Continuing)

22          Q.   Okay.  Perfect.

23          You testified earlier that the bank's loan

24  agents are not expected to use their own personal cell

25  phones in communicating with potential borrowers.  Did I

                                        Page  219

1          I declare under penalty of perjury that the

2     foregoing is true and correct.   Subscribed at

3     _____, California, this_____day of

4     _____, 2022.

5

6

7

8

9               _____

10                      PETER J. HILL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 233

**Exhibit FFF - 17**

```
 1                    C E R T I F I C A T E
 2            I, Maureen Kelly, Oregon CSR No. 00-0364,
      Washington CSR No. 3401, do hereby certify that
 3    prior to the commencement of the examination, PETER J.
      HILL, was duly remotely sworn by me to testify to the
 4    truth, the whole truth and nothing but the truth.
 5            I DO FURTHER CERTIFY that the foregoing is a
      verbatim transcript of the testimony as taken
 6    stenographically by me at the time, place and on the
      date hereinbefore set forth, to the best of my
 7    ability.
 8            I DO FURTHER CERTIFY that I am neither a
      relative nor employee nor attorney nor counsel of
 9    any of the parties to this action, and that I am
      neither a relative nor employee of such attorney or
10    counsel, and that I am not financially interested in
      the action.
11
              Witness my hand at Portland, Oregon, this 15th
12    day of September, 2022.
13
14            Maureen Kelly
15
              MAUREEN KELLY - RPR
16            Certified Shorthand Reporter
              Oregon CSR No. 00-0364
17            Washington CCR No. 3401
18
19
20
21
22
23
24
25
                                        Page  234
```

**Exhibit FFF - 18**

```
 1    Sean C. Wagner, Esq

 2    sean.wagner@wagnerhicks.law

 3                                    September 23, 2022

 4    RE: Goldwater Bank, N.A. vs. Artur Elizarov, Et Al.

 5    9/9/2022, PETER J. HILL, JOB NO. 5429400

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10        to schedule a time to review the original transcript at

11        a Veritext office.

12    X_ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13        Transcript - The witness should review the transcript and

14        make any necessary corrections on the errata pages included

15        below, noting the page and line number of the corrections.

16        The witness should then sign and date the errata and penalty

17        of perjury pages and return the completed pages to all

18        appearing counsel within the period of time determined at

19        the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21        Counsel - Original transcript to be released for signature

22        as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24        time of the deposition.

25
```

Page 235

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 236

**Exhibit FFF - 20**

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.