ILYA ALEKSEYEFF [CA 242462]
ilya@loia.legal
LOIA, INC. (APLC)
727 W 7th St PH 1-13
Los Angeles, CA 90017
Tel: (213)537-4592

Attorney for Artur Elizarov and defendant *in pro per*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| GOLDWATER BANK, NA, | **5:21-cv-616-JWH-PSx** |
|---|---|
| *Plaintiff,* versus  ARTUR ELIZAROV ET AL., *Defendants.* | DECLARATION OF ILYA ALEKSEYEFF SUPPORTING MOTION TO DISQUALIFY MAGISTRATE JUDGE SHERI PYM  Date: 1/13/2023 Time: 9:00 am Judge: Hon. John W. Holcomb |

I

1. My name is Ilya Alekseyeff.

2. I am an attorney duly admitted to practice before this court.

3. I am also a member of the California State Bar.

4. In this action, I represent defendant Artur Elizarov as well as myself *in propria persona*.

II

5. On October 28, 2021, this court ordered the parties and their counsel to appear before The Honorable Sheri Pym, United States Magistrate Judge, for an early settlement conference.

6. Magistrate Judge Pym ordered the parties to submit (but not file) settlement statements.

7. I complied with Magistrate Judge Pym's order and submitted my memorandum via email prior to the hearing

8. As I did in Mr. Elizarov's answer, I explained in my memorandum that Mr. Elizarov *did not deny* liability to Goldwater.

9. Mr. Elizarov admitted that he owed Goldwater the outstanding balance of the mortgage loan but insisted that Goldwater had to accept payment in monthly installments rather than in a lump sum.

III

10. The settlement conference was scheduled for November 10, 2021.

11. Due to the ongoing public health emergency caused by the novel coronavirus "COVID-19," Magistrate Judge Pym ordered the parties to participate in the conference remotely via Zoom.

12. After Mr. Elizarov and I logged in from two separate computers, Magistrate Judge Pym (or someone acting on her behalf, such as the courtroom assistant) assigned Mr. Elizarov and me into a "breakout room," which allowed Magistrate Judge Pym to confer with Mr. Elizarov and me in private and precluded

the other parties and their counsel from overhearing our discussions with Magistrate Judge Pym.

### IV

13. Going into this settlement conference, I had anticipated that Magistrate Judge Pym would act as neutral and consistent with the stated purpose "to permit an informal discussion between the attorneys, parties, non-party indemnitors or insurers, and the settlement judge, of every aspect of the case bearing on its settlement value."  [Ref Dkt NO. 94 at p. 2 (¶ 1)]

14. But the moment Magistrate Judge Pym joined Mr. Elizarov's and my "breakout room," she immediately stated: "I've never seen anything like this.  I cannot believe that you, as an officer of the court, would tell me that your client didn't have to pay the bank back just because the bank didn't record its lien."

15. I found Magistrate Judge Pym's attack on my integrity *as an officer of the court* surprising and unwarranted because I said nothing of sorts to Magistrate Judge Pym in my settlement statement.

16. Once I had a second to recover, I calmly explained to Magistrate Judge Pym that I had not made such a claim and then explicitly asked: "Where did you get the idea that I was suggesting anything like that?"

17. I felt compelled to ask because I expected Magistrate Judge Pym to have read my settlement statement, which said nothing like what Magistrate Judge Pym had just accused me of, and found her unwarranted accusation surprising.

18. Magistrate Judge Pym did not respond to my query but proceeded to discuss other issues in the case.

19. As we continued to discuss the case, Magistrate Judge Pym presented Goldwater's claims in accusatory terms (Magistrate Judge Pym advised me that she had already spoken to Goldwater and its counsel about the case prior to joining Mr. Elizarov's and my "breakout room") and interrupted me as I tried to correct Magistrate Judge Pym's understanding of those facts.

20. Almost immediately, I became convinced that unlike an objective mediator, Magistrate Judge Pym was not interested in helping the parties discuss "every aspect of the case bearing on its settlement value"; she was only interested in forcing Mr. Elizarov and me to accept *Goldwater's litigation position* regardless of the facts, evidence, law, or the truth.

21. Although I would typically terminate settlement discussions under these circumstances, I decided to continue both because this court ordered the parties to participate and because I was convinced the case could resolve.

22. I also documented Magistrate Judge Pym's comments and my response in my notes nearly verbatim as soon as I had an opportunity after Magistrate Judge Pym left Mr. Elizarov's and my "breakout room" because I found the comments very disturbing and inappropriate.

V

23. After spending a few minutes in Mr. Elizarov's and my "breakout room," Magistrate Judge Pym left to speak to the other litigants in their respective "breakout rooms."

24. When she returned, Magistrate Judge Pym immediately said this: "I have to tell you, I've never seen a case like this before. I've seen criminal cases like this but not civil. Your client has to think about that. And you also have to think what you're doing because you may lose your license because of this case."

