# **EXHIBIT 5**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

50

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

THIS IS A REALTIME ROUGH DRAFT TRANSCRIPT.  IT IS NOT

CERTIFIED BY THE DEPOSITION OFFICER PURSUANT TO CCP

SECTION 2025(R)(2).  IT MAY NOT BE USED, CITED OR

TRANSCRIBED AS THE CERTIFIED TRANSCRIPT OF THE

DEPOSITION PROCEEDINGS.  THE ROUGH DRAFT TRANSCRIPT MAY

NOT BE CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT

OR CONTRADICT THE CERTIFIED TRANSCRIPT OF THE DEPOSITION

PROCEEDINGS AS PROVIDED BY THE DEPOSITION OFFICER.

BY ACCEPTING A ROUGH DRAFT TRANSCRIPT, I AM ORDERING A

FINAL CERTIFIED TRANSCRIPT.  I AGREE NOT TO SHARE, GIVE,

COPY, SCAN, FAX OR IN ANY WAY DISTRIBUTE THE REALTIME

ROUGH DRAFT IN ANY FORM (WRITTEN OR COMPUTERIZED) TO ANY

PARTY.  HOWEVER, MY OWN EXPERTS, CO-COUNSEL, CLIENT(S)

AND STAFF MAY HAVE LIMITED INTERNAL USE OF SAME WITH THE

UNDERSTANDING THAT I AGREE TO DESTROY ALL REALTIME ROUGH

DRAFTS AND/OR COMPUTERIZED FORMS, IF ANY, AND REPLACE

SAME WITH THE FINAL TRANSCRIPT AND/OR FINAL COMPUTERIZED

Page 1

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

FORM UPON ITS COMPLETION.


**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

51


BY MR. KATZ:

    Q    Good morning, Ms. Overbeck.

    A    Good morning.

    Q    Have you ever had your deposition taken before?

    A    No.

    Q    Do you understand that today you are testifying at this deposition the same as if you were testifying in a court of law in front of a jury?

    A    Yes.

    Q    Is there any reason why you would be unable to give accurate and truthful testimony today?

    A    No.

    Q    Are you feeling well enough to testify today?

    A    Yes, sir.

    Q    And without going into any specific condition, do you have any medical conditions or are you on any

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

medication that would prevent you from recalling

information?

     A   No, sir.

     Q   Are you the person that has been designated to

testified to on behalf of Goldwater Bank, N.A.?

     A   Yes.

     Q   Has anyone else been designated, or are you

the sole designee for testimony?

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

52

     A   I believe I am the sole designee.

     Q   All right.  And if I refer to Goldwater Bank,

N.A. as Goldwater, are you okay with that?

     A   Yes.

     Q   All right.  During today's deposition there's

going to be times I ask you a question.  If you answer

it, I'm going to assume that you understood it.  Do you

believe that's fair?

     A   Yes.

     Q   And if for some reason you don't understand my

question or if there is a technology hiccup due to the

nature of remote depositions these days, please let me

know.  I could re-ask it or rephrase it or have the

Page 3

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

court reporter read it back.  Okay?

    A   Yes.

    Q   There are times that the other attorneys may

object or comment.  That is part of the normal

deposition process.  All right.  Did you review any

documents to prepare for today's deposition?

    A   (No audible response.)

    Q   I'm sorry.  For our court reporter -- and

there is a slight lag -- if you could please speak up

and give a verbal response.  It's difficult for our

court reporter to note if you nod your head yes or if

you point your finger.  So if you could please make a

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

53

loud, audible response.

    A   Yes.

    Q   Okay.  What documents did you review in

preparation for today's deposition?

    A   I reviewed what was provided to me by Abbey

and Sean.  So I reviewed depositions, documents

referring to the application process.

    Q   Any other documents that you reviewed?

Page 4

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    Can you repeat that?

Q    Any other documents that you reviewed?

A    From my recollection, there was a lot of paperwork.  But I don't recall the names of those documents.

Q    And do you recall the nature of the documents that you reviewed?

A    Yes, I recall the nature.

Q    What was the nature of the documents that you reviewed?

A    The nature of the documents that I reviewed was a loan application for Mr. Elizarov for a purchase of a home, along with other paperwork regarding forbearance, payment history, and along with other depositions.  I believe that's it.  That's what I've reviewed.

Q    For those other depositions that you reviewed,

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

54

did that include the deposition of Mr. Peter Hill?

A    Yes, sir.

Q    Did that include the deposition of Andrea Cross?

Page 5

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    Yes, sir.

Q    Did that include the deposition of Jacqueline Seidick?

A    Yes.

Q    Did that include the deposition of Britney Shaw?

A    Yes.

Q    Did that include the deposition of Ms. Crestani?

A    I don't recall that name.

Q    A Vicky Crestani?

A    I'm sorry.  I don't recall the name.

Q    Did you recall -- did you review the deposition transcript of a deposition of Jay Hibert?

A    Yes.

Q    How about Scott Howlett?

A    Yes.

Q    I believe we mentioned -- I just want to doublecheck -- Arthur Elizarov?

A    Yes.

Q    So just a little nomenclature, I might refer

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

55

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

to Andrea Cross as Ms. Cross.

    A    Okay.

    Q    I might refer to Jacqueline Seidick as
Ms. Seidick.  I might refer to Scott Howlett as Howlett.
I might refer to Mr. Elizarov as Elizarov.  And there's
a few other names that come up.  If I ever use a name
that you are unsure of, please let me know.  Okay?

    A    Okay.

    Q    In preparing for today's deposition, did you
review any of Goldwater's policies and procedures?

    A    Yes.

    Q    What types of policies and procedures of
Goldwater did you review?

    A    For this particular case, or just my normal --

    Q    Are there times that you reviewed Goldwater's
policies and procedures?

    A    Yes.  I manage the policies and procedures.
And whenever we go through an audit, I have to review
them.  So, for example, I had five that needed to be
reviewed before the Board of Directors meeting for any
changes.

    Q    So are you generally familiar with Goldwater's
policies and procedures?

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Jeremy, I think this is -- we're

going to object, say this is outside the scope of the

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

56

topics designated for deposition.  So if you'd like to

ask some questions within the topics, I think that would

be great.  Go ahead.  So Ms. Overbeck, please don't

answer that question.

        MR. KATZ:  It's foundational.  And I'm not

asking about policies and procedures that are beyond

those that are in the topics that I designated.  I'm

asking about her general knowledge of Goldwater's

policies and procedures.  It's a foundational question.

Are you instructing the witness to withhold that

information?

        MS. KRYSAK:  I'm instructing the witness to

not answer a question that's outside the scope of the

topics.  So if you'd like to ask a question that's

within the scope of the topics, please go ahead.

BY MR. KATZ:

    Q    What is your job at Goldwater?

    A    My role at Goldwater is I'm the senior vice

president for the mortgage division, operations.

                    Page 8

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    Does that include residential and commercial mortgage?

A    Only residential.

Q    Ms. Shaw, is she your counterpart over in the commercial side?

A    Yes.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

57

Q    Are you generally familiar with the policies and procedures by which the residential lending side of Goldwater makes loans?

MS. KRYSAK:  Objection.  Mr. Katz, please stay within the bounds of the topics.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

Q    Are you familiar with policies and procedures by which Goldwater onboards a loan?

MS. KRYSAK:  Objection to form.

BY MR. KATZ:

Q    But you can answer.

MS. KRYSAK:  Go ahead and answer, Ms. Overbeck.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

THE WITNESS:  Can you repeat the question?

MR. KATZ:  Can you read the question back, please?

(Record read.)

THE WITNESS:  I'm unfamiliar with the term onboarding for a mortgage.

BY MR. KATZ:

Q    What term would you use to describe the process by which Goldwater brings a new loan into its system?

MS. KRYSAK:  Mr. Katz, I'm going to object

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

58

again.  Let's stay within the bounds of the topics.  The topics with respect to residential mortgages are limited to anything applicable to Mr. Elizarov's loan or within a respective timeframe.  So please stay within the topics.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

Q    Within the applicable topic, withing the applicable timeframe and as applicable to a residential real estate loan, like Mr. Elizarov's, what is the term you would use to describe the process by which Goldwater

Page 10

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

brings that loan into its system?

    A   We would call that an application.

    Q   An application.  The application process?

    A   When a borrower applies for a mortgage, we refer to it as an application.

    Q   And at what point does the application process end?

    A   At funding or closing.

    Q   What do you -- what term does Goldwater use to describe the process post-closing?

        MS. KRYSAK:  Just one moment, Ms. Overbeck. Objection.  Mr. Katz, are we to assume that all of these questions are within a specific timeframe, or are you going to -- it might be helpful to let the witness know what timeframe you are referring to, something along

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

59

those lines, so we don't have any ambiguity here

regarding the application and the scope of the

questions.

BY MR. KATZ:

    Q   Has Goldwater changed the policies and

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
procedures for post-closing work since the time that it

originated Elizarov's loan?

     MS. KRYSAK:  Objection; outside the scope of

the topics, Mr. Katz.  Please don't answer,

Ms. Overbeck.

     MR. KATZ:  It's foundational.  If the policies

haven't changed, I don't need to keep doing the preface

each time.

     MR. ALEKSEYEFF:  Mr. Katz, if I could jump in.

I'm so sorry.  This is Ilya Alekseyeff.  Abbey, while

this was happening, I have a case for you, California

Foundation of Independent Living Centers versus County

of Sacramento, 142 F. Supp. 3d 1035 from the Eastern

District of California issued and published in 2015,

which states that a deponent may testify to matters

beyond the designated topics.  A witness may be

instructed not to answer only if a privilege is raised.

If the witness believes that the answer is outside the

designated topics, the witness simply needs to state

that she does not have responsive knowledge.  So to that

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

60

extent -- and you are welcome to review it.  To the

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

extent that you are objecting and instructing the

witness not to answer, that is not the proper process,

unless you raise a specific privilege.

BY MR. KATZ:

    Q   So with that, has there been any change in

Goldwater's post-closing procedures since the time that

Goldwater originated Mr. Elizarov's loan?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  Not that I am aware of.

BY MR. KATZ:

    Q   Is it fair to say that, generally, Goldwater

has the same post-closing procedures today that it had

in place at the time that it originated Mr. Elizarov's

loan?

        MS. KRYSAK:  Objection; form, outside the

scope.  To the extent that you know, Ms. Overbeck, go

ahead.

        THE WITNESS:  Can you repeat the question?

        MR. KATZ:  Can you read it back, please?

        (Record read.)

        THE WITNESS:  Yes.

BY MR. KATZ:

    Q   Just to make sure I've got the timeline here

straight, the same post-closing procedures in 2019 -- Or

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

61

Mr. Elizarov got the loan from Goldwater in 2019, correct?

A    Correct.

Q    So what post-closing procedures were there in effect at the time that Goldwater made the loan to Mr. Elizarov in 2019?

MS. KRYSAK:  Objection; form.  Go ahead, Ms. Overbeck.

THE WITNESS:  I'm sorry.  Did you ask what kind of a -- what form or format?

BY MR. KATZ:

Q    Let me ask it a slightly different way.  At the time Goldwater made the loan to Mr. Elizarov, did Goldwater have written policies and procedures regarding the post-closing process?

A    I believe so, yes.

Q    And where are those written procedures maintained?

MS. KRYSAK:  Objection; form.  Go ahead, Ms. Overbeck.

Page 14

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

THE WITNESS:  We house our policies, that are different than procedures -- so our policies are policies, and they are housed in our intranet called iConnect.

BY MR. KATZ:

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

62

Q    I'm sorry.  IConnect?

A    Uh-huh.  Yes, sir.

Q    And what about procedures?  Do you have any written procedures regarding the post-closing process?

MS. KRYSAK:  Objection; form.  Could you make clear, Mr. Katz, are you asking for about this as within the scope of the topics or are you going outside the scope of the topics and asking about that with respect to the applicable time period?

MR. KATZ:  I'm trying to get the foundational question in first, and then I will ask about the specific time period.

MS. KRYSAK:  But you need to be clear about the time period that you are referring to, given that you are asking questions about things that are outside the scope of the topics.  It appears concerning here

Page 15

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

that you are going outside of the scope of the topics

quite consistently.  So if you could go ahead and be

clear with the witness as to what timeframe you are

referring to so she can answer appropriately, that would

be great.  Thank you.

BY MR. KATZ:

    Q    Ms. Overbeck, you distinguished between

policies and procedures.  Can you explain what the

difference is, in your mind?


        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
63


    A    Policies are approved by the Board of

Directors, and procedures are just written by the

department heads to guide an employee on a process.

    Q    Did Goldwater have any written procedures for

post-closing at the time that it made the loan to

Mr. Elizarov in 2019?

    A    I am -- I didn't look for anything, so I'm not

sure.

    Q    If you were to look for those written

procedures, where would you look for them?

    A    IConnect.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MR. LEVOTA:  This is Joseph LeVota.  I just

wanted to interrupt and state that, while some questions

outside the scope may be asked, that any answers given

by the witness on matters outside of the scope of the

designation of the witness, then those answers are not

the answers of the corporation.  So I'm just putting

that on the record, but we can proceed.

BY MR. KATZ:

    Q   Now, you said that you do some -- that you --

Ms. Overbeck, you say that -- I may ask a different

question.  Are you a Goldwater employee?

    A   Yes, I'm a Goldwater employee.

    Q   How long have you been a Goldwater employee?

    A   Four years.


    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

64


    Q   Were you a Goldwater employee in 2019?

    A   Yes.

    Q   And were you a Goldwater employee in

July 2019?

    A   Yes.

    Q   What was your job at Goldwater in July 2019?

    A   I was the manager for branch support,

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

corporate communications, and marketing.

    Q   In that capacity, did you interact -- did you deal with any written procedures for residential real estate post-closing processes?

          MS. KRYSAK:  Objection; form.

          THE WITNESS:  I was aware there are procedures.

BY MR. KATZ:

    Q   Did you read in Ms. -- I'm sorry.  There was a stray noise.  You said that you read Ms. Shaw's deposition transcript, correct?

    A   Yes.

    Q   Did you recall the part of Ms. Shaw's deposition transcript where she described the post-closing procedures in the commercial real estate lending division of Goldwater?

    A   I believe so.

    Q   Did Goldwater's residential real estate

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

65

lending side have similar procedures in effect in 2019 when it made the loan to Mr. Elizarov?

Page 18

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    A   I have not read the commercial post-closing

procedures, so I am not aware of any differences.

    Q   Are you aware of any post-closing procedures

that were in effect -- written post-closing procedures

in effect in July 2019 at the time of Mr. Elizarov's

loan?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  I know they existed in iConnect,

but I don't recall reading them in 2019.

BY MR. KATZ:

    Q   Have you read them at any point since 2019?

    A   Yes.

    Q   What were the post-closing procedures that

were in effect in July 2019 at the time that Goldwater

closed the loan to Mr. Elizarov?

        MS. KRYSAK:  Object to form.

        THE WITNESS:  Can you repeat the question?

        MR. KATZ:  Can you read it back, please?

        (Record read.)

        THE WITNESS:  They were the post-closing

policies that were reviewed and approved by the Board at

that time.

BY MR. KATZ:

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

66

    Q   In those post-closing policies or procedures,
was there a policy or procedure for checking to make
sure that Goldwater's deed of trust had been recorded?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  Not that I am aware of.

BY MR. KATZ:

    Q   Ms. Shaw testified to the effect that, in the
commercial lending side, there is a checklist that
occurs at one week post-closing and two weeks
post-closing to confirm that a deed of trust has been
recorded.  Is there any similar process in Goldwater's
residential real estate division?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  Not that I am aware of.

BY MR. KATZ:

    Q   Why not?

        MS. KRYSAK:  Objection; form and outside the
scope.

        THE WITNESS:  The question is, Why not?
Commercial and residential are run differently.  They
are different departments.

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    Is there ever a point when the residential real estate department confirms that its deed of trust has been recorded?

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

67

MS. KRYSAK:  Objection; form, outside the scope.

THE WITNESS:  Not that I am aware of, no. It's the responsibility of the title company.

BY MR. KATZ:

Q    Why do you say that?

A    The title company's responsibility is to record any deeds associated with any loan that is closing.

Q    As part of a post-closing procedure, does Goldwater's residential real estate division ever check to see if a title policy has actually been issued?

MS. KRYSAK:  Objection; form, outside the scope.

THE WITNESS:  Yes, we confirm that we receive a final title policy versus a preliminary title report.

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    At what point in the life of the loan does

Goldwater's residential real estate division confirm

that they have received a final title policy?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  Post-closing.

BY MR. KATZ:

    Q    What is the time scale?  Are we talking about

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
68


days after closing, weeks after closing, months after

closing, or years after closing?

        MS. KRYSAK:  Objection; form, outside of

scope.

        THE WITNESS:  That it is sent to us or

received or documented?

BY MR. KATZ:

    Q    The point at which Goldwater checks to make

sure that a final title policy has been issued.

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  I'd have to refer to either a

policy or procedure on when they place a receipt that

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

they received the final title policy.

BY MR. KATZ:

    Q    Do you have any understanding of the order of
magnitude of time, whether it's days, weeks, months or
years after closing?

        MS. KRYSAK:  Objection; form, outside the
scope.

        THE WITNESS:  When it's post-close, the post-
closing department is supposed to make sure that any
following documents, which there typically are, are
received in a timely manner.

BY MR. KATZ:

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
69


    Q    What is a timely manner?

        MS. KRYSAK:  Objection; form, outside the
scope.

        THE WITNESS:  I would have to say within 30
days is when we monitor, from Day 1 to Day 30.

BY MR. KATZ:

    Q    What documents is the post-closing department
monitoring during that 30-day period to see if Goldwater

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
has received?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  It can be an investor condition,

something like a 4506 that needed an additional

signature, an illegible document that the investor is

requesting.  It could be a list of different items from

the investor that they are looking for or need in

addition to.

BY MR. KATZ:

    Q   Does the post-closing department have a

checklist of documents that they are confirming have

been received after closing?

        MS. KRYSAK:  Mr. Katz, can you explain what

topics any of these questions over the past 15 to 20

minutes relate to or are part of?

        MR. KATZ:  Custodial maintenance.

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

70

        MS. KRYSAK:  Are you intending to just take

the deposition of Ms. Overbeck today and disregard the

topics?  Is that what's happening?

        MR. KATZ:  I want foundation for her

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

knowledge.  I want to determine whether she's actually

qualified to testify on the topics.  These do relate to

what we discussed as onboarding.  It relates to other

topics in here, including custodial maintenance.  And

these are all foundational questions.  So I'm going to

ask -- unless you are telling Ms. Overbeck not to

disclose this information at all, I can ask.  You can

always move to exclude a response at a later time.

        MS. KRYSAK:  Mr. Katz, this is not

foundational questioning.  This is well outside the

scope of the topics.  All of your questions have been.

