# EXHIBIT 15

**SEAN C. WAGNER** (*Pro Hac Vice*)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice*)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**


**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA 90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. | Case No. 5:21-cv-00616-JWH-SP |
| *Plaintiff,* | **VERIFIED AMENDED COMPLAINT FOR:** |
| vs. | |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWLETT; BANK OF THE WEST; and ILYA ALEKSEYEFF | **1. BREACH OF CONTRACT**<br>**2. UNJUST ENRICHMENT**<br>**3. FRAUD** |
| *Defendants.* | **4. FRAUDULENT TRANSFER**<br>**5. CIVIL CONSPIRACY**<br>**6. INJUNCTIVE RELIEF**<br>**7. QUIET TITLE**<br>**8. DECLARATORY JUDGMENT** |

Plaintiff Goldwater Bank, N.A. ("Goldwater"), pursuant to Fed. R. Civ. P. 15(a), hereby files this Amended Complaint and alleges the following:[1]

## PARTIES

1.      Plaintiff Goldwater Bank, N.A. is a national association with its principal place of business in Phoenix, Arizona.

2.      Defendant Artur Elizarov, is an individual who resided in Riverside County, California at certain times at issue in this matter.

3.      Defendant Unison Agreement Corp. is a corporation organized under the laws of the state of Delaware with its principal place of business in San Francisco, California.

4.      Defendant Scott Howlett is an individual and resident of San Francisco County, California.

---

[1] The Court's pending decision on Goldwater's request for a preliminary injunction need not be affected by the filing of this Amended Complaint. "Where the claim and prayer for injunctive [relief] forming the basis for a motion for preliminary injunction remains in an amended pleading and the motion for injunctive relief does not rely on factual allegations that substantially differ between the superseded and amended complaint, construing a motion for injunctive relief as relying on the amended pleading is appropriate." *JBF Interlude 2009 Ltd - Israel v. Quibi Holdings, LLC*, No. CV20-2299-CAS (SKX), 2020 WL 3963863, at *6 (C.D. Cal. July 13, 2020). Here, Goldwater's motion for TRO and preliminary injunction sought relief based on Goldwater's claims for breach of contract, unjust enrichment, and constructive trust, which are still present in this amended complaint, and Goldwater is not asking the Court to rule on the pending motion for preliminary injunction based on the new causes of action asserted herein. Additionally, Goldwater's motion did not rely on the factual allegations of a verified Complaint but on separate declarations from Goldwater regarding the facts at issue. Goldwater contends the Court can and still should rule on the request for preliminary injunction based on Goldwater's claims for breach of contract, unjust enrichment, and constructive trust. "Requiring the refiling of the Motion and related documents would be a needless waste of party and judicial resources." *Id.* (construing a pending motion for preliminary injunction to relate to the amended complaint as the operative complaint with respect to the claims at issue in the motion).

5. Defendant Bank of the West is a corporation organized under the laws of the state of California with its principal place of business in San Francisco, California.

6. Defendant Ilya Alekseyeff is an individual and resident of Los Angeles County, California.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Goldwater's claims pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Goldwater and Defendants and the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

8. A large portion of the conduct giving rise to the claims against Defendants, as more fully described below, occurred in the Central District of California.

9. In addition, the real property over which Plaintiff claims a security interest at issue in this action is located in Riverside County, California within the Central District of California.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## DEMAND FOR JURY TRIAL

11. Plaintiff Goldwater hereby demands a trial by jury on all issues so triable.

## BACKGROUND

### *The Goldwater Loan and the Unison Lien*

12. On or around July 31, 2019, Goldwater, as lender, originated a mortgage loan to Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by certain real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").

13. Elizarov is a real estate broker holding an active license from the the California Department of Real Estate, and his license ID number is 01954357.

14. The Goldwater Loan was memorialized in an Adjustable Rate Note (the "Note") and a Deed of Trust (the "Deed of Trust"), both dated July 31, 2019. A true and

accurate copy of the Note and Deed of Trust are attached and incorporated herein as **Exhibit A** and **Exhibit B**, respectively.

15.    The Deed of Trust created a valid and enforceable lien between Goldwater and Elizarov.

16.    Also on or around July 30, 2019, Elizarov entered into another deed of trust with Unison as trustee, which was also secured by the Subject Property (the "Unison Lien").

17.    Elizarov informed Unison of the Goldwater Loan and Goldwater's lien.

18.    Upon information and belief, Elizarov purchased the Subject Property for $915,000 using proceeds of both the Goldwater Loan and funds from Unison, and Unison agreed to subordinate the Unison Lien in exchange for an equity share in the value of the Subject Property upon re-sale.

19.    Specifically, Unison and Elizarov entered into a document titled Unison Homebuyer Uniform Subordination Agreement (the "Subordination Agreement") on or around July 31, 2019.  A true and accurate copy of the Subordination Agreement is attached hereto as **Exhibit C**.

20.    The Subordination Agreement identifies Unison as a Subordinating Lien Holder of a Junior Lien on the Subject Property.

21.    The Subordination Agreement further identifies the Goldwater lien as the First Mortgage on the Subject Property by reference to Goldwater's loan number, the date of the Note, and the principal amount of $686,250.00.

22.    The Subordination Agreement was recorded with the Riverside County Recorder's office on or around August 7, 2019.

### *Elizarov's Mortgage Application*

23.    To obtain the Goldwater Loan, Elizarov submitted a Uniform Residential Loan Application (the "Loan Application") to Goldwater on or around July 3, 2019.

24.    In the Loan Application, Elizarov made several material misrepresentations of fact.

25.     In the Loan Application, Elizarov did not identify himself as "Married (include registered domestic partners)." Rather, Elizarov identified himself as "Unmarried."

26.     This was a misrepresentation of fact because Elizarov and Defendant Alekseyeff have been in a domestic partnership, which is registered with the state of California, since May 2003.

27.     In the Loan Application, Elizarov also identified his total assets, separate from his income, as $227,103.00 in a JP Morgan savings account.

28.     Elizarov also stated in the Loan Application that he was not a party to any lawsuit.

29.     This was a misrepresentation of fact because Elizarov was in fact a named plaintiff at that time in litigation in the Superior Court of California, Los Angeles County, which was captioned *Artur Elizarov v. BMW Financial Services NA, LLC* (19STCV08507). Elizarov was represented by Alekseyeff in that action.

30.     Elizarov stated on the loan application that he was not "presently delinquient or in default on an Federal debt[.]"

31.     Upon information and belief, this was a misrepresentation of fact because, at the time, Elizarov was subject to a federal tax lien of $107,787.69.

32.     In signing the Mortgage Application, Elizarov represented, agreed, and acknowledged that "the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, *et seq.*"

33.     Elizarov's multiple misrepresentations were material to the transaction because they are directly relevant to Elizarov's reliability and financial position.

34.     Elizarov's marital status was material to the transaction because California is a community property state, meaning that Elizarov could be held responsible for his domestic partner's liabilities incurred during the span of the domestic partnership.

35.     Goldwater relied on Elizarov's misrepresentations in approving him for and making the Goldwater Loan.

### *Elizarov's Payment History*

36.     Elizarov defaulted on the Goldwater Loan and is delinquent on the payment obligations as of April 1, 2020, meaning that the payments that Elizarov has made only satisfy his ordinary payment obligations through April 1, 2020.

37.     On or around May 2020, Goldwater transferred responsibilities for servicing the Goldwater Loan to an affiliated entity named Weststar Mortgage Corporation.

38.     On or around May 5, 2020, Elizarov completed a Mortgage Assistance Application (the "Assistance Application") requesting assistance based on reduction in income and disaster.

39.     In the Assistance Application, Elizarov represented that his only form of income was $1,050.00 per week in unemployment benefit income.

40.     In the Assistance Application, Elizarov represented that his only assets, excluding retirement funds, was $3,500 in cash on hand.

41.     Upon information and belief, Elizarov misrepresented the full extent of his assets and income.

42.     Noticeably, Elizarov failed to report the JP Morgan savings account on his Assistance Application, despite reporting it on his Mortgage Application.   Upon information and belief, the JP Morgan savings account was still in existence at the time Elizarov completed the Assistance Application.

