*__Goldwater Bank v. Elizarov, et al.__*, C.D. Cal. Case No. 21-cv-00616-JWH-SP

# __OMNIBUS__
# __JOINT EXHIBIT PART C__

# __KATZ DECLARATION__

HALL GRIFFIN LLP
HOWARD D. HALL, State Bar No. 145024
 *hdhall@hallgriffin.com*
JEREMY T. KATZ, State Bar No. 267361
 *jkatz@hallgriffin.com*
KASANDRA C. GOLDBERG, State Bar No. 345364
 *kgoldberg@hallgriffin.com*
1851 East First Street, 10th Floor
Santa Ana, California 92705-4052
Telephone: (714) 918-7000
Facsimile: (714) 918-6996

Attorneys for Defendant and Cross-Complainant SCOTT HOWLETT;
Defendant BMO HARRIS BANK N.A., Successor by Merger to BANK OF THE WEST

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| Goldwater Bank, N.A. | CASE NO. 21-cv-00616-JWH-SP |
| Plaintiff, | JUDGE:   Hon. John W. Holcomb<br>CTRM.:   9D |
| vs. | **DECLARATION OF JEREMY T. KATZ IN SUPPORT OF DEFENDANTS HOWLETT AND BANK OF THE WEST'S OPPOSITION TO PLAINTIFF GOLDWATER'S RULE 56 MOTION FOR SUMMARY JUDGMENT** |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWLETT; BANK OF THE WEST; and ILYA ALEKSEYEFF, | |
| Defendants. | |
| AND RELATED CROSS-ACTIONS | JUDGE:  Hon. John W. Holcomb<br>DATE:    September 15, 2023<br>TIME:    9:00 a.m.<br>CRTRM.:   9D |
| | TRIAL DATE:    November 27. 2023 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

1    I, Jeremy T. Katz, declare as follows:

2    1.    I am an attorney with the law firm of Hall Griffin LLP, counsel of

3    record for Defendant and Cross-Complainant SCOTT HOWLETT; and Defendant

4    BMO HARRIS BANK N.A., Successor by Merger to BANK OF THE WEST

5    ("BOTW") (collectively "Defendants") in this action.  I have knowledge of the facts

6    set forth in this Declaration based on my own personal knowledge and my review of

7    the records Hall Griffin LLP regularly kept during its representation of Defendants.

8    If called as a witness, could and would competently testify to such facts under oath.

9    2.    On Tuesday, August 8, 2023, I receive an email from Abbey Krysak,

10   counsel of record for Plaintiff Goldwater Bank, N.A. ("Goldwater") transmitting an

11   excel spreadsheet containing Goldwater's proposed Joint Statement for Goldwater's

12   Rule 56 motion against Howlett and BOTW.

13   3.    Pursuant to Judge Holcomb's Standing Order regarding the "iterative"

14   process for preparing summary judgment documents, I worked through the weekend

15   to prepare Howlett/BOTW's iterative response and additional facts.  I circulated an

16   excel spreadsheet containing that responding information very late on Sunday

17   (technically, 12:13 a.m. PST on Monday, August 14, 2023).

18   4.    I concurrently asked Ms. Krysak if she would agree that the Joint

19   Statement should be organized into a roughly chronological order, with the Plaintiff-

20   proponent and Howlett/BOTW-proponent interspersed:

21

22   • We believe it will be helpful to the Court to have the facts arranged into roughly chronological
     order. **Please let us know if you disagree.**

23   • To achieve chronological order, I interspersed the new Howlett-proponent facts with the
     Plaintiff-proponent facts.   Each fact is clearly labeled either Plaintiff-proponent or Howlett-
24   proponent.

25

26   5.    The following paragraphs describe discovery matters and discovery

27   documents from this action that serve as evidence for this motion.

28   6.    On September 15, 2022, Scott Howlett's deposition was taken.  A true

2

HALL GRIFFIN

1  and correct copy of pertinent excerpts of the transcript of Scott Howlett's deposition

2  is in Joint Exhibit C as **Exhibit 29**.

3      7.   On September 23, 2022, Defendant Artur Elizarov's deposition was

4  taken.  A true and correct copy of pertinent excerpts of Artur Elizarov's deposition

5  is in Joint Exhibit C as **Exhibit 30.**

6      8.   On November 8, 2022, Brittany Shaw's deposition was taken.

7  Ms. Shaw testified that she is an employee of Plaintiff Goldwater Bank

8  ("Goldwater").  A true and correct copy of pertinent excerpts of the transcript of

9  Brittany Shaw's deposition is in Joint Exhibit C as **Exhibit 31**.

10     9.   On September 9, 2022, Peter Hill's deposition was taken.  Mr. Hill

11  testified that he is Goldwater's Chief Credit Officer.  A true and correct copy of

12  excerpts of the transcript of Peter Hill's deposition is in Joint Exhibit C as **Exhibit**

13  **31**.  Additional excerpts the transcript of Peter Hill's deposition are in Joint Exhibit

14  E as **Exhibit 70**.  A true and correct copy of exhibit 44 from Peter Hill's deposition

15  (a February 4, 2021 email exchange between Peter Hill, Gregory Hill, Matt Teskey

16  and Annette Baca) is in Joint Exhibit E as **Exhibit 77**.   A true and correct copy of

17  exhibit 45 from Peter Hill's deposition (an March 3 to March 4, 2021 email

18  exchange between Peter Hill and Theo Haugen) is in Joint Exhibit E as **Exhibit 71**.

19     10.   On June 8, 2022, Andrea Cross's deposition was taken.  A true and

20  correct copy of excerpts of the transcript of Andrea Cross' deposition is in Joint

21  Exhibit Part E as **Exhibit 72**.  A true and correct copy of exhibit 7 from Ms. Cross'

22  deposition (a Request for Demand dated March 3, 2021 addressed to "Unison

23  Midgard Holdings LLC c/o Goldwater, ATTN: Pete Hill") is in Joint Exhibit Part E

24  as **Exhibit 79**.

25     11.   On May 12, 2023, the deposition of Goldwater's first Rule 30(b)(6)

26  witness, Christine Overbeck, was taken.  A true and correct copy of the Notice of

27  Deposition is in Joint Exhibit E as **Exhibit 65.**  A true and correct copy of pertinent

28  excerpts of the transcript of the May 12 deposition of Christine Overbeck is in Joint

3

HALL GRIFFIN

Exhibit E as **Exhibit 66.**

12.     On May 31, 2023, the deposition of Goldwater's second Rule 30(b)(6) witness, Cory Bearden, was taken.  A true and correct copy of pertinent excerpts of the transcript of the May 31 deposition of Cory Bearden is in Joint Exhibit E as **Exhibit 74**

13.     During discovery, Goldwater subpoenaed the records of Escrow of the West, and my office received Escrow of the West's resulting production.  A true and correct copy of pertinent excerpts from Escrow of the West's production is in Joint E as **Exhibit 75.**

14.     On May 22, 2022, Howlett and BOTW served its First Set of Requests for Admission on Goldwater, which Goldwater responded to on July 22, 2022.  A true and correct copy of pertinent excerpts of Goldwater's response to Howlett and BOTW's Requests for Admission is in Joint Exhibit C as **Exhibit 33**.

15.     On April 4, 2022, Goldwater responded to Elizarov's Interrogatories, which was produced to Hall Griffin.  A true and correct copy of excerpts of Goldwater's responses to Elizarov's Interrogatories No. 5 is in Joint Exhibit C as **Exhibit 34.**  Additional excerpts of Goldwater's responses to Elizarov's Interrogatories Nos. 3, 4, 9, and 19 are in Joint Exhibit E as **Exhibit 73.**

16.     On April 4, 2022, Goldwater responded to Elizarov's Request for Admission, which was produced to Hall Griffin.  A true and correct copy of excerpts of Goldwater's responses to Elizarov's Requests for Admission Nos.  3 and 74 is in Joint Exhibit E as **Exhibit 81.**

17.     Goldwater produced numerous documents in connection with requests for production.  A true and correct copy of excerpts of Goldwater's document production is in Joint Exhibit C as **Exhibit 35.**

18.     My office subpoenaed documents from Weststar.  In response on July 20, 2022, Weststar's counsel, Wagner Hicks, sent a letter in response.  A true and correct copy of this letter is in Joint Exhibit Part E as **Exhibit 80.**  However,

4

HALL GRIFFIN

1  Weststar did produce records during the litigation, including the documents Bates-

2  numbered Weststar_0347-0348, a true and correct copy of which is in Joint Exhibit

3  E as **Exhibit 78.**

4        19.    My office also responded to Requests for Production to BOTW, which

5  resulted in the production of a document Bates-numbered BOTW0002331-2332, a

6  true and correct copy of which is in Joint Exhibit E as **Exhibit 76**.

7        20.    The following paragraphs identify documents that were filed in this

8  action through the CM/ECF system (and are subject to the accompanying Request

9  for Judicial Notice) which serve as evidence for this motion.

10        21.  On April 6, 2021, Goldwater filed its Complaint (Dkt No. 1). A true

11  and correct copy of Goldwater's Complaint (omitting the internal exhibits) is in

12  Joint Exhibit C as **Exhibit 39.**

13        22.  On April 16, 2021, Goldwater filed an *ex parte* Application for a

14  Temporary Restraining Order ("TRO") to prevent Elizarov from restraining or

15  alienating the proceeds of the sale (Dkt No. 19). A true and correct copy of

16  Goldwater's *ex parte* Application for a TRO is in Joint Exhibit C as **Exhibit 40.**

17        23.  On April 16, 2021, in connection with its *ex parte* Application for a

18  TRO Goldwater filed a Memorandum of Points and Authorities (Dkt No. 19-1). A

19  true and correct copy of Goldwater's Memorandum of Points and Authorities in

20  connection with its *ex parte* Application is in Joint Exhibit C as **Exhibit 41.**

21        24.  On April 20, 2021, at 1:35pm, the Court entered its Order regarding

22  Goldwater's TRO, restraining and enjoining Elizarov from transferring, alienating,

23  or expending the proceeds that Elizarov received from the sale of the Property (Dkt

24  No. 23). A true and correct copy of the Court's Order regarding Goldwater's

25  requested TRO is in Joint Exhibit C as **Exhibit 42**.

26        25.  On April 30, 2021, Goldwater filed its reply to Elizarov's response to

27  Order to Show Cause (Dkt. No. 31). A true and correct copy of Goldwater's Reply

28  (omitting internal exhibits) is in Joint Exhibit C as **Exhibit 43**.

HALL GRIFFIN

1    26.   On May 4, 2021, the Court Amended and Extended the TRO (Dkt No.

2    32).  A true and correct copy of excerpts of the Court's Order amending and

3    extending the TRO is in Joint Exhibit C as **Exhibit 44**.

4    27.   On May 17, 2021, Goldwater filed its Opening Supplemental Brief in

5    support of Preliminary Injunction (Dkt No. 39).  A true and correct copy of

6    Goldwater's Opening Supplemental Brief in support of its Preliminary Injunction is

7    in Joint Exhibit C as **Exhibit 45**.

8    28.   On May 27, 2021, Goldwater filed its First Amended Complaint

9    ("FAC") (Dkt No. 44).  A true and correct copy of Goldwater's FAC (omitting

10   internal exhibits) is in Joint Exhibit D as **Exhibit 46**.

11   29.   On May 27, 2021, in connection with its FAC, Goldwater filed its

12   Promissory Note as an Exhibit (Dkt No. 44-1).  A true and correct copy of

13   Goldwater's Promissory Note from its FAC is in Joint Exhibit D as **Exhibit 47.**

14   30.   On May 27, 2021, in connection with its FAC, Goldwater filed its

15   unrecorded Deed of Trust (Dkt No. 44-2).  A true and correct copy of Goldwater's

16   unrecorded Deed of Trust from its FAC is in Joint Exhibit D as **Exhibit 48**.

17   31.   On May 27, 2021, in connection with its FAC, Goldwater filed

18   Howlett's recorded Grant Deed (Dkt No. 44-5).  A true and correct copy of

19   Howlett's recorded Grant Deed from Goldwater's FAC is in Joint Exhibit D as

20   **Exhibit 49.**

21   32.   On May 27, 2021, in connection with its FAC, Goldwater filed a copy

22   of the Master Settlement Statement (Dkt No. 44-6).  A true and correct copy of the

23   Master Settlement Statement from Goldwater's FAC is in Joint Exhibit D as **Exhibit**

24   **50**.

25   33.   On June 10, 2021, Howlett filed his Cross-Complaint against Elizarov

26   (Dkt No. 51).  A true and correct copy of excerpts of Howlett's Cross-Complaint is

27   in Joint Exhibit D as **Exhibit 51**.

28   34.   On June 25, 2021, the parties filed their Joint Rule 26(f) Report (Dkt

6

HALL GRIFFIN

1    No. 57).  A true and correct copy of excerpts of the parties Joint Rule 26(f) Report is

2    in Joint Exhibit D as **Exhibit 52**.

3           35.   On April 1, 2021, Goldwater sent a demand letter to Elizarov.  Elizarov

4    and Goldwater each filed a copy of this April 1, 2021 letter (Dkt Nos. 30-6 and 124-

5    2).  A true and correct copy of the April 1, 2021 Letter is in Joint Exhibit D as

6    **Exhibit 53**.

7           36.   On April 19, 2022, the Court entered the Preliminary Injunction against

8    Elizarov (Dkt No. 162).  A true and correct copy of excerpts of the Court's Order

9    regarding the Preliminary Injunction is in Joint Exhibit D as **Exhibit 54**.

10          37.   On April 19, 2022, Elizarov appealed the Court's Order regarding the

11   Preliminary Injunction (Dkt No. 163).  A true and correct copy of Elizarov's Notice

12   of Appeal is in Joint Exhibit D as **Exhibit 55**.

13          38.   On April 21, 2022, the Ninth Circuit Court of Appeal accepted

14   Elizarov's appeal (Dkt No. 164).  A true and correct copy of the Ninth Circuit's

15   Letter dated April 19, 2022 is in Joint Exhibit D as **Exhibit 56**.

16          39.   On January 25, 2023, the 9th Circuit Court of Appeal affirmed the

17   Preliminary Injunction (Dkt No. 250).  A true and correct copy of the Court of

18   Appeal's Order affirming the Preliminary Injunction is in Joint Exhibit D as **Exhibit**

19   **57.**

20          40.   On September 7, 2022, Elizarov filed a Rule 11 Motion (Dkt No. 183).

21   A true and correct copy of excerpts of Elizarov's Rule 11 Motion is in Joint Exhibit

22   D as **Exhibit 58**.

23          41.   On February 13, 2023, the Court denied Elizarov's Rule 11 Motion

24   (Dkt No. 257).  A true and correct copy of excerpts of the Court's Order denying

25   Elizarov's Rule 11 Motion is in Joint Exhibit D as **Exhibit 59**.

26          42.   On February 24, 2023, Goldwater filed a Motion to recover the

27   attorneys' fees it incurred in opposing Elizarov's Rule 11 Motion (Dkt No. 259).  A

28   true and correct copy of excerpts of that Motion for Attorneys' Fees is in Joint

7

Exhibit D as **Exhibit 60**.

43.  On May 9, 2023, the Court granted Goldwater's Motion for Attorneys' Fees and ordered Elizarov to pay Goldwater $20,970.75 (Dkt No. 279).  A true and correct copy of excerpts of the Court's Order regarding Goldwater's Motion for Attorneys' Fees is in Joint Exhibit D as **Exhibit 61**.

44.  On June 7, 2023, Elizarov filed a statement that he was unable to comply with the Court's May 9, 2023 Order (Dkt No. 292).  A true and correct copy of Elizarov's Statement of Non-Compliance is in Joint Exhibit D as **Exhibit 62**.

45.  On June 9, 2023, the Court held a Status Conference (Dkt No. 294).  A true and correct copy of excerpts of the transcript from the Court's June 9, 2023 Status Conference is in Joint Exhibit D as **Exhibit 63**.

46.  On July 31, 2023, Goldwater filed a Joint Status Report on the status of Defendant Elizarov's Compliance with the Court's May 9, 2023 Order (Dkt No. 303).  A true and correct copy of the Joint Status Report is in Joint Exhibit D as **Exhibit 64**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 14th day of August, 2023, at Santa Ana, California.

_____

Jeremy T. Katz

# THIS PAGE INTENTIONALLY LEFT BLANK

# REQUEST FOR JUDICIAL NOTICE

HALL GRIFFIN LLP
HOWARD D. HALL, State Bar No. 145024
 *hdhall@hallgriffin.com*
JEREMY T. KATZ, State Bar No. 267361
 *jkatz@hallgriffin.com*
KASANDRA C. GOLDBERG, State Bar No. 345364
 *kgoldberg@hallgriffin.com*
1851 East First Street, 10th Floor
Santa Ana, California 92705-4052
Telephone: (714) 918-7000
Facsimile: (714) 918-6996

Attorneys for Defendant and Cross-
Complainant SCOTT HOWLETT;
Defendant BMO HARRIS BANK N.A.,
Successor by Merger to BANK OF THE
WEST

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| GOLDWATER BANK, N.A. | CASE NO. 21-cv-00616-JWH-SP |
| Plaintiff, | JUDGE:  Hon. John W. Holcomb<br>CTRM.:   9D |
| vs. | |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWLETT; BANK OF THE WEST; and ILYA ALEKSEYEFF, | **HOWLETT AND BOTW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | JUDGE:  Hon. John W. Holcomb<br>DATE:   September 15, 2023<br>TIME:   9:00 A.M.<br>CRTRM.:   9D |
| AND RELATED CROSS-ACTIONS | TRIAL DATE:   November 27, 2023 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

HALL GRIFFIN

Defendants SCOTT HOWLETT ("Howlett") and BMO HARRIS BANK N.A., Successor by Merger to BANK OF THE WEST ("BOTW") hereby request that the Court take judicial notice of the following documents concurrently filed and attached as Exhibits 8 to 36 contained in Joint Exhibit Part A and Joint Exhibit Part B.  This request is made pursuant to Rule 201 of the Federal Rules of Evidence and authorities cited below.  This request is made in connection with Howlett and BOTW's Motion for Summary Judgment.

## **RECORDED DOCUMENTS**

1.   Grant Deed from Elizarov to Howlett (Recorded 3/29/21).  A true and correct copy of Howlett's Grant Deed is in Joint Exhibit C as **Exhibit 36.**

2.   BOTW Deed of Trust (Recorded 3/29/21).  A true and correct copy of BOTW's Deed of Trust is in Joint Exhibit C as **Exhibit 37.**

3.   Goldwater Deed of Trust (Recorded 4/20/21).  A true and correct copy of Goldwater's recorded Deed of Trust is in Joint Exhibit C as **Exhibit 38.**

4.   Unison Deed of Trust (Recorded 8/07/19).  A true and correct copy of Unison's Deed of Trust is in Joint in Exhibit E as **Exhibit 67.**

5.   Unison Memorandum (Recorded 8/07/19).  A true and correct copy of Unison's Memorandum is in Joint Exhibit E as **Exhibit 68.**

6.   Unison Assignment (Recorded 8/07/19).  A true and correct copy of Unison's Assignment is in Joint Exhibit E as **Exhibit 69.**

**BASIS FOR REQUESTING JUDICIAL NOTICE FOR ITEMS 1 to 6 ABOVE**

These documents can either be accurately and readily determined from sources whose accuracy cannot reasonably be questioned or are officially recorded documents.  The date of recording and the contents contained therein at the time of recording are facts not reasonably subject to dispute and capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.  Fed. R. Evid. 201.

2

## DOCUMENTS FILED IN THIS ACTION

7. On April 6, 2021, Goldwater filed its Complaint (Dkt No. 1). A true and correct copy of Goldwater's Complaint (omitting the internal exhibits) is in Joint Exhibit C as **Exhibit 39.**

8. On April 16, 2021, Goldwater filed an *ex parte* Application for a Temporary Restraining Order ("TRO") to prevent Elizarov from restraining or alienating the proceeds of the sale (Dkt No. 19). A true and correct copy of Goldwater's *ex parte* Application for a TRO is in Joint Exhibit C as **Exhibit 40.**

9. On April 16, 2021, in connection with its *ex parte* Application for a TRO Goldwater filed a Memorandum of Points and Authorities (Dkt No. 19-1). A true and correct copy of Goldwater's Memorandum of Points and Authorities in connection with its *ex parte* Application for a TRO is in Joint Exhibit C as **Exhibit 41.**

10. On April 20, 2021, at 1:35pm, the Court entered its Order regarding Goldwater's TRO, restraining and enjoining Elizarov from transferring, alienating, or expending the proceeds that Elizarov received from the sale of the Property (Dkt No. 23). A true and correct copy of the Court's Order regarding Goldwater's requested TRO is in Joint Exhibit C as **Exhibit 42.**

11. On April 30, 2021, Goldwater filed its reply to Elizarov's response to Order to Show Cause (Dkt. No. 31). A true and correct copy of Goldwater's Reply (omitting internal exhibits) is in Joint Exhibit C as **Exhibit 43**.

12. On May 4, 2021, the Court Amended and Extended the TRO (Dkt No. 32). A true and correct copy of excerpts of the Court's Order amending and extending the TRO is in Joint Exhibit C as **Exhibit 44**.

13. On May 17, 2021, Goldwater filed its Opening Supplemental Brief in support of Preliminary Injunction (Dkt No. 39). A true and correct copy of

3

1    Goldwater's Opening Supplemental Brief in support of its Preliminary

2    Injunction is in Joint Exhibit C as **Exhibit 45**.

3    14.    On May 27, 2021, Goldwater filed its First Amended Complaint ("FAC")

4    (Dkt No. 44).  A true and correct copy of Goldwater's FAC (omitting

5    internal exhibits) is in Joint Exhibit D as **Exhibit 46.**

6    15.    On May 27, 2021, in connection with its FAC, Goldwater filed its

7    Promissory Note as an Exhibit (Dkt No. 44-1).  A true and correct copy of

8    Goldwater's Promissory Note from its FAC is in Joint Exhibit D as

9    **Exhibit 47.**

10   16.    On May 27, 2021, in connection with its FAC, Goldwater filed its

11   unrecorded Deed of Trust (Dkt No. 44-2).  A true and correct copy of

12   Goldwater's unrecorded Deed of Trust from its FAC is in Joint Exhibit D

13   as **Exhibit 48**.

14   17.    On May 27, 2021, in connection with its FAC, Goldwater filed Howlett's

15   recorded Grant Deed (Dkt No. 44-5).  A true and correct copy of Howlett's

16   recorded Grant Deed from Goldwater's FAC is in Joint Exhibit D as

17   **Exhibit 49**.

18   18.    On May 27, 2021, in connection with its FAC, Goldwater filed a copy of

19   the Seller's Final Settlement Statement (Dkt No. 44-6).  A true and correct

20   copy of the Seller's Final Settlement Statement from Goldwater's FAC is

21   in Joint Exhibit D as **Exhibit 50**.

22   19.    On June 10, 2021, Howlett filed his Cross-Complaint against Elizarov

23   (Dkt No. 51).  A true and correct copy of excerpts of Howlett's Cross-

24   Complaint is in Joint Exhibit D as **Exhibit 51**.

25   20.    On June 25, 2021, the parties filed their Joint Rule 26(f) Report (Dkt No.

26   57).  A true and correct copy of excerpts of the parties Joint Rule 26(f)

27   Report is in Joint Exhibit D as **Exhibit 52**.

28   21.    On April 1, 2021, Goldwater sent a demand letter to Elizarov.  Elizarov

HALL GRIFFIN

4

and Goldwater each filed a copy of this April 1, 2021 letter (Dkt Nos. 30-6 and 124-2).  A true and correct copy of the April 1, 2021 Letter is in Joint Exhibit D as **Exhibit 53**.

22.   On April 19, 2022, the Court entered the Preliminary Injunction against Elizarov (Dkt No. 162).  A true and correct copy of the Court's Order regarding the Preliminary Injunction is in Joint Exhibit D as **Exhibit 54.**

23.   On April 19, 2022, Elizarov appealed the Court's Order regarding the Preliminary Injunction (Dkt No. 163).  A true and correct copy of Elizarov's Notice of is in Joint Exhibit D as **Exhibit 55**.

24.   On April 21, 2022, the Ninth Circuit Court of Appeal accepted Elizarov's appeal (Dkt No. 164).  A true and correct copy of the Ninth Circuit's Letter dated April 19, 2022 is in Joint Exhibit D as **Exhibit 56**.

25.   On January 25, 2023, the 9th Circuit Court of Appeal affirmed the Preliminary Injunction (Dkt No. 250).  A true and correct copy of the Court of Appeal's Order affirming the Preliminary Injunction is in Joint Exhibit D as **Exhibit 57.**

26.   On September 7, 2022, Elizarov filed a Rule 11 Motion (Dkt No. 183).  A true and correct copy of excerpts of Elizarov's Rule 11 Motion is in Joint Exhibit D as **Exhibit 58**.

27.   On February 13, 2023, the Court denied Elizarov's Rule 11 Motion (Dkt No. 257).  A true and correct copy of excerpts of the Court's Order denying Elizarov's Rule 11 Motion is in Joint Exhibit D as **Exhibit 59**.

28.   On February 24, 2023, Goldwater filed a Motion to recover the attorneys' fees it incurred in opposing Elizarov's Rule 11 Motion (Dkt No. 259).  A true and correct copy of excerpts of Goldwater's Notice of Motion and Motion for Attorneys' Fees following denial of Rule 11 Motion is in Joint Exhibit D as **Exhibit 60**.

29.   On May 9, 2023, the Court granted Goldwater's Motion for Attorneys'

HALL GRIFFIN

1    Fees and ordered Elizarov to pay Goldwater $20,970.75 (Dkt No. 279).  A

2    true and correct copy of the Court's Order regarding Goldwater's Motion

3    for Attorneys' Fees is in Joint Exhibit D as **Exhibit 61**.

4    30.    On June 7, 2023, Elizarov filed a statement that he was unable to comply

5    with the Court's May 9, 2023 Order (Dkt No. 292).  A true and correct

6    copy of Elizarov's Statement of Non-Compliance is in Joint Exhibit D as

7    **Exhibit 62**.

8    31.    On June 9, 2023, the Court held a Status Conference (Dkt No. 294).  A

9    true and correct copy of excerpts of the transcript from the Court's June 9,

10   2023 Status Conference is in Joint Exhibit D as **Exhibit 63**.

11   32.    On July 31, 2023, Goldwater filed a Joint Status Report on the status of

12   Defendant Elizarov's Compliance with the Court's May 9, 2023 Order

13   (Dkt No. 303).  A true and correct copy of the Joint Status Report is in

14   Joint Exhibit D as **Exhibit 64**.

15   **BASIS FOR REQUESTING JUDICIAL NOTICE FOR ITEMS 7 TO 36**

16        These documents can either be accurately and readily determined from

17   sources whose accuracy cannot reasonably be questioned or are officially filed

18   documents.  The date of filing and contents contained therein at the time of filing are

19   not facts reasonably subject to dispute and capable of immediate and accurate

20   determination by resort to sources of reasonably indisputable accuracy. Fed. R.

