***Goldwater Bank v. Elizarov, et al.***, C.D. Cal. Case No. 21-cv-00616-JWH-SP

# OMNIBUS JOINT EXHIBIT PART D

# EXHIBIT 46

# Goldwater's First Amended Complaint (omitting internal exhibits) (Dkt No. 44) (Filed 5/27/21)

**SEAN C. WAGNER** (*Pro Hac Vice*)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice*)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA  90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Goldwater Bank, N.A. | Case No. 5:21-cv-00616-JWH-SP |
|       *Plaintiff,* | **VERIFIED AMENDED COMPLAINT FOR:** |
| vs. | |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWLETT; BANK OF THE WEST; and ILYA ALEKSEYEFF | **1. BREACH OF CONTRACT** |
| | **2. UNJUST ENRICHMENT** |
|       *Defendants.* | **3. FRAUD** |
| | **4. FRAUDULENT TRANSFER** |
| | **5. CIVIL CONSPIRACY** |
| | **6. INJUNCTIVE RELIEF** |
| | **7. QUIET TITLE** |
| | **8. DECLARATORY JUDGMENT** |

Plaintiff Goldwater Bank, N.A. ("Goldwater"), pursuant to Fed. R. Civ. P. 15(a), hereby files this Amended Complaint and alleges the following:[1]

## PARTIES

1.     Plaintiff Goldwater Bank, N.A. is a national association with its principal place of business in Phoenix, Arizona.

2.     Defendant Artur Elizarov, is an individual who resided in Riverside County, California at certain times at issue in this matter.

3.     Defendant Unison Agreement Corp. is a corporation organized under the laws of the state of Delaware with its principal place of business in San Francisco, California.

4.     Defendant Scott Howlett is an individual and resident of San Francisco County, California.

---

[1] The Court's pending decision on Goldwater's request for a preliminary injunction need not be affected by the filing of this Amended Complaint. "Where the claim and prayer for injunctive [relief] forming the basis for a motion for preliminary injunction remains in an amended pleading and the motion for injunctive relief does not rely on factual allegations that substantially differ between the superseded and amended complaint, construing a motion for injunctive relief as relying on the amended pleading is appropriate." *JBF Interlude 2009 Ltd - Israel v. Quibi Holdings, LLC*, No. CV20-2299-CAS (SKX), 2020 WL 3963863, at *6 (C.D. Cal. July 13, 2020). Here, Goldwater's motion for TRO and preliminary injunction sought relief based on Goldwater's claims for breach of contract, unjust enrichment, and constructive trust, which are still present in this amended complaint, and Goldwater is not asking the Court to rule on the pending motion for preliminary injunction based on the new causes of action asserted herein. Additionally, Goldwater's motion did not rely on the factual allegations of a verified Complaint but on separate declarations from Goldwater regarding the facts at issue. Goldwater contends the Court can and still should rule on the request for preliminary injunction based on Goldwater's claims for breach of contract, unjust enrichment, and constructive trust. "Requiring the refiling of the Motion and related documents would be a needless waste of party and judicial resources." *Id.* (construing a pending motion for preliminary injunction to relate to the amended complaint as the operative complaint with respect to the claims at issue in the motion).

Omnibus Joint Statement Part D, page 1207

5. Defendant Bank of the West is a corporation organized under the laws of the state of California with its principal place of business in San Francisco, California.

6. Defendant Ilya Alekseyeff is an individual and resident of Los Angeles County, California.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Goldwater's claims pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Goldwater and Defendants and the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

8. A large portion of the conduct giving rise to the claims against Defendants, as more fully described below, occurred in the Central District of California.

9. In addition, the real property over which Plaintiff claims a security interest at issue in this action is located in Riverside County, California within the Central District of California.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## DEMAND FOR JURY TRIAL

11. Plaintiff Goldwater hereby demands a trial by jury on all issues so triable.

## BACKGROUND

### *The Goldwater Loan and the Unison Lien*

12. On or around July 31, 2019, Goldwater, as lender, originated a mortgage loan to Elizarov in the amount of $686,250.00 (the "Goldwater Loan") to be secured by certain real property located at 291 W. Overlook Road, Palm Springs, California 92264 (the "Subject Property").

13. Elizarov is a real estate broker holding an active license from the the California Department of Real Estate, and his license ID number is 01954357.

14. The Goldwater Loan was memorialized in an Adjustable Rate Note (the "Note") and a Deed of Trust (the "Deed of Trust"), both dated July 31, 2019. A true and

accurate copy of the Note and Deed of Trust are attached and incorporated herein as **Exhibit A** and **Exhibit B**, respectively.

15. The Deed of Trust created a valid and enforceable lien between Goldwater and Elizarov.

16. Also on or around July 30, 2019, Elizarov entered into another deed of trust with Unison as trustee, which was also secured by the Subject Property (the "Unison Lien").

17. Elizarov informed Unison of the Goldwater Loan and Goldwater's lien.

18. Upon information and belief, Elizarov purchased the Subject Property for $915,000 using proceeds of both the Goldwater Loan and funds from Unison, and Unison agreed to subordinate the Unison Lien in exchange for an equity share in the value of the Subject Property upon re-sale.

19. Specifically, Unison and Elizarov entered into a document titled Unison Homebuyer Uniform Subordination Agreement (the "Subordination Agreement") on or around July 31, 2019. A true and accurate copy of the Subordination Agreement is attached hereto as **Exhibit C**.

20. The Subordination Agreement identifies Unison as a Subordinating Lien Holder of a Junior Lien on the Subject Property.

21. The Subordination Agreement further identifies the Goldwater lien as the First Mortgage on the Subject Property by reference to Goldwater's loan number, the date of the Note, and the principal amount of $686,250.00.

22. The Subordination Agreement was recorded with the Riverside County Recorder's office on or around August 7, 2019.

### *Elizarov's Mortgage Application*

23. To obtain the Goldwater Loan, Elizarov submitted a Uniform Residential Loan Application (the "Loan Application") to Goldwater on or around July 3, 2019.

24. In the Loan Application, Elizarov made several material misrepresentations of fact.

Omnibus Joint Statement Part D, page 1209

25.     In the Loan Application, Elizarov did not identify himself as "Married (include registered domestic partners)."   Rather, Elizarov identified himself as "Unmarried."

26.     This was a misrepresentation of fact because Elizarov and Defendant Alekseyeff have been in a domestic partnership, which is registered with the state of California, since May 2003.

27.     In the Loan Application, Elizarov also identified his total assets, separate from his income, as $227,103.00 in a JP Morgan savings account.

28.     Elizarov also stated in the Loan Application that he was not a party to any lawsuit.

29.     This was a misrepresentation of fact because Elizarov was in fact a named plaintiff at that time in litigation in the Superior Court of California, Los Angeles County, which was captioned *Artur Elizarov v. BMW Financial Services NA, LLC* (19STCV08507).  Elizarov was represented by Alekseyeff in that action.

30.     Elizarov stated on the loan application that he was not "presently delinquient or in default on an Federal debt[.]"

31.     Upon information and belief, this was a misrepresentation of fact because, at the time, Elizarov was subject to a federal tax lien of $107,787.69.

32.     In signing the Mortgage Application, Elizarov represented, agreed, and acknowledged that "the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, *et seq.*"

33.     Elizarov's multiple misrepresentations were material to the transaction because they are directly relevant to Elizarov's reliability and financial position.

34.     Elizarov's marital status was material to the transaction because California is a community property state, meaning that Elizarov could be held responsible for his domestic partner's liabilities incurred during the span of the domestic partnership.

35.     Goldwater relied on Elizarov's misrepresentations in approving him for and making the Goldwater Loan.

*Elizarov's Payment History*

36.     Elizarov defaulted on the Goldwater Loan and is delinquent on the payment obligations as of April 1, 2020, meaning that the payments that Elizarov has made only satisfy his ordinary payment obligations through April 1, 2020.

37.     On or around May 2020, Goldwater transferred responsibilities for servicing the Goldwater Loan to an affiliated entity named Weststar Mortgage Corporation.

38.     On or around May 5, 2020, Elizarov completed a Mortgage Assistance Application (the "Assistance Application") requesting assistance based on reduction in income and disaster.

39.     In the Assistance Application, Elizarov represented that his only form of income was $1,050.00 per week in unemployment benefit income.

40.     In the Assistance Application, Elizarov represented that his only assets, excluding retirement funds, was $3,500 in cash on hand.

41.     Upon information and belief, Elizarov misrepresented the full extent of his assets and income.

42.     Noticeably, Elizarov failed to report the JP Morgan savings account on his Assistance Application, despite reporting it on his Mortgage Application.   Upon information and belief, the JP Morgan savings account was still in existence at the time Elizarov completed the Assistance Application.

43.     In signing the Assistance Application, Elizarov certified and acknowledged that "all of the information in this Mortgage Assistance Application is truthful . . . [and that] [k]nowingly submitting false information may violate Federal and other applicable law."

Omnibus Joint Statement Part D, page 1211

44. In reliance on the information reported in Elizarov's Assistance Application, Elizarov was approved for forbearance. Elizarov was required to make reduced monthly payments of $1,101.31, which reflected the escrow amount of his ordinary payments.

45. Elizarov continued to report that he still suffered from the same hardships, and he continued to receive forbearance extensions. However, Elizarov failed to regularly and timely make his reduced monthly payments.

46. During the time when Elizarov was seeking and receiving forbearance, Alekseyeff communicated with Goldwater regarding Elizarov's forbearance.

*Elizarov Sells the Subject Property*

47. At some point following the default, Elizarov decided to sell the Subject Property, and Elizarov communicated that intent to Goldwater in March 2021.

48. On March 3, 2021, the escrow company for the pending sale, Escrow of the West, Inc., made contact with Goldwater regarding the payoff of Goldwater's lien on the Subject Property in connection with a pending sale of the Subject Property.

49. During the course of the escrow relationship and prior to the closing of the sale, Escrow of the West, Inc., as escrow agent for Elizarov as seller and Howlett as buyer of the Subject Property, learned that Goldwater's Deed of Trust was had never been recorded in the Riverside County Register of Deed's office.

50. On or around March 24, 2021, Goldwater provided Escrow of the West with its payoff calculations, which noted a complete payoff amount of $729,354.80 and daily interest of $101.46. A true and accurate copy of the Payoff Calculations is attached hereto as **Exhibit D.**

51. On March 25, 2021, Escrow of the West provided Goldwater with an estimated settlement statement showing that the proceeds of the sale would pay off a $491,000.00 lien to Unison, a mechanic's lien in the amount of $107,270.00, various closing costs, and a final payout of $677,074.53 in proceeds to Elizarov.

52. Goldwater thereafter communicated with Elizarov on March 25, 2021 by email and by phone regarding the disbursement of the proceeds of the pending sale, which

Omnibus Joint Statement Part D, page 1212

would have been insufficient to pay off the Goldwater Loan, the Unison Lien, and the mechanic's lien in full.

53.     In the communications on March 25, 2021, Elizarov represented that, despite Goldwater's Deed of Trust being unrecorded, Goldwater would recieve $675,000 of the proceeds following the sale of the Subject Property, which would have paid off a substantial majority of the Goldwater Loan.

54.     Elizarov sold the Subject Property to Scott Howlett on or around March 25, 2021, by a Grant Deed that was recorded on or around March 29, 2021.  A true and accurate copy of the Grant Deed is attached and incorporated herein as **Exhibit E**.

55.     Elizarov never informed Goldwater that the sale occurred and continued communicating with Goldwater after March 25, 2021 regarding what amount of the proceeds Goldwater would receive.

56.     On or around March 29, 2021, Goldwater asked Elizarov about the status of the closing, and Elizarov denied that the sale occurred.

57.     To date, Goldwater has received none of the proceeds from the sale of the Subject Property.

58.     Elizarov made these representations about the insufficiency of the proceeds to pay off the Goldwater Loan in full and the promise that Goldwater would nevertheless receive a $675,000 payout with the intent that Goldwater would rely on the misrepresentations and not interfere with the sale.

59.     Goldwater did in fact rely on Elizarov's representations.

60.     Elizarov's statement that the Subject Property was subject to a $107,270.00 mechanic's lien was a misrepresentation of material fact.  The Seller's Final Settlement Statement from Escrow of the West indicates that Unison was the only lienholder paid with the proceeds of the sale.  A true and accurate copy of the Seller's Final Settlement Statement is attached hereto as **Exhibit F**.

61.     Elizarov's representations that the sale of the Subject Property would yield insufficient funds to pay off the Goldwater Loan was a misrepresentation of material fact.

Elizarov in fact received $785,741.36 in proceeds from the sale, <u>Ex. F</u>, which is in excess of Goldwater's payoff demand of $729,354.80.

62. Following the sale of the property, Goldwater also discovered a flyer advertising the Subject Property for sale identifies Artur Elizarov and his firm DreamHome Realty Group, Inc. as the realtor to be contacted about the property.  A true and accurate copy of this flyer is attached hereto as **Exhibit G**.

63. Because of Elizarov's status as a licensed real estate broker in the State of California and his role in marketing the Subject Property for sale, Elizarov cannot deny that he was aware of the validity of the Deed of Trust and Goldwater's right to the proceeds of the sale of the Subject Property.

64. Goldwater's status as a secured creditor with regard to Elizarov is now at risk, and Goldwater faces a significant likelihood that it will effectively become an unsecured creditor of Elizarov.

65. If Goldwater is an unsecured creditor of Elizarov, there is a high risk that Goldwater will not be made whole, as the evidence of Elizarov's insolvency is well documented.

66. At the time of the sale of the Subject Property, Elizarov was already almost a year behind in his payments on the Goldwater Loan, which is significant in light of the fact that he owned the Subject Property for less than two years.

67. Additionally, on December 18, 2019, Elizarov was discharged from an IRS tax lien in the amount of $107,787.69.

68. Elizarov's recent history of carrying significant debts suggests that the proceeds of the sale of the Subject Property will be wasted and disposed of prior to the entry of a final judgment in this matter.

69. On April 1, 2021, Goldwater demanded that Elizarov return the promised funds and advised that it intended to pursue its full legal remedies if the funds were not returned.

### *The Validity of Goldwater's Deed of Trust*

70.   Goldwater's unrecorded Deed of Trust is valid between Goldwater, Elizarov, and any other party with notice of the Deed of Trust.  Cal. Civ. Code § 1217.

71.   Upon information and belief, Unison had actual knowledge of Goldwater's Deed of Trust as evidenced by the Subordination Agreement.

72.   Howlett and Bank of the West had, at minimum, constructive knowledge or inquiry notice of the Goldwater Lien by virtue of the duly-recorded Subordination Agreement.

73.   Howlett and Bank of the West also had imputed knowledge of the Goldwater Lien because Escrow of the West obtained knowledge of Goldwater's adverse interest while acting within the course and scope of its authority as an agent of Elizarov, Howlett, and Bank of the West.

74.   On March 29, 2021, a deed of trust was recorded in the Riverside County Recorder's office describing a lien given by Howlett to Bank of the West secured by the Subject Property.

### *Elizarov's Dissipation of the Proceeds of the Sale of the Subject Property*

75.   Following the sale of the Subject Proceeds, Elizarov received $785,741.36, which was wired to an account with Ally Bank ending in account number -8480 (the "Proceeds Account") on or around March 30, 2021.

76.   On April 6, 2021, one week after receiving the proceeds, Elizarov entered into a contract for the purchase of real property for $630,000 in cash in Wilton Manors, Florida (the "Wilton Manors Property").

77.   Elizarov paid approximately $19,000 in cash out of the Proceeds Account as a down payment for the Wilton Manors Property on April 7, 2021.

78.   Elizarov closed on the purchase of the Wilton Manors Property on April 16, 2021 and paid the remaining $613,000.00 out of the Proceeds Account to complete the sale.

79. On April 20, 2021, allegedly within hours of being restrained from further transferring assets from the Proceeds Account Elizarov transferred $84,843.22 from the Proceeds Account to pay off a loan that belonged to Alekseyeff.

80. At the time that Elizarov transferred the $84,843.22, he was aware of Goldwater's claims and the pending request for an order to prohibit the transfer of those assets.

81. On May 12, 2021, Goldwater sent a Notice of Acceleration to Elizarov informing him that Goldwater was accelerating the Note and demanding payment in full within thirty (30) days. As of this date, Goldwater has not received payment in full. A true and accurate copy of the Notice of Acceleration is attached hereto as **Exhibit H**.

82. As a result of Elizarov's conduct, Goldwater Bank has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract, as to Elizarov)**

83. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

84. Goldwater had an agreement with Elizarov to make the Goldwater Loan in exchange for his obligations in the Note and the Deed of Trust.

85. The Note and Deed of Trust is a valid and binding contract between the parties.

86. Pursuant to the Note and Deed of Trust, Goldwater is entitled to the proceeds from a sale of the Subject Property.

87. Elizarov breached the Note and Deed of Trust by failing to make all payments when due, including by failing to provide Goldwater with the proceeds of the sale of Subject Property.

88. Rather than pay the proceeds from the sale of the Subject Property to Goldwater, Elizarov has wrongfully retained those proceeds in an amount of approximately $675,000.

89.   Elizarov agreed in the Note that in the event of a default and acceleration of the Goldwater Loan, Goldwater would be entitled to recover its costs and expenses incurred in enforcing the Note, including its reasonable attorney's fees. (Ex. A, Note, § 7(E)).

90.   As a direct and proximate result of Elizarov's breach, Goldwater has been directly and proximately damaged in an amount to be determined at trial.

91.   As a direct and proximate result of the foregoing acts and conduct, Goldwater has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe on Plaintiff

92.   Goldwater additionally seeks the entry of an order declaring that Elizarov holds, in constructive trust as trustee for the benefit of Goldwater, such amounts as were transferred to him personally in connection with the sale of the Subject Property, as well as an order directing Elizarov to disgorge and transfer any and all such amounts to Goldwater.

### SECOND CAUSE OF ACTION
### (Unjust Enrichment)

93.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

94.   By engaging in the acts described above, Elizarov has and continues to benefit from his wrongdoing and has been unjustly enriched by reaping the benefits of his unlawful activities to the damage and irreparable harm of Goldwater.