25. Although I interpreted Magistrate Judge Pym's reference to criminal cases as a threat against Mr. Elizarov, which I independently found inappropriate and offensive, her threat against me and my license left me stunned.

26. In response, I demonstrably sat back in my chair and said: "I do not appreciate the court threatening my license!"

27. I said these words in a raised voice and a stern tone because I wanted to impress on Magistrate Judge Pym that she had crossed the line.

28. Apparently recognizing the change in my tone, Magistrate Judge Pym responded: "I'm not threatening your license. I'm just telling you to think about the consequences."

29. Although I did not address this response with Magistrate Judge Pym, I found the response insufficient because she had no reason to mention any risk to my license unless she had intended that I interpreted her words as a threat.

30. Again, because I found Magistrate Judge Pym's conduct disturbing, I wrote the conversation down nearly verbatim at the next break when Magistrate Judge Pym left to speak to the others.

## VI

31. After Magistrate Judge Pym left Mr. Elizarov's and my "breakout room," Mr. Elizarov became upset with me because I addressed Magistrate Judge Pym's threat against me and my license but left her threat of criminal prosecution against Mr. Elizarov unaddressed.

32. At that point, Mr. Elizarov wanted to terminate the conference but decided to continue because I explained to Mr. Elizarov that Magistrate Judge Pym likely thought that trying to bully *us* was the most effective way to resolve the case, a technique that I recognized from my years litigating criminal cases as Public Defender in Los Angeles County (which I will describe in more detail shortly).

## VII

33. After Magistrate Judge Pym returned back to Mr. Elizarov's and my "breakout room," she, to her credit, did not hurl any more threats at me or Mr. Elizarov.

34. However, Magistrate Judge Pym continued to repeat Goldwater's claims as gospel and continued to dismiss me each time I attempted to correct her understanding of the facts.

35. Then, when discussing her perceived lack of merit in Mr. Elizarov's and my case, Magistrate Judge Pym made the following comment: "I would not take a case like this to a jury."

36. Although, in my experience, mediators try to steer parties in a particular direction, neutrals do not infuse themselves into the conversation but rather describe the case in general, e.g., "this case may be difficult to win."

VIII

37. From my years of experience as a public defender in Los Angeles County Superior Court, reportedly the largest criminal court in the entire world, I had become familiar with nearly every technique that Magistrate Judge Pym employed during the "mediation".

38. I recognized both the threats to Mr. Elizarov and the attempts to interfere with my attorney-client relationship as typical techniques that judges *in state criminal prosecutions* had employed in my and my colleagues' cases to *bully* the defendants to settle cases on the terms most favorable to the prosecution.

39. To help the court understand my actions, I believe it may be helpful to summarize these experiences.

A

40. I became admitted to practice law in in California in June of 2006.

41. In September 2006, I was hired as Deputy Public Defender I (the entry-level position) by the Los Angeles County Office of the Public Defender.

42. In November of 2008, I laterally transferred to the Los Angeles County Office of the Alternate Public Defender as Deputy Alternate Public Defender II.

43. Since February 2011, I have litigated felony cases exclusively.

44. In 2015, I earned the title Deputy Alternate Public Defender IV, the highest trial-level position available for lawyers in Los Angeles County and indicates that my experience qualifies me to handle homicide cases where the

1  maximum potential sentence is death (i.e., the so-called "death penalty
2  homicides").

B

3
4  45.   By the time I appeared before Magistrate Judge Pym for the
5  settlement conference on November 10, 2021, I had tried sixty-eight criminal trials
6  (including eight homicides), all but two of which were jury trials, handled close to
7  one thousand evidentiary preliminary hearings in felony cases, and resolved
8  thousands of criminal cases without trial.
9  46.   In the year 2016 alone when assigned to the Lancaster Courthouse, I
10 tried thirteen felonies, including homicide and two attempted-homicide cases.

C

11
12 47.   During those years of practice, my clients (and to a lesser extent, I)
13 had often been subjected to unspeakable abuse by Los Angeles Superior Court
14 judges.
15 48.   I had often had judges threaten my clients with harsh sentences unless
16 my clients resolved their cases on the terms proposed by the prosecution, but only
17 because the terms often included an offer to dismiss certain charges, which, if not
18 dismissed, would allow a sentencing judge to impose a significantly higher
19 sentence than offered.
20 49.   Similarly, I had often heard judges describe the case or the
21 consequences of a potential conviction to my clients *differently* than I did during
22 my confidential conferences with my clients because these judges wanted to "drive
23 a wedge" between my clients and me, discredit my opinion about the case or the
24 possible sentence, and convince my clients to accept the judge's view (which
25 invariably favored the prosecution) over mine.
26 50.   One recent example may help illustrate the worst of the abuse that my
27 criminal clients and I have experienced.
28

51. On November 24, 2022, I started to select a jury in a four-defendant homicide case entitled *People of the State of California versus Jesus Pacheco, Claudia Mendez, David Mejia, and Edgar Sanchez*, Los Angeles Superior Court case number GA107905.