So I'm wondering if you are going to actually ask some

questions within the topics, or if you are just going to

continue forward outside of the proposed topics.

        MR. KATZ:  These are within the topics.

        MS. KRYSAK:  Which topics?

        MR. KATZ:  Among others, Topic 7, regarding

custodial maintenance, handling and control of original

loan documents.

        MS. KRYSAK:  That's not the question that you

asked.  You are asking broadly about policies and

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

71

                        Page 25

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

procedures.  Perhaps you can start to ask --

        MR. KATZ:  Policies and procedures are topics --

        MS. KRYSAK:  -- about something related specifically to that.

        MR. KATZ:  Policies and procedures for recording deeds of trust are Topic 6.  Policies for recording deeds post-closing, these are within the topics.

        MS. KRYSAK:  That's not what you're asking, Mr. Katz.

        MR. KATZ:  And if you disagree, you can make an objection and we can deal with it later, unless you are instructing her to withhold the information.

        MS. KRYSAK:  No, I'm objecting to every single question.  I mean, if you want to continue on this path, you are not going to get any information from Goldwater themselves, you are just going to be taking the deposition of Ms. Overbeck.  Go ahead, Mr. Katz.

        MR. KATZ:  Could you read back the last actual questions, please?

        (Record read.)

        THE WITNESS:  I am not aware of a checklist.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
BY MR. KATZ:

   Q    As part of the residential real estate

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

72

post-closing department, do they do any sort of check to

see if the deed of trust has been recorded?

    MS. KRYSAK:  Objection; form, outside the

scope.

    THE WITNESS:  I'm not aware of a checklist.

BY MR. KATZ:

   Q    Separate from an actual checklist, does the

post-closing department do any sort of checking to see

if Goldwater's deed of trust has indeed been recorded?

    MS. KRYSAK:  Objection; form, outside the

scope.

    THE WITNESS:  During that timeline, I am not

aware of a checklist.

BY MR. KATZ:

   Q    My question wasn't about a checklist.  My

question was whether there is any checking, the act of

checking.  Is there any act of checking in the post-

closing department to see if a deed of trust has been

recorded?

Page 27

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  I am not aware of an act.

BY MR. KATZ:

    Q    Who maintains -- as of July 2019, at the time

that Mr. Elizarov got this loan, who maintains the

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

73

custody of Goldwater's original loan documents?

    A    Weststar.

    Q    And did Weststar maintain custody of

Mr. Elizarov's original loan documents from 2019 post-

closing through March 2021?

    A    What I am aware of, yes, they were in

possession because they were the custodian.

    Q    Is there any sort of written agreement between

Goldwater and Weststar dealing with the custodial

relationship between Weststar and Goldwater?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  I am not aware of a written

agreement.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

    Q    Is there any unwritten agreement between Weststar and Goldwater regarding custodial maintenance of Goldwater's loan documents?

        MS. KRYSAK:  Objection; form, outside the scope.

        THE WITNESS:  I am not aware that there are. I know I have not read any.

BY MR. KATZ:

    Q    Is there any agreement -- written agreement between Goldwater and Weststar regarding the servicing

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

74

of a residential real estate loan, like Mr. Elizarov's loan?

        MS. KRYSAK:  Objection; form, outside the scope.  Do you mean that would be applicable to Mr. Elizarov's loan, Mr. Katz?

        MR. KATZ:  Well, I'm going to --

        MS. KRYSAK:  Is that what you meant to say?

        MR. KATZ:  -- ask generally, and then I'm going to ask if there's any that are applicable to Mr. Elizarov's loan.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    So in general, are there any written

agreements between Goldwater and Weststar regarding the

servicing of residential real estate loans, like

Mr. Elizarov's loan?

MS. KRYSAK:  Objection; form, outside the

scope.

THE WITNESS:  I am not aware of a written

agreement between Weststar and Goldwater for servicing.

BY MR. KATZ:

Q    Are you aware of any written agreement that

would -- relating to the servicing of Mr. Elizarov's

loan between Weststar and Goldwater?

A    Specific to Mr. Elizarov's loan, no.

Q    What were Goldwater's policies and procedures

for recording deeds of trust in effect at the time that

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

75

Mr. Elizarov's loan closed?

A    We don't have a written policy or procedure

for recording specific to Mr. Elizarov's loan.

Q    Are there any unwritten procedures that are

followed?

Page 30

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Objection; form.

THE WITNESS:  Not that I am aware of.

BY MR. KATZ:

Q    Are you familiar with Goldwater's policies and
procedures in effect between July 2019 and April 2021
regarding the custodial maintenance of loan documents?

MS. KRYSAK:  Objection; form.

THE WITNESS:  I'm not aware of a policy or
procedure for custodial responsibilities of Weststar --
between Weststar and Goldwater.

BY MR. KATZ:

Q    How about for the handling and control of
original loan documents?

MS. KRYSAK:  Objection; form.

THE WITNESS:  Signed documents or printed
documents?

BY MR. KATZ:

Q    Either.

A    Well, we draw the loan documents and deliver
them to either escrow attorney, depending on what state.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

76

At that point they are usually either printed or

Page 31

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

E-signed, and the originals are returned as directed on

the loan documents.  We're talking specifically loan

documents, correct?

Q    Yes.  And by loan documents, do you understand

that to mean a promissory note?

A    Yes.

Q    And do you understand that to mean a deed of

trust?

A    Yes.

Q    How does -- at the time that Goldwater made

the loan to Mr. Elizarov, how did Goldwater communicate

to the escrow holder for that transaction what was to be

done with the original wet-ink loan documents?

MS. KRYSAK:  Objection; form, outside the

scope.  Did you say wet ink?

BY MR. KATZ:

Q    I'll say original.  Let's do this.  Original

documents are ones signed by the borrower, right?

A    Yes.

Q    Does Goldwater have any sort of policy and

procedure in place as of 2019 as to whether original

loan documents had to be signed with a pen, as opposed

to typed?

MS. KRYSAK:  Objection; form, outside the

Page 32

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

77

scope.

       THE WITNESS:  I'm not aware of a policy
requiring a wet signature.  But the loan documents, to
be valid, would need to be signed by the borrower or
borrowers.

BY MR. KATZ:

    Q    And by signed by the borrower --

    A    And any documents that need to be notarized.

    Q    And when you say signed by the borrowers, does
that mean with a pen or with a authentication system,
like DocuSign?

       MS. KRYSAK:  Objection; form, outside the
scope.

       THE WITNESS:  Our documents at that time were
hand-signed.

BY MR. KATZ:

    Q    Okay.  So if I'm referring to a wet-ink
signature, I'm referring to something that was hand-
signed.  Okay?

    A    Okay.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q     So what was Goldwater's policy and procedure

for communicating to the escrow holder for a transaction

how the wet -- the signed loan documents should be

handled and transmitted?

MS. KRYSAK:  Objection; form, outside the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

78

scope.

THE WITNESS:  The loan documents are delivered

to either an escrow company or title company or

attorney, depending on what state, by our closing

department to that person via email.

BY MR. KATZ:

Q     And does Goldwater prepare a set of lenders

instructions to the escrow for a transaction like

Mr. Elizarov's transaction?

MS. KRYSAK:  Objection; form, outside the

scope.

THE WITNESS:  Correct, yes.

BY MR. KATZ:

Q     Have you reviewed the lender's instructions

that Goldwater prepared for Mr. Elizarov's transaction?

A     No, I have not.

Page 34

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    But is it Goldwater's regular practice to

prepare lender instructions for residential real estate

loans to inform escrow how to handle loan documents?

MS. KRYSAK:  Objection; form, outside the

scope.

THE WITNESS:  The lenders instructions provide

guidance to the escrow company of the documents that are

included and maybe a missing condition that the borrower

is supposed to bring to the signing table.  They are

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

79

instructions.

BY MR. KATZ:

Q    And are those instructions prepared by

Goldwater?

A    They are prepared by a Goldwater employee in

the closing department.

Q    What is the difference between the closing

department that you just described and the post-closing

department that we were previously discussing?

MS. KRYSAK:  Objection; form, outside the

scope.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

          THE WITNESS:  Closing is our closing

department, so the loan has not closed yet.  They handle

the loan documents and balancing of the file.  When it's

signed by the consumer and the loan funds, then, once

that loan funds, it goes to post-closing department,

which is two different departments.

BY MR. KATZ:

     Q    And what does the post-closing department do?

          MS. KRYSAK:  Objection; form, outside the

scope.

          THE WITNESS:  Post-closing manages closed

loans and prepares to either sell to Weststar or to an

investor.

BY MR. KATZ:

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
80


     Q    When you say sell to Weststar, what do you

mean?

          MS. KRYSAK:  Objection; form, outside the

scope.

          THE WITNESS:  What I refer to as sell, meaning

we fund the loan at Goldwater Bank and we sell the loan

to an investor.  For example, Fannie Mae, Freddie Mac,

                         Page 36

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

they buy the loan.

      MS. KRYSAK:  Mr. Katz, I hate to interrupt,
but we'd like to go ahead and take a quick five-minute
break.

      MR. KATZ:  Sure.  I've got 10:47.  You want to
come back at 10:55?

      MS. KRYSAK:  That sounds great.  Thank you.

      (Recess.)

      MR. KATZ:  All right.  While we were off,
Mr. Alekseyeff politely reminded us that counsel have
not yet officially stated their appearance on the
record, so I will do so and start.  I am Jeremy Katz.
I'm with Hall Griffen, attorneys of record for Defendant
and Cross-Complaint Scott Howlett and Defendant BMO
Harris Bank, N.A., successor by merger through Bank of
the West.  I will from time to time referral to Bank of
the West as BOTW.

      MR. ALEKSEYEFF:  Good morning.  My name is

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

81

Ilya Alekseyeff.  I represent Defendant Artur Elizarov,
as well as myself as a defendant.

Page 37

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Good morning.  My name is Abbey
Krysak, and I represent Goldwater Bank N.A.

MR. WAGNER:  My name is Sean Wagner.  I
represent Goldwater Bank.

MR. LEVOTA:  Joseph LeVota; Goldwater Bank.

MS. GOLDBERG:  Kasandra Goldberg from Hall
Griffin representing Defendant and Cross-Complainant
Scott Howlett and Defendant BMO Harris Bank, N.A., a
successor by merger through Bank of the West.

MR. KATZ:  All right.  Administrative tasks
achieved.  Thank you so much, Ilya.

Q    Before we left on the break, you had made
reference to selling the loan to Weststar.  What did you
mean by that?

MS. KRYSAK:  Objection; form, outside the
scope.

THE WITNESS:  I am not prepared to answer that
question right now.

BY MR. KATZ:

Q    Well, you used the phrase sell the loan to
Weststar.  What did you mean by that when you used that
phrase?

MS. KRYSAK:  Objection; form, outside the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

Page 38

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

82

scope.

THE WITNESS:  I'm not prepared to answer that question right now.

BY MR. KATZ:

Q    Are you -- do you have any understanding of what it means to sell a loan to Weststar?

MS. KRYSAK:  Objection; form, outside the scope.

THE WITNESS:  I am not prepared to answer that question today.

BY MR. KATZ:

Q    Well, you used that phrase, and I want to understand what you meant by it.  So what did you mean when you used the phrase sell a loan to Weststar?

MS. KRYSAK:  Objection; form, outside the scope.

THE WITNESS:  I am not prepared to answer that question today.

BY MR. KATZ:

Q    Are you refusing to answer that question?

MS. KRYSAK:  Objection; form, outside the scope.  And she answered the question, Mr. Katz.  Let's

Page 39

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

go ahead and move on.

        MR. KATZ:  No, she did not answer the

question.  She told me that she is not prepared to

       **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

83

answer what a thing meant that she said.  She used the

phrase, and I'm trying to get what her understanding is.

She said she is not prepared to tell me what the

understanding is.

    Q   Why aren't you prepared to tell me the

understanding of something -- of a phrase that you used?

        MS. KRYSAK:  Objection; form, outside the

scope.  She's answered your question.  Duplicative.

Let's move on.

BY MR. KATZ:

    Q   Did Goldwater sell Elizarov's loan to Weststar

in the manner that you referenced selling a loan to

Weststar?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  I'm not prepared to answer that

question.

Page 40

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

    Q    What is the relationship between Goldwater and Weststar?

        MS. KRYSAK:  Objection; form, outside the scope.  You can answer, to the extent that you know.

        THE WITNESS:  Yeah.  So Kent Wicker owns Weststar; Kent Wicker owns Goldwater.  We are affiliated.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

84

BY MR. KATZ:

    Q    Do they share office space?

        MS. KRYSAK:  Objection; form, outside the scope?

        THE WITNESS:  We do not share office space. We are on the same floor, but we do not share office space.

BY MR. KATZ:

    Q    You are both on the same floor of the same building?

        MS. KRYSAK:  Objection; form, outside the scope.  You can answer, to the extent that you know.

        THE WITNESS:  We have -- we're on the 11th

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

floor.  Goldwater Bank is our bank, and Weststar has an

office on the same floor.

BY MR. KATZ:

    Q    Are you aware of any Goldwater Bank employees

who use a Weststar email address?

       MS. KRYSAK:  Objection; form, outside the

scope.  Can you be more specific, Mr. Katz?  Do you have

any employees that you are asking about specifically?

       MR. KATZ:  I'm asking if she is aware of any.

       THE WITNESS:  I'm sorry.  I missed the last

part of your question.

BY MR. KATZ:

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

85

    Q    Are you aware of any Goldwater employees who

use a Weststar email address?

       MS. KRYSAK:  What topic is this relevant to,

Mr. Katz?

       MR. KATZ:  The relationship between Goldwater

and Weststar, service transferring and, as she said,

their selling of loans.

       MS. KRYSAK:  What topic is that?  Can you

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
point me to that topic?

    MR. KATZ:  It's foundational for the service

transfer of the loan.

    Q  So are you aware --

    MS. KRYSAK:  Can you point me to a specific

topic?

BY MR. KATZ:

    Q  Are you aware of any Weststar employees -- or

I'll ask it a different way.  Are you aware of any

Weststar employees who use a Goldwater email address?

    MS. KRYSAK:  Objection; form, outside the

scope.  Let's move on.  You've already asked the

question.

    MR. KATZ:  But she hasn't answered it.

    MS. KRYSAK:  I know, but it's also completely

irrelevant, outside of the scope, and a waste of time.

    MR. KATZ:  I'll lay a foundation.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

86

    Q  Is part of Goldwater's factual basis for

asserting claims against Mr. Howlett and Bank of the

West based on a communication email chain between

members -- Mr. Hill of Weststar and Melissa Melendez

Page 43

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

of -- I'm sorry -- Mr. Hill of Goldwater and

Ms. Melendez of Weststar?

        MS. KRYSAK:  Mr. Katz, do you have a copy of

the email chain you are referring to?

        MR. KATZ:  I do.

    Q   But is that part of the factual basis for

Goldwater's claims against Mr. Howlett and Bank of the

West, is that based on email communications between

Mr. Hill, Ms. Melendez and Escrow of the West?

        MS. KRYSAK:  What email communications,

Mr. Katz?  That would be helpful.

        MR. KATZ:  We can get to it.

        MS. KRYSAK:  You could be more specific.

BY MR. KATZ:

    Q   Is that part of the factual basis for

Goldwater's claims?

        MS. KRYSAK:  Ms. Overbeck -- Objection; form,

outside the scope.  To the extent you know or can

determine what he's saying, Ms. Overbeck, or asking, go

ahead and answer.

        THE WITNESS:  So there was a lot that was just

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

87

                        Page 44

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

said there, but I think the question was about an email.
Are there employees that have a Weststar or Westloan
email address and a Goldwater, is that what the question
was?

BY MR. KATZ:

    Q    That was one of the questions.

    A    Okay.  Yes, I am.  And what was the second
question?

    Q    I'll come back to it.  Who were the employees
that use a West- -- who are the Goldwater employees that
you are aware of who use a Weststar email address?

        MS. KRYSAK:  Objection; form, outside the
scope.  We're not -- do you know what, Mr. Katz?  We are
just not going to answer outside the scope anymore.  I
appreciate your citations to case law, but we are just
not doing that.  So if you would like to ask any
questions specific to the number of topics that were
agreed upon, we can go ahead.  Or we'll -- if you are
disagreeing, we'll just move onto Mr. Alekseyeff, see if
he can give his topics a try, and then move forward.

        MR. KATZ:  So are you instructing the witness
to withhold the information?

        MS. KRYSAK:  I am instructing the witness not

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
to answer questions outside of the scope any longer.

BY MR. KATZ:


    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
88


    Q    Does Ms. Melissa Melendez, does she use a

Goldwater email address?

        MS. KRYSAK:  Objection; form, outside the

scope.  Please do not answer, Ms. Overbeck.

BY MR. KATZ:

    Q    In preparing for today's deposition, did you

review any email chains with Ms. Melendez on them?

    A    Not to my recollection.

    Q    Is Ms. Melendez employed by Goldwater?

        MS. KRYSAK:  Objection; form, outside the

scope.  Don't answer, Ms. Overbeck.  If you are asking

about an email chain specifically, Mr. Katz, go ahead

and pull it out and show her so that we can figure out

whether or not what you're asking about is outside the

scope because at this point it truly is.

        MR. KATZ:  It's not.  I believe it's part of

the factual basis.  But I'll ask.

    Q    What is the factual -- why is Goldwater --

what is the factual basis for Goldwater asserting a

Page 46

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

quiet title claim against Mr. Howlett?

        MS. KRYSAK:  Objection; form.

        MR. LEVOTA:  Objection; attorney-client

privilege, work product.

        MR. KATZ:  I'm not asking --

        MR. LEVOTA:  I mean, you are asking whether

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

89

she has an independent understanding of the factual

basis for the legal pleading of a quiet title action?

Is that your question?  And you're asking if she has

that factual understanding outside of conversations with

counsel?

        MR. KATZ:  One of the topics was the factual

basis for claims.

    Q    What is the factual basis for the quiet title

cause of action against Unison?

        MS. KRYSAK:  Our understanding, Mr. Katz, was

that you were going to ask about the facts.

        MR. KATZ:  Yeah.

        MS. KRYSAK:  So are you going to ask about the

facts --

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MR. KATZ:  Yeah.

MS. KRYSAK:  -- or are you going to ask it in such a way where you are seeking attorney work product and attorney-client privileged communications?

MR. KATZ:  I'm seeking the underlying facts.

MR. LEVOTA:  Objection; calls for a narrative, attorney-client privilege, work product.  Can you ask a more specific question that does not call for a narrative?

MR. KATZ:  Sure.

Q    Are you familiar with Mr. Peter Hill?

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

90

A    Yes.

Q    Mr. Hill was the chief credit officer of Goldwater Bank at the time of -- in March 2021?

A    Yes.