43.     In signing the Assistance Application, Elizarov certified and acknowledged that "all of the information in this Mortgage Assistance Application is truthful . . . [and that] [k]nowingly submitting false information may violate Federal and other applicable law."

44.     In reliance on the information reported in Elizarov's Assistance Application, Elizarov was approved for forbearance.  Elizarov was required to make reduced monthly payments of $1,101.31, which reflected the escrow amount of his ordinary payments.

45.     Elizarov continued to report that he still suffered from the same hardships, and he continued to receive forbearance extensions.  However, Elizarov failed to regularly and timely make his reduced monthly payments.

46.     During the time when Elizarov was seeking and receiving forbearance, Alekseyeff communicated with Goldwater regarding Elizarov's forbearance.

*Elizarov Sells the Subject Property*

47.     At some point following the default, Elizarov decided to sell the Subject Property, and Elizarov communicated that intent to Goldwater in March 2021.

48.     On March 3, 2021, the escrow company for the pending sale, Escrow of the West, Inc., made contact with Goldwater regarding the payoff of Goldwater's lien on the Subject Property in connection with a pending sale of the Subject Property.

49.     During the course of the escrow relationship and prior to the closing of the sale, Escrow of the West, Inc., as escrow agent for Elizarov as seller and Howlett as buyer of the Subject Property, learned that Goldwater's Deed of Trust was had never been recorded in the Riverside County Register of Deed's office.

50.     On or around March 24, 2021, Goldwater provided Escrow of the West with its payoff calculations, which noted a complete payoff amount of $729,354.80 and daily interest of $101.46.  A true and accurate copy of the Payoff Calculations is attached hereto as **Exhibit D.**

51.     On March 25, 2021, Escrow of the West provided Goldwater with an estimated settlement statement showing that the proceeds of the sale would pay off a $491,000.00 lien to Unison, a mechanic's lien in the amount of $107,270.00, various closing costs, and a final payout of $677,074.53 in proceeds to Elizarov.

52.     Goldwater thereafter communicated with Elizarov on March 25, 2021 by email and by phone regarding the disbursement of the proceeds of the pending sale, which

would have been insufficient to pay off the Goldwater Loan, the Unison Lien, and the mechanic's lien in full.

53.    In the communications on March 25, 2021, Elizarov represented that, despite Goldwater's Deed of Trust being unrecorded, Goldwater would recieve $675,000 of the proceeds following the sale of the Subject Property, which would have paid off a substantial majority of the Goldwater Loan.

54.    Elizarov sold the Subject Property to Scott Howlett on or around March 25, 2021, by a Grant Deed that was recorded on or around March 29, 2021.  A true and accurate copy of the Grant Deed is attached and incorporated herein as **Exhibit E**.

55.    Elizarov never informed Goldwater that the sale occurred and continued communicating with Goldwater after March 25, 2021 regarding what amount of the proceeds Goldwater would receive.

56.    On or around March 29, 2021, Goldwater asked Elizarov about the status of the closing, and Elizarov denied that the sale occurred.

57.    To date, Goldwater has received none of the proceeds from the sale of the Subject Property.

58.    Elizarov made these representations about the insufficiency of the proceeds to pay off the Goldwater Loan in full and the promise that Goldwater would nevertheless receive a $675,000 payout with the intent that Goldwater would rely on the misrepresentations and not interfere with the sale.

59.    Goldwater did in fact rely on Elizarov's representations.

60.    Elizarov's statement that the Subject Property was subject to a $107,270.00 mechanic's lien was a misrepresentation of material fact.  The Seller's Final Settlement Statement from Escrow of the West indicates that Unison was the only lienholder paid with the proceeds of the sale.  A true and accurate copy of the Seller's Final Settlement Statement is attached hereto as **Exhibit F**.

61.    Elizarov's representations that the sale of the Subject Property would yield insufficient funds to pay off the Goldwater Loan was a misrepresentation of material fact.

Elizarov in fact received $785,741.36 in proceeds from the sale, <u>Ex. F</u>, which is in excess of Goldwater's payoff demand of $729,354.80.

62.    Following the sale of the property, Goldwater also discovered a flyer advertising the Subject Property for sale identifies Artur Elizarov and his firm DreamHome Realty Group, Inc. as the realtor to be contacted about the property.  A true and accurate copy of this flyer is attached hereto as **<u>Exhibit G</u>**.

63.    Because of Elizarov's status as a licensed real estate broker in the State of California and his role in marketing the Subject Property for sale, Elizarov cannot deny that he was aware of the validity of the Deed of Trust and Goldwater's right to the proceeds of the sale of the Subject Property.

64.    Goldwater's status as a secured creditor with regard to Elizarov is now at risk, and Goldwater faces a significant likelihood that it will effectively become an unsecured creditor of Elizarov.

65.    If Goldwater is an unsecured creditor of Elizarov, there is a high risk that Goldwater will not be made whole, as the evidence of Elizarov's insolvency is well documented.

66.    At the time of the sale of the Subject Property, Elizarov was already almost a year behind in his payments on the Goldwater Loan, which is significant in light of the fact that he owned the Subject Property for less than two years.

67.    Additionally, on December 18, 2019, Elizarov was discharged from an IRS tax lien in the amount of $107,787.69.

68.    Elizarov's recent history of carrying significant debts suggests that the proceeds of the sale of the Subject Property will be wasted and disposed of prior to the entry of a final judgment in this matter.

69.    On April 1, 2021, Goldwater demanded that Elizarov return the promised funds and advised that it intended to pursue its full legal remedies if the funds were not returned.

### *The Validity of Goldwater's Deed of Trust*

70. Goldwater's unrecorded Deed of Trust is valid between Goldwater, Elizarov, and any other party with notice of the Deed of Trust. Cal. Civ. Code § 1217.

71. Upon information and belief, Unison had actual knowledge of Goldwater's Deed of Trust as evidenced by the Subordination Agreement.

72. Howlett and Bank of the West had, at minimum, constructive knowledge or inquiry notice of the Goldwater Lien by virtue of the duly-recorded Subordination Agreement.

73. Howlett and Bank of the West also had imputed knowledge of the Goldwater Lien because Escrow of the West obtained knowledge of Goldwater's adverse interest while acting within the course and scope of its authority as an agent of Elizarov, Howlett, and Bank of the West.

74. On March 29, 2021, a deed of trust was recorded in the Riverside County Recorder's office describing a lien given by Howlett to Bank of the West secured by the Subject Property.

### *Elizarov's Dissipation of the Proceeds of the Sale of the Subject Property*

75. Following the sale of the Subject Proceeds, Elizarov received $785,741.36, which was wired to an account with Ally Bank ending in account number -8480 (the "Proceeds Account") on or around March 30, 2021.

76. On April 6, 2021, one week after receiving the proceeds, Elizarov entered into a contract for the purchase of real property for $630,000 in cash in Wilton Manors, Florida (the "Wilton Manors Property").

77. Elizarov paid approximately $19,000 in cash out of the Proceeds Account as a down payment for the Wilton Manors Property on April 7, 2021.

78. Elizarov closed on the purchase of the Wilton Manors Property on April 16, 2021 and paid the remaining $613,000.00 out of the Proceeds Account to complete the sale.

79. On April 20, 2021, allegedly within hours of being restrained from further transferring assets from the Proceeds Account Elizarov transferred $84,843.22 from the Proceeds Account to pay off a loan that belonged to Alekseyeff.

80. At the time that Elizarov transferred the $84,843.22, he was aware of Goldwater's claims and the pending request for an order to prohibit the transfer of those assets.

81. On May 12, 2021, Goldwater sent a Notice of Acceleration to Elizarov informing him that Goldwater was accelerating the Note and demanding payment in full within thirty (30) days. As of this date, Goldwater has not received payment in full. A true and accurate copy of the Notice of Acceleration is attached hereto as **Exhibit H**.