21   Evid. 201.

22   DATED:  August 14, 2023          HALL GRIFFIN LLP

23                                    By: _____

24                                        Howard D. Hall

25                                        Jeremy T. Katz

                                          Kasandra C. Goldberg

26                                    Attorneys for Defendant and Cross-Complainant

27                                    SCOTT HOWLETT; Defendant BMO HARRIS BANK

                                      N.A., Successor by Merger to BANK OF THE WEST

28

_HALL GRIFFIN_

HOWLETT AND BOTW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Omnibus Joint Exhibit Part C, page 1017

4874-3878-3095.1

# THIS PAGE INTENTIONALLY LEFT BLANK

# EXHIBIT 29

# TRANSCRIPT OF DEPOSITION: SCOTT HOWLETT (Excerpts)

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3    _____

 4    GOLDWATER BANK, N.A.,

 5              Plaintiff,

 6         v.                          Case No.

 7    ARTUR ELIZAROV, UNISON AGREEMENT    5:21-cv-00616-

 8    CORP., SCOTT HOWLETT, BANK OF       JWH-SPx

 9    THE WEST, and ILYA ALEKSEYEFF,

10              Defendants,

11    _____

12    SCOTT HOWLETT,

13              Cross-complainant,

14         v.

15    ARTUR ELIZAROV, ET AL.,

16              Cross-defendants.

17    _____

18              VIDEOCONFERENCE DEPOSITION OF

19                   SCOTT HOWLETT

20    DATE:          Thursday, September 15, 2022

21    TIME:          1:38 p.m.

22    LOCATION:      Remote Proceeding

23                   San Francisco, CA

24    REPORTED BY:   Jess Wakefield, Notary Public

25    JOB NO.:       5382189
```

                                              Page 1

```
 1                A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF GOLDWATER BANK, N.A.:
 3         JOSEPH A. LEVOTA, ESQUIRE (by videoconference)
 4         Hilbert & Satterly LLP
 5         409 Camino Del Rio South, Suite 104
 6         San Diego, CA 92108
 7         jlevota@hscallaw.com
 8         (619) 795-0300
 9
10    ON BEHALF OF PLAINTIFF GOLDWATER BANK, N.A.:
11         DEREK M. BAST, ESQUIRE (by videoconference)
12         Wagner Hicks PLLC (NC)
13         831 East Morehead Street, Suite 860
14         Charlotte, NC 28202
15         derek.bast@wagnerhicks.law
16         (704) 705-7538
17
18    ON BEHALF OF DEFENDANT UNISON AGREEMENT CORP.:
19         JENNIFER HAIDER, ESQUIRE (by videoconference)
20         Orsus Gate
21         388 Market Street, Suite 1300
22         San Francisco, CA 94111
23         jhaider@orsusgate.com
24         (213) 674-9042
25
```

<div align="right">Page  2</div>

<div align="right">Omnibus Joint Exhibit Part C, page 1021</div>

```
 1              A P P E A R A N C E S (Cont'd)
 2    ON BEHALF OF DEFENDANT AND CROSS-DEFENDANT ARTUR
 3    ELIZAROV:
 4         ILYA ALEKSEYEFF, ESQUIRE (by videoconference)
 5         Loia, Inc. (APLC)
 6         8721 Santa Monica Boulevard, Suite 119
 7         West Hollywood, CA 90069
 8         ilya@loia.legal
 9
10    ON BEHALF OF DEFENDANT AND CROSS-COMPLAINANT SCOTT
11    HOWLETT AND DEFENDANT BANK OF THE WEST:
12         JEREMY KATZ, ESQUIRE (by videoconference)
13         Hall Griffin LLP
14         1851 East First Street, 10th Floor
15         Santa Ana, CA 92705
16         jkatz@hallgriffin.com
17         (714) 918-7000
18
19         RYAN C. THOMASON, ESQUIRE (by videoconference)
20         Hall Griffin LLP
21         1851 East First Street, 10th Floor
22         Santa Ana, CA 92705
23         rthomason@hallgriffin.com
24
25
```

Page 3

Omnibus Joint Exhibit Part C, page 1022

```
 1                      I N D E X

 2   EXAMINATION:                                     PAGE

 3        By Mr. Levota                               8

 4        By Ms. Haider                               50

 5

 6                    E X H I B I T S

 7   NO.             DESCRIPTION                      PAGE

 8   Exhibit 5       Amended Preliminary Notice       29

 9   Exhibit 12      Supplemental Escrow Instructions 32

10   Exhibit 13      Amended Escrow Instructions      34

11   Exhibit 14      Page 10 of 10, Purchase and

12                   Sale Agreement                   25

13   Exhibit 15      Lender's Closing Instructions    33

14   Exhibit 23      Preliminary Report               27

15   Exhibit 72      Uniform Residential Loan

16                   Application                      30

17   Exhibit 73      Note                             36

18   Exhibit 74      Deed of Trust                    39

19   Exhibit 75      Buyer's Final Settlement

20                   Statement                        40

21              (Exhibits retained by counsel.)

22

23

24

25

                                             Page  4
```

```
 1                    E X H I B I T S (Cont'd)

 2        P R E V I O U S L Y   M A R K E D   E X H I B I T S

 3     NO.                DESCRIPTION                      PAGE

 4     Exhibit 2        Purchase Agreement                 23

 5     Exhibit 38       Email Chain                        42

 6                  (Exhibits retained by counsel.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  5
```

```
 1    So I can't say whether or not she said hello or goodbye,

 2    but it was probably to the extent of that.

 3         Q    I appreciate that detail, and that's very

 4    responsive to what I'm saying.  And I think you just

 5    said this, but I want to confirm that your partner, he

 6    also neither had any substantive conversations with the

 7    seller or the seller's agent during the first or second

 8    visit, and that's --

 9         A    Correct.  No one did.

10         Q    Okay.  And then you said the purpose of the

11    second visit was just to see the home after it had been

12    in contract?

13         A    Correct, and to recall what we had seen a

14    month before.

15         Q    And how long was that visit?

16         A    Maybe five minutes, my estimation.

17         Q    Let me back up.  I'm assuming that your real

18    estate agent spoke with the seller's real estate agent

19    during the transaction; correct?

20         A    Yeah, she -- correct.  She presented my offer.

21         Q    Okay.  Okay.  I'm sorry.  I'm making sure I

22    don't jump around too much.

23         A    No problem.

24         Q    So I'm going to show you what's been

25    previously marked as Exhibit 2.
```

<div align="right">Page 22</div>

```
 1                 (Exhibit 2 was previously marked for
 2                 identification.)
 3          Okay.  And this is going to be the format of
 4    the deposition, will be that I share my screen with
 5    certain documents that are being marked as exhibits.
 6    Almost all of them or most of them --
 7        A    Could you please just give me a moment?  I
 8    need to readjust my screen so I can see both you and
 9    the -- and the document.
10        Q    Okay.
11        A    Okay.
12        Q    And so all I'm saying is that I'll be showing
13    a document.  Unfortunately, you don't have the power to
14    flip through it yourself.  But if at any point you want
15    to see more of a document or I'm scrolling too fast,
16    then let me know.  And I'll show you any part of any
17    document that we're going over here today.
18             So to start off, this is a document entitled
19    California Residential Purchase Agreement in Joint
20    Escrow Instructions.  It's ten pages, and I'm scrolling
21    through each page.  At the bottom, there are some
22    initials.
23             At the bottom, there appears to be buyer's
24    initials SH, and we're looking at page 4 of Exhibit 2;
25    do you see that?
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part C, page 1026

1       A     Yes.

2       Q     Are those your initials?

3       A     Yes.

4       Q     And so we're just going through.  And then,

5   again, page 5, again, buyer's initials, SH.  That's you;

6   right?

7       A     Yes.

8       Q     And so we're getting through, and we're at now

9   page 9 of Exhibit 2.  And there's a part where it has a

10  buyer, and it has your name printed.  And then there's a

11  signature next to that; do you see that?

12      A     Yes.

13      Q     Is it your understanding that that's your

14  electronic signature on this document?

15      A     I think that's one of the font options on

16  DocuSign, and yes.

17      Q     And it appears to be dated February 14, 2021.

18  Is it your recollection that that's the date that you

19  affixed your electronic signature to this document?

20      A     I have no reason to think that's not the date.

21      Q     And then moving to page 10, then there appears

22  to be a signature by the seller.  And I'm not asking you

23  to authenticate that it is his signature but to confirm

24  that it was your understanding that the seller was

25  signing this document; correct?

Page  24

1        A    That was my understanding.

2        Q    Okay.   And so we've gone through this, and I'm

3   back at the first page here.   And this appears to be the

4   purchase and sale agreement for your acquisition of the

5   Overlook property; correct?

6        A    Correct.

7        Q    And it is, date prepared, February 12th of

8   2021.   And is that your recollection of when this was

9   prepared and around the time it was executed?

10       A    That seems about right.

11       Q    So after there's a purchase and sale

12   agreement, then there's usually the opening of escrow.

13   So was escrow opened with respect to this transaction?

14       A    I believe so.   I mean, I think that happened

15   shortly thereafter.

16       Q    And I'm going to go ahead and show you what's

17   been previously marked as Exhibit 14 and what we'll mark

18   as Exhibit 14 for this deposition.

19             (Exhibit 14 was marked for

20              identification.)

21        This is a one-page document, and this is page

22   10 of 10 of the purchase and sale agreement that we were

23   just looking at.   But this page has some information for

24   the escrow holder; do you see that?

25       A    I see what you're saying.   I'm not sure if

                                              Page 25

```
 1        A    Yes.

 2        Q    And what is this document?

 3        A    Where the -- you're asking me for -- to

 4   explain my understanding of what it means?

 5        Q    Yes.  Exactly.

 6        A    Where -- I'm sorry?

 7        Q    I said, "Exactly."  I'm sorry.

 8        A    Oh, okay.  I thought that was -- where the

 9   funds get distributed upon closing.

10        Q    And you'll see, about a third of the page

11   down, that there's a line where it says New First Trust

12   Deed, Bank of the West; do you see that?

13        A    Yes.

14        Q    Do you understand that as a reference to Bank

15   of the West and its loan to you?

16        A    Yes.

17        Q    So just kind of following our timeline, then,

18   in the holiday season of 2020 through maybe the

19   beginning of January 2021, you became aware of the

20   property.

21        A    Yes.

22        Q    In February, then, there's a purchase and sale

23   agreement.  And then in March, the transaction closes.

24        A    Yes.

25        Q    On this document that we're looking at,
```

                                                    Page 41

Omnibus Joint Exhibit Part C, page 1029

1    Exhibit 75, it says that the closing date is March 29th.

2    And then underneath it, it says closing signing date,

3    March 27th.  And then, it says, disbursement date, March

4    30th.  And my question is, is it your understanding that

5    the closing date was March 29, 2021?

6         A    Approximately, yes.  It -- it must be.

7         Q    Okay.  You don't have any information that it

8    would be some different date?

9         A    No.

10        Q    Okay.  So just for the timeline, sitting

11   imaginatively on March 29, 2021, so as of that point in

12   time, had you ever heard of the name Goldwater Bank?

13        A    No.

14        Q    Okay.  As of that time, then we've established

15   this, you had no substantive conversations with the

16   seller or the seller's agent; correct?

17        A    That's correct.

18        Q    Okay.  And your partner never had, to your

19   knowledge, substantive conversations with the seller or

20   the seller's agent; correct?

21        A    Correct.

22        Q    Okay.  All right.  So I'm going to show you

23   what's been previously marked as Exhibit 38.

24             (Exhibit 38 was previously marked for

25             identification.)

Page 42

```
 1                    THE WITNESS:  Sure.

 2                       EXAMINATION

 3     BY MS. HAIDER:

 4          Q    So thank you, first of all, for taking the

 5     time.  I know it's been a long day, and you'd probably

 6     like to have this over sooner rather than later.  But

 7     again, I just have a few questions.

 8          A    Sure.

 9          Q    So earlier, you testified to Mr. LeVota that

10     you don't remember Unison coming up before everything

11     was recorded on March 29, 2021.  Is that correct?

12          A    I believe that -- I want to make sure I'm

13     really clear.  I think the name Unison showed up in the

14     settlement page that -- it was one of the last documents

15     that Mr. LeVota showed.  And I think -- well, at some

16     point, I heard of the name Unison, but I'm not -- I

17     don't have prior knowledge to this transaction of the

18     name Unison.

19               Goldwater, I've never heard of until then,

20     until the lawsuit.  Unison, I think, is listed somewhere

21     or it came up in the papers that were served.  I don't

22     know when I heard about it first.

23          Q    Okay.  Thank you.

24          A    Sure.

25          Q    Were you aware, when you were looking at the
```

Page 50

Omnibus Joint Exhibit Part C, page 1031

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, JESS WAKEFIELD, the officer before whom the
 3      foregoing proceedings were taken, do hereby certify that
 4      any witness(es) in the foregoing proceedings, prior to
 5      testifying, were duly sworn; that the proceedings were
 6      recorded by me and thereafter reduced to typewriting by
 7      a qualified transcriptionist; that said digital audio
 8      recording of said proceedings are a true and accurate
 9      record to the best of my knowledge, skills, and ability;
10      that I am neither counsel for, related to, nor employed
11      by any of the parties to the action in which this was
12      taken; and, further, that I am not a relative or
13      employee of any counsel or attorney employed by the
14      parties hereto, nor financially or otherwise interested
15      in the outcome of this action.
16
17      JESS WAKEFIELD
18      Notary Public in and for the
19      State of Washington
20
21      [X] Review of the transcript was requested.
22
23
24
25
```

Page 56

```
1              CERTIFICATE OF TRANSCRIBER
2         I, SARAH COSTA, do hereby certify that this
3    transcript was prepared from the digital audio recording
4    of the foregoing proceeding, that said transcript is a
5    true and accurate record of the proceedings to the best
6    of my knowledge, skills, and ability; that I am neither
7    counsel for, related to, nor employed by any of the
8    parties to the action in which this was taken; and,
9    further, that I am not a relative or employee of any
10   counsel or attorney employed by the parties hereto, nor
11   financially or otherwise interested in the outcome of
12   this action.
13
14
15   SARAH COSTA
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1    JEREMY KATZ, ESQ.

 2    jkatz@hallgriffin.com

 3                                      October 3, 2022

 4    RE: GOLDWATER BANK, N.A. vs. ELIZAROV

 5    September 15, 2022, SCOTT HOWLETT, JOB NO. 5382189

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part C, page 1034

1    _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  59

```
1    GOLDWATER BANK, N.A. vs. ELIZAROV

2    SCOTT HOWLETT (#5382189)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   WITNESS                           Date

25

                                          Page 60
```

# EXHIBIT 30

# TRANSCRIPT OF DEPOSITION: ARTUR ELIZAROV (Excerpts)

**GOLDWATER BANK, N.A. vs ARTUR ELIZAROV, ET AL.**
**Transcript of Proceedings on 09/23/2022**

```
 1                 UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5    GOLDWATER BANK, N.A.,                    )
                                              )
 6              PLAINTIFF,                     )
                                              )   CASE NO.
 7       VS.                                   )   5:21-CV-
                                              )   00616-JWH-
 8    ARTUR ELIZAROV, ET. AL.                  )   SPX
                                              )
 9              DEFENDANTS.                    )
      _____)
10

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                 FRIDAY SEPTEMBER 23, 2022

14                        VOLUME I

15

16

17

18

19

20

21

22

23

24
      MARIANNE DER CLINT, CSR #10847
25    OFFICIAL REPORTER
```

**GOLDWATER BANK, N.A. vs ARTUR ELIZAROV, ET AL.**
**Transcript of Proceedings on 09/23/2022**                                    **Page 2**

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:        WAGNER HICKS PLLC
                                BY:  SEAN WAGNER, ESQ.
 4                              DEREK M. BAST, ESQ.
                                831 EAST MOREHEAD STREET
 5                              SUITE 860
                                CHARLOTTE, NORTH CAROLINA 28202
 6                              (704) 705-7538

 7
      FOR THE DEFENDANT,        LAW OFFICE OF ILYA ALEKSEYEFF
 8    ARTUR ELIZAROV:           BY: ILYA ALEKSEYEFF, ESQ.
                                727 WEST 7TH STREET
 9                              PH 1-13
                                LOS ANGELES, CALIFORNIA 90017
10                              (213) 537-4592
                                ILYA@LOIA.LEGAL
11

12    FOR THE CROSS-DEFENDANT, ORSUS GATE
      UNISON AGREEMENT CORP.:   BY:  NABIL BISHARAT, ESQ.
13                              16 NORTH MARENGO AV.
                                SUITE 316
14                              PASADENA, CALIFORNIA  91101
                                (213) 373-4357
15

16    FOR THE CROSS-DEFENDANT, HILBERT & SATTERLY LLP
      GOLDWATER:                BY:  JOSEPH A. LE VOTA, ESQ.
17                              409 CAMINO DEL RIO SOUTH
                                SUITE 104
18                              SAN DIEGO, CALIFORNIA 92108
                                (619) 795-0300
19

20    FOR THE CROSS-DEFENDANT, HALL GRIFFIN
      SCOTT HOWLETT:            BY: RYAN THOMASON, ESQ.
21                              1851 EAST FIRST STREET
                                10TH FLOOR
22                              SANTA ANA, CALIFORNIA 92705
                                (714) 918-7000
23

24

25
```

Omnibus Joint Exhibit Part C, page 1039

**GOLDWATER BANK, N.A. vs ARTUR ELIZAROV, ET AL.**
Transcript of Proceedings on 09/23/2022                    Page 3

```
 1                    I N D E X

 2

 3

 4          CHRONOLOGICAL INDEX OF WITNESSES

 5

 6   WITNESSES:                              PAGE

 7   ARTUR ELIZAROV
        DIRECT EXAMINATION BY MR. WAGNER         19
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Omnibus Joint Exhibit Part C, page 1040

**GOLDWATER BANK, N.A. vs ARTUR ELIZAROV, ET AL.**
**Transcript of Proceedings on 09/23/2022**                    **Page 236**

```
 1        A     Within the time specified in paragraph 1-A,
 2    seller has duty to disclose to buyer all matters known
 3    to seller effective title, whether recorded or not.
 4        Q     Did that mean that you were obligated to tell
 5    Mr. Howlett about all matters affecting title when they
 6    were recorded or not?
 7        A     Generally, yes.
 8        Q     When you say generally, what do you mean?
 9        A     Well, I'm also California licensed broker, as
10    I mentioned earlier.  I didn't -- I wasn't notified
11    that there was an issue with Goldwater I believe until
12    the latter like four days before it closed, or three
13    days before it closed.  I'm also aware of the race
14    notice, and I did not notify the seller -- I mean, the
15    buyer to protect him precisely from this litigation.
16        Q     So let me just make sure I understand.  You
17    didn't notify Mr. Howlett of the Goldwater lien that
18    his property could have been -- could be subject to to
19    protect him?
20        A     Correct.
21        Q     And how does that protect him?
22        A     I would suggest you look up the race notice
23    requirements.  I'm not going to speak to it from a
24    legal perspective.
25        Q     I don't want you to.  I don't want you to
```

Omnibus Joint Exhibit Part C, page 1041

```
 1    STATE OF CALIFORNIA      )

 2                             )   ss.

 3    COUNTY OF LOS ANGELES    )

 4

 5

 6

 7

 8       I, _____, the undersigned,

 9    say I have read the foregoing deposition and hereby

10    declare under penalty of perjury the foregoing is true

11    and correct.

12

13            Executed this _____ day of _____, 20__,

14    at_____,_____.

15

16

17

18

19                    _____

20                        D E C L A R A N T

21

22

23

24

25
```

Omnibus Joint Exhibit Part C, page 1042

**GOLDWATER BANK, N.A. vs ARTUR ELIZAROV, ET AL.**
Transcript of Proceedings on 09/23/2022                    Page 296

```
 1                        )

 2  STATE OF CALIFORNIA)   ss.

 3                        )

 4

 5          I, MARIANNE L. DER CLINT, 10847, a

 6  Certified Shorthand Reporter within and for the State

 7  of California, do hereby declare:

 8          That pursuant to 2093 (b) CCP, I administered

 9  the oath to the deponent;

10          That the foregoing deposition was taken before

11  me at the time and place set forth and was taken down

12  by me in shorthand and thereafter transcribed under my

13  direction and supervision;

14          That the foregoing deposition is a full, true

15  and correct transcript of my shorthand notes so taken.

16          I further declare that I am neither counsel

17  for, nor related to, any of the parties to said action,

18  nor in any way interested in the outcome thereof.

19          I declare under penalty of perjury this

20  5th day of October, 2022, that the foregoing is true

21  and correct.

22

23                  CERTIFIED SHORTHAND REPORTER FOR
                         THE STATE OF CALIFORNIA
24

25
```

Omnibus Joint Exhibit Part C, page 1043

# <u>EXHIBIT 31</u>

# <u>TRANSCRIPT OF DEPOSITION:</u>
# <u>BRITTANY SHAW (Excerpts)</u>

1                  UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

3                          ---oOo---

4       GOLDWATER BANK, N.A.,

5                          Plaintiff,

6       -vs-                             NO.
                                         5:21-cv-00616-JWH-SP

7       ARTUR ELIZAROV; UNISON AGREEMENT

        CORP.; SCOTT HOWLETT; BANK OF THE

8       WEST; and ILYA ALEKSEYEFF,

9                          Defendants.
        _____/

10

11

12

13

14

15

16            VIDEOCONFERENCE DEPOSITION OF BRITTANY SHAW

17                      November 7, 2022

18

19

20

21

22      Reported by Nicolette Smith, RPR, CSR 11275, WA CCR 2568

23      Job No. 5550557

24      Pages: 1 - 113

25

                                              Page 1

```
 1                       I N D E X
 2
 3                                                  PAGE
 4     EXAMINATION BY MR. KATZ                        5
 5     EXAMINATION BY MS. HAIDAR                      93
 6     EXAMINATION BY MR. WAGNER                      97
 7
 8
 9
10                   E X H I B I T S
11   DEFENDANTS'
                                                  PAGE
12
       Exhibit 57      Document on Goldwater         35
13                     letterhead, which says "Early
                       Closing Disclosure Review
14                     Checklist"
15     Exhibit 77      Goldwater Bank monthly        51
                       mortgage statement for Artur
16                     Elizarov
17     Exhibit 78      Weststar statement dated      53
                       7/17/2020
18
       Exhibit 79      Email, dated March 30th, 2021 54
19
       Exhibit 80      Email chain, the top of which 72
20                     is March 30th, 2021, at 4:42
                       p.m.
21
       Exhibit 46      Email from March 25th         76
22
23
24
25

                                              Page  2
```

```
 1              TELEPHONIC DEPOSITION OF BRITTANY SHAW

 2

 3              BE IT REMEMBERED, that pursuant to Notice and on

 4    this 7th day of November, 2022, commencing at the hour of

 5    1:43 p.m., via videoconference, before me, NICOLETTE

 6    SMITH, RPR, CSR No. 11275, a Certified Shorthand

 7    Reporter, licensed by the State of California, appeared

 8    BRITTANY SHAW, produced as a witness in said action, and

 9    being by me first duly sworn, pursuant to stipulation,

10    was thereupon examined as a witness in said cause.

11

12                          ---oOo---

13    (All appearances were made via Zoom)

14    APPEARANCES:

15    Appearing on behalf of the Plaintiff:

16                      JOHN FOREST HILBERT

                        Hilbert & Satterly

17                      409 Camino Del Rio South, Suite 104

                        San Diego, CA 92108

18                      (619) 795-0300

                        jhilbert@hscallaw.com

19

20    Appearing pro hac vice on behalf of the Plaintiff:

21                      SEAN C. WAGNER

                        MEAGAN ALLEN

22                      Wagner Hicks

                        831 East Morehead Street, Suite 860

23                      Charlotte, NC 28202

                        (704) 705-7538

24                      sean.wagner@wagnerhicks.law

25

                                              Page  3
```

Omnibus Joint Exhibit Part C, page 1047

```
1    Appearing on behalf of the Defendants and
     Cross-Complainants Scott Howlett and Bank of the West:
2
                         JEREMY T. KATZ
3                        Hall Griffin
                         1851 East First Street, 10th Floor
4                        Santa Ana, CA 92705-4052
                         (714) 918-7000
5                        jkatz@hallgriffin.com
6
     Appearing in pro per on behalf of the Defendants Artur
7    Elizarov and Ilya Alekseyeff:
8                        ILYA ALEKSEYEFF
                         Loia, Inc.
9                        8721 Santa Monica Blvd., Suite 119
                         West Hollywood, CA 90069
10                       (213) 537-4592
                         ilya@loia.legal
11
12   Appearing on behalf of the Defendant Unison Agreement
     Corp:
13
                         JENNIFER HAIDAR
14                       Orsus Gate
                         16 N. Marengo Avenue, Suite 316
15                       Pasadena, CA 91101
                         (213) 973-2052
16                       jhaidar@orsusgate.com
17
18
19
20
21
22
23
24
25
```

                                                    Page  4

```
1          Q.   Okay.  Every real estate loan.

2               Are there any non-real-estate loans in your

3     department?

4          A.   Yes.

5          Q.   Okay.

6               (There was a discussion off the record.)

7               (Ms. Alekseyeff exits the proceedings.)

8     BY MR. KATZ:

9          Q.   All right.  I'm going to go back to the

10    screen-share.  So here, this part about title insurance,

11    did you look and see whether there -- whether or not

12    there was title insurance on Mr. Elizarov's loan from

13    Goldwater?

14         A.   No, I didn't.

15         Q.   Do you know if anyone else looked to see if

16    there was title insurance on the loan for Mr. Elizarov?

17         A.   I don't know.

18         Q.   So a little bit further down in the letter --

19    I'm highlighting a portion here.  I'm going to try to

20    highlight a portion here.  This sentence, "In

21    confirmation of your conversations with Mr. Hill,

22    Goldwater Bank is requesting the recording of our Deed of

23    Trust.  We understand that it [sic] may be in 3rd Lien

24    Position."  What did you mean by that?

25         A.   I was taking direction from Pete Hill.  I do not
```

                                        Page 69

1    know.

2          Q.   Pete Hill instructed you to tell First American

3    that Goldwater may be in third lien position?

4          A.   According to this, yes.

5          Q.   Did you ask him at all what that meant?

6          A.   No.

7          Q.   Did you ask him why Goldwater would be in third

8    lien position?