95.   As a direct and proximate result of Elizarov's misconduct, Goldwater has been damaged in an amount to be proven at trial, but in excess of $675,000.

### THIRD CAUSE OF ACTION
### (Fraud, as to Elizarov)

96.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

Omnibus Joint Statement Part D, page 1217

97.   By providing incorrect information and omitting information on the Mortgage Application and the Assistance Application, Elizarov made false representations of material facts on both the Mortgage Application and the Assistance regarding his financial status.

98.   Elizarov made other false representations as described above, including the misrepresentations that the sale of the Subject Property would result in insufficient proceeds to pay off the Goldwater Loan in full and that Goldwater would nevertheless receive a payout of $675,000.00.

99.   Elizarov's misrepresentations were reasonably calculated to deceive Goldwater.

100.   Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and enter into the Goldwater Loan.

101.   Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and approve Elizarov's request for mortgage assistance.

102.   Elizarov's misrepresentations were made with the intent to deceive Goldwater and with the intent that Goldwater would rely on the misrepresentations and not interfere with the sale of the Subject Property or rush to record its Deed of Trust.

103.   Elizarov's misrepresentations did in fact deceive Goldwater.

104.   Goldwater's reliance on Elizarov's representations was reasonable.

105.   Elizarov's actions proximately caused Goldwater damages exceeding $75,000 exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

### (Fraudulent Transfer as to Elizarov and Alekseyeff)

106.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

107. On April 20, 2021, Elizarov transferred $84,843.22 from the Proceeds Account to a third-party creditor to pay off a loan on Alekseyeff's behalf.

108. At the time Elizarov made the transfer, Elizarov acted with actual intent to hinder, delay, or defraud Goldwater, and his intent is reflected by, among other things, the fact that the transfer was made after Goldwater had already instituted litigation against Elizarov, Elizarov concealed assets, and Elizarov had previously made representations of insolvency to Goldwater.

109. As such, the transfer of the $84,843.22 for Alekseyeff was fraudulent pursuant to California Civil Code § 3439.04 and Goldwater is entitled to void the transfer and pursue all other remedies set forth in §3439.07.

### FIFTH CAUSE OF ACTION

### (Conspiracy as to Elizarov and Alekseyeff)

110. Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

111. Elizarov and Alekseyeff entered into an agreement with each other to defraud Goldwater, to dissipate the proceeds of the sale of the Subject Property, and to otherwise make misrepresentations to Goldwater so as to induce it to make the Goldwater Loan and subsequently approve Elizarov for mortgage assistance.

112. Elizarov and Alekseyeff took overt actions in furtherance of the conspiracy, including by misrepresenting Elizarov's marital status and financial position, by instructing Escrow of the West not to communicate with Goldwater, by purchasing the Wilton Manors Property in an all-cash deal shortly after receiving the proceeds and while on notice of Goldwater's claims, and by taking further steps to dissipate the proceeds of the sale of the Subject Property.

113. Elizarov and Alekseyeff's actions proximately caused Goldwater damages exceeding $75,000, exclusive of interest and costs.

### SIXTH CAUSE OF ACTION

### (Injunctive Relief, as to Elizarov)

114.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

115.   As of the date of filing of this Complaint, Goldwater faces significant exposure with regard to the Goldwater Loan, as Elizarov has sold the Subject Property and wrongfully retained the proceeds of the sale in an amount in excess of $675,000.

116.   Goldwater's status as a secured creditor of Elizarov has been threatened, and the likelihood of Goldwater being able to recover in full as an unsecured creditor is low.

117.   Goldwater justifiably fears that it will sustain significant losses and irreparable harm as a result of Elizarov's misappropriation of the proceeds of the sale of the Subject Property.

118.   Unless Elizarov's assets, including the proceeds of the sale of the Subject Property, are marshalled, accounted for, and preserved, Goldwater's security interest in the Goldwater Loan will not be adequately secured with respect to Elizarov.

119.   Goldwater is without a plain, speedy, or adequate remedy at law which would serve to immediately exonerate, indemnify, and save it harmless for its actual and anticipated losses, and Goldwater would be irreparably and permanently injured unless this Court grants immediate injunctive and equitable relief.

## SEVENTH CAUSE OF ACTION

### (Quiet Title, as to Unison, Howlett, and Bank of the West)

120.   Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

121.   Goldwater held and now holds a first-priority security interest in the Subject Property pursuant to the July 31, 2019 Note and Deed of Trust between Goldwater and Elizarov.

122.   Goldwater seeks to quiet title against the claims of any and all defendants who claim to have an interest in the Subject Property, which has the following legal description:

the real property in the City of Palm Springs, County of Riverside, State of California described as: Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56 both inclusive of Maps, in the office of the County of said county. Also Known as: 291 W. Overlook Road, Palm Springs, CA 92264

123.  Elizarov granted Goldwater a lien in the Subject Property through Goldwater's Deed of Trust.

124.  At the sale of the Subject Property, the Goldwater Lien was not paid off, and Goldwater's security interest has not been extinguished because all other parties who have claimed an interest in the Subject Property, including Unison, Howlett, and Bank of the West, had notice of Goldwater's Deed of Trust.

125.  Union had actual knowledge of Goldwater's Deed of Trust and agreed to subordinate its lien to Goldwater's.

126.  Howlett had constructive knowledge or was on inquiry notice of the Goldwater Deed of Trust by virtue of the duly-recorded Subordination Agreement and the knowledge obtained by Escrow of the West during the course of their role as agent for Elizarov, Howlett, and Bank of the West.

127.  Bank of the West had constructive knowledge or was on inquiry notice of the Goldwater Deed of Trust by virtue of the duly-recorded Subordination Agreement and by Howlett's knowledge.

128.  Goldwater seeks a determination that, as of March 29, 2021, Goldwater held a first-priority security interest in the Subject Property, that Howlett took the Subject Property subject to the Goldwater Lien, and that Bank of the West's security interest in the Subject Property is subordinate to the Goldwater Lien.

129.  The claims of Unison, Howlett, and Bank of the West, each of them adverse to Goldwater's interest, are without any right whatever and such defendants' rights are all subject to Goldwater's superior security interest.

130.    For the reasons stated above, Goldwater requests an Order from this Court pursuant to Cal. Code of Civil Procedure § 760.020 *et seq.*, quieting title in the Subject Property and declaring that Goldwater holds a first-priority security interest in the Subject Property.

## EIGHTH CAUSE OF ACTION

### (Declaratory Judgment, as to Unison, Howlett, and Bank of the West)

131.    Goldwater incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

132.    There exists an actual, definite, and concrete controversy between Goldwater, Unison, Howlett, and Bank of the West related to the priority of Goldwater's security interest relative to those defendant's interests in the Subject Property.

133.    Goldwater contends that it has a first-priority lien on the Subject Property based upon all Defendant's notice of Goldwater's unrecorded Deed of Trust, and Goldwater is informed and believes that Defendants Unison, Howlett, and Bank of the West dispute these contentions.

134.    A judicial determination is necessary and appropriate at this time in order that the parties may ascertain their rights and duties with respect to the Subject Property.

## PRAYER FOR RELIEF

**WHEREFORE**, Goldwater requests the Court order relief, as follows:

1.    Preliminary and permanent injunctive relief (i) enjoining Elizarov from alienating or disposing of the proceeds of the sale of the Subject Property and (ii) requiring Elizarov to make an accounting of his assets following the sale of the Subject Property;

2.    Actual, compensatory, consequential, punitive, and exemplary damages in an amount to be determined at trial for all losses and damages suffered as a result of the acts and transactions complained of herein;

3.    A constructive trust for the benefit of Goldwater over the proceeds received by Elizarov in connection with the sale of the Subject Property;

4. All costs and expenses incurred by Goldwater Bank in enforcing its rights under the Note and Deed of Trust;

5. An order quieting title and declaring that Goldwater holds a first-priority security interest in the Subject Property.

6. Declaratory relief stating that Goldwater holds a first-priority security interest in the Subject Property.

Dated: May 27, 2021

IVIE McNEILL WYATT
PURCELL & DIGGS

/s/ Marie Maurice
W. Keith Wyatt, Esq.
Marie Maurice, Esq.

AND

WAGNER HICKS PLLC

/s/ Derek M. Bast
Sean C. Wagner, Esq.
Derek M. Bast, Esq.
ATTORNEYS FOR PLAINTIFF GOLDWATER BANK N.A.

# CERTIFICATE OF SERVICE

I certify that all counsel of record who has consented to electronic notification is being served on May 27, 2021 with a copy of **PLAINTIFF'S AMENDED COMPLAINT** via the Court's CM/ECF system. Pursuant to Local Rule 5-3.1.2, I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants listed below:

Unison Agreement Corp.
First Corporate Solutions, Inc., Registered Agent
650 California Street, Suite 1800
San Francisco, CA 94108

/s/ Derek M. Bast
Derek M. Bast

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Goldwater Bank, N.A. )
   *Plaintiff,* ) Case No. 5:21-cv-00616-JWH-SP
   vs. ) _____
ARTUR ELIZAROV; UNISON )
AGREEMENT CORP.; SCOTT )
HOWLETT; BANK OF THE WEST; )
and ILYA ALEKSEYEFF ) **VERIFICATION**
   *Defendants.* )
                                        )
                                        )
                                        )
                                        )
                                        )
                                        )
_____ )

    I, Peter Hill, an authorized agent of Goldwater Bank, N.A., pursuant to 28 U.S.C. § 1746, do hereby verify under penalty of perjury that the foregoing allegations contained in this Verified Complaint are true and correct to the best of my current knowledge.

    Dated:  May 27, 2021.

_____
Peter Hill

# EXHIBIT 47

## Goldwater's First Amended Complaint Exhibit 1 – Adjustable Rate Note (Dkt No. 44-1) (Filed 5/27/21)

LOAN #: 909216931
MIN: 1009209-4100147547-4

## ADJUSTABLE RATE NOTE
(LIBOR One-Year Index (As Published In The Wall Street Journal)-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY
MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.

| July 31, 2019 | Palm Springs, | California |
|---|---|---|
| [Date] | [City] | [State] |

291 W. Overlook Road, Palm Springs, CA 92264-8934
[Property Address]

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. **$686,250.00** (this amount is called
"Principal"), plus interest, to the order of the Lender. The Lender is **Goldwater Bank, N.A..**

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of **5.375 %.**        The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any
default described in Section 7(B) of this Note.

### 3. PAYMENTS
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the **1st**       day of each month beginning on **September 1, 2019.**
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be
applied to interest before Principal. If, on **August 1, 2049,**       I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at **2525 E. Camelback Rd, Suite 1100**
**Phoenix, AZ 85016**

or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. **$3,842.80.**       This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that
I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in
accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the **1st**       day of **August, 2024**       and on that day every
**12th**       month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of
interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published
in **The Wall Street Journal.** The most recent Index value available as of the date 45 days before each Change Date
is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed
to be zero for purposes of calculating my interest rate.
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable infor-
mation. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE**
percentage point(s) ( **3.000 %**       ) (the "Margin") to the Current Index.
The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Sub-
ject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR – Single Family – **Fannie Mae UNIFORM INSTRUMENT** Form 3526 6/01 (rev. 6/16)
Ellie Mae, Inc. Page 1 of 3 F3526NOT  0816
F3526NOT (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.375 %** or less than **5.375 %.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** month(s). My interest rate will never be greater than **11.375 %. My interest rate will never be less than the start rate or 5.375 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar day(s) after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR** – Single Family – **Fannie Mae UNIFORM INSTRUMENT Form 3526 6/01 (rev. 6/16)**
Ellie Mae, Inc. Page 2 of 3 F3526NOT 0816
F3526NOT (CLS)
07/31/2019 10:36 AM PST



**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



_____(Seal)
**ARTUR ELIZAROV**

**Lender: Goldwater Bank, N.A.**
**NMLS ID: 452955**
**Loan Originator: Gregory Hill**
**NMLS ID: 247349**

[Sign Original Only]

MULTISTATE ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR – Single Family – Fannie Mae UNIFORM INSTRUMENT Form 3526 6/01 (rev. 6/16)
Ellie Mae, Inc.                                          Page 3 of 3                                  F3526NOT  0816
                                                                                                      F3526NOT (CLS)
                                                                                                      07/31/2019 10:36 AM PST

# EXHIBIT 48

# Goldwater's First Amended Complaint Exhibit 2 – Deed of Trust (Dkt No. 44-2) (Filed 5/27/21)

HFS

When recorded, mail to:
Goldwater Bank, N.A.
Attn: Final Document Department
P.O. Box 25064
Albuquerque, NM 87125
844-799-4653

Title Order No.: 0625-5974427
Escrow No.: 0625-5974427
LOAN #: 909216931

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

> MIN 1009209-4100147547-4
> MERS PHONE #: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **July 31, 2019,** together with all Riders to this document.

**(B) "Borrower"** is **ARTUR ELIZAROV, AN UNMARRIED MAN.**

Borrower's address is **828 Westmount Drive, West Hollywood, CA 90069.**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **Goldwater Bank, N.A..**

Lender is **a Corporation,** organized and existing under the laws of
**The United States of America.** Lender's address is **2525 E. Camelback Rd, Suite**
**1100, Phoenix, AZ 85016.**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **Form 3005 1/01**
Ellie Mae, Inc. Page 1 of 13 CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Case 5:21-cv-00666-JWH-SP Document 428-5 Filed 05/27/23 Page 28 of 144 Page ID #:12129

(D) "Trustee" is **First American Title Company.**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **July 31, 2019.** The Note states that Borrower owes Lender **SIX HUNDRED EIGHTY SIX THOUSAND TWO HUNDRED FIFTY AND NO/100\* \***
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* Dollars (U.S. **$686,250.00** )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2049.**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Other(s) [specify]
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider
☐ V.A. Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3005 1/01**
Ellie Mae, Inc.                         Page 2 of 13                                CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1232

LOAN #: 909216931

all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**                    [Type of Recording Jurisdiction] of **Riverside**                                [Name of Recording Jurisdiction]:

**LOT 8 OF BLOCK 7, PALM CANYON MESA TRACT, AS PER MAP RECORDED IN BOOK 12, PAGES 52 THROUGH 56, BOTH INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. APN #: 513-363-023-2**

which currently has the address of    **291 W. Overlook Road, Palm Springs,**

[Street] [City]

California **92264-8934**           ("Property Address"):
         [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3005 1/01**
Ellie Mae, Inc.                              Page 3 of 13                              CAEDEDL 0219
                                                                                    CAEDEDL (CLS)
                                                                                    07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1233

Case 5:21-cv-00616-JWH-SP Document 328-5 Filed 05/09/23 Page 30 of 144 Page ID #:12131

to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3005 1/01
Ellie Mae, Inc. Page 4 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1234

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,



LOAN #: 909216931

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3005 1/01
Ellie Mae, Inc.                                Page 6 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST

from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3005 1/01
Ellie Mae, Inc.
Page 7 of 13

CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1237

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.



Omnibus Joint Statement Part D, page 1238

Case 5:21-cv-00616-JWH-SP Document 328-5 Filed 05/07/21 Page 35 of 144 Page ID #:12136

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     **Form 3005 1/01**
Ellie Mae, Inc.
Page 9 of 13
CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1239

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     Form 3005 1/01
Ellie Mae, Inc.                                                 Page 10 of 13                                                 CAEDEDL  0219
                                                                                                                                                                          CAEDEDL (CLS)
                                                                                                                                                           07/31/2019 10:36 AM PST

Case 5:21-cv-00061-WWHS-PD Document 28-5 Filed 05/09/21 Page 37 of 144 Page ID #:12138

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.



Omnibus Joint Statement Part D, page 1241

**LOAN #: 909216931**

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**ARTUR ELIZAROV**

4\31\2019 **(Seal)**
**DATE**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

**State of CALIFORNIA**
**County of** Los Angeles

**On** July 31. 2019 **, before me,** Estela Noemy Moreno Aviles NOTARY PUBLIC
**(here insert name and title of the officer), personally appeared ARTUR ELIZAROV, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.**

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

**WITNESS my hand and official seal.**

**Signature** _ENIGLCIVO_

_____**(NOTARY)**

**(SEAL)**

ESTELA NOEMY MORENO AVILES
Notary Public - California
Los Angeles County
Commission # 2293165
My Comm. Expires Jun 15, 2023

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **Form 3005 1/01**
Ellie Mae, Inc. Page 12 of 13
CAEDEDL 0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

Lender: Goldwater Bank, N.A.
NMLS ID: 452955
Loan Originator: Gregory Hill
NMLS ID: 247349

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.                                     Page 13 of 13

CAEDEDL  0219
CAEDEDL (CLS)
07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1243

LOAN #: 909216931
MIN: 1009209-4100147547-4

## ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In The Wall Street Journal-Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **31st** day of **July, 2019,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Goldwater Bank, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at: **291 W. Overlook Road, Palm Springs, CA 92264-8934.**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of **5.375 %.** The Note provides for changes in the interest rate and the monthly payments as follows:
## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the **1st** day of **August, 2024,** and on that day every **12th** month thereafter. Each date on which my interest rate could change is called a "Change Date."
### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
**Form 3189 6/01 (rev. 6/16)**
Ellie Mae, Inc.                    Page 1 of 4                    F3189RLU  0816
                                                                   F3189RLU (CLS)
                                                                   07/31/2019 10:36 AM PST



**LOAN #: 909216931**

deposits in the London market ("LIBOR"), as published in **The Wall Street Journal.** The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE** percentage point(s) ( **3.000 %** ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.375 %** or less than **5.375 %.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** month(s). My interest rate will never be greater than **11.375 %. My interest rate will never be less than the start rate or 5.375 %.**

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc. Page 2 of 4

F3189RLU 0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae UNIFORM INSTRUMENT
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                                    Page 3 of 4                                    F3189RLU 0816
F3189RLU (CLS)
07/31/2019 10:36 AM PST



LOAN #: 909216931

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____     7/31/2019     (Seal)
ARTUR ELIZAROV                                                                            DATE

MULTISTATE ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-**Fannie Mae UNIFORM INSTRUMENT**
Form 3189 6/01 (rev. 6/16)
Ellie Mae, Inc.                                    Page 4 of 4                                    F3189RLU  0816
                                                                                                 F3189RLU (CLS)
                                                                                        07/31/2019 10:36 AM PST



Omnibus Joint Statement Part D, page 1247

# EXHIBIT 49

# Goldwater's First Amended Complaint Exhibit 5 – Grant Deed (Dkt No. 44-5) (Filed 5/27/21)

03/29/2021 04:55 PM Fees: $17.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

DOC #2021-0196602

RECORDING REQUESTED BY:
Orange Coast TItle

AND WHEN RECORDED MAIL TO:

Scott Howlett
44 Hartford
San Francisco, CA 94144

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: REGINA #080

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: 210-2216078-10 | Escrow No.: 02-035523-AC |
|---|---|

APN 513-363-623
TRA 011

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

## DOCUMENTARY TRANSFER TAX is $1,490.50

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X] City of Palm Springs **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Artur Elizarov, a Single Man**

hereby GRANT(s) to:

**Scott Howlett, a Single Man**

the real property in the City of Palm Springs, County of Riverside, State of California,
described as:
Lot 8 of Block 7, Palm Canyon Mesa Tract as per map recorded in Book 12, Pages 52 to 56
both inclusive of Maps,  in the office of the County of said county.