52. The prosecution alleged that my client Jesus Pacheco stabbed the victim during the fight while the other three aided and abetted Mr. Pacheco's conduct.

53. If convicted, Mr. Pacheco was facing a maximum sentence of 15 years to life in state prison.

54. During pretrial proceedings, the prosecutor had extended offers to all the other defendants *except* for Mr. Pacheco.

55. Consistent with the Los Angeles District Attorney's usual practice in cases like these, the other defendants' offers were "packaged" with Mr. Pacheco's case, meaning that the entire cases had to resolve at the same time or none of the defendants could take their respective offers.

56. Since Mr. Pacheco had never had an offer other than his maximum sentence of 15 years to life in prison, he understandably insisted on going to trial.

57. After the case was assigned to The Honorable Suzettle Clover in Department F of the Pasadena Courthouse, the judge who presided over the pretrial proceedings in the case and had recently retired from the bench (but continued to assist the court on a *per diem* basis) invited all the attorneys to discuss the case further.

58. During the discussions, I quickly became convinced that the judge had only one purpose: to convince *me* that my client should accept the sentence of life (i.e., resolve the case without any compromise), not to convince *the prosecutor* to lessen my client's sentence or even "unpackage" the other defendants' deals and allow those defendants to resolve the case even though my client wished to go to trial.

59.     So, when the judge proposed speaking to all the defendants, I absolutely refused because I knew that the judge would employ one of those famous techniques and attempt to persuade my client to disregard my opinions and accept the judge's, which, of course, favored the prosecutor's position.

60.     Once the judge realized that she could say nothing that would convince me to have my client give up his right to trial when that decision would only benefit the other defendants in the case, the judge made a stunning statement: she suggested that if the other defendants lost their case and similarly received life sentences (rather than the negotiated sentences), David Mejia or Edgar Sanchez might end up in the same prison with Mr. Pacheco and hurt or even kill Mr. Pacheco in retribution.

61.     To be clear, this retired judge explicitly threatened my client's very life unless he agreed to "plead out" the case solely for the other defendants' benefit.

62.     I then immediately terminated the conference.

63.     And while this judge had crossed nearly every line in her efforts to settle a criminal case, she still didn't cross one: *she did not threaten me nor my license as a negotiation technique.*

D

64.     Although I had always found these techniques troubling, I nonetheless tolerated them because under the Los Angeles Superior Court's "master calendar" system, judges who presided over pre-trial proceedings (including settlement negotiations) would typically *not* be assigned to preside over the eventual trial.

65.     Under the "master calendar" system, once the case is ready for trial, the case is assigned to a "master calendar" court, which then assigns the case for trial, often to a *different* judge.

66.     But even in the rare instances when the case does get assigned to the same pre-trial judge, if I felt that the judge had expressed a strong view of the facts

or my client, I also have the option to challenge the judge under California Code of Civil Procedure section 170.6.

67. Therefore, I had never felt concerned that the *pre-trial judge's* feelings about the case would somehow prejudice my clients.

E

68. But civil cases in federal courts are very different.

69. First, unlike criminal courts, which are concerned with protecting society, civil courts are only concerned about resolving disputes between two private parties.

70. Second, the judges who preside over settlement negotiations remain assigned to hear all further proceedings in the case, including discovery disputes and, eventually, the trial itself.

71. For these reasons, I was very concerned not only that Magistrate Judge Pym employed the same techniques *in this civil dispute* that I had witnessed many times in state *criminal prosecutions*, but also because Magistrate Judge Pym *threatened me and my license*, which even the worst, most abusive state judges had never done before and have never done since.

IX

72. Although I found Magistrate Judge Pym's behavior inappropriate and borderline illegal, I still believed that when called upon to decide disputed issues in the case, she would approach the case fairly.

73. Accordingly, I did not immediately seek to disqualify Magistrate Judge Pym from his case nor report her conduct to the United States Court of Appeals for the Ninth Circuit.

74. Unfortunately, Magistrate Judge Pym's subsequent conduct on the bench convinced me that my initial decision to dismiss her misconduct was a wrong one.

75. With much regret, I now seek to disqualify Magistrate Judge Pym from further proceedings in this case.

X

76. At the time I prepared this declaration, I could no longer remember Magistrate Judge Pym's exact comments.

77. However, because I took contemporaneous notes during the settlement conference, I consulted those notes, which sufficiently refreshed my recollection and allowed me to report the details of my conversations with Magistrate Judge Pym accurately.

XI

78. When I discussed this motion with counsel for all the parties on December 1, 2022, counsel informed me that none had any position on the motion because none were privy to the events that necessitated the motion.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration within the United States on Thursday, December 8, 2022.

*Ilya Alekseyeff*
_____
ILYA ALEKSEYEFF, ESQ.