Q    And he was also vice president of Goldwater Bank?

A    At that time I'm not sure about vice president.

Q    What was your understanding of Mr. Hill's role at Goldwater Bank in or around March 2021?

Page 48

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Objection; form, outside the

scope.  You can answer, to the extent that you know,

Ms. Overbeck.

        THE WITNESS:  I'm trying to figure out what

timeline.  Did you say 2021?

BY MR. KATZ:

    Q    March 2021, at the time that he was

communicating with Escrow of the West about

Mr. Elizarov's loan.

    A    He was the chief credit officer.

    Q    Are you familiar with Mr. Gregory Hill?

    A    Yes, sir.

    Q    Was Mr. Gregory Hill a sales representative

for Goldwater?

        MS. KRYSAK:  Is there a specific time period

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
91

you're asking about here, Mr. Katz?

BY MR. KATZ:

    Q    Was Mr. Hill the sales representative for

Goldwater for the origination of Mr. Elizarov's loan?

    A    Yes.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    And was Mr. Hill still a sales representative

for Goldwater as of March 2021, at the time that

Mr. Hill was communicating with Escrow of the West?

A    Yes.  Wait are you referring to Gregory Hill?

Q    Gregory Hill.

A    Yes.  I just need to know between Pete Hill

and Gregory Hill.  Sorry.

MS. KRYSAK:  So when you said Mr. Hill,

Mr. Katz, you know, who did you mean, Greg or Pete?

BY MR. KATZ:

Q    Was Gregory Hill still a sales representative

for Goldwater as of March 2021?

A    Yes.

Q    Are you familiar with Matt Teskey?

A    Yes.

Q    What was Mr. Teskey's role at Goldwater as of

2021?

MS. KRYSAK:  Objection; form, outside the

scope.  You can answer, to the extent that you know,

Ms. Overbeck.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

92

THE WITNESS:  President of the mortgage

Page 50

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

division.

BY MR. KATZ:

    Q    Is it fair to say that he's your boss?

        MS. KRYSAK:  Objection; form, outside the scope.  You don't have to answer, Ms. Overbeck.

BY MR. KATZ:

    Q    But you can.

        MS. KRYSAK:  Come on, Mr. Katz.  No, I'm telling her not to answer, just as we said.  We're not answering questions outside the scope.  I was hoping that you were moving in a positive direction and going to as questions that were within the topics.  And so we're going outside the bounds again.  So let's move on, please.

BY MR. KATZ:

    Q    Who at Goldwater Bank do you report to?

        MS. KRYSAK:  Objection; form, outside the scope.  Ms. Overbeck, answer to the extent that you know.

        THE WITNESS:  The last question, did you say who did I report to?

BY MR. KATZ:

    Q    Who do you report to?

    A    During that -- today?

Page 51

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
93

Q    Today, who do you report to?

MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

Q    In March 2021 who did you report to?

MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

Q    Did you have any personal involvement with
Mr. Elizarov's loan between the time it was originated
and April 2021, when Goldwater recorded its deed of
trust?

MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.

MR. KATZ:  That's foundational as to
everything.

Q    Did you have any involvement with
Mr. Elizarov's loan prior to April 2021, when Goldwater
recorded its deed of trust?

MS. KRYSAK:  Objection; form, outside the

Page 52

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
scope.  You can answer, to the extent you know,

Ms. Overbeck.

        THE WITNESS:  I did not have any participation

in Mr. Elizarov's loan.

BY MR. KATZ:

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
94


        Q    And by participation, I just want to make sure

I understand.  Did you have any personal knowledge of

Mr. -- personal involvement with Mr. Elizarov's loan or

the deed of trust for his loan as of April 2021?

        A    I did not.

        Q    When was the first time that you heard about

any issue with Mr. Elizarov's loan?

        MS. KRYSAK:  Objection; form, outside the

scope.  Also, Ms. Overbeck -- oh, attorney-client

privilege, attorney work product.  Ms. Overbeck, to the

extent you can answer his question without revealing

attorney-client privileged communications, please go

ahead.

        THE WITNESS:  I don't recall the first time I

heard about Mr. Elizarov's loan.

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    Q   Are you familiar with a person named Devan Lucero Miller?

    A   No.

    Q   How about Lynette Suina-Cole?

    MS. KRYSAK:  Mr. Katz, do you want to give some context as to why you are asking about these individuals?  At this point it's, Objection; form, outside the scope.  It would be helpful to know what this topic -- what relevancy this is about, what you are

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
95

referring to, what topic this is connected to.

BY MR. KATZ:

    Q   You can answer.

    MS. KRYSAK:  Objection; form, outside the scope.

    THE WITNESS:  The two names, can you repeat the names again?

BY MR. KATZ:

    Q   Lynette Suina-Cole.

    A   I'm familiar with her name, but I do not work with her.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    Where does she work?

MS. KRYSAK:  Objection; form, outside the scope.  At this point, Mr. Katz, without further context or specification, your questions are all falling outside the scope again.  You can answer, to the extent that you know, Ms. Overbeck.

THE WITNESS:  I'm not sure if she is remote or where she works.

BY MR. KATZ:

Q    For whom?  Is she a Weststar employee?

MS. KRYSAK:  Objection; form, outside the scope.

THE WITNESS:  From my understanding, she is Weststar.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

96

BY MR. KATZ:

Q    What is the relationship between Goldwater and Unison as of the time that Goldwater made its loan to Mr. Elizarov?

MS. KRYSAK:  Mr. Katz, what topic is this relevant to?

MR. KATZ:  Nine.

Page 55

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Nine?  What's nine?

MR. KATZ:  The relationship between Goldwater

and Unison as it relates to the subordination agreement

in this action.

MS. KRYSAK:  So are you asking about the

subordination agreement?  I mean, your question was more

broad as to any relationship between Goldwater and

Unison, so that's going to be outside the scope.

BY MR. KATZ:

    Q    What is the relationship between Goldwater and

Unison as it relates to the subordination agreement at

issue in this action?

    A    At issue of what?

    Q    All right.  Are you familiar with a

subordination agreement that is at issue in this

lawsuit?

    A    Yes.  I usually refer to it as a second --

recorded second trust deed that's in second position.

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
97

      MR. KATZ:  I'm going to share my screen.  This

is a document that was previously marked as Deposition

Page 56

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Exhibit 24.  We'll maintain that number here.

Q    Is this the subordination agreement that you were referring to?

A    Can you zoom in on it for me?  Sorry.

Q    Sure.  Let me know if you'd like me to scroll up or down.

A    If you can scroll down.

Q    This is the middle of page 2.

A    Okay.

Q    Is this the subordination agreement that you were referring to?

A    Yes, it looks like one of the Unison subordination agreements.

Q    When you say one of, is there more than one Unison subordination agreement involving Goldwater and Unison?

A    No.  I meant that this is the one that I you referred to, that I reviewed.

Q    Are you aware of any others?

A    There's only one subordination from Unison.

Q    What is the relationship between Goldwater Bank and Unison?

MS. KRYSAK:  Objection; form, outside the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

98

scope.  Mr. Katz, are you referring to this agreement specifically?

MR. KATZ:  Sure.

Q    With relation to this agreement, what is the relationship between Goldwater and Unison?

A    Goldwater provides a first trust deed mortgage, and Unison provides a -- what we refer to as a participation in equity in a subordination position.

Q    Who prepared this subordination agreement?

A    Unison prepares their own loan documents.

Q    Did Goldwater see the subordination agreement before it was executed?

A    When you say executed, do you mean signed by the consumer?

Q    Yes.

A    I am not aware.  I don't -- I'm not sure.

Q    Did Goldwater see the subordination agreement at any time between the loan origination time period and March 2021?

A    I don't want to make any assumptions, but they typically use the same loan documents.  There's nothing that changes, except the specifics to the loan.

Page 58

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    When you say they typically use the same loan
document, who is the they you were referring to?

A    Unison.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
99

Q    How do you know that Unison typically uses
this same loan document?

A    Well, based just on my familiarity with Unison
and this document, most companies use the same standard
documents, just referring to filling in borrower-
specific, property-specific information.

Q    Did Goldwater have any involvement in the
preparation of the subordination agreement?

A    Not that I am aware of, no.

Q    Why not?

A    We prepare our first documents.  We don't have
Unison participate in preparing our loan documents.

Q    Did Goldwater check to see if the information
that Unison was putting into the subordination agreement
regarding the senior lender was correct?

A    I am not sure.

Q    Have you done any investigation into whether

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Goldwater checked to see -- checked to see if the

information in this was correct?

    A   I did not.

    Q   Are you aware of -- did Goldwater make any

efforts to confirm that the information in the

subordination agreement was accurate?

    A   I am not sure.

    Q   Did Goldwater make any efforts to obtain a

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

100

copy of the subordination agreement as it was recorded

prior to March 2021, when the property was sold to

Mr. Howlett?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  I'm not aware.

BY MR. KATZ:

    Q   Just to make sure that I understand, you're

not aware of any efforts or you are not aware whether

there were any efforts?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  I'm not aware if there were any

efforts to see if Unison had been recorded.

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    Q   Why didn't Goldwater check to make sure that
the subordination agreement was accurate -- had an
accurate description of the senior lender?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  Can you repeat the question?

        MR. KATZ:  Can you read it back?

        (Record read.)

        THE WITNESS:  My previous answer was I was not
aware if Goldwater had checked the subordination before
it was signed.

BY MR. KATZ:

    Q   Did Goldwater have any policies or procedures

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

101

in place at the time that Mr. Elizarov's loan originated
regarding the preparation of subordination agreements?

    A   Not that I am aware of.

    Q   Did Goldwater have any policies and procedures
in place at the time that Mr. Elizarov's loan originated
regarding the execution and recording of subordination
agreements?

        MS. KRYSAK:  Objection; form.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

         THE WITNESS:  Not that I am aware of.

BY MR. KATZ:

     Q    I'm sorry.  Yes, that you are aware of; or,

no, you are not aware of?

     A    Not that -- no, not that I am aware of.

         MS. KRYSAK:  Mr. Katz, just to clarify, are we

talking about all subordination agreements ever or this

specific subordination agreement or Unison's

subordinations agreements?

         MR. KATZ:  Applicable to Unison's

subordination agreements.

         MS. KRYSAK:  All Unison subordination

agreements ever?

BY MR. KATZ:

     Q    Are you aware of any other Unison

subordination agreements?

         MS. KRYSAK:  Objection; form, outside the

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

102

scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

     Q    Is this the only -- is Mr. Elizarov's loan the

only transaction in which Goldwater had a subordination

                        Page 62

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

agreement in place with regard to Unison?

        MS. KRYSAK:  Objection; form, outside the

scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

    Q    What is the process in effect at the time of

Mr. Elizarov's in which Goldwater negotiates whether its

loan will be junior or senior to a loan such as

Unison's?

        MS. KRYSAK:  Objection; form, outside the

scope.  I mean, please don't answer, Ms. Overbeck.  If

you can add some specificity there, Mr. Katz, or clarify

your question I think that would be helpful.

        MR. KATZ:  All right.

    Q    Why was there a subordination agreement in

place for Mr. Elizarov's loan?

    A    Unison is a lender.  Goldwater Bank provides

the first trust deed.  Unison provides a participation

which is in second or subordination position.

    Q    Is that an inherent structure of a Unison

transaction, or is that something that was negotiated

between Goldwater and Unison?

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

103

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Objection; form, outside the
scope.  Can you clarify, Mr. Katz?

BY MR. KATZ:

Q    Was there an agreement, other than the -- was
there a negotiation between Goldwater and Unison
relating to the subordination of Unison's loan?

MS. KRYSAK:  Any Unison loan or specific to
Mr. Elizarov?

MR. KATZ:  This loan.

MS. KRYSAK:  Objection; form, outside the
scope.

THE WITNESS:  I'm not aware of any negotiation
on Mr. Elizarov's loan.

BY MR. KATZ:

Q    How about applicable to loans like
Mr. Elizarov's loan?

MS. KRYSAK:  Objection; form, outside the
scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

Q    Did Goldwater provide information to Unison to
be used in this subordination agreement?

A    Yes.

Q    I'm sorry.  Was there an answer?

Page 64

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    Yes.  I said yes.

Q    What information did Goldwater provide to

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

104

Unison to be used in this subordination agreement?

A    The terms of our first trust deed.

Q    How was that information provided to Unison?

A    Via email.

Q    Have you reviewed those emails prior to
today's deposition?

A    No, I have not.

Q    How do you know that it was done by email?

A    That's typically how they communicate or our
department communicates to Unison when Unison was still
in business.

Q    Who provided the loan number for the senior
lender that is listed in the subordination agreement?

A    It could have been Mr. Gregory Hill or the
loan processor.

Q    By loan processor do you mean Goldwater's loan
processor?

A    Correct.

Q    The loan number in the subordination agreement

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

does not match the loan number that Goldwater assigned

to Mr. Elizarov's loan, correct?

 A Can you share with me the loan number for

Goldwater on -- that you are referring to?

 Q Yes, one second.  I'll put the two documents

side by side.  On my right -- are you able to see two

  **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

105

documents side by side?

 A I can see side by side.

 Q I understand --

 A You'll need to -- yes, thank you.

 Q I'm going to zoom in.  On the right-hand side

is a document that was previously marked as Exhibit 18,

a request for a payoff quote.

 A For Weststar?

 Q Oh, I'm sorry.  I'm going to flip to a

slightly different one.  One second.  All right.  I'm

showing you now on the right a document that was

previously marked as Exhibit 70, which I'll represent to

you was -- came as Exhibit D to Goldwater's operative

complaint.  In it there's an account number listed here

Page 66

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
under Account Data, Account Number.  You would agree
with me --

A    Yes.

Q    -- that the account number listed in the
right-hand side in Exhibit 70 does not match the loan
account number for the senior lender listed in the
Exhibit 24 subordination agreement, correct?

A    You are referring -- I'm sorry.  You are
referring to Weststar's loan number, not Goldwater
Bank's loan number.

Q    Okay.  Weststar's loan number for

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
106

Mr. Elizarov's loan does not match the number in the
Unison subordination agreement, correct?

A    Weststar did not make the loan for the
purchase for Mr. Elizarov.  We'd have to refer to the
loan number on the loan documents for the purchase
transaction that was closed by Goldwater.  Do you have
that loan number?

Q    Let me ask a more general question that may
just cut to the chase here.  Does Goldwater use eight
digits for it loan number or nine?

Page 67

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    MS. KRYSAK:  Objection; form, outside the

scope.  Do you mean -- Mr. Katz, do you mean in this

transaction?

BY MR. KATZ:

    Q    How many digits are there in Goldwater's loan

number for Mr. Elizarov's loan?

    A    I believe there's nine.  It should start with

a 909.

    Q    Goldwater's loan number for Mr. Elizarov's

loan starts with a 909?

    A    Yes.

    Q    So the Unison subordination agreement that

we've marked as Exhibit 24, on page 2 I have here on the

screen, the loan number listed for the senior lender is

not Goldwater's loan number for Mr. Elizarov's loan,

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
107

correct?

    A    Are you referring to 90216931?

    Q    Yes.  That is not Goldwater's loan number for

Mr. Elizarov's loan, correct?

    MS. KRYSAK:  Mr. Katz, it looks like you took

                    Page 68

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

down the other exhibit that you were asking Ms. Overbeck

about Do you think you could put that back up on the

screen for her?

        MR. KATZ:  Sure.  Here is the Weststar payoff

calculation that was Exhibit D to Goldwater's complaint.

And I will zoom in on the account number.

        MS. KRYSAK:  Mr. Katz, I think you had the

deed of trust up after Ms. Overbeck asked you to put up

a Goldwater document.

        MR. KATZ:  Sure.  Here is Goldwater's deed of

trust.

        THE WITNESS:  Where is the loan number on that

document?

BY MR. KATZ:

    Q    If you look at the words deed of trust --

    A    Yes.

    Q    -- above it on the left it says Tile Order No,

Escrow No., and a loan number.

    A    Can you zoom in on that for me?  I'm sorry.

    Q    I'll even highlight it.  I'll temporarily

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

108

highlight it.

Page 69

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    No, it's okay.  If you can just zoom in on
that one document?  I can barely read the number.  Thank
you.  Our loan number is 909216931.  It looks like the
Unison subordination is missing a nine.

Q    Do you agree with me that the Unison
subordination agreement does not list the loan number
that Goldwater used for Mr. Elizarov's loan?

A    Correct, it's missing a nine.

Q    Did Goldwater check the accuracy of the Unison
subordination agreement at any time before it was
recorded?

MS. KRYSAK:  Objection; form, asked and
answered.  Let's move on, Mr. Katz.

BY MR. KATZ:

Q    Why didn't Goldwater check the accuracy of the
Unison subordination agreement before the Elizarov loan
transaction closed?

MS. KRYSAK:  Objection; form, outside the
scope, asked and answered, relevance.

MR. KATZ:  I'm sorry.  I don't think you
answered that one before.

MS. KRYSAK:  We're instructing her not to
answer.  Move on, Mr. Katz.

MR. KATZ:  That would involve the preparation.

Page 70

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

109

That's under the topics.

        MS. KRYSAK:  Which topic?

        MR. KATZ:  Nine and eight.

        MS. KRYSAK:  Mr. Katz, we didn't prepare
Unison's document.

        MR. KATZ:  Yes.  That wasn't my question.  My
question is different.

    Q    Did Goldwater check --

        MS. KRYSAK:  You do know that?

BY MR. KATZ:

    Q    Did Goldwater check to confirm that the
information on the subordination agreement was accurate
at any time prior to the close of Mr. Elizarov's
transaction?

        MS. KRYSAK:  That's not the topic, Mr. Katz,
so outside the scope.  We're instructing her not to
answer.

BY MR. KATZ:

    Q    What efforts, if any, did Goldwater undertake
to confirm the information in this subordination

Page 71

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
agreement was accurate?

     A    I'm not prepared to answer that question right
now.

     Q    Why aren't you prepared?  That's literally in
one of the topics, in Topic 9.

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
110


     A    I'm not aware of any steps that any person
took to review the subordination agreement.

     Q    Did Goldwater have access to the subordination
agreement prior to the close of Mr. Elizarov's loan?

     A    I would have to go back and look at the
records.

     Q    Where would you look to determine that?

     MS. KRYSAK:  Mr. Katz, in an effort for
Ms. Overbeck to be able to answer your question --
Ms. Overbeck, would you like to take a break to review
the records you are referring to?

     THE WITNESS:  Sure.  Yes, that would be great.
Thank you.

     MR. KATZ:  All right.  Why don't we take five
minutes.

     (Recess.)

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

Q    Did you review any documents during the break?

A    No.

Q    During the break did you check to see whether
the subordination agreement was made available to
Goldwater at the time of the origination transaction?

A    Yes.  I have no record of Goldwater reviewing
the subordination agreement.