82. As a result of Elizarov's conduct, Goldwater Bank has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract, as to Elizarov)**

83. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

84. Goldwater had an agreement with Elizarov to make the Goldwater Loan in exchange for his obligations in the Note and the Deed of Trust.

85. The Note and Deed of Trust is a valid and binding contract between the parties.

86. Pursuant to the Note and Deed of Trust, Goldwater is entitled to the proceeds from a sale of the Subject Property.

87. Elizarov breached the Note and Deed of Trust by failing to make all payments when due, including by failing to provide Goldwater with the proceeds of the sale of Subject Property.

88. Rather than pay the proceeds from the sale of the Subject Property to Goldwater, Elizarov has wrongfully retained those proceeds in an amount of approximately $675,000.

89.     Elizarov agreed in the Note that in the event of a default and acceleration of the Goldwater Loan, Goldwater would be entitled to recover its costs and expenses incurred in enforcing the Note, including its reasonable attorney's fees.  (Ex. A, Note, § 7(E)).

90.     As a direct and proximate result of Elizarov's breach, Goldwater has been directly and proximately damaged in an amount to be determined at trial.

91.     As a direct and proximate result of the foregoing acts and conduct, Goldwater has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe on Plaintiff

92.     Goldwater additionally seeks the entry of an order declaring that Elizarov holds, in constructive trust as trustee for the benefit of Goldwater, such amounts as were transferred to him personally in connection with the sale of the Subject Property, as well as an order directing Elizarov to disgorge and transfer any and all such amounts to Goldwater.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

93.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

94.     By engaging in the acts described above, Elizarov has and continues to benefit from his wrongdoing and has been unjustly enriched by reaping the benefits of his unlawful activities to the damage and irreparable harm of Goldwater.

95.     As a direct and proximate result of Elizarov's misconduct, Goldwater has been damaged in an amount to be proven at trial, but in excess of $675,000.

## THIRD CAUSE OF ACTION

### (Fraud, as to Elizarov)

96.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

97.     By providing incorrect information and omitting information on the Mortgage Application and the Assistance Application, Elizarov made false representations of material facts on both the Mortgage Application and the Assistance regarding his financial status.

98.     Elizarov made other false representations as described above, including the misrepresentations that the sale of the Subject Property would result in insufficient proceeds to pay off the Goldwater Loan in full and that Goldwater would nevertheless receive a payout of $675,000.00.

99.     Elizarov's misrepresentations were reasonably calculated to deceive Goldwater.

100.    Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and enter into the Goldwater Loan.

101.    Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and approve Elizarov's request for mortgage assistance.

102.    Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and not interfere with the sale of the Subject Property or rush to record its Deed of Trust.

103.    Elizarov's misrepresentations did in fact deceive Goldwater.

104.    Goldwater's reliance on Elizarov's representations was reasonable.

105.    Elizarov's actions proximately caused Goldwater damages exceeding $75,000 exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

### (Fraudulent Transfer as to Elizarov and Alekseyeff)

106.    Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

107. On April 20, 2021, Elizarov transferred $84,843.22 from the Proceeds Account to a third-party creditor to pay off a loan on Alekseyeff's behalf.

108. At the time Elizarov made the transfer, Elizarov acted with actual intent to hinder, delay, or defraud Goldwater, and his intent is reflected by, among other things, the fact that the transfer was made after Goldwater had already instituted litigation against Elizarov, Elizarov concealed assets, and Elizarov had previously made representations of insolvency to Goldwater.

109. As such, the transfer of the $84,843.22 for Alekseyeff was fraudulent pursuant to California Civil Code § 3439.04 and Goldwater is entitled to void the transfer and pursue all other remedies set forth in §3439.07.

## FIFTH CAUSE OF ACTION

### (Conspiracy as to Elizarov and Alekseyeff)

110. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

111. Elizarov and Alekseyeff entered into an agreement with each other to defraud Goldwater, to dissipate the proceeds of the sale of the Subject Property, and to otherwise make misrepresentations to Goldwater so as to induce it to make the Goldwater Loan and subsequently approve Elizarov for mortgage assistance.

112. Elizarov and Alekseyeff took overt actions in furtherance of the conspiracy, including by misrepresenting Elizarov's marital status and financial position, by instructing Escrow of the West not to communicate with Goldwater, by purchasing the Wilton Manors Property in an all-cash deal shortly after receiving the proceeds and while on notice of Goldwater's claims, and by taking further steps to dissipate the proceeds of the sale of the Subject Property.

113. Elizarov and Alekseyeff's actions proximately caused Goldwater damages exceeding $75,000, exclusive of interest and costs.

## SIXTH CAUSE OF ACTION

### (Injunctive Relief, as to Elizarov)

114. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

115. As of the date of filing of this Complaint, Goldwater faces significant exposure with regard to the Goldwater Loan, as Elizarov has sold the Subject Property and wrongfully retained the proceeds of the sale in an amount in excess of $675,000.

116. Goldwater's status as a secured creditor of Elizarov has been threatened, and the likelihood of Goldwater being able to recover in full as an unsecured creditor is low.

117. Goldwater justifiably fears that it will sustain significant losses and irreparable harm as a result of Elizarov's misappropriation of the proceeds of the sale of the Subject Property.

118. Unless Elizarov's assets, including the proceeds of the sale of the Subject Property, are marshalled, accounted for, and preserved, Goldwater's security interest in the Goldwater Loan will not be adequately secured with respect to Elizarov.

119. Goldwater is without a plain, speedy, or adequate remedy at law which would serve to immediately exonerate, indemnify, and save it harmless for its actual and anticipated losses, and Goldwater would be irreparably and permanently injured unless this Court grants immediate injunctive and equitable relief.

## **SEVENTH CAUSE OF ACTION**

### **(Quiet Title, as to Unison, Howlett, and Bank of the West)**

120. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

121. Goldwater held and now holds a first-priority security interest in the Subject Property pursuant to the July 31, 2019 Note and Deed of Trust between Goldwater and Elizarov.

122. Goldwater seeks to quiet title against the claims of any and all defendants who claim to have an interest in the Subject Property, which has the following legal description:

the real property in the City of Palm Springs, County of Riverside, State of California described as: Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56 both inclusive of Maps, in the office of the County of said county. Also Known as: 291 W. Overlook Road, Palm Springs, CA 92264

123. Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

124. At the sale of the Subject Property, the Goldwater Lien was not paid off, and Goldwater's security interest has not been extinguished because all other parties who have claimed an interest in the Subject Property, including Unison, Howlett, and Bank of the West, had notice of Goldwater's Deed of Trust.

125. Union had actual knowledge of Goldwater's Deed of Trust and agreed to subordinate its lien to Goldwater's.

126. Howlett had constructive knowledge or was on inquiry notice of the Goldwater Deed of Trust by virtue of the duly-recorded Subordination Agreement and the knowledge obtained by Escrow of the West during the course of their role as agent for Elizarov, Howlett, and Bank of the West.

127. Bank of the West had constructive knowledge or was on inquiry notice of the Goldwater Deed of Trust by virtue of the duly-recorded Subordination Agreement and by Howlett's knowledge.

128. Goldwater seeks a determination that, as of March 29, 2021, Goldwater held a first-priority security interest in the Subject Property, that Howlett took the Subject Property subject to the Goldwater Lien, and that Bank of the West's security interest in the Subject Property is subordinate to the Goldwater Lien.

129. The claims of Unison, Howlett, and Bank of the West, each of them adverse to Goldwater's interest, are without any right whatever and such defendants' rights are all subject to Goldwater's superior security interest.

130.   For the reasons stated above, Goldwater requests an Order from this Court pursuant to Cal. Code of Civil Procedure § 760.020 *et seq.*, quieting title in the Subject Property and declaring that Goldwater holds a first-priority security interest in the Subject Property.

## **EIGHTH CAUSE OF ACTION**

### **(Declaratory Judgment, as to Unison, Howlett, and Bank of the West)**

131.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

132.   There exists an actual, definite, and concrete controversy between Goldwater, Unison, Howlett, and Bank of the West related to the priority of Goldwater's security interest relative to those defendant's interests in the Subject Property.