9          A.   I did not.

10          Q.   Did you have any conversations with him or

11    anyone else at Goldwater Bank about the lien priority for

12    the Elizarov loan?

13          A.   No.

14          Q.   At least in your department, on the commercial

15    side, you've got multiple layers of procedures to make

16    sure that there's title insurance for a loan within weeks

17    of the loan closing, right?

18              MR. WAGNER:   Objection.   Misstates prior

19    testimony.

20              But go ahead.

21              THE WITNESS:   I don't remember the question.

22    BY MR. KATZ:

23          Q.   Here you're saying, at Mr. Hill's direction, "We

24    may under-" -- "We understand that we may be in 3rd Lien

25    Position" and you're requesting title insurance.   At

                                                    Page 70

```
 1                    SIGNATURE OF DEPONENT

 2

 3          I, the undersigned, BRITTANY SHAW, do hereby

 4   certify that I have read the foregoing deposition and

 5   find it to be a true and accurate transcription of my

 6   testimony, with the following corrections, if any:

 7   PAGE      LINE          CHANGE

 8   _____    _____    _____

 9   _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23

24                    _____

                      BRITTANY SHAW, Date

25


                                          Page 109
```

```
 1                      REPORTER'S CERTIFICATE

 2

 3           I, NICOLETTE SMITH, a Shorthand Reporter, State

 4      of California, do hereby certify:

 5           That BRITTANY SHAW, in the foregoing deposition

 6      named, was present and sworn by me as a witness in the

 7      above-entitled action at the time and place therein

 8      specified.

 9           That said deposition was taken before me at said

10      time and place, and was taken down in shorthand by me, a

11      Certified Shorthand Reporter of the State of California,

12      and was thereafter transcribed into typewriting, and that

13      the foregoing transcript constitutes a full, true and

14      correct report of said deposition and of the proceedings

15      which took place.

16           That before completion of the proceedings,

17      review of the transcript was requested.

18           IN WITNESS WHEREOF, I have hereunder subscribed

19      my hand this 20th day of November 2022.

20

21

22      _____

             NICOLETTE SMITH, RPR

23           CSR NO. 11275

             State of California

24

25
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part C, page 1052

1    MEAGAN ALLEN

2    meagan.allen@warnerhicks.law

3                                     November 20, 2022

4    RE: GOLDWATER BANK, N.A. VS. ARTUR ELIZAROV

5    NOVEMBER 7, 2022, BRITTANY SHAW, JOB NO. 5550557

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 111

1   _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, notating the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9   __ Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Omnibus Joint Exhibit Part C, page 1054

```
 1   RE: GOLDWATER BANK, N.A. VS. ARTUR ELIZAROV

 2   BRITTANY SHAW, JOB NO. 5550557

 3                    E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                              Date

25
```

Page 113

# EXHIBIT 32

# TRANSCRIPT OF DEPOSITION: PETER HILL (Excerpts)

```
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4     Goldwater Bank, N.A.,     )CASE NO. 5:21-cv-00616-JWH-SP
                                 )
 5              Plaintiff,       )
                                 )
 6          vs.                  )
                                 )
 7     ARTUR ELIZAROV; UNISON    )
       AGREEMENT CORP.; SCOTT    )
 8     HOWLETT; BANK OF THE WEST;)
       and ILYA ALEKSEYEFF,      )
 9                               )
                Defendants.      )
10     _____)

11

12

13                         --oOo--

14              DEPOSITION OF PETER J. HILL

15                  September 9, 2022

16            ***TAKEN VIA VIDEOCONFERENCE***

17                         --oOo--

18

19

20

21

22

23

24

25

                                             Page 1
```

```
 1              BE IT REMEMBERED THAT, pursuant to the Federal
 2    Rules of Civil Procedure, the deposition of PETER J.
 3    HILL, was taken before Maureen Kelly, OCSR No. 00-0364,
 4    WCSR No. 3401, on Friday, September 9, 2022, commencing
 5    at the hour of 9:59 a.m., the proceedings being reported
 6    via Zoom videoconference.
 7                          --oOo--
 8
 9                       APPEARANCES
10             (ALL APPEARING VIA VIDEOCONFERENCE)
11    Attorneys for Plaintiff Goldwater Bank, N.A.:
                  Joseph A. LeVota, Esq.
12                HILBERT & SATTERLY, LLP
                  409 Camino Del Rio South, Suite 104
13                San Diego, CA 92108
                  jlevota@hscallaw.com
14
      Pro Hac Vice Attorneys for Plaintiff Goldwater Bank,
15    N.A.:
                  Sean C. Wagner, Esq.
16                Derek M. Bast, Esq.
                  WAGNER HICKS, PLLC
17                831 East Morehead Street, Suite 860
                  Charlotte, NC 28202
18                sean.wagner@wagnerhicks.law
                  derek.bast@wagnerhicks.law
19
      Attorneys for Defendant and Cross-Complainant SCOTT
20    HOWLETT and Defendant BANK OF THE WEST:
                  Jeremy T. Katz, Esq.
21                Ryan C. Thomason, Esq.
                  HALL GRIFFIN LLP
22                1851 East First Street, 10th Floor
                  Santa Ana, California 92705-4052
23                jkatz@hallgriffin.com
                  rthomason@hallgriffin.com
24
25    (Continued on next page.)


                                              Page  2
```

```
 1                    APPEARANCES (CONTINUED)
 2              (ALL APPEARING VIA VIDEOCONFERENCE)
 3    Attorneys for Defendant Artur Elizarov and Defendant
      Ilya Alekseyeff (in Pro Per):
 4               Ilya Alekseyeff, Esq.
                 LOIA, INC. (APLC)
 5               8721 Santa Monica Blvd., #119
                 West Hollywood, CA 90069
 6               ilya@loia.legal
 7    Attorneys for Defendant Unison Agreement Corp.:
                 Nabil Bisharat, Esq.
 8               ORSUS GATE, LLP
                 16 N. Marengo Ave., Suite 316
 9               Pasadena, CA 91101
                 nbisharat@orsusgate.com
10
11
      Also Present: (None.)
12
                         --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
                                               Page  3
```

Omnibus Joint Exhibit Part C, page 1059

```
 1              Q.   All right.  And down below -- I just
 2      scrolled it a little bit to help you see.
 3              A.   Thank you.
 4              Q.   It says, From Goldwater Bank --
 5              A.   Yes.
 6              Q.   -- Joleen Boeckel.  I'm probably not saying
 7      it correctly.  It's B-O-E-C-K-E-L.  To Monica Cameron at
 8      Stewart Title.  Do you see that?
 9              A.   I do.  Thank you for scrolling up.
10              Q.   No worries.  It's my fault.  I should have
11      done it sooner.
12                   So does this appear to be a confirmation of
13      delivery of the deed of trust to escrow for recording?
14              A.   To Stewart Title for recording, yes.
15              Q.   And was Mr. Elizarov's deed of trust
16      ultimately recorded in Riverside County on the same
17      date, which was April 20th, 2021?
18              A.   I know that it was recorded.  I can't
19      confirm the date as I sit here.
20              Q.   Okay.  No worries.  Give me just one
21      second.
22                            (EXHIBIT marked: Exhibit 69.)
23      BY MR. ALEKSEYEFF:   (Continuing)
24              Q.   All right.  I'm going to show you what I
25      just marked as Exhibit 69.  It consists of 17 pages.
```

<div align="right">Page 142</div>

```
 1    Can you see it, sir?

 2              A.    I can, yes.

 3              Q.    All right.   Do you recognize it?

 4              A.    Yes.

 5              Q.    Does this appear to be a recorded copy of

 6    Mr. Elizarov's deed of trust?

 7              A.    It does.

 8              Q.    And was it recorded on April 20th, 2021?

 9              A.    It appears that it was, yes.

10              Q.    After the pandemic began in March of 2020,

11    did Goldwater Bank create a forbearance process for its

12    residential mortgage borrowers?

13                    MR. WAGNER:   Just to clarify, Ilya, you

14    were here earlier and you are aware of when Mr. Hill

15    started with Goldwater Bank.   So I just want to be clear

16    that he's not the corporate representative.   He can't

17    testify about things that were established prior to

18    his -- beginning his employment with Goldwater.

19                    MR. ALEKSEYEFF:   I understand.

20    BY MR. ALEKSEYEFF:   (Continuing)

21              Q.    At some point after you began your

22    employment -- and actually I think I know that you began

23    in 2020.   I don't think I recall the date.   What was the

24    date when you started to work for Goldwater Bank?

25              A.    March 24th.
```

Page 143

1          I declare under penalty of perjury that the

2     foregoing is true and correct.  Subscribed at

3     _____, California, this_____day of

4     _____, 2022.

5

6

7

8

9                   _____

10                        PETER J. HILL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  233

```
 1                    C E R T I F I C A T E
 2            I, Maureen Kelly, Oregon CSR No. 00-0364,
      Washington CSR No. 3401, do hereby certify that
 3    prior to the commencement of the examination, PETER J.
      HILL, was duly remotely sworn by me to testify to the
 4    truth, the whole truth and nothing but the truth.
 5            I DO FURTHER CERTIFY that the foregoing is a
      verbatim transcript of the testimony as taken
 6    stenographically by me at the time, place and on the
      date hereinbefore set forth, to the best of my
 7    ability.
 8            I DO FURTHER CERTIFY that I am neither a
      relative nor employee nor attorney nor counsel of
 9    any of the parties to this action, and that I am
      neither a relative nor employee of such attorney or
10    counsel, and that I am not financially interested in
      the action.
11
              Witness my hand at Portland, Oregon, this 15th
12    day of September, 2022.
13
14            Maureen Kelly
15
              MAUREEN KELLY - RPR
16            Certified Shorthand Reporter
              Oregon CSR No. 00-0364
17            Washington CCR No. 3401
18
19
20
21
22
23
24
25
                                              Page  234
```

```
 1   Sean C. Wagner, Esq

 2   sean.wagner@wagnerhicks.law

 3                                      September 23, 2022

 4   RE: Goldwater Bank, N.A. vs. Artur Elizarov, Et Al.

 5   9/9/2022, PETER J. HILL, JOB NO. 5429400

 6   The above-referenced transcript has been

 7   completed by Veritext Legal Solutions and

 8   review of the transcript is being handled as follows:

 9   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   X_ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25
```

Page 235

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 236

Omnibus Joint Exhibit Part C, page 1065

```
 1   Goldwater Bank, N.A. vs. Artur Elizarov, Et Al.

 2   PETER J. HILL (#JOB NO 5429400)

 3                   E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   PETER J. HILL                              Date