Also Known as:  291 W. Overlook Road, Palm Springs, CA  92264
APN#: 513-363-023-2

**DATED: March 22, 2021**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

Title Order No.: 210-2216078-10
Escrow No.: 02-035523-AC

APN# 513-363-023-2

**Signature Page**

_(signature)_

Artur Elizarov

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _Florida_

COUNTY OF _Broward_

On _03/25/21_ before me, _Antonio Perez_ A Notary Public personally

appeared _Artur Elizarov_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature_____ (Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN

_(notary seal)_ **ANTONIO PEREZ**
Commission # HH 079732
Expires January 12, 2025
Bonded Thru Budget Notary Services

# EXHIBIT 50

# Goldwater's First Amended Complaint Exhibit 6 – Settlement Statement (Dkt No. 44-6) (Filed 5/27/21)



**ESCROW OF THE WEST**

9440 Santa Monica Blvd., #310
Beverly Hills, CA 90210

Phone: (310) 402-5555
Fax: (310) 402-5556
www.escrowofthewest.com

### SELLER'S FINAL SETTLEMENT STATEMENT

| | | | |
|---|---|---|---|
| **PROPERTY:** | 291 W. Overlook Road<br>Palm Springs, CA 92264 | **DATE:** | March 30, 2021 |
| **SELLER:** | Artur Elizarov | **CLOSING DATE:**<br>**ESCROW NO.:** | March 29, 2021<br>02-035523-AC |

|  | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 1,355,000.00 |
| | | |
| **PAYOFF CHARGES - Unison Milgard Holdings LLC** | | |
| **[Total Payoff $491,000.00]** | | |
| Principal Balance | 491,000.00 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| County Taxes at $5,819.60/semi-annually from 03/29/2021 to 07/01/2021 | | 2,974.46 |
| | | |
| **COMMISSION CHARGES** | | |
| Keller Williams | 33,875.00 | |
| Compass | 33,875.00 | |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Rudy's Termite and Pest Control for Termite Report/Work | 95.00 | |
| Old Republic Home Protection Inc. Home Warranty | 900.00 | |
| Property ID for Natural Hazard Disclosure Report | 99.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Orange Coast Title** | | |
| Title - Owner's Title Insurance (optional) | 2,761.00 | |
| Title - Recording Service Fee | 12.50 | |
| Title - Sub Escrow Fee | 62.50 | |
| Title - Wire Fee | 50.00 | |
| Recording Grant Deed | 17.00 | |
| Recording Reconveyance | 31.00 | |
| Recording Quitclaim Deed | 20.00 | |
| Transfer Tax - County to Riverside County | 1,490.50 | |
| Property Taxes (2nd Install) to Riverside County Tax Collector | 5,819.60 | |
| | | |
| **ESCROW CHARGES - Escrow of the West** | | |
| Title - Escrow Fee | 3,060.00 | |
| Professional Courtesy Discount | | 1,355.00 |
| Title - Wire Fee | 25.00 | |
| Title - Overnight Fee | 20.00 | |
| Title - Admin Fee | 250.00 | |
| Title - Archive Fee | 50.00 | |
| Title - Messenger/Handling Fee | 75.00 | |
| | | |
| **Net Proceeds** | 785,741.36 | |
| | | |
| **TOTAL** | $ 1,359,329.46 | $ 1,359,329.46 |

### SAVE THIS STATEMENT FOR INCOME TAX PURPOSES

# **EXHIBIT 51**

# **Howlett Cross-Complaint (Dkt No. 51) (Filed 6/10/21) (Excerpts)**

1  HALL GRIFFIN LLP
   HOWARD D. HALL, State Bar No. 145024
2    hdhall@hallgriffin.com
   DAMIAN P. RICHARD, State Bar No. 262805
3    drichard@hallgriffin.com
   1851 East First Street, 10th Floor
4  Santa Ana, California 92705-4052
   Telephone: (714) 918-7000
5  Facsimile: (714) 918-6996

6  Attorneys for Defendant and Cross-
   Complainant SCOTT HOWLETT

7

8            UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

10

| | |
|---|---|
| 11  Goldwater Bank, N.A., | CASE NO. 21-cv-00616-JWH-SP |
| 12          Plaintiff, | JUDGE:   Hon. John W. Holcomb<br>CTRM.:    2 |
| 13          vs. | **CROSS-COMPLAINT FOR:** |
| 14  ARTUR ELIZAROV; UNISON<br>AGREEMENT CORP.; SCOTT | **1. FRAUD AND DECEIT**<br>**2. NEGLIGENCE** |
| 15  HOWLETT; BANK OF THE WEST;<br>and ILYA ALEKSEYEFF, | **3. EQUITABLE INDEMNITY**<br>**4. IMPLIED INDEMNITY** |
| 16          Defendants. | **5. COMPARATIVE INDEMNITY**<br>**6. CONTRIBUTION** |
| 17 | **7. DECLARATORY RELIEF**<br>**8. UNJUST ENRICHMENT** |
| 18  SCOTT HOWLETT | TRIAL DATE:    None Set |
| 19  , | |
| 20          Cross-Complainant, | |
| 21          vs. | |
| 22  ARTUR ELIZAROV, GOLDWATER<br>BANK, N.A., and ROES 1-10, | |
| 23          Cross-Defendants. | |

24  / / /

25  / / /

26  / / /

27  / / /

28

4826-4277-0670.1

Final Judgment be entered by this Court in his favor against Cross-Defendants as follows:

     1.     Restitution.  Restitution of all monies that were unlawfully, unfairly, and/or fraudulently obtained by any Cross-Defendant;

     2.     Damages and Attorney's Fees. Awarding Cross-Complainant damages as against all Cross-Defendants, in an amount to be determined at trial, together with punitive damages, incidental damages, including Cross-Complainant's reasonable attorney's fees, any applicable interest, and the costs of this action;

     5.     Declaratory Relief.  Enter Judgment in favor Cross-Complainant and against Cross-Defendants declaring the Goldwater Loan as invalid and unenforceable as against either Cross-Complainant or the Property; and

     6.     Such other relief as the court deems just and proper.


DATED:  June 10, 2021          HALL GRIFFIN LLP


By:    /s/ Damian P. Richard

     Howard D. Hall
     Damian P. Richard
     Attorneys for Defendant and Cross-Complainant SCOTT HOWLETT

HALL GRIFFIN

4826-4277-0670.1

Omnibus Joint Statement Part D, page 1255

1

## CERTIFICATE OF SERVICE

2
    I am employed in the County of Orange, State of .  I am over the age of 18 and not a party to the within action.  My business address is 1851 East First Street, 10th Floor, Santa Ana, CA 92705-4052.

3

4
    On June 10, 2021, I served the within document(s) described as**:**

5
**CROSS-COMPLAINT FOR:  1.  FRAUD AND DECEIT; 2.  NEGLIGENCE; 3.  EQUITABLE INDEMNITY; 4.  IMPLIED INDEMNITY; 5.  COMPARATIVE INDEMNITY; 6.  CONTRIBUTION; 7.  DECLARATORY RELIEF; and 8.  UNJUST ENRICHMENT**

6

7
    on each interested party in this action, as stated below:

8
**SEE ATTACHED SERVICE LIST**

9

10
    **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

11

12
    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

13

14
    Executed on June 10, 2021, at Santa Ana, California.

15

16

17
Rebecca Vogel

18

19

20

21

22

23

24

25

26

27

28

4826-4277-0670.1

Omnibus Joint Statement Part D, page 1256

1

2

**SERVICE LIST**
**Goldwater Bank, N.A. v. Artur Elizarov, et al.**
**Case No. 5:21-cv-00616-JWH-SP**

3  Sean C. Wagner, Esq.                    W. Keith Wyatt, Esq.

4  Derek M. Bast, Esq.                     Marie Maurice, Esq.
   Wagner Hicks PLLC                       Ivie, McNeill, Wyatt, Purcell & Diggs

5  831 East Morehead Street, Suite 860     444 S. Flower Street, Suite 1800
   Charlotte, NC 28202                     Los Angeles, CA 90071-2919

6  (704) 705-7538; Fax: (704) 705-7787     (213) 489-0028; Fax: (213) 489-0552
   sean.wagner@wagnerhicks.law             wkyatt@imwlaw.com
   derek.bast@wagnerhicks.law              mmaurice@imwlaw.com

7  **Pro Hac Vice Attorneys for Plaintiff**   **Local Counsel for Plaintiff Goldwater**
   **Goldwater Bank. N.A.**                 **Bank. N.A.**

8

9  Ilya Alekseyeff, Esq.
   Loia, Inc. (APLC)

10 8721 Santa Monica Blvd., #119
   West Hollywood, CA 90069

11 (213) 537-4592
   ilya@loia.legal

12 **Attorneys for Defendant Artur**
   **Elizarov**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HALL GRIFFIN

---

CROSS-COMPLAINT

4826-4277-0670.1

# EXHIBIT 52

# Joint Rule 26(f) Report (Dkt No. 57) (Filed 6/25/21) (Excerpts)

**SEAN C. WAGNER** (*Pro Hac Vice*)
Sean.Wagner@wagnerhicks.law
**DEREK M. BAST** (*Pro Hac Vice*)
Derek.Bast@wagnerhicks.law
**WAGNER HICKS PLLC**
831 East Morehead Street, Suite 860
Charlotte NC 28202
Tel: (704) 705-7538; Fax: (704) 705-7787
Attorneys for Plaintiff,
**GOLDWATER BANK, N.A.**

**JOHN FOREST HILBERT (S.B.N. 105827)**
jhilbert@hscallaw.com
Hilbert and Satterly LLP
409 Camino Del Rio South, Suite 104
San Diego, CA 92108
Tel: (619) 795-0300

**W. KEITH WYATT (S.B.N.: 80859)**
**MARIE MAURICE (S.B.N.: 258069)**
mmaurice@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 S. Flower Street, Suite 1800
Los Angeles, CA 90071-2919
Tel: (213) 489-0028; Fax (213) 489-0552

Local Counsel for Plaintiff,
**GOLDWATER BANK, N.A.**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Goldwater Bank, N.A. | Case No. 5:21-cv-00616-JWH-SP |
| *Plaintiff,* | |
| vs. | **JOINT RULE 26(f) REPORT** |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWLETT; BANK OF THE WEST; and ILYA ALEKSEYEFF | |
| *Defendants.* | |

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, counsel for Goldwater Bank, N.A. ("Goldwater"), Artur Elizarov ("Elizarov"), Scott Howlett

Howlett seeks to recover undisclosed damages, and punitive damages, against both Goldwater and Elizarov, including damages in the form of attorney's fees incurred under the *tort of another* doctrine.

**6.** __Insurance__

At this time, Goldwater is unaware of any insurance coverage for the liability alleged in Howlett's crossclaims.

Howlett contends that Goldwater's liability, as alleged in Howlett's crossclaims, was caused by the failure to record the DOT, and subsequent concealment and refusal to cure such failure, is, upon information and belief, insured by a lender's policy of title insurance issued by FATCO.

Real Advantage Title Insurance Co. issued a policy of title insurance to Howlett.

**7.** __Motions__

Goldwater does not at this time anticipate a further amendment to its pleadings. Goldwater does expect to file a motion to dismiss the cross-claims asserted against it by Howlett.

Elizarov has a motion to dismiss Goldwater's amended complaint under Rule 12(b)(6) pending. Alekseyeff will file his motion to dismiss Goldwater's amended complaint under Rule 12(b)(6) by June 25, 2021. Elizarov will move to dismiss Howlett's cross-complaint under Rule 12(b)(6) by Thursday, July 1, 2021.

Elizarov plans to implead Orange Coast Title Company of Southern California for damages based on negligence.

Howlett plans to file a motion for summary judgment.

**8.** __Complex Cases__

The Parties do not believe the procedures in the manual for complex litigation are necessary at this time.

**9.** __Status of Discovery__

Omnibus Joint Statement Part D, page 1260

At this time, the parties anticipate trial counsel will be the following:

Goldwater:  Sean Wagner and Derek Bast of Wagner Hicks, PLLC

Elizarov: Ilya Alekseyeff of LOIA, Inc. (APLC)

Howlett: Howard Hall and Damian Richard of Hall Griffin LLP.

Alekseyeff: *pro per*

Unison and Bank of the West:  Presently unknown

## 17.  **Independent Expert**

The parties do not believe an independent expert or master is required.

## 18.  **Amending Pleadings**

See Exhibit A for the parties' proposed Schedule of Pretrial and Trial Dates for Civil Cases

## 19.  **Other Issues**

Although Defendants Unison and Bank of the West have both been served, they have not yet appeared in this case.  Their appearance, and any Rule 12 motions or claims they may assert, may require adjustments to the case schedule.  There is a related case currently before the Court, *Elizarov v. Goldwater Bank, N.A.*, 2:21-cv-04679-JWH-SP, in which a motion to dismiss is presently pending.  At this time, Goldwater does not expect that the related case will impact the schedule of this action.

## 20.  **Consent to Magistrate**

The parties have not consented to a magistrate.


Date:  June 25, 2021.                    PURCELL & DIGGS
                                         /s/ Marie Maurice
                                         _____
                                         W. Keith Wyatt, Esq.
                                         Marie Maurice, Esq.

                                              AND
                                         HILBERT AND SATTERLY, LLP
                                         /s/ John Hilbert
                                         _____
                                         John Forest Hilbert

Omnibus Joint Statement Part D, page 1261

AND

WAGNER HICKS PLLC
/s/ Derek M. Bast
Sean C. Wagner, Esq.
Derek M. Bast, Esq.
ATTORNEYS FOR DEFENDANTS GOLDWATER BANK
N.A. AND WAGNER HICKS, PLLC

Date: June 25, 2021.


/s/ Ilya Alekseyeff
Ilya Alekseyeff, Esq.
LOIA, Inc.
8721 Santa Monica Blvd # 119
West Hollywood, CA 90069

DATED: June 25, 2021            HALL GRIFFIN LLP



By:      /s/ Damian Richard
     Damian P. Richard
Attorneys for Defendant
SCOTT HOWLETT

## CERTIFICATE OF SERVICE

I certify that all counsel of record who has consented to electronic notification is being served on June 25, 2021 with a copy of **JOINT RULE 26(f) REPORT** via the Court's CM/ECF system.

/s/ Derek M. Bast
Derek M. Bast

# EXHIBIT 53

# April 1, 2021 Letter from Goldwater's Counsel to Elizarov (Dkt Nos. 30-6 and 124-2) (Filed 4/28/21 and Refiled 1/03/22)



**WAGNER HICKS PLLC**
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
(704) 705-7787

**DEREK M. BAST**
Attorney at Law
(704) 705-8311
derek.bast@wagnerhicks.law

April 1, 2021

**VIA EMAIL**

Artur Elizarov
9350 Wilshire Blvd
Suite 203
Beverly Hills, CA 90212
Arthur.elizarov@gmail.com
Art@dhr.company

>   **Re:   DEMAND FOR TRANSFER OF PROCEEDS OF PROPERTY SALE**
>   **Loan # 909216931**
>   **Property Address: 291 W. Overlook Road, Palm Springs, California 92264-8934**

Dear Mr. Elizarov:

Our firm is counsel to Goldwater Bank, N.A. ("Goldwater") with regard to claims arising from the above loan (the "Loan") and the sale of the property located at 291 W. Overlook Road, Palm Springs, California 92264-8934 (the "Property"). The Loan is secured by a deed of trust and a promissory note in the amount of $686,250.00 dollars, dated July 31, 2019.

We are aware that you previously communicated with Goldwater regarding a payoff of the Loan in advance of a sale of the property. Indeed, you had previously made certain representations to Goldwater regarding the payoff amount that would be directed to Goldwater. We are aware that the proceeds from the sale were paying prior liens held by Goldwater, Unison Midgard Holdings, LLC, and a separate holder of a mechanic's lien. Pursuant to your conversations with Goldwater, $675,000 was to be paid to Goldwater immediately following the sale.

Goldwater has since learned, however, that the sale of the property occurred on or about March 29, 2021, by grant deed to Scott Howlett. Goldwater has received no proceeds from the sale. Alarmingly, when Goldwater reached out to you to ask about the status of the proceeds, you denied that the closing had occurred and quickly terminated the phone call. Your misrepresentations regarding the status of the sale and your sudden refusal to communicate with Goldwater are highly concerning. Goldwater will not tolerate your wrongful retention of the proceeds of the sale.

We are also aware that you are a real estate broker licensed to do business in the State of California (License ID # 01954357).  The fact that you are a real estate professional makes your wrongful retention of the funds particularly egregious, as you are surely well aware of your rights and responsibilities to pay off lienholders on a real estate transaction.  If this matter is not promptly resolved, we may bring this matter to the attention of the California Department of Real Estate.

Goldwater demands the promised funds of $675,000 be immediately returned to Goldwater.  I have attached a copy of the wiring instructions by which the funds can be returned to Goldwater as **Exhibit 1**.  If the funds are not returned by **5:00 p.m. PST tomorrow, on April 2, 2021**, Goldwater will be initiating litigation against you to foreclose on the Loan and seek a judgment against you for the full amount of the Loan and other damages allowed by law and the Loan documents, including Goldwater's attorney's fees.