Q    Okay.  I understand you have no record of

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
111

Goldwater reviewing the subordination agreement.  My
question is, Did Goldwater have access to the
subordination agreement at the time that Mr. Elizarov's
transaction closed?

A    From what I understand, no.  The subordination
agreement was sent directly from Unison to either escrow
or title.

Q    And from where do you gain that information,
other than information provided to you by your counsel?

MS. KRYSAK:  Objection.

THE WITNESS:  Sorry.  Just the loan

Page 73

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
production -- sorry.  The loan documents that were

provided for this case, reviewed.

BY MR. KATZ:

    Q    Does Goldwater maintain a loan file for

Mr. Elizarov's loan?

    A    Yes.  I know it sounds weird, but a loan file

meaning we have everything, you know, digitally now.  So

everything is in a digital.

    Q    Okay.  So Goldwater maintains a digital loan

file for Mr. Elizarov's loan?

    A    Yes.

    Q    Is the Unison subordination agreement in that

digital loan file?

    A    I did not review that digital file.


    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

112


    Q    What is the name of the system where Goldwater

maintains it's digital loan file for Mr. Elizarov's

loan?

    MS. KRYSAK:  Objection; form, outside the

scope.  Answer, to the extent you know.

    THE WITNESS:  I believe in Goldwater's

digital -- referred to as Blitz.

Page 74

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

    Q    Is that BlitzDocs?

    A    Yes.

    Q    Is that a system where images of documents can
be uploaded?

        MS. KRYSAK:  Objection; form, outside the
scope.  You can answer, to the extent you know,
Ms. Overbeck.

        THE WITNESS:  From what I understand Blitz,
you can sink or upload.

BY MR. KATZ:

    Q    And in Blitz, or BlitzDocs, to your knowledge,
is there metadata that a user can input beyond just
uploading images of documents?

        MS. KRYSAK:  Objection; form, outside the
scope.

        THE WITNESS:  I don't know.

BY MR. KATZ:

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
113

    Q    Who was responsible for uploading
Mr. Elizarov's loan documents into the BlitzDocs system?

Page 75

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Objection; form, outside the

scope.  Can you be more specific, Mr. Katz?

BY MR. KATZ:

    Q    Well, Mr. Elizarov's loan documents got inside

the BlitzDocs system, right?

    A    I believe so, yes.

    Q    And were they loaded into the BlitzDocs system

in or around the time the loan closed?

    A    Yes.

    Q    Who loaded them into the system?

    A    It depends.  So if it's marked ready to

ship -- and that's any document.  That's referred to as

the ready-to-ship button.  That pushes any of the loan

documents to Blitz.

    Q    Does Goldwater have the ability to upload

documents into Blitz?

        MS. KRYSAK:  Objection; form, outside the

scope.  What topic is this falling under, Mr. Katz?

        MR. KATZ:  It's custodial maintenance.

    Q    Does Goldwater have the ability to upload

documents into the Blitz?

        MS. KRYSAK:  What topic?  Can you give me a

number?

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

114

MR. KATZ:  It deals with the custodial maintenance of handling of the loan documents.  Seven, among others.

MR. WAGNER:  The loan documents -- we already kind of said that the loan documents are the note and deed of trust.  I mean, she's certainly prepared to talk about how the original documents are maintained and held and who the custodian is for them.  But you are talking about BlitzDocs, like digital records.

BY MR. KATZ:

Q    Okay.  Where is the original of Goldwater's deed of trust located?

A    Original deed of trust are shipped, based on the direction on the deed of trust, to that specific address.

Q    Are they in Goldwater's custody or are they in Weststar's custody?

MS. KRYSAK:  Objection; form, outside the scope, asked and answered.  But go ahead, Ms. Overbeck, to the extent you know.

THE WITNESS:  The original deed of trust is shipped to Albuquerque, New Mexico, which is a Weststar

Page 77

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

location.  They are a custodial.

BY MR. KATZ:

    Q   What happens when the original loan docs are

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

115

received at that custodial location?

       MS. KRYSAK:  Objection; form, outside the

scope.  You can answer to the -- Can you be more

specific?  I mean, are you referring to this specific

situation?

BY MR. KATZ:

    Q   You said that original loan docs are sent to

Weststar's Albuquerque facility.  What happens once they

arrive at the Albuquerque facility?  How are they

handled?

       MS. KRYSAK:  Objection; form, outside the

scope.  Also, how is she to know what Weststar does?

How does Goldwater know what Weststar does?  You can go

ahead and answer, to the extent you know, Ms. Overbeck.

       THE WITNESS:  Yeah, that's a Weststar process.

I'm not familiar with what they do upon receipt.

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    Do you know how Goldwater's deed of trust was uploaded into the BlitzDocs system?

A    No.

Q    Do you know who up- -- or whether it was Goldwater or Weststar who uploaded the documents into the Blitz system?

A    I don't even know if it's in Blitz.  We have a copy.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

116

Q    Does Goldwater have -- Goldwater itself has access to the BlitzDocs system, right?

A    Yes.

MS. KRYSAK:  Objection; form, outside the scope.  You can answer, to the extent that you know, Ms. Overbeck.

THE WITNESS:  Yes, Goldwater Bank does have access to Blitz.

BY MR. KATZ:

Q    And is Blitz Goldwater's system of record for maintaining -- for documents for the loan?  Is that system of record for maintaining the loan file?

MS. KRYSAK:  What's a system -- objection;

Page 79

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

form, outside the scope.  Also, what's a system of

record, Mr. Katz?  Maybe could you clarify?

        MR. KATZ:  Other than Blitz --

        MS. KRYSAK:  Maybe lay a little foundation or

explain.

BY MR. KATZ:

    Q   Other than BlitzDocs, is there any other

system Goldwater uses to maintain its loan file for

Mr. Elizarov's loan?

        MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, you can answer, to the extent that

you know.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

117

        THE WITNESS:  The loan is originated in

Encompass, which is where we house income, assets, those

types of loan documents, disclosures.  So that's one

entity, and Blitz is the other.

BY MR. KATZ:

    Q   Is it fair to say that pre-closing things are

housed in iCompass (sic) and post-closing they are

housed in BlitzDocs?

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, you can answer, to the extent that

you know.

THE WITNESS:  I'm not sure.

BY MR. KATZ:

Q    Does Goldwater have any specific policy or

procedure for where it maintains the loan file for a

loan like Mr. Elizarov's loan?

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, you can answer, to the extent that

you know.

THE WITNESS:  Well, since we draw loan

documents from Encompass, they are in Encompass.

BY MR. KATZ:

Q    And after closing?

MS. KRYSAK:  Objection; form, outside the

scope.  You can answer, to the extent that you know, Ms.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

118

Overbeck.

THE WITNESS:  I believe they are uploaded into

Encompass and ready to ship to Blitz.

BY MR. KATZ:

Page 81

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    What do you mean ready to ship to Blitz?

A    It's a button we refer to.  Once it's been
uploaded to Encompass we hit the button, ready to ship,
and it pushes it to Blitz.

Q    So if anyone at Goldwater wanted to see
documents from Mr. Elizarov's loan file post-closing,
would they look in BlitzDocs -- could they look in
BlitzDocs?

        MS. KRYSAK:  Objection; form, outside the
scope.  You can answer, to the extent you know.

        THE WITNESS:  I believe there are limited
people who could review in BlitzDocs.  It just depends
on your persona.

BY MR. KATZ:

Q    How about someone like Peter Hill?

        MS. KRYSAK:  Objection; form, outside the
scope.

        THE WITNESS:  Yeah, I don't know.

        MS. KRYSAK:  Ms. Overbeck, you can answer, to
the extent you know.

        THE WITNESS:  Yeah, I don't know if he has

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

119

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

access to Blitz.

　　　　MS. KRYSAK:  Mr. Katz, what topic are we under
right now?

　　　　MR. KATZ:  Handling of loan documents.  It
also goes to the factual basis of some of Goldwater's
claim.

　　　　MS. KRYSAK:  The handling of loan documents?

　　　　MR. KATZ:  Uh-huh.

　　　　MS. KRYSAK:  Where is the handling of loan
documents?

　　　　MR. KATZ:  Here is an exhibit that was
previously marked as Exhibit 53.

　　Q    Are you able to see a page -- I'm going to
zoom into the bottom for a moment -- that was Bates
numbered GOLDWATER 001152 in the bottom right-hand
corner?

　　A    Yes.

　　Q    All right.  This is part of a two-paged email
chain.  I had a question about this portion here,
March 26, 2021, at 7:57 a.m.  Here Ms. Lynette
Suina-Cole -- it's an email from her.  Are you familiar
with -- is Ms. Suina-Cole -- do you know if she's a
Goldwater employee or a Weststar employee?

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A     I am not sure which.  She appears to be a

Goldwater employee.


**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

120


Q     And Peter Hill, that's the same Peter Hill we

have been discussing, the chief credit officer?

A     Yes, Peter Hill is chief credit officer.

Q     Jaime Johnson?

A     Post-close.

Q     Jamie Johnson is in Goldwater's post-closing

department?

A     Yes.

Q     I'm going to zoom in a little bit more to make

it a little easier for you to see.

A     Thank you.

Q     Is that a little easier now?

A     Yes.

Q     Okay.  How about Shelley Thurlow?

MS. KRYSAK:  Objection; form, outside the

scope.  You can answer, to the extent you know,

Ms. Overbeck.

THE WITNESS:  Shelley Thurlow was the

operations manage at that time.

Page 84

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

    Q    Do you know what her job duties were as
operations manager?

        MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, you can -- or please do not answer
the question.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
121

BY MR. KATZ:

    Q    As an operations manager, did Ms. Thurlow have
any responsibility or oversight into the custodial
maintenance and handling of original loan documents?

        MS. KRYSAK:  Objection; form, outside the
scope.  You can answer, to the extent that you know,
Ms. Overbeck.

        THE WITNESS:  Yeah.  From what I understand,
in operations at that time there was no -- she did not
have access to original documents.

BY MR. KATZ:

    Q    And Mr. Teskey, is this the same Mr. Teskey
that we had referred to earlier, president of Goldwater?

    A    He was -- Matt Teskey was the president of

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
Goldwater at that time, yes.

    Q   Did Mr. Teskey have any position at that time
at Weststar?

       MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

    Q   Do you have knowledge of whether Mr. Teskey
was an employee of Weststar at that time?

       MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

       **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

122

    Q   What was Mr. Teskey's role at that time?

       MS. KRYSAK:  Objection; form, outside the
scope.  Ms. Overbeck, please don't answer.  Is there a
topic that this is relevant to, Mr. Katz --

       MR. KATZ:  Yeah.

       MS. KRYSAK:  -- what Mr. Teskey's employment
position was?

       MR. KATZ:  It's foundational to many of the
other documents, and he's on communications going back
and forth.  I'm asking background info on him.  If she,

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

she knows; if she doesn't, she doesn't.  And if she

doesn't know, she can say and then --

        MS. KRYSAK:  Mr. Katz, you understand --

        MR. KATZ:  -- I don't need to ask more --

        MS. KRYSAK:  -- that we are in a -- you

understand we are in a 30(b)(6) --

        MR. KATZ:  Yep.

        MS. KRYSAK:  -- deposition, right?

        MR. KATZ:  Yep.

    Q    So do you have knowledge of Mr. Teskey's role

at that time?

        MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, please don't answer.  We never

agreed to a fact deposition of Ms. Overbeck; we agreed

to a 30(b)(6) with designated topics.

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

123

BY MR. KATZ:

    Q    Do you see in this email on the line where it

says in BlitzDocs there is a copy of what was uploaded

as a recorded copy.  However, there was no recording

information?

                Page 87

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    Yes, I can see that sentence.

Q    Do you know if that was accurate -- an accurate description of the situation at that time?

     MS. KRYSAK:  Mr. Katz, I think Goldwater has already stipulated that the deed of trust was not recorded at that time.  So I think we can go ahead and move on from whether or not -- you are asking her whether or not it was recorded on this day.  That's already been stipulated to in the pleading.

BY MR. KATZ:

Q    In BlitzDocs is there any information as to whether -- BlitzDocs at that time is there any information as to whether Goldwater's deed of trust was recorded?

     MS. KRYSAK:  Objection; form, outside the scope.  Also, it's stipulated that -- Goldwater has already stipulated and asserted in its pleadings that the deed of trust was not recorded at that time.  Ms. Overbeck, please do not to answer.  Lets move on, Mr. Katz, and spend some time on the actual topics --

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
124

BY MR. KATZ:

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    Q   What information gets coded --

        MS. KRYSAK:  -- if we can.

BY MR. KATZ:

    Q   Is there information coded into BlitzDocs

about whether a document is recorded?

        MS. KRYSAK:  Objection; form, outside the

scope.  She wasn't noticed to talk about BlitzDocs.

Ms. Overbeck, please don't answer.

BY MR. KATZ:

    Q   Did Goldwater have knowledge as of March 26,

2021, as to whether it's deed of trust had been

recorded?

        MS. KRYSAK:  Objection; form, outside the

scope.  Also stipulated to.  Ms. Overbeck, you can

answer, to the extent that you know.

        THE WITNESS:  I missed the first part of the

question.  You broke up.

        MR. KATZ:  Can you read it back?

        (Record read.)

        THE WITNESS:  I believe they had communication

that -- I'm not sure of that specific date, that it had

not been recorded.

BY MR. KATZ:

    Q   When did Goldwater learn that its deed of

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

125

trust was not recorded?

        MS. KRYSAK:  Objection; form, outside the scope.

        MR. KATZ:  Topic 16.

    Q    When did Goldwater learn that its deed of trust was not recorded?

        MS. KRYSAK:  Wait.  Which number topic is that --

        MR. KATZ:  Sixteen.

        MS. KRYSAK:  -- Mr. Katz?  All right.  Thank you for that.  Go ahead, Ms. Overbeck.

        THE WITNESS:  Yeah, I believe it was around this time, March 25th/26th.

BY MR. KATZ:

    Q    How did Goldwater learn that its deed of trust was not recorded?

    A    When they locate the deed of trust.

    Q    Where did they locate the deed of trust?

    A    Weststar.  They are the custodian of the document.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    Q    Had Weststar provided a copy of the post- --

of the deed of trust post-closing to Goldwater prior to

March 2021?

    A    I do not have any information on that topic.

    Q    What actions did Goldwater take upon learning

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
126

that its deed of trust had not been recorded?

    A    From my understanding and what I read through

as far as the emails, Goldwater Bank overnighted the

non-recorded deed of trust to First American Title to

have it recorded.

    Q    Did Goldwater have any communications with

Stewart Title about recording the deed of trust?

    A    Can you repeat that question?  I'm sorry.

    Q    Did Goldwater have any communications with

Stewart Title about recording its deed of trust?

    A    When they discovered that the deed of trust

had not been recorded?

    Q    Yes.

    A    Not that I am aware of.

    Q    Other than sending the deed of trust to First

American to be recorded, did Goldwater do anything else

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

to get its deed of trust recorded?

    A    From what I reviewed and what was provided,

the non-recorded deed of trust was Federal Expressed out

to American Title to be recorded.

    Q    Are you aware of the communications between

Goldwater and First American regarding the recordation

of the deed of trust?

        MS. KRYSAK:  Mr. Katz, are there specific

communications you are asking about?  I think there were

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
127

a few of them.

        MR. KATZ:  Yes.

    Q    Did you review communications between

Goldwater and First American Title Insurance Company

between March 1, 2021, and April 15, 2021, in

preparation for today's deposition?

    A    I do not recall seeing the emails from First

American.  I would love the opportunity to review them.

Do you want to share them with me?

    Q    Are you aware of any communications between

Goldwater and First American between March 1, 2021, and

                        Page 92

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
April 15, 2021?

MS. KRYSAK:  Mr. Katz, she just testified to

communications between them during that time period.

THE WITNESS:  I recall, from what I reviewed,

that there was communication possibly with Pete Hill and

First American Title and Britney Shaw.  Britney Shaw is

the one that overnighted it to First American.

BY MR. KATZ:

Q    When Goldwater learned that its deed of trust

was not recorded, did it do any investigation as to why

its deed of trust had not been recorded?

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, please don't answer that question.

MR. KATZ:  It falls within 16, the actions

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
128

Goldwater took to get it recorded.

MS. KRYSAK:  No, it does not, Mr. Katz.  That

has nothing to with the actions they took to get it

recorded.  Ms. Overbeck, please don't --

MR. WAGNER:  The why is not the action.

MS. KRYSAK:  The why is not the action.

Ms. Overbeck, please don't answer the question.

Page 93

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

   Q   What is the loan servicing arrangement between Goldwater and Weststar?

     MS. KRYSAK:  Objection; form, outside the scope.  You can answer, to the -- Or what topic does this relate to?

     MR. KATZ:  Factual basis for Goldwater's claims in which, among other things, they allege the loan was service transferred to Weststar.

     MS. KRYSAK:  Objection; form, outside the scope.  Ms. Overbeck, you can answer, to the extent that you know.

     THE WITNESS:  I'm not aware of an agreement.

BY MR. KATZ:

   Q   What policies did Goldwater have in place as of May 2020 -- sorry.  What policies or procedures did Goldwater have in place in and around May 2020 relating to the service transferring of a loan of the kind that

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

129

Mr. Elizarov's is?

     MS. KRYSAK:  Objection; form, outside the

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

scope.  Let's help Mr. Katz here, Ms. Overbeck.  You can

answer the question, to the extent there's a policy or

procedure applicable to Mr. Elizarov's loan.

       THE WITNESS:  I'm not aware if there's a

policy or procedure particular specifically to

Mr. Elizarov's loan.

BY MR. KATZ:

   Q   Yeah, I'm not asking if there's a policy or

procedure in which Mr. Elizarov's name appears or a

specific loan number appears but for a loan -- are there

any policies applicable to loans like Mr. Elizarov's

relating to the service transferring of a loan?

   A   No, not that I am aware of.

   Q   Goldwater -- in May 2020 Goldwater --

according to its complaint, Goldwater service

transferred Mr. Elizarov's loan to Weststar.  Are there

any policies applicable to that transaction for how the

service transfer occurs?

       MS. KRYSAK:  Objection; form, outside the

scope, asked and answered.  You can answer, to the

extent that you know, Ms. Overbeck.

       THE WITNESS:  No, not that I am aware of.

BY MR. KATZ:

   **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

Page 95

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
130

         Q    Are there any procedures in place for when a

loan like Mr. Elizarov's loan is service transferred to

Weststar?

         MS. KRYSAK:  Objection; form, outside the

scope, asked and answered.  You can answer, to the

extent that you know, Ms. Overbeck.

         THE WITNESS:  Like Mr. Elizarov's loan, not

that I am aware of, no.