133.   Goldwater contends that it has a first-priority lien on the Subject Property based upon all Defendant's notice of Goldwater's unrecorded Deed of Trust, and Goldwater is informed and believes that Defendants Unison, Howlett, and Bank of the West dispute these contentions.

134.   A judicial determination is necessary and appropriate at this time in order that the parties may ascertain their rights and duties with respect to the Subject Property.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Goldwater requests the Court order relief, as follows:

1.     Preliminary and permanent injunctive relief (i) enjoining Elizarov from alienating or disposing of the proceeds of the sale of the Subject Property and (ii) requiring Elizarov to make an accounting of his assets following the sale of the Subject Property;

2.     Actual, compensatory, consequential, punitive, and exemplary damages in an amount to be determined at trial for all losses and damages suffered as a result of the acts and transactions complained of herein;

3.     A constructive trust for the benefit of Goldwater over the proceeds received by Elizarov in connection with the sale of the Subject Property;

4.     All costs and expenses incurred by Goldwater Bank in enforcing its rights under the Note and Deed of Trust;

5.     An order quieting title and declaring that Goldwater holds a first-priority security interest in the Subject Property.

6.     Declaratory relief stating that Goldwater holds a first-priority security interest in the Subject Property.

Dated:     May 27, 2021

                   IVIE McNEILL WYATT
                   PURCELL & DIGGS

                   /s/ Marie Maurice
                   W. Keith Wyatt, Esq.
                   Marie Maurice, Esq.

                         AND

                   WAGNER HICKS PLLC

                   /s/ Derek M. Bast
                   Sean C. Wagner, Esq.
                   Derek M. Bast, Esq.
                   *ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.*

## **CERTIFICATE OF SERVICE**

I certify that all counsel of record who has consented to electronic notification is being served on May 27, 2021 with a copy of **PLAINTIFF'S AMENDED COMPLAINT** via the Court's CM/ECF system. Pursuant to Local Rule 5-3.1.2, I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants listed below:

      Unison Agreement Corp.
      First Corporate Solutions, Inc., Registered Agent
      650 California Street, Suite 1800
      San Francisco, CA 94108

                              /s/ Derek M. Bast
                              Derek M. Bast

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Goldwater Bank, N.A.

    *Plaintiff,*

    vs.

ARTUR ELIZAROV; UNISON
AGREEMENT CORP.; SCOTT
HOWLETT; BANK OF THE WEST;
and ILYA ALEKSEYEFF

    *Defendants.*

Case No. 5:21-cv-00616-JWH-SP

_____

**VERIFICATION**

I, Peter Hill, an authorized agent of Goldwater Bank, N.A., pursuant to 28 U.S.C. § 1746, do hereby verify under penalty of perjury that the foregoing allegations contained in this Verified Complaint are true and correct to the best of my current knowledge.

Dated: May 27, 2021.

_____

Peter Hill

LOAN #: 909216931
MIN: 1009209-4100147547-4

# ADJUSTABLE RATE NOTE
### (LIBOR One-Year Index (As Published In The Wall Street Journal)-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.

**July 31, 2019**  **Palm Springs,**  **California**
[Date]  [City]  [State]

**291 W. Overlook Road, Palm Springs, CA 92264-8934**
**[Property Address]**

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. **$686,250.00**  (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Goldwater Bank, N.A..**

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.375 %.** The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the **1st** day of each month beginning on **September 1, 2019.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2049,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at **2525 E. Camelback Rd, Suite 1100**
**Phoenix, AZ 85016**

or at a different place if required by the Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. **$3,842.80.** This amount may change.
### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the **1st** day of **August, 2024** and on that day every **12th** month thereafter. Each date on which my interest rate could change is called a "Change Date."
### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.** The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE** percentage point(s) ( **3.000 %** ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR – Single Family – Fannie Mae UNIFORM INSTRUMENT Form 3526 6/01 (rev. 6/16)**
Ellie Mae, Inc.  **Page 1 of 3**  F3526NOT  0816
F3526NOT (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.375 %**       or less than **5.375 %.**        Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO**                          percentage point(s) ( **2.000 %**        ) from the rate of interest I have been paying for the preceding  **12**              month(s). My interest rate will never be greater than **11.375 %. My interest rate will never be less than the start rate or 5.375 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15**              calendar day(s) after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR** – Single Family – **Fannie Mae UNIFORM INSTRUMENT Form 3526 6/01 (rev. 6/16)**
Ellie Mae, Inc.                                   Page 2 of 3                                   F3526NOT  0816
                                                                                               F3526NOT (CLS)
                                                                                               07/31/2019 10:36 AM PST



LOAN #: 909216931

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



_____ (Seal)
**ARTUR ELIZAROV**

**Lender: Goldwater Bank, N.A.**
**NMLS ID: 452955**
**Loan Originator: Gregory Hill**
**NMLS ID: 247349**

[Sign Original Only]

*HFS*

When recorded, mail to:
Goldwater Bank, N.A.
Attn: Final Document Department
P.O. Box 25064
Albuquerque, NM 87125
844-799-4653

Title Order No.: 0625-5974427
Escrow No.: 0625-5974427
LOAN #: 909216931

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

| MIN 1009209-4100147547-4 |
| --- |

MERS PHONE #: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **July 31, 2019,** together with all Riders to this document.

(B) "Borrower" is **ARTUR ELIZAROV, AN UNMARRIED MAN.**

Borrower's address is **828 Westmount Drive, West Hollywood, CA 90069.**

Borrower is the trustor under this Security Instrument.
(C) "Lender" is **Goldwater Bank, N.A..**

Lender is **a Corporation,** organized and existing under the laws of **The United States of America.** Lender's address is **2525 E. Camelback Rd, Suite 1100, Phoenix, AZ 85016.**

Case 5:21-cv-00666-JWH-SP Document 24-1 Filed 05/23/23 Page 26 of 60 Page ID #:7132

LOAN #: 909216931

**(D) "Trustee"** is **First American Title Company.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **July 31, 2019.** The Note states that Borrower owes Lender **SIX HUNDRED EIGHTY SIX THOUSAND TWO HUNDRED FIFTY AND NO/100* * * \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*** Dollars (U.S. **$686,250.00** )

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2049.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Other(s) [specify]
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider
☐ V.A. Rider

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3005 1/01
Ellie Mae, Inc.          Page 2 of 13                                          CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **Riverside** [Name of Recording Jurisdiction]:

**LOT 8 OF BLOCK 7, PALM CANYON MESA TRACT, AS PER MAP RECORDED IN BOOK 12, PAGES 52 THROUGH 56, BOTH INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. APN #: 513-363-023-2**

which currently has the address of   **291 W. Overlook Road, Palm Springs,**

[Street] [City]

California **92264-8934**          ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice

Case 5:21-cv-00666-JWH-SP Document 42-1 Filed 05/05/23 Page 28 of 60 Page ID #:7134

to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3005 1/01
Ellie Mae, Inc. Page 4 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3005 1/01**
Ellie Mae, Inc. Page 5 of 13

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3005 1/01
Ellie Mae, Inc.                                                      Page 6 of 13

Case 5:21-cv-00666-JWH-SP Document 484-1 Filed 05/05/23 Page 7 of 17 Page ID #:7137

from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration



period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Case 5:21-cv-00666-JWH-SP Document 42-1 Filed 05/05/23 Page 33 of 60 Page ID #:7139

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3005 1/01
Ellie Mae, Inc.                                                   Page 9 of 13



CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc. Page 10 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.