25

                                          Page 237
```

# EXHIBIT 33

# Goldwater's Response to Howlett and BOTW's First Set of Requests for Admission (Excerpts)

1   Sean C. Wagner (Pro Hac Vice)
    Derek M. Bast (Pro Hac Vice)
2   **WAGNER HICKS PLLC**
    831 East Morehead Street, Suite 860
3   Charlotte, North Carolina 28202
    Tel: (704) 705-7538
4   Fax: (704) 705-7787

5   John Forest Hilbert, Esq. (SBN 105827)
    Joseph A. LeVota, Esq. (SBN 226760)
6   **HILBERT & SATTERLY LLP**
    409 Camino del Rio S. #104
7   San Diego, California 92108
    Telephone:   (619) 795-0300
8   Facsimile:   (619) 501-6855

9   Counsel for Plaintiff
    GOLDWATER BANK, N.A.

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14   GOLDWATER BANK, N.A.,          | Case No. 5:21-cv-00616-JWH-SPx

15              Plaintiff,          | **PLAINTIFF GOLDWATER BANK,**
                                    | **N.A.'S RESPONSES TO SCOTT**
16        v.                        | **HOWLETT AND BANK OF THE**
                                    | **WEST'S FIRST SET OF**
17   ARTUR ELIZAROV, ET AL.         | **REQUESTS FOR ADMISSION**

18              Defendants.

19

20   PROPOUNDING PARTY:   Defendants Scott Howlett and Bank of The West

21   RESPONDING PARTY:    Plaintiff Goldwater Bank, N.A.

22   SET NO.:             One

23

24        Responding Party hereby provides its responses to Propounding Party's Request

25   for Genuineness and Request for Admission, Set One.

26

27

28

HILBERT &
SATTERLY LLP

1
PLAINTIFF GOLDWATER BANK, N.A.'S RESPONSE TO DEFENDANT SCOTT HOWLETT AND
BANK OF THE WEST'S REQUEST FOR ADMISSION SET ONE

Omnibus Joint Exhibit Part C page 1068

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that GWB did not record its lien instrument for the GOLDWATER LOAN prior to April 1, 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that GWB's name and contact information is not listed anywhere in the recorded SUBORDINATION AGREEMENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Responding Party admits that the Unison Homebuyer Uniform Subordination Agreement recorded in the Official Records of the Riverside County Recorder's Office on August 7, 2019, as Document No. 2019-0299193 refers to a "Senior Lender" but does not contain the name of Goldwater Bank, N.A. in the document.

**REQUEST FOR ADMISSION NO. 5:**

Admit that on March 24, 2021, EOW put GWB on notice that the sale of the PROPERTY was proceeding notwithstanding any information that GWB had received to the contrary.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Responding Party admits that on March 24, 2021, at or around 12:33 p.m. (PDT), Andrea Cross sent an email to Peter Hill stating: "Hi Pete, no – we are proceeding and estimating to close within next few days. I have not heard otherwise."

**REQUEST FOR ADMISSION NO. 6:**

Admit that the document attached hereto as Exhibit C is a true and correct copy of the email (with all attachments) from Andrea Cross to Peter Hill dated March 22, 2021.

Omnibus Joint Exhibit Part C page 1069

Dated:  July 22, 2022.

WAGNER HICKS PLLC
By: ___/s/ Derek M. Bast_____
     Sean C. Wagner, Esq.
     Derek M. Bast, Esq.

     And

HILBERT & SATTERLY LLP

By: /s/ Joseph A. Levota_____
     John Forest Hilbert, Esq.
     Joseph A. LeVota, Esq.

*ATTORNEYS FOR GOLDWATER BANK, N.A.*

HILBERT &
SATTERLY LLP

PLAINTIFF GOLDWATER BANK, N.A.'S RESPONSE TO DEFENDANT SCOTT HOWLETT AND
BANK OF THE WEST'S REQUEST FOR ADMISSION SET ONE

Omnibus Joint Exhibit Part C, page 1070

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing by email addressed to the following person(s) at the following address(es):

Ilya Alekseyeff, Esq.
Loia, Inc. (APLC)
8721 Santa Monic Blvd., #119
West Hollywood, CA 90096
(213) 537-4592
Ilya@loia.legal
*Attorney for Defendant Artur Elizarov and Defendant pro per*

Howard D. Hall
Jeremy T. Katz
Ryan Thomason
Hall Griffin, LLP
1851 East First Street, 10th Floor
Santa Ana, CA 92705-4052
hdhall@hallgriffin.com
drichard@hallgriffin.com
(714) 918-7000; Fax: (714) 918-6996
*Attorneys for Defendant Scott Howlett and Bank of the West*

Denis Shmidt
Nabil Bisharat
Orsus Gate, LLP
16 N Marengo Ave, Suite 316
Pasadena, CA 91101
(213) 973-2052
dshmidt@orsusgate.com
nbisrahat@orsusgate.cm
*Attorneys for Defendant Unison Agreement Corp.*

Date:  July 22, 2022

/s/ Derek M. Bast
Derek M. Bast

HILBERT &
SATTERLY LLP

23

PLAINTIFF GOLDWATER BANK, N.A.'S RESPONSE TO DEFENDANT SCOTT HOWLETT AND BANK OF THE WEST'S REQUEST FOR ADMISSION SET ONE

Omnibus Joint Exhibit Part C page 1071

# EXHIBIT 34

# Goldwater's Responses to Elizarov's First Set of Interrogatories (Excerpts)

Sean C. Wagner (Pro Hac Vice)
Derek M. Bast (Pro Hac Vice)
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte, North Carolina 28202
Tel: (704) 705-7538
Fax: (704) 705-7787

John Forest Hilbert, Esq. (SBN 105827)
Joseph A. LeVota, Esq. (SBN 226760)
**HILBERT & SATTERLY LLP**
409 Camino del Rio S. #104
San Diego, California 92108
Telephone:  (619) 795-0300
Facsimile:   (619) 501-6855

Counsel for Plaintiff
GOLDWATER BANK, N.A.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDWATER BANK, N.A.,<br><br>                    Plaintiff,<br><br>        v.<br><br>ARTUR ELIZAROV, ET AL.<br><br>                    Defendants. | Case No. 5:21-cv-00616-JWH-SPx<br><br>**PLAINTIFF GOLDWATER BANK, N.A.'S RESPONSES TO ARTUR ELIZAROV'S FIRST SET OF INTERROGATORIES** |

PROPOUNDING PARTY:      Defendant Artur Elizarov

ANSWERING PARTY:      Plaintiff Goldwater Bank, N.A.

SET NO.:      One

NOW COMES Plaintiff Goldwater Bank, N.A. ("Goldwater"), by and through counsel, and responds to Defendant Artur Elizarov's ("Elizarov") First Set of Interrogatories (the "Interrogatories") as follows:

**RESPONSE:** Goldwater objects to Interrogatory No. 4 to the extent it is a contention interrogatory that potentially seeks attorney-client privileged and attorney-work product information. This matter is in the early stage of discovery, and Goldwater's views about the application of the facts to the relevant law are subject to change as discovery progresses. Goldwater objects to the term "interfered" as vague, because it is not reasonably clear what Elizarov contends would have amounted to interference. In addition, Goldwater objects to this interrogatory as improperly compound, resulting in the total number of interrogatories exceeding the limits of Fed. R. Civ. P. 33(a)(1). Subject to and without waiving his objections, Goldwater answers as follows: Goldwater relied on Elizarov's assurances that Goldwater would receive a substantial payout following the sale of the Palm Springs House. In the absence of these assurances, Goldwater would have sought to record its Deed of Trust prior to the sale of the Palm Springs House, although its efforts would have been frustrated by the fact that Elizarov made misrepresentations and failed to inform Goldwater of the date of the closing.

Evidence of these false statements, as well as other misrepresentations, can be ascertained through the business records being produced in response to Elizarov's discovery requests pursuant to Fed. R. Civ. P. 33(d).

Goldwater employee Pete Hill communicated with Elizarov leading up to the sale of the Palm Springs House, has knowledge of the same, and can be contacted through Goldwater's counsel. Other relevant witnesses include Escrow of the West's corporate representative and the escrow agent specifically involved in this transaction, Andrea Cross. Escrow of the West's address is 9440 S Santa Monica Blvd #310, Beverly Hills, CA 90210.

**5.** State the legal name and CONTACT INFORMATION of each PERSON who, as of February 2, 2021, March 25, 2021, and December 1, 2021, had custody, possession, or control of the DEED OF TRUST bearing ELIZAROV's original notarized signature.

**RESPONSE:  Goldwater objects to Interrogatory No. 5 as irrelevant and not likely to lead to the discovery of admissible evidence, because the identity of the individuals who possessed the original deed of trust on each of those days is not relevant to the claims and defenses at issue in this litigation.  Subject to and without waiving its objections, Goldwater states that the original deed of trust was located shortly after this litigation began in the files of Weststar Mortgage Corporation, who was servicing the loan, and the deed of trust was filed in the Riverside County Recorder's office on April 20, 2021.**

**6.** State the legal name and CONTACT INFORMATION of each PERSON that GOLDWATER hired in 2019 to record with Riverside County Clerk/Recorder DEED OF TRUST bearing ELIZAROV's original notarized signature.

**RESPONSE:  Goldwater objects to Interrogatory No. 6 to the extent it asks for information outside of Goldwater's possession, custody, or control.  First American Title Insurance Company ("First American"), with whom Elizarov interacted at the 2019 closing, was tasked with recording the Deed of Trust and would have the information requested in this interrogatory.  Evidence of First American's role and can be ascertained through the business records being produced in response to Elizarov's discovery requests pursuant to Fed. R. Civ. P. 33(d).**

**7.** Does GOLDWATER contend that GOLDWATER suffered harm as a direct result of GOLDWATER's reliance on any false statements that ELIZAROV made in LOAN APPLICATION? If so, state:

**7.1.** All facts on which GOLDWATER based its contention, including, at the minimum, the statements relied on, the amount of damages, exactly how GOLDWATER calculated those damages, and how ELIZAROV's false statement directly caused those damages;

Dated:  April 22, 2022.

WAGNER HICKS PLLC
By: ___/s/ Derek M. Bast_____
         Sean C. Wagner, Esq.
         Derek M. Bast, Esq.

         And

HILBERT & SATTERLY LLP
By: /s/ Joseph A. Levota_____
         John Forest Hilbert, Esq.
         Joseph A. LeVota, Esq.

*ATTORNEYS FOR GOLDWATER BANK, N.A.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDWATER BANK, N.A., | Case No. 5:21-cv-00616-JWH-SPx |
| Plaintiff, | |
| | **VERIFICATION** |
| v. | |
| ARTUR ELIZAROV, ET AL. | |
| Defendants. | |

I, Peter Hill, an authorized agent of Goldwater Bank, N.A., declare under penalty of perjury that I have reviewed the foregoing answers to interrogatories, and I am personally familiar with the information contained therein.  The information contained therein is true and correct to the best of my knowledge and investigation.

This the 22nd day of April, 2022.

_____
Peter Hill

Omnibus Joint Exhibit Part C, page 1077

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing by email and by United States Postal Service, addressed to the following person(s) at the following address(es):

Ilya Alekseyeff, Esq.
Loia, Inc. (APLC)
8721 Santa Monic Blvd., #119
West Hollywood, CA 90096
(213) 537-4592
Ilya@loia.legal
*Attorney for Defendant Artur Elizarov and Defendant pro per*

Howard D. Hall
Damian P. Richard
Hall Griffin, LLP
1851 East First Street, 10th Floor
Santa Ana, CA 92705-4052
hdhall@hallgriffin.com
drichard@hallgriffin.com
(714) 918-7000; Fax: (714) 918-6996
*Attorneys for Defendant Scott Howlett and Bank of the West*

Denis Shmidt
Nabil Bisharat
Orsus Gate, LLP
16 N Marengo Ave, Suite 316
Pasadena, CA 91101
(213) 973-2052
dshmidt@orsusgate.com
nbisrahat@orsusgate.cm
*Attorneys for Defendant Unison Agreement Corp.*

Date:  April 22, 2022

/s/ Derek M. Bast
Derek M. Bast

# EXHIBIT 35

# Goldwater's Production of Documents (Excerpts)

## Loss Mitigation 90-120 Days Delinquency Review Checklist

Account# 909216931       [X] Checked Note & Mortgage for all cosigners

Borrower: Artur Elizarov      Co-Borrower: _____

Property Address: 828 Westmount Drive, West Hollywood, CA. 90069

Original Balance: $ 686,250.00       Investor: FNMA

Unpaid Principal Balance: $679,565.53      Loan Type: Conventional

UA Balance $ 0       Date Closed: 07/31/2019

Interest Rate: 5.3750 %

Payment: $ 4944.11

Next Due: 04/01/2020

**Reason For Default:**

| | | |
|---|---|---|
| ___ | 1 | Death of Principal Mortgagor/Family Member |
| ___ | 2 | Illness of Principal Mortgagor/Family Member |
| ___ | 3 | Marital Difficulties/Divorce |
| ___ | 4 | Curtailment of Income |
| ___ | 5 | Excessive Obligations |
| ___ | 6 | Property Problem |
| ___ | 7 | Inability To Rent/Sell Property |
| ___ | 8 | Military Service |
| ___ | 9 | Unemployed Date _____ |
| X | 10 | Other  (Explain)   COVID19 |

2 Month Letter : N/A

Demand Letter: N/A

FTF (NM only): _____

Last Inspection: 8/10/2020

Good X    Fair_____    Poor_____

Vacant_____   Owner x   Tenant_____   UTV_____

Last Lexis Nexis: None

_____

_____

Property Type: SFH_____ (MFH Taxed as Real Estate?): _____

HOA: Yes_____ Last Call: 9/30/2020_____ Next Call: 10/01/2020

Collector Arrangement (Include Starting date - Ending date, Amounts, Terms, Etc.)

Borrower on a covid19 forbearance extension from 7/01 to 9/30, financial hardship not resolved.

borrower stated he will be needing an extension as he is still in work hours reduction due to covid19, did send request.

_____

Collector Approved: Leticia(Lettie)Aguilar_____ Date: 9/30/2020_____

Manager Comments: _____

_____

_____

[ ] Ready to Scan      [ ] Needs Further Review See Comments

Home Retention Manager Approved: _____ Date: _____

## Foreclosure Referral

Approved: _____ Date: _____

Approved: _____ Date: _____

Approved: _____ Date: _____

Omnibus Joint Exhibit Part C, page 1080    GOLDWATER 000531

# **<u>EXHIBIT 36</u>**

# **<u>Grant Deed from Elizarov to Howlett (Recorded 3/29/21)</u>**

**DOC # 2021-0196602**
03/29/2021 04:55 PM Fees: $17.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

RECORDING REQUESTED BY:
Orange Coast Title

AND WHEN RECORDED MAIL TO:

Scott Howlett
44 Hartford
San Francisco, CA 94144

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: REGINA #080

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: 210-2216078-10 | | Escrow No.: 02-035523-AC |
|---|---|---|

APN 513-363-023
TRA 011

**GRANT DEED**

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is** $1,490.50

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of Palm Springs **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Artur Elizarov, a Single Man**

hereby GRANT(s) to:

**Scott Howlett, a Single Man**

the real property in the City of Palm Springs, County of Riverside, State of California,
described as:
Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56
both inclusive of Maps,  in the office of the County of said county.

Also Known as:  291 W. Overlook Road, Palm Springs, CA  92264
APN#: 513-363-023-2

**DATED: March 22, 2021**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

DOC #2021-0196602  Page 2 of 2

Title Order No.: 210-2216078-10
Escrow No.: 02-035523-AC

APN# 513-363-023-2

### Signature Page

_Artur Elizarov_
Artur Elizarov

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF _Florida_

COUNTY OF _Broward_

On _03/25/21_ before me, _Antonio Perez_ A Notary Public personally

appeared _Artur Elizarov_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW, IF NO PARTY SHOWN, MAIL AS SHOWN

NOTARY PUBLIC · STATE OF FLORIDA

**ANTONIO PEREZ**
Commission # HH 079732
Expires January 12, 2025
Bonded Thru Budget Notary Services

# **EXHIBIT 37**

# **BOTW Deed of Trust (Recorded 3/29/21)**

DOC #2021-0196603
03/29/2021 04:55 PM Fees: $62.00
Page 1 of 17
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

## ORANGE COAST TITLE CO.

210-2216078-10

Recording Requested By:
**Bank of the West, a California state
banking corporation**

After Recording Return To:
**Bank of the West
Post-Closing - NE-BBP-LL-P
13505 California St.
Omaha, NE 68154**

Prepared By:
**Keena Bauer
BOTW Primary Ops Center
13505 California St
Omaha, NE 68154**

Parcel ID Number: **513-363-023** ✓

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: REGINA #080

Exempt from fee per GC 27388.1 (a)
(2); recorded concurrently in connection
with a transfer subject to the imposition
of documentary transfer tax

[Space Above This Line For Recording Data]

## DEED OF TRUST

MIN: **1001040-8810555781-1**
Loan #: **8810555781**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**   **"Security Instrument"** means this document, which is dated **March 27, 2021**, together with all Riders to this document.
**(B)**   **"Borrower"** is **SCOTT HOWLETT, A SINGLE MAN.** Borrower's address is **44 HARTFORD ST, SAN FRANCISCO, CA 94114.** Borrower is the trustor under this Security Instrument.
**(C)**   **"Lender"** is **Bank of the West, a California state banking corporation.**   Lender is a **Corporation** organized and existing under the laws of **THE STATE OF CALIFORNIA.** Lender's address is **13505 California Street, Omaha, NE 68154.**
**(D)**   **"Trustee"** is **First Santa Clara Corporation, a California corporation, 180 Montgomery St, San Francisco, CA 94104.**
**(E)**   **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)**   **"Note"** means the promissory note signed by Borrower and dated **March 27, 2021.** The Note states that Borrower owes Lender **ONE MILLION EIGHTY FOUR THOUSAND AND NO/100** Dollars (U.S. **$1,084,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 01, 2051.**
**(G)**   **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005 1/01 *(page 1 of 15 pages,*

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] VA Rider |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | [ ] Other(s)[specify] |

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M)** **"Escrow Items"** means those items that are described in Section 3.
**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY of RIVERSIDE**:





CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3004 09/14

Form 3005 1/01 *(page 2 of 15 pages,*

**The land referred to in this report is situated in the City of Palm Springs, the County of Riverside, State of California, and is described as follows: Lot 8 of Block 7, Palm Canyon Mesa Tract, in the City of Palm Springs, the County of Riverside, State of California, as per maprecorded in Book 12, Pages 52 through 56, both inclusive of maps, in the Office of the County Recorder of said County.APN: 513-363-023"Purchase Money"**

which currently has the address of **291 WEST OVERLOOK RD, PALM SPRINGS**, California **92264** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Mortgage Cadence Document Center © 3004 09/14

Form 3005 1/01 *(page 3 of 15 pages,*

applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.





CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005 1/01 *(page 4 of 15 pages)*

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005  1/01  *(page 5 of 15 pages)*

Mortgage Cadence Document Center  © 3004 09/14

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless



*881055578 1*

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  ©  3004 09/14



* M C M O R T D O T *

Form 3005  1/01   *(page 6 of 15 pages;*

Omnibus Joint Exhibit Part C, page 1090

extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3004 09/14

Form 3005 1/01 *(page 7 of 15 pages)*

Omnibus Joint Exhibit Part C, page 1091

insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.   If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.   Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.   Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.   If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.   Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.   Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.   These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.   If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."   Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.   Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.   **Assignment of Miscellaneous Proceeds; Forfeiture.**   All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005  1/01  *(page 8 of 15 pages)*

Omnibus Joint Exhibit Part C, page 1092

Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any,  paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.   Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third





CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005  1/01  *(page 9 of 15 pages)*

persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.**   Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.   Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.   Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.   Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of





Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There





CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3004 09/14

Form 3005 1/01 *(page 11 of 15 pages,*

also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:
**22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration**





CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005  1/01 *(page 12 of 15 pages)*

Omnibus Joint Exhibit Part C, page 1096

following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section



CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3004 09/14



Form 3005 1/01 *(page 13 of 15 pages)*

Omnibus Joint Exhibit Part C, page 1097

2943 of the Civil Code of California.

**The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)

Borrower - **SCOTT HOWLETT**

_____ [Space Below This Line for Acknowledgment] _____



CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3004 09/14



Form 3005 1/01 *(page 14 of 15 pages)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California)

County of _San Francisco_ )

On _3/27/2021_ before me, _Jermaine Jones, Notary Public_

_____ (herein insert name and title of officer), personally appeared

_Scott Howlett_

_____.

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JERMAINE JONES
Notary Public - California
San Francisco County
Commission # 2312377
My Comm. Expires Nov 11, 2023

NOTARY MUST PRINT OR TYPE
This must be printed or typed in a manner that is photographically reproducible (GC27201.5)

Name of the notary: _Jermaine Jones_

County of notary's principal place of business: _San Francisco_

Notary's phone number: _310-309-0147_

Notary's registration number: _2312377_

Commission expiration date: _11/11/2023_

Origination Company: **Bank of the West**
    NMLSR ID: **19116**
Originator: **Aida Merrill**
    NMLSR ID: **394158**





CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3004 09/14

Form 3005 1/01 (page 15 of 15 pages)

MIN: **1001040-8810555781-1**                                    Loan #: **8810555781**

## SECOND HOME RIDER

    THIS SECOND HOME RIDER is made this **27th** day of **March, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **Bank of the West, a California state banking corporation** (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

**291 WEST OVERLOOK RD, PALM SPRINGS, CA 92264**
[Property Address]

    In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

    **6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

MULTISTATE SECOND HOME RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3890 1/01 (rev. 4/19)
Mortgage Cadence Document Center  © 3221 04/19                                                                                       *(page 1 of 2)*

* 8 8 1 0 5 5 5 7 8 1 *          * M C 2 N D H M R D R *

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.



_____ (Seal)
Borrower - **SCOTT HOWLETT**

Origination Company: **Bank of the West**
    NMLSR ID: **19116**
Originator: **Aida Merrill**
    NMLSR ID: **394158**

MULTISTATE SECOND HOME RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3890 1/01 (rev. 4/19)
Mortgage Cadence Document Center  © 3221 04/19    (page 2 of 2)

# EXHIBIT 38

# Goldwater Deed of Trust (Recorded 4/20/21)

RECORDING REQUESTED BY
STEWART TITLE OF CA, INC.

**When recorded, mail to:**
**Goldwater Bank, N.A.**
**Attn: Final Document Department**
**P.O. Box 25064**
**Albuquerque, NM 87125**
**844-799-4653**

DOC # 2021-0245826
04/20/2021 03:02 PM Fees: $147.00
Page 1 of 17
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: ELENA #448

Title Order No.: 0625-5974427
Escrow No.: 0625-5974427
LOAN #: 909216931

-------------------- [Space Above This Line For Recording Data] --------------------

# DEED OF TRUST

## Accommodation Recording

MIN 1009209-4100147547-4
MERS PHONE #: 1-888-679-6377

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated **July 31, 2019,**                        together with all Riders to this document.
**(B) "Borrower" is**   ARTUR ELIZAROV, AN UNMARRIED MAN.

Borrower's address is   **828 Westmount Drive, West Hollywood, CA 90069.**

Borrower is the trustor under this Security Instrument.
**(C) "Lender" is**   **Goldwater Bank, N.A..**

Lender is   **a Corporation,**                                    organized and existing under the laws of
**The United States of America.**                    Lender's address is   **2525 E. Camelback Rd, Suite**
**1100, Phoenix, AZ 85016.**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3005 1/01**
Ellie Mae, Inc.                                  Page 1 of 13                      CAEDEDL   0219
                                                                                    CAEDEDL (CLS)
                                                                                    07/31/2019 10:36 AM PST



LOAN #: 909216931

**(D) "Trustee"** is **First American Title Company.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **July 31, 2019.** The Note states that Borrower owes Lender **SIX HUNDRED EIGHTY SIX THOUSAND TWO HUNDRED FIFTY AND NO/100* *** ********************************************************** Dollars (U.S. **$686,250.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2049.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |
| ☐ V.A. Rider | | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and

**LOAN #: 909216931**

all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  **County**                                              [Type of Recording Jurisdiction] of  **Riverside**                                             [Name of Recording Jurisdiction]:

**LOT 8 OF BLOCK 7, PALM CANYON MESA TRACT, AS PER MAP RECORDED IN BOOK 12, PAGES 52 THROUGH 56, BOTH INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. APN #:  513-363-023-2**

which currently has the address of      **291 W. Overlook Road, Palm Springs,**

[Street] [City]

**California  92264-8934**              ("Property Address"):
          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.                                          Page 3 of 13                                          CAEDEDL   0219
                                                                                                          CAEDEDL (CLS)
                                                                                                          07/31/2019 10:36 AM PST



**LOAN #: 909216931**

to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

　　**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

　　If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

　　Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

　　**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

　　Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

　　The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**　Form 3005 1/01
Ellie Mae, Inc.

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



DOC #2021-0245826  Page 5 of 17

**LOAN #: 909216931**

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.

Page 5 of 13

CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
Ellie Mae, Inc.                                   Page 6 of 13                        CAEDEDL   0219
                                                                                      CAEDEDL (CLS)
                                                                                      07/31/2019 10:36 AM PST



**LOAN #: 909216931**

from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
Ellie Mae, Inc.

Page 7 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1,109

**LOAN #: 909216931**

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.
                                   Page 8 of 13                                   CAEDEDL   0219
                                                                                  CAEDEDL (CLS)
                                                                                  07/31/2019 10:36 AM PST



**LOAN #: 909216931**

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3005 1/01**

Ellie Mae, Inc.

Page 9 of 13

CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1111

**LOAN #: 909216931**

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.

Page 10 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1112

**LOAN #: 909216931**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3005 1/01**
Ellie Mae, Inc.

Page 11 of 13

CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



**LOAN #: 909216931**

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____     7/31/2019     (Seal)
**ARTUR ELIZAROV**                                  DATE

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

**State of CALIFORNIA**
**County of** Los Angeles

On July 31. 2019 _____, before me, Estela Noemy Moreno Aviles NOTARY PUBLIC
(here insert name and title of the officer), personally appeared ARTUR ELIZAROV, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
_____ (NOTARY)

(SEAL)



ESTELA NOEMY MORENO AVILES
Notary Public - California
Los Angeles County
Commission # 2293165
My Comm. Expires Jun 15, 2023

---

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
Ellie Mae, Inc.                        Page 12 of 13

CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

**LOAN #: 909216931**

**Lender: Goldwater Bank, N.A.**
**NMLS ID: 452955**
**Loan Originator: Gregory Hill**
**NMLS ID: 247349**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**      **Form 3005 1/01**
Ellie Mae, Inc.                                                                           Page 13 of 13

CAEDEDL   0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1115

LOAN #: 909216931
MIN: 1009209-4100147547-4

# ADJUSTABLE RATE RIDER
**(LIBOR One-Year Index (As Published In The Wall Street Journal-Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this **31st** day of **July, 2019,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Goldwater Bank, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:    **291 W. Overlook Road, Palm Springs, CA 92264-8934.**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **5.375 %.**    The Note provides for changes in the interest rate and the monthly payments as follows:
**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the **1st**    day of  **August, 2024,** and on that day every **12th**    month thereafter. Each date on which my interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated

**MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.                                  Page 1 of 4                        F3189RLU   0816
                                                                                                             F3189RLU (CLS)
                                                                                           07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1116

**LOAN #: 909216931**

deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.**
The most recent Index value available as of the date 45 days before each Change
Date is called the "Current Index," provided that if the Current Index is less than zero,
then the Current Index will be deemed to be zero for purposes of calculating my inter-
est rate.

If the Index is no longer available, the Note Holder will choose a new index which
is based upon comparable information. The Note Holder will give me notice of this
choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by
adding  **THREE**                          percentage point(s) (  **3.000 %**                )
(the "Margin") to the Current Index. The Note Holder will then round the result of this
addition to the nearest one-eighth of one percentage point (0.125%). Subject to the
limits stated in Section 4(D) below, this rounded amount will be my new interest rate
until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that
would be sufficient to repay the unpaid principal that I am expected to owe at the
Change Date in full on the maturity date at my new interest rate in substantially
equal payments. The result of this calculation will be the new amount of my monthly
payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than
**7.375 %**      or less than  **5.375 %.**        Thereafter, my interest rate will never be increased
or decreased on any single Change Date by more than  **TWO**
percentage point(s) (  **2.000 %**        ) from the rate
of interest I have been paying for the preceding  **12**       month(s). My interest rate will
never be greater than  **11.375 %. My interest rate will never be less than the start rate or 5.375
%.**

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the
amount of my new monthly payment beginning on the first monthly payment date after
the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest
rate and the amount of my monthly payment before the effective date of any change.
The notice will include information required by law to be given to me and also the title

**MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-**Single Family-**Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.                                      Page 2 of 4                              F3189RLU  0816
                                                                                             F3189RLU (CLS)
                                                                               07/31/2019 10:36 AM PST