Please direct all further communications in this matter to our firm.

Sincerely,

Derek M. Bast



EXHIBIT 1

# **Wire Instructions for Goldwater Bank Customers:**

To:           Goldwater Bank, NA
                    2525 E. Camelback Rd. Suite 1100
                    Phoenix, AZ 85016
                    ABA #122106277

Final Credit:  Client Name / Client Account Number / Attn: Loan Operations

# <u>EXHIBIT 54</u>

# <u>Order issuing Preliminary Injunction (Dkt No. 162) (Entered 4/19/22)</u>

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   GOLDWATER BANK, N.A.,              Case No. 5:21–cv–00616–JWH–SPx

12              Plaintiff,              **PRELIMINARY INJUNCTION**
                                        **ORDER**
13        v.

14   ARTUR ELIZAROV;
     UNISON AGREEMENT CORP.; and
15   SCOTT HOWELL,

16              Defendants.

17   ―――――――――――――――――――
     AND RELATED COUNTERCLAIMS
18      AND CROSSCLAIMS.

19
20
21
22
23
24
25
26
27
28

Before the Court is its order to show cause why a preliminary injunction should not issue.  The Court conducted a hearing on this matter on March 4, 2022.[1]  After considering the arguments of all parties at the hearing and reviewing their recent written responses[2] and previous filings,[3] the Court orders that a preliminary injunction is **GRANTED**, as set forth herein.

## I.  BACKGROUND

The parties are familiar with the facts and procedural history of this case.  A succinct summary of the relevant allegations follows:

The central dispute in this case concerns a parcel of real property in Palm Springs, California (the "Subject Property"), for which Plaintiff Goldwater Bank, N.A. provided a mortgage loan to Defendant Artur Elizarov.[4]  Goldwater failed, however, to record its Deed of Trust with the Riverside County Register of Deed's Office.[5]  Elizarov subsequently defaulted on that loan and then sold the Subject Property to Defendant Scott Howlett without informing Goldwater.[6]  Howlett was unaware of Goldwater's loan or interest in the property.[7]  Elizarov ultimately received $785,741.36 in cash proceeds from the sale of the Subject

---

[1]     *See* Min. Order of Video H'rg [ECF No. 151].

[2]     The Court considered:  (1) Pl.'s Suppl. Br. on Prelim. Inj. (the "Goldwater Brief") [ECF No. 158]; and (2) Def.'s Mem. in Opp'n to Prelim. Inj. (the "Elizarov Brief") [ECF No. 157].

[3]     The Court also considered the following:  (1) Pl.'s *Ex Parte* Appl. for TRO (the "Application") [ECF No. 19]; (2) Def.'s Opp'n to the Application [ECF No. 30]; (3) Pl.'s Reply in Supp. of the Application [ECF No. 31]; (4) Def.'s Suppl. Opp'n to Prelim. Inj. [ECF No. 38]; (5) Pl.'s Suppl. Br. in Supp. of Prelim. Inj. [ECF No. 39]; (6) Def.'s Reply in Opp'n to Prelim. Inj. [ECF No. 40]; and (7) Pl.'s Suppl. Resp. Br. [ECF No. 41].

[4]     *See, e.g.*, Am. Compl. (the "Amended Complaint") [ECF No. 44] ¶ 12.

[5]     *Id.* at ¶ 49.

[6]     *Id.* at ¶¶ 36, 54, & 55.

[7]     *See e.g.*, Howlett's First Am. Crosscompl. (the "Amended Crosscomplaint") [ECF No. 97] ¶¶ 13-18.

-2-

Property,[8] which Elizarov used to purchase real property in Florida instead of paying his debt to Goldwater.[9]

In April 2021, the Court issued a temporary restraining order that enjoined Elizarov and all persons acting in concert with him "from transferring, alienating, or expending the proceeds that Elizarov received from the sale of the Subject Property."[10]  The TRO also ordered the parties to show cause why a preliminary injunction should not issue.[11]

After receiving briefing from the parties and conducting a hearing on the matter, the Court issued an amended and extended temporary restraining order.[12]  The Amended TRO restrained and enjoined Elizarov and all persons acting in concert with him "from transferring, alienating, encumbering (including by a mechanics lien), or disposing of the Florida 'homestead' and real property located in Broward County (or any legal right or beneficial interest therein)" and "from transferring, alienating, encumbering, or disposing of the remaining proceeds from the sale of the Subject Property in the amount of $70,000."[13]  Through the Amended TRO, the Court directed parties to file supplementary briefing regarding the propriety of a preliminary injunction.[14]  At the March 4, 2022, hearing, the Court directed the parties to file one more round of supplemental briefing.

---

[8]    Amended Complaint ¶ 61.

[9]    *Id.* at ¶¶ 76-78.

[10]   TRO and Order to Show Cause Regarding Prelim. Inj. (the "TRO") [ECF No. 23] 9:12-20.

[11]   *Id.* at 9:25-26.

[12]   Am. and Extended TRO and Order to Show Cause (the "Amended TRO") [ECF No. 32].

[13]   *Id.* at 7:12-20.

[14]   *Id.* at 7:21-8:2.

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citations omitted).  An injunction is binding only on parties to the action, their officers, agents, servants, employees, and attorneys and those "in active concert or participation" with them.  Fed. R. Civ. P. 65(d)(2).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

## III.  DISCUSSION

In the TRO and the Amended TRO, the Court discussed why the *Winters* factors weighed in Goldwater's favor.[15]  The Court need not repeat its analysis here.  At issue now are the issues raised in the briefing and hearings regarding the propriety of a preliminary injunction.

Elizarov argues that a preliminary injunction should not issue because the Court lacks the power to freeze the sale proceeds.[16]  Elizarov contends that because Goldwater seeks "a purely legal remedy[,]" the Court must follow the precedent set in *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527

---

[15]      *See* Amended TRO 6:11-16; TRO 6:1-9:7.

[16]      *See* Elizarov Brief 2:1.

-4-

1  U.S. 308, 310 (1999).[17]  In *Grupo Mexicano*, the Supreme Court held that a

2  district court has "no authority to issue a preliminary injunction preventing

3  [defendants] from disposing of their assets pending adjudication of [plaintiff's]

4  contract claim for money damages."  *Id.* at 527 U.S. at 333.

5      The problem with Elizarov's argument is two-fold.  First, he is wrong in

6  averring that Goldwater seeks a purely legal remedy.  Goldwater's second claim

7  for relief is for unjust enrichment,[18] which is an "***equitable principle*** that

8  underlies various legal doctrines and remedies."  *Cty. of San Bernardino v.*

9  *Walsh*, 158 Cal. App. 4th 533, 542 (2007), *as modified on denial of reh'g* (Jan. 25,

10 2008), *as modified* (Jan. 28, 2008) (emphasis added).  Second, *Grupo Mexicano*

11 "applies only to cases seeking *exclusively* legal damages."  *Sec. & Exch. Comm'n*

12 *v. Liu*, 851 F. App'x 665, 668 (9th Cir. 2021) (emphasis in original) (citing

13 *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *In re Focus Media Inc.*,

14 387 F.3d 1077, 1084-85 (9th Cir. 2004)).

15      After considering the arguments that the parties raised in their papers and

16 at the hearing, the Court finds that a preliminary injunction is warranted.  *See*

17 *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (holding that a "district

18 court need not consider arguments raised for the first time in a reply brief" and

19 therefore a district court need not consider arguments not raised at all).  Because

20 the *Winters* factors weigh heavily in Goldwater's favor, and because *Grupo*

21 *Mexicano* does not prohibit the issuance of a preliminary injunction when the

22 plaintiff seeks equitable relief, the Court will issue a preliminary injunction.

23      Neither party addresses whether Goldwater should be compelled to

24 provide a larger (or smaller) bond.  Accordingly, the Court finds it appropriate

25 to keep in place the $2,500 bond that Goldwater previously posted.[19]

26 _____

27 [17]    *Id.* at 1:21-2:9.

   [18]    *See* Amended Complaint ¶¶ 93-95.

28 [19]    *See* TRO 9:20-22.

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      Defendant Artur Elizarov and his agents, representatives, and all persons acting in concert with him are **RESTRAINED AND ENJOINED** from transferring, alienating, encumbering (including by a mechanics lien), or disposing of the Florida "homestead" and real property located at 2735 NE 10th Ave., Wilton Manors, Florida 33334, or any legal right or beneficial interest therein.

2.      Defendant Elizarov and his agents, representatives, and all persons acting in concert with him are **RESTRAINED AND ENJOINED** from transferring, alienating, encumbering, or disposing of the remaining proceeds from the sale of the Subject Property in the amount of $70,000.

3.      This Order shall remain in effect until further order of the Court.

4.      The bond of $2,500 previously posted by Goldwater shall remain in place to satisfy the standard set forth in Rule 65(c) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Dated: April 19, 2022

John W. Holcomb
UNITED STATES DISTRICT JUDGE

# **EXHIBIT 55**

# **Notice of Appeal (Dkt No. 163) (Filed 4/19/22)**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF  CALIFORNIA (CENTRAL)

### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

U.S. District Court case number:

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court:

Date of judgment or order you are appealing:

Docket entry number of judgment or order you are appealing:

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

○ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Is this a cross-appeal?  ○ Yes    ○ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?  ○ Yes    ○ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City:          State:          Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature**          **Date**

*Complete and file with the attached representation statement in the U.S. District Court*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?    ○ Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                              *1*                              *New 12/01/2018*

Omnibus Joint Statement Part D, page 1277

Continued list of parties and counsel: *(attach additional pages as necessary)*

## Appellants

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

## Appellees

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *2*                    *New 12/01/2018*

Omnibus Joint Statement Part D, page 1278

# **EXHIBIT 56**

# **Ninth Circuit Letter Dated 4/19/22 (Dkt No. 164) (Filed 4/21/22)**



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

April 19, 2022

No.:              22-55404

D.C. No.:         5:21-cv-00616-JWH-SP

Short Title:      Goldwater Bank, N.A. v. Artur Elizarov, et al

Dear Appellant/Counsel

A copy of your notice of appeal/petition has been received in the Clerk's office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. You must indicate this Court of Appeals docket number whenever you communicate with this court regarding this case.

Please furnish this docket number immediately to the court reporter if you place an order, or have placed an order, for portions of the trial transcripts. The court reporter will need this docket number when communicating with this court.

**Preliminary Injunction Appeal. Circuit Rule 3-3.**

**Briefing schedule will be set by future court order.**

# **<u>EXHIBIT 57</u>**

# **<u>Ninth Circuit Order Affirming Preliminary Injunction (Dkt No. 250) (Filed 1/25/23)</u>**

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JAN 25 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GOLDWATER BANK, N.A., | No.    22-55404 |
|             Plaintiff-Appellee, | D.C. No. 5:21-cv-00616-JWH-SP |
|  v. | |
| ARTUR ELIZAROV, | MEMORANDUM[*] |
|             Defendant-Appellant, | |
|  and | |
| UNISON AGREEMENT CORP.; et al., | |
|             Defendants. | |

Appeal from the United States District Court
for the Central District of California
John W. Holcomb, District Judge, Presiding

Argued and Submitted November 16, 2022
Pasadena, California

Before:  WARDLAW and W. FLETCHER, Circuit Judges, and KORMAN,[**] District Judge.

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]    The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

This appeal arises out of a mortgage loan issued by Goldwater Bank ("Goldwater") to Artur Elizarov ("Elizarov") for a home in California (the "Subject Property") in July 2019. Elizarov defaulted on the mortgage loan in April 2020. Because Goldwater's deed of trust was unrecorded, Elizarov was able to sell the home unencumbered by a deed of trust. He received a majority of the proceeds of the sale of the home (the "Proceeds") and purchased a home in Florida for cash with the Proceeds. Goldwater filed a complaint seeking recovery of its loan and a preliminary injunction restraining Elizarov from further dissipating any Proceeds. The district court issued a preliminary injunction that restrained and enjoined Elizarov from transferring, alienating, encumbering, or disposing of his Florida property and the remaining Proceeds. Elizarov appeals, arguing that the district court abused its discretion by entering the preliminary injunction and by setting the bond at $2,500. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We affirm.

1.      A plaintiff seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm if the injunction is not granted; (3) that the balance of equities weighs in the plaintiff's favor; and (4) that an injunction is in the public interest. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). At issue in this appeal is whether the district court abused its discretion in finding that Goldwater had demonstrated a likelihood of success on

2

the merits and a likelihood of irreparable harm.

The parties dispute the applicability of *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) here.  Elizarov concedes that *Grupo Mexicano* applies "only to the case where legal remedies are sought and does not apply to cases where equitable relief is also available."  Because Goldwater seeks the equitable relief of a constructive trust in addition to legal remedies, *Grupo Mexicano*'s prohibition on asset-freezing injunctions does not apply here.  *See Johnson v. Couturier*, 572 F.3d 1067, 1083–84 (9th Cir. 2009) ("The Supreme Court expressly stated that a preliminary injunction barring asset transfer is available where the suit seeks equitable relief.").

Under California law, a constructive trust can be established where (1) a specific, identifiable property interest exists; (2) the plaintiff has a right to that property interest; and (3) the defendant wrongfully acquired or detained the property interest.  *See Higgins v. Higgins*, 11 Cal. App. 5th 648, 659 (2017); Cal. Civ. Code §§ 2223, 2224.  A plaintiff seeking such relief need not show the absence of an adequate remedy at law.  *See GHK Assocs. v. Mayer Grp.*, 224 Cal. App. 3d 856, 878 (1990).  Goldwater seeks the establishment of a constructive trust over "the proceeds received by Elizarov in connection with the sale of the Subject Property."  The district court found that Goldwater was likely to succeed

3

on the merits of its equitable claim[1] because Goldwater "provided evidence . . . of a note secured with a deed of trust on the Subject Property," as well as evidence that Elizarov "was aware of his obligation to repay the note," but that he misled Goldwater "regarding the status of the sale of the Subject Property." Pursuant to the deed of trust, Goldwater was entitled to proceeds from a sale of the Subject Property and thus has an interest in the property here. Goldwater has also shown Elizarov wrongfully acquired the Proceeds by pleading breach of contract, fraud, and fraudulent transfer. Therefore, the district court did not abuse its discretion in concluding that Goldwater has demonstrated a likelihood of success on the merits because the record plausibly supports Goldwater's constructive trust claim.

The district court also found that "Elizarov's conduct and his purported insolvency suggest an intention to dissipate or alienate the funds received from the sale of the Subject Property." Dissipation of assets can create a likelihood of irreparable harm. *See In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004); *Johnson*, 572 F.3d at 1085. The record contains sufficient evidence to suggest a pattern of dissipation of assets by Elizarov, such as his

---

[1] Although the district court relied on Goldwater's unjust enrichment claim—which fails as a matter of law because there is a valid contract between the parties—in its analysis of Goldwater's likelihood of success on the merits rather than Goldwater's constructive trust remedy, we are free to affirm "on any ground raised below and fairly supported by the record." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th Cir. 2015) (quoting *Columbia Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).

misrepresentations regarding the sale of the Subject Property; his failure to pay the

Proceeds owed to Goldwater; his termination of communication with Goldwater;

and his quick, all-cash purchase of property in Florida using the Proceeds after

receiving a pre-litigation demand letter.  Based on this record, the district court's

finding that Elizarov intended to transfer or alienate the Proceeds owed to

Goldwater was not "illogical, implausible, or without support from inferences that

may be drawn from facts in the record." *Pac. Radiation Oncology, LLC v.

Queen's Med. Ctr.*, 810 F.3d 631, 635 (9th Cir. 2015).  Thus, we find that the

district court did not abuse its discretion by finding a likelihood of irreparable

harm.

2.     The district court did not abuse its discretion in setting the bond at

$2,500.  Because a "district court is in a far better position to determine the amount

and appropriateness of the security required under [Federal Rule of Civil

Procedure] 65," the district court is afforded wide "discretion in determining" the

bond amount,  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir.

2005) (citations and internal quotation marks omitted), and can even dispense with

the security requirement entirely where a party will not suffer damages from the

injunction, *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878,

882 (9th Cir. 2003).   Elizarov has offered no evidence that he would suffer harm

from the injunction in excess of $2,500.  The district court was fully within its

5

Omnibus Joint Statement Part D, page 1286

discretion to set the preliminary injunction bond at $2,500.

**AFFIRMED.**

# **EXHIBIT 58**

# **Rule 11 Motion (Dkt No. 183) (Filed 9/7/22) (Excerpts)**

ILYA ALEKSEYEFF [CA 242462]
    ilya@loia.legal
LOIA, INC. (APLC)
727 W 7th St PH 1-13
Los Angeles, CA 90017
Tel: (213)537-4592

Attorney for Artur Elizarov

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GOLDWATER BANK, NA**, *Plaintiff,* | **5:21-cv-616-JWH-SP** |
| vs. | **MEMORANDUM SUPPORTING MOTION FOR SANCTIONS UNDER RULE 11** |
| **ARTUR ELIZAROV ET AL**, *Defendant.* | Date: 10/21/2022 Time: 9:00 AM Court: Hon. John W. Holcomb |
| **AND RELATED CROSS-ACTION.** | |

i

Dated: 08/08/2022

LOIA, INC. (APLC)

*Ilya Alekseyeff*
_____
By: Ilya Alekseyeff, Esq.
Attorney for Artur Elizarov

25

MEMORANDUM SUPPORTING MOTION FOR SANCTIONS UNDER
RULE 11

# CERTIFICATE OF SERVICE

I, Ilya Alekseyeff, certify that on August 8, 2022, I served the attached "MEMORANDUM SUPPORTING MOTION FOR SANCTIONS UNDER RULE 11" by mail as follows:

| | |
|---|---|
| Derek Bast<br>Wagner Hicks, PLLC<br>831 E Morehead St Ste 860<br>Charlotte, NC 28202 | Joseph LeVota<br>Hilbert Satterly LLP<br>409 Camino del Rio St Ste 104<br>San Diego, CA 92108 |
| Marie Maurice<br>Ivie McNeill Wyatt Purcell & Diggs,<br>444 S Flower St Fl 18<br>Los Angeles, CA 90071-2919 | |

I further certify that on that on August 8, 2022, I also served the attached "MEMORANDUM SUPPORTING MOTION FOR SANCTIONS UNDER RULE 11" by email as follows:

1. Derek Bast, derek.bast@waghernicks.law
2. Marie Maurice, mmaurice@imwlaw.com
3. Joseph LeVota, jlevota@hscallaw.com
4. Ryan Thomason, rthomason@hallgriffin.com
5. Nabil Bisharat, nbisharat@orsusgate.com

I declare under penalty of perjury under the laws of the United States that the above certification is true and correct.