         MR. KATZ:  I'm going to share on the screen a

new exhibit, which I am going to mark -- I'm going a

little out of order.  I'm going to mark that as 140, as

new Exhibit 140.

              (Exhibit 140 was marked for

              identification.)

BY MR. KATZ:

         Q    Are you familiar with this kind of document?

I'll scroll down, and you can see it's got a Goldwater

Bates number at the bottom.

         A    No, I am not familiar with that document.

         Q    Is there a system Goldwater uses to annotate

events occurring in the loan after disclosing?

              MS. KRYSAK:  Objection; form, outside the

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

scope.  You can answer, to the extent that you know,

Ms. Overbeck.

THE WITNESS:  When you say annotate, do you

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

131

mean, like, making note in a conversation log?

BY MR. KATZ:

Q    Well, like, do you see here, there's a note on

this document produced by Goldwater from January 9,

2020, from GLD Amanda that says, attempted to contact --

looks like an acronym for borrower.

A    Uh-huh.

Q    The attempt to contact borrower, is that part

of the servicer's job?

A    You had asked Goldwater, but this is a

Weststar mortgage loan servicing.  And I'm not sure what

system they use to generate this.

Q    Do you know if Goldwater has access to this

Weststar-generated system used to generate this

document, Exhibit 140?

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, you can answer, to the extend that

Page 97

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
you know.

THE WITNESS:  I don't know if anybody at

Goldwater has access to this.  I don't.

BY MR. KATZ:

Q    When was Mr. Elizarov's loan service

transferred from Goldwater to Weststar?

A    May of 2020.

Q    How did Goldwater make notes -- internal notes

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
132

regarding Mr. Elizarov's loan prior to May 2020 service

transfer?

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

Q    What is the process or procedure by which a

loan that is in default gets prepared for foreclosure at

Goldwater?

MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, please do not answer.  Mr. Katz,

is there a topic?  What topic are we on?

MR. KATZ:  Let's explore Topic 14, the status

of the mortgage loan.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

    Q    As of March 2021 was Mr. Elizarov's mortgage

loan in default?

    A    March 2021, he was originally in forbearance

and had not made payments.  Once the forbearance was

lifted, he was going into foreclosure.

    Q    What do you mean going into foreclosure?

    A    Well, there's a process that Weststar has to

follow as far as the legalities, I guess, of going

through a foreclosure procedure.

    Q    What is that process?

    MS. KRYSAK:  Objection; form, outside the

scope.  And you are asking about Weststar procedures.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

133

We're here with Goldwater.

    THE WITNESS:  Yeah, I don't have -- like Abbey

says, I'm with Goldwater.  I don't have a Weststar

procedure for what they do for foreclosure.

BY MR. KATZ:

    Q    Do you know whether that process had started

for Mr. Elizarov's loan as of March 2021?

    MS. KRYSAK:  Objection; form, outside the

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

scope.  Also, she just said she doesn't know anything

about Weststar.  Asked and answered.

BY MR. KATZ:

    Q    Had the foreclosure process begun for

Mr. Elizarov's loan as of March 2021?

    A    I don't have access to what Weststar's process

is.  If you can provide that document, I can review it.

What I have seen are just the statements of him not

making mortgage payments.

    Q    More of what I previously identified as

Exhibit 140, particularly this line here.  This is

page 4 of Exhibit 140 from August 27, 2020.  It says

borrower is on August FC list.  Do you know what the FC

list is?

        MS. KRYSAK:  Wait.  This is outside the scope.

Mr. Katz --

        MR. WAGNER:  We're talking about the status of

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

134

the loan in March of 2021.  She said it was in default.

And then, if you want to ask about the payment history

between February 2021 and April 2021, that's the next

part of this.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MR. KATZ:  I'm laying a foundation.

        MR. WAGNER:  But this note from Weststar --

BY MR. KATZ:

   Q   Are you familiar with the term the FC list?

        MR. WAGNER:  Objection; outside the scope.

She's not going to answer.

BY MR. KATZ:

   Q   Was Mr. Elizarov's mortgage loan on an FC list

as of March 2021?

   A   I am not aware.

        MS. KRYSAK:  Objection; form, outside the

scope.  To the extent that -- you can answer, to the

extent you know.

        THE WITNESS:  I'm not aware of a list.

BY MR. KATZ:

   Q   Is Goldwater made aware of any nonperforming

loans that are potentially going to be foreclosed on by

Weststar?  Is that part of information that Weststar

provides to Goldwater for its loans?

        MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, please don't answer.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

135

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

    Q   As of March 2021 was Goldwater aware that
Mr. Elizarov's loan was being considered for
foreclosure?

        MS. KRYSAK:  Objection; form.  You can answer,
to the extent you know.

        THE WITNESS:  Based on the documents that were
reviewed and provided, I believe Goldwater was aware at
that time.

BY MR. KATZ:

    Q   What is Goldwater's process when a loan -- or
procedures when a loan is identified as being put into
foreclosure?

        MS. KRYSAK:  Objection; form, outside the
scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

    Q   What is the term -- what are Weststar's
duties, as servicer, for Mr. Elizarov's loan?

        MS. KRYSAK:  Objection; form, outside the
scope.  Please don't answer, Ms. Overbeck.  Also -- do
you know what?  Never mind, Ms. Overbeck.  You can
answer, to the extent you know what Weststar's policies
and procedures are.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
            THE WITNESS:  Well, I think he referred to it

as duties.


     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
136


            MR. KATZ:  I didn't ask policies and

procedures; I asked duties.

     Q    What was Weststar's -- what was Weststar

supposed to do when it began servicing Elizarov's loan?

            MS. KRYSAK:  You do understand, Mr. Katz, that

we're here on a deposition for Goldwater, right?

BY MR. KATZ:

     Q    What did Goldwater believe that Weststar was

supposed to do when Weststar began servicing

Mr. Elizarov's loan?

            MS. KRYSAK:  Objection; form, outside the

scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

     Q    Did Goldwater have any instructions to

Weststar relating to the servicing of a loan at the time

of a service transfer?

     A    Not that I am aware of, no.

     Q    How did the service transfer occur?

            MS. KRYSAK:  Objection; form, outside the
                        Page 103

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

scope.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

    Q    How did Goldwater -- did Goldwater communicate

to Weststar that Weststar was supposed to start

servicing Mr. Elizarov's loan?

    A    I'm not aware of a specific communication

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

137

for -- from Goldwater to Weststar to start servicing his

loan.  Are you referring to May of 2020?

    Q    Yes.  Is that -- that's when you said they

started servicing.  How did Goldwater communicate to

Weststar that Weststar was supposed to start servicing

the loan?

    A    I don't see -- I wasn't privy to any email

communications from Goldwater to Weststar making that

request.  Can they be provided?

    Q    When did Goldwater come into possession of the

original deed of trust for Mr. Elizarov's loan?

    A    When did Goldwater become in possession of the

original deed of trust that wasn't recorded?

    Q    Yes.

Page 104

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    I believe it was around March 25th/26th that

it was shipped from our custodian Weststar to Goldwater.

Q    Are there any documents that reflect what

Weststar's responsibility, as a servicer, are upon --

for when Weststar starts taking over as a servicer for a

loan?

MS. KRYSAK:  Objection; form, outside the

scope, asked and answered.  Please don't answer,

Ms. Overbeck.  Mr. Katz, can we talk about relevance

here?  Can you let me know when you are going to get to

any relevant questions or explain to me why all of this,

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

138

the line of questioning you have been utilizing over the

past two hours, is relevant?

MR. KATZ:  I'm trying to get background

foundation for Goldwater's claims and factual basis.

MS. KRYSAK:  And what does servicing

responsibilities or related -- what does servicing

responsibilities have to do with that?  Goldwater's

claim against Bank of the West is that Bank of the

Wealth and Howlett knew at the time that they funded the

loan about Goldwater's lien.  So tell me what is

Page 105

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

relevant about --

       MR. KATZ:  Let's go to that.

       MS. KRYSAK:  -- service transferring.

BY MR. KATZ:

   Q    What is the factual basis for Goldwater's contention that Bank of the West knew about Goldwater's lien at the time that the Elizarov-to-Howlett sale closed?

       MS. KRYSAK:  And so I'm going to object -- right? -- as before to a narrative and to attorney-client privilege and attorney work product.  If you'd like to be more specific and ask about facts, that would be helpful.  Thank you.  Ms. Overbeck, please don't answer.

BY MR. KATZ:

   **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

139

   Q    Did Goldwater record its deed of trust?

   A    Goldwater doesn't record deeds of trust.  The title company or County Recorder's Office records the deed of trust.

   Q    Goldwater's deed of trust was not recorded

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

prior to the sale from Mr. Elizarov to Mr. Howlett,

correct?

    A   Are you referring to Elizarov's original

purchase or when Elizarov sold it to Mr. Howlett?

    Q   Goldwater's deed of trust for its loan to

Mr. Elizarov was not recorded as of the time that

Mr. Elizarov sold the property to Mr. Howlett, correct?

        MS. KRYSAK:  Objection; form, outside the

scope.  Also, Goldwater has already stipulated, as all

parties have, that it was filed in April.

BY MR. KATZ:

    Q   Is the subordination agreement part of

Goldwater's factual basis for why it contends that Bank

of the West, and not Mr. Howlett, had notice of

Goldwater's lien?

        MS. KRYSAK:  Same objections.

        MR. LEVOTA:  Objection; calls attorney-client

privileged communications and attorney work product.  If

she has some understanding of that outside of

conversations with counsel, then she may be able to

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

140

answer that.  You are asking her -- you are asking this

Page 107

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

witness to provide you with a list of the legal

arguments and legal contentions made by Goldwater in

this litigation?

       MR. KATZ:  No, I'm asking for the factual

basis for the factual contentions.

       MR. LEVOTA:  And just a narrative of all the

facts that would be relevant to that and facts that she

has only because of conversations she has with counsel

telling her that they are relevant or facts that she

determined on her own and determined that they are

relevant?

       MR. KATZ:  I'm asking Goldwater's position for

the factual basis for its claim that Bank of the West

had notice of Goldwater's lien.  What is the factual

basis for that contention?

       MR. LEVOTA:  Well, I don't think that you

could ask her contention interrogatories during a

deposition.

       MR. KATZ:  I'm not asking --

       MR. LEVOTA:  That's certainly not what this

process is for.  That is the process for

interrogatories, to ask counsel to articulate legal

arguments based on facts in the case.  If you want to

ask her about actual facts, like did you know this, did

Page 108

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

141

Goldwater know that, then that's relevant.  But if
you're asking for a narrative of facts that she may have
solely from conversations that she has with counsel that
are relevant to the legal position in this case, that's
just -- that's not an appropriate question.  And it's
not even a question she can answer.

BY MR. KATZ:

    Q    Did Goldwater have notice that its deed of
trust was not recorded prior to the close of
Mr. Howlett's purchase?

      MS. KRYSAK:  Objection; form, outside the
scope.  You can answer, to the extent that you know,
Ms. Overbeck.

      THE WITNESS:  Yeah, I mean, I just recall
reading through what was provided in email that notified
Goldwater that the deed of trust was not recorded.

BY MR. KATZ:

    Q    Was that an email from Escrow of the West?

    A    No, I believe -- I don't recall what email, if
it came from Bank of the West.

Page 109

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Mr. Katz, do you have the email?

Would you like to show her?

        THE WITNESS:  Yeah, I would like to see --

show me the email.

        MR. KATZ:  Sure.  I'm going to share -- this

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

142

is a document that was previously marked as Exhibit 6.

It's a 17-page long email chain.  I'm referring

specifically to page 4 and an email from Andrea Cross to

Mr. Hill on March 25th at 1:49 p.m.

    Q    Is this the email you were referring to in

which Goldwater learns that its dead of trust had not

been recorded?

    A    Yes, this is the email that I was referring --

that I have read.

    Q    What is Goldwater's standard practice upon

learning that a deed of trust had not been recorded?

        MS. KRYSAK:  Objection; form, outside the

scope.  Is this relevant to a given topic?  Which topic

is this, Mr. Katz?

        MR. KATZ:  I'm trying to figure out what

Goldwater normally does and what happened here.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

   MR. WAGNER:  What does that change in this

case?

BY MR. KATZ:

  Q In response to being --

   MS. KRYSAK:  What does that change in this

case?

BY MR. KATZ:

  Q In response to being notified that its deed of

trust had not been recorded, what did Goldwater do?

   **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

143


   MS. KRYSAK:  What does that change in this

case, Mr. Katz?  It's completely irrelevant.

   MR. KATZ:  We disagree.

  Q What did Goldwater do in response to being

notified that its deed of trust had not been recorded?

   MS. KRYSAK:  Objection; form, outside the

scope.  Please don't answer, Ms. Overbeck.

BY MR. KATZ:

  Q Did Mr. Hill provide Escrow of the West with a

copy of its unrecorded lien instrument prior to the

close of the sale to Mr. Howlett?

     Page 111

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

                MS. KRYSAK:  Is this within the time period

you are talking about, Mr. Katz, that's within the

topics or are you referring to ever?

BY MR. KATZ:

        Q    In the March 2021 time period.

        A    I am not aware that Mr. Hill -- Peter Hill

sent a copy of the deed of trust.

        Q    Why not?  Why didn't Mr. Hill send a copy of

the deed of trust to escrow?

                MS. KRYSAK:  Objection; form, outside the

scope.  Also, that's Mr. Hill.  You can refer to

Mr. Hill's testimony.  Goldwater doesn't know what

Mr. Hill was thinking.

BY MR. KATZ:

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
144


        Q    Mr. Hill is a Goldwater employee?

                MS. KRYSAK:  Please don't answer.

                THE WITNESS:  Did you ask if Mr. Hill is a

Goldwater employee?

BY MR. KATZ:

        Q    Yeah.  He's a Goldwater employee, right?

        A    Yes, Mr. Peter Hill is a Goldwater Bank

                        Page 112

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

employee.

    Q     Why didn't Goldwater send Escrow a copy of its

unrecorded deed of trust as part of Mr. Hill's email

exchange -- or at the time of Mr. Hill's email exchange

with Ms. Cross.

        MS. KRYSAK:  Objection; form, outside the

scope, also irrelevant.

        THE WITNESS:  Can you repeat the question?

BY MR. KATZ:

    Q     Why didn't Goldwater send a copy of its deed

of trust to Ms. Cross around the time of Mr. Hill's

email exchange with Ms. Cross, March 25th, 2021, and

March 26th, 2021?

    A     I don't know why they would send a

non-recorded copy.

    Q     Did Mr. -- did Goldwater ever explicitly tell

Escrow of the West that it was the first position lien

holder for the subject property?

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
145


    A     Yes, I believe in communication between

Mr. Hill, Peter Hill, with Escrow.  And I also believe

                        Page 113

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Elizarov shared that Goldwater was in first position

with Escrow.

    Q   What is the basis for your belief that

Mr. Elizarov told Escrow of the West that Goldwater was

in first position?

    A   I'm sorry.  I might be confused with which

escrow.  Are we talking about the sale to Mr. Howlett or

when he purchased the property?

    Q   I'm talking about the sale to Mr. Howlett.

    A   Got it.  I'm sorry.  I was referring to his --

when he purchased the property.

    Q   So did --

    A   Typically --

    Q   To your knowledge, did Mr. Elizarov ever tell

Escrow of the West during the March 2021 sale to

Mr. Howlett that Goldwater was a lien holder on the

property?

       MS. KRYSAK:  Objection; form, outside the

scope.  Please don't answer, Ms. Overbeck.  What topic

is that relevant to, Mr. Katz?  I'm getting tired of

saying over and over again outside of scope.

BY MR. KATZ:

    Q   Are Mr. Elizarov's representations to Escrow

  **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
146

of the West in and around March 2021 a factual basis

upon which Goldwater is pursuing its quiet title claim?

      MS. KRYSAK:  Again, I'm going to renew the

same objections that Mr. LeVota asserted earlier on you

can ask about specific facts but stop seeking

contentions or legal bases or conversations she shared

with counsel.

BY MR. KATZ:

     Q     Okay.  So is Goldwater aware --

      MS. KRYSAK:  Please don't answer,

Ms. Overbeck.

BY MR. KATZ:

     Q     -- of any representation from Mr. Elizarov to

Escrow of the West that Goldwater was a lien holder at

and around the time March 25th, 2021?

     A     I believe there was communication -- email

communication between Mr. Elizarov and Mr. Peter Hill

about the payoff of the existing first trust deed with

Goldwater Bank.

     Q     Okay.  I appreciate that.  That wasn't my

question.  My question is, Is Goldwater aware of any

communications from Mr. Elizarov to Escrow of the West

Page 115

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

in which Mr. Elizarov represented that Goldwater was a

first lien holder for this property from 2021?

    A    I'm not aware of an email or another form of

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

147

communication.  But from what I reviewed in the

communication, it was clear that Mr. Elizarov shared

with the escrow company to stop communication with

Goldwater Bank.

    Q    Are you aware of any recorded documents --

sorry.  Is Goldwater aware of any recorded documents as

of March 2021 that identified Goldwater as a lien holder

for this property?

    A    The deed of trust was not recorded.

    Q    Other than that deed of trust, is Goldwater

aware of any recorded documents that provide notice that

Goldwater is the first lien holder for the subject

property?

        MR. LEVOTA:  Objection; calls for a legal

conclusion as to what documents would provide notice.

        MR. KATZ:  I'll rephrase it.

    Q    Is Goldwater aware of any recorded documents

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

that identify Goldwater as a lien holder for this

property as of the March 2021 sale to Mr. Howlett?

       MR. LEVOTA:  And you are carving out of that

the subordination agreement that refers to the senior

lender?

       MR. KATZ:  The subordination agreement does

not have the word Goldwater in it.  It does not identify

Goldwater.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

148

       MR. LEVOTA:  So other than that document?

Because I would argue that it does provide information.

So other than that document, you are asking?

       MR. KATZ:  My question --

       MR. LEVOTA:  Other recorded document that

identifies Goldwater as having a first priority lien

against this property?

BY MR. KATZ:

   Q   My question is, Are you aware of any recorded

document that explicitly identifies Goldwater as a lien

holder on this property?

   A   No.

       MR. WAGNER:  What do you think about lunch

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

plans?

       MR. KATZ:  We can take a lunch break.

       MR. WAGNER:  Forty-five minutes good?  An

hour?  What do you guys need?

       MR. LEVOTA:  Let's do 45, if that's okay with

everyone else.

       MR. ALEKSEYEFF:  Sure.

       MR. KATZ:  All right.  I have got 12:41 right

now.  Do you want to come back at 1:30?

       MS. KRYSAK:  Yes.

       MR. ALEKSEYEFF:  This is Ilya.  That works for

me.

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

149

       MR. KATZ:  Great.  We'll come back at 1:30.

Thank you all.

       (Lunch recess.)