**LOAN #: 909216931**

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**ARTUR ELIZAROV**

4\31\2019 **(Seal)**
**DATE**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of CALIFORNIA**
**County of** Los Angeles

**On** July 31. 2019 **, before me,** Estela Noemy Moreno Aviles NOTARY PUBLIC
(here insert name and title of the officer), personally appeared ARTUR ELIZAROV, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**Signature**

_____**(NOTARY)**

**(SEAL)**

ESTELA NOEMY MORENO AVILES
Notary Public - California
Los Angeles County
Commission # 2293165
My Comm. Expires Jun 15, 2023

LOAN #: 909216931

Lender: Goldwater Bank, N.A.
NMLS ID: 452955
Loan Originator: Gregory Hill
NMLS ID: 247349

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3005 1/01**
Ellie Mae, Inc.                                            Page 13 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

LOAN #: 909216931
MIN: 1009209-4100147547-4

# ADJUSTABLE RATE RIDER

## (LIBOR One-Year Index (As Published In The Wall Street Journal-Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **31st** day of **July, 2019,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Goldwater Bank, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at: **291 W. Overlook Road, Palm Springs, CA 92264-8934.**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of **5.375 %.** The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the **1st** day of **August, 2024,** and on that day every **12th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.                                                    Page 1 of 4                          F3189RLU 0816
                                                                                                        F3189RLU (CLS)
                                                                                                        07/31/2019 10:36 AM PST



deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.** The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE** percentage point(s) ( **3.000 %** ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.375 %** or less than **5.375 %.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO**

percentage point(s) ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** month(s). My interest rate will never be greater than **11.375 %. My interest rate will never be less than the start rate or 5.375 %.**

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title

**MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR**-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.

F3189RLU  0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.

F3189RLU 0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

ARTUR ELIZAROV                                7/31/2019 ___(Seal)
                                                        DATE

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                    Page 4 of 4                    F3189RLU  0816
                                                                 F3189RLU (CLS)
                                                                 07/31/2019 10:36 AM PST



**DOC # 2019-0299193**
08/07/2019 05:00 PM Fees: $38.00
Page 1 of 9
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

PLEASE COMPLETE THIS INFORMATION
RECORDING REQUESTED BY:

FIRST AMERICAN TITLE

AND WHEN RECORDED MAIL TO:
AND MAIL TAX STATEMENTS TO:

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: MARY #420

Space above this line for recorder's use only

UNISON HOMEBUYER UNIFORM SUBORDINATION AGREEMENT

Title of Document

**TRA:** 011-003

**DTT:** $0.00

**Exemption reason declared pursuant to Government Code 27388.1**

☐ This document is a transfer that is subject to the imposition of documentary transfer tax.

☑ This is a document recorded in connection with a transfer that is subject to the imposition
of documentary transfer tax.
Document reference: CONCURRENTLY HEREWITH

☐ This document is a transfer of real property that is a residential dwelling to an owner-
occupier.

☐ This is a document recorded in connection with a transfer of real property that is a
residential dwelling to an owner-occupier.
Document reference:_____

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

ACR 238 (Rev. 01/2018)                    Available in Alternate Formats

Recording Requested by
First American Title Company

DOC #2019-0299193 Page 2 of 9

Prepared by, recording requested by, and
when recorded mail to:

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

Unison HomeBuyer Agreement ID Number:
FRX-226269

## UNISON HOMEBUYER UNIFORM SUBORDINATION AGREEMENT

**Legal Description of Property:** That certain real property described in **Exhibit B** attached hereto.

**Property Address:** 291 W Overlook Rd, Palm Springs, CA 92264

**Senior Lender/First Mortgage:**

Lender ("**Senior Lender**"):
Borrower / Homeowner ("**Owner**"): Artur Elizarov
Loan Number: 90216931
Note Dated: __July 30, 2019__
Original Principal Amount: $ 686,250

**Subordinating Lien Holder/Junior Lien:**

Unison Agreement Corp., its successors and assigns ("**Subordinating Lien Holder**")

Unison HomeBuyer ID Number: FRX-226269

Dated As Of: ___July 30, 2019___ ("**Effective Date**")

This **Unison HomeBuyer Uniform Subordination Agreement** is made pursuant to and as of the Effective Date of that certain Unison HomeBuyer Agreement made by and between Owner and Subordinating Lien Holder and securing the Junior Lien of Subordinating Lien Holder ("**Unison HomeBuyer Agreement**").

Defined terms not defined in the text herein are defined in **Exhibit A** attached hereto or in **Schedule A** to the **Unison HomeBuyer Covenant Agreement** executed by Owner and Subordinating Lien Holder as a component of the Unison HomeBuyer Agreement.

When the context requires, singular nouns and pronouns include the plural.

Page 1 of 7

© 2016, **Unison**

Form 405 HBA-Multi (12/1/2016)

**WHEREAS,** Senior Lender is the owner and holder of the First Mortgage on the above-referenced property (the "**Property**") which is the senior lien on title to the Property and an interest in that title; and

**WHEREAS,** Subordinating Lien Holder is the owner and holder of the Junior Lien on title to the Property which is the junior lien on title to the Property and an interest in that title pursuant to the Unison HomeBuyer Agreement.

**NOW, THEREFOR,** for value received and to induce the Senior Lender to originate the First Mortgage on the Property:

1.      Subordinating Lien Holder unconditionally subordinates its lien on, and all other rights and interests in, the title to the Property resulting from the Junior Lien to the lien on, and to all other rights and interests in, the title to the Property resulting from the First Mortgage. Subordinating Lien Holder agrees that its lien on, and all other rights and interests in, the title to the Property resulting from the Junior Lien will at all times remain subordinate to the lien on, and all other rights and interests in, the title to the Property resulting from the First Mortgage.

2.      Subordinating Lien Holder hereby agrees that its lien on, and all other rights and interests in, the title to the Property resulting from the Junior Lien will remain subordinate to the lien on, and all other rights and interests in, the title to the Property resulting from any renewal, extension or modification of the First Mortgage made in connection with a **Bona Fide Loan Modification** by Senior Lender, and agrees that no increase in Owner's indebtedness on the First Mortgage resulting from such renewal, extension or modification exceeding the **Maximum Authorized Debt** as defined in the Unison HomeBuyer Agreement shall constitute an actionable **Event of Default** by Owner under the Unison HomeBuyer Agreement.

3.      Subordinating Lien Holder hereby agrees that the written approval of Senior Lender to a **Short Sale** of the Property in connection with **Bona Fide Loss Mitigation** by Senior Lender on the First Mortgage shall not constitute an event occasioning Subordinating Lien Holder's right to exercise its option to purchase an undivided percentage interest in the Property under the Unison HomeBuyer Agreement; and further, that upon Lender's written approval of such Short Sale, in the event the "Investor Interest" of Subordinating Lien Holder (as such term is defined in the Unison HomeBuyer Agreement) is calculated as no greater than $0, Subordinating Lien Holder shall timely consent to such Short Sale in writing and release the Junior Lien to facilitate the Short Sale without demand of consideration.

4.      Subordinating Lien Holder hereby agrees to the following with respect to any judicial or non-judicial foreclosure action on the Property undertaken by Senior Lender in accordance with applicable law in response to a default by Owner under the First Mortgage ("**Senior Foreclosure**"):

(a)      A Senior Foreclosure shall not constitute a sale of the Property to a **Third Party Buyer**, nor shall a foreclosure sale by Senior Lender constitute an event occasioning Subordination Lien Holder's right to exercise its option to purchase an undivided percentage interest in the Property under the Unison HomeBuyer Agreement.

(b)      Subordinating Lien Holder expressly waives any right of redemption in or to the Property which would accrue to Subordinating Lien Holder under applicable law following the completion of a Senior Foreclosure.

© 2017. Unison                                      Form 405 HBA-Multi (3/2/2017)

(c)     Notice of Senior Foreclosure shall be given by Senior Lender to Subordinating Lien Holder in accordance with customary practice and applicable law.

(d)     Any and all covenants running with the land pursuant to the terms of the Unison HomeBuyer Agreement shall be automatically extinguished by a completed Senior Foreclosure.

5.     Subordinating Lien Holder hereby agrees that in the event of any judicial or non-judicial foreclosure action on the Property undertaken by Subordinating Lien Holder in accordance with applicable law in response to a default by Owner under the Junior Lien ("**Junior Foreclosure**"), Subordinating Lien Holder shall provide written notice of such Junior Foreclosure to Senior Lender simultaneously and in the same form as such notice is given by Subordinating Lien Holder to Owner.