**LOAN #: 909216931**

and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.                                    Page 3 of 4                         F3189RLU  0816
                                                                                        F3189RLU (CLS)
                                                                              07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1118

LOAN #: 909216931

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____     7/31/2019  (Seal)
ARTUR ELIZAROV                                                    DATE

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                    Page 4 of 4                F3189RLU   0816
                                                              F3189RLU (CLS)
                                                              07/31/2019 10:36 AM PST



Omnibus Joint Exhibit Part C, page 1119

# EXHIBIT 39

# Complaint (omitting internal exhibits) (Dkt No. 1) (Filed 4/6/21)

1
**SEAN C. WAGNER** (*Pro Hac Vice* Forthcoming)
Sean.Wagner@wagnerhicks.law
2
**DEREK M. BAST** (*Pro Hac Vice* Forthcoming)
Derek.Bast@wagnerhicks.law
3
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
4
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
5
**GOLDWATER BANK, N.A.**

6

7
**W. KEITH WYATT (S.B.N.: 80859)**
wkwyatt@imwlaw.com
8
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
9
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA 90071-2919
10
Tel: (213) 489-0028; Fax (213) 489-0552

11
Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

12

13
## UNITED STATES DISTRICT COURT

14
## CENTRAL DISTRICT OF CALIFORNIA

15

16
Goldwater Bank, N.A.      )

          *Plaintiff,*  )

17
           )

          vs.      )    Case No. _____

18
           )

ARTUR ELIZAROV, UNISON  )    **COMPLAINT FOR:**
19
AGREEMENT CORP., and SCOTT  )
HOWELL            )
20
           )    **1. BREACH OF CONTRACT**

      *Defendant.*  )    **2. UNJUST ENRICHMENT**
21
           )    **3. INJUNCTIVE RELIEF**

           )    **4. DECLARATORY JUDGMENT**
22
           )

23
           )

_____)
24

25
      Plaintiff, Goldwater Bank, N.A. ("Goldwater"), by and through undersigned
26
counsel, brings this action against Defendants Artur Elizarov ("Elizarov"), Unison
27
Agreement Corp. ("Unison") and Scott Howell ("Howell") and alleges as follows:

28

- 1 -

## **PARTIES**

1.      Plaintiff Goldwater Bank, N.A. is a national association with its principal place of business in Phoenix, Arizona.

2.      Defendant Artur Elizarov, is an individual and resident of Riverside County, California.

3.      Defendant Unison Agreement Corp. is a corporation organized under the laws of the state of Delaware with its principal place of business in San Francisco, California.

4.      Defendant Scott Howell is an individual and resident of San Francisco County, California.

## **JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over Goldwater's claims pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Goldwater and Defendants and the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

6.      A large portion of the conduct giving rise to the claims against Defendants, as more fully described below, occurred in the Central District of California.

7.      In addition, the real property over which Plaintiff claims a security interest at issue in this action is located in Riverside County, California within the Central District of California.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## **DEMAND FOR JURY TRIAL**

9.      Plaintiff Goldwater hereby demands a trial by jury on all issues so triable.

Omnibus Joint Exhibit Part C, page 1122

## **BACKGROUND**

10. On or around July 31, 2019, Goldwater, as lender, originated a mortgage loan to Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by certain real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").

11. Elizarov is a real estate broker holding an active license from the California Department of Real Estate, and his license ID number is 01954357.

12. The Goldwater Loan was memorialized in an Adjustable Rate Note (the "Note") and a Deed of Trust (the "Deed of Trust"), both dated July 31, 2019. A true and accurate copy of the Note and Deed of Trust are attached and incorporated herein as **Exhibit A** and **Exhibit B**, respectively.

13. The Deed of Trust created a valid and enforceable lien between Goldwater and Elizarov.

14. On or around August 7, 2019, Elizarov entered into another deed of trust with Unison as trustee, which was also secured by the Subject Property (the "Unison Lien").

15. Elizarov informed Unison of the Goldwater Loan and Goldwater's lien.

16. Elizarov defaulted on the Goldwater Loan and is delinquent on the payment obligations as of April 1, 2020.

17. At some point following the default, Elizarov decided to sell the Subject Property, and Elizarov communicated that intent to Goldwater in March 2021.

18. On March 3, 2021, the escrow company for the pending sale, Escrow of the West, Inc., made contact with Goldwater regarding the payoff of Goldwater's lien on the Subject Property in connection with a pending sale of the Subject Property.

Omnibus Joint Exhibit Part C, page 1123

19. During the course of the escrow relationship, Escrow of the West, Inc., as escrow agent for Elizarov as seller and Howell as buyer of the Subject Property, learned that Goldwater's Deed of Trust was unrecorded.

20. On or about March 3, 2021 Escrow of the West informed Goldwater that its Deed of Trust on the Subject Property had never been recorded in the Riverside County Register of Deed's office.

21. Goldwater also learned in conversation with the escrow agent that the Subject Property was subject to two other liens in addition to Goldwater's, including a mechanic's lien in an amount of approximately $107,000 and the Unison Lien in the amount of $491,000.

22. Goldwater thereafter communicated with Elizarov regarding the disbursement of the proceeds of the pending sale, which would have been insufficient to pay off the Goldwater Loan, the Unison Lien, and the mechanic's lien in full.

23. Elizarov indicated that $675,000 of the proceeds would be transmitted to Goldwater following the sale of the Subject Property.

24. Upon information and belief, Howell and Unison had actual knowledge of Goldwater's Deed of Trust because the parties to the pending sale, including Elizarov, Howell and Unison, discussed the matter of Goldwater's unrecorded Deed of Trust and its impact on the pending sale.

25. Goldwater's unrecorded Deed of Trust is valid between Goldwater, Elizarov, and any other party with notice of the Deed of Trust. Cal. Civ. Code § 1217.

26. Elizarov sold the Subject Property to Scott Howell by a Grant Deed that was executed on or around March 22, 2021 and recorded on or around March 29, 2021. A true and accurate copy of the Grant Deed is attached and incorporated herein as **Exhibit C**.

- 4 -

27. Elizarov never informed Goldwater that the sale occurred and continued communicating with Goldwater after March 22, 2021 regarding what amount of the proceeds they would receive.

28. On or around March 29, 2021, Goldwater asked Elizarov about the status of the closing, and Elizarov denied that the sale occurred.

29. Elizarov has ceased responding to Goldwater's queries regarding the status of the $675,000 that was to be paid towards the Goldwater Loan following the sale of the Subject Property.

30. Upon information and belief, the proceeds from the sale of the Subject Property paid off the mechanic's lien and the Unison Lien in full.

31. Upon information and belief, Elizarov received and is wrongfully retaining the remaining proceeds of the sale of the Subject Property, including the $675,000 that Elizarov previously indicated would be paid to Goldwater.

32. To date, Goldwater has received none of the proceeds from the sale of the Subject Property.

33. Following the sale of the property, Goldwater also discovered a flyer advertising the Subject Property for sale identifies Artur Elizarov and his firm DreamHome Realty Group, Inc. as the realtor to be contacted about the property. A true and accurate copy of this flyer is attached hereto as **Exhibit D**.

34. Because of Elizarov's status as a licensed real estate broker in the State of California and his role in marketing the Subject Property for sale, Elizarov cannot deny that he was aware of the validity of the Deed of Trust and Goldwater's right to the proceeds of the sale of the Subject Property.

35. Goldwater's status as a secured creditor with regard to Elizarov is now at risk, and Goldwater faces a significant likelihood that it will effectively become an unsecured creditor of Elizarov.

36.     If Goldwater is an unsecured creditor of Elizarov, there is a high risk that Goldwater will not be made whole, as the evidence of Elizarov's insolvency is well documented.

37.     At the time of the sale of the Subject Property, Elizarov was already almost a year behind in his payments on the Goldwater Loan, which is significant in light of the fact that he owned the Subject Property for less than two years.

38.     Additionally, on December 18, 2019, Elizarov was discharged from an IRS tax lien in the amount of $107,787.69.

39.     Elizarov's recent history of carrying significant debts suggests that the proceeds of the sale of the Subject Property will be wasted and disposed of prior to the entry of a final judgment in this matter.

40.     As a result of Elizarov's conduct, Goldwater Bank has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract, as to Elizarov)**

41.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

42.     Goldwater had an agreement with Elizarov to make the Goldwater Loan in exchange for his obligations in the Note and the Deed of Trust.

43.     The Note and Deed of Trust is a valid and binding contract between the parties.

44.     Pursuant to the Note and Deed of Trust, Goldwater is entitled to the proceeds from a sale of the Subject Property.

45.     Elizarov breached the Note and Deed of Trust by failing to make all payments when due, including by failing to provide Goldwater with the proceeds of the sale of Subject Property.

Omnibus Joint Exhibit Part C, page 1126

46.     Rather than pay the proceeds from the sale of the Subject Property to Goldwater, Elizarov has wrongfully retained those proceeds in an amount of approximately $675,000.

47.     Elizarov agreed in the Note that in the event of a default and acceleration of the Goldwater Loan, Goldwater would be entitled to recover its costs and expenses incurred in enforcing the Note, including its reasonable attorney's fees. (Ex. A, Note, § 7(E)).

48.     As a direct and proximate result of Elizarov's breach, Goldwater has been directly and proximately damaged in an amount to be determined at trial.

49.     As a direct and proximate result of the foregoing acts and conduct, Goldwater has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe on Plaintiff

50.     Goldwater additionally seeks the entry of an order declaring that Elizarov holds, in constructive trust as trustee for the benefit of Goldwater, such amounts as were transferred to him personally in connection with the sale of the Subject Property, as well as an order directing Elizarov to disgorge and transfer any and all such amounts to Goldwater.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

51.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

52.     By engaging in the acts described above, Elizarov has and continues to benefit from his wrongdoing and has been unjustly enriched by reaping the benefits of his unlawful activities to the damage and irreparable harm of Goldwater.

53.     As a direct and proximate result of Elizarov's misconduct, Goldwater has been damaged in an amount to be proven at trial, but in excess of $675,000.

- 7 -

## THIRD CAUSE OF ACTION

### (Injunctive Relief, as to Elizarov)

54.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

55.     As of the date of filing of this Complaint, Goldwater faces significant exposure with regard to the Goldwater Loan, as Elizarov has sold the Subject Property and wrongfully retained the proceeds of the sale in an amount in excess of $675,000.

56.     Goldwater's status as a secured creditor of Elizarov has been threatened, and the likelihood of Goldwater being able to recover in full as an unsecured creditor is low.

57.     Goldwater justifiably fears that it will sustain significant losses and irreparable harm as a result of Elizarov's misappropriation of the proceeds of the sale of the Subject Property.

58.     Unless Elizarov's assets, including the proceeds of the sale of the Subject Property, are marshalled, accounted for, and preserved, Goldwater's security interest in the Goldwater Loan will not be adequately secured with respect to Elizarov.

59.     Goldwater is without a plain, speedy, or adequate remedy at law which would serve to immediately exonerate, indemnify, and save it harmless for its actual and anticipated losses, and Goldwater would be irreparably and permanently injured unless this Court grants immediate injunctive and equitable relief.

## FOURTH CAUSE OF ACTION

### (Declaratory Judgment, as to Unison and Elizarov)

60.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

Omnibus Joint Exhibit Part C, page 1128

61.     There exists an actual, definite, and concrete controversy between Goldwater, Unison, and Elizarov related to the priority of Goldwater's security interest relative to the Unison Lien.

62.     Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

63.     Prior to the sale of the Subject Property to Howell, Elizarov and Unison both obtained actual knowledge of Goldwater's unrecorded Deed of Trust.

64.     Nevertheless, in the sale of the Subject Property, the Unison Lien was paid off in full as a lien with a higher priority than Goldwater's.

65.     For the reasons stated above, Goldwater requests an Order from this Court declaring that Goldwater's lien created by the Deed of Trust was first in priority over the Unison Lien.

66.     By reason of the foregoing, an actual and justifiable controversy exists between the parties as to the duties, rights and obligations of the agreement.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment, as to Scott Howell)

67.     Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

68.     There exists an actual, definite, and concrete controversy between Goldwater and Howell related to the validity of the Goldwater Loan and Goldwater's security interest in the Subject Property.

69.     Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

70.     Prior to the sale of the Subject Property from Elizarov to Howell, Howell obtained actual knowledge of Goldwater's Deed of Trust.

71.     By virtue of his knowledge, Goldwater's Deed of Trust is valid and binding as between Goldwater and Howell, and Goldwater's security interest in the Subject Property persists.  Cal Civ. Code § 1217.

72.     The Grant Deed between Elizarov and Howell does not indicate that title in the Subject Property is being transferred subject to Goldwater's security interest.

73.     By reason of the foregoing, an actual and justifiable controversy exists between the parties as to the duties, rights, and obligations of Goldwater's security interest.

74.     For the reasons stated above, Goldwater requests an Order from this Court declaring that the sale of the Subject Property from Elizarov to Howell transferred title subject to Goldwater's security interest in the Subject Property.

## PRAYER FOR RELIEF

**WHEREFORE**, Goldwater requests the Court order relief, as follows:

1.     Preliminary and permanent injunctive relief (i) enjoining Elizarov from alienating or disposing of the proceeds of the sale of the Subject Property and (ii) requiring Elizarov to make an accounting of his assets following the sale of the Subject Property;

2.     Actual, compensatory, consequential, and exemplary damages in an amount to be determined at trial for all losses and damages suffered as a result of the acts and transactions complained of herein;

3.     A constructive trust for the benefit of Goldwater over the proceeds received by Elizarov in connection with the sale of the Subject Property;

4.     All costs and expenses incurred by Goldwater Bank in enforcing its rights under the Note and Deed of Trust;

5.     A declaratory judgment that the Goldwater's security interest in the Subject Property had priority over the Unison Lien prior to the sale, or in the

- 10 -

Omnibus Joint Exhibit Part C, page 1130

alternative, that Howell's title in the Subject Property is subject to Goldwater's security interest established by the Deed of Trust.


Dated: April 6, 2021                    _____/s/ Marie Maurice_____
                                        W. Keith Wyatt, Esq.
                                        Marie Maurice, Esq.


                                        -AND-


                                        **/s/ Sean C. Wagner**
                                        Sean C. Wagner, *PHV materials forthcoming*
                                        Derek M. Bast, *PHV materials forthcoming*
                                        WAGNER HICKS PLLC
                                        831 E. Morehead Street, Suite 860
                                        Charlotte, NC 28202
                                        Telephone: (704) 705-7358
                                        sean.wagner@wagnerhicks.law
                                        derek.bast@wagnerhicks.law

                                        ATTORNEYS FOR PLAINTIFF GOLDWATER BANK
                                        N.A.

- 11 -

# EXHIBIT 40

# Goldwater's ex parte Application for TRO (Dkt No. 19) (Filed 4/16/21)

**SEAN C. WAGNER** (*Pro Hac Vice* Forthcoming)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice* Forthcoming)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE, McNEILL & WYATT**
444 S. Flower Street, Suite 1800
Los Angeles, CA 90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Goldwater Bank, N.A. | ) | Case No. 5:21-cv-00616-JWH-SP |
| | ) | |
| *Plaintiff,* | ) | **PLAINTIFF'S *EX PARTE*** |
| | ) | **APPLICATION FOR (1) A** |
| vs. | ) | **TEMPORARY RESTRAINING** |
| | ) | **ORDER; (2) ORDER TO SHOW** |
| ARTUR ELIZAROV, UNISON | ) | **CAUSE FOR A PRELIMINARY** |
| AGREEMENT CORP., and SCOTT | ) | **INJUNCTION; AND (3) AN ORDER** |
| HOWELL | ) | **FOR EXPEDITED DISCOVERY** |
| | ) | |
| *Defendant.* | ) | |

Plaintiff, Goldwater Bank, N.A. ("Goldwater"), by and through undersigned counsel, hereby applies for an *ex parte* Order pursuant to Fed. R. Civ. P. 26, 34, and 65 for (1) an order halting Defendant Artur Elizarov ("Elizarov") from alienating or disposing of proceeds in his possession from the sale of 291 W. Overlook Road, Palm Springs, California (the "Proceeds"), (2) an order requiring Elizarov to provide an accounting of the Proceeds since the date of the sale, and (3) an order allowing Plaintiff to conduct expedited discovery in order to identify all of the recipients of funds from the sale of the property.

Good cause exists for granting Goldwater's application for a preliminary injunction to halt Elizarov from further transferring or alienating the Proceeds as it is undisputed that a valid deed of trust existed between Elizarov and Goldwater with regards to the Property.

Good cause exists for granting Goldwater's application for a preliminary injunction requiring Elizarov to provide an accounting of the Proceeds since the sale of the property as it is undisputed that a valid deed of trust existed between Elizarov and Goldwater with regards to the Property.

Good cause exists for granting Goldwater's application for leave to conduct expedited discovery. Allowing Goldwater to conduct expedited discovery, including the service of a third-party subpoena and limited discovery on Defendants to produce documents and tangible things, will enable Goldwater to identify where Elizarov has transferred the Proceeds since the sale.

Further allowing expedited discovery will increase the likelihood that Goldwater is able to recover the proceeds of the sale of its security interest. Without expedited discovery, there is a good possibility that the Proceeds will be further alienated, thus precluding this Court from granting effective relief.

///
///
///

Omnibus Joint Exhibit Part C, page 1134

Goldwater submits the accompanying Memorandum in support of its Application for a Temporary Restraining Order and for Expedited Discovery.

Dated: April 15, 2021

IVIE McNEILL WYATT
PURCELL & DIGGS

/s/ Marie Maurice
W. Keith Wyatt, Esq.
Marie Maurice, Esq.

AND-

/s/ Sean C. Wagner
Sean C. Wagner, *PHV materials forthcoming*
Derek M. Bast, *PHV materials forthcoming*
WAGNER HICKS PLLC
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
derek.bast@wagnerhicks.law

*ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A*

# EXHIBIT 13

# Memorandum of Points and Authorities (Dkt No. 19-1) (Filed 4/16/21)

**SEAN C. WAGNER** (*Pro Hac Vice* Forthcoming)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice* Forthcoming)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**


**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE, McNEILL & WYATT**
444 S. Flower Street, Suite 1800
Los Angeles, CA  90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. | Case No. 5:21-cv-00616-JWH-SP |
| *Plaintiff,* | **MEMORANDUM OF POINTS AND** |
| | **AUTHORITIES IN SUPPORT OF** |
| vs. | **PLAINTIFF'S *EX PARTE*** |
| | **APPLICATION FOR (1) A** |
| ARTUR ELIZAROV, UNISON | **TEMPORARY RESTRAINING** |
| AGREEMENT CORP., and SCOTT | **ORDER; (2) ORDER TO SHOW** |
| HOWELL | **CAUSE FOR A PRELIMINARY** |
| | **INJUNCTION; AND (3) AN ORDER** |
| *Defendant.* | **FOR EXPEDITED DISCOVERY** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND ........................................................................ 2

A.  Goldwater's Loan to Elizarov ...................................................................... 2

B.  Elizarov Sells the Subject Property ............................................................ 3

C.  Goldwater's Efforts to Recover the Proceeds. ........................................... 4

III.  LEGAL ARGUMENT .................................................................................. 5

A.  Goldwater is Entitled to Immediate Injunctive Relief Against Elizarov ................. 5

1.  Goldwater is Likely to Succeed on the Merits ............................................ 5

2.  Goldwater will Continue to Suffer Irreparable Harm If Injunctive Relief is Not
Granted ......................................................................................................... 6

3.  The Balance of Equities is Decidedly in Favor of Goldwater .................... 8

4.  An Injunction is in the Public Interest ........................................................ 9

B.  Goldwater is Entitled to Conduct Expedited Discovery ........................... 9

IV.   CONCLUSION ............................................................................................ 11

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Am. LegalNet, Inc. v. Davis*
673 F. Supp. 2d 1063 (C.D. Cal. 2009) ........................................................ 10

*Harley-Davidson Credit Corp. v. Monterey Motorcycles, Inc.*
No. 5:12-CV-01864 EJD, 2012 WL 1309151 (N.D. Cal. Apr. 16, 2012)................... 7, 9

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*
736 F.3d 1239 (9th Cir. 2013) ........................................................................ 6

*In re Focus Media, Inc.*
387 F.3d 1077 (9th Cir. 2004) ....................................................................... 7

*Lavan v. City of Los Angeles*
No. CV 11-2874 PSG, 2011 WL 1533070, (C.D. Cal. Apr. 22, 2011) ........................... 5

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980) ....................................................................... 6

*MLP U.S.A., Inc. v. PM Corp. Grp., Inc.*
No. CV09-5810 DSF AGRX, 2009 WL 10675901 (C.D. Cal. Aug. 11, 2009) ........... 7, 8

*Oasis West Realty, LLC v. Goldman*
250 P.3d 1115 (Cal. 2011). ......................................................................... 5

*Phillip Morris USA Inc. v. Shalabi*
352 F. Supp. 2d 1067 (C.D. Cal. 2004) ........................................................... 8

*Semitool, Inc. v. Tokyo Electron. Am., Inc.*
208 F.R.D. 273 (N.D. Cal. 2002)................................................................. 9, 10

*Toyo Tire Holdings of Ams. Inc. v. Cont'l. Tire N. A., Inc.*
609 F.3d 975 (9th Cir. 2010) ....................................................................... 5

*Winter v. Natural Res. Def Council, Inc.*
555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)........................................ 5

**STATUTES**

Cal. Civ. Code s 1217 ................................................................2, 6

**RULES**

Fed. R. Civ. P. 26 ..................................................................9

Fed. R. Civ. P. 34 ..................................................................9

# I.   INTRODUCTION

Plaintiff Goldwater Bank, N.A. ("Goldwater") seeks injunctive relief against Defendant Artur Elizarov only ("Elizarov") for his misappropriation of proceeds received from the sale of a property secured by a deed of trust between Elizarov and Goldwater (the "Proceeds").

On or around July 31, 2019, Goldwater loaned Elizarov $686,250.00, which was secured through a Note and Deed of Trust by certain real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").  (Declaration of Peter Hill, hereinafter "Hill Decl.," ¶ 2, attached hereto as **Exhibit A**).  In March 2021, Elizarov informed Goldwater that he intended to sell the Subject Property, and an escrow agent at Escrow of the West, Inc. ("Escrow of the West") made contact with Goldwater regarding the upcoming payoff.  (Ex. A, Hill Decl., ¶ 5).  Leading up to the closing, Elizarov and Goldwater learned that Goldwater's Deed of Trust had never been recorded. (Ex. A, Hill Decl., ¶ 9).  Elizarov informed Goldwater that it would nevertheless receive a substantial payout from the sale immediately following closing.  (Ex. A, Hill Decl., ¶ 13).   Unbeknownst to Goldwater, however, the sale occurred and the funds were disbursed on or around March 22, 2021.  (Ex. A, Hill Decl., ¶ 15).  Elizarov subsequently lied to Goldwater about the sale occurring and ceased communications with Goldwater. (Ex. A, Hill Decl., ¶ 17).

After making a demand for the Proceeds, Goldwater initiated this action seeking (1) to recover its share of the Proceeds of the sale from Elizarov, (2) a declaratory judgment that, by virtue of their knowledge of Goldwater's deed of trust, Defendants Unison Agreement Corp. ("Unison") and Scott Howlett ("Howlett")[1] are bound by

---

[1] The Complaint used the name "Scott Howell," which is a misnomer. Goldwater intends to amend its Complaint to correct Mr. Howlett's name in the near future.  The correction of Mr. Howlett's name is unrelated to the relief requested in the present motion.

Goldwater's Deed of Trust, and (3) a declaration that Howlett purchased the property subject to Goldwater's lien.  (Doc. No. 1, Compl., Prayer for Relief).

It is indisputable as a matter of law that an unrecorded deed of trust is nevertheless valid between the parties to the document and any other parties with knowledge.  Cal. Civ. Code § 1217.  Unless the Court enters a Temporary Restraining Order prohibiting Elizarov from further transferring or alienating the Proceeds of the sale, Goldwater will have lost the benefit of its security interest and will be rendered an unsecured creditor of Elizarov.

The relief is being sought on an *ex parte* basis because Elizarov actively made misrepresentations to Goldwater regarding the occurrence of the sale and the location of the Proceeds.  Plaintiff has made repeated efforts to serve and contact Elizarov, but his continued efforts to avoid service indicate that, if notice were given, Elizarov would further seek to alienate the Proceeds, precluding this Court from granting effective relief.

Consequently, Goldwater seeks an order (1) halting Elizarov's use of the Proceeds, (2) requiring Elizarov to make an accounting of the Proceeds since the date of the sale, and (3) allowing Goldwater leave to conduct limited expedited discovery to identify how the Proceeds were disbursed following the sale of the Subject Property.

## II.    FACTUAL BACKGROUND

### A.    Goldwater's Loan to Elizarov

On or about July 31, 2019, Goldwater, as lender, originated a mortgage loan to Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").  (Ex. A, Hill Decl., ¶ 2).  The Goldwater Loan was documented in an Adjustable Rate Note (the "Note") and a Deed of Trust (the "Deed of Trust"), both dated July 31, 2019.  (Ex. A, Hill Decl., ¶ 3).  Elizarov subsequently defaulted on the Goldwater Loan and is delinquent on the payment obligations as of April 1, 2020.  (Ex. A, Hill Decl., ¶ 4).  At the beginning of March 2021, Elizarov communicated to Goldwater an intent to sell the Subject Property.  (Ex. A, Hill Decl., ¶ 5).

### B.      Elizarov Sells the Subject Property

On March 3, 2021, Goldwater was contacted by Escrow of the West, who was serving as the escrow agent for a pending sale of the Elizarov property.  (Ex. A, Hill Decl., ¶ 7).  Escrow of the West learned that Goldwater's Deed of Trust was unrecorded and informed Goldwater and Elizarov of the same.  (Ex. A, Hill Decl., ¶ 9).  Goldwater also learned in conversation with the escrow agent that the Subject Property was subject to two other liens in addition to Goldwater's lien.  (Ex. A, Hill Decl., ¶ 10).  The other liens were a mechanic's lien in an amount of approximately $107,000 and a lien in favor of Unison in the amount of $491,000.  (Ex. A, Hill Decl., ¶ 10).  The Unison lien appears to have arisen from a deed of trust entered into between Elizarov and Unison on or around August 7, 2019.  (Ex. A, Hill Decl., ¶ 11).  Elizarov informed Goldwater that he was insolvent and would not be able to pay off the Goldwater Loan in full, but he stated that Goldwater would nevertheless receive approximately $675,000 in proceeds from the sale of the Subject Property.  (Ex. A, Hill Decl., ¶¶ 12–13).

The sale of the Subject Property occurred on or around March 22, 2021, and the Grant Deed was recorded on or around March 29, 2021.  (Ex. A, Hill Decl., ¶ 15). Elizarov never informed Goldwater that the sale occurred, and Goldwater never received any proceeds from the sale.  (Ex. A, Hill Decl., ¶ 18).  Public records indicate that the Subject Property sold for a price of $1,355,000.00.  (Ex. A, Hill Decl., ¶ 15).  On or around March 29, 2021, Goldwater asked Elizarov about the status of the closing. Elizarov denied that the sale had occurred.  (Ex. A, Hill Decl., ¶¶ 16–17).  Goldwater informed Elizarov that it was aware of the recorded Grant Deed and asked about the status of the $675,000.  (Ex. A, Hill Decl., ¶ 17).  In response, Elizarov promptly ceased communications with Goldwater.  (Ex. A, Hill Decl., ¶ 17).  Goldwater has since learned that Elizarov also withdrew Escrow of the West's authorization to communicate with Goldwater or disburse funds to Goldwater.  (Declaration of Derek Bast, hereinafter "Bast Decl.", ¶ 9, attached hereto as **Exhibit B**).

Subtracting the $107,000 mechanic's lien and the $491,000 Unison lien from the sale price of the results in a remainder of $757,000.00.  Some of that amount would have gone to closing costs and other minor transaction fees.  The vast majority of those proceeds, however, would have been paid out to Elizarov.

### C.    Goldwater's Efforts to Recover the Proceeds.

Goldwater made demand to Elizarov to return the Proceeds prior to initiating this litigation.  (Ex. B, Bast Decl. ¶ 2).  Elizarov failed to return the Proceeds following Goldwater's demand.  (Ex. B, Bast Decl. ¶ 2).  Elizarov's wrongful retention of the Proceeds is particularly alarming to Goldwater because Elizarov is himself a licensed real estate broker in the state of California.  (Hill Decl. ¶ 19).  Moreover, Elizarov was also personally involved in marketing the Subject Property for sale.  (Hill Decl. ¶ 20).  Thus, because Elizarov presumably has more knowledge of California real estate law than the average individual, it is unreasonable that Elizarov would believe he has any claim to the Proceeds as a result of Goldwater's Deed of Trust being unrecorded.

Since filing the instant action, Goldwater has made numerous efforts to serve Elizarov with process, to no avail.  (Ex. B, Bast Decl. ¶ 9).  Presently, Elizarov has avoided service and has not been present at any other address associated with him in California, including the addresses he has on file with the California Department of Real Estate. (Ex. B, Bast Decl. ¶¶ 6, 8)  Goldwater has engaged private processor servers who, over the last week, have made seventeen service attempts at five different addresses across two states.  (Ex. B, Bast Decl. ¶ 8).  Additionally, Goldwater has contacted an attorney for Elizarov asking him to accept service on Elizarov's behalf.  (Bast Decl. ¶ 11).  Although the attorney has indicated that he will be representing Elizarov in this litigation, he has refused to accept service.  (Ex. B, Bast Decl., ¶ 13).