Date: 08/08/2022        Signature: *Ilya Alekseyeff*

26

MEMORANDUM SUPPORTING MOTION FOR SANCTIONS UNDER RULE 11

# EXHIBIT 59

# Order denying Rule 11 Motion (Dkt No. 257) (Filed 2/13/23) (Excerpts)

1
2
3
4
5
6
7
8
## UNITED STATES DISTRICT COURT
9
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11 GOLDWATER BANK, N.A.,

12          Plaintiff,

13     v.

14 ARTUR ELIZAROV;
UNISON AGREEMENT CORP.;
15 SCOTT HOWELL;
BANK OF THE WEST; and
16 ILYA ALEKSEYEFF,

17          Defendants.

18 ─────────────────────────────

19 AND RELATED COUNTERCLAIMS
    AND CROSSCLAIMS.

Case No. 5:21–cv–00616–JWH–SPx

**ORDER REGARDING MOTION OF DEFENDANT ARTUR ELIZAROV FOR SANCTIONS [ECF No. 182]**

20
21
22
23
24
25
26
27
28

costs associated with defending against a sanctions motion. *See Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001) ("A party defending a Rule 11 motion need not comply with the separate document and safe harbor provisions when counter-requesting sanctions.").

### IV. CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      Elizarov's Motion is **DENIED**.

2.      Goldwater Bank is **DIRECTED** to file no later than February 24, 2023, a motion for its fees and expenses associated with opposing the Motion. Goldwater Bank's memorandum in support of that motion is not to exceed three pages.  Goldwater Bank may file a declaration supporting the quantum of the fees and expenses that it incurred.

3.      Elizarov may file no later than March 3, 2023, a memorandum—not to exceed five pages—in opposition to Goldwater Bank's anticipated motion.

4.      The hearing on Goldwater Bank's anticipated motion is **SET** for March 17, 2023, at 9:00 a.m. in Courtroom 9D of the Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th Street, Santa Ana, California.

**IT IS SO ORDERED.**

Dated: February 13, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE

# EXHIBIT 60

# Goldwater's Notice of Motion and Motion for Attorneys' Fees following denial of Rule 11 Motion (Dkt No. 259) (Filed 2/24/23) (Excerpts)

1  Sean C. Wagner (Pro Hac Vice)
   Abbey M. Krysak (Pro Hac Vice)
2  **WAGNER HICKS PLLC**
   831 East Morehead Street, Suite 860
3  Charlotte, North Carolina 28202
   Tel: (704) 705-7538
4  Fax: (704) 705-7787

5  John Forest Hilbert, Esq. (SBN 105827)
   Joseph A. LeVota, Esq. (SBN 262760)
6  **HILBERT & SATTERLY LLP**
   409 Camino del Rio S. #104
7  San Diego, California 92108
   Telephone:  (619) 795-0300
8  Facsimile:   (619) 501-6855

9  Marie B. Maurice (SBN 258069)
   Marina Samson (SBN 315024)
10 **IVIE McNEILL WYATT PURCELL & DIGGS**
   444 S. Flower Street, Suite 1800
11 Los Angeles, California 90071
   Telephone:  (213) 489-0028
12 Facsimile:   (213) 489-0552

13 Counsel for Plaintiff
   GOLDWATER BANK, N.A.

14

15 **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**

16 | **GOLDWATER BANK, N.A.**, | Case No. 5:21-cv-00616-JWH-SPx |
17 | | *Assigned to the Hon. John W. Holcomb* |
   | Plaintiff, | |
18 | | **PLAINTIFF'S NOTICE AND MOTION** |
19 | v. | **FOR ATTORNEYS' FEES AND** |
   | | **EXPENSES BASED UPON DEFENDANT** |
20 | **ARTUR ELIZAROV**, *ET AL*. | **ARTUR ELIZAROV'S FRIVOLOUS** |
21 | | **"MOTION FOR SANCTIONS UNDER** |
   | Defendants. | **RULE 11" [ECF No. 182]** |
22 | | |
23 | | Hearing date:  March 17, 2023 |
   | | Hearing time: 9:00 a.m. |
24 | | Courtroom:  9D |
25 | | Pre-Trial Conf.: July 14, 2023 |
26 | | Trial Date: August 7, 2023 |
   | | Discovery Cut-off: March 17, 2023 |
27

28 NOTICE OF MOTION AND MOTON FOR ATTORNEYS' FEES AND EXPENSES
   -1-

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

      **NOTICE IS HEREBY GIVEN** that on March 17, 2023, at 9:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 9D of the above entitled court, located at 3470 Twelfth Street, Riverside CA 92501, Plaintiff Goldwater Bank, N.A. will and hereby does move for an Order awarding it all attorneys' fees and other expenses incurred in defending against Defendant Artur Elizarov and his counsel and co-Defendant Ilya Alekseyeff's frivolous and vexatious "Motion for Sanctions Under Rule 11," filed in this Court on September 7, 2022 [ECF No. 182]. Goldwater notices and makes this motion pursuant to FED. R. CIV. P. 11(C)(2) and this Court's Order of February 13, 2023, directing Goldwater to file a motion for its fees and expenses associated with opposing Elizarov and Alekseyeff's Motion for Sanctions, and further setting the hearing on the same to occur at the date, time, and location above. [ECF No. 257].

      The Motion is based upon this Notice of Motion and Motion, the memorandum of points and authorities filed herewith, the Declarations of Sean C. Wagner and Joseph A. LeVota and the documentation appended thereto, all papers and pleadings on file in this case, and upon such other evidence and argument as the Court may consider at or before the hearing on this Motion.

      Dated: February 24, 2023

                     Respectfully submitted,

                     **WAGNER HICKS PLLC**

                     By: */s/ Sean C. Wagner*
                         Sean C. Wagner, Esq.
                         Abbey M. Krysak, Esq.

                         AND

                     **HILBERT & SATTERLY LLP**

**NOTICE OF MOTION AND MOTON FOR ATTORNEYS' FEES AND EXPENSES**

-2-

1

2 John Forest Hilbert, Esq.
 Joseph A. LeVota, Esq.

3

4 AND

5 **IVIE McNEILL WYATT PURCELL & DIGGS**

6

7 Marie B. Maurice, Esq.
 Marina Samson

8

9 *ATTORNEYS FOR DEFENDANT*
 *GOLDWATER BANK N.A.*

10

11

12 **CERTIFICATE OF SERVICE**

  I hereby certify that I caused the foregoing "Plaintiff's Notice and Motion for

13 Attorneys' Fees and Expenses Relative to Defendant Artur Elizarov's Frivolous

14 'Motion for Sanctions Under Rule 11'" to be filed electronically with the Clerk of

15 Court using the CM/ECF system, which will send notification of such filing to all

registered CM/ECF users.

16

  This the 24th day of February, 2023.

17

18     */s/ Sean C. Wagner*

19     Sean C. Wagner

20

21

22

23

24

25

26

27

28 **NOTICE OF MOTION AND MOTON FOR ATTORNEYS' FEES AND EXPENSES**
      -3-

# **EXHIBIT 61**

# **Order Granting Goldwater's Motion for Attorneys' Fees (Dkt No. 279) (Entered 5/9/23)**

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDWATER BANK, N.A., | Case No. 5:21-cv-00616-JWH-SP |
| Plaintiffs, | |
| v. | **ORDER REGARDING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [ECF No. 259]** |
| ARTUR ELIZAROV; UNISON AGREEMENT CORP.; SCOTT HOWELL; BANK OF THE WEST; and ILYA ALEKSEYEFF, | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS AND CROSSCLAIMS | |

To understand why this Court now imposes monetary sanctions on Defendant Artur Elizarov for his frivolous motions—primarily through the conduct of Elizarov's attorney and domestic partner, co-Defendant Ilya Alekseyeff—one need simply review the history of this case. Although this Court's order requiring Elizarov to pay attorneys' fees was motivated by his baseless motion for sanctions under Rule 11 against Plaintiff Goldwater Bank, N.A.,[1] the entire record shows that Elizarov has engaged in a pattern of meritless filings that have served no purpose other than increasing litigation and imposing unnecessary costs on the parties and burden on this Court.

Before the Court is Goldwater's motion seeking an award of attorney's fees against Elizarov.[2] The Court finds this matter appropriate for resolution without a hearing. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support and in opposition,[3] the Court orders that the Motion is **GRANTED-in-part** and **DENIED-in-part**, for the reasons set forth herein.

## I. BACKGROUND

### A.    Factual Background

The central dispute in this case concerns a parcel of real property in Palm Springs, California (the "Palm Springs Property"), for which Goldwater originated a mortgage loan to Elizarov.[4] Much to its present chagrin, Goldwater failed to record its Deed of Trust with the Riverside County Register of Deed's Office.[5]

---

[1]    *See* Def.'s Mem. Supp. Mot. for Sanctions Under Rule 11 (the "Rule 11 Motion") [ECF No. 183].

[2]    Pl.'s Mot. for Att'y Fees & Expenses Based Upon Def.'s Frivolous Mot. for Sanctions Under Rule 11 (the "Motion") [ECF No. 259].

[3]    The Court considered the documents of record in this action, including the following papers: (1) Am. Compl. (the "Amended Complaint") (including its attachments) [ECF No. 44]; (2) Motion (including its attachments); and (3) Def.'s Opp'n to the Motion (the "Opposition") [ECF No. 264].

[4]    Amended Complaint ¶ 12.

[5]    *Id.* at ¶ 49.

1  Elizarov defaulted on that loan and then sold the property to Defendant
2  Scott Howlett, without informing Goldwater of the sale.[6]  Howlett was unaware
3  of Goldwater's loan or interest in the Palm Springs Property.[7]  Elizarov
4  ultimately received $785,741.36 in cash proceeds from the sale,[8] which Elizarov
5  used to purchase real property in Florida instead of paying his debt to
6  Goldwater.[9]

7  **B.    Procedural Background**

8  Goldwater filed this action against Elizarov in April 2021, asserting claims
9  for relief based upon allegations that Elizarov made several material
10  misrepresentations within his loan application, including misstatements about
11  his background, employment, and financial status.[10]  Goldwater also asserts
12  claims for civil conspiracy against Elizarov and Alekseyeff, alleging that
13  $84,843.22 in proceeds from Elizarov's sale of the Palm Springs Property was
14  used to pay off a debt owed by Alekseyeff.[11]

15  In the early weeks of this case, the Court granted Goldwater's application
16  for a temporary restraining order (the "<u>TRO</u>") that enjoined Elizarov from
17  further transferring, alienating, or expending his proceeds from the sale of the
18  Palm Springs Property.[12]  The Court converted the TRO into a preliminary
19  injunction,[13] which Elizarov appealed to the Ninth Circuit.  In January 2023, the

---

6    *Id.* at ¶¶ 36, 54, & 55.
7    *See*, *e.g.*, Def.'s Amended Crosscompl. [ECF No. 97] ¶¶ 13-18.
8    Amended Complaint ¶ 61.
9    *Id.* at ¶¶ 76-78.
10   *Id.* at ¶¶ 36 & 38-46.
11   *Id.* at ¶¶ 79 & 110-113.
12   *See* TRO and Order to Show Cause Regarding Preliminary Injunction [ECF No. 23].
13   *See* Preliminary Injunction Order [ECF No. 162].

Omnibus Joint Statement Part D, page 1302

Ninth Circuit affirmed this Court's preliminary injunction. *See Goldwater Bank, N.A. v. Elizarov*, 2023 WL 387037 (9th Cir. Jan. 25, 2023).

In June 2021, Elizarov filed two motions to dismiss Goldwater's Amended Complaint,[14] which this Court denied with respect to Goldwater's claims for breach of contract, unjust enrichment, fraud, fraudulent transfer, and conspiracy.[15] The Court did grant Elizarov's motion to dismiss Goldwater's claim for injunctive relief.[16]

Elizarov filed a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure against Goldwater in September 2022, alleging that Goldwater's claims for fraud, conspiracy, fraudulent transfer, and unjust enrichment lacked evidentiary support and were baseless under California law.[17] This Court denied Elizarov's Rule 11 Motion and, upon finding that Elizarov's motion for sanctions was itself subject to Rule 11 sanctions, directed Goldwater to file a motion for an award of the attorneys' fees and expenses that it incurred in opposing Elizarov's Rule 11 Motion.[18]

## II. LEGAL STANDARD

District courts may impose sanctions under their power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). A court may assess attorney's fees as a sanction when "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," including when a party has

---

[14] Def.'s Mot. to Dismiss Pl.'s Am. Compl. [ECF No. 52]; Def.'s Mot. to Dismiss Fourth & Fifth Claims of Pl.'s Am. Compl. [ECF No. 60].

[15] *See* Video Hearing re: Def.'s Mot. to Dismiss, etc. [ECF No. 93].

[16] *See id.*

[17] Rule 11 Motion 1:2-9.

[18] *See* Order re: the Rule 11 Motion (the "Sanctions Order") [ECF No. 257].

willfully disobeyed a court order. *Chambers*, 501 U.S. at 45 (internal quotations and citations omitted). A court may similarly impose attorney's fees as a sanction when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id.* at 46 (internal quotations and citation omitted). A court may even dismiss an action for a party's failure to prosecute or to comply with a court order. *See Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962) (citing Fed. R. Civ. P. 41(b)).

Those inherent powers of the court, however, "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45.

## III.  DISCUSSION

In lieu of opposing Goldwater's calculation of attorneys' fees, Elizarov instead used his Opposition to attempt to relitigate this Court's order imposing sanctions upon Elizarov.[19] While Elizarov's chosen course of action was unhelpful to the Court in calculating Goldwater's attorneys' fees, this Order will examine the merits of Elizarov's Opposition and explain why sanctions are appropriate in this case.

**A.    Rule 11(b) and Frivolous Claims**

Elizarov contends that Goldwater is not entitled to attorneys' fees because "Goldwater did not specifically identify factual allegations that lacked evidentiary basis or legal claims that were not warranted by the law. Fed. R. Civ. P. 11(b)(2), (3)."[20] Additionally, Elizarov asserts that Goldwater claimed that Elizarov's Rule 11 Motion was frivolous in only general terms, which claim does not comply with Rule 11's specificity requirements.[21]

---

[19]    *See generally* Opposition.
[20]    *Id.* at 1:22-25.
[21]    *Id.* at 1:24-27.

As a preliminary matter, a court may impose Rule 11 sanctions on its own initiative, and a formal motion by Goldwater was unnecessary in this case. *See* Fed. R. Civ. P. 11(c)(3); L.R. 11-9 ("The presentation to the Court of frivolous motions or opposition to motions (or the failure to comply fully with this rule) subjects the offender at the discretion of the Court to the sanctions of L.R. 83-7."). Such sanctions may include monetary sanctions or the imposition of costs and attorneys' fees to opposing counsel. L.R. 83-7.

Furthermore, in its opposition, Goldwater ***does*** specify why Elizarov's Rule 11 Motion was frivolous and lacked evidentiary or legal basis:

> The vast majority of the instant Motion does not advance legitimate arguments about Rule 11 but instead improperly deploys merits arguments, ignores the well-pleaded allegations in the Complaint, and seeks to relitigate Elizarov and Alekseyeff's motions to dismiss.[22]

Earlier in its opposition, Goldwater highlights why Elizarov's Rule 11 Motion was an improper attempt at relitigating his previously denied motion to dismiss.[23] In particular, Goldwater cites *Douglas v. TD Bank USA*, which held that "[a] Rule 11 motion for sanctions is not an appropriate substitute for summary judgment proceedings." *Douglas v. TD Bank USA*, 2021 WL 5861558, at *3 (D. Or. Aug. 11, 2021). Goldwater explains in depth that Rule 11 motions are inappropriate substitutes for motions addressing the merits, and Goldwater repeatedly argues that point throughout its opposition. *See GN Resound A/S v. Callpod, Inc.*, 2013 WL 5443046, at *4 (N.D. Cal. Sept. 30, 2013).

---

[22] Goldwater's Opposition to Elizarov's Motion for Sanctions (the "Rule 11 Opposition") [ECF No. 197] 26:19-22.

[23] *Id.* at 10:19-21.

1    In his reply, Elizarov acknowledges that his Rule 11 Motion "*does* test the

2    *evidentiary basis*" for Goldwater's claims,[24] but he offers no sound reason why

3    he filed a sanctions motion instead of a motion for summary judgment.

4    Moreover, in its opposition, Goldwater defends the factual basis for each of its

5    claims, and this Court outlined why Elizarov's Rule 11 Motion was

6    inappropriate regarding each of those claims.[25]

7    According to Ninth Circuit authority on Rule 11 sanctions, Elizarov was

8    clearly wrong in disguising a motion for summary judgment as a Rule 11 Motion.

9    "Among other grounds, a district court may impose Rule 11 sanctions if a paper

10   filed with the court is for an improper purpose, or if it is frivolous." *G.C. & K.B.*

11   *Invs., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003). The standard

12   governing both the "improper purpose" and "frivolous" inquiries is objective.

13   *See id.* (citing *Townsend v. Holman Consulting*, 929 F.2d 1358, 1362 (9th Cir.

14   1990) (*en banc*). "[T]he subjective intent of the . . . movant to file a meritorious

15   document is of no moment. The standard is reasonableness. The 'reasonable

16   man' against which conduct is tested is a competent attorney admitted to

17   practice before the district court." *Id.* (citing *Zaldivar v. City of Los Angeles*, 780

18   F.2d 823, 830 (9th Cir.1986)).

19   Here, Elizarov as much as admits that his Rule 11 Motion was the motion-

20   equivalent of a mulligan and that it was a thinly veiled attempt to relitigate his

21   denied motion to dismiss. Even if Elizarov, and his counsel Alekseyeff, thought

22   that the Rule 11 Motion was meritorious based upon their superior evidence, no

23   reasonable attorney admitted to practice before this Court would have

24   misconstrued a Rule 11 Motion with either a motion to dismiss or a motion for

25   summary judgment. *See Bell v. Nat'l Credit Servs. Inc.*, 2020 WL 8832899

---

[24]    Rule 11 Motion Reply [ECF No. 206] 4:1-4 (emphasis in original).