BY MR. KATZ:

   Q   Ms. Overbeck, what is the total amount of

attorney fees that Goldwater has incurred to date in

this action?

   A   Dollar, around 650,000.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    And if Goldwater were to be successful in its

declaratory judgment or quiet title claims against Bank

of the West and Howlett, what is the total amount of the

lien Goldwater claims that Bank of the West and Howlett

would be responsible for?

A    I believe -- I'd have to look at the demand

for the exact dollar amount with accrued interest.

Q    Could you ballpark it for me?

A    You want me to ballpark it?  I mean, the

original loan, that was, what, 680,000?  So the original

loan, that was 680,000.  He made two payments, I

believe.

MR. WAGNER:  Hold on just a second, Jeremy.

MS. KRYSAK:  Mr. Katz, since you're asking as

of today, we can -- Ms. Overbeck, if you're comfortable

with that, can ballpark it.  And we're happy to provide

you with an updated payoff statement confirming the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

150

exact amount later today or Monday, if that works.

MR. KATZ:  Yeah, that works.  I'll take a

ballpark figure now, and I'll take a payoff statement

later today or Monday.

Page 119

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

        MS. KRYSAK:  Okay.

        THE WITNESS:  It's around 800,000.

        MR. ALEKSEYEFF:  And Abbey, this is Ilya.
Will you include me in that email that will include that
payoff statement as well, please?

        MR. WAGNER:  That's fine.  She misspoke.  It's
not a payoff statement.  We were just going to get the
exact numbers for you guys --

        MR. ALEKSEYEFF:  Oh, perfect.  Okay.

        MS. KRYSAK:  -- the most up-to-date numbers
and send them over.

        MR. ALEKSEYEFF:  Yeah, if you could just
include me in that communication as well, I'd appreciate
it.
BY MR. KATZ:

    Q    I just want to be clear, for that payoff
amount, what is the total -- what is the total amount of
the lien Goldwater claims Bank of the West and Howlett
would be responsible for if Goldwater would be
successful on its quiet title claim?  Assume, for the
sake of argument, that the Court sides with Goldwater,

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

151

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

enters a quiet title judgment in Goldwater's favor and says that Goldwater's lien is indeed in first position, which is what Goldwater is trying to achieve by way of this action, what is the total amount of the lien that that deed of trust would secure as of today?

A    The question was to me, correct?

Q    Yes.

A    Okay.  So with attorneys fees and the payoff -- I think I already shared the attorneys fees.  So, again, we'll get the exact number.  But I'm looking at probably 800,000.  Is that not the amount?

Q    I'm asking you.

A    Yeah.  If you don't mind, can I refer to the most recent demand?  And then I can somewhat come up with a ballpark figure of interest.

Q    What is the most recent demand?

MR. WAGNER:  Are you just asking, Jeremy, if the full amount of attorneys fees is going to be requested?

MR. KATZ:  Sure.  We can ask that.

Q    Is the full amount of attorneys fees going to be requested as part of the lien?

A    (No audible response.)

Page 121

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
Q    And oath than your attorneys, who appear to be

nodding their heads on the video, if Goldwater prevails

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
152

in its quiet title action such that its lien is deemed

to be in first position, would Goldwater seek to recover

its attorney fee amounts as part of the lien on the

property?

        MS. KRYSAK:  Objection; asked and answered.

Go ahead, Ms. Overbeck.

        MR. LEVOTA:  I don't think we heard Chris say

her answer.

        MR. KATZ:  Thank you, Mr. LeVota.

        THE WITNESS:  Yes.

        MR. LEVOTA:  The answer is yes?

        THE WITNESS:  Yes.

        MR. LEVOTA:  And, obviously, that answer has a

bit of speculation in it and hypothetical and legal

conclusions and all that.

        THE WITNESS:  Yes.

BY MR. KATZ:

    Q    Okay.  That ballpark figure is approximately

600,000 in attorney fees and approximately 800,000 in

Page 122

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

loan payments, ballpark?

       MS. KRYSAK:  I think she said 650,000.  Madam

Court Reporter, can you read that back?

       (Record read.)

BY MR. KATZ:

   Q    All right.  Did Goldwater ever communicate

      **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

153

directly with Mr. Howlett regarding Goldwater's alleged

first lien holder position status?

   A    Did Goldwater communicate directly with

Mr. Howlett?  Was that the question?

   Q    That is the question.

   A    From my understanding, what I've reviewed, no.

   Q    Okay.  Did Goldwater ever communicate directly

with Bank of the West regarding its alleged lien holder

status?

   A    From what I've reviewed, no, I did not see

communication directly from Goldwater to Bank of the

West.

   Q    Did Goldwater ever communicate directly with

Mr. Howlett's real estate agent for the sale transaction

Page 123

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

from Mr. Elizarov regarding Goldwater's alleged lien

holder status?

      MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, you can answer, to the extent that

you know.

      THE WITNESS:  In this particular case I'm not

aware of Goldwater Bank communicating with a real estate

agent.

BY MR. KATZ:

    Q    Are you aware of Goldwater communicating with

a real estate broker about its lien holder status in and

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

154

around March 2021?

    A    I am not aware of any communications between

Goldwater Bank and a broker.

    Q    Okay.  Other than communications between

Goldwater Bank and Escrow of the West, are there any

other direct communications from Goldwater regarding its

status as a lien holder for this loan that formed the

basis of Goldwater's claims?

    A    I have reviewed email communication between

Goldwater Bank and Escrow of the West, along with

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Goldwater communicating with First American Title.

    Q   Are you aware of any telephone communications between Goldwater Bank and Escrow of the West from March 2021?

    A   I'm sorry.  What kind of communications, to be clear?

    Q   Telephone.

    A   I did not have the opportunity to review any phone records.

    Q   Are you aware of any telephone calls that were made between Goldwater and Escrow of the West in March 2021 regarding Mr. Elizarov's loan or the proposed sale of the property?

    A   I recall reading an email between Mr. Peter Hill and Escrow of the West about having a phone call.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

155


    Q   But are you aware of the actual occurrence of any phone calls, other than a reference to a phone call in that email?

    A   I'm not aware of a phone call.

    Q   So this is a good opportunity just to take a

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
brief switch for a moment.  We have been referring in

this deposition to something that we have been calling

the property.  I have been meaning by the property as

the real property commonly known as 291 West Overlook

Road in Palm Springs, California 92264.  Does that match

your understanding of the term the property that we have

been using?

        A    Yes.

        Q    Okay.  And that's --

        MS. KRYSAK:  Which -- I mean, was there a

specific -- which questions?  Mr. Katz, which questions?

I think you have referred to both Howlett's -- you know,

the property, other properties.  I mean, which question

specifically are you looking for that to apply to.

        MR. KATZ:  We have had discussed of the

property, in air quotes.  I don't think we've ever

actually defined the property during this deposition, so

I just wanted to make sure.

        Q    There's a property in Palm Springs that formed

the basis of Goldwater's loan to Mr. Elizarov, right?

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
156

        A    Yes, there is a loan against the property for
                        Page 126

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Elizarov.

    Q    And this entire time I have been using the
term the property to refer to that property, the one
that formed the basis of the loan to Mr. Elizarov.  Is
that matching the way that you have used that term?

        MS. KRYSAK:  Again, objection to the extent --
I'm not really sure which times you are referring to
when you referred to the property.

BY MR. KATZ:

    Q    Are there any -- I've always referred to it --

        MS. KRYSAK:  You can answer, to the extent you
know, Ms. Overbeck.

BY MR. KATZ:

    Q    I just want to say, if we use -- if we say the
property, I'm referring to the Palm Springs property
that forms the basis of -- is part of Goldwater's loan
to Mr. Elizarov?

    A    Understood that, when you refer to the term
the property, that you are referring to the subject
property located in Palm Springs.

    Q    Okay.  All the times that I have been asking
you questions today, have you understood the term the
property to mean anything else?  Because I always meant
it to refer to the Palm Springs property that's at issue

Page 127

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

157

here.

    A   It never occurred to me that you were referring to another property.

    Q   Okay.  So you also understood the term the property to refer to the Palm Springs property at issue in this lawsuit and that was part of Mr. Elizarov's loan from Goldwater, right?

    A   Yes, I understand that, when you are referring to the property, that you were referring to the subject property of this case.

    Q   Okay.  Thank you.  I just wanted to clear that up, make sure there's no confusion.  All right.  You mentioned an email from Goldwater to Escrow of the West. And you said there was an email that you saw -- or a communication from Goldwater to First American.  Are there any other emails that you are aware of in which Goldwater articulated its status as a lien holder for the property in Palm Springs to Escrow of the West?

    A   I reviewed what was provided to me, and I did see emails to Bank of the West and an email regarding

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
First American and recording of the deed.

        Q    I'm sorry.  You saw an email to Bank of the
West?

        A    I'm sorry.  Escrow of the West.

        Q    Okay.  So you have not seen -- just to circle

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
158

that square, you have not seen any direct communications
between Goldwater Bank and Bank of the West?

        A    In the documentation that was provided to me,
I did not see an email from Goldwater Bank and/or to
Bank of the West.

        Q    All right.  And are you aware of any phone
calls from Goldwater Bank to Mr. Howlett in and around
March 2021 regarding Goldwater's lien holder status?

        A    I don't believe I was provided any phone
records to review as part of this case.

        Q    Okay.  Are you aware of any telephone calls
occurring -- or any direct communications in writing or
by phone between Goldwater and Mr. Howlett from around
March 2021 regarding Goldwater's lien holder status?

        A    Again, I don't have access -- or I was not
provided any phone records to review.  I am not aware,

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

since I don't have phone records to review.

Q    Are you aware of any phone communications directly between Goldwater and Bank of the West regarding Goldwater's lien holder status that occurred in and around March 2021?

A    In the documentation that was provided to me for review, there -- I did not see any phone records for review.

Q    And I am going to ask a few more, just to

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

159

round out, make sure.  Are you aware of any telephone calls from Goldwater directly to the agents or brokers for the transaction in which Mr. Elizarov sold the property to Mr. Howlett regarding Goldwater's lien holder status?

MS. KRYSAK:  Mr. Katz, just to be clear, do you mean real estate agents when you --

MR. KATZ:  Real estate agents.

MS. KRYSAK:  -- say agents?  You are not using the legal term, right?

MR. KATZ:  No real estate agents.

Page 130

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

          MS. KRYSAK:  Okay.  Thanks.

          THE WITNESS:  Excuse me.  Again, I was not

provided any phone records or documentation that there

was a phone call -- or phone call or phone calls made to

any of the real estate agents or broker that you

referred to.

BY MR. KATZ:

     Q    Are you aware of any communications from

Goldwater prior to March 2021 to either Escrow of the

West, Mr. Howlett, or Bank of the West regarding

Goldwater's lien holder status prior to March 2021?

     A    I believe that Goldwater Bank, based on the

emails that I recall, there was email communication with

Escrow of the West when, I believe, the demand was

          **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

160

requested.

     Q    Are you referring to an email chain involving

Mr. Peter Hill and Ms. Andrea Cross?

     A    Yes.

     Q    Okay.  I'm going to bring that email chain up

in a second.  We can go through it.

     A    Thank you.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    And that email chain, I'll represent to you,
the start of it is in March 22nd, 2021, and the tail end
of it is in March 26, 2021.  Other than that email
chain, have you seen any -- are you aware of any
communications from Goldwater to Escrow of the West
regarding Goldwater's lien holder status?

A    If I could refer back to the emails, I believe
there was another communication with another escrow
officer at Escrow of the West, but I don't recall the
name.  I'd have to go back and look.

Q    Do you recall when that other communication
was?

A    Not off the top of my head.  No, sir.

Q    Do you remember anything about what was said
in that other communication?

A    I believe there was an email, and maybe it was
Ms. Cross that was escalating to her supervisor.

Q    Are you referring to a communication where

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

161

Ms. Cross provides information about how to contact her
supervisor?

Page 132

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    I believe she shared the name of her

supervisor and possibly the email address.

Q    Okay.  I'm going to show you -- I'm going to

share my screen.  All right.  On the screen right now,

full page, is a document that was previously marked as

Exhibit 6, and we'll use Exhibit 6 to indicate it here

too.  It's a 17-paged document.  This is the email chain

I was referring to that the tail end of which was

March 26, 2021, between Mr. Hill and Ms. Cross.  I'm

going to briefly scroll to the bottom to find the

chronologically first one.  The chronologically first

email of that chain is dated March 22, 2021, from

Ms. Cross to Mr. Hill.  And I'm going to show you in

this -- we'll go more specifically through it.  In this

email chain on page 2 Ms. Cross on March 25th provides

the name of her office manager with an email address.

And if you want, we could take the time to have you read

through -- is this one -- to have you through page by

page.  But is this one of the documents that you

reviewed in preparation for today's deposition?

A    Yes.

Q    So other than this email exchange in Exhibit 6

between March 22nd and March 26th, are you aware of any

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
Page 133

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

162

other direct communications between Goldwater and Escrow

of the West regarding Goldwater's alleged lien holder

status?

     A     I believe I read a lot more emails than just

this one.

     Q     Again, this is a 17-paged long email chain.

I'm referring to entire chain.  And if you want --

     A     Yes, I've read this.

     Q     -- we can take a break to have you look

through the entirety of the document.

     A     Okay.  We can do that.

     MR. LEVOTA:  And what is the question pending?

BY MR. KATZ:

     Q     The question is, Other than this email

exchange, the entire exchange in Exhibit 6, are there

any other direct communications from Goldwater to Escrow

of the West regarding Goldwater's alleged lien holder

status?  And I'll ask it -- I'll phrase it a slightly

different way as you consider it during the upcoming

break.  Is this email the entire universe of the

communications from Goldwater -- is this email chain the

entire universe of communications from Goldwater to

Page 134

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Escrow of the West regarding Goldwater's alleged lien

holder status?

        MR. LEVOTA:  Is this supposed to be like a

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

163

trick question because --

        MR. KATZ:  No.

        MR. LEVOTA:  -- Cross Exhibit 16 is the same

email chain with a different email at the top.  I mean,

are you talking about -- I mean, so there's, obviously,

an email outside of this email chain.

        MR. KATZ:  I'm sorry.  The only difference

between this Exhibit 6 and the Exhibit 16 appears to be

a responsive email that says thank you, which would not

seem to pertain to a lien holder status.  I'm not trying

to -- I'll have you take a look over the break at both

Exhibit 6 and Exhibit 16.

        MR. LEVOTA:  I'm not trying to make it more

difficult.  I just want to make sure that -- you are

saying now 6 and 16, is she aware of any emails outside

of those as direct communications between Goldwater and

Escrow of the West, and then you are adding onto that

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
specifically regarding their lien status.  And I'm not

trying to put any words; I'll just trying to understand

the question.

          MR. KATZ:  We'll take it a step back.

     Q    Over the break take a look at 6 and 16.  And

other than those, are you aware of any other direct

email exchanges between Goldwater and Escrow of the West

regarding the loan?

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
164



          MS. KRYSAK:  All right.  Great.  Thank you.

          MR. KATZ:  Do you folks need me to circulate a

copy, or do you have one that you can make available to

the witness?

          MS. KRYSAK:  It's 6 and 16.  If you can

circulate copies, that would be great.

          MR. KATZ:  Yeah.  One second.

          MR. LEVOTA:  Include eight.

          MR. KATZ:  Sure.  I'll include 8.  And I'm not

trying to set this up as a trick question.  I want to

know if this email exchange, including any attachments

that were exchanged as part of this email exchange, I

want to know if this is any other email -- if this is

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

the universe of emails between Goldwater and Escrow of

the West.  So one second.  I'll see if I can --

        MR. LEVOTA:  Forty-five.

        MR. KATZ:  I'll put it a different way.  I'm

trying to determine the universe of the email

communications.  I believe it is functionally 6, but

you're right 8 and the other one have slight add-ons

where there's a word thank you.  I'm trying to determine

the exact universe of communications between Goldwater

and Escrow of the West regarding the loan.

        MR. LEVOTA:  And I am just trying to help

that.

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

165

        MR. KATZ:  Yep.  Let's go off the record.

I'll email these.

        (Recess.)

        MS. KRYSAK:  Mr. Katz, for the record, she was

able to review all eight exhibits that you did email

over, along with the additional exhibits to Ms. Cross'

deposition.  So go right ahead, Mr. Katz.

BY MR. KATZ:

Page 137

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    All right.  So over the break I sent you

exhibits that have been premarked as 6, 16, and -- 6 and

16 and a few others, which I believe are the email

exchanges, along with some attachments from those email

exchanges, that I think may comprise the entire universe

of email exchanges between Goldwater and Escrow of the

West.  Specifically, I sent you Exhibit 16, Exhibit 8,

Exhibit 6, Exhibit 7, Exhibit 10, Exhibit 2, a duplicate

copy of Exhibit 6 and it looks like a duplicate copy of

Exhibit 7.  You've reviewed those emails and those

attachments.  Are those exhibits, at least the email

chain portion of those exhibits, the universe of emails

from Goldwater to Escrow of the West regarding

Elizarov's loan?

A    Yes, for the email communication, yes.

Q    Other than those email communications I had

just sent you, are you aware of any other communications

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

166

from Goldwater to Escrow of the West regarding

Elizarov's loan?

A    In reviewing the documents that you provided,

along with, I think, Exhibit 25, and referring back to

Page 138

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

some of the depositions, I believe there was a phone

call made from Pete, Mr. Pete Hill.  But we don't have

phone records.

    Q   Goldwater doesn't have phone records of that

call?

    A   I was not provided phone records.

    Q   Do you have any understanding of the specific

contents of that phone call between Mr. Hill and Escrow

of the West?

    A   I do not have any information on that verbal

confirmation -- or conversation between Pete.

    Q   Who at Escrow of the West did Mr. Hill talk to

by phone that you were referring to?

    A   According to -- after reviewing his

deposition, it was Ms. Cross.

    Q   All right.  I'm going to bring up Exhibit 6.

Are you able to see it on your screen?

    A   Yes, I can see the document on the screen.  I

can't read it, but I could see it.

    Q   I'll make it bigger.  I just wanted you to see

the whole page and the exchange.  In here there is -- in

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

167

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

this email exchange there is an email from Mr. Hill to

Ms. Cross dated March 25, 2021, at 11:06 a.m. in which

Mr. Hill says here is our payoff letter.  The payoff

letter that was attached to Mr. Hill's March 25th, 2021,

email was for a borrower who is not Mr. Elizarov,

correct?

    A   From what I understand, yes.

    Q   And it was for a property that is not the

property at issue in this lawsuit, correct?

    A   From what I understand, correct.

    Q   Okay.  It was in fact for a property in an

entirely different state?

    A   I'd have to review the document.  I'm not sure

what state -- I recall what state it was in.