6.     Subordinating Lien Holder hereby agrees that its lien on, and all other rights and interests in, the title to the Property resulting from the Junior Lien will remain subordinate to any and all rights and interests of Senior Lender in and to, rents and other profits derived from the Property resulting from any lease of the Property approved by Senior Lender in connection with Bona Fide Loss Mitigation by Senior Lender on the First Mortgage, and that no such lease of the Property shall constitute an actionable Event of Default under the Unison HomeBuyer Agreement.

7.     Subordinating Lien Holder hereby unconditionally and automatically subordinates its lien on, and all other rights and interests in, the title to the Property accruing as a result of any **Unpaid Owner Obligations** of Owner (as such term is defined in the Unison HomeBuyer Agreement) in connection with the Junior Lien, to the lien on, and to all other rights and interests in, the title to the Property resulting from the First Mortgage.

8.     Subordinating Lien Holder hereby agrees that if, in connection with Bona Fide Loss Mitigation by Senior Lender on the First Mortgage, Senior Lender has not declared Owner to be in default of the occupancy provisions of the First Mortgage, then Subordinating Lien Holder shall not deem Owner to be in default under the occupancy provisions of the Unison HomeBuyer Agreement.

9.     Subordinating Lien Holder hereby agrees that if, in connection with Bona Fide Loan Modification of the First Mortgage by Senior Lender, Senior Lender extends the term of months of the First Mortgage beyond its amortization period at origination, Subordinating Lien Holder shall automatically extend, and shall execute and record any and all necessary addenda and documentation required to extend, the Term of the Unison HomeBuyer Agreement such that the Unison HomeBuyer Agreement is coterminous with the extended amortization period of the First Mortgage.

10.     Subordinating Lien Holder hereby agrees that any consummation of Subordinating Lien Holder's purchase of an undivided percentage interest in and to the Property under the terms of the Unison HomeBuyer Agreement shall automatically constitute a transfer or sale of the Property occasioning Senior Lender's rights immediately to accelerate the First Mortgage; and that in the event Senior Lender commences a Senior Foreclosure in response to such acceleration, Subordinating Lien Holder expressly waives any and all defenses to such Senior Foreclosure which might accrue to Subordinating Lien Holder as record title owner of a percentage interest in and to the Property, except as to those rights of reinstatement of the First

© 2017, Unison                                    Form 405 HBA-Multi (3/2/2017)

Mortgage or redemption of the Property which may accrue to Subordinating Lien Holder under applicable law prior to the completion of a foreclosure sale.

**11.**     Subordinating Lien Holder shall provide prompt written notice to Senior Lender upon tender of an offer of **Orderly Sale** to Owner under the terms of the Unison HomeBuyer Agreement, and shall not tender such offer unless or until Senior Lender has reasonably exhausted attempts at Bona Fide Loan Modification and Bona Fide Loss Mitigation in connection with Owner's default on the First Mortgage.

**12.**     Following the death of the **Last Surviving Owner,** Subordinating Lien Holder shall notify the heir(s) (and/or estate, as appropriate) of the Last Surviving Owner if Subordinating Lien Holder elects to exercise its right to purchase its undivided percentage interest in and to the Property under the Unison HomeBuyer Agreement; provided, however, that Subordinating Lien Holder shall temporarily forbear from exercising its right to purchase its undivided percentage interest in and to the Property in the event a surviving spouse, child, parent, grandparent, grandchild, brother or sister of the Last Surviving Owner ("**Surviving Occupant**") is occupying or intends to occupy the Property as his or her primary residence, and the First Mortgage is either not in default, or Senior Lender is engaged in a Bona Fide Loan Modification in response to a default thereunder, and provided further that such right shall automatically recommence upon the earliest of any of the following:

(a)     Senior Lien Holder elects to accelerate, or exercise its due-on-sale rights with respect to, the First Mortgage;

(b)     Surviving Occupant ceases to occupy the Property as his or her primary residence;

(c)     Surviving Occupant transfers or attempts to further transfer the Property to any new transferee;

(d)     an event occurs which would constitute a default under the Unison HomeBuyer Agreement occasioning Subordinating Lien Holder's right to accelerate the Junior Lien, and which Surviving Occupant fails to cure, including, without limitation: the obligation to maintain and repair the property; to pay taxes and insurance thereon when due; to permit Subordinating Lien Holder to appraise and physically inspect the Property; or any other material event of default specified in the Unison HomeBuyer Agreement; or

(e)     The death of Surviving Occupant.

The Term of the Unison HomeBuyer Agreement shall automatically extend to permit Subordinating Lien Holder to purchase its undivided percentage interest in and to the Property promptly following any of the events set forth in subsections 12(a) - (e) above.

**13.**     This Subordination Agreement shall be binding upon all successors and assigns of Subordinating Lien Holder. Subordinating Lien Holder shall provide written notice to Senior Lender of any assignment of the Junior Lien and shall require of its assignees in writing that no subsequent assignment of the Junior Lien shall be effective until the delivery of written notice to Senior Lender of such assignment.

© 2017, **Unison**                    Form 405 HBA-Multi (3/2/2017)

Unison Agreement Corp., a Delaware corporation

By:  _____

Name:   Ismael Casas Jr

Title:    Vice President

Date signed: _____  7/3/2019

## ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )

) ss.

COUNTY OF SAN FRANCISCO )

On _____, 20___, before me _____,

Notary Public, personally appeared _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

(seal)

© 2017, Unison                    Form 405 HBA-Multi (3/2/2017)

## BENEFITED PARTY'S ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the
> identity of the individual who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or validity of that document.

State of California           )
County of San Francisco       )

On __JUL 3 1 2019__ _____ before me, _____Angelica Padilla, a notary public____
personally appeared _____Ismael Casas, Jr._____ who proved to me
on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/
their signature(s) on the instrument the  person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

ANGELICA PADILLA
COMM. #2272624
Notary Public - California
San Francisco County
My Comm. Expires Dec. 23, 2022

Signature _____     **(Seal)**
        Angelica Padilla

## Exhibit A

**Bona Fide Loan Modification.** A modification to the First Mortgage offered by Senior Lender or its assignee: (a) in accordance with, or which is functionally equivalent to, a loan modification program approved by the government–sponsored enterprises (i.e. Fannie Mae or Freddie Mac), (b) granted in response to Owner's documented and verified inability to make required payments on the First Mortgage; and (c) restricted in its terms such that there is no "cash out" payment to Owner.

**Bona Fide Loss Mitigation.** A deed-in-lieu of foreclosure, Short Sale, or other action approved and undertaken by Senior Lender in response to: (a) Owner's documented and verified inability to make required payments on the First Mortgage; and (b) based on a documented and verified calculation of the actual market value of the Property by a neutral third party which calculation is free of fraud, bias or undue influence.

**Junior Foreclosure:** A judicial or non-judicial foreclosure action by Subordinating Lien Holder.

**Junior Lien.** The Unison HomeBuyer Agreement equity investment contract.

**Last Surviving Owner.** The last surviving individual person who is both a borrower under the First Mortgage and a signatory homeowner to the Unison HomeBuyer Agreement.

**Maximum Authorized Debt.** The maximum principal amount of total indebtedness secured by any lien on the Property that Owner is permitted to incur under, and as defined in, the Unison HomeBuyer Agreement.

**Memorandum of Unison HomeBuyer Agreement.** A contractual component of the Unison HomeBuyer Agreement equity investment contract constituting the Junior Lien on the Property.

**Mortgage.** A mortgage, deed of trust, trust deed or other security instrument.

**Owner(s).** The above-named homeowner(s) who is/are both borrower(s) under the First Mortgage, and signatory homeowner(s) to the Unison HomeBuyer Agreement.

**Senior Foreclosure.** A judicial or non-judicial foreclosure action by Senior Lender.

**Senior Lender.** The above-named lender which makes the First Mortgage on the Property, and all of its successors and assigns.

**Short Sale.** A sale by Owner wherein the Senior Lender on the First Mortgage expressly agrees to accept an amount that is less than the full amount due and payable to release the senior lien.