## III.   LEGAL ARGUMENT

### A.   Goldwater is Entitled to Immediate Injunctive Relief Against Elizarov

Goldwater is entitled to a temporary restraining order and preliminary injunction[2] if it can demonstrate (1) a likelihood of success on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in favor of the party requesting the preliminary relief, and (4) an injunction is in the public interest.  *See Toyo Tire Holdings of Ams. Inc. v. Cont'l. Tire N. A., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365,374, 172 L. Ed. 2d 249 (2008)).  Here, Goldwater request that the Court grant a temporary restraining order on an *ex parte* basis, pending the hearing on the preliminary injunction.

#### 1.   Goldwater is Likely to Succeed on the Merits

Goldwater has asserted claims against Elizarov for breach of the Note and Deed of Trust, as well as unjust enrichment.  As part of its ultimate relief, Goldwater asks the Court to declare a constructive trust over the Proceeds.  In order to succeed on its claim of breach of contract, Goldwater must prove (1) the existence of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) the resulting damage to plaintiff.  *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

The Note and Deed of Trust are valid contracts between Goldwater and Elizarov, pursuant to which Borrower provided Goldwater with a security interest in the Subject Property.  (Ex. A, Hill Decl., ¶ 3).  Elizarov apparently believes that the fact that Goldwater's Deed of Trust was unrecorded absolves him from having to repay the Goldwater Loan, as he initially identified Goldwater as a lienholder to Escrow of the West, (Ex. A, Hill Decl., ¶ 8), but then withheld the Proceeds from Goldwater after

---

[2] The standard for granting a temporary restraining order is the same as preliminary injunction. *See Lavan v. City of Los Angeles*, No. CV 11-2874 PSG, 2011 WL 1533070, *1 (C.D. Cal. Apr. 22, 2011) ("an application for a temporary restraining order must satisfy the same legal standard governing the issuance of a preliminary injunction").

learning that the Deed of Trust was unrecorded.  (Ex A., Hill Decl. ¶ 17).  Nevertheless, it is indisputable that Goldwater's security interest in the Subject Property was valid as between Elizarov and Goldwater.  Under California law, "[a]n unrecorded instrument is valid as between the parties thereto and those who have notice thereof."  Cal. Civ. Code § 1217.  The fact that the Goldwater Deed of Trust was unrecorded may be a factor in Goldwater's claims against Howlett and Unison, but it has no impact on Goldwater's claims against Elizarov.

The Note and Deed of Trust gave Goldwater a security interest in the Subject Property, and Elizarov breached those documents by selling the Subject Property without paying off the Goldwater Loan.  Goldwater has undoubtedly been damaged by Elizarov's breach because it has effectively wiped out Goldwater's security interest, rendering it an unsecured creditor of Elizarov.[3]  Furthermore, Elizarov was already in default on the Goldwater Loan as of April, 2020, and he has failed to take any steps to repay the Goldwater Loan.  (Ex. A., Hill Decl., ¶ 4).

## 2.   Goldwater will Continue to Suffer Irreparable Harm If Injunctive Relief is Not Granted

Goldwater will suffer irreparable harm if the Court does not freeze the Proceeds of the Subject Property.  Irreparable harm exists where a party lacks an adequate remedy at law.  *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  "Monetary injury is not normally considered irreparable."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (emphasis added).  Goldwater's injury, however, is more than pure economic loss.

---

[3] Goldwater's claims against Unison and Howlett contend that both parties had notice of Goldwater's Deed of Trust. Even if Goldwater succeeds on these claims and secures an order that Howlett took the Subject Property subject to Goldwater's lien, there is a strong possibility that any surviving lien would not include the amounts that should have been disbursed to Goldwater from the sale of the Subject Property.  As such, Goldwater is still at significant risk of losing the very security it bargained for and agreed to with Elizarov.

Goldwater will suffer irreparable harm in the absence of an injunction because of Elizarov's insolvency and the potential loss of its security interest.

This Court has previously found that irreparable harm is likely to occur where a party's security interest is put at risk, particularly where the defendant is insolvent, reasoning that, "[a]s the entire point of the security interest is to allow Plaintiff to be made whole in the circumstance that Defendant has no monetary assets to collect against, Plaintiff would suffer irreparable harm by losing the recourse to that security." *MLP U.S.A., Inc. v. PM Corp. Grp., Inc.*, No. CV09-5810 DSF AGRX, 2009 WL 10675901, at *1 (C.D. Cal. Aug. 11, 2009).  In addition, "the possibility that a defendant will dissipate assets which could satisfy a judgment can constitute irreparable harm. *Harley-Davidson Credit Corp. v. Monterey Motorcycles, Inc.*, No. 5:12-CV-01864 EJD, 2012 WL 1309151, at *3 (N.D. Cal. Apr. 16, 2012) ("The court finds that the strong possibility of continued asset dissipation supports the issuance of a TRO.") (citing *In re Focus Media, Inc.*, 387 F.3d 1077 (9th Cir. 2004)).

Here, Elizarov's sale of the Subject Property and diversion of the Proceeds to himself has effectively destroyed Goldwater's security interest.  As a result of Elizarov's actions, he received and is wrongfully retaining at least $675,000 from the sale, which should have been applied to reduce Goldwater's Loan.  The likelihood that Elizarov will further dissipate the Proceeds and be rendered insolvent is high.  Elizarov himself informed Goldwater that he was insolvent and would be unable to satisfy the Goldwater Loan through the pending sale.  (Ex. A, Hill Decl., ¶ 12).  Other evidence also reflects that Elizarov was in fact in significant debt.  He had already defaulted on the Goldwater Loan, held another deed of trust in the amount of $491,000, and failed to pay a contractor, resulting in a $107,000 mechanic's lien on the Subject Property.  (Ex. A, Hill Decl., ¶ 10).  Elizarov's further intent to dissipate the assets is reflected in the fact that he made misrepresentations about the status of the closing after learning that Goldwater's Deed of Trust was unrecorded.  (Ex. A, Hill Decl., ¶ 17).  When Goldwater asked Elizarov about

the status of the Proceeds, he promptly discontinued the call and has not spoken further with Goldwater.  (Ex. A, Hill Decl., ¶ 17).

In the absence of an injunction, the Proceeds are likely to be dissipated during the course of this litigation, and Elizarov is unlikely to be able to pay a monetary judgment for the full amount of the Deed of Trust.  If that occurs, Goldwater will have lost the very security that was supposed to be afforded to it by the Deed of Trust.  Goldwater will "suffer irreparable harm by losing recourse to that security" in the absence of an injunction.  *MLP U.S.A., Inc.*, 2009 WL 10675901, at *1.  Therefore, this factor weighs heavily in favor of entry of preliminary relief.

### 3.    The Balance of Equities is Decidedly in Favor of Goldwater

Elizarov's wrongful retention of the Proceeds, when balanced against Goldwater's rights to be made whole by its security interest in the Subject Property, unquestionably tips the equities in favor of Goldwater.  In *MLP U.S.A., Inc*, when granting an injunction restraining the defendant from further alienating property under dispute, this Court stated that, "[w]hile Defendant may bear some expense associated with the granting of the injunction in that its plans for moving the property . . . will be disrupted, the balance of the equities tips in favor of Plaintiff because there is no reason to believe that Defendant could not be made whole for the losses due to the injunction."  *MLP USA, Inc.* 2009 WL 10675901, at *1.  The same rationale applies here.

Eliarov is currently sitting on a windfall of more than half a million dollars, which he would not have in the absence of his breach of the Note and the Deed of Trust and subsequent deceptive conduct.  While Elizarov may bear some expense associated with enjoining the transfer of the Proceeds, any expenses would be minimal compared to the significant losses Goldwater would face by losing the proceeds of its security interest.  Moreover, because the requested injunction would merely require Elizarov to comply with the valid Note and Deed of Trust, there will be no adverse impact on Elizarov's legitimate activities.  *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1075 (C.D. Cal. 2004) ("Plaintiff is only seeking to enjoin illegal activity.  The injunction will

not adversely affect any of Defendants' legitimate business operations."). For these reasons, there is no question that the balance of the equities weighs heavily in favor of injunctive relief.

### 4.      An Injunction is in the Public Interest

It is well established that the public interest supports the enforcement of valid contracts. *Harley-Davidson Credit Corp.*, 2012 WL 1309151, at *3 ("[I]ssuance of a TRO serves the overarching public interest of enforcing contracts."). This is particularly true with regard to contracts creating security interests. "An injunction is [] in the public interest because there is a strong social interest in ensuring a continuing free flow of capital into industry through the use of security interests in property. The public would be harmed if loans were reduced due to a concern about the ability to repossess properties that were subject to security interests." *MLP USA, Inc.*, 2009 WL 10675901, at *2. The public interest greatly favors the issuance of preliminary injunctive relief in this action. Elizarov has attempted to thwart the obligations of his mortgage and deprive Goldwater of the Proceeds from the sale of the Subject Property. Permitting borrowers to convert valid security interests into uncollectable unsecured judgments will cause significant disruption to the consumer mortgage market. Accordingly, the issuance of a temporary restraining order and preliminary injunction will serve the public interest.

### B.      Goldwater is Entitled to Conduct Expedited Discovery

Goldwater moves the Court for leave to conduct limited expedited discovery to trace the Proceeds from the sale of the Subject Property. Goldwater makes its request pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, which allows the Court to order a defendant to produce documents pursuant to a Rule 34 request in an expedited manner. Goldwater also makes is request pursuant to Rule 26(d) of the Federal Rules of Civil Procedure, which permits parties to seek discovery prior to the Rule 26(f) conference with leave of the Court.

The Ninth Circuit employs a flexible "good cause" standard for determining when expedited discovery should be allowed. *See Semitool, Inc. v. Tokyo Electron. Am., Inc.*,

208 F.R.D. 273, 276 (N.D. Cal. 2002). According to the *Semitool* court, "good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* "Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009). All of these factors weigh in Goldwater's favor for granting expedited discovery.

First, by this application, Goldwater has requested a temporary restraining order and preliminary injunction.

Second, Goldwater's discovery requests are narrowly tailored to tracing the Proceeds of the sale of the Subject Property from the escrow company to each payee and then accounting for any transfer of the Proceeds in Elizarov's hands. Specifically, Goldwater intends to issue a third party subpoena to Escrow of the West and narrow discovery requests to Elizarov for bank records evidencing the location and any transfer of the Proceeds in his possession.

Third, the purpose of the expedited discovery is clear. The Proceeds of the sale of the Subject Property represent the conversion of Goldwater's security interest into fungible, but identifiable, funds. Goldwater has an urgent need to identify those funds before Elizarov transfers and expends those funds, or becomes insolvent.

Fourth, expedited discovery will create no burden on Elizarov beyond modestly accelerating the timeline for responding to discovery requests and allowing for the service of subpoenas on third parties.

Fifth, expedited discovery would merely advance the timeline of discovery by a few weeks.

In sum, good cause exists for the authorization of expedited discovery, including *inter alia*: (1) the issues upon which Plaintiffs seek expedited discovery are clearly relevant to this action, and (2) it is highly likely that Defendants would have to produce this evidence in the course of the normal discovery process. Because Defendants will not be prejudiced by providing expedited discovery and because Plaintiffs have demonstrated a legitimate need for the same, an order granting Plaintiffs leave to conduct expedited discovery is appropriate in this case.

## IV. CONCLUSION

For the reasons stated herein, Goldwater respectfully requests that the Court grant the relief requested herein.

Dated: April 15, 2021

/s/ Marie Maurice
W. Keith Wyatt, Esq.
Marie Maurice, Esq.

-AND-

/s/ Sean C. Wagner
Sean C. Wagner, *PHV materials forthcoming*
Derek M. Bast, *PHV materials forthcoming*
WAGNER HICKS PLLC
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
derek.bast@wagnerhicks.law

*ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.*

# <u>EXHIBIT 42</u>

# <u>Order Granting TRO (Dkt No. 23) (Entered 4/20/21) (Excerpts)</u>

cc: Fiscal Section

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

GOLDWATER BANK, N.A.,

       Plaintiff,

  v.

ARTUR ELIZAROV;
UNISON AGREEMENT CORP.; and
SCOTT HOWELL,

       Defendants.

Case No. 5:21-cv-00616-JWH-SPx

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

## I.  **INTRODUCTION**

Before the Court is the *Ex Parte* Application of Plaintiff Goldwater Bank, N.A. for (1) Temporary Restraining Order; (2) Order to Show Cause for a Preliminary Injunction; and (3) expedited discovery.[1]  As explained below, the Court **GRANTS** the Application.

## II.  **BACKGROUND**

The following facts are drawn from the Application and supporting papers.

On or around July 31, 2019, Goldwater Bank originated a mortgage loan to Defendant Artur Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").[2]  Elizarov defaulted on the Goldwater Loan.[3]  In March 2021, Elizarov told Goldwater Bank that he intended to sell the Subject Property.[4]

On March 3, 2021, an escrow agent at Escrow of the West, Inc. contacted Peter Hill, the Chief Credit Officer and Executive Vice-President of Goldwater Bank, regarding the pending sale of the Subject Property.[5]  Escrow of the West sent Goldwater Bank a Request for Demand that stated, "An escrow has been opened in this office by Artur Elizarov wherein you are listed as the holder of the Note and Deed of Trust covering property legally described as [the Subject Property]."[6]  Shortly thereafter, Escrow of the West informed Goldwater Bank and Elizarov that Goldwater Bank's Deed of Trust had never been recorded

---

[1]     *Ex Parte* Appl. for TRO (the "Application") [ECF No. 19].
[2]     Decl. of Peter Hill (the "Hill Declaration") [ECF No. 19-4] ¶ 2.
[3]     *Id.* at ¶ 4.
[4]     *Id.* at ¶ 5.
[5]     *Id.* at ¶¶ 1 & 7.
[6]     *Id.* at ¶ 8.

Omnibus Joint Exhibit Part C, page 1154

with the Register of Deeds for Riverside County, California.[7]  Goldwater Bank also learned of two competing liens on the Subject Property, including a mechanic's lien in the amount of about $107,000 and a lien in favor of Defendant Unison Agreement Corp. for $491,000.[8]

Elizarov told Hill that Elizarov was insolvent and that the proceeds from the sale of the Subject Property would not be enough to satisfy the outstanding amount of the Goldwater Loan and the two other liens.[9]  Elizarov also told Hill that Goldwater Bank would receive $675,000 from the sale of the Subject Property.[10]  On or around March 29, 2021, Goldwater Bank discovered that the sale of the Subject Property had occurred on March 22, 2021, by Grant Deed from Elizarov to Defendant Scott Howell.[11]  Public records indicate that the Subject Property sold for $1,355,000.[12]

On or around March 29, 2021, Hill called Elizarov to inquire about the status of the closing and the proceeds from the sale.[13]  Elizarov told Hill that the sale had ***not*** occurred.[14]  Hill responded to Elizarov that Goldwater Bank knew of the Grant Deed and asked about the status of the $675,000 that Goldwater Bank was to receive from the sale.[15]  Elizarov replied that he did not want to discuss the matter any further and terminated the call.[16]  Elizarov has not made

---

[7]   *Id.* at ¶ 9.
[8]   *Id.* at ¶ 10.
[9]   *Id.* at ¶ 12.
[10]  *Id.* at ¶ 13.
[11]  *Id.* at ¶ 15.
[12]  *Id.*
[13]  *Id.* at ¶ 16.
[14]  *Id.* at ¶ 17.
[15]  *Id.*
[16]  *Id.*

1  any further contact with Goldwater Bank, and Goldwater Bank has not received

2  any proceeds from the sale of the Subject Property.[17]

3      On April 6, 2021, Goldwater Bank filed its Complaint, commencing this

4  action.[18]  The Complaint asserts claims for relief for, *inter alia*, breach of

5  contract, unjust enrichment, injunctive relief, and declaratory judgment against

6  Elizarov.[19]  Despite multiple attempts, Goldwater Bank has been unable to serve

7  the Complaint on Elizarov.[20]

8      On April 16, 2021, Goldwater Bank filed the instant Application.

9  ### III.  LEGAL STANDARD

10     A temporary restraining order ("TRO") preserves the *status quo* and

11 prevents irreparable harm until a hearing may be held on the propriety of a

12 preliminary injunction.  *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d

13 1126, 1131 (9th Cir. 2006).  The standard for issuing a TRO is identical to the

14 standard for issuing a preliminary injunction.  *Lockhead Missile & Space Co. v.*

15 *Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

16     "A preliminary injunction is an extraordinary and drastic remedy; it is

17 never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citations

18 omitted).  An injunction is binding only on parties to the action, their officers,

19 agents, servants, employees, and attorneys and those "in active concert or

20 participation" with them.  Fed. R. Civ. P. 65(d)(2).

21     "A plaintiff seeking a preliminary injunction must establish that he is

22 likely to succeed on the merits, that he is likely to suffer irreparable harm in the

23 absence of preliminary relief, that the balance of equities tips in his favor, and

24 that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council,*

25

26 [17]    *Id.* at ¶ 18.

27 [18]    Compl. [ECF No. 1].

   [19]    *Id.*

28 [20]    *See* Decl. of Derek Bast [ECF No. 19-2] ¶¶ 5-13.

1    *Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, "serious questions going to the

2    merits and a balance of hardships that tips sharply towards the plaintiff can

3    support issuance of a preliminary injunction, so long as the plaintiff also shows

4    that there is a likelihood of irreparable injury and that the injunction is in the

5    public interest."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

6    Cir. 2011) (internal quotations omitted).

7                              **IV.  DISCUSSION**

8          Goldwater Bank argues that it has satisfied the requirements for

9    preliminary injunctive relief.  For the reasons explained below, the Court agrees.

10   **A.    Lack of Notice**

11         As a preliminary matter, the Court notes that Elizarov has not been served

12   with the Complaint or the Application, and Elizarov has not appeared in this

13   action.  *See* Fed. R. Civ. P. 65(b)(2).  Goldwater Bank's counsel testifies that his

14   firm has attempted service on Elizarov a total of 17 times, at five different

15   addresses.[21]  In addition, Elizarov withdrew Escrow of the West's authorization

16   to communicate with Goldwater Bank or its agents.[22]  Elizarov's attorney, Ilya

17   Aleskeyeff, has also stated that he is not authorized to accept service on

18   Elizarov's behalf.[23]  Moreover, the allegations summarized above indicate that

19   Elizarov may attempt to transfer or alienate the funds received from the sale if

20   he were to receive notice of the Application.  Accordingly, the Court finds that

21   good cause exists under Rule 65(b)(1)(A) & (B) to issue this Order without

22   notice.  *See, e.g.*, *Harley-Davidson Credit Corp. v. Monterey Motorcycles, Inc.*, 2012

23   WL 1309151, at *3 (N.D. Cal. Apr. 16, 2012) (providing advance notice "may

24   render this litigation fruitless since" the additional time could be used to further

25   dissipate assets).

26   _____

27   [21]    *Id.* at ¶ 8.
     [22]    *Id.* at ¶ 10.

28   [23]    *Id.* at ¶ 13.

**B.      Likelihood of Success**

Goldwater Bank has demonstrated a strong likelihood of success on the merits.[24]  Goldwater Bank has provided evidence showing the existence of a note secured with a deed of trust on the Subject Property.[25]  The fact that the deed of trust was unrecorded does not change Elizarov's obligation to repay the note nor remove Goldwater Bank's security interest in the Subject Property.  "An unrecorded instrument is valid as between the parties thereto and those who have notice thereof."  Cal. Civ. Code § 1217.  The evidence submitted with the Application also indicates that Elizarov was aware of his obligation to repay the note,[26] but that he instead misinformed Goldwater Bank regarding the status of the sale of the Subject Property and then ceased communicating with Goldwater Bank.[27]  Accordingly, Goldwater Bank has shown a strong likelihood of success on the merits.

**C.      Irreparable Harm**

The evidence shows that Goldwater Bank is likely to suffer irreparable harm without a TRO.  Elizarov told Hill that Goldwater Bank would receive $675,000 from the sale of the Subject Property.[28]  Hill testifies that instead of remitting the funds, however, Elizarov misinformed Goldwater Bank regarding the status of the sale and then ceased communicating with Goldwater Bank.[29]  Hill also testifies that "Elizarov informed me that he was insolvent."[30]  Elizarov's conduct and his purported insolvency suggest an intention to dissipate or alienate the funds received from the sale of the Subject Property.

---

[24]      *See* Application at 5:12-6:14.
[25]      *See* Hill Declaration at ¶¶ 2 & 3.
[26]      *See id.* at ¶ 13.
[27]      *See id.* at ¶¶ 14-18.
[28]      *Id.* at ¶ 13.
[29]      *See id.* at ¶¶ 17 & 18.
[30]      *Id.* at ¶ 12.

6

1         "As the entire point of the security interest is to allow Plaintiff to be made

2   whole in the circumstance that Defendant has no monetary assets to collect

3   against, Plaintiff would suffer irreparable harm by losing the recourse to that

4   security." *MLP U.S.A., Inc. v. PM Corp. Grp., Inc.*, 2009 WL 10675901, at *1

5   (C.D. Cal. Aug. 11, 2009); *see also Harley-Davidson Credit Corp.*, 2012 WL

6   1309151, at *3 ("Although pure economic loss alone is not normally sufficient to

7   [support] the issuance of a TRO, the possibility that a defendant will dissipate

8   assets which could satisfy a judgment can constitute irreparable harm.") (citing

9   *In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir.2004)).  Here, Hill's testimony

10  indicates that Elizarov (1) misinformed Goldwater Bank regarding the status of

11  the sale; (2) failed to remit the funds owed to Goldwater Bank; (3) ceased

12  communicating with Goldwater Bank after it informed Elizarov that it was aware

13  of the sale; and (4) withdrew his consent for Escrow of the West to

14  communicate with Goldwater Bank.  These facts indicate an intention to

15  transfer or alienate the proceeds from the sale of the Subject Property, which

16  would effectively result in Goldwater Bank losing its security interest in the

17  Subject Property, particularly because Hill testifies that Elizarov told Hill that

18  Elizarov was insolvent.  Accordingly, Goldwater Bank has shown a likelihood of

19  irreparable injury in the absence of a TRO.

20  **D.    <u>Balance of the Equities</u>**

21        The balance of the equities tips in favor of Goldwater Bank.  The evidence

22  indicates that Elizarov has wrongly received a windfall from the sale of the

23  Subject Property.  While Elizarov may incur some expenses if he is enjoined

24  from transferring the proceeds from the sale, such expenses would likely be

25  minimal compared to the loss Goldwater Bank is likely to incur if it is unable to

26  recover on the note and loses its security interest in the Subject Property.

27  Moreover, the TRO is temporary and would merely require Elizarov to comply

28  with what appears to be a valid note and deed of trust.  Thus, Goldwater Bank

Omnibus Joint Exhibit Part C, page 1159

1  has shown that "the balance of equities tips in [its] favor." *Winter*, 555 U.S. at
2  20.

3  **E.    Public Interest**

4      The public interest factors also weigh in favor of granting the TRO. *See*
5  *Alliance for the Wild Rockies*, 632 F.3d at 1138. There is a public interest in
6  allowing a bank to enforce its "secured property interests against default."
7  *Omega v. Wells Fargo & Co.*, 2012 WL 685440, at *13 (N.D. Cal. Mar. 2, 2012).
8      Accordingly, all four requirements for a TRO have been satisfied.

9  **F.    Request for Expedited Discovery**

10      Goldwater Bank also requests that the Court permit it to take limited
11  expedited discovery to trace the proceeds from the sale of the Subject
12  Property.[31]  "[D]istrict courts in this Circuit have allowed expedited discovery
13  prior to the Rule 26(f) conference upon a showing of good cause." *BDMR*
14  *Holdings, LTD. v. Does*, 2019 WL 7865178, at *1 (C.D. Cal. Dec. 10, 2019).
15  "Factors commonly considered in determining the reasonableness of expedited
16  discovery include, but are not limited to:  (1) whether a preliminary injunction is
17  pending; (2) the breadth of the discovery requests; (3) the purpose for
18  requesting the expedited discovery; (4) the burden on the defendants to comply
19  with the requests; and (5) how far in advance of the typical discovery process the
20  request was made." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067
21  (C.D. Cal. 2009) (internal quotations and citations omitted).

22      Here, these factors weigh in favor of granting expedited discovery.
23  Goldwater Bank seeks a TRO and a preliminary injunction, and the requested
24  discovery is aimed at preserving the *status quo* by enabling Goldwater Bank to
25  trace the proceeds from the sale of the Subject Property.  The burden of
26  complying with the requested discovery would be relatively minimal because it is
27

28  [31]    Application 9:19-10:27.

-8-

limited in scope.  Expedited discovery may also be necessary to allow Goldwater Bank to trace funds obtained from the sale before they are dissipated or transferred beyond the reach of this Court.  Accordingly, the Court will permit Goldwater Bank to issue third-party subpoenas solely for the purpose of tracing the proceeds from the sale of the Subject Property.  The Court will also permit Goldwater Bank to issue narrow discovery requests to Elizarov for bank records evidencing the location of the proceeds from the sale of the Subject Property.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Application.  The Court hereby **ORDERS** as follows:

1.  Defendant Elizarov and his agents, representatives, and all persons acting in concert with him are **RESTRAINED AND ENJOINED** from transferring, alienating, or expending the proceeds that Elizarov received from the sale of the Subject Property.

2.  Goldwater Bank may immediately issue third-party subpoenas solely for the purpose of tracing the proceeds from the sale of the Subject Property.  Goldwater Bank may also immediately issue narrow discovery requests to Elizarov for bank or other financial records evidencing the location of the proceeds from the sale of the Subject Property.

3.  The Court finds that a bond of $2,500 appropriately satisfies the standard set forth in Rule 65(c) of the Federal Rules of Civil Procedure.[32]  This Order will not take effect until Goldwater Bank posts the bond with the Court.

4.  This Order is issued on April 20, 2021, at 1:35 p.m.  *See* Fed. R. Civ. P. 65(b)(2).

5.  The Court sets a video hearing on an Order to Show Cause Why a Preliminary Injunction Should Not Issue on Monday, May 3, 2021, at 1:00 p.m.

---

[32]     This amount roughly approximates the time value of the money at stake during the pendency of the TRO based upon an interest rate of 10% per annum.

6. Elizarov is **DIRECTED** to file his response to the Order to Show Cause, and any supporting evidence, no later than 12:00 noon on Wednesday, April 28, 2021.

7. Goldwater Bank is **DIRECTED** to file its reply, if any, to Elizarov's response to the Order to Show Cause no later than 12:00 noon on Friday, April 30, 2021.

8. Goldwater Bank is **DIRECTED** immediately to provide Elizarov with notice of this TRO by all reasonable means, including, if necessary, via email and telephone call to all known telephone numbers and email addresses. Goldwater Bank is also **DIRECTED** immediately to provide Ilya Aleskeyeff—Elizarov's counsel, according to the Hill Declaration—with notice of this Order. Goldwater Bank is further **ORDERED** to file a report with the Court indicating whether and by what means notice of this Order has been provided to Elizarov, within 48 hours of providing such notice.

9. This Order shall remain in effect until the conclusion of the hearing on the Order to Show Cause.

**IT IS SO ORDERED.**

Dated: April 20, 2021

John W. Holcomb
UNITED STATES DISTRICT JUDGE

# EXHIBIT 43

# Goldwater's Reply to Elizarov's Response to Order to Show Cause (Dkt No. 31) (Filed 4/30/21)

**SEAN C. WAGNER** (*Pro Hac Vice*)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice*)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA 90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. | ) |
|         *Plaintiff,* | ) Case No. 5:21-cv-00616-JWH-SP |
|         vs. | ) |
| ARTUR ELIZAROV, UNISON AGREEMENT CORP., and SCOTT HOWELL | ) _____ |
|         *Defendant.* | ) **PLAINTIFF'S REPLY TO ELIZAROV'S RESPONSE TO ORDER TO SHOW CAUSE** |

# **TABLE OF CONTENTS**

I.     Introduction ................................................................................................ 4

II.    Argument ..................................................................................................... 5

   A.  Elizarov Has Failed to Account For All of the Proceeds From the Sale of the
         Subject Property................................................................................... 5

   B.  Elizarov's argument that he has not received notice of the preliminary injunction
         proceedings is illogical and completely meritless. ............................... 6

   C.  The Requested Injunction is Permissible Under Federal Law. .............. 8

   D.  The Preliminary Injunction is Not Mooted by Elizarov's Last-Minute Purchase of
         Property in Florida. ............................................................................ 10

   E.  Elizarov's Allegations of Misconduct and Unclean Hands are Completely
         Meritless................................................................................................ 13

III.   Conclusion ................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Communist Party v. 522 Valencia, Inc.*, 41 Cal. Rptr. 2d 618 (Cal Ct. App. 1995) ...... 11

*Dateline Exports, Inc. v. Basic Construction, Inc.*, 306 F.3d 912 (9th Cir. 2002) ........... 9

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck*
    *Drivers Local No. 70 of Alameda County*, 415 U.S. 423 (1974) ............................... 7

*Great-West Life & Annuit Insurance Co. v. Knudson*, 534 U.S. 204 (2002) ................. 11

*Grupo Mexicano v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) .......................... 8, 9

*Higgins v. Higgins*, 217 Cal. Rptr. 3d 691, 700 (Cal. Ct. App. 2017) .......................... 11

*In re Focus Media*, 387 F. 38 1077, 1085 (9th Cir. 2004) ............................................. 9

*In re Marriage of Cloney*, 110 Cal. Rptr. 2d 615 (Cal. Ct. App. 2001) ........................ 10

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ......................................... 8, 9, 11

*Korea Supply Co. v Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003) ......................... 11

*Reebok Intern. Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521
    (S.D. Cal. 1989) ..................................................................................................... 11

*Shaffy v. United Airlines*, No. CV 07-4338 GAF (CTX), 2008 WL 11429999
    (C.D. Cal. July 9, 2008) ......................................................................................... 14

*Stirling Mortimer Glob. Prop. Fund PCC Ltd. v. Roberts*, 545 Fed. Appx. 640
    (9th Cir. 2013) .......................................................................................................... 9

*U.S. Dept. of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275 (4th Cir. 2006) ........... 7

**Statutes**

Cal. Civ. Code § 1214 ....................................................................................................... 9

Cal. Civ. Code § 1217 ..................................................................................................... 1**0**

**Rules**

California Rule of Professional Conduct 3.10(a) ...................................................... 14, 15