[25]    *See* Sanctions Order.

1   (W.D. Wash. Oct. 14, 2020), *report and recommendation adopted*, 2021 WL

2   928161 (W.D. Wash. Mar. 11, 2021) ("Counsel should know that Rule 11 is not

3   the vehicle to obtain a judgment on the merits as it applies only to the signing of

4   a pleading or motion and when evaluating the pleading, the Court looks

5   objectively at the attorney's conduct at the time of signing." (citing *Community*

6   *Elec. Serv. v. National Elec. Contractors Ass'n, Inc.*, 869 F.2d 1235, 1243 (9th Cir.

7   1989), *cert. denied*, 493 U.S. 891 (1989)).  As such, the frivolous nature of

8   Elizarov's Rule 11 Motion was sufficiently egregious to warrant sanctions under

9   Rule 11(b).

10  **B.    Rule 11(c)(6) and Sanctioned Conduct**

11       Elizarov contends that this Court did not sufficiently describe in its Order

12  what conduct by Elizarov or Alekseyeff was being sanctioned.[26]  Rule 11(c)(6)

13  requires that "[a]n order imposing a sanction must describe the sanctioned

14  conduct and explain the basis for the sanction."  Although Part III.A of the

15  instant Order discusses in depth the improper nature of Elizarov's Rule 11

16  Motion, this Court's previous Sanctions Order also plainly identified Elizarov's

17  sanctionable conduct:

18       Elizarov's Motion represents a pattern of vexatious behavior in the

19       instant action; the Court previously admonished Elizarov regarding

20       his filings.  Instead of heeding the Court's warning, Elizarov chose

21       instead to consume additional judicial resources with the instant

22       meritless Motion.[27]

23       With respect to sanctions motions, the Federal Rules provide that "[i]f

24  warranted, the court may award to the prevailing party the reasonable expenses,

25  including attorney's fees, incurred for the motion."  Fed. R. Civ. P. 11(c)(2); *see*

26

27  ───────────────

    [26]   Opposition 1:27-2:5.

28  [27]   Sanctions Order 10:15-19.

1   *also* L.R. 83-7 (allowing courts to impose costs and attorneys' fees to opposing

2   counsel for bad faith or willful disobedience of a court order).  Furthermore,

3   pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the

4   proceedings in any case unreasonably and vexatiously may be required by the

5   court to satisfy personally the excess costs, expenses, and attorneys' fees

6   reasonably incurred because of such conduct."

7        Moreover, Elizarov—and his attorney Alekseyeff—should have known

8   that merely ***filing*** a Rule 11 Motion against Goldwater created a risk that this

9   Court would impose sanctions against Elizarov.  As the Advisory Committee's

10  notes on Rule 11 state:

11       As under former Rule 11, ***the filing of a motion for sanctions is itself***

12       ***subject to the requirements of the rule and can lead to sanctions.***

13       However, service of a cross motion under Rule 11 should rarely be

14       needed since under the revision the court may award to the person

15       who prevails on a motion under Rule 11—whether the movant or the

16       target of the motion-reasonable expenses, including attorney's fees,

17       incurred in presenting or opposing the motion.

18  Fed. R. Civ. P. 11. (emphasis added); *see also Patelco Credit Union v. Sahni*, 262

19  F.3d 897, 913 (9th Cir. 2001) (imposing costs and attorneys' fees as a counter-

20  sanction for the defendant filing an improper sanctions motion).  Because

21  Elizarov forced Goldwater to defend itself against an improper and legally

22  baseless Rule 11 Motion, Elizarov opened the door to the instant imposition of

23  an award to Goldwater of its costs and attorneys' fees.

24  **C.   Deterrence and Frivolous Filings**

25       Elizarov's final argument against the Court's imposition of costs and fees

26  is that it will not deter him from "making 'frivolous' arguments" and that it is

27  "impossible for Elizarov and his counsel to determine what they must do to

28

improve."[28]  Although this Court's Sanctions Order made it plainly obvious why Elizarov's Rule 11 Motion was inappropriate, in the intervening months Elizarov has continued to file baseless motions, most recently through his and Alekseyeff's motion to disqualify Magistrate Judge Sheri Pym.[29]  Although the Court did not sanction Elizarov or Alekseyeff for that frivolous filing, both Elizarov and Alekseyeff have been on notice[30] that it is precisely the type of baseless motion that the instant award is meant to deter.

In their Motion to Disqualify, Elizarov and Alekseyeff complained about Magistrate Judge Pym's candid review of their case during confidential settlement negotiations that took place over a year ago.[31]  Specifically, Elizarov and Alekseyeff took issue with Magistrate Judge Pym's frank assessment of Alekseyeff's conduct, in which she allegedly stated:

> I have to tell you, I've never seen a case like this before.  I've seen criminal cases like this but not civil.  Your client has to think about that.  And you also have to think what you're doing because you may lose your license because of this case.[32]

Despite the privacy of that conversation—within the confidential confines of settlement negotiations in which Magistrate Judge Pym sought to impress upon Elizarov and Alekseyeff the seriousness of their legal situation—they filed a baseless motion to disqualify Magistrate Judge Pym on account of her supposed

---

[28]    Opposition 2:6-12.

[29]    *See* Def.'s Mot. to Disqualify Magistrate judge Sheri Pym ("Motion to Disqualify") [ECF No. 243].

[30]    *See* Order on Mots. to Dismiss [ECF No. 148] 8:21-9:2 ("Elizarov's misinterpretation is so flagrant that the Court must admonish Elizarov and his counsel that '[t]he presentation to the Court of frivolous . . . opposition to motions . . . subjects the offender at the discretion of the Court to the sanctions of L.R. 83-7.'  L.R. 11-9.").

[31]    *See* Order Denying Elizarov's Mot. to Disqualify [ECF No. 265].

[32]    *Id.* at 4.

bias.[33]  Elizarov and Alekseyeff filed their Motion to Disqualify on the heels of several unsuccessful motions before Magistrate Judge Pym, including seven discovery-related motions and *ex parte* applications.[34]

Elizarov and Alekseyeff concluded their meritless Motion to Disqualify by impugning Magistrate Judge Pym's character and insinuating that she harbored prejudice against Elizarov and Alekseyeff because both "were *gay men* and were in a *domestic partnership*."[35]  This Court's order detailed why Elizarov and Alekseyeff's allegation was baseless and insulting and how it ran afoul of State Bar of California Rule 8.2(a), which states:  "A lawyer shall not make a statement of fact that the lawyer knows* to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge or judicial officer."

The Court noted that Elizarov and Alekseyeff's Motion to Disqualify was "**fragrantly frivolous**," and Elizarov and his counsel were "**admonished not to make any more frivolous motions in this action**, particularly those containing baseless allegations against officers of the court."[36]  Alekseyeff is an experienced public defender, with over 16 years of experience practicing law in California.[37]  From Alekseyeff's years of experience, this Court can assume that he knows the difference between a reasonable motion and one that is baseless and without

---

[33]      *Id.* at 3.

[34]      *See* Mot. to Dismiss First, Second, Third, Fourth, Fifth, and Sixth Causes of Action in the Am. Compl. [ECF No. 52]; Mot. to Dismiss Scott Howlett's Cross-Complaint [ECF No. 63]; *Ex Parte* App. for Relief From Non-Party Subpoenas *Duces Tecum* [ECF No. 171]; Mot. to Quash Subpoenas *Duces Tecum* to Rite Care Hospice, Inc. and eCivis [ECF No. 176]; Mot. for Sanctions Against Pl. Goldwater Bank, *et al.* [ECF No. 182]; Mot. to Compel a Response to Interrogatories, Requests for Admissions, and Requests for Production, as Well as Documents From Pl. Goldwater Bank, *et al.* [ECF No. 184]; and Mot. for Review re Order on Motion to Quash [ECF No. 202].

[35]      Motion to Disqualify 8:5-6 (emphasis in original).

[36]      Order Denying Elizarov's Mot. to Disqualify 6 (emphasis in original).

[37]      Decl. of Ilya Alekseyeff Supporting the Motion to Disqualify [ECF No. 243-1] ¶¶ 40 & 41.

-11-

1    merit.  For Elizarov to protest in his instant Opposition that the Court has made

2    it "impossible for Elizarov and his counsel to determine what they must do to

3    improve" strains the Court's credulity.[38]  The Court has patiently and

4    repeatedly informed Elizarov how his and his counsel's conduct have swerved

5    into unacceptable territory.  Accordingly, the Court finds that the imposition of

6    costs and attorneys' fees associated with Elizarov's Rule 11 Motion is

7    appropriate.

8         Finally, Elizarov maintains that monetary sanctions should not be

9    awarded because they are granted so rarely that "Elizarov did not even request

10   those as a part of his own motion for sanctions," but a quick read through

11   Elizarov's Rule 11 Motion exposes his statement as false.[39]  In the final sentence

12   before concluding his Rule 11 Motion, Elizarov requests that the Court "impose

13   a reasonable sanction to ***compensate*** Elizarov for litigating these baseless

14   allegations."[40]  Monetary compensation was exactly what Elizarov requested as

15   a sanction in his Rule 11 Motion, and the Court concludes that "what's good for

16   the goose is good for the gander."  *E.g.*, *E.E.O.C. v. Waffle House, Inc.*, 534 U.S.

17   279, 314 (2002) (Thomas, J., dissenting).

18   **D.    Costs and Attorneys' Fees Calculations**

19        Next, the Court must calculate the award of reasonable attorneys' fees

20   and costs for Goldwater's defense against Elizarov's frivolous Rule 11 Motion.

21   A reasonable attorneys' fee is decided in two steps.  First, the Court must

22   determine a reasonable "lodestar" fee by multiplying the number of hours

23   reasonably expended by the attorneys on the litigation by a reasonable hourly

24   rate.  *See, e.g.*, *McElwaine v. US West, Inc.*, 176 F.3d 1167, 1173 (9th Cir. 1999).  A

25   reasonable hourly rate is "calculated according to the prevailing market rates in

26   

---

27   [38]    Opposition 2:6-10.

     [39]    *Id.* at 3:16-18.

28   [40]    Rule 11 Motion 24:22-24 (emphasis added).

the relevant community." *Lanard Toys Ltd. v. Dimple Child LLC*, 2021 WL
1577784, at *1 (C.D. Cal. Apr. 21, 2021) (citing *Sorenson v. Mink*, 239 F.3d 1140,
1145 (9th Cir. 2001)).

The burden is on the party seeking fees to produce evidence "that the
requested rates are in line with those prevailing in the community for similar
services by lawyers of reasonably comparable skill, experience, and reputation."
*Id.* Courts should "exclude from the lodestar amount hours that are not
reasonably expended because they are 'excessive, redundant, or otherwise
unnecessary.'" *Id.* "Where the documentation of hours is inadequate, the
district court may reduce the award accordingly." *Sorenson*, 239 F.3d at 1146
(internal quotation marks and citation omitted). Second, the court determines if
the lodestar should be adjusted to reflect a reasonable fee by looking at the
factors discussed in *Kerr v. Screen Extras Guild*, 526 F.2d 67 (9th Cir. 1975).[41]
"A trial court has broad discretion to determine the reasonable amount of an
attorney fee award, including whether to increase or decrease the lodestar
figure." *Jadwin v. County of Kern*, 767 F. Supp. 2d 1069, 1141 n.80 (E.D. Cal.
2011).

Here, Goldwater requests $26,827.00 in attorneys' fees and expenses
related to defending Elizarov's Rule 11 Motion.[42] Goldwater asserts that billable
rates in the range of $500 per hour for attorneys with approximately 10 years of
experience are reasonable. *See Jay F. v. William S. Hart Union High Sch. Dist.*,

---

[41] The 12 *Kerr* factors bearing on reasonableness are: "(1) the time and
labor required, (2) the novelty and difficulty of the questions involved, (3) the
skill requisite to perform the legal service properly, (4) the preclusion of other
employment by the attorney due to acceptance of the case, (5) the customary
fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by
the client or the circumstances, (8) the amount involved and the results
obtained, (9) the experience, reputation, and ability of the attorneys, (10) the
'undesirability' of the case, (11) the nature and length of the professional
relationship with the client, and (12) awards in similar cases." *Kerr*, 526 F.2d at
70.

[42] Motion 4:25-5:3.

-13-

2020 WL 10965070, at *2 (C.D. Cal. Jan. 31, 2020).  Although the Court

concurs with Goldwater's estimated billable rates, multiple time-entries exceed

what would reasonably be expected of an attorney defending against Elizarov's

meritless motion.  *See Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041,

1045 (9th Cir. 2000) ("A district court should exclude from the lodestar amount

hours that are not reasonably expended because they are 'excessive, redundant,

or otherwise unnecessary.'") (citation omitted).

As such, the Court reduces the following five time entries by 50%:

- August 24, 2022:  3.8 hours billed by Joseph LeVota at $300 per hour for
  a total of $1,140, for "[d]raft and revise meet and confer letter re
  Elizarov's proposed Motion for Rule 11 Sanctions."[43]

- September 29, 2022:  4.8 hours billed by Derek Bast at $425 per hour for a
  total of $2,040, for "[t]end to preparation of Response in Opposition to
  Rule 11 Motion including researching applicable law and argument
  incorporation into current draft."[44]

- September 29, 2022:  5.9 hours billed by Sean Wagner at $500 per hour
  for a total of $2,950, for "[w]ork on preparing and revising response to
  frivolous Rule 11 motion including researching applicable law and
  argument incorporation into current draft."[45]

- September 30, 2022:  10.7 hours billed by Derek Bast at $425 per hour for
  a total of $4,547.50, for "[w]ork on preparing and revising response to
  frivolous Rule 11 motion including additional legal research, adding
  additional supportive, substantive evidence, and seeking monetary
  sanctions in exchange."[46]

---

[43]  Decl. of Joseph LeVota in Supp. of the Motion [ECF No. 259-3] 4.

[44]  Decl. of Season Wagner in Supp. of the Motion [ECF No. 259-2] 6.

[45]  *Id.*

[46]  *Id.*

-14-

- February 21, 2023: 2.3 hours billed by Abbey Krysak at $425 per hour for a total of $1,035, for "[t]end to preparation of Application for Fees pursuant to Court Order, including supporting declarations and exhibits thereto."[47]

Accordingly, the Motion's award request will be reduced by $5,856.25, and Goldwater will be awarded $20,970.75 in reasonable attorneys' fees and costs.

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.     Goldwater's Motion is **GRANTED-in-part** and **DENIED-in-part**.

2.     No later than June 2, 2023, Elizarov is **DIRECTED** to remit to Goldwater $20,970.75 in reasonable attorneys' fees and costs.

3.     Elizarov is also **DIRECTED** to file a Notice of Compliance with Sanctions Order within 48 hours of his compliance with this Order.

**IT IS SO ORDERED.**

Dated:_____May 9, 2023_____

_____
John W. Holcomb
UNITED STATES DISTRICT JUDGE

---
[47]     *Id.*

# EXHIBIT 62

# Elizarov's Statement of Non-Compliance re Payment of Sanctions (Dkt No. 292) (Filed 6/7/23)

ILYA ALEKSEYEFF [CA 242462]
    ilya@loia.legal
LOIA, INC. (APLC)
727 W 7th St PH 1-13
Los Angeles, CA 90017
Tel: (213)537-4592

Attorney for Artur Elizarov

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GOLDWATER BANK, NA**, <br> *Plaintiff,* <br><br> **vs.** <br><br> **ARTUR ELIZAROV, ET AL.,** <br> *Defendant.* | **5:21-cv-616-JWH-SP** <br><br> STATEMENT OF COMPLIANCE <br> RE: PAYMENT OF SANCTIONS |

On May 9, 2023, the court ordered defendant Artur Elizarov to pay plaintiff Goldwater Bank, NA $20,970.75 by no later than June 2, 2023. [Dkt No. 279]. The court also ordered Elizarov to file a statement regarding compliance with the order.

Elizarov is <u>unable</u> to comply with the order. Although Elizarov has $70,000 available on deposit at Ally Bank, the Court previously restrained Elizarov from using those funds for any purpose. Therefore, Elizarov does not currently have access to his funds to satisfy the order. Nor does Elizarov otherwise have $20,750.75 readily available to pay Goldwater Bank.

If Goldwater Bank, NA desired to receive its sanctions payment *now*, then Goldwater Bank, NA should work with Elizarov and the Court on modifying the restraining order to allow a limited draw on the funds so that the sanctions are paid.

1

STATEMENT OF COMPLIANCE RE: PAYMENT OF SANCTIONS

Unless the order is modified, Elizarov will remain unable to pay the sanctions because Elizarov does not have $20,970.75 to satisfy the order.