    Q   This is the document that was -- now on the

screen is Exhibit 10, previously marked from a prior

depo, so we'll mark it as 10 for this one, too.  This

was the email that Mr. Hill testified -- or the payoff

calculation Mr. Hill testified was attached to his

March 25th email to Ms. Cross.  This is for borrowers

name Jared and Paige Gillman for a property in Palm

Beach County, Florida, correct?

    A   Yes, that is correct.

Page 140

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    And Mr. Hill never sent Escrow of the West a

payoff demand on Weststar letterhead for Mr. Elizarov's

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

168

loan, correct?

     A    In this email it appears he attached the

incorrect payoff.  I don't believe he re-sent the

correct one.

     Q    All right.  I'm referring back to the

Exhibit 6 email exchange.  This March 25th, 2021, email

from Mr. Hill to Ms. Cross, this is the email in which

Mr. Hill transmitted an incorrect payoff quote to Escrow

of the West, correct?

          MS. KRYSAK:  Objection; form.

          THE WITNESS:  From reviewing this email that

is from what I -- after I reviewed, correct.

BY MR. KATZ:

     Q    And in the chain Ms. Cross notified Mr. Hill

that he had sent a payoff quote for a different

borrower, correct?

     A    Yes.  It says, this is for a different

borrower.

     Q    So at least as of March 25th, 2021, at

Page 141

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

11:12 a.m. Mr. Hill was notified that he had sent an incorrect payoff quote for a different property in a different state, correct?

A    Yes, in reviewing this email, correct.

Q    Right.  Now, right above that there's an email from Mr. Hill as part of the Exhibit 6 exchange,

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

169

March 25th, 2021, at 1:30 p.m., where Mr. Hill says here is the correct payoff statement.  Now, there was no payoff statement attached to Mr. Hill's March 25th, 2021, 1:30 p.m. email, was there?

A    Upon reviewing all the documentation in this email, I am aware that he did not attach the corrected payoff statement.

Q    Did Mr. Hill ever provide Escrow of the West with a payoff statement for Mr. Elizarov's loan?

A    Based on this chain, it doesn't appear that he attached the corrected one.

Q    Yes.  But my question was, Did Mr. Hill ever provide a correct payoff statement for Mr. Elizarov's loan to Escrow of the West?

Page 142

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    I'd have to go back and look through the

documentation.  I don't recall.

Q    Are you aware of any communication where

Mr. Hill provided Escrow of the West with a payoff

statement for Mr. Elizarov's loan prior to the close of

the sale of the property for Mr. Elizarov to

Mr. Howlett?

A    I don't recall.

Q    Mr. Hill received from Weststar a payoff

demand for Mr. Elizarov's loan around this time, right?

MS. KRYSAK:  Objection; form, outside the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

170

scope.  You can answer, to the extent that you know,

Ms. Overbeck.

THE WITNESS:  I believe that Weststar -- I'm

not sure how or how it was communicated, but I believe

Pete received a payoff from Weststar.

BY MR. KATZ:

Q    For Mr. Elizarov's loan?

A    For Mr. Elizarov's loan, correct.

Q    All right.  I'm going to scroll earlier in

time in this email chain.  Going to the part of the

Page 143

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Exhibit 6 email chain March 22nd, 2021, in here

Ms. Cross at 11:47 a.m. emails Mr. Hill.  And among

other things she says attached is a request for a payoff

demand.  Also enclosed is a copy of the purchase

agreement.

      MS. KRYSAK:  Mr. Katz, I don't see the email

on screen anymore.

      MR. KATZ:  Oh, so sorry.

      MS. KRYSAK:  Did you mean to take it down?

      MR. KATZ:  Now can you see the email on your

screen?

      MS. KRYSAK:  Yes.

      MR. KATZ:  Thank you, Ms. Krysak.

   Q   So as part of the Exhibit 6 email exchange, on

March 22nd Ms. Cross represents that she is sending a

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

171

payoff demand and a copy of the purchase agreement.  I'm

going to open up a document that was premarked from a

prior deposition as Exhibit 2, and we'll call it

Exhibit 2 here as well.  It's a copy of a Residential

Purchase Agreement and Joint Escrow Instructions dated

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

2/12/2021 from Mr. Howlett to Mr. Elizarov for the

purchase of the subject property.  Did Goldwater

actually receive a copy of this purchase agreement by

way of Ms. Cross' email exchange with Mr. Hill?

    A   I read through the email, but I'm not sure if

I saw a copy of this.

    Q   You're not sure if you saw a copy of the

actual purchase agreement?

    A   Correct.

    Q   Do you know one way or the other whether

Goldwater received a copy of the purchase agreement for

Mr. Howlett's purchase of the property from

Mr. Elizarov?

    A   Well, the email said Ms. Cross sent it to Pete

Hill.  Is that correct?

    Q   I'll put them side by side.

    A   Okay.

    Q   I'm going to have to make the Ms. Cross email

a wee bit smaller.  All right.  So looking at them side

by side, on the left you should be seeing part of

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

172

Exhibit 6, the email exchange; on the right is the

Page 145

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

purchase agreement.  In the email exchange she says also
enclosed is a copy of the purchase agreement.  Do you
know whether --

        A    Yes.

        Q    Okay.  Do you know whether Goldwater received
a copy of the purchase agreement that is referenced in
Ms. Cross' email here?

        A    From what I understand, yes.

        Q    Okay.  And there's -- also in her March 22nd
email there's a reference to a payoff demand.  I'm going
to bring it up.  This is an exhibit that was used from a
prior depo as Exhibit 7, and we'll use it as seven here,
a Request for Demand from Escrow of the West dated
March 3rd, 2021.  I can zoom in on it, if you need.  But
to your understanding, is this the payoff demand that
was transmitted from Ms. Cross to Mr. Hill by way of
that March 22nd email?

        A    Yes.

        Q    I can zoom in, if you'd like.

        A    If you don't mind.  Okay.  Thank you.  Thank
you.

        Q    All right.  So I'm going to put them side by
side for a moment.  Is Exhibit 7 a payoff demand -- or
sorry.  Is the Request for Demand in Exhibit 7, is that

Page 146

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

173

the payoff -- request for payoff demand referenced in
Ms. Cross' March 22nd, 2021, email?

A    Yes.  She states that she attached the payoff
demand.

Q    And Goldwater received the Exhibit 7 payoff
demand by way of Ms. Cross' March 22nd, 2021, 11:47 a.m.
email?

A    Yes.

Q    And the Exhibit 7 email (sic) is addressed to
Unison Midgard Holdings, LLC, care of Goldwater Bank.
Do you have an understanding as who Unison Midgard
Holdings, LLC is?

A    Unison is the subordinated second between --
behind Goldwater Bank's first when Mr. Elizarov first
purchased the home.

Q    One brief moment.  All right.  In the Exhibit
7 Request for Demand that Goldwater received from
Ms. Cross by way of her March 22nd, 2021, email, here
near the bottom there's a reference to -- or in the
middle please forward all documents necessary to release

Page 147

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

your encumbrance and memorandum, together with your

demand to Orange Coast Title.  And there's an attention

and all that.  Did Goldwater have a memorandum relating

to its loan to Mr. Elizarov?

    A   I'm not aware of a memorandum.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

174

    Q   Do you know if Unison had a memorandum

relating to its -- the Unison's loan to Mr. Elizarov?

    MS. KRYSAK:  Objection; form.

    THE WITNESS:  I don't know what Unison had in

place, except the subordination agreement.

BY MR. KATZ:

    Q   Do you know what form of documents Unison

recorded, other than the subordination agreement?

    MS. KRYSAK:  Objection; form.

    THE WITNESS:  The only document I referred to

is the recorded Unison subordination agreement that went

behind Goldwater's first.

BY MR. KATZ:

    Q   Do you have any idea of what the memorandum is

that's being referenced in this Request for Demand

that's in Exhibit 7?

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

A    I'm not sure what Escrow of the West was

specifically asking for, if there was a memorandum.

Q    And then down here further there's a reference

near the bottom of Exhibit 7 to a Memorandum of

HomeBuyer Agreement.  Does Goldwater have any sort of

loan documents for its loan that is a Memorandum of

HomeBuyer Agreement?

MS. KRYSAK:  Jeremy, do you mean the loan for

Mr. Elizarov?

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

175

MR. KATZ:  Yeah.

MS. KRYSAK:  Go ahead, Ms. Overbeck.

THE WITNESS:  If you don't mind, if you can

just zoom in so I can read that sentence.

BY MR. KATZ:

Q    Sure.  This part, I can even put a box around

it, if you need.  I'm going to draw a temporary box

around what I'm referring to here, where it says

Memorandum of HomeBuyer Agreement.

MR. WAGNER:  Can you make it full screen so we

can see the whole sentence?

Page 149

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

MS. KRYSAK:  Yeah, I'm sorry about that.  Did you hear Sean, Jeremy?  Can you just make that one the full screen?

THE WITNESS:  Yeah, thank you.

MR. KATZ:  I'm zooming it up so it's front and center.

THE WITNESS:  There we go.

MS. KRYSAK:  It just when in split screen.  It can be a little tough.  Thank you for that.

MR. KATZ:  I understand.

Q    So this part that I've drawn a temporary box around here, where it says Memorandum of HomeBuyer Agreement, to the best of your knowledge, is the Memorandum of HomeBuyer Agreement a part of Goldwater's

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

176

loan documents for Mr. Elizarov's loan?

A    If you don't mind, I'm just going to read the whole sentence.  Sorry.

Q    Sure.  I'll take the box off.

A    Perfect.  Thank you.  And I am not familiar with a Memorandum of a HomeBuyer Agreement as part of our loan documents.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    To the best of your understanding, if you know, is the Memorandum of HomeBuyer Agreement part of Unison's loan documents for Unison's loan to Mr. Elizarov, if you know?

          MS. KRYSAK:  Objection; form.

          THE WITNESS:  I do not know.

BY MR. KATZ:

Q    In this email exchange Mr. Hill on March 22nd, 2021, at 12:34 p.m. in the Exhibit 6 email exchange he references that he's forwarded the request to Melissa Melendez, who handles this for the mortgage company.  Do you know who Melissa Melendez is?

A    It looks like she was an employee at West Loan.

Q    By West Loan, do you mean Weststar?

A    I'm sorry.  Yes.

Q    Is there a company called Westloan that's affiliated with Goldwater?

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

177

          MS. KRYSAK:  Objection; form.

          THE WITNESS:  I believe they are affiliated

                    Page 151

2023.0512 PMK of Goldwater Depo Transcript _ROUGH with Weststar.

BY MR. KATZ:

Q    Do you have any understanding of the relationship between Weststar and Westloan?

MS. KRYSAK:  Objection; form.

THE WITNESS:  They are one and the same.

BY MR. KATZ:

Q    So here in this March 22nd, 2021, 12:34 p.m. email Melissa Melendez appears to have an email address ending in Westloan.com.  Is it your understanding that that is a Weststar email address?

A    That is correct.

Q    Ms. Melendez response up above at 12:44 p.m. on March 22nd saying that she has received the request. Other than the email exchanges that you reviewed during the break that I had circulated during the break, are you aware of any other email exchanges from Ms. Melendez to Escrow of the West regarding Goldwater's loan, other than this email exchange here and the other ones you reviewed during the break that we have discussed before?

A    I reviewed the ones that were provided over the break, and that's what I -- that I reviewed.  Is there a different chain that I should be reviewing?

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
Page 152

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
178

Q    My understanding is that the emails that were
provided -- that I provided to you and circulating
during the break constitute the universe of
communications from Goldwater to Escrow of the West and
also from Weststar to Escrow of the West regarding
Goldwater's loan.  Is that your understanding as well?

        MS. KRYSAK:  Objection; form.

        THE WITNESS:  I reviewed these emails, the
chain, regarding -- from West- -- between Weststar,
Goldwater and Escrow of the West.

BY MR. KATZ:

Q    Are you aware of any other emails from
Weststar to Escrow of the West about Goldwater's loan?

A    Specific to Mr. Elizarov, no.

Q    Up the email chain, at March 22nd, 2021,
12:51 p.m. in the Exhibit 6 email chain there appears to
be an email from Ms. Melendez to, among others, Andrea
Cross and Matt Teskey.  Matt Teskey was the president of
Goldwater Bank at that time?

        MS. KRYSAK:  Objection; outside the scope.
You can answer, to the extent that you know.

        THE WITNESS:  He was president of the mortgage
                        Page 153

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

division.

BY MR. KATZ:

    Q    Okay.  So he's not president of the overall

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
179

bank, just the mortgage division?

    A    Correct.

    Q    All right.  And on March 24th Ms. Melendez
sends an email at 10:01 p.m. to Ms. Cross, Mr. Hill, and
Mr. Teskey representing that a payoff demand will arrive
by the end of the business day, at the latest.  Is that
how you understand Ms. Melendez's March 24th, 2021,
10:04 a.m. email?

    A    Yes.  She responded to Andrea Cross' email
saying to expect the payoff demand by end of business
day, at the latest.

    Q    And in this email chain where they are talking
about a payoff quote, at least as of this point, the
subject line is request for payoff demand Unison
Agreement Corp. and the 291 West Overlook Road property
address.  Are you aware of any communications where the
subject line changed to say it's a payoff demand

Page 154

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

regarding Goldwater?

MS. KRYSAK:  Objection.  Do you mean in just

these exhibits, Mr. Katz, or any communications at all

that bore a different subject line in any of the

production that Goldwater produced?

BY MR. KATZ:

Q    In the universe of communication between

Goldwater, its affiliate Weststar, and Escrow of the

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

180

West regarding Goldwater's loan, are you aware of any

emails where the subject line explicitly referenced a

payoff demand for a Goldwater loan?

A    Not that I am aware of.  I'm reviewing this

chain of emails, and it doesn't appear that the subject

line was changed.

Q    Further up in the Exhibit 6 email chain on

March 24th, 2021, at 12:28 p.m. Mr. Hill emails Andrea

Cross inquiring -- saying Mr. Elizarov tells me this

sale has fallen through.  Is that correct?  At this

point -- March 24th, 2021 -- was Mr. Hill in

communication with Mr. Elizarov about the loan?

A    According to my recollection of reading

Page 155

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Pete Hill's deposition, yes.

     Q    And what was Mr. Hill discussing with

Mr. Elizarov as of March 24, 2021, about the loan?

     A    I believe Mr. Elizarov was providing an update

or status of the sale of his home.

     Q    Why didn't Goldwater include Escrow of the

West on any of those communications between Mr. Hill and

Mr. Elizarov?

     A    You mean if they were email exchanges between

Mr. Hill and Mr. Elizarov?

     Q    Yes.

     A    I believe that his deposition stated there was

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

181

a phone call.

     Q    Between Mr. -- the email communications

between Mr. Hill and Mr. Elizarov -- wait.  Were there

email communications between Mr. Hill and Mr. Elizarov

as of March 24th, 2021, about the loan?

     A    I believe they were phone calls.

     Q    So here on March 24th, 2021, 12:33 p.m.

Ms. Cross notifies Mr. Hill that the escrow is

Page 156

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
proceeding and will close within the next few days.  Did

that match the information as of March 24th that

Goldwater was receiving directly from Mr. Elizarov?

    A   Can you rephrase that question?  I'm sorry.

    Q   Sure.  March 24th, 2021, 12:33 p.m., Ms. Cross

tells Mr. Hill that they are proceeding with an

estimated close in the next few days.  As I read this, I

believe it means a close of escrow for the sale to

Mr. Howlett within the next few days.  Does that match

your understanding of Ms. Cross' email from March 24th

at 12:33 p.m.?

    A   Yes.

    Q   And does that information, that the escrow for

the sale to Mr. Howlett is going to close within the

next few days, does that match the information that

Goldwater was receiving from Mr. Elizarov at that time?

    A   I don't know what was received from

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

182

Mr. Elizarov, but it was a conversation, per Pete's

deposition, that he had a conversation.  From what I

understand -- and I agree -- that, basically, what she

is saying, as far as Andrea Cross, that the close of

Page 157

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

escrow will take place over the next couple of days.

Q    Going up the email chain on Exhibit 6 on March 24, 2021, at 12:35 p.m. Mr. Hill requests an estimated settlement statement.  Do you see that?

A    I do see that, yes.

Q    And in the next Ms. Cross says she needs permission.  And moving up the chain, at 12- -- March 25th, 2021, at 10:46 Ms. Cross sends an email to Mr. Hill saying, We're working on a closing statement. Going up the chain, it appears Mr. Hill is very interested in what the estimated settlement statement would be or when it's available.  Did Goldwater receive an estimated settlement statement for the sale of the property from Mr. Elizarov to Mr. Howlett?

A    I don't believe so.

Q    I'm sorry.  Was that you do believe so or you do not believe so?

A    I do not believe so.

MR. KATZ:  I'm bringing up on the screen a new document which we're going to identify as Exhibit 146. That's got a Goldwater Bates number on it.  It's a four-

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

183

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

paged document.

        (Exhibit 146 was marked for

        identification.)

BY MR. KATZ:

    Q   This appears to be an email from Mr. Hill,

cc'ing Mr. Teskey and Mr. Theo Haugen, from March 25th,

2021, at 5:16 p.m.  Have you seen this email before?

    A   No.  Can you zoom in a little bit?  I'm sorry.

I'm having a hard time reading that.

    Q   I understand.

        MR. LEVOTA:  What's the Bates number?

        MR. KATZ:  GOLDWATER001666 through

GOLDWATER001669.  It is among the documents from

Goldwater's most recent document production.

        MS. KRYSAK:  Mr. Katz, 166 is also Exhibit 52

to Mr. Hill's deposition, right?  Am I correct there?

        MR. KATZ:  Yes.  The email portion of

Exhibit 146 matches Exhibit 52 from Mr. Hill's

deposition.  But at the time of Mr. Hill's deposition

Goldwater had not yet produced the attachment that was

attached to that email.  And Exhibit 146 is the email

with the attachments, as produced by Goldwater.  So,

yes, the first page of Exhibit 146 matches Exhibit 52,

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
but the new Exhibit 146 contains the additional

attachments from that email that were disclosed by

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

184

Goldwater to us yesterday, May 11th, 2023.

    Q    So have you seen this before -- this email

exchange before, which would have been Exhibit 52 for

Mr. Hill's deposition?

    A    I do not recall seeing this email.

    Q    Do you know who Mr. Theo Haugen is?

    A    I do not.

    Q    In the Exhibit 146 email, and also in the

Exhibit 52 email, Mr. Hill references that he's attached

a spreadsheet, a Weststar payoff statement, and an

estimated settlement statement on a sale that is

expected to close as soon as we can figure this out.

And form yesterday's document production Goldwater

produced a page that was Bates numbered 1668, the

Seller's Estimated Settlement Statement that was

attached to Mr. Hill's March 25th email.  Based on this,

do you still belief that Goldwater did not receive an

estimated settlement statement for the proposed -- for

the sale of the property from Mr. Elizarov to

Page 160

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Howlett?