**Subordinating Lien Holder.** Unison Agreement Corp. and its successors and assigns.

**Surviving Occupant.** A surviving spouse, child, parent, grandparent, grandchild, brother or sister of the Last Surviving Owner who elects to occupy the Property as his or her established primary residence.

**Unison HomeBuyer Agreement.** The equity investment contract which constitutes the Junior Lien on the Property of Subordinate Lien Holder, consisting of the following: (a) the Unison HomeBuyer Option Agreement; (b) the Unison HomeBuyer Covenant Agreement; (c) the Unison HomeBuyer Subordinated Security Instrument; (d) the Memorandum of Unison HomeBuyer Agreement; and (e) all addenda and amendments thereto.

**Unison HomeBuyer Covenant Agreement.** A contractual component of the Unison HomeBuyer Agreement equity investment contract constituting the Junior Lien on the Property.

**Unison HomeBuyer Option Agreement.** A contractual component of the Unison HomeBuyer Agreement equity investment contract constituting the Junior Lien on the Property.

**Unison HomeBuyer Subordinated Security Instrument.** The contractual component of the Unison HomeBuyer Agreement equity investment contract which secures the Junior Lien and which is expressly made subordinate to the First Mortgage both by its terms and under this Subordination Agreement, and which is recorded following the recording of the First Mortgage in the jurisdiction where the Property is located.

Page 6 of 7

© 2017, Unison

Form 405 HBA-Multi (3/2/2017)

## Exhibit B

### LEGAL DESCRIPTION OF PROPERTY

That certain real property situated in the City of Palm Springs, County of Riverside, State of CA, described as follows:

LOT 8 OF BLOCK 7, PALM CANYON MESA TRACT, AS PER MAP RECORDED IN BOOK 12, PAGES 52 THROUGH 56, BOTH INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: APN: 513-363-023-2

**[end of legal description]**

© 2017, Unison

Form 405 HBA-Multi (3/2/2017)

**West Star**
Mortgage Corporation

**PAYOFF CALCULATIONS**

| Prepared for: | Andrea Cross<br>Escrow of the West | Request Date :<br>Payoff Date :<br>Telephone :<br>FAX : | 03/24/21<br>04/23/21<br>310 402-5555<br>310 402-5556 |
|---|---|---|---|

Account Data :
Account      909-21693-1 Artur Elizarov
Legal               LOT 8 OF BLOCK 7 PALM CANYON
                    MESA TRACT, RECORDED IN BOOK 12, PAGE 52
                    THROUGH 56,

Remarks              Conventional Loan

Detail Data :

| Current Balance | 679,565.53 | Interest Paid To | 03/01/20 |
|---|---|---|---|
| Unpaid Interest | .00 | Payoff To | 04/23/21 |
| Interest | 41,802.72 | Number of Days | 412 |
| Recording/Recon Fee | 201.00 | Annual Int Rate | 5.3750% |
| MIP/PMI | .00 | Regular Payment | 4,944.11 |
| Advanced GWB Funds | 1,968.95 | | |
| Negative Escrow Funds | 5,816.60 | | |
| Statement fee | | | |
| Certified Mail Fee | | | |

Payoff Amount :        729,354.80  Daily Interest     101.46

PAYMENTS RECEIVED IN THE OFFICE AFTER 3:00pm MST WILL BE CREDITED THE
NEXT BUSINESS DAY.

Weststar reserves the right to demand additional funds to correct any
error or omission in the above payoff figure that was calculated in
good faith, whether the error or omission is mathematical, clerical,
typographical, or for any transactions that occurred on or after the
date of this payoff quote.  Payoff funds must be paid through Weststar

**FUNDS SHOULD BE MADE PAYABLE TO WESTSTAR AND TENDERED IN THE FORM
OF MONEY ORDER, CASHIER'S CHECK, OR TITLE COMPANY CHECK.  ALL OTHER
CHECKS WILL BE HELD 10 (ten) CALENDAR DAYS TO CLEAR. **

Issuance of this statement does not suspend the requirement to make
mortgage payments when due.





West Star
Mortgage Corporation

**Payoff Calculations Page 2 of 2**

## IMPORTANT PAYMENT INFORMATION

**IF YOUR LOAN IS AN FHA NOTE, CONTACT OUR OFFICE FOR WIRE INSTRUCTIONS AS YOUR METHOD OF PAYMENT. Funds must be received before 2:00 p.m. MST. for same day credit and must be received no later than the last business day of the calendar month so an additional month's interest will not accrue.**

Account 909216931

Your loan has a late fee of $192.14 if paid more than 15 days after the current payment is due, and must be added to the payoff if received after that date.

Your account currently has an escrow balance of $-5819.60. This may not be an available balance, pending bills received prior to the "Payoff To" date.

If you have an automated payment scheduled (ACH), it is your responsibility to discontinue the service.

Remit all payoff funds promptly on or before the "Payoff To" date on page 1. Should the date expire prior to your remittance of funds, you should request an updated payoff calculation statement to ensure your final remittance is sufficient.

Any shortage of the payoff funds received will delay processing and cause additional fees and/or interest to accrue.

Funds may be deducted from escrow to cure any shortage in the payoff received.

Payoff funds must be certified (title company checks accepted) and must be received before 2:00 p.m. mountain standard time (MST) to be posted that business day. Funds received after 2:00 MST may post the following business day.

MAIL CERTIFIED FUNDS TO:

Weststar Mortgage/Loan Servicing
2155 Louisiana Blvd NE # 8000
Albuquerque NM 87110
Attn:  payment processing

Do not place a stop payment on any recent payments made as the payment may be reflected in the payoff calculation. Any payments that are returned NSF are required to be repaid, in addition to any fees that are assessed as a result.

If there is mortgage insurance (MI) on your loan, there is an estimation of the MIP amount due on the payoff calculations statement. Several factors determine the final amount due, including, but not limited to, the actual payoff date. Should any MIP amount collected not be required, it will be refunded.

Any payoff overage, including excess escrow funds, will be mailed within 20 business days after the loan is paid in full.

If you have any questions, you may contact us at 800-640-0635 Monday – Friday 7:00 a.m. – 5:00 p.m. MST.



03/29/2021 04:55 PM Fees: $17.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

DOC #2021-0196602

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: REGINA #080

**RECORDING REQUESTED BY:**
Orange Coast Title

**AND WHEN RECORDED MAIL TO:**

Scott Howlett
44 Hartford
San Francisco, CA 94144

THIS SPACE FOR RECORDER'S USE ONLY:

Title Order No.: 210-2216078-10          Escrow No.: 02-035523-AC

APN 513-363-023
TRA 011

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

### DOCUMENTARY TRANSFER TAX is $1,490.50

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of Palm Springs **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Artur Elizarov, a Single Man**

hereby GRANT(s) to:

**Scott Howlett, a Single Man**

the real property in the City of Palm Springs, County of Riverside, State of California,
described as:
Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56
both inclusive of Maps,  in the office of the County of said county.