Fed. R. Civ. P. 6(c)(1) ...................................................................................................... 6

Fed. R. Civ. P. 65(a)(1) ............................................................................................ 6, 7, 8

Plaintiff Goldwater Bank, N.A., ("Goldwater Bank") by and through undersigned counsel, hereby files its reply to Defendant Artur Elizarov's ("Elizarov") Opposition to Motion for Preliminary Injunction (Doc. No. 30, the "Opposition"), pursuant to the Court's Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (Doc. No. 23, the "TRO").

## I.    INTRODUCTION

Acting in concert with counsel, Elizarov admits that he rushed to alienate the proceeds of the sale of the real property located at 291 W. Overlook Road, Palm Springs, California, 92264 (the "Subject Property") after receiving a pre-litigation demand letter. More specifically, on the same day the Complaint was filed, Elizarov entered into a contract to make an all-cash purchase of property in Wilton Manors, Florida (the "Wilton Manors Property"). (Doc. No. 30-2, Elizarov Decl., ¶ 23). The closing occurred just ten (10) days later and title to the Wilton Manors Property is held, rather surprisingly, in a joint tenancy with Elizarov's attorney. (Doc. No. 30-2, Elizarv Elizarov Decl., ¶ 26; Exhibit C, Warranty Deed). Elizarov goes to great lengths in his Opposition to distract from the central issue in this lawsuit, which is Goldwater Bank's entitlement to the proceeds of the sale of the Subject Property (the "Proceeds") by virtue of the existence and validity of Goldwater Bank's security interest in the Subject Property.

While Elizarov rushed to dissipate the Proceeds, Elizarov engaged in a coordinated effort to evade service of process, with Elizarov misrepresenting his identity to a process server. (Doc. No. 28, Affidavit of Service). Elizarov apparently also refused to allow his attorney to accept service of process at the same time his attorney was preparing to become a co-owner of the Wilton Manors Property purchased with the Proceeds. (Doc. No. 19-3, April 15, 2021 Email From I. Alekseyeff). These efforts appear to demonstrate a troubling campaign to delay any action by the Court until such time as the purchase of the Wilton Manors Property was completed. Then, on the day the TRO was entered, Elizarov inexplicably claims to have paid $84,843.22 to an unnamed creditor, and he

claims that the payment occurred just hours before the Court's entry of the TRO.  (Doc. No. 30-2, Elizarov Decl., ¶ 28).

    Now, having admitted to engaging in the precise conduct Goldwater Bank seeks to enjoin, Elizarov offers no valid reason for the Court not to convert the TRO into a preliminary injunction.

## II.    ARGUMENT

### A.    ELIZAROV HAS FAILED TO ACCOUNT FOR ALL OF THE PROCEEDS FROM THE SALE OF THE SUBJECT PROPERTY

    In the Opposition, Elizarov claims that Goldwater Bank "seeks to recover $675,000.00 from Elizarov and nothing else."  (Doc. No. 30, Opposition, p. 9).  Elizarov misstates Goldwater Bank's allegations.  From the beginning, Goldwater Bank has always maintained that the balance of the loan was greater than $675,000.00, which is merely the amount the Elizarov had stated that Goldwater Bank would receive from the sale.  Specifically, Goldwater Bank's Complaint asserts that "Goldwater Bank faces significant exposure with regard to the Goldwater Loan, as Elizarov has sold the Subject Property and wrongfully retained the proceeds of the sale in an amount in excess of $675,000."  (Doc. No. 1, Complaint, ¶ 55).  Likewise, in support of its motion for the entry of the TRO, Goldwater Bank stated that Elizarov had informed Goldwater Bank that it "would receive $675,000 from the sale of the Subject Property, which would have significantly reduced the balance of the Goldwater Loan."  (Doc. No. 19-4, Hill Decl. ¶ 13).  In fact, on March 24, 2021, Goldwater Bank prepared a payoff calculation for the escrow agent on the transaction, Escrow of the West, Inc. ("Escrow of the West"), which showed the total payoff amount as $729,354.80, with daily interest of $101.46.  A true and accurate copy of this payoff calculation is attached hereto as **Exhibit A**.

    Because Elizarov and Escrow of the West ceased communications with Goldwater Bank prior to the sale of the Subject Property, Goldwater Bank was unaware at the time of the filing of the Complaint or the Motion for the Temporary Restraining Order what amount Elizarov actually received at the closing.  Following the Court's order allowing

Goldwater Bank to obtain expedited discovery, Goldwater Bank received records from Escrow of the West showing that Elizarov received a payoff of $785,741.36 at closing. A true and accurate copy of the payoff records from Escrow of the West are attached hereto as **Exhibit B**.  In other words, the Goldwater Loan *could have been paid off in full* at the closing, but for Elizarov's misappropriation of those funds.  To be clear, Goldwater Bank's claims in this case are not limited to the $675,000 promised by Elizarov. Goldwater Bank is seeking, and has always sought, recovery for its full damages. Likewise, the TRO was not limited to the specific amount of $675,000, as it simply restrained and enjoined Elizarov "from transferring, alienating, or expending the proceeds that Elizarov received from the sale of the Subject Property."  (Doc. No. 23, TRO, Conclusion ¶ 1).

Elizarov's Opposition describes the transfer of $714,843.22 of the Proceeds since the closing; he states that he spent $630,000.00 to purchase real property for cash in Wilton Manors, Florida and $84,843.22 to payoff an unnamed creditor on the same day that the Court issued the TRO.  (Doc. No. 30-2, Elizarov Decl., ¶¶ 24–28).  Even assuming these statements are true, Elizarov has failed to account for $70,898.14 of the $785,741.36 in Proceeds from the sale of the Subject Property.

**B.   ELIZAROV'S ARGUMENT THAT HE HAS NOT RECEIVED NOTICE OF THE PRELIMINARY INJUNCTION PROCEEDINGS IS ILLOGICAL AND COMPLETELY MERITLESS.**

In his Response, Elizarov makes the remarkable assertion that the Court lacks the authority to enter a preliminary injunction due to Goldwater Bank's purported failure to send opposing counsel a copy of "Goldwater's motion or any supporting evidence." (Doc. No. 30, Opposition, p. 6).  In support of this argument, Elizarov relies on Fed. R. Civ. P. 65(a)(1) for the proposition that notice, which Elizarov interprets to mean service of the motion and supporting evidence, must be given to a party prior to entry of a preliminary injunction, and further relies on Fed. R. Civ. P. 6(c)(1) for the proposition that such notice must be served at least fourteen (14) days prior to the hearing on the

motion for entry of a preliminary injunction. (*Id.*). But these assertions are based on apparent misinterpretations of the applicable rules of civil procedures. Although Rule 65(a)(1) does state that a preliminary injunction may not issue without notice, it does not define what notice must be given. *See* Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party."). In *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, the Supreme Court explained that "[t]he notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." 415 U.S. 423, 433 (1974). Although there are no bright-line rules regarding the amount of notice of a hearing that must be given, as little as 24-hours' notice may be sufficient if, under the circumstances, the party to be preliminarily enjoined would be given a fair opportunity to oppose the injunction. *See U.S. Dept. of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 283 (4th Cir. 2006) (finding 24-hour notice sufficient for purposes of notice under Rule 65(a)). Thus, the relevant inquiry is whether the notice given was sufficient to permit Elizarov and his counsel a fair opportunity to prepare for the hearing on the preliminary injunction.

Applying these principles to the instant case, there is simply no question that Elizarov was given ample notice of the hearing on the preliminary injunction. It is undisputed that Elizarov and his counsel received notice, at the very latest, of the Court's April 20, 2020 TRO and Order to Show Cause, on April 20, 2020, at 2:41 p.m. (PT). (Doc. No. 30, Opposition, p. 6). The Court's TRO set a hearing on the Order to Show Cause Why a Preliminary Injunction Should Not Issue on Monday, May 3, 2021, at 1:00 p.m. (PT), giving Elizarov and his counsel of record[1] nearly two-weeks' notice of the hearing. Elizarov responded through his counsel of record by submitting a lengthy

---

[1] Goldwater notes that Elizarov's counsel has not formally entered an appearance in this matter.

Opposition, with supporting materials, which specifically responds to Goldwater Bank's motion for preliminary relief. (*See generally*, Doc. No. 30, Opposition). Notably, Elizarov does not argue that the notice provided was insufficient to permit him to prepare for the hearing. (*Id.*). Accordingly, because it is undisputed that Elizarov was given ample notice of the hearing on the preliminary injunction, the Court should reject Elizarov's contention that preliminary injunctive relief is inappropriate due to failure to comply with the notice provision of Rule 65(a)(1).[2]

## C. THE REQUESTED INJUNCTION IS PERMISSIBLE UNDER FEDERAL LAW.

Elizarov's Opposition relies heavily on *Grupo Mexicano v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), to argue that the Court lacks authority to order Elizarov not to further alienate or encumber the Proceeds. (Do. No. 30, Opposition, pp. 6–9). Specifically, Elizarov contends that *Grupo Mexicano* stands for the principle that a federal court lacks authority to preliminarily enjoin the transfer of assets in which no lien or equitable interest is claimed. (Doc. No. 30, Opposition, p. 6). In advancing this argument, however, Elizarov mischaracterizes the nature of this action, which seeks both monetary damages and equitable relief.

The Ninth Circuit has clearly stated that "by its very terms, the holding of *Grupo Mexicano* is limited to cases in which only monetary damages are sought." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). "The Supreme Court expressly stated

---

[2] Elizarov also relies on Rule 6(c) for the proposition that Goldwater was required to serve its motion and supporting materials fourteen (14) days in advance of the hearing set by the Court. (Doc. No. 30, Opposition, p. 6). Although Elizarov recognizes that these deadlines may be modified by Court order, he inexplicable ignores the Court's briefing schedule, which expressly sets the deadlines for filing and service of motions. (Doc. No. 23, TRO, pp. 9-10). Moreover, it is worth noting that it appears Elizarov went to significant lengths to avoid service of process, even misrepresenting his identity when he was ultimately served and purportedly declining to permit his attorney, Mr. Alekseyeff, to accept service on his behalf. (Doc. No. 28, Aff. of Service; Doc. No. 19-3, April 15, 2021 Email from I. Alekseyeff). Accordingly, Elizarov should not be permitted to complain about service of moving papers after attempting to evade service of process.

that a preliminary injunction barring asset transfer <u>is available</u> where the suit seeks equitable relief." *Id.* at 1084 (emphasis added). Because this action involves Elizarov's attempt to convert real property in which Goldwater Bank holds a security interest, Goldwater Bank's Complaint seeks not only monetary damages but a constructive trust over the wrongfully converted funds. (Doc. No. 1, Complaint, ¶ 50, Prayer for Relief ¶ 3). The presence of both legal and equitable remedies allows the Court to issue a preliminary injunction enjoining Elizarov from further transferring, alienating, or encumbering the Proceeds of the sale of the Subject Property.

In particular, the Ninth Circuit has repeatedly held that *Grupo Mexicano* does not prohibit a preliminary injunction where the plaintiff seeks a "constructive trust, which is equitable in nature." *In re Focus Media*, 387 F. 38 1077, 1085 (9th Cir. 2004) (construing *Grupo Mexicano* and affirming preliminary injunction freezing assets where the relief sought included both money damages and a constructive trust); *see also Stirling Mortimer Glob. Prop. Fund PCC Ltd. v. Roberts*, 545 Fed. Appx. 640, 641 (9th Cir. 2013) (affirming preliminary injunction and holding that *Grupo Mexicano* did not apply where the "operative complaint asserts a claim for imposition of a constructive trust, which we have held to support injunctive relief"). The Ninth Circuit case cited by Elizarov, *Dateline Exports, Inc. v. Basic Construction, Inc.*, 306 F.3d 912 (9th Cir. 2002), is distinguishable. *Dateline Exports* did not include a request for equitable relief, and so the Court in that case did not reach the rule outlined in *Johnson* and *In re Focus Media*, both of which were decided after *Dateline Exports*, that federal courts may preliminarily enjoin the transfer of assets when the plaintiff's claims seek equitable relief.

Elizarov incorrectly contends that Goldwater Bank is an unsecured creditor, contending that Goldwater Bank's security interest became "void" when Elizarov sold the Subject Property. (Doc. No. 30, Opposition, p. 8). Elizarov cites Cal. Civ. Code § 1214 in support of his argument, but that provision describes the rights of a good faith purchaser for value. Cal. Civ. Code § 1214. An unrecorded deed of trust does <u>not</u> become void as against the original borrower, because it is always valid between the parties to the

agreement and any other parties with notice. Cal. Civ. Code § 1217. Moreover, the contention that Elizarov sold the property to a good faith purchaser for value, while not material to the Court's decision on the preliminary injunction, is incorrect. Escrow of the West, Inc. learned about Goldwater Bank's unrecorded deed of trust while it was serving as escrow agent on the transaction. (Doc. No. 19-4, Hill Declaration, ¶ 9). Under California law, "an escrow agent in a real property conveyance is a dual agent for the both the purchaser and the seller." *In re Marriage of Cloney*, 110 Cal. Rptr. 2d 615, 623 (Cal. Ct. App. 2001). "[I]nsofar as the escrow agent—acting within the course and scope of his or her agency duties—acquires specific material information pertinent to matters within the same escrow that could have a substantial adverse effect on the principal, such knowledge will be imputed to the principal." *Id.* As such, because Escrow of the West acquired specific knowledge of Goldwater Bank's deed of trust in the scope of its duties as escrow agent, the purchaser of the Subject Property is charged with constructive knowledge of Goldwater Bank's deed of trust.

**D.** **THE PRELIMINARY INJUNCTION IS NOT MOOTED BY ELIZAROV'S LAST-MINUTE PURCHASE OF PROPERTY IN FLORIDA.**

Goldwater Bank sought, and the Court granted, the TRO on an *ex parte* basis precisely out of the fear that Elizarov would act quickly to alienate the Proceeds of the Subject Property. Elizarov's Opposition confirms that Goldwater Bank's concern was, unfortunately, legitimate. Between the time Goldwater Bank filed the Complaint on April 6, 2021, and the entry of the TRO on April 20, 2021, Elizarov entered into a contract for and then closed on the purchase of the Wilton Manors Property for a purchase price of $630,000.00. (Doc. No. 30-2, Elizarov Decl., ¶¶ 23–27). Elizarov also contends that "on the morning of April 20, 2021," just before the Court issued the TRO, he paid $84,843.22 to another, unnamed, creditor. (Doc. No. 30-2, Elizarov Decl., ¶ 28). Elizarov contends that his rapid use of a portion of the Proceeds from the sale of the Subject Property to buy the Wilton Manors Property renders the requested preliminary injunction moot. (Doc. No. 30, Opposition, p. 13). Elizarov's arguments are misplaced, however.

As an initial matter, between the purchase of the Wilton Manors Property and the payment to the unnamed creditor, Elizarov has only described the use of $714,843.22, which is less than the full $785,741.36 that he received from the sale of the Subject Property.  Accordingly, Elizarov is still presumably in possession of a portion of those funds, and Goldwater Bank's requested injunctive relief is therefore not moot.

Irrespective of the unaccounted for funds, Elizarov's use of the Proceeds to purchase another property does not moot the requested injunction.  Goldwater Bank's Complaint seeks a constructive trust over the Proceeds.  (Doc. No. 1, Compl. ¶ 50).  A constructive trust may be imposed if Goldwater Bank demonstrates:  "(1) a specific, identifiable property interest, (2) the plaintiff's right to the property interest, and (3) the defendant's acquisition or detention of the property interest by some wrongful act." *Higgins v. Higgins*, 217 Cal. Rptr. 3d 691, 700 (Cal. Ct. App. 2017) (citing *Communist Party v. 522 Valencia, Inc.*, 41 Cal. Rptr. 2d 618, 623 (Cal Ct. App. 1995)).  There must be "money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." *Korea Supply Co. v Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003) (quoting *Great-West Life & Annuit Insurance Co. v. Knudson*, 534 U.S. 204, 213 (2002)).

It is well settled law that "[a] preliminary injunction barring asset transfer is available where the suit seeks equitable relief." *Johnson*, 572 F.3d at 1083–84.  "[A]n order freezing defendant's assets is appropriate in order to preserve the *status quo*, so that assets can be preserved to satisfy an equitable decree." *Reebok Intern. Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521, 1525 (S.D. Cal. 1989).  Although Elizarov claims the Proceeds are no longer in his possession, he has informed the Court that he simply converted the vast majority of those Proceeds into a different, yet still identifiable, asset. Goldwater Bank has satisfied the elements required for entitlement to a constructive trust: (1) Goldwater Bank had a specific, identifiable property interest by virtue of the deed of trust, (2) Goldwater Bank had the right to the Proceeds from the sale of the Subject Property, and (3) Elizarov wrongfully retained the Proceeds from the sale of the Subject

Property.  Those Proceeds can, by Elizarov's own admission, be readily traced to the Wilton Manors Property.

The circumstances of the purchase of the Wilton Manors Property are highly suspect and readily demonstrate an intent to further remove the Proceeds from Goldwater Bank's reach.  Elizarov entered into the contract for purchase on the day the Complaint was filed, and he closed on the sale just ten days later.  (Doc. No. 30-2, Elizarov Decl., ¶¶ 23, 26).  The entire purchase price was paid in cash, using a significant portion of the Proceeds.  The Warranty Deed recorded with the Broward County, Florida Register of Deeds, which Elizarov noticeably did not provide the Court, reveals a further surprising and shocking detail.  Elizarov owns the Wilton Manors Property as a joint tenant with rights of survivorship with his attorney in this action, Ilya Alekseyeff.  A true and accurate copy of this Warranty Deed is attached hereto as **Exhibit C**.  In other words, shortly after receiving Goldwater Bank's prelitigation demand on April 1, 2021, Elizarov and his attorney acted quickly in using $630,000 of the Proceeds to purchase real property in Florida.  Even more, all of these actions were apparently undertaken by Elizarov and his counsel, while both parties worked to evade service of process and delay the Court's ability to enjoin the very conduct Elizarov now admits to engaging in.[3]  These actions demonstrate a clear attempt to transfer the Proceeds prior to the Court taking any action, and it is likely that such actions will continue in the absence of a preliminary injunction.

Therefore, a preliminary injunction ordering Elizarov not to further alienate the Proceeds of the sale of the Subject Property, including by transferring or otherwise encumbering the Wilton Manors Property, would still be effective and is necessary to prevent irreparable harm to Goldwater Bank.

---

[3] Interestingly, Elizarov's Opposition includes a screenshot of a March 31, 2021 email revealing that Elizarov was "blind carbon copying" or BCC-ing Alekseyeff on emails with Goldwater regarding the Subject Property prior to the litigation or Goldwater's prelitigation demand letter.  (Doc. No. 30, Opposition p. 11).

### E.    ELIZAROV'S ALLEGATIONS OF MISCONDUCT AND UNCLEAN HANDS ARE COMPLETELY MERITLESS.

In an attempt to distract from the merits of Goldwater Bank's claims, Elizarov's Opposition instead levies an array of allegations that Goldwater Bank and Goldwater Bank's counsel have somehow made misrepresentations to the Court or otherwise acted improperly.  As set forth below, these allegations are completely meritless.

Elizarov first contends that Goldwater Bank's representative, Peter Hill, misrepresented the date when Elizarov informed Goldwater Bank that he intended to sell the Subject Property.  (Doc. No. 30, Opposition, p. 10).  Elizarov contends that he informed Goldwater Bank in February 2021, not in March 2021 as attested to by Hill.  (Doc. No. 30, Opposition, p. 10).  Hill's declaration, however, simply stated that, "[i]n March 2021, Elizarov informed Goldwater Bank that he intended to sell the Subject Property."  (Doc. No. 19-4, Hill Decl., ¶ 5).  This is accurate, as Elizarov did, by his own admission, inform Goldwater Bank that he intended to sell the Subject Property to Defendant Scott Howlett for the first time in March 2021.  (Doc. No. 30-2, Elizarov Decl., ¶ 35).  There is no misrepresentation in Hill's statement.

Elizarov also contends that Hill made misrepresentations in his declaration that Elizarov represented himself in the sale of the Subject Property to Howlett.  (Doc. No. 30, Opposition, p. 12).  This allegation, however, ignores the clear language in Hill's declaration.  Hill did not, as alleged, assert definitively that Elizarov represented himself.  Rather, Hill informed the Court that it had recently discovered marketing materials for the Subject Property that identified Elizarov as the broker.  (Doc. No. 19-4, Hill Decl., ¶ 20).  Hill provided a copy of these materials in full to the Court.  (Doc. No. 19-4, Hill Decl., ¶ 20).  Finally, Hill stated simply that, based on the marketing materials, Elizarov "apparently played an active role in marketing the sale of the Subject Property."  (Doc. No. 19-4, Hill Decl., ¶ 20).  Hill never, as alleged by Elizarov, asserted that Elizarov was in fact the broker.

Elizarov alleges that Hill made a final misrepresentation regarding the last date on which he communicated with Elizarov. Hill's declaration describes a final phone call with Elizarov on March 29, 2021, and then states that Elizarov had not made any further contact with Goldwater Bank. (Doc. No. 19-4, Hill Decl., ¶¶ 16–18). In response, Elizarov provides the Court with an email sent by Elizarov two days later, on March 31, 2021. (Doc. No. 30-2, Elizarov Decl., ¶¶ 3–5). Significantly, Elizarov's March 31, 2021 email reveals that there was no change in position from Elizarov's March 29, 2021 phone call with Hill; Elizarov makes no commitment to return the Proceeds to Goldwater Bank and insists that there was no "deal" with Goldwater Bank. (Doc. No. 30-4). At most, the March 31, 2021 email demonstrates a 2-day discrepancy in Hill's recollection of Elizarov's last contact with Goldwater Bank. As such, any discrepancy in the dates is minor and immaterial, and it need not prevent the Court from entering a preliminary injunction. *Shaffy v. United Airlines*, No. CV 07-4338 GAF (CTX), 2008 WL 11429999, at *7 (C.D. Cal. July 9, 2008) (addressing allegations of inaccuracies in a party's declaration, noting minor inaccuracies, and concluding that "[t]hese discrepancies simply are not material").

The various allegations regarding Hill's purported "misrepresentations" are without merit. Notably, none of the alleged inaccuracies have any bearing on the appropriateness of a preliminary injunction; they do not impact the Court's conclusion in the TRO that Goldwater Bank has demonstrated a likelihood of success on the merits, that Goldwater Bank will suffer irreparable harm in the absence of an injunction, and that the balance of the equities and the public interest supports an injunction.

Elizarov's Opposition suggests that Goldwater Bank's counsel violated California Rule of Professional Conduct 3.10(a) in a prelitigation demand letter. (Doc. No. 30, Opposition, pp. 11–12). In that demand letter, undersigned counsel stated that Elizarov's wrongful retention of the Proceeds from the sale of the Subject Property was particularly egregious because Elizarov is a licensed real estate broker, and counsel further stated that it would consider reporting this matter to the California Department of Real Estate if

Elizarov's wrongful retention of the funds continued.  (Doc. No. 30-6).  Elizarov contends that this letter violates the rule that "[a] lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."  Cal. R. Prof. Conduct 3.10(a).  But Elizarov's claim is simply misplaced.

The Official Comments to the Rules of Professional Conduct make clear that the prelitigation demand letter did not make inappropriate threats.  Indeed, "if a lawyer believes in good faith that the conduct of the opposing lawyer or party violates criminal or other laws, the lawyer may state that if the conduct continues the lawyer will report it to criminal or administrative authorities."  Cal. R. Prof. Conduct 3.10(a), Comment 1. Furthermore, "[a] statement that a lawyer will pursue 'all available legal remedies,' or words of similar import" is not in violation of the rule.  *Id.*, Comment 2.  The prelitigation demand letter clearly falls within these examples of permissive statements.  The letter informed Elizarov that Goldwater Bank was considering reporting Elizarov's wrongful retention of the funds to the California Department of Real Estate in the event that his improper conduct continued.  (Doc. No. 30-6).  The Opposition fails to demonstrate how the prelitigation demand letter sought any "advantage in a civil dispute," which is an essential part of the rule.  Cal. R. Prof. Conduct 3.10(a), Comment 1 ("Paragraph (a) does not prohibit a statement . . . unless the statement is made to obtain an advantage in a civil dispute.").  In sum, Elizarov's arguments regarding the prelitigation demand letter are without merit and are nothing more than an attempt to shift attention from his inexcusable actions in attempting to rapidly move the Proceeds beyond Goldwater Bank's reach.

## III.  CONCLUSION

For the reasons stated herein, Goldwater Bank respectfully requests that the Court convert the TRO into a preliminary injunction enjoining Elizarov from transferring, alienating, or encumbering the Proceeds—including the Wilton Manors Property—of the sale of the Subject Property.  It is clear from Elizarov's brazen conduct in the early stages of this dispute that he will continue to try to impede Goldwater Bank's ability to recover in this action in the absence of injunctive relief.

Dated:       April 30, 2021

IVIE McNEILL WYATT
PURCELL & DIGGS

/s/ Marie Maurice
W. Keith Wyatt, Esq.
Marie Maurice, Esq.

AND

WAGNER HICKS PLLC

/s/ Derek M. Bast
Sean C. Wagner, Esq.
Derek M. Bast, Esq.
ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.

## CERTIFICATE OF SERVICE

I certify that all counsel of record who has consented to electronic notification is being served on April 30, 2021 with a copy of **PLAINTIFF'S REPLY TO ELIZAROV'S RESPONSE TO ORDER TO SHOW CAUSE** via the Court's CM/ECF system. Pursuant to Local Rule 5-3.1.2, I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants listed below:

    Unison Agreement Corp.
    First Corporate Solutions, Inc., Registered Agent
    650 California Street, Suite 1800
    San Francisco, CA 94108

                                   /s/ Derek M. Bast
                                   Derek M. Bast

# <u>EXHIBIT 44</u>

# <u>Order Amending and Extending TRO (Dkt No. 32) (Entered 5/4/21)</u>

1

2

3

4

5

6

7

8        **UNITED STATES DISTRICT COURT**

9      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   GOLDWATER BANK, N.A.,                Case No. 5:21-cv-00616-JWH-SPx

12            Plaintiff,
                                          **AMENDED AND EXTENDED**
13       v.                               **TEMPORARY RESTRAINING**
                                          **ORDER AND ORDER TO SHOW**
14   ARTUR ELIZAROV;                      **CAUSE REGARDING**
     UNISON AGREEMENT CORP.; and          **PRELIMINARY INJUNCTION**
15   SCOTT HOWELL,

16            Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

# I.  INTRODUCTION

Still pending before the Court is the *Ex Parte* Application of Plaintiff Goldwater Bank, N.A. for (1) Temporary Restraining Order ("TRO"); (2) Order to Show Cause for a Preliminary Injunction ("OSC"); and (3) expedited discovery.[1]  The Court previously granted the Application and issued a TRO and an OSC regarding Preliminary Injunction.[2]  The OSC came on for hearing on May 3, 2021.[3]  For the reasons set forth herein, the Court now issues this Order amending and extending the TRO.

# II.  BACKGROUND

The following facts are drawn from the Application and supporting papers.[4]

On or around July 31, 2019, Goldwater Bank originated a mortgage loan to Defendant Artur Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").[5]  Elizarov defaulted on the Goldwater Loan.[6]  In or about March 2021, Elizarov told Goldwater Bank that he intended to sell the Subject Property.[7]

On March 3, an escrow agent at Escrow of the West, Inc. contacted Peter Hill, the Chief Credit Officer and Executive Vice-President of Goldwater Bank,

---

[1]    *Ex Parte* Appl. for TRO (the "Application") [ECF No. 19].
[2]    Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (the "Original TRO") [ECF No. 23].
[3]    Unless otherwise indicated, all dates set forth herein are in 2021.
[4]    Elizarov disputes some of these facts.  *See* Elizarov's Opp'n to Mot. For Prelim. Inj. (the "Opposition") [ECF No. 30].  However, the Court finds that these disputes are not material to its instant decision, particularly in view of Elizarov's stipulation consenting to this relief.
[5]    Decl. of Peter Hill (the "Hill Declaration") [ECF No. 19-4] ¶ 2.
[6]    *Id.* at ¶ 4.
[7]    *Id.* at ¶ 5.

regarding the pending sale of the Subject Property.[8]  Escrow of the West sent

Goldwater Bank a Request for Demand that stated, "An escrow has been

opened in this office by Artur Elizarov wherein you are listed as the holder of the

Note and Deed of Trust covering property legally described as [the Subject

Property]."[9]  Shortly thereafter, Escrow of the West informed Goldwater Bank

and Elizarov that Goldwater Bank's Deed of Trust had never been recorded

with the Register of Deeds for Riverside County, California.[10]  Goldwater Bank

also learned of two competing liens on the Subject Property, including a

mechanic's lien in the amount of about $107,000 and a lien in favor of

Defendant Unison Agreement Corp. for $491,000.[11]

Elizarov told Hill that Elizarov was insolvent and that the proceeds from

the sale of the Subject Property would not be enough to satisfy the outstanding

amount of the Goldwater Loan and the two other liens.[12]  Elizarov also told Hill

that Goldwater Bank would receive $675,000 from the sale of the Subject

Property.[13]  On or around March 29, Goldwater Bank discovered that the sale of

the Subject Property had occurred on March 22, by Grant Deed from Elizarov to

Defendant Scott Howell.[14]  Public records indicate that the Subject Property

sold for $1,355,000.[15]

On or around March 29, Hill called Elizarov to inquire about the status of

the closing and the proceeds from the sale.[16]  Elizarov told Hill that the sale had

---

[8]     *Id.* at ¶¶ 1 & 7.
[9]     *Id.* at ¶ 8.
[10]    *Id.* at ¶ 9.
[11]    *Id.* at ¶ 10.
[12]    *Id.* at ¶ 12.
[13]    *Id.* at ¶ 13.
[14]    *Id.* at ¶ 15.
[15]    *Id.*
[16]    *Id.* at ¶ 16.

1    ***not*** occurred.[17]  Hill responded to Elizarov that Goldwater Bank knew of the

2    Grant Deed and asked about the status of the $675,000 that Goldwater Bank was

3    to receive from the sale.[18]  Elizarov replied that he did not want to discuss the

4    matter any further and terminated the call.[19]  Elizarov has not made any further

5    contact with Goldwater Bank, and Goldwater Bank has not received any

6    proceeds from the sale of the Subject Property.[20]

7          On April 6, Goldwater Bank filed its Complaint, commencing this

8    action.[21]  The Complaint asserts claims for relief for, *inter alia*, breach of

9    contract, unjust enrichment, injunctive relief, and declaratory judgment against

10   Elizarov.[22]

11         On April 16, Goldwater Bank filed the instant Application.  The Court

12   issued the Original TRO on April 20.[23]  In accordance with that order, on

13   April 28 Elizarov filed his opposition to the OSC,[24] and on April 30 Goldwater

14   Bank filed its reply.[25]

15         On May 3, the Court heard oral argument on the OSC.  At the hearing,

16   Elizarov stipulated to a modified TRO to permit time for additional briefing on

17   the OSC.

18   ### III.  <u>LEGAL STANDARD</u>

19         A temporary restraining order ("<u>TRO</u>") preserves the *status quo* and

20   prevents irreparable harm until a hearing may be held on the propriety of a

21

---

22   [17]  *Id.* at ¶ 17.

23   [18]  *Id.*

     [19]  *Id.*

24   [20]  *Id.* at ¶ 18.