Dated: 06/05/2023.                    LOIA, INC. (APLC)

_Ilya Alekseyeff_

By: Ilya Alekseyeff
Attorney for Artur Elizarov

2
STATEMENT OF COMPLIANCE RE: PAYMENT OF SANCTIONS

# EXHIBIT 63

# Joint Status Report re Elizarov's Non-Compliance with Payment of Sanctions (Dkt No. 303) (Filed 7/31/23)

1  Sean C. Wagner (Pro Hac Vice)
   Abbey M. Krysak (Pro Hac Vice)
2  **WAGNER HICKS PLLC**
   831 East Morehead Street, Suite 860
3  Charlotte, North Carolina 28202
   Tel: (704) 705-7538
4  Fax: (704) 705-7787

5  John Forest Hilbert, Esq. (SBN 105827)
   Joseph A. LeVota, Esq. (SBN 262760)
6  **HILBERT & SATTERLY LLP**
   409 Camino del Rio S. #104
7  San Diego, California 92108
   Telephone:  (619) 795-0300
8  Facsimile:   (619) 501-6855

9  Marie B. Maurice (SBN 258069)
   Marina Samson (SBN 315024)
10 **IVIE McNEILL WYATT PURCELL & DIGGS**
   444 S. Flower Street, Suite 1800
11 Los Angeles, California 90071
   Telephone:  (213) 489-0028
12 Facsimile:   (213) 489-0552

13 Counsel for Plaintiff
   GOLDWATER BANK, N.A.

14
                **UNITED STATES DISTRICT COURT**
15              **CENTRAL DISTRICT OF CALIFORNIA**

16 **GOLDWATER BANK, N.A.,**          Case No. 5:21-cv-00616-JWH-SPx

17                                     *Assigned to the Hon. John W. Holcomb*
              Plaintiff,
18                                     **JOINT STATUS REPORT ON STATUS**
                                       **OF DEFENDANT ELIZAROV'S**
19     v.                              **COMPLIANCE WITH ORDER**

20 **ARTUR ELIZAROV, *ET AL.***       Pre-Trial Conf.: November 3, 2023
21                                     Trial Date: November 27, 2023
              Defendants.             Discovery Cut-off: June 15, 2023
22

23

24

25         Pursuant to the Court's June 9, 2023 Order, Goldwater Bank, N.A.

26 ("Goldwater") hereby submits this Joint Status Report on behalf of Goldwater and

27 Defendant Artur Elizarov "regarding the status of Elizarov's compliance with the

28                      **JOINT STATUS REPORT**
                                -1-

Order Regarding Plaintiff's Motion for Attorneys' Fees [ECF No. 279]" (ECF No. 294).

As of the date of this filing, Goldwater and Defendant Elizarov have not reached an agreement regarding compliance with the Court's Order Regarding Plaintiff's Motion for Attorney's Fees, and Goldwater has not received any payments toward the same.

Dated: July 31, 2023

Respectfully submitted,

**WAGNER HICKS PLLC**

By:    */s/ Abbey M. Krysak*
Sean C. Wagner, Esq.
Abbey M. Krysak, Esq.

AND

**HILBERT & SATTERLY LLP**

John Forest Hilbert, Esq.
Joseph A. LeVota, Esq.

AND

**IVIE McNEILL WYATT PURCELL & DIGGS**

Marie B. Maurice, Esq.
Marina Samson

*ATTORNEYS FOR DEFENDANT*
*GOLDWATER BANK N.A.*

**JOINT STATUS REPORT**
-2-

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users.

This the 31st day of July, 2023.

*/s/ Abbey M. Krysak*

Abbey M. Krysak

**JOINT STATUS REPORT**

# EXHIBIT 64

# Transcript of June 9, 2023 Status Conference (Excerpts)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

**HONORABLE JOHN W. HOLCOMB, U.S. DISTRICT JUDGE**

GOLDWATER BANK, N.A.,                )
                                     )
                    Plaintiff,       )   **Certified Transcript**
                                     )
        vs.                          )   Case No.
                                     )   5:21-cv-00616-JWH-SP
ARTUR ELIZAROV, et al.,              )
                                     )
                    Defendants.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

FRIDAY, JUNE 9, 2023

11:01 A.M.

SANTA ANA, CALIFORNIA

_____

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                      APPEARANCES OF COUNSEL:

 2

 3     FOR PLAINTIFF:

 4             WAGNER HICKS PLLC
               BY:  ABBEY M. KRYSAK, ATTORNEY AT LAW
 5             831 East Morehead Street
               Suite 860
 6             Charlotte, North Carolina 28202
               704-705-7942
 7             abbey.krysak@wagnerhicks.law

 8             HILBERT & SATTERLY LLP
               BY:  JOSEPH A. LeVOTA, ESQ.
 9             409 Camino del Rio South
               Suite 104
10             San Diego, California 92108
               619-795-0300
11             jlevota@hscallaw.com

12     FOR DEFENDANT ARTUR ELIZAROV:

13             LOIA, INC.
               BY:  ILYA ALEKSEYEFF, ESQ.
14             727 West 7th Street
               Penthouse 1-13
15             Los Angeles, California 90017
               213-537-4592
16             ilya@loia.legal

17     FOR DEFENDANTS SCOTT HOWELL, BMO HARRIS BANK, BANK OF THE WEST:

18             HALL GRIFFIN LLP
               BY:  JEREMY TSVI KATZ, ESQ.
19             1851 East First Street
               10th Floor
20             Santa Ana, California 92705
               L714-918-7000
21             jkatz@hallgriffin.com

22             HALL GRIFFIN LLP
               BY:  KASANDRA COLLEEN GOLDBERG, ATTORNEY AT LAW
23             1851 East First Street
               10th Floor
24             Santa Ana, California 92705
               714-918-7000
25             kgoldberg@hallgriffin.com
```

UNITED STATES DISTRICT COURT

|   | **SANTA ANA, CALIFORNIA; FRIDAY, JUNE 9, 2023** |
|---|---|
| 1 | |

      1            **SANTA ANA, CALIFORNIA; FRIDAY, JUNE 9, 2023**

      2                      **11:01 A.M.**

      3                          **- - -**

      4

11:01AM  5         THE COURTROOM DEPUTY:  Calling Item Number 2, Case

      6  Number EDCV-21-00616-JWH, Goldwater Bank, N.A. vs. Artur

      7  Elizarov, et al.

      8          Counsel, please state your appearances, beginning

      9  with the plaintiff.

11:01AM 10         MS. KRYSAK:  Good morning, Your Honor.  My name is

    11  Abbey Krysak, and I am here on behalf of the plaintiff,

    12  Goldwater Bank.

    13          MR. LEVOTA:  Joseph LeVota for Goldwater Bank.

    14          THE COURT:  All right, Ms. Krysak and Mr. LeVota.

11:01AM 15         MR. ALEKSEYEFF:  Good morning, Your Honor.  Ilya

    16  Alekseyeff for defendant, Artur Elizarov, and also representing

    17  myself, also, as a defendant.  Good morning.

    18          THE COURT:  Mr. Alekseyeff, good morning again.

    19  Good to see you.

11:01AM 20         MS. GOLDBERG:  Good morning, Your Honor.  Kasandra

    21  Goldberg on behalf of defendants Scott Howlett and Bank of the

    22  West.

    23          THE COURT:  Ms. Goldberg, good morning.

    24          MR. KATZ:  Good morning, Your Honor.  Jeremy Katz,

11:02AM 25  also on behalf of defendants Scott Howlett and Bank of the

```
  1   West.
  2           THE COURT:  Mr. Katz, good morning.
  3           All right.  We're here on a status conference.  You
  4   are probably wondering why did I set a status conference.  I
11:02AM  5   want to talk to you about resolution.  I've been dealing with
  6   this case for, what, two years now, and it raises some very
  7   interesting issues.  But I'm thinking that for the amount of
  8   money that is at stake, a million dollars in terms of the
  9   original loan, and I think the bottom line demand on the -- for
11:02AM 10   the breach of contract claim is 720,000, 730-, something like
 11   that; correct?  Roughly.
 12           MS. KRYSAK:  Roughly, Your Honor.
 13           THE COURT:  Now, I don't mean to suggest that that's
 14   not a substantial sum of money.  It certainly is, and I'm sure
11:03AM 15   it is to all of your respective clients, but it's become a very
 16   complicated case with now 291 items on the docket.  We've had
 17   claims and counterclaims and cross-claims and 12(b)(6) motions
 18   and a lot of discovery motions and sanctions motions, and
 19   there's just a lot of activity for a case of this nature.
11:03AM 20           Now -- and I'm not faulting you for that.  I'm sure
 21   you're all representing your clients the way that you think
 22   that you should.  And I'm happy for that.  But it may make
 23   sense for the parties, collectively, to try to reach a business
 24   resolution to this case and stop spending money filing stuff
11:03AM 25   with me and coming to see me.
```

UNITED STATES DISTRICT COURT

 1             MR. ALEKSEYEFF:  Your Honor, just a clarifying

 2     question.  So the State and the Court expects us to file, once

 3     we have the mediation date, that is just advising the Court

 4     what the date is?

11:21AM  5             THE COURT:  Yes.  Joint report from all parties.

 6     Notice to the Court, mediation has been set for July 3rd --

 7             MR. ALEKSEYEFF:  Thank you so much, Your Honor.

 8             THE COURT:  -- at 9:30 in Judge Clarkson's chambers.

 9     I just want to know when you're doing it.  Because he's not

11:21AM 10     going to -- he's not automatically going to tell me, because we

11     don't communicate about cases when he's mediating them for me.

12     So good question.

13             Anything else on the mediation?

14             Okay.  I received a notice from Mr. Alekseyeff, who

11:21AM 15     signed it on behalf of his client, Mr. Elizarov, statement of

16     compliance -- actually noncompliance with the payment of

17     sanctions.

18             So I had issued sanctions against Mr. Elizarov in

19     the amount of $20,970.75, and I directed that be paid to

11:22AM 20     Goldwater Bank no later than June 2nd.  Mr. Elizarov, in this

21     notice, says that he's unable to comply, I guess among other

22     things, because there is $70,000 -- seven, zero, zero, zero,

23     zero -- available on deposit, but that -- that account has been

24     frozen by me in connection with all the issues going on in this

11:22AM 25     case.

```
 1              So Goldwater Bank, do you want me to authorize

 2    Mr. Elizarov to pay you the sanction amount of almost $21,000

 3    out of that $70,000?

 4              MS. KRYSAK:  No, Your Honor.  We would request that

 5    Mr. Elizarov provide and meet his burden of production to

 6    demonstrate by a preponderance of the evidence that he has an

 7    actual inability to pay by proving up his financial assets.

 8              THE COURT:  Mr. Alekseyeff, am I mispronouncing

 9    Mr. Elizarov's name?

10              MR. ALEKSEYEFF:  Yeah, you're not, Your Honor.

11              And Your Honor, if I may jump in to address

12    Goldwater's concern.

13              THE COURT:  Go ahead.

14              MR. ALEKSEYEFF:  He does have the ability to pay.

15    That ability is the $70,000 that's still legally

16    Mr. Elizarov's.  That money is his, up until this point, until

17    there's a judgment.  It's just right now, he cannot use it

18    because the Court is saving it for Goldwater's benefit.  And

19    that amount will go to Goldwater.

20              THE COURT:  Well, we'll see at the end of the day, I

21    guess.  Depends how the case is resolved.  But yeah, I wanted

22    that money set aside.  And Mr. Elizarov is also not permitted

23    to encumber the house he bought in Florida from the proceeds.

24              MR. ALEKSEYEFF:  Which he has not.  So Goldwater

25    wants to have it both ways.  And as I said --
```

The timestamps shown: 11:23AM at lines 5, 10, 15, 20; 11:24AM at line 25.

1          THE COURT:  Well, hold on.

2          MR. ALEKSEYEFF:  Sorry.

3          THE COURT:  When we were talking about being present

4    at the mediation, I think you said Mr. Elizarov has a busy

11:24AM  5    travel schedule.

6          MR. ALEKSEYEFF:  Yes.

7          THE COURT:  I assume that is, at least in part, from

8    work?

9          MR. ALEKSEYEFF:  It is 100 percent from work.

11:24AM 10          THE COURT:  So is he not earning money from work?

11          MR. ALEKSEYEFF:  He is, but it doesn't mean that he

12    has $20,000 in liquid assets, all in one lump sum, to pay

13    Goldwater, which is what this statement stated.  He does earn,

14    but there are also expenses that that income goes to cover.

11:24AM 15    And what's left is nowhere near $20,000 that Goldwater is

16    asking for, which is why my compromise was, well, he has the

17    assets and he's more than happy to use those assets to pay

18    Goldwater the funds.

19          But they want it both ways.  They want to keep that

11:25AM 20    money and not allow Mr. Elizarov to use it, even though it's

21    available, and then have him come up with some other money from

22    some other unidentified source, perhaps printing it on a

23    printer, so that he can -- I did not mean to be flippant,

24    Your Honor, but that argument seems silly to me.

11:25AM 25          There is $70,000 that's available to pay the

sanctions.  And they're saying, we don't want him to use that

money.  We want him to come up with money from some other

source, which is just -- I don't really know what word to use

to describe that.

11:25AM  THE COURT:  Well, okay.  I don't claim to know a lot

about community property, because it doesn't usually come up,

but is there not some community property that's available to

Mr. Elizarov?

MR. ALEKSEYEFF:  I am including all that,

11:25AM  Your Honor.  So what I'm explaining to the Court is the bulk of

the money that's readily available in a large sum is in that

account that the Court had set aside.  Whatever we earn,

because I'm supporting my mother, he's supporting his mother,

we're partially supporting his brother, all of that money

11:26AM  pretty much goes away.  Whatever we have left is nowhere near

$20,000 that the Court wants Mr. Elizarov to pay to Goldwater.

But again, there is $70,000 that's still legally

Mr. Elizarov's that he can use to pay that amount.  So I just

don't --

11:26AM  THE COURT:  Right.  But that's been set aside.

That's been set aside for now.  And if Goldwater Bank had

said -- if Goldwater Bank wanted the money, the 20,000 now,

now, now, I presume Goldwater Bank would have said, "Yes,

that's fine."  You can -- Goldwater Bank is -- would consent

11:26AM  that Mr. Elizarov can tap into the $70,000 that has been set

aside.  They did not say that.

And I understand, and I agree -- I do not agree with
Mr. Elizarov's position that, gee, that's where the payment
should come from.  This almost $21,000 sanction is for conduct
that arose post activities that gave rise to this lawsuit.

Well, there are a few ways that we can deal with
this.  It was an order to pay that sum.  So there's contempt of
power of court.  I'm not -- I -- that would be a last resort.
If I can -- if you will permit my idle musings, I don't believe
in debtor's prison.  I don't think that's helpful for anyone.
But there are other ways we can deal with this.

Goldwater Bank suggested a more robust showing from
Mr. Elizarov about the status of his finances, which may
include community property, to justify why he can't -- cannot
satisfy this debt.  And it may very well be that the other
obligations are significant enough, like caring for elderly
parents or whatever they may be, that it would not be just to
force this payment at this point.

Does it make sense for me to allow Goldwater Bank to
take some very limited discovery into Mr. Elizarov's finances
to determine -- perhaps Goldwater Bank can suggest, after
taking that discovery, a means of payment, or Mr. Elizarov can.

What are your thoughts, Ms. Krysak?

MS. KRYSAK:  That sounds feasible, Your Honor.  We
would be happy to be given the opportunity to do some limited

1   discovery into Mr. Elizarov's financial assets just for this

2   currently -- right? -- with respect to his inability to pay.

3   And from that, Goldwater can review and determine if it would

4   be appropriate to further press the issue or agree to take the

11:29AM 5   money out of what has been frozen.

6           However, you know, the issue here for Goldwater,

7   just to be open and honest with the Court, is, you know,

8   Goldwater believes that those assets that are frozen are their

9   proceeds from the sale.

11:29AM 10           THE COURT:  No, I understand.  That's why I --

11           MS. KRYSAK:  Yeah, to reduce that based on the

12   attorneys' fees that were later done.

13           THE COURT:  That's why I made the remarks that I was

14   not persuaded by -- sorry, Mr. Alekseyeff, I'm not persuaded by

11:29AM 15   that argument that it ought to come out of the 70K.

16           But Mr. Alekseyeff, let me hear your thoughts on

17   very limited discovery.

18           MR. ALEKSEYEFF:  Well, one, I wasn't ready to

19   address that point because the Court's notice did not alert me

11:30AM 20   that this would be an issue.  So I wasn't ready to address it

21   one way or the other.

22           My position is whatever Goldwater wants, the money

23   has been preserved for Goldwater.  The money that I'm seeking

24   to withdraw from $70,000 will go to Goldwater.  There's only

11:30AM 25   one pot of gold.  And no matter how that gold is distributed,

1    it's still just one pot.  I cannot add to it.

2           So if Goldwater wants some discovery, fine, I'll

3    give them some discovery.  But at the end of the day, it's all

4    going to be an exercise in futility.  And as the Court

11:30AM 5    previously mentioned rule 1, which requires inexpensive

6    litigation, it seems to apply additional expense for everybody

7    on both sides, when, again, there is a source of funds readily

8    available that we can tap into to pay off Goldwater's

9    sanctions.

11:30AM 10          THE COURT:  One moment, Mr. Katz.

11          Mr. Alekseyeff, what I would have expected is

12    something more like, "Gee, what if we pay you $500 a month

13    until the nearly 21,000 is paid?" or some amount of money?

14          MR. ALEKSEYEFF:  That's another option.  I did not

11:31AM 15   realize that Goldwater might be willing to accept that.  But

16    that is another option perhaps.  I just have to sit down and

17    calculate exactly how much is left of the daily budget to find

18    out exactly what it is.

19           So one thing I can do as a compromise is I can give

11:31AM 20   Goldwater a confidential tally showing the income and what the

21    expenses are, with any supporting documents we can come up

22    with, so that we don't actually deal with formal discovery, and

23    see if we can come up with some sort of an amount that

24    Mr. Elizarov can pay on a monthly basis to Goldwater.

11:31AM 25          But my position is still that the money should come

         1    out of $70,000 that's still Mr. Elizarov's, which will avoid

         2    this entire ordeal.

         3             THE COURT:  Mr. Katz, did you have something on this

         4    issue?

11:31AM  5             MR. KATZ:  Yes, I do.

         6             THE COURT:  Go ahead.

         7             MR. KATZ:  I don't have a dog directly in the fight

         8    about sanctions and how they're paid, but because Goldwater is

         9    seeking to recover attorney fees through the lien they're

11:32AM 10    trying to impose on my client, Mr. Howlett's property --

        11             THE COURT:  I'm sorry, say that again.  I'm not

        12    quite --

        13             MR. KATZ:  Because Goldwater is seeking to recover

        14    attorney fees by way of the lien they are trying to impose into

11:32AM 15    first position on Mr. Howlett's property, essentially trying to

        16    recover the attorney fees they spend in this action as of the

        17    equity of Mr. Howlett's property, and Mr. Howlett has not done

        18    anything wrong to Goldwater, if there is formal discovery,

        19    that, again, compounds the ever-spiraling attorneys' fees.

11:32AM 20             THE COURT:  And therefore?

        21             MR. KATZ:  My solutions to this would be either if

        22    Goldwater is not interested in having the money paid

        23    immediately, they can reserve the issue of the sanctions

        24    payment.  It can be added on at some later point.  The

11:32AM 25    suggestion about having a small monthly payment is fine.

1    There's an option of perhaps posting a bond.

2            But the issue of triggering yet more discovery and

3    yet more depositions, when Goldwater has a history of sending

4    three senior attorneys to attend, appear, and make arguments on

11:33AM 5    the record at depositions, I want to keep the discovery tight.

6    Because they are escalating it to where the attorney fees are

7    going to -- if they haven't already, are going to eclipse the

8    actual money from the loan.

9            THE COURT:  And you blame Goldwater Bank for that?

11:33AM 10            MR. KATZ:  I blame everyone but Mr. Howlett and Bank

11   of the West.  They are the innocent parties in all of this.

12   And they should not have to either bear the cost or the

13   potential exposure or the more difficult arrangement when it

14   comes to mediation of spiraling attorneys' fees.  When -- it

11:33AM 15   appears that rather than mitigating damages, it seems like some

16   of the other parties are interested in maximizing on the

17   attorney fee side.

18            MR. ALEKSEYEFF:  If I can also jump in, Your Honor.

19   Mr. Katz did mention something.  I didn't want to broach it,

11:34AM 20   necessarily, so I didn't criticize the Court's orders, but he

21   did touch on the subject.

22            The typical practice, from what I've looked, is to

23   include any sanctions as part of a judgment, which is why I was

24   somewhat surprised that the court order specifically required

11:34AM 25   Mr. Elizarov to make the payment ahead of the judgment.