    A    My question is, How did he receive this?  I don't know how it was received.

    Q    You would agree with me that, at least as of March 25th, 2021, it appears that Mr. Hill is circulating to other people a copy of the estimated

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

185

settlement statement for the sale of the property from Mr. Elizarov to Mr. Howlett?

    A    Yes.  What you are sharing with me, it appears that does he have possession of the estimated settlement statement.

    Q    Now, in this -- attached to Mr. Hill's email, among the documents that were produced by Goldwater yesterday on May 11th, 2023, there are three what looks like copies of pieces from a spreadsheet listing a sale price, a Weststar payoff, a Unison payoff, and a mechanics lien payoff, a sales costs and net proceeds. What is Goldwater's understanding of how the equity in the property was supposed to be distributed between Goldwater and Unison arising from a sale of the

Page 161

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
property?

   MS. KRYSAK:  Objection; form, outside the

scope.  Ms. Overbeck, go ahead and answer, to the extent

you know.

   THE WITNESS:  Well, I haven't seen this

before.  So my understanding -- and I think your

question had to do with an equity position?

BY MR. KATZ:

 Q So let's say there's proceeds from the sale of

the property.  What is Goldwater's understanding of how

those proceedings are supposed to be distributed between

   **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
186

Goldwater and Unison?

 A Well, typically, if you refer to the

settlement statement, it provides columns with --

showing the payoff of the first -- Goldwater, let's

say -- Unison, and any other liens.  And then at the

bottom of the settlement statement it either shows short

to close or the additional funds that the borrower would

need to bring in.

 Q Let's look at the settlement statement that

Mr. Hill was distributing as of March 25th, 2021.  In

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

here this settlement statement does not identify

Goldwater as a lien holder to be paid off, does it?

    MS. KRYSAK:  Objection; form.

    THE WITNESS:  Do you mind zooming in on that

just a little bit, please?

BY MR. KATZ:

  Q Sure.

  A Thank you.

  Q Let me know if you need to scroll anywhere.

  A Correct, it shows the payoff for Unison and a

mechanics lien.

  Q Did Mr. Hill ever notify Escrow of the West

that its estimated settlement statement was incorrect

because it did not list Goldwater as a lien holder?

  A I'm not sure if Mr. Hill received this

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

187

settlement statement from Escrow of the West, and I

don't recall seeing an email from Mr. Pete Hill to

Escrow of the West notifying them of this.

  Q Notifying them that the Seller's Estimated

Settlement Statement dated March 25th, 2021, that

Page 163

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Hill was circulating to, among others, Mr. Teskey,

notifying them that there was an error in it?

    A    Yeah, I don't believe that Mr. Hill -- Pete

Hill sent it -- the request or notifying Escrow of the

West that -- or Goldwater being first is not on the

Seller's Estimated Statement.

    Q    In Mr. Hill's March 25th, 2021, email that was

Exhibit 52 from his deposition and Exhibit 146 here

complete with its attachments, he makes reference to the

issue is that net proceeds are insufficient to pay off

Weststar, Unison, and a contractor mechanic's lien for

improvements.  What is Goldwater's understanding at that

time of how proceeds are supposed to be distributed

between Weststar, Unison -- sorry.  Between -- yeah,

Weststar, Unison, and a contractor with a mechanics

lien?

        MS. KRYSAK:  Objection; form, outside the

scope.  Go ahead and answer, to the extent that you

know, Ms. Overbeck.

        THE WITNESS:  So I think this email is having

        **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

188

a discussion.  After they calculated everything out,

Page 164

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

there's not enough proceeds to pay off Weststar, Unison, and a contractor mechanics lien.

BY MR. KATZ:

 Q Why is Mr. Hill referring to a payoff to Weststar if this was a Goldwater loan?

 A Well, Goldwater closed the loan and Weststar started servicing the loan as of May 2020.

 Q Did Goldwater ever sell the loan to Weststar?

 MS. KRYSAK:  Objection; form, outside the scope.  You may answer, to the extent you know, Ms. Overbeck.

 THE WITNESS:  From what I understand, Goldwater Bank actually serviced this loan for some time.  But I believe, yes, on our products we sell to Weststar.

BY MR. KATZ:

 Q So did Goldwater sell Mr. Elizarov's loan to Weststar?

 MS. KRYSAK:  Objection; form, outside the scope.  Go ahead and answer, to the extent you know, Ms. Overbeck.

 THE WITNESS:  I believe so, yes.

BY MR. KATZ:

 Q When did Goldwater sell Mr. Elizarov's loan to

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

189

Weststar?

       MS. KRYSAK:  Objection; form, outside the scope.

       MR. WAGNER:  We probably need to clarify what was sold because you are going to go down a line of questioning and realize that the clarification might change.

       MR. KATZ:  Let's not coach the witness.  Let's not be coaching the witness as to anything.  I want to know what she means.  And I asked her earlier, and she said she wasn't prepared to say what they means by sell the loan.  And if you think there's something you need to clean up on redirect, you can clean up on redirect.

       MR. WAGNER:  Go ahead.  It's fine.  Go ahead.

       THE WITNESS:  Can you repeat the question, please?

BY MR. KATZ:

    Q    When did Goldwater sell the loan to Weststar?

       MS. KRYSAK:  Objection; form, outside the scope.  Go ahead and answer, to the extent you know,

Page 166

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
Ms. Overbeck.

THE WITNESS:  I'd have to refer back to the

documents.  But, typically, after Goldwater funds the

loan it could be anywhere between 1 to 30 days of

selling that loan.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
190


BY MR. KATZ:

Q    Okay.  What do you mean by selling the loan?

MS. KRYSAK:  Objection; form, outside the

scope.

THE WITNESS:  Meaning we funded the loan,

Goldwater Bank.  We sell the loan to Weststar, and they

pay us for the loan.

BY MR. KATZ:

Q    Did Goldwater ever repurchase the loan from

Weststar?  Sorry.  Did Goldwater ever repurchase

Mr. Elizarov's loan from Weststar?

A    From what I've reviewed, no.

Q    In Mr. Hill's March 25th email to Mr. Teskey

and Mr. Haugen, he represents that he reviewed it with

Mr. Teskey.  And Mr. Teskey explained that the Unison

agreement has a provision by which the cost of

Page 167

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

improvements are to be netted against the payoff/gain

calculation.  Was that an accurate representation of

Goldwater's understanding as of March 25th, 2021?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  Yes.

BY MR. KATZ:

   Q   And then Mr. Hill says that he's done some

verification -- I have some verification to be done, but

     **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

191

the spreadsheet lays out the situation as I understand

it at this point this afternoon.  This afternoon

appearing to be March 25th, 2021.  Would you agree with

me that that part referencing this afternoon means

March 25th, 2021?

   A   I am going to assume that that's what Mr. Hill

was communicating.

   Q   All right.  Now, when he says the spreadsheet

lays out the situation and he attaches these

spreadsheet-like figures, is it Goldwater's

understanding -- or do these figures represent

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Goldwater's understanding of how the funding -- how the

proceeds from the sale of the property should be

distributed between Goldwater, Unison, and a mechanics

lien claimant?

        MS. KRYSAK:  Outside the scope.

        THE WITNESS:  I'm just reviewing the numbers

and just trying to see why -- so Unison was going to be

taking a lower payoff on the second Excel box.

BY MR. KATZ:

    Q    Yeah.  I'm going to scroll down just a hint so

you could see the bottom of that third box.  There you

go.

    A    Is the 79,655.47 -- was that pulled from the

estimated settlement statement?

       **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

192

    Q    Let's take a look.  I'm going to scroll to the

estimated settlement statement on the next page.  And

here is the Weststar payoff that was also attached to

the email.

    A    I'm just wondering where they came in with

that 79,000, if they were adding something up.  Thank

you for scrolling through.  Can we go back to the Excel

Page 169

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

boxes.

    Q    Yeah.  So I'm going to do a fine adjustment so
they are all three on the screen.  There we go.

    A    So the last box is basically Unison
calculating the home improvement gain at 70 percent.
What was your question?  I'm sorry.  I just had to
review the numbers.

    Q    Do these represent Goldwater's understanding
of how the proceeds from the sale to Mr. Howlett would
be applied to Goldwater, Unison, and a mechanics lien
claimant?

         MS. KRYSAK:  Objection; form, outside the
scope.

         THE WITNESS:  Proceeds to Howlett, but Howlett
is purchasing.

BY MR. KATZ:

    Q    Howlett's purchasing.  Howlett's paying money.
Money comes out of escrow.  How is the payoff coming out

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

193

of escrow supposed to be allocated between Goldwater,
Unison, and a mechanics lien claimant?  Do these

                    Page 170

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
spreadsheets that are prepared by Mr. Hill reflect

Goldwater's understanding of how the total payoffs

coming out of escrow would be allocated between

Goldwater, Unison, and a mechanics lien claimant?

        MS. KRYSAK:  Objection; form, outside the

scope.

        THE WITNESS:  I'm sorry.  You said Goldwater,

Unison, and I missed the last one you said.

BY MR. KATZ:

    Q    A mechanics lien claimant.

    A    It looks to me that Goldwater Bank is

providing detailed information on what was expected to

be paid off from the sale of the property.

    Q    Correct me if I'm wrong.  But from this third

box, where it says Unison Payoff Reconciliation, it

appears that the cost of a mechanics lien would come out

of a payoff to Unison.  It looks like Mr. Hill's

calculations are that the Unison payoff at 491 would

be -- there would be a deduction for the 107,270 for the

mechanics lien such that the adjustment payoff to Unison

for $383,730.

    A    I'm not sure if Mr. Hill prepared this

spreadsheet, but that's what it appears to be as far as

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

194

minussing out the mechanics lien.

Q    All right.  So based on this, was it
Goldwater's understanding as of March 25th that, if
there was a mechanics lien on the property, the cost of
that mechanics lien would be deducted or offset against
Unison's payoff?

A    That appears to be a reconciliation.  From
what I see in the first box is what Goldwater's -- the
real numbers are.

Q    Do those figures represent Goldwater's
understanding about how the cost of improvements to the
property are to be netted against the payoff/gain
calculations for Goldwater and Unison?

        MS. KRYSAK:  Objection; form, outside the
scope.

        THE WITNESS:  Yeah, I don't refer to it as
cost of improvements.  I'm referring to it as a
mechanics lien.

BY MR. KATZ:

Q    Okay.  How the mechanics lien is being netted
out against payoffs to Goldwater or Unison?

A    According to the Unison Payoff

Page 172

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Reconciliation -- and I'm not sure who prepared that,

those numbers -- is they are saying less cash

improvements, which is the mechanics lien.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

195

Q    And then here on the top right corner, where

it says Elizarov Payoff Worksheet, Adjusted, it appears

that the cost of the mechanics lien would be deducted

from the payoff to Unison rather than deducted from any

payoff to Gold- -- to Weststar here, correct?

A    Correct.

Q    So as of March 25th, 2021, was it Goldwater's

understanding that, if there was a mechanics lien on the

property, the cost of mechanics lien would be netted out

against any payoff to Unison rather than netted out

against any payoff to Goldwater?

MS. KRYSAK:  Objection; form, outside the

scope.

THE WITNESS:  From what I just reviewed, yes.

BY MR. KATZ:

Q    All right.  Back up into the Exhibit 6 email

chain.  On March 25th at 1:49 p.m. Ms. Cross tells

Page 173

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Mr. Hill to disregard the request -- the demand request.

Seller has instructed we are not to make payoff to

Goldwater.  Since there is not a secured lien to the

chain of title, we would only have been able to pay with

seller's instruction to do so.  Is that email the first

time that Goldwater learned that it's deed of trust had

not been recorded?

    A   From what I understand, yes.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

196

    Q   At this point in Goldwater's document imaging

system, could Goldwater have gone and looked at the deed

of trust to see if it had a copy of the deed of trust as

recorded imaged into its system?

      MS. KRYSAK:  Objection; form, outside the

scope, speculation.  You can answer, to the extent that

you know, Ms. Overbeck.

      THE WITNESS:  Are you refer to BlitzDocs when

you say digital imaging system?

BY MR. KATZ:

    Q   So at this the point, assuming Mr. Hill had

access to BlitzDocs, could he have gone in and seen

whether the deed of trust as part of Goldwater's loan

Page 174

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

file had actually been recorded?  Or put a different

way --

    A   If he had access.

    Q   If he had BlitzDocs, could he have gone in and

seen if the copy of the deed of trust in Goldwater's

records was a recorded copy of the deed of trust?

    MS. KRYSAK:  Objection; form, outside the

scope, speculation.  You can answer, to the extent you

know, Ms. Overbeck.

    THE WITNESS:  If Mr. Pete Hill had access to

BlitzDocs and knew how to use BlitzDocs, I'm sure he

could have gone in there.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

197

BY MR. KATZ:

    Q   Do you know if Weststar has access to

BlitzDocs?

    MS. KRYSAK:  Objection; outside the scope,

form.

    THE WITNESS:  I believe Weststar uses

BlitzDocs as well.

BY MR. KATZ:

Page 175

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    And when Weststar takes custodial -- takes

custody of the original loan documents, is Weststar the

one uploading images into BlitzDocs?

        MS. KRYSAK:  Objection; form, outside the

scope.  We're here on Goldwater's deposition, not

Weststar.  Answer to the extent you know, Ms. Overbeck.

        THE WITNESS:  I'm not sure if they -- how they

manage the recorded documents upon receipt.

BY MR. KATZ:

    Q    So at some point here the original loan

documents were received by Weststar.  Weststar took

custody.  Did Weststar upload images of the executed

documents into BlitzDocs?

        MS. KRYSAK:  Objection; form, outside the

scope.  Goldwater can't testify as to what Weststar did.

You can answer, to the extent that you know,

Ms. Overbeck.

    **UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

198

        THE WITNESS:  Yeah, I'm not sure what their

process is upon receipt of original loan documents or

recorded documents.

BY MR. KATZ:

                    Page 176

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

Q    All right.  Now, did Goldwater ever upload copies of the original loan documents into BlitzDocs?

MS. KRYSAK:  Objection.  Is there -- are you saying ever, at any time, Mr. Katz?

BY MR. KATZ:

Q    At or around closing.

A    Well, we have the unsigned documents that we save in our file.

Q    At what point in the process are executed loan documents uploaded into BlitzDocs?

MS. KRYSAK:  Objection; form, outside the scope.  I think she testified that Weststar is the custodian.  The documents are sent to Weststar.  She does not know what Weststar does with the documents once they are uploaded.

MR. KATZ:  Right.  I'm asking what Goldwater did.

MS. KRYSAK:  Go ahead.  Answer, to the extent you know or there's anything new or additional beyond what you have already said.

THE WITNESS:  Right.  So there's just a

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

199

Page 177

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

difference between, like, when it's actually funded and recorded, right?  So we do -- Goldwater does receive a digital copy of the signed documents so we can validate signatures.  And we upload them into Encompass, and then we hit the ready to ship.  And I believe they go get pushed to the Blitz.  But I don't think (unintelligible).

Q    I'm sorry.  Could you say that last part again?

A    Yeah, I'm not sure which -- if all the documents -- you know, it's a pretty hefty size of loan documents.  I'm sure you've signed them.  For us to fund, I'm not sure if we receive the whole package or just some of the signed documents.  But we do verify that the loan documents have been signed at closing.

Q    Prior to March 26, 2021, did Goldwater have a copy of the signed original loan documents?

MS. KRYSAK:  What do you mean by loan documents, Mr. Katz?  Maybe that would be helpful.

MR. KATZ:  Deed of trust.

MS. KRYSAK:  I mean, there's a lot of -- she just referred to a large package.  If there's a specific amount or specific document you are referring to?

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

BY MR. KATZ:

Q    The deed of trust.


**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

200


A    We receive a copy of the signed, notarized
copy of the deed of trust.  The original is sent to
title to be recorded.

Q    At what point in the pre-closing and post-
closing process does Goldwater receive a copy of the
signed deed of trust?

A    Not recorded?

Q    Correct.

A    At times -- when escrow sends a copy of the
signed loan documents, we receive them typically the day
that the borrower signed.

Q    So Goldwater typically receives a signed deed
of trust prior to funding and closing a loan
transaction?

A    Yes.  It's not recorded, but yes.

Q    And the signed copy of the deed of trust that
Goldwater receives prior to closing gets uploaded into
the Encompass system?

MS. KRYSAK:  Objection; form, outside the

Page 179

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

scope.

THE WITNESS:  From what I understand, yes.

BY MR. KATZ:

Q    And then at a point the documents are ready to

send and, presumably, sent from Encompass to BlitzDocs?

A    Yes.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**

201

MS. KRYSAK:  Mr. Katz, I think we have been

going for a little while.  Do you want to take a quick

five-minute break?

MR. KATZ:  I just have a couple more

questions, then we can take a quick five-minute break.

MS. KRYSAK:  We'd like to take a break now,

Mr. Katz.

MR. WAGNER:  Five-minute bathroom break.

MS. KRYSAK:  A five-minute bathroom break.

MR. KATZ:  Okay.

MS. KRYSAK:  Thank you.

(Recess.)

MS. KRYSAK:  For the record, Goldwater has

asked and is closing down the deposition at this time.

2023.0512 PMK of Goldwater Depo Transcript _ROUGH
The corporate designee is not feeling well.  It has

impacted her ability to testify.  In good faith,

Goldwater has offered and will pay for the court

reporter's costs for the day today, and we will be

reaching out to all counsel first thing Monday morning

to promptly reschedule the remainder of the deposition.

MR. ALEKSEYEFF:  And Abbey, this is Ilya.  If

I can jump in.  I'm assuming the court reporter does not

have to wait until we finish the second leg of the

deposition to start preparing her transcript.  She can

go ahead and start doing it now, I'm assuming.  Is that

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**
202

right?  Because we may not have the same court report

for the second leg, and I don't know if it makes,

necessarily, sense to wait.

MR. KATZ:  Why don't we designate today's

transcript as Volume 1 and we can have her prepare

Volume 1.

MS. KRYSAK:  We'll object to that.  Goldwater

is going to object to that for now, based on our belief

that she has an altered mental state today, and so we'll

preserve that objection for the record.

Page 181

2023.0512 PMK of Goldwater Depo Transcript _ROUGH

   MR. ALEKSEYEFF:  Okay.  Thank you.  So then we are off the record at this point, in recess?

   MS. KRYSAK:  Yes.

   MR. ALEKSEYEFF:  Okay.  Perfect.  And just so that the time is clear, it's 4:08 p.m. on Friday, May 12th.

   MR. KATZ:  And we took the last break at 3:29.

   MR. ALEKSEYEFF:  Correct, and resumed at approximately 4:04.  All right.  Thank you so much.

**UNEDITED REALTIME TRANSCRIPT - NOT CERTIFIED**