Also Known as:  291 W. Overlook Road, Palm Springs, CA  92264
APN#: 513-363-023-2

**DATED: March 22, 2021**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

Title Order No.: 210-2216078-10
Escrow No.: 02-035523-AC

APN# 513-363-023-2

## Signature Page

_signature_

Artur Elizarov

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _Florida_

COUNTY OF _Broward_

On _03/25/21_ before me, _Antonio Perez_ A Notary Public personally

appeared _Artur Elizarov_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____ (Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN

ANTONIO PEREZ
Commission # HH 079732
Expires January 12, 2025
Bonded Thru Budget Notary Services



9440 Santa Monica Blvd., #310
Beverly Hills, CA 90210

Phone: (310) 402-5555
Fax: (310) 402-5556
www.escrowofthewest.com

## SELLER'S FINAL SETTLEMENT STATEMENT

**PROPERTY:** 291 W. Overlook Road
Palm Springs, CA 92264

**DATE:** March 30, 2021

**SELLER:** Artur Elizarov

**CLOSING DATE:** March 29, 2021
**ESCROW NO.:** 02-035523-AC

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 1,355,000.00 |
| | | |
| **PAYOFF CHARGES - Unison Milgard Holdings LLC** | | |
| **[Total Payoff $491,000.00]** | | |
| Principal Balance | 491,000.00 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| County Taxes at $5,819.60/semi-annually from 03/29/2021 to 07/01/2021 | | 2,974.46 |
| | | |
| **COMMISSION CHARGES** | | |
| Keller Williams | 33,875.00 | |
| Compass | 33,875.00 | |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Rudy's Termite and Pest Control for Termite Report/Work | 95.00 | |
| Old Republic Home Protection Inc. Home Warranty | 900.00 | |
| Property ID for Natural Hazard Disclosure Report | 99.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Orange Coast Title** | | |
| Title - Owner's Title Insurance (optional) | 2,761.00 | |
| Title - Recording Service Fee | 12.50 | |
| Title - Sub Escrow Fee | 62.50 | |
| Title - Wire Fee | 50.00 | |
| Recording Grant Deed | 17.00 | |
| Recording Reconveyance | 31.00 | |
| Recording Quitclaim Deed | 20.00 | |
| Transfer Tax - County to Riverside County | 1,490.50 | |
| Property Taxes (2nd Install) to Riverside County Tax Collector | 5,819.60 | |
| | | |
| **ESCROW CHARGES - Escrow of the West** | | |
| Title - Escrow Fee | 3,060.00 | |
| Professional Courtesy Discount | | 1,355.00 |
| Title - Wire Fee | 25.00 | |
| Title - Overnight Fee | 20.00 | |
| Title - Admin Fee | 250.00 | |
| Title - Archive Fee | 50.00 | |
| Title - Messenger/Handling Fee | 75.00 | |
| | | |
| **Net Proceeds** | 785,741.36 | |
| | | |
| **TOTAL** | $ 1,359,329.46 | $ 1,359,329.46 |

**SAVE THIS STATEMENT FOR INCOME TAX PURPOSES**

# Escrow of the West

## REQUEST FOR OUTGOING BANK WIRE TRANSFER

1 - 01 - City National Bank - Account #: ███████

**Escrow No.:** 02-035523-AC                     **Ref No.:** 32767

**Date:** March 30, 2021                          **Amount:** $785,741.36

**Property:** 291 W. Overlook Road, Palm Springs, CA,  92264

| | |
|---|---|
| Wire To Bank: | Ally Bank |
| Bank Address 1/Care of: | |
| Bank Address 2: | |
| City, State, Zip: | |
| Bank ABA/Routing No.: | ███████ |
| Bank ID Type: | ABA |
| Recipient Name: | Artur Elizarov |
| Recipient Account. Number: | ███████ |
| Recipient Acct. Type: | DDA |
| Recipient Address 1: | 711 S. Olive St. #505 |
| Recipient Address 2: | |
| Recipient City, State, Zip: | Los Angeles, CA  90014 |
| Additional Instructions: ( i.e. Loan Number ) | Net Proceeds |
| Intermediary Bank: | |
| Intermediary Bank Address 1: | |
| Intermediary Bank Address 2: | |
| City, State, Zip: | |
| Intermediary Bank ABA: | |
| Intermediary Bank ABA Type: | |
| Receiving Bank Account #: | |
| Receiving Bank Account Type: | |

_____          _____
Authorized Signature                                      Authorized Signature



**Arten Elizarov**
DreamHome Realty Group Inc
art@dhr.company
323-326-7657

**CalBRE # 02020109**

$1,399,000

WWW.291OVERLOOK.COM

# FOR SALE

291 W OVERLOOK RD
PALM SPRINGS, CA 92264

**3 beds / 4 baths / 2,400 SF**



**291 W OVERLOOK RD - PALM SPRINGS, CA**     **$1,399,000**

Meticulously Remodeled With The Finest Of Modern Finishes. Located in The Mesa, a beautiful and historic neighborhood in South Palm Springs. At the base of the San Jacinto Mountains, it offers a front row view of the beautiful rock formations. A serene ambiance among multi-million dollar estates, this ultra modern home offers three separate master suites. The suites do not hare common walls. An entertainers delight with floor-to-ceiling glass overlooking a front-loaded heated pool, open floor plan, a front, side, and rear yard. All common spaces and suites have separate AC units.



**Artur Elizarov**
DreamHome Realty Group Inc
art@dhr.company
323-326-7657
DreamHome Realty Group Inc
## CalBRE # 02020109



The information contained herein has been obtained through sources deemed reliable but cannot be guaranteed for its accuracy. We recommend to the buyer that any information, which is of special interest, should be obtained through independent verification. ALL MEASUREMENTS ARE APPROXIMATE.



**WAGNER HICKS PLLC**
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
(704) 705-7787

**DEREK M. BAST**
Attorney at Law
(704) 705-8311
derek.bast@wagnerhicks.law

May 12, 2021

**VIA CERTIFIED MAIL & EMAIL**

Artur Elizarov
c/o Ilya Alekseyeff, Esq.
LOIA, Inc.
8721 Santa Monica Boulevard, Suite 119
West Hollywood, CA 90069
ilya@loia.legal

Artur Elizarov
c/o Ilya Alekseyeff, Esq.
291 W. Overlook Road
Palm Springs, CA 92264-8934

> Re:     *Notice of Acceleration – Loan No. 909216931*

Dear Mr. Elizarov:

The undersigned firm has been retained by Goldwater Bank, N.A. ("Goldwater Bank") with regard to your breach of the terms of a mortgage (the "Mortgage"), memorialized in a Note and Deed of Trust, on real property located at 291 W. Overlook Road, Palm Springs, California 92264-8934 (the "Mortgaged Property"). As you know, you sold the Mortgaged Property to Scott Howlett on or around March 29, 2021, and that sale has been memorialized in a Grant Deed (Doc. No. 2021-0196602) on file with the Recorder's office in Riverside County, California. Mr. Elizarov did not secure Goldwater Bank's prior written consent to this sale pursuant to the express terms of the Note and Deed of Trust.

Your sale of the Mortgaged Property without Goldwater Bank's prior written consent permits Goldwater Bank to accelerate the loan and require immediate payment in full of "all sums secured by this Security Interest." Section 18 of the Deed of Trust provides, in relevant part:

> If all or any part of the Property or any Interest in the Property is sold or transferred . . . without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Interest.
> . . .

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Pursuant to Section 18 of the Deed of Trust and Section 11 of the Note, Goldwater Bank hereby provides you notice that it is exercising its rights to accelerate the Mortgage and demand immediate payment in full of all sums secured by the Note and Deed of Trust. You shall have thirty (30) days from the date of this notice of acceleration within which to pay all sums secured by this Security Instrument. The total amount demanded pursuant to this notice of acceleration is $734,326.34. If you fail to pay this sum prior to the expiration of thirty (30) days from the date of this notice, Goldwater reserves its full rights to invoke any permissible remedies at law and under the Note and Deed of Trust. Be advised that this Mortgage accrues *per diem* interest in an amount of $101.46, and this notice of acceleration shall not limit Goldwater's recovery if you fail to pay the amount of $734,326.34 within the time demanded.

Section 15 of the Deed of Trust and Section 8 of the Note require notice to be given to you in writing by first class mail to "the Property Address unless Borrower has designated a substitute notice address by notice to Lender." At this time, Goldwater is aware that you no longer reside at the Mortgaged Property, but you have not given formal notice of a substitute notice address to Goldwater Bank. Nevertheless, in the litigation pending in the United States District Court for the Central District of California, captioned *Goldwater Bank, N.A. v. Elizarov*, No. 5:21-cv-00616-JWH-SP, your attorney Mr. Alekseyeff has been authorized to accept legal notices on your behalf, and the subject matter of that litigation is the Mortgage and the Mortgaged Property. Goldwater Bank therefore is directing this notice both to the Mortgaged Property address and to Mr. Alekseyeff's address as your substitute notice address. (Deed of Trust, § 15).

You may contact me for payment instructions in the event you are prepared to pay all amounts due and owing within thirty (30) days.

Sincerely,



Derek M. Bast

WH