25   [21]  Compl. [ECF No. 1].

26   [22]  *Id.*

     [23]  *See* Original TRO.

27   [24]  *See* Opposition.

28   [25]  *See* Pl.'s Reply (the "<u>Reply</u>") [ECF No. 31].

Omnibus Joint Exhibit Part C, page 1185

1  preliminary injunction.  *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d

2  1126, 1131 (9th Cir. 2006).  The standard for issuing a TRO is identical to the

3  standard for issuing a preliminary injunction.  *Lockheed Missile & Space Co. v.*

4  *Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

5      "A preliminary injunction is an extraordinary and drastic remedy; it is

6  never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citations

7  omitted).  An injunction is binding only on parties to the action, their officers,

8  agents, servants, employees, and attorneys and those "in active concert or

9  participation" with them.  Fed. R. Civ. P. 65(d)(2).

10      "A plaintiff seeking a preliminary injunction must establish that he is

11  likely to succeed on the merits, that he is likely to suffer irreparable harm in the

12  absence of preliminary relief, that the balance of equities tips in his favor, and

13  that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council,*

14  *Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, "serious questions going to the

15  merits and a balance of hardships that tips sharply towards the plaintiff can

16  support issuance of a preliminary injunction, so long as the plaintiff also shows

17  that there is a likelihood of irreparable injury and that the injunction is in the

18  public interest."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

19  Cir. 2011) (internal quotations omitted).

20                    **IV.  DISCUSSION**

21      Goldwater Bank argues that it has satisfied the requirements for

22  temporary injunctive relief.  Elizarov consents to that temporary relief, in

23  substantial part, without prejudice to its substantive opposition to the issuance

24  of a preliminary injunction.

25  **A.  Notice**

26      As the Court noted in its Original TRO, at the time of its issuance on

27  April 20, Goldwater Bank had not served Elizarov with the Complaint or the

28

1   Application, and Elizarov had not appeared in this action.[26]  However, on

2   April 26, Goldwater Bank filed a Proof of Service professing that it had

3   accomplished service of process on Elizarov on April 16.[27]  Thereafter, on

4   April 28, Elizarov filed papers in opposition to the OSC.[28]  At the hearing on the

5   OSC, Elizarov consented to the issuance of this Amended and Extended TRO,

6   thereby providing the parties with time to submit further briefing on the OSC.

7           Accordingly, the Court concludes that Elizarov has received adequate

8   notice.  *Cf.* Fed. R. Civ. P. 65(b)(2).

9   **B.    Likelihood of Success, Irreparable Harm, Balance of the Equities, and**

10          **Public Interest**

11          As the Court explained in the Original TRO, Goldwater Bank has

12   demonstrated (1) a strong likelihood of success on the merits;[29] (2) a likelihood

13   of irreparable injury in the absence of a TRO;[30] (3) the balance of equities tips in

14   favor of Goldwater Bank;[31] and (4) the public interest factors weigh in favor of

15   granting the TRO.[32]  The Court need not repeat its analysis here.  Moreover,

16   Elizarov has stipulated to the entry of this Order.

17   **C.    Request for Expedited Discovery**

18          As the Court also previously explained, Goldwater Bank made an

19   adequate showing to obtain expedited discovery, and the Court ordered that

20   relief.[33]  Goldwater Bank then propounded expedited discovery in accordance

21

22

23   [26]    *See* Original TRO 5:11-25.
24   [27]    *See* Proof of Service [ECF No. 28].
     [28]    *See* Opposition.
25   [29]    *See* Original TRO 6:2-13.
26   [30]    *See id.* at 6:15-7:19.
     [31]    *See id.* at 7:21-8:2.
27   [32]    *See id.* at 8:4-7.
28   [33]    *See id.* at 8:10-9:7.

-6-

1  with the Court's instructions.[34]  The Court finds that it need not now extend

2  that relief.

3  **D.**  <u>**Bond**</u>

4      To secure the Original TRO, the Court required Goldwater Bank to post a

5  bond in the amount of $2,500, in accordance with Rule 65(c) of the Federal

6  Rules of Civil Procedure.[35]  Goldwater Bank posted that bond on April 20.[36]

7  The Court finds and concludes that that bond remains sufficient to secure the

8  instant Amended and Extended TRO.

9                            **V.  <u>CONCLUSION</u>**

10     For the foregoing reasons, the Court **GRANTS** in part the Application.

11  The Court hereby **ORDERS** as follows:

12     1.  Defendant Elizarov and his agents, representatives, and all persons

13  acting in concert with him are **RESTRAINED AND ENJOINED** from

14  transferring, alienating, encumbering (including by a mechanics lien), or

15  disposing of the Florida "homestead" and real property located in Broward

16  County (or any legal right or beneficial interest therein).[37]

17     2.  Defendant Elizarov and his agents, representatives, and all persons

18  acting in concert with him are **RESTRAINED AND ENJOINED** from

19  transferring, alienating, encumbering, or disposing of the remaining proceeds

20  from the sale of the Subject Property in the amount of $70,000.

21     3.  Elizarov and Goldwater Bank are **DIRECTED** to file their

22  respective opening supplemental briefs regarding the propriety of the Court's

23

24

25  ---

26  [34]    *See* Reply.

27  [35]    *See id.* at 9:20-22 & n.32.

28  [36]    *See* Financial Entry [ECF No. 45].

[37]    Specifically, the Court refers to the "homestead" and real property
referenced in Elizarov's declaration [ECF No. 30-2] ¶¶ 23-27.

Omnibus Joint Exhibit Part C, page 1188

issuance of a preliminary injunction, not to exceed 10 pages in length, by 12:00 noon on Monday, May 17, 2021.

      4.    Elizarov and Goldwater Bank are **DIRECTED** to file their respective responsive supplemental briefs, not to exceed 5 pages in length, by 12:00 noon on Monday, May 24, 2021.

      5.    Pursuant to the stipulation of Elizarov's counsel at the May 3, 2021, hearing, this Order shall remain in effect until further order of the Court.

      **IT IS SO ORDERED.**

Dated: May 4, 2021

John W. Holcomb
UNITED STATES DISTRICT JUDGE

# EXHIBIT 45

# Goldwater's Supplemental Brief in support of Preliminary Injunction (Dkt No. 39) (Filed 5/17/21)

**SEAN C. WAGNER** (*Pro Hac Vice*)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice*)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA  90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. | ) |
|        *Plaintiff,* | ) Case No. 5:21-cv-00616-JWH-SP |
|     vs. | ) |
| ARTUR ELIZAROV, UNISON AGREEMENT CORP., and SCOTT HOWELL | ) _____ |
|        *Defendant.* | ) **PLAINTIFF'S OPENING SUPPLEMENTAL BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION** |

I.  Introduction ...................................................................................................... 4

II.  Argument ........................................................................................................... 5

   A.  The Authority to Trace Proceeds is Not Dependent on Goldwater's Security Interest ................................................................................................ 5

   B.  The Court Has the Authority to Issue the Requested Injunction on the Basis of Elizarov's Actions in Dissipating Assets ................................................. 6

   C.  Goldwater's Constructive Trust Remedy Allows a Preliminary Injunction Over the Traceable Proceeds ..................................................................... 9

   D.  The Preliminary Injunction Should Enjoin Elizarov From Transferring $164,343.22 ............................................................................................... 11

   E.  Elizarov's Allegations of "Self-Help" Are Meritless and Do Not Impact the Court's Analysis in Issuing an Injunction ............................................. 13

III.  Conclusion ...................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Abatti v. Eldridge*, 163 Cal. Rptr. 82 (Cal. Ct. App. 1980) ................................................. 5

*Abrams v. Blackburne and Sons Realty Capital Corp.*, No. 2:19-CV-06947-CAS (AS),
2020 WL 5028877 (C.D. Cal. June 16, 2020)................................................... 7, 10

*Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914 (S.D. Cal. 2020)......................................... 13

*Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116 (E.D. Cal. 2003) ................... 5

*DirecTV, Inc. v. Webb*, No. CV 03-3399-SVW (SSX), 2006 WL 8453423 (C.D. Cal. June
22, 2006)................................................................................................... 12

*Heckmann v. Ahmanson*, 214 Cal. Rptr. 177 (Cal. App. 1985)...................................... 10

*Hendricks v. Bank of America, N.A.*, 408 F.3d 1127 (9th Cir. 2005).............................. 7

*In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467
(9th Cir. 1994)................................................................................  6, 7

*La Jolla Cove Investors, Inc. v. GoConnect Ltd.*, No. 11CV1907 JLS (JMA), 2012 WL
1580995 (S.D. Cal. May 4, 2012)................................................................ 7

*Lincoln Benefit Life Co. v. Dallal*, No. CV 16-9307-MWF (EX), 2019 WL 5538929 (C.D.
Cal. Oct. 25, 2019)................................................................................. 9

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873
(9th Cir. 2009)...................................................................................... 6

*Martin v. Kehl*, 193 Cal. Rptr. 312, 317 (Cal. App. 1983) ........................................... 10

*Mitchell v. Dunn*, 294 P. 386 (Cal. 1930) .................................................................... 11

*Noble v. Noble*, 243 P. 439 (Cal. 1926) ....................................................................... 11

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986)........................................ 7

## Other Authorities

Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2020)...................................... 9

## Rules

Fed. R. Civ. P. 8................................................................................................... 6

Plaintiff Goldwater Bank, N.A., ("Goldwater") by and through undersigned counsel, hereby files its opening supplemental brief pursuant to the Court's Amended and Extended Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (Doc. No. 32, the "Extended TRO").

## I.     INTRODUCTION

This matter involves a blatant, coordinated attempt to quickly dissipate assets from the sale of Elizarov's Palm Springs property (the "Subject Property") in order to avoid obligations to a creditor.  It is well-settled law that this Court has the authority to issue an injunction to prevent a defendant's further dissipation of assets, and the record before the Court is clear.  Elizarov (1) misled Goldwater regarding his intentions to use the proceeds of the sale to repay a significant portion of the Goldwater Loan, (2) made false statements to Goldwater regarding the existence of a mechanic's lien to create the illusion that the total sale price would be insufficient to satisfy the liens on the property, (3) misrepresented the status of the property sale, (4) instructed the escrow company to discontinue conversations with Goldwater, and (5) then went on to dissipate nearly all of the $785,741.36 in proceeds after learning of the Goldwater lawsuit.  Moreover, during this same period, he misrepresented his identity to a process server and instructed his counsel to refuse to accept service of process on his behalf.

Even more, Elizarov's deceptive conduct has continued in this litigation, and Elizarov made blatant misrepresentations to the Court regarding the payment of the $84,843.22 and the amount of the proceeds that he retained.  Records received from Ally Bank ("Ally") demonstrate that Elizarov's account contained in excess of $100,000 prior to receiving the proceeds of the sale of the Subject Property.  Therefore, Elizarov's payment of the $84,843.22 obligation was not in fact a payment made out of the proceeds.  Elizarov already had sufficient funds to make that payment of his own accord.  His false representation to the Court that the payment was made out of the proceeds was merely an attempt to reduce the scope of the Court's injunction and further shield assets from a final judgment.

As set forth below, Elizarov has at all times acted with clear intent to prevent Goldwater from ultimately collecting the proceeds to which it is entitled. The Court should grant a preliminary injunction that restrains Elizarov from transferring assets, to include the real property purchased in Wilton Manors, Florida (the "Wilton Manors Property") and funds in excess of $70,000. [1]

## II.    ARGUMENT

Goldwater has asserted claims against Elizarov for both money damages, through its breach of contract claim, and equitable relief, through its claim for unjust enrichment and a constructive trust remedy. The pursuit of both money damages and equitable remedies is appropriate at this stage in the litigation, contrary to Elizarov's contention that Goldwater is limited to money damages for a pure breach of contract. The rules of pleading allow a party to assert multiple claims alternatively, regardless of consistency. Fed. R. Civ. P. 8(d). *See, also Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116, 1120 (E.D. Cal. 2003) (stating that no magic words are required to plead alternatively). As demonstrated below, the Court has the authority, on the basis of both the claims for monetary damages and equitable relief, to issue a preliminary injunction freezing the proceeds of the sale of the Subject Property.

### A.    THE AUTHORITY TO TRACE PROCEEDS IS NOT DEPENDENT ON GOLDWATER'S SECURITY INTEREST

In ordering supplemental briefing, the Court specifically asked for authority that allows the tracing of proceeds. Goldwater does not dispute the statement of law in California that "the holder of security in real property by virtue of a trust deed has no secured interest in the proceeds of the sale of that property." *Abatti v. Eldridge*, 163 Cal. Rptr. 82, 87 (Cal. Ct. App. 1980). This rule, however, addresses only the law regarding

---

[1] In the Court's Extended TRO, the Court directed counsel for Goldwater and Elizarov to provide "opening supplemental briefs regarding the propriety of the Court's issuance of a preliminary injunction." The relevant facts in support of a preliminary injunction have previously been set out by Goldwater in its initial motion and its reply memorandum. (Doc. No. 19-1, Memo. In Supp. Of TRO; Doc. No. 31, Reply Memo.)

security interests.  Goldwater does not contend that it has a security interest that allows it
to foreclose on the proceeds of the sale of the Subject Property in Elizarov's possession.
Indeed, it is because of this very rule that Goldwater has sought a preliminary injunction.
By virtue of his actions, Elizarov impaired Goldwater's ability to foreclose against
Elizarov and has acted intentionally in transferring the assets that would otherwise have
been available to satisfy Goldwater's judgment in this action.[2]

Through its claims, Goldwater moves the Court to issue an injunction preserving
the *status quo* pending a final judgment.  The *status quo*, for purposes of preliminary
injunctions, means "the last, uncontested status which preceded the pending
controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,
879 (9th Cir. 2009).  As demonstrated in more detail below, Goldwater is entitled to trace
the proceeds of the sale of the Subject Property.  An injunction prohibiting Elizarov from
further transferring, alientating, or encumbering those assets will preserve the *status quo*
prior to the last, uncontested status which preceded this controversy, wherein Elizarov
made misrepresentations regarding the disbursements of the proceeds of the sale of the
Subject Property.

**B.    THE COURT HAS THE AUTHORITY TO ISSUE THE REQUESTED INJUNCTION ON
THE BASIS OF ELIZAROV'S ACTIONS IN DISSIPATING ASSETS**

Where a plaintiff seeks money damages, the Ninth Circuit holds that a district court
can issue a preliminary injunction preventing the defendant's further transfer of assets.
*In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1480 (9th Cir.
1994) ("We join the majority of circuits in concluding that a district court has authority
to issue a preliminary injunction where the plaintiffs can establish that money damages
will be an inadequate remedy due to impending insolvency of the defendant or that
defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment.").
This type of injunction is "designed to freeze the status quo and protect the damages

[2] For clarity, Goldwater still maintains the enforceability of its security interest against
Howlett.  That claim, however, is not at issue in this preliminary injunction.

remedy." *La Jolla Cove Investors, Inc. v. GoConnect Ltd.*, No. 11CV1907 JLS (JMA), 2012 WL 1580995, at *3 (S.D. Cal. May 4, 2012) (quoting *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986)).

The propriety of an injunction preventing the transfer of assets rule focuses on the defendant's conduct rather than the plaintiff's claim. *See, e.g.*, *Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1141 (9th Cir. 2005) (affirming injunction freezing defendant from drawing down on letter of credit because the defendant was in serious financial straits and would likely dissipate the funds prior to the plaintiffs obtaining a judgment); *Abrams v. Blackburne and Sons Realty Capital Corp.*, No. 2:19-CV-06947-CAS (AS), 2020 WL 5028877, at *4 (C.D. Cal. June 16, 2020) (finding irreparable harm and issuing asset-freeze injunction where the evidence indicated that defendant was judgment proof and underinsured). Indeed, the *Estate of Marcos* case did not involve money damages arising from a security interest but rather claims for money damages arising from human rights violations. *Marcos*, 25 F.3d at 1469. In issuing a preliminary injunction, the Court relied on the facts that the plaintiffs were likely to obtain a significant monetary judgment, the defendants had identifiable assets that could satisfy the judgment, and that the defendants had previously made efforts to dispose of assets to frustrate creditors. *Id.* at 1480. Here, Goldwater has established both Elizarov's impending insolvency, the existence of assets to satisfy a judgment, and his pattern of dissipating assets to avoid judgment.

Prior to the sale of the Subject Property, Elizarov was not current on payments of his loan; the payments he had made only brought the account current through April 1, 2020. (Doc. No. 19-4, Hill Decl., ¶ 4). In addition, he informed Goldwater that he was insolvent and had insufficient assets to satisfy the Goldwater Loan in full. (Doc. No. 19-4, Hill Decl., ¶ 12). This was consistent with Elizarov's prior representations; on a May 20, 2020 application to Goldwater for mortgage forbearance, a true and accurate copy of which is attached hereto as **Exhibit A**, Elizarov informed Goldwater that he had only $3,500 in assets, plus $1,050 in monthly unemployment assistance. (Ex. A, p. 3).

Elizarov stated that, as a result of the Unison Mortgage and a mechanic's lien, the sale of the Subject Property would be insufficient to satisfy the Goldwater Loan.  (Doc. No. 19-4, Hill Decl., ¶ 12).  Despite these representations about his financial position, ELizarov informed Goldwater that it would nevertheless receive $675,000 from the sale of the Subject Property.  (Doc. No. 19-4, Hill Decl., ¶ 13).  Goldwater relied on these representations and submitted a payoff demand to Escrow of the West.  (Doc. No. 31-1, Payoff Calculations).  To challenge the evidence of Elizarov's insolvency, he offers only a conclusory, unsupported statement that "I am not currently insolvent."  (Doc. No. 30-2, Elizarov Decl., ¶ 21).  Elizarov's unsupported statement is insufficient to call into question the specific evidence offered by Goldwater. Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2020) (stating that affidavits in connection with an injunction may be disregarded if "too vague or conclusory").

Around the time of the sale of the Subject Property, however, Elizarov began actively withholding the proceeds from Goldwater and quickly disposing of them. Elizarov misrepresented to Goldwater that the sale had occurred.  (Doc. No. 19-4, Hill Decl., ¶ 17).  Despite now acknowledging that the Deed of Trust is a valid contract, (Doc. No. 34, Elizarov Answer, ¶¶ 12–13), Elizarov informed Goldwater just after the sale of the Subject Property that he had no formal agreement with Goldwater (Doc. No. 30-4). Then, after receiving Goldwater's demand for return of the Proceeds, Elizarov immediately entered into an all-cash contract for the purchase of the Wilton Manors Property for $630,000.  (Doc. No. 30-2, Elizarov Decl., ¶¶ 9, 23).  The sale closed on April 16, 2021.  (Doc. No. 30-2, Elizarov Decl., ¶ 26).  Then, on the same day that the original TRO issued, Elizarov paid $84,843.22 "to cover a pre-existing debt."  (Doc. No. 30-2, Elizarov Decl., ¶ 28).  Notably, Elizarov does not state that this is his pre-existing debt, which is consistent with the statement of Elizarov's counsel at the May 3, 2021 hearing that the $84,843.22 was a debt belonging to Elizarov's brother for which

Elizarov's counsel was the guarantor.[3]  With each of these transactions, which occurred while Elizarov had notice of Goldwater's claims, Elizarov asserts that the money used was the "proceeds from the sale of my Palm Springs property." (Doc. No. 30-2, Elizarov Decl., ¶¶ 24, 27).

Thus, by Elizarov's own admission, he spent most of the proceeds of the sale of the Subject Property while on notice of Goldwater's claims, and he has not refuted the evidence that he will be unable to satisfy a final judgment in the absence of a preliminary injunction preventing him from further disposing of his assets.  Elizarov's actions suggest a motive to dispose of the very assets at issue in this case, and an injunction is therefore justified.  *Lincoln Benefit Life Co. v. Dallal*, No. CV 16-9307-MWF (EX), 2019 WL 5538929, at *3 (C.D. Cal. Oct. 25, 2019) (granting an asset-freeze injunction because the Defendant's actions in transferring assets were not indicative of a neutral motive).  In *Lincoln Benefit Life Co.*, the circumstances of the defendants' asset transfers, including the timing of the transfers, the lack of consideration for the transfers, and the fact that the defendants had not demonstrated that they currently would be able to satisfy the judgment, indicated that the defendant's motives were "not necessarily pure." *Id.*  The Court can, and should, reach the same conclusion here.

## C.    GOLDWATER'S CONSTRUCTIVE TRUST REMEDY ALLOWS A PRELIMINARY INJUNCTION OVER THE TRACEABLE PROCEEDS

Elizarov wrongly contends that Goldwater is not entitled to a constructive trust remedy because of the availability of legal remedies.  (Doc. No. 38, Elizarov Opening Suppl. Br., p. 6).  To the contrary, "[i]n California, as in most jurisdictions, an action in

---

[3] At the May 3, 2021 hearing, Elizarov's counsel indicated that he was in a domestic partnership with Mr. Elizarov and that the $84,843.22 paid off a debt for which Elizarov's counsel was guarantor.  The record before the Court, however, is unclear.  Elizarov has not previously identified this relationship.  (Doc. No. 31-3, Warranty Deed).  On the first page of his loan application to Goldwater, a true and accurate copy of which is attached hereto as **Exhibit C**, Elizarov identified himself as unmarried and not in a domestic partnership.

equity to establish a constructive trust does not depend on the absence of a legal remedy." *Heckmann v. Ahmanson*, 214 Cal. Rptr. 177, 187 (Cal. App. 1985) (affirming a preliminary injunction prohibiting the transfer of assets to preserve the plaintiff's constructive trust remedy); *Abrams*, 2020 WL 5028877, at *3 (issuing an asset-freeze injunction based on plaintiffs' claim for constructive trust under California law).  "The purpose of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrong. . . . Thus, under a constructive trust upon money, the plaintiff is entitled to trace the fund to its ultimate product or profit." *Heckmann*, 214 Cal. Rptr. at 188 (citation omitted).

Goldwater has demonstrated a likelihood of success in its entitlement to a constructive trust through ample evidence that Elizarov (1) made misrepresentations to Goldwater regarding its payout following the sale of the Subject Property and then (2) quickly transferred the proceeds of the sale of the Subject Property to keep them from Goldwater.  After learning that its Deed of Trust was unrecorded, Goldwater relied on Elizarov's representations that the sale would not result in sufficient funds to payoff the Goldwater Loan.  This statement was apparently false, because the $107,000 mechanic's lien was ultimately not part of Escrow of the West's final payout.  (Doc. No. 31-2, Final Settlement Statement, p. 1).  Goldwater further relied on Elizarov's representations that, despite the alleged shortfall, Goldwater would nevertheless receive a payout of $675,000.  "The essence of the constructive trust theory is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrongdoing. . . . In such a trust based upon wrongdoing, *an oral promise is sufficient*."  *Martin v. Kehl*, 193 Cal. Rptr. 312, 317 (Cal. App. 1983).  It suffices to say that, in the absence of Elizarov's oral promises, Goldwater would have acted quickly to record its deed of trust or otherwise stop the sale of the Subject Property.  Elizarov, however, took advantage of his own wrongdoing by misrepresenting his intentions to Goldwater and then quickly using those proceeds to purchase real property in another state and payoff a debt for which he was not responsible.

The ability of an injunction to trace property in a constructive trust is consistent with California trust law generally.  Under well-settled California law, a trust beneficiary is entitled to trace the proceeds of trust property commingled with non-trust property.  *Noble v. Noble*, 243 P. 439, 442 (Cal. 1926) ("When the money or property of the trustor can be traced into a particular fund or deposit, where it remains, though mingled with other money, the beneficiary may seek to follow the specific personal property and enforce the trust."); *Mitchell v. Dunn*, 294 P. 386, 389 (Cal. 1930) ("The rule is now settled in this state that, when the money of the trustor can be traced into a particular fund, or deposit, though it be mingled with other money, the beneficiary may enforce the trust.")  Here, pursuant to the Deed of Trust, Elizarov became the trustor of, and Goldwater became the beneficiary of, a trust over the Subject Property.  (Doc. No. 19-6, Deed of Trust, pp. 1–2).  Under California law, Goldwater, as the beneficiary under the Deed of Trust and under a potential constructive trust, is entitled to trace the proceeds from the sale of the Subject Property, and the Court should enter a preliminary injunction to preserve Goldwater's remedy by preventing Elizarov from further transferring or encumbering the proceeds from the sale of the Subject Property, including the Wilton Manors Property.

**D.   THE PRELIMINARY INJUNCTION SHOULD ENJOIN ELIZAROV FROM TRANSFERRING $164,343.22**

In his response to the Show Cause Order, Elizarov contended that no injunction should issue because he had already spent all of the proceeds.  (Doc. No. 30, Elizarov Memo. Opp. Prelim. Inj., p. 13).  After Goldwater noted that approximately $70,000 of the proceeds were still unaccounted for, Elizarov consented to the Court's entry of the Extended TRO limiting the injunction to $70,000 in cash proceeds.  Throughout this process, Elizarov misrepresented to the Court the amount of proceeds in his possession.

Following the sale of the Subject Property, Elizarov received $785,741.36 by wire transfer to an account at Ally Bank (the "Proceeds Account").  (Doc. No. 31-2, Wire Transfer Record, p. 2).  Records received from Ally Bank for the Proceeds Account

demonstrate that, prior to Elizarov receiving the proceeds of the Subject Property, the account already had a balance of $113,462.47.  A true and accurate copy of these account records is attached hereto as **Exhibit B**.  This amount is notable because it exceeds the $84,843.22 that Elizarov claimed, under penalty of perjury, that he spent "from the proceeds from the sale of my Palm Springs Property."  (Doc. No. 30-2, Elizarov Decl., ¶ 28).  When Elizarov paid that $84,843.22 debt of another individual, he already had sufficient funds to pay that amount out of his own funds.  He merely attributed that payment to the proceeds of the sale of the Subject Property to mislead the Court about what property should be subject to the TRO.

Notably, despite the Court's April 20, 2021 TRO prohibiting Elizarov from transferring the proceeds of the Subject Property, Elizarov did in fact make transactions out of the Proceeds Account.  The records from Ally show two transfers on April 28, 2021 totaling $9,500.  (Ex. A, p. 2).  One of those transfers was of $6,500 to Elizarov's counsel, who also had notice of the TRO at the time.  (Ex. A, p. 2).

Elizarov may attempt to explain away his misrepresentations and violations of the original TRO by claiming this was a joint account and he did not have ownership of the $113,462.47, but that claim cannot succeed.  "In California, a presumption exists that the debtor who holds an interest in a joint account owns the entire account."  *DirecTV, Inc. v. Webb*, No. CV 03-3399-SVW (SSX), 2006 WL 8453423, at *2 (C.D. Cal. June 22, 2006) (applying California law); *see also Alioto v. U.S.*, 593 F. Supp. 1402, 1410 (N.D. Cal. 1984) (citing rule that when individual and trust funds are commingled, it is presumed that subsequent dissipations are presumed to come out of personal funds first).  Elizarov's misrepresentation that the $84,843.22 was paid from the proceeds is even more egregious given that the $84,843.22 was not Elizarov's personal obligation but that of his counsel, and his counsel appears to be the joint owner of the Proceeds Account.

The records from Ally reflect that on April 28, 2021, the day that Elizarov informed the Court that a preliminary injunction would be "moot because there is nothing left for the court to freeze," (Doc. No. 30, Memo. Opp. Order Show Cause, p. 13), the Proceeds

Account still had a balance of $168,113.17.  Elizarov's actions demonstrate a clear intent to dissipate assets.  To prevent further irreparable harm to Goldwater, the Court should enter the preliminary injunction and increase the amount of the restricted funds to $164,343.22.[4]  In addition, the Court should initiate contempt proceedings for Elizarov's violations of the original TRO.

**E.    ELIZAROV'S ALLEGATIONS OF "SELF-HELP" ARE MERITLESS AND DO NOT IMPACT THE COURT'S ANALYSIS IN ISSUING AN INJUNCTION**

Rather than argue the merits of the injunction, Elizarov devotes a significant portion of his opening supplemental brief arguing that Goldwater acted improperly in providing notice of the original TRO to Ally, where Escrow of the West wired Elizarov's disbursement of the proceeds.  (Doc. No. 38, Elizarov Opening Suppl. Br., p. 9).  Goldwater was well within its rights to provide Ally with notice of a court order prohibiting Elizarov from transferring assets that Ally held in its control.  *See, e.g.*, *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914 (S.D. Cal. 2020) (noting that the "active concert or participation" criterion for who is bound by an injunction merely requires purposeful acts, and not conspiratorial intent).  Goldwater is not responsible for how Ally chose to act in response to the Court's TRO, and Ally did in fact receive the Extended TRO two days after it was issued.  Once again, Elizarov seeks to distract the Court from the facts of his own misconduct and the law actually at issue with regard to the injunction.

### III.    CONCLUSION

For the reasons stated herein, the Court should grant a preliminary injunction enjoining Elizarov from further transferring, alienating, or encumbering the proceeds of the sale of the Subject Property, which are the Wilton Manors Property and $164,343.22 of remaining cash proceeds.

---

[4] This amount represents the current $70,000 amount, plus the payments of $84,843.22 and $9,500, all of which should be attributed to Elizarov's personal funds rather than the proceeds.

1    Dated:        May 17, 2021

2                                              IVIE McNEILL WYATT
                                               PURCELL & DIGGS
3

4                                               /s/ Marie Maurice
                                               W. Keith Wyatt, Esq.
5                                              Marie Maurice, Esq.

6
                                                        AND
7

8                                              WAGNER HICKS PLLC

9
                                                /s/ Derek M. Bast
10                                             Sean C. Wagner, Esq.
                                               Derek M. Bast, Esq.
11                                             *ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28