```
 1   Judgments are typically enforced by --

 2            THE COURT:  Right.  A judgment is not an obligation.

 3   It is not an order to pay.  But the sanctions order is an order

 4   to pay.  Sanctions are a little different.

 5            MR. ALEKSEYEFF:  I agree.  But like I said, when I

 6   have looked at historical decisions -- and, again, the Court is

 7   within its power to do what the Court did.  It's just the

 8   typical practice is just to order that amount to be included as

 9   part of any eventual judgment, which is, frankly, what I

10   thought might happen.  But it didn't, and now we are in this

11   circumstance.

12            THE COURT:  But to talk about the elephant in the

13   room, isn't one of the issues Goldwater Bank's concern that it

14   will get a judgment, it will be uncollectible because of the

15   Florida homestead exemption?

16            MR. ALEKSEYEFF:  There's still $70,000 that's

17   frozen.  They can attach it.  Because at this point,

18   Mr. Elizarov cannot touch it.  Which, again, brings me back to

19   same the $70,000.

20            THE COURT:  But Goldwater Bank -- put aside

21   Mr. Howlett and Bank of the West.  Goldwater Bank, on the main

22   claim, is seeking breach of contract damages of 730,000 -- I

23   forget the exact number.  And this 21,000 will be on top of

24   that; right?

25            MR. ALEKSEYEFF:  Correct.
```

```
 1              THE COURT:  And what I'm saying is I think, again,
 2    the elephant in the room is that a judgment is -- might be very
 3    effective for the 70,000 -- seven, zero -- but won't be
 4    effective for the rest.  Isn't that a large bit of what this
 5    case is about?
 6              MR. ALEKSEYEFF:  Yes.  And to address the Court's
 7    concern, what the arguments have been throughout is not that
 8    the judgment is necessarily uncollectible.  The property in
 9    Florida can still be -- the lien can still be imposed on the
10    property.  It's just the property cannot be forced sold.  So
11    there cannot be an order saying you have to sell the property
12    to satisfy.  But it's still going to be subject to the lien.
13              So if the property is ever sold, Goldwater will get
14    the first dibs, so to speak, on any proceeds from the sale of
15    that property.  So security will still be there for Goldwater.
16              But it still doesn't resolve our issue where there
17    is a large chunk of money that's available and the Court is
18    saying, "Mr. Elizarov, you don't get to touch any of that money
19    that's still legally yours."  That is what I'm having a problem
20    with.  And, instead, he has to come up with money from
21    elsewhere.
22              THE COURT:  I've heard that argument, and I found it
23    unpersuasive.
24              Okay.  So here's what I'm inclined to do --
25              Go ahead.
```

11:36AM (line 5)
11:36AM (line 10)
11:36AM (line 15)
11:36AM (line 20)
11:37AM (line 25)

```
 1              MS. KRYSAK:  May I, Your Honor?  Just in response to

 2    your suggestion of a payment schedule.

 3              Goldwater is certainly more than open to that and

 4    would be willing to propose a payment -- a monthly payment the

11:37AM  5    same as Mr. Elizarov's mortgage payment to Goldwater.

 6              THE COURT:  How much was that?

 7              MS. KRYSAK:  Roughly $4,644 a month.  And that has

 8    not been paid for years.  And our understanding is because of

 9    the cash purchase of the Florida property, there's been no

11:37AM 10    mortgage payments.

11              THE COURT:  Okay.  So here's what I'm going to do.

12    I would like Mr. Elizarov and Goldwater Bank to meet and confer

13    over this issue.  See if you can reach a resolution.  Perhaps

14    it's a payment plan.  Perhaps it's a lien on something else.

11:37AM 15    Be creative and see if you can come up with something.

16              I'm not going to order discovery at this point.  I

17    do believe in rule 1, and let's try not to multiply these

18    proceedings any more than we have to.  I did issue this

19    sanctions order, and I -- I take it very seriously.  I thought

11:38AM 20    about this long and hard.

21              So I do want to see my order complied with, expect

22    it to be complied with.  But I'm also sensitive to

23    Mr. Elizarov's financial situation, whenever it may be.  I

24    don't know what it is.  But you talk about it and see if you

11:38AM 25    can come to a resolution.
```

|              |    |                                                                              |
|--------------|----|------------------------------------------------------------------------------|
|              | 1  | So why don't you -- maybe this can be an additional                          |
|              | 2  | element of the mediation that you have.  I was thinking of                    |
|              | 3  | having an obligation for you to tell me where you are sooner                  |
|              | 4  | rather than later.  But why don't I make it July 31st as the                  |
| 11:39AM      | 5  | deadline for the parties -- for Mr. Elizarov and Goldwater Bank               |
|              | 6  | to file a status report with me regarding efforts to resolve                  |
|              | 7  | the -- Mr. Elizarov's obligation to pay these sanctions.                      |
|              | 8  | So again, hopefully you can resolve it.  Maybe you                            |
|              | 9  | can file something next week saying, "Yeah, we got it worked                  |
| 11:39AM      | 10 | out and here's the payment schedule and everybody is good."  Or               |
|              | 11 | maybe you can't, and then -- I hope that you can.  Please try                 |
|              | 12 | hard.  I think you know how I feel about this.  I think that                  |
|              | 13 | the money needs to be paid, but I'm sensitive to Mr. Elizarov's               |
|              | 14 | actual financial condition.                                                  |
| 11:40AM      | 15 | So Madam Clerk, do you have that for our minute                               |
|              | 16 | order memorializing this hearing?                                             |
|              | 17 | THE COURTROOM DEPUTY:  Yes, Your Honor.                                       |
|              | 18 | THE COURT:  Okay.  What else do we need to                                    |
|              | 19 | accomplish today?                                                             |
| 11:40AM      | 20 | MS. KRYSAK:  Nothing from Goldwater, Your Honor.                              |
|              | 21 | THE COURT:  Mr. Alekseyeff, on behalf of you and                             |
|              | 22 | Mr. Elizarov?                                                                 |
|              | 23 | MR. ALEKSEYEFF:  Nothing, Your Honor.                                         |
|              | 24 | THE COURT:  Okay.  Mr. Katz or Ms. Goldberg?                                  |
| 11:40AM      | 25 | MR. KATZ:  In the currently operative scheduling                             |

```
 1    order, it says -- there was a schedule for filing MSJs on or

 2    before August 14, with a hearing to be heard September 15th.

 3              Now, I am an optimist.  In the event that the

 4    parties are able to get through the iterative fact development

11:40AM 5  process for Your Honor's MSJ procedures in advance, would we be

 6    able to have the MSJ heard earlier?  Because I think the

 7    earlier the MSJ could be heard, the more likely the case is to

 8    resolve.

 9              THE COURT:  If you satisfy Local Rule 7-3 in my

11:41AM 10 standing order, you can file your motion today and set it for

11    hearing 28 days from today.  That's -- that September 15th

12    date, assuming that you -- that that's correct.  No reason to

13    doubt you.  I just don't have my scheduling order in front of

14    me -- that's a deadline, not the one and only day that

11:41AM 15 dispositive motions can be heard.  That make sense?

16              MR. KATZ:  It does, Your Honor.  Thank you.  And

17    just to make the record clear, I was referring to Docket 263 as

18    the most recent scheduling order.  And specifically Item

19    Number 2-B, as in "boy."

11:42AM 20             THE COURT:  Madam Clerk, do you have September 15th

21    as a deadline for hearing dispositive motions?

22              This is a good thing for us to discuss, including

23    the case schedule.

24              MS. KRYSAK:  Respectfully, Your Honor, I do have a

11:42AM 25 copy of ECF Number 263 in front of me, with the dates specific
```

1   that the Court has set for the scheduling of the rest -- of the

2   remaining case, if that's helpful.

3               THE COURT:  So 9/15 was the deadline for hearing

4   dispositive motions.  What is motions in limine, pretrial

11:42AM 5   conference, and trial?

6               MS. KRYSAK:  Motions in limine are due October 27th

7   of 2023; final pretrial conference, November 3rd, 2023, at

8   1:00 p.m.; and trial, November 27, 2023, at 9:00 a.m.  And with

9   respect to the summary judgment, the hearing deadline is

11:43AM 10   September 15th, but the filing deadline is August 14th of 2023.

11               THE COURT:  Did I specifically say that or --

12               MS. KRYSAK:  Just for clarity, I think we had maybe

13   just hit the hearing.  So I wanted to make sure we had the

14   filing and hearing date for the record.

11:43AM 15               MR. KATZ:  I have the same dates.

16               MR. ALEKSEYEFF:  Your Honor, if I may jump in.  I

17   think the confusion is the Court's order seems to suggest that

18   September 15 will be the actual hearing date because there's a

19   briefing schedule attached to it as well.  It says, "The motion

11:43AM 20   set to be heard on September 15."

21               So I think that was Mr. Katz's confusion and he

22   wasn't sure, perhaps, if the Court had that date and only that

23   date in mind or if it still left a possibility of an earlier

24   date, if the parties so wished.

11:43AM 25               THE COURT:  Hold on a second.  ECF 263?

1               MS. KRYSAK:  That is correct.

2               MR. ALEKSEYEFF:  Filed on March 1st, Your Honor.

3               THE COURT:  Madam Clerk, can you print out the

4      substantive page of that for me, please.

11:44AM 5               THE COURTROOM DEPUTY:  Yes.

6               THE COURT:  Okay.  I see what happened here.  I

7      think you submitted to me -- somebody filed an ex parte

8      application to modify the scheduling order, and there was no

9      opposition.  And so I took your -- the proposed order, I think,

11:45AM 10      tinkered with it a little bit, and entered it.

11               So it wasn't my intent to say September 5th is the

12      one and only date for hearing dispositive motions.  It looks

13      like the order says that.

14               Well, so again, Mr. Katz, your question I think was

11:45AM 15      can you file it early?  The answer is yes.  I'm not sure why

16      the -- the schedule set forth in this order ECF 263 seems to

17      be -- oh, I see.  It tightens the schedule a little bit; right?

18      It tightens it in some ways and -- yeah, it tinkers with the

19      standard local rules schedule for motions.  That's what it

11:46AM 20      does.  Okay.

21               So may you file it early, Mr. Katz?  Yes.  And if

22      you do, comply with my standing order and the local rules,

23      which require, I think, 28 days' notice on motions.  And you

24      might also want to coordinate with the other parties in the

11:46AM 25      case, in case somebody wants more time.  You can accommodate

```
  1   them, if you can.

  2           Do you understand what I'm saying?

  3           MR. KATZ:  I understand exactly what you're saying.

  4   Again, my clients, who are the parties here who have done no

11:46AM 5   wrong, want out of this case as quick as they can.

  6           THE COURT:  So yes, you may file your summary

  7   judgment motions such that they are heard before that

  8   September 8th date set forth in ECF 263.

  9           MR. KATZ:  Thank you, Your Honor.

11:47AM 10          THE COURT:  But again, I prefer not to get an

 11   ex parte application from somebody saying, "Gee, the local

 12   rules provide for one week.  And I just need more than one week

 13   to respond."

 14           MR. KATZ:  I imagine that the iterative process that

11:47AM 15   Your Honor has for developing the facts will take more than a

 16   week to accomplish.

 17           THE COURT:  And I think the other adjective that you

 18   were reaching for, other than "iterative," was "onerous."

 19           MR. KATZ:  Certainly.  "Thorough" would also be an

11:47AM 20   apt description.

 21           THE COURT:  Very polite.

 22           What I do there is -- in all candor, I foist on the

 23   parties the work that otherwise we would have to do in

 24   chambers, to match evidence and alleged facts and opposition

11:48AM 25   and disputed facts.  It's all laid out right there, and you do
```

```
 1   all the work and we just look for disputed facts or not.
 2            MR. KATZ:  I did have one clarification question
 3   about that procedure.  And this might be something we can
 4   simply negotiate ourselves.  But as we go through that
11:48AM 5   iterative process, I imagine the quantity of underlying
 6   evidence may change.  The total amounts -- so instead of -- as
 7   we go through the iterative process, rather than identifying
 8   something as being compendium of evidence Volume I at page 16,
 9   we can go through and say:  It is this specific document.  It
11:48AM 10  is this transcript testimony.  It is this declaration.
 11           And once we've assembled the sum total of documents
 12  or documentary evidence to go in, then we can work together to
 13  make a single compendium that is paginated and easy for
 14  Your Honor to find.
11:49AM 15           As I read the process, the only, what I believe
 16  cumbersome part -- truly cumbersome part would be trying to
 17  designate things into volumes of evidence and specific page
 18  numbers before we have all the evidence gathered into one
 19  bucket.  Once it's all in one bucket, it's easy to assemble it
11:49AM 20  all into a joint package.
 21           THE COURT:  I think that's right, if I'm
 22  understanding you.  As you're going through the process, Bank
 23  of the West, for example, might have a declaration from
 24  somebody that provides a fact that Bank of the West wants to
11:49AM 25  rely on for its motion.  So you have Declaration of Joan Smith.
```

1    You don't know where that's going to ultimately be

2    in the compendium.  So you have a placeholder, Declaration of

3    Joan Smith, that you circulate.  At the end of the day, as

4    you're finally putting your papers together, instead of

11:50AM 5    Declaration of Joan Smith, you'll have, you know, Joint Exhibit

6    Volume II, page 17.

7        MR. KATZ:  My thought exactly, Your Honor.  And as

8    we're developing these facts and developing the evidence, that

9    declaration itself may ultimately change, depending on what

11:50AM 10   facts each side is the proponent of or opponent of.

11       So I will work with all the parties to try to get it

12   done, but rather than taking the extra step of identifying the

13   particular volume and page, I'd like to propose that we have

14   just the underlying piece of evidence for the purpose of

11:50AM 15   negotiating what the facts are.

16       THE COURT:  That's the intent, I think, of the

17   standing order procedure.

18       MR. KATZ:  Thank you, Your Honor.

19       THE COURT:  Next iteration of the standing order,

11:50AM 20   I'll try to keep that in mind and clarify.

21       MR. KATZ:  I want to be both thorough and I want to

22   be diligent in following the instruction.

23       THE COURT:  I appreciate that.  Okay.  Good

24   question.  Good issue.

11:51AM 25       What else?

```
        1            MS. KRYSAK:  Nothing from Goldwater, Your Honor.

        2    Thank you.

        3            MR. ALEKSEYEFF:  Nothing, Your Honor.

        4            MR. KATZ:  Nothing else, Your Honor.

11:51AM 5            THE COURT:  Okay.  Counsel, thank you very much for

        6    coming here.  I wish you luck in your settlement process with

        7    Judge Clarkson.  I think you'll -- I think you really will find

        8    him a delight to work with.  He may squeeze you, but that's the

        9    way it works.

11:51AM 10           So good luck.  Have a good rest of the day.  I guess

       11    I won't see you until -- we have a hearing -- oh, that's

       12    another thing.  We have a hearing in a challenge to Judge Pym's

       13    order.  When is that set for?  Is that the 30th?

       14            MS. KRYSAK:  Correct me if I'm wrong, I believe that

11:51AM 15   is June 30th.

       16            MR. ALEKSEYEFF:  I believe the date is correct.  I

       17    was going to check my calendar, but I think it's Friday,

       18    June 30th.

       19            MS. KRYSAK:  Goldwater Bank's response is due today,

11:52AM 20   and that's going to be filed this afternoon.

       21            THE COURT:  No reason -- I didn't really want to hit

       22    pause on the litigation and have you mediate.  I'd rather, in

       23    all candor, have your feet held to the fire.  That may motivate

       24    you more to reach a business resolution of this action.

11:52AM 25           That having been said, does it make sense to go
```

```
  1    forward with the hearing on June 30th?  I'm happy to -- if
  2    nobody says no, let's wait on that.
  3             MR. ALEKSEYEFF:  Either way is fine with me,
  4    Your Honor, because technically, it's a motion relating to a
11:52AM 5    third party.  So it's --
  6             THE COURT:  Something we should go forward with.
  7             MS. KRYSAK:  Yes.  We can move forward with it and
  8    still focus on good faith steps to settle as well.
  9             THE COURT:  Okay.  Then I will not tamper with any
11:53AM 10    of those dates.
 11             Anything else?
 12             Counsel, again, thank you very much.  Have a good
 13    rest of the day, good weekend.  I'll see some of you on
 14    June 30th.  I wish you luck in the process.
11:53AM 15             THE COURTROOM DEPUTY:  All rise.  This Court is
 16    adjourned.
 17             (Proceedings concluded at 11:53 a.m.)
 18                          --oOo--
 19
 20
 21
 22
 23
 24
 25
```

UNITED STATES DISTRICT COURT

1                        *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  July 27, 2023*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*_____

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25