*__Goldwater Bank v. Elizarov, et al.__*, C.D. Cal. Case No. 21-cv-00616-JWH-SP

# OMNIBUS
# JOINT EXHIBIT PART H

# EXHIBIT 98

# EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF JAY HIBERT

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3    _____

 4    GOLDWATER BANK, N.A.,

 5          Plaintiff,

 6       v.                        Case No.

 7    ARTUR ELIZAROV, ET AL.,          5:21-cv-00616-JWH-SPx

 8          Defendants.

 9    _____

10    AND RELATED CROSS CLAIMS.

11    _____

12              VIDEOCONFERENCE DEPOSITION OF

13                     JAY HIBERT

14    DATE:          Thursday, December 15, 2022

15    TIME:          10:06 a.m.

16    LOCATION:      Remote Proceeding - CA

17                   Carlsbad, CA

18    OFFICIATED BY: Jess Wakefield, Notary Public

19    JOB NO.:       5622501

20

21

22

23

24

25

                                              Page 1
```

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF GOLDWATER BANK, N.A.:

 3         JOSEPH A. LEVOTA, ESQUIRE (by videoconference)

 4         Hilbert & Satterly LLP

 5         409 Camino Del Rio South, Suite 104

 6         San Diego, CA 92108

 7         jlevota@hscallaw.com

 8

 9    ON BEHALF OF DEFENDANTS BANK OF THE WEST AND SCOTT

10    HOWLETT:

11         JEREMY KATZ, ESQUIRE (by videoconference)

12         Hall Griffin LLP

13         1851 East First Street, 10th Floor

14         Santa Ana, CA 92705

15         jkatz@hallgriffin.com

16         (714) 918-7000

17

18    ON BEHALF OF DEFENDANT UNISON AGREEMENT CORP.:

19         NABIL BISHARAT, ESQUIRE (by videoconference)

20         Orsus Gate

21         16 North Marengo Avenue, Suite 316

22         Pasadena, CA 91101

23         nbisharat@orsusgate.com

24

25

                                          Page  2
```

Omnibus Joint Exhibit Part H, page 1747

```
1              A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANTS ARTUR ELIZAROV AND ILYA

3    ALEKSEYEFF:

4         ILYA ALEKSEYEFF, ESQUIRE (by videoconference)

5         Loia, Inc. (APLC)

6         8721 Santa Monica Boulevard, Suite 119

7         West Hollywood, CA 90069

8         ilya@loia.legal

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  3
```

```
 1                    P R O C E E D I N G S
 2                    THE OFFICER:  Good morning.  We're on the
 3       record at 10:06 a.m.  My name is Jess Wakefield; I'm the
 4       deposition officer assigned by Veritext to take the
 5       record of this proceeding.
 6                    This is the deposition of Jay Hibert
 7       taken in the matter of Goldwater Bank, N.A. vs. Artur
 8       Elizarov, et al. on Thursday, December 15, 2022, and the
 9       deponent is in Carlsbad, California.
10                    I am a notary authorized to take
11       acknowledgments and administer oaths in Washington
12       State.  Parties agree that as the deposition officer, I
13       will swear in the witness remotely.
14                    Additionally, absent an objection on the
15       record before the witness is sworn, all parties and the
16       witness understand and agree that any certified
17       transcript produced from the recording of this
18       proceeding:
19                         - is intended for all uses permitted
20                         under applicable procedural and
21                         evidentiary rules and laws in the same
22                         manner as a deposition recorded by
23                         stenographic means; and
24                         - shall constitute written stipulation
25                         of such.
```

Page 6

```
 1                    At this time will everyone in attendance

 2      please identify yourself for the record, beginning with

 3      the taking attorney.

 4                    MR. LEVOTA:   Joseph LeVota, counsel for

 5      Goldwater Bank.

 6                    MR. BISHARAT:   Nabil Bisharat, counsel

 7      for Unison Agreement Corp.

 8                    MR. KATZ:   Jeremy Katz, counsel for Scott

 9      Howlett and Bank of the West.

10                    MR. ALEKSEYEFF:   And good morning.   Ilya

11      Alekseyeff, counsel for Artur Elizarov, and I also

12      represent myself as a defendant.

13                    THE OFFICER:   And Mr. "Hibbert," if you

14      would just introduce yourself.

15                    MR. HIBERT:   Sure.   And just for the

16      record, it's Hibert, H-I-B-E-R-T.   Jay Hibert, and I'm

17      expert witness on behalf of Mr. Hibert and Bank of the

18      West.

19                    THE OFFICER:   My apologies, Mr. Hibert.

20                    MR. HIBERT:   No.   No problem.   I hadn't

21      -- that, that's typical, because "Heebert" is normally

22      what everybody calls me; I just have to make little

23      corrections.   No problem.

24                    THE OFFICER:   All right.   Hearing no

25      objection, I'll now swear in the witness.   Please raise
```

Page 7

Omnibus Joint Exhibit Part H, page 1750

1    your right hand.

2    WHEREUPON,

3                          JAY HIBERT,

4    called as a witness, and having been first duly sworn to

5    tell the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7                    THE OFFICER:  Thank you.  Counsel, you

8    may proceed.

9                    MR. LEVOTA:  Good morning, Mr. Hibert.

10   Would you please state and spell your name?

11                   THE WITNESS:  Yes.  It's Jay Hibert.  J-

12   A-Y, H-I-B-E-R-T.

13                   MR. LEVOTA:  Okay.  Thank you.  And we're

14   here this morning for your deposition, and I'll be

15   examining you most of the time, but counsel for Unison

16   Agreement Corp. had a few initial questions that they

17   want to ask, so we're going to go ahead and let that

18   counsel ask his questions now, and then we'll move to my

19   examination, okay?

20                   THE WITNESS:  Excellent.

21                   MR. BISHARAT:  Thank you, Joe.  I

22   appreciate the professional courtesy.

23                          EXAMINATION

24   BY MR. BISHARAT:

25        Q    Good morning, Mr. Hibert.  How are you?

                                                    Page 8

1      Q    How come?

2      A    Well -- again, there's nothing in there about

3  the loan totals that you would see, or a summary

4  statement that you would see with an actual payoff

5  demand; that would be transmitted by a bank to escrow.

6  He's referencing his conversation, but again, my review

7  of the file shows that Ms. Cross did not have any

8  knowledge of the, the deed of trust that was not

9  recorded, so she did not know.  She's just -- she's just

10  reading -- in my opinion, reading what he's saying about

11  his conversations with the bank and Elizarov.

12      Q   Do you feel as though any of these facts that

13  we've gone over in this email chain are relevant to the

14  opinion that you've rendered in this action?

15      A    Yes.

16      Q   How come none of those facts are listed in

17  your recitation of facts?

18      A    I think that in my report --

19      Q   I'm looking at page 8, paragraph 31 -- where

20  are we at -- we were at paragraph 28.  "Later on March

21  25, '21, Escrow of the West notified Goldwater that

22  Goldwater had sent an incorrect payoff demand."  But you

23  don't reference any of the other email communications

24  after that; how come?

25      A    Most likely, because I wasn't finding  it as

Page 50

Omnibus Joint Exhibit Part H, page 1752

1    relevant to the idea of communicating about a proper

2    payoff demand or Mr. Hill communicating that they had a

3    deed of trust that had not been recorded.

4         Q    Your expert report in the fact recitations

5    make no mention of this email from Peter Hill to Andrea

6    Cross on March 26, 2021, at 11:06.  How come?

7         A    As I sit here today, Mr. LeVota, I don't know.

8    I don't recall if I cite to that in -- later in my

9    report or not, but -- so I really don't know.

10        Q    Does the substance of this email on March 26th

11   from Peter Hill to Andrea Cross impact your opinions in

12   this matter?

13        A    It, it impacts it to the degree that I

14   mentioned in my report, one of my opinions is it didn't

15   make sense -- or doesn't make sense to me that a bank

16   would even be negotiating a short payoff if they

17   believed that they were in a senior secured position.

18   Just -- and I think I wrote that in my report later.

19             So I guess from that standpoint, that email

20   impacted my opinion on the fact that the bank was

21   negotiating that rather than acting with urgency to

22   notify and put folks on notice that they had a deed of

23   trust that had been executed and not recorded.

24        Q    On page 9 of your report, paragraph 33, then

25   you state "Escrow closed on March 26, 2022."  What do

                                              Page 51

1   you base that statement on?

2        A    I would have to go back to my file, but I

3   would have to have a document in there that would give

4   me that date.  I'd have to look.  It was either -- it's

5   -- what document it came from, I can't tell you if it

6   was -- came from the complaint, or the amended

7   complaint, or if it came from any of the answers.

8             But I would not have cited that date if I

9   didn't have it in my file.  I just can't recall which

10  particular document I pulled that from.  Trying to look

11  and see.

12       Q    I'm going to show you what was previously

13  marked as Exhibit 34 to the deposition of Andrea Cross.

14            (Exhibit 34 was previously marked for

15             identification.)

16       A    Okay.

17       Q    And this is a document called Seller's Final

18  Settlement Statement.  Are you familiar with this

19  document?

20            MR. KATZ:  I'm sorry, Joe.  Could you

21  scroll down just so we could see the bottom and the

22  Bates number -- and there's a -- okay.  Thank you.

23  BY MR. LEVOTA:

24       Q    Are you familiar with this document?

25       A    Yes.

                                        Page 52

Omnibus Joint Exhibit Part H, page 1754

```
 1   receiving the information back -- and so therefore, the

 2   conclusion -- and again, I'm not speaking for her --

 3   would be that they were not a secured lender.

 4        Q    Okay.  So let's ask this hypothetical --

 5   because this is truly a hypothetical.  She has a

 6   subordination agreement, and Goldwater is, you know,

 7   doing all this stuff.

 8             But Andrea Cross asked Goldwater and says,

 9   "Hey, Goldwater, are you the senior lender referenced in

10   the subordination agreement?"  And they say yes.  In

11   that situation, what should Andrea Cross do with that

12   information?

13        A    In that --

14             MR. KATZ:  Objection: asked and answered.

15             THE WITNESS:  Yes.  In, in that

16   hypothetical, then she would have the knowledge and

17   that, that would raise the question to most likely a

18   title officer to say, "Listen, I've been informed that

19   there is a senior secured lender and I've been given a

20   copy of an unrecorded deed of trust."

21   BY MR. LEVOTA:

22        Q    Well -- no, no.  Let's back up.  She doesn't

23   get a copy of the unrecorded deed of trust.  She is

24   simply told that the identity of the senior lender in

25   the subordination agreement is Goldwater.  But they
```

Page 129

Omnibus Joint Exhibit Part H, page 1755

1    still don't have a recorded lien; they still haven't

2    given any unrecorded deed of trust to her.  What would

3    you think she should do in that situation?

4        A    If she's being told the identity, then that

5    would raise a question potentially with the seller, the

6    borrower, as to, where is the, the evidence -- or, you

7    know, who is this loan with?  Sometimes what an escrow

8    officer will ask for in a situation like that is a loan

9    statement so that they have some evidence of the loan.

10   That kind of thing.

11       Q    And the subordination agreement lists the

12   original principal amount of 686,250.  That's on there;

13   correct?

14       A    Yes.

15       Q    So that's information that anyone would have

16   from reading this document; correct?

17       A    Yes.

18       Q    And when we look at the email thread -- oh,

19   got to bring it up here -- between Andrea Cross and --

20   oh, jeez.  Hang on, I'm going to stop sharing.  Where

21   she says, you know, keep them in the loop; we're going

22   to be taking 675 as a short-sale.

23       A    Yes.  I'm familiar.

24       Q    Would a reasonable person look at that and

25   say, "Huh, I have a subordination agreement that's

Page 130

1   referring to a loan to this guy for 686; I have this

2   mortgage company saying that they're ahead of the entity

3   referenced as the junior lienholder in the subordination

4   agreement.  And now they're saying that they're going to

5   accept 675 as a short-sale."

6          Would a reasonable person look at that and ask

7   themselves, is Goldwater the senior lender referenced in

8   the subordination agreement?

9       A    One could draw that conclusion, but one could

10  also draw the conclusion that they wouldn't be because

11  it would be highly unusual for a senior lender to be

12  asking for a short payoff.  So that, that's kind of a,

13  an odd part to the story.

14      Q    So I understand that that's an odd part of the

15  story, and I believe your testimony is that you've never

16  heard of that ever happening?

17      A    Not if you're in a senior position and --

18  there's just no reason to negotiate that.  Now you would

19  negotiate a discount, sale, certain things like that,

20  transfer to a mortgage servicing company to discount.

21  But if you believe you're in a position to be paid in

22  full and you have a senior position, no reason to ask

23  for a short payoff.

24      Q    Would you say that Unison's interest in the

25  property represents a typical mortgage situation?

                                           Page 131

```
 1        A     No.  It's not typical.

 2        Q     It's more of like, an equity sharing kind of

 3   investment?

 4        A     Correct.

 5        Q     How many transactions have you encountered

 6   where the junior lienholder was in the position of

 7   Unison of being a equity investor?

 8        A     Quite a few.  It's not overly common.  It's

 9   more -- it's actually more common -- it -- I shouldn't

10   say it's not common.  There's a lot of these types of

11   transactions that have occurred over the years.  But

12   it's actually very common in the -- in the private

13   lending world as well.

14        Q     In that type of situation, are there ever

15   limits on what the second will be subordinated to as

16   amounts owing to the first?

17        A     Yes, there can be.

18        Q     And would that kind of decision ever impact a

19   first priority position lienholder's decision of whether

20   or not to take a short sale in a situation?

21        A     It, it could.  I'm not saying there's not a

22   hypothetical that could exist or a situation that might

23   arise.  It's certainly an out -- a potential outcome.

24   I've just not seen it happen.

25        Q     So let's talk about this specific case in
```

Page 132

```
 1    which Goldwater's made this loan to Artur Elizarov.
 2    It's nonperforming; correct?
 3          A    Yes.
 4          Q    He's been in COVID forbearance for a while?
 5          A    Yes.
 6          Q    The bank is looking at a situation where
 7    there's not enough in the payoff to pay the liens that
 8    are represented on the settlement statement that was
 9    provided to them by the escrow officer; correct?
10          A    Correct.
11          Q    And they're looking at a situation where this
12    transaction is closing in a couple days because it's
13    closing soon, relatively soon; correct?
14          A    Yes.
15          Q    And so they're looking at this and saying,
16    "Okay, we can either accept a short payoff, a $55,000
17    discount, and get paid, and move on to other loans and
18    other transactions, or we could fight with Unison, or we
19    could do whatever, and try to get our full amount paid."
20               Would you think that there would be any
21    reasonableness to Goldwater deciding to have the cash
22    now and get out of this investment?  Or do you think
23    that it was completely unreasonable for them to make
24    that decision?
25                    MR. KATZ:   Object as to form.
```

Page 133

1            THE WITNESS:   I would say given the fact

2     pattern that I see based on the documents in this case,

3     it would not make sense to take a discount because

4     there's other steps they could have taken to put

5     themselves -- or to put everybody on notice that they

6     had a secured position.   And then there wouldn't have

7     been a fight.   They would have --

8     BY MR. LEVOTA:

9         Q     Well -- I understand that they could have made

10    a different decision and that you might have advised

11    them to make a different decision -- but that's not

12    really what I asked.   I asked, was the decision that

13    they made within the realm of reasonableness for a

14    business decision?

15                   MR. KATZ:   Objection as to form.

16        A     I, I think based on the language I used in my

17    report, the answer is no.   I, I don't see it as

18    reasonable given this case.   I, I agree with you that

19    there are situations where it would be a reasonable

20    decision, right?   But I think in this particular case,

21    given the amounts, given what I saw -- I -- not only

22    would I not advise them to; I would tell them that

23    that's an unreasonable decision.   It's an unreasonable

24    path, an unnecessary path.

25        Q     And so you would advise them to just -- what

                                        Page 134

Omnibus Joint Exhibit Part H, page 1760

1    would you advise them to do?

2        A    I would put the world on notice.  I would -- I

3    would file an instant action with a lis pendens if they

4    had to, get that deed, the, the unrecorded copy and, and

5    move forward with that.  That, that's what I would have

6    done.  And, and they -- I would have done that much

7    earlier in the process.

8        Q    And had they done that -- in your opinion, do

9    you think this transaction would have closed?

10                MR. KATZ:  Objection: incomplete

11   hypothetical.

12       A    Based on the information that I saw, yes.

13       Q    So you feel that if they would have gone out,

14   filed an action, reported a lis pendens, and recorded

15   their deed of trust after learning that it wasn't

16   recorded from Andrea Cross in March 25th timeframe that

17   this transaction would have still closed?

18       A    It may not have closed in -- on the same

19   timing, but there was enough in the purchase price --

20   my, my understanding based on the documents -- that is a

21   transaction that could have been completed.

22       Q    There would have been a delay, though, in the

23   completion of that; is that what you said?

24       A    That's what I'm saying.  The, the further --

25   closer it got to the scheduling closing date, the more

                                        Page 135

1    you base this statement on?

2         A    It's based on my professional experience --

3    again, my collective consciousness, collective

4    experience -- and the fact that when dealing in areas of

5    title, title insurance, it's commonly known by lenders

6    that if there's any issue that might impact title, or

7    impact the ability to be a receiver of title insurance

8    benefits, that title companies should be notified as

9    soon as possible -- like immediately.

10        Q    In paragraph 53, you state "The minimum

11   standard in the mortgage lending industry when learning

12   that real property used as collateral is not properly

13   recorded is to immediately contact the title insurance

14   company.  In this case, however, Goldwater knew that

15   there was a pending sale in escrow, and yet no one from

16   Goldwater ever informed Escrow of the West that it had

17   an unrecorded deed of trust in its possession."

18             What are you basing this statement on?

19        A    The same.  And again, I'm, I'm not here to

20   opine on title insurance policies, but I've read

21   countless title insurance policies, and it's pretty

22   clear that, that a lender is to notify the, the title

23   company -- or in this case, escrow company -- in any

24   transaction that there is a, an issue.  That's why we

25   used the words up above immediately.  And the

Page 148

1    notification should come immediately.

2        Q    And I think we've gone over this.  In

3    paragraph 55, then you say "It is also unclear to me as

4    a lending expert with 36 years of industry experience

5    why a lender would work towards a short payoff when

6    claiming to be in a senior secured position."

7            And that's just based on your opinion that if

8    you're in a first position, then you get paid what

9    you're owed and everyone else figures it out?  Is that

10   kind of the sentiment?

11       A    That's generally the sentiment.  When you're

12   in a senior secured position, you did point out that

13   there can be some, some exceptions with types of deals,

14   private deals, and so forth.  But in, in general, vast

15   majority of the times, that's not the case.

16           If you're in a senior position and there's the

17   equity in, in place, then you'll receive your, your pay,

18   payoff.

19       Q    Then we're here -- we're moving into section

20   11.  "The inquiry notice standard was satisfied and

21   discharged when Cross requested a payoff demand from

22   Goldwater, and Goldwater never provided a payoff demand

23   for Elizarov's loan or a copy of Goldwater's deed of

24   trust."

25           So I mean, you're saying here, duty of inquire

Page  149

1    was satisfied because they did not get a copy of the

2    deed of trust for the payoff demand.   So how is Andrea

3    Cross's duty of inquiry satisfied because she did not

4    receive actual knowledge or actual notice from Goldwater

5    as to the ultimate facts?   I still just don't understand

6    that.

7         A     That's okay.  Because the way I -- the way I

8    have been trained and what I see in the mortgage lending

9    industry, and based on my professional experience, many

10    -- too many years at this point in my career of 37 years

11    -- she made inquiry, she asked for a demand.

12             Goldwater had knowledge that it had an

13    unrecorded deed of trust and they never provided that

14    back to Ms. Cross, nor did they provide a payoff demand

15    that was correct.   And they had the opportunity to do

16    that.

17             I think -- I don't -- I don't know when --

18    this, this is a legal conclusion I can't make, but at

19    some point, in, in my opinion, a, a person can ask so

20    many times, and at some point, I think it's not their

21    responsibility any further to continue asking if, if the

22    other party is not responding.

23             So that's just my opinion.   In, in this

24    industry, what I see when a lender or an escrow officer,

25    or someone in that -- in, in the transaction is aware of

                                           Page 150

1    a document, then it makes a difference.  When a lender

2    is aware that they have a document that's not been

3    recorded, it's just beyond my comprehension as to why

4    they didn't do something.  That's just not what I would

5    -- what I would see in the industry.

6        Q    But your opinions as to what Ms. Cross should

7    or should not have done is not based on any experience

8    as an escrow officer; correct?

9        A    Correct.  It's just based on my participation

10   in the escrow process.

11       Q    If an escrow agent learns information about a

12   document that's not listed in a preliminary report that

13   may affect title, can they ignore that information?

14            MR. KATZ:  Objection: calls for a legal

15   conclusion, improper speculation.  And anything is

16   possible.

17            THE WITNESS:  I, I wouldn't expect them

18   to ignore it.  The, the outcome or what they do with it

19   would depend on the type of information.  I think you

20   would agree.

21   BY MR. LEVOTA:

22       Q    Based on your review of the documents, was

23   there anything keeping Andrea Cross from halting the

24   transaction to obtain clarity regarding Goldwater's

25   claims?

Page 151

```
 1        A    Anything to stop her from halting the
 2   transaction?
 3                 MR. KATZ:  Objection.
 4                 THE WITNESS:  I don't --
 5                 MR. KATZ:  Calls for a legal conclusion.
 6                 THE WITNESS:  Yeah.  I, I think I've
 7   addressed it from the other direction that I don't -- I
 8   didn't see anything that would cause her to halt it --
 9   if, if that answers your question.
10   BY MR. LEVOTA:
11        Q    It doesn't.
12        A    Okay.  Sorry.  Trying.
13        Q    I understand.  But my question is more, I
14   mean, she could have paused the transaction, responded
15   to that March 26th email from Goldwater, talked to
16   Goldwater and Elizarov together, and figured out what
17   was going on.  Was there anything that was physically
18   stopping her from doing that?
19        A    Oh, that's what you're saying.  No.  Nothing
20   physically stopping her from doing that.
21        Q    If the escrow officer receives authorization
22   from the seller and direction from the seller to obtain
23   a payoff demand statement from a mortgage company, and
24   then later, the mortgage company is saying, "Yeah, we're
25   owed money, and we're trying to get -- you know, we're
```

Page 152

1    owed -- we want to take 675 from this."

2         And then the seller says, "Don't talk to that

3    mortgage company any further."  Would you say that all

4    those instructions are consistent with each other?

5         A    No.  Not, not necessarily.  And that -- and

6    again, that's, that's why I come back to the opinion of,

7    Goldwater knew that; Goldwater should have acted on

8    that.  It, it -- and so they -- I mean, they knew the

9    inconsistencies themselves and were holding an

10   unrecorded deed of trust.  I think they really held the

11   -- they held the cars if you will, and, and didn't do

12   anything.

13        So I, I don't -- that's, that's really the

14   angle that I come at it from because it's, it's -- in my

15   opinion, it's the secured lender's responsibility to

16   protect its collateral position.  When they know there's

17   something that's causing an impact or could cause an

18   impact, then they should act immediately.

19        Q    Does an escrow officer have any obligations to

20   only close a transaction when there's clear direction as

21   to all material instructions?

22        A    To close it?

23             MR. KATZ:  Objection: calls for legal

24   conclusion.

25             THE WITNESS:  Based on my experience, an

Page 153

```
 1    escrow officer, an escrow company, will follow through

 2    with closing if the joint instructions have been adhered

 3    to.

 4    BY MR. LEVOTA:

 5        Q    And so is there any inconsistency between the

 6    instruction from Elizarov to no longer speak to

 7    Goldwater, and Goldwater saying, you know, "We've

 8    reached an agreement with Elizarov, and we're to be

 9    paid"?  Is there any inconsistency between those two

10    statements?

11              MR. KATZ:  Objection: incomplete

12    hypothetical.

13        A    I, I understood the communication to say that

14    they were going to try to be in touch with Mr. Elizarov.

15    In other words, they had had a, an approval, but I, I

16    think -- and maybe I'm not recalling the email correctly

17    -- but I think the, the end of the email was that they

18    were going to try to be in touch with Mr. Elizarov.

19              THE OFFICER:  Counsel, whenever there's a

20    convenient time, can we take a short bathroom break?

21              MR. LEVOTA:  Let me do this questioning

22    real quick, and then we'll take a quick break.

23    BY MR. LEVOTA:

24        Q    So we're talking about the email chain between

25    Andrea Cross and Peter Hill.
```

                                          Page 154

Omnibus Joint Exhibit Part H, page 1768

```
 1    deed of trust."  As I said before in earlier testimony,

 2    the first step is to notify the title insurance company

 3    that you think there's going to be or could be a

 4    potential problem.

 5              But knowing that there was a transaction in

 6    process, which they knew, then clearly, they could send

 7    over the copy that they had -- whether or not it was a

 8    photocopy, it doesn't matter.  Just get, get something

 9    in the hands of the parties to know -- or to, to show

10    them that there has been a deed of trust that was

11    signed, just not recorded.

12       Q    Now I'm going to give you a hypothetical that

13    is different from the facts we have in our case.  If

14    Andrea Cross had asked Goldwater, are you the senior

15    lienholder for this property, and if Goldwater stayed

16    silent, what conclusion should Andrea have drawn from

17    Goldwater's silence?

18       A    That they're not secured because a reasonable

19    person would expect a mortgage lender to respond that

20    they're -- that they're secured, or respond with the,

21    the documents, and respond with whatever information is

22    necessary to show that they're in a secured position.

23       Q    Same hypothetical, but again, this time,

24    Andrea Cross would tell Goldwater -- instead of staying

25    silent, Goldwater would return a payoff demand for the
```

Page 211

Omnibus Joint Exhibit Part H, page 1769

1    wrong loan, wrong borrower, wrong state, wrong

2    property -- what conclusion could Andrea draw from that

3    given your understanding of that a reasonable lender

4    would do in that scenario?

5        A    Again, the, the -- she would not understand

6    them to be in a secured position because they supplied

7    incorrect information.

8        Q    And if she had told them that they had

9    provided incorrect information, and she didn't receive

10   any substantiating documents in response, what would you

11   expect her to believe based on what a reasonable senior

12   lender would do in that circumstance?

13       A    That, that she would draw the conclusion that

14   they must not be in a secured position because -- or

15   that, that they need to be paid off because they're not

16   responding with proper payoff information.

17       Q    Now in a situation where there's different

18   priority lienholders -- the first and the second -- and

19   there's not enough money from a proposed sale of a

20   property to pay off both, who gets paid in full first?

21       A    The senior secured lender.

22       Q    Is there any reason for a reasonable first

23   position senior secured lender to accept less than the

24   full amount of what they're owed if there's enough money

25   in the escrow transaction for them to be paid in full?

                                      Page  212

1          A    No.   That doesn't make any sense.   That,

2     that's what I was saying in my report.   And in this

3     situation, it, it -- to me, it definitely appeared there

4     was enough money in escrow -- so there -- it just didn't

5     make any sense.

6          Q    And if there's two lienholders on a property,

7     first and a second, and there's a deficiency in the

8     escrow funds to pay out both in full, who would you

9     expect in that scenario to take a haircut?   The first or

10    the second?

11         A    Absent some sort of exceptional agreement

12    which we talked about, then the second would take the

13    haircut.

14         Q    Is it consistent with industry practices for a

15    real estate secured lender to fail to provide a payoff

16    quote in response to a demand from an escrow company?

17         A    No, not at all.   The, the supply of a payoff

18    demand is, is a regulated instrument.   They're required

19    to, to respond in -- I believe the timeframe is still 72

20    hours.   It used to be, I think, five days, but I think

21    it's now down to three.

22         Q    Regardless of the timeframe for response, is

23    it your understanding that a real estate secured lender

24    who is obligated to respond to a payoff demand -- to a

25    request for a payoff demand from an escrow company?

                                              Page  213

1    A    Yes, they are.

2    Q    And if in response to a request for an escrow

3    company, if someone submitted documents that did not

4    substantiate their interest in a property

5    notwithstanding more than one request for documentation,

6    is it fair to say that they were behaving differently

7    than a reasonable real estate secured lender would?

8    A    Yes.  Absolutely.  That's, that's definitely

9    what I've said.

10    Q    You mentioned things about a real estate

11    secured lender checking to make sure their deed of trust

12    is recorded.  Why would a real estate lender double

13    check to make sure that their deed of trust is recorded

14    rather than merely relying on outside vendors to take

15    care of it for them?

16    A    Because it's, it's a critical part of secured

17    lending, is, is receiving not only the recorded deed of

18    trust to know that it's been recorded so that it's

19    public, constructive notice, but also the title policy

20    to ensure that position.  To protect their -- to protect

21    their interest in a loan.

22    Q    And if a person who was expecting to be a real

23    estate secured lender after the close of that

24    transaction did not receive a recorded copy of their

25    deed of trust or a title policy, what would you expect

Page  214

1    them to do in that situation?

2        A    To quickly contact the title and escrow

3    company, specifically the title company that would have

4    the instructions, and find out what happened.  Where is

5    the deed of trust?  We, you know -- it's been submitted;

6    it was part of the document package.  And if one was

7    missing, then they would immediately follow up with the

8    borrower to have another one executed.

9        Q    And is it typical in the secured real estate

10   lending industry that a lender would go more than a year

11   without checking to see if their deed of trust had ever

12   been recorded after the close of a transaction?

13       A    No, it's not typical.  As I testified to

14   before, the standard is to have a tickler, and I think

15   Mr. Hill said the same thing, that the standard -- most

16   policies and procedures that I've reviewed in the

17   banking industry and the mortgage industry would have a,

18   a procedure for a tickler system specifically to follow

19   up on recorded documents.

20       Q    And what is the risk of not recording a deed

21   of trust, at least for a California real estate

22   transaction?

23       A    Not having a secured position.  Having the

24   collateral sold.  Risk of not being repaid.

25       Q    Are those risks known to real estate secured

                                        Page 215

Omnibus Joint Exhibit Part H, page 1773

1    the majority of the cases, if not all.

2        Q    So I'm going to give you a hypothetical here.

3    Based on the closing disclosure dated March 23rd that

4    Mr. LeVota showed you where there was a blank line for

5    first lien payoff, if there was a subsequent disclosure

6    from Escrow of the West identifying two payees out of

7    the proceeds of an escrow, both of whom were

8    lienholders, would that resolve any initial inquiry that

9    would come as to who the missing first was on the March

10   23, 2021, closing disclosure?

11       A    Yes.  As best you could change like that, yes.

12       Q    For the purpose of inquiry notice, does the

13   person making the inquiry have to do an exhaustive

14   search?  Did they have to be Sherlock Holmes and not

15   rest until they had found the actual be-all, end-all

16   explanation?

17       A    No.  Not in my experience, and that's why I

18   was saying before, I -- based on, you know, not giving a

19   legal opinion, I'm not sure how far one needs to go.

20   But in my experience, not very far.  I mean, you, you

21   make the inquiry.

22       Q    So does the resolution of inquiry notice, or

23   the satisfaction or discharge of inquiry notice -- does

24   it require A-plus effort?  Or does it just require a

25   answer that resolves whatever discrepancy caused the

                                          Page  221

Omnibus Joint Exhibit Part H, page 1774

1    inquiry in the first place?

2        A    In, in my professional experience, it does not

3    require -- it, it could be average.  It could be because

4    the A-plus needs to come from the, the other side, and

5    this -- and in particular, a secured transaction needs

6    to come from the lender that's wanting the collateral,

7    wanting the lead position.

8        Q    Now I mean, we have been back and forth

9    through that email exchange between Mr. Hill and Andrea

10   Cross.  The one that finished with "Just to keep you in

11   the loop" -- is the communications in there -- well --

12   there was a communication that said -- from Andrea Cross

13   -- saying Goldwater, this is a bad payoff quote.

14            And there's a communication after Mr. Hill

15   thought he had transmitted another one, where there was

16   nothing attached.  The next communication says "No need

17   to submit any further.  I have been instructed not to

18   pay you.  You are not a recorded lienholder."

19            Is Goldwater's conduct after being told that

20   they cannot be paid, and that they are not in the

21   recorded chain of title, and that the escrow has been

22   instructed not to speak with them anymore -- is

23   Goldwater's conduct after that consistent or

24   inconsistent with what a reasonable and prudent real

25   estate secured senior lienholder would do?

Page  222

1          A          It's inconsistent, very much so.

2          Q          And Goldwater could have provided Ms. Cross an

3     escrow with actual notice of Goldwater's lien

4     instrument, whether recorded or otherwise, right?

5          A          That's my understanding.   They had in their

6     possession a copy of the signed deed of trust,

7     unrecorded.

8          Q          If you were advising Goldwater, as of the time

9     that Andrea Cross said you were not a lienholder of

10    record, I can't pay you, I can't speak to you -- would

11    you advise Goldwater to send Ms. Cross a copy of the

12    unrecorded deed of trust?

13         A          I would have advised him to do it immediately,

14    and I would have advised him to send it to the title

15    insurance company immediately.   And knowing that there's

16    a transaction in, in moving forward -- the existing

17    transaction -- I might have advised them to, to get a

18    copy to all the parties that they could that were part

19    of that transaction.   If they -- you know, anybody that

20    they could that's a part of the transaction.

21         Q          And in that situation, if you had a copy of

22    the purchase and sale agreement the way Goldwater had a

23    copy of the purchase and sale agreement -- if you had a

24    copy of the purchase and sale agreement and you were

25    told that a bank that you represented was not in the

                                                     Page  223

Omnibus Joint Exhibit Part H, page 1776

1      recorded chain of title, was not going to be paid from

2      the escrow transaction, and that escrow had been

3      instructed not to speak with them -- would you send a

4      copy of the unrecorded deed of trust to every single

5      person identified in the purchase of sale agreement?

6            A      Absolutely.

7            Q      And why would you do that?

8            A      To, to make it absolutely clear and provide

9      notice that there is an unrecorded deed of trust, and

10     to, to put everybody on notice, essentially.  I mean,

11     it's, it's -- again, that's credit 101.  Just, just

12     doesn't make any sense to, to hold onto the document

13     when you have it in your possession.

14           Q      Now we had just discussed failing to record a

15     deed of trust is an F in the real estate lending world.

16     What about this situation where a lender is told they're

17     not in the recorded chain of title, they're not going to

18     get paid from the transaction, they are not going to be

19     -- escrow has been instructed not to speak with them --

20     would it be a failing grade, an F, if the lender at that

21     point did not deliver actual notice or documentation

22     that substantiated its lien interest?

23           A      Yes.  If they have that information and they

24     don't deliver it, then that's -- I just can't comprehend

25     that.  It doesn't make any sense to me.

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part H, page 1777

1          Q       And if Goldwater had the ability to resolve

2     any confusion that escrow may have had, does Goldwater

3     as a real estate secured lender have any obligation to

4     put -- to deliver actual notice if it's capable of

5     delivering actual notice?

6          A       In, in my professional experience and

7     understanding, yes.

8          Q       Is that because it's the lender's

9     responsibility to protect their collateral?

10         A       Yes.

11         Q       And if a lender does not protect their

12    collateral, do you believe that the lender bears any

13    responsibility if the collateral is lost?

14         A       I do.   And I, I've seen it happen so many

15    times, unfortunately, but I do.   That's why it's so

16    important to protect the interest.

17         Q       And the ways that a normal real estate secured

18    lender would protect their interest would be by

19    recording, or by shouting from the rooftops and

20    providing actual notice upon being told that they hadn't

21    -- that are not in the recorded chain of title?

22         A       Absolutely.   Especially, like I said, if, if

23    they've got it in their possession.   Then they can

24    provide actual notice.

25         Q       I'm going to ask you a couple questions about

Page  225

```
 1    the subordination agreement.  You said that sometimes a

 2    subordination agreement can be recorded before the

 3    actual transaction, the loan is funded; is that right?

 4         A    Correct.

 5         Q    And is that just to make sure that the lien

 6    priority positioning is established as between the

 7    persons supposed to be in first and supposed to be in

 8    second?

 9         A    Correct.  And the junior lienholders that,

10    that know that -- it's not a -- it's, it's not a

11    surprise.  So those documents would be prepared because

12    it would be -- because they would be required.

13         Q    Who typically prepares subordination

14    documentation as between the person who is supposed to

15    be elevated to first, or the person supposed to be

16    demoted down to second?

17         A    It comes from the second side.  So the -- it

18    -- on occasion, the first or the senior lender will

19    prepare the document or will supply a document.  But

20    typically it comes from the, the junior lienholder

21    and/or the title and escrow company.

22         Q    And what is the to-be-elevated senior

23    lienholder's role in the preparation and recording of a

24    subordination agreement?

25         A    To review it for accuracy, to make sure that
```

Page 226

```
 1        Q    As a representative of a bank or a consultant

 2   to a bank, if an escrow officer came forward and said,

 3   "I need to delay the transaction on a suspicion that

 4   just turned out to be wrong and the transaction fell

 5   apart, would the bank consider -- or would you recommend

 6   to the bank to consider pursuing legal action against

 7   the escrow for negligence?

 8        A    That would be my recommendation because that's

 9   the, the problem with incorrect information in a -- in

10   a, a real estate transaction.  It can really create --

11   it can create a problem.  If the -- if a deal doesn't

12   close and needs to close, I mean, there's all sorts of

13   monetary damages that are possible when you're buying

14   and selling real estate.

15        Q    And is it the flipside of that hypothetical

16   where the real estate agent comes into information,

17   they're suspicious, but they don't disclose it to the

18   principals -- and then something goes horribly wrong --

19   if you were in a bank in that situation, would you

20   recommend pursuing legal action against the escrow for

21   failing to disclose?

22        A    If, if I felt that there was a failure to

23   disclose something that should have been disclosed, yes.

24        Q    Would you agree or disagree with the statement

25   that generally, escrow officers do not have duties to
```

Page 235

```
 1    disclose suspicions, mere suspicions, to the principals
 2    of the escrow transaction because they're faced with a
 3    dilemma wherein, if they disclose and they're wrong,
 4    they're liable, and if they don't disclose and they're
 5    right, they're liable?
 6         A     It, it is -- in my experience, it is an issue.
 7    And I've been a part of transactions where issues have
 8    come up, and it's natural to try to get the information
 9    from an escrow officer, and you can't get the answers
10    because of the hypotheticals that you're talking about
11    now -- or the situations you're talking about now.
12         Q     Do you believe that escrow -- or I'm sorry --
13    do you believe that Goldwater should have put escrow on
14    actual notice that it had an unrecorded deed of trust?
15         A     Oh, hundred percent, I do.
16         Q     And why do you believe that Goldwater should
17    have done that?
18         A     Well -- it would have -- as we said before, it
19    would have protected their interest, and there was
20    enough money to close the transaction.  I mean, it just
21    -- I can't think of a reason not to put them on actual
22    notice.
23         Q     If Goldwater had the capacity to do it?
24         A     Yeah, if they had the capacity to do it, I, I
25    cannot think of a reason not to.
```

Page 236

Omnibus Joint Exhibit Part H, page 1781

1      Q    There was a hypothetical Joe LeVota gave you

2  earlier about receiving a subpoena that was incorrect,

3  and you said that if you got a -- you know, you'd talk

4  to your attorneys, but if it was just the two of you, if

5  you got a subpoena delivered to you that had someone

6  else's name on it, you'd contact Joe, and you'd say,

7  "Hey, this is the wrong thing."

8           And if you kept getting subpoenas that were

9  wrong -- would you expect that you were to show up

10  somewhere and testify at a deposition if you did not --

11  if after more than one request, you did not receive a

12  subpoena with your name on it?

13     A    No.  At some point, I, I'd probably stop

14  opening them, but.

15     Q    And is that really analogous to the situation

16  here?  At some point, should Goldwater have responded to

17  the inquiries by declaring itself unambiguously, "I am a

18  lienholder; I have a deed of trust; here is my deed of

19  trust; move forward at your peril"?

20     A    Right.  Absolutely, that's, that's what should

21  have happened.  It is -- it is a different situation

22  because I, one, work in, in this industry, so I would

23  have no problem picking up the phone and calling the

24  attorney who's sending me the wrong notices.

25           But, but when you have an unrecorded deed of

Page  237

1   trust and absolutely just put an end to the situation,

2   and, and put them on actual notice.

3       Q    So if you were advising Goldwater throughout

4   this transaction, what would you advise them to do, or

5   to have done differently?

6       A    I would have -- the, the second I found out

7   that they had an unrecorded deed available, I would have

8   advised them to send it to every party that they could

9   that had something to do with the transaction -- and

10  starting with the title company.

11          And depending on when in the timeframe they

12  had knowledge of that, might depend on whether or not I

13  would advise them to contact an attorney and file an

14  action in lis pendens to, to put notice out there

15  quickly.  If there was not enough time, I would advise

16  them to get in your car and drive to the escrow company.

17  Do whatever you have to do, but get them that deed, the

18  unrecorded deed.

19      Q    And if you had instructed -- if you were the

20  president of a bank, or advising the president of a

21  bank, or the chief credit officer of a bank, to go find

22  out whether you're recorded or not, the president of the

23  bank delegates that task to a senior officer at the bank

24  to contact the servicer to get loan documentation.

25          The senior officer receives back from the

Page  238

 1   servicer only an unrecorded copy of the deed of trust,

 2   no documentation showing that it was recorded.  How soon

 3   in that chain would you at least try to either record or

 4   put the world on notice of your record of your lien?

 5        A    It would be the next thing I would do.

 6        Q    And based on the documentation you've read and

 7   that you've seen, does the fact that Goldwater did not

 8   get repaid in full on its loan, a direct result of

 9   Goldwater failing to record and/or failing to put the

10   other parties on actual notice of its lien interest in

11   the property?

12        A    In my opinion, based on what I reviewed, yes.

13        Q    Do you have any explanation as to why

14   Goldwater didn't -- or a lender like Goldwater wouldn.t

15   put the other parties on actual notice of its lien

16   interest?

17        A    No.  I, I really -- I, I don't get it at all.

18   I have no understanding.  I, I don't know why they

19   wouldn't do it.  It doesn't make any sense.

20        Q    Mr. LeVota had proposed a hypothetical where

21   perhaps Goldwater -- even though first lienholders

22   generally get paid in full, perhaps the reason why

23   Goldwater told Ms. Cross that they would take a haircut,

24   or a short payoff, was because Goldwater didn't want to

25   delay the transaction; they just wanted to get paid one

                                                Page  239

1    way or another?

2            Is there anything that prevented Goldwater

3    from saying, "I am a lienholder; here's my deed of

4    trust, unrecorded, but here it is -- and I'm willing to

5    take 675 on a short payoff"?

6        A    Nothing's stopping them from doing that.

7    They're, they're -- once the actual notice of the deed

8    of trust would be provided, and they follow up with the

9    correct payoff, they could put whatever number they want

10   on the payoff.  And up to the, the limit of the

11   principal balance, interest, and fees.  But if they

12   wanted to put $600,000 down, they could.

13       Q    They could have said, "Hey, we'll take a zero

14   payoff on this; we're just going to let it go," if they

15   had wanted to?

16       A    Yes.

17       Q    And they could have said, "I want a 75 percent

18   payoff or a full payoff"?

19       A    Correct.

20       Q    And for a payoff demand, what are you

21   expecting to see in something that was a payoff demand

22   statement?

23       A    The borrower information, the property address

24   information, loan number, principal balance, the

25   interest, daily accrual so that they can come out with

Page  240

1    say, "Here, here's my broker fee; pay me on this

2    transaction."

3            That, that's not good enough.  They're,

4    they're going to need to see authorization; they're

5    going to need to see my agreements that have been signed

6    by the lender and, and by the parties of the

7    transaction.  Even if they know me and, and trust me as

8    a person, they're still not going to pay me without the

9    proper documentation.

10       Q    And if someone is on inquiry notice and they

11   make an inquiry, how many times do you think they need

12   to ask someone for documentation to substantiate an

13   interest in the property before they can reasonably

14   conclude that person does not have an interest in the

15   property?

16       A    Again, I don't -- I can't give any kind of

17   conclusion.  It's for the Court to decide.  But I, I

18   would say one time.  You just -- you make your inquiry.

19       Q    And if they did two inquiries, is that a

20   double-check?

21       A    Yeah.  Yes.

22       Q    Does any sort of standard that you're aware of

23   require triple-checking or quadruple-checking?

24       A    No.  None that I'm aware of, and, and again,

25   I'm, I'm not an escrow officer.  But I do know that

                                    Page  243

Omnibus Joint Exhibit Part H, page 1786

```
 1    escrow officers are generally busy.  They handle a lot
 2    of transactions, and they've got a checklist, and they
 3    go down their checklist -- and, and that's probably a
 4    good thing, 'cause they check what they're doing.
 5           But I don't know that escrow officers are
 6    going to make two, three, four, you know, inquiries.
 7    They're, they're going to have a question.  They'll ask
 8    a question.  If they give back the proper information,
 9    then they'll move forward; if they don't, they're
10    probably going to move forward with what they have in
11    the escrow instructions.
12         Q    Is that because a reasonable, prudent real
13    estate secured lender wouldn't have just sat silently,
14    or mumbled, or made a cryptic statement; a reasonable
15    real estate secured lender would have full-throatedly
16    been yelling, "I'm a lienholder; here's my deed of
17    trust"?
18         A    Yes.  And I, I would expect that.
19         Q    Oh.  One of Mr. LeVota's hypos earlier
20    involved someone going to a property -- buying a
21    property and there's a person in possession who is not
22    the seller.  And he had proposed a hypothetical where
23    you ask the person, "Are you a renter or an owner?"
24           And there was some response to that, but I
25    just want to clarify that hypothetical.  If you went to
```

<div align="right">Page  244</div>

```
 1   someone who said, "Are you an owner," and they didn't

 2   say yes, is it reasonable to assume that the person is

 3   not an owner?

 4        A    Yes.  It would be reasonable to assume they're

 5   not.

 6        Q    And is that because ownership has more value

 7   than mere renting?

 8        A    Yes.

 9        Q    And the situation he proposed where the renter

10   responds, "I'm a renter with an option to buy," that's

11   not anything like what happened here.  There's no

12   representation from Goldwater saying, "I'm a lender and

13   I have a secured lien on the property"?

14        A    Correct.  It's not the same.

15        Q    If you were advising a bank that its service

16   transferred a real estate secured loan to a third party

17   like Goldwater did to Weststar, and Weststar for more

18   than a year did not check to make sure that the deed of

19   trust had been recorded, would you advise that bank or

20   lender to pursue legal action against Weststar for

21   negligence, or otherwise failing to notice and failing

22   to disclose the deed of trust had been unrecorded?

23        A    Well -- only 'cause I've looked in so many

24   servicing, servicing and sale agreements -- it, it would

25   depend on the servicing and sale agreement, depending on
```

Page 245

Omnibus Joint Exhibit Part H, page 1788

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, JESS WAKEFIELD, the officer before whom the
 3      foregoing proceedings were taken, do hereby certify that
 4      any witness(es) in the foregoing proceedings, prior to
 5      testifying, were duly sworn; that the proceedings were
 6      recorded by me and thereafter reduced to typewriting by
 7      a qualified transcriptionist; that said digital audio
 8      recording of said proceedings are a true and accurate
 9      record to the best of my knowledge, skills, and ability;
10      that I am neither counsel for, related to, nor employed
11      by any of the parties to the action in which this was
12      taken; and, further, that I am not a relative or
13      employee of any counsel or attorney employed by the
14      parties hereto, nor financially or otherwise interested
15      in the outcome of this action.
16
17      JESS WAKEFIELD
18      Notary Public in and for the
19      State of Washington
20
21      [X] Review of the transcript was requested.
22
23
24
25

                                               Page  263
```

Omnibus Joint Exhibit Part H, page 1789

```
 1              CERTIFICATE OF TRANSCRIBER

 2              I, HANNAH STOREY-GORE, do hereby certify that

 3     this transcript was prepared from the digital audio

 4     recording of the foregoing proceeding, that said

 5     transcript is a true and accurate record of the

 6     proceedings to the best of my knowledge, skills, and

 7     ability; that I am neither counsel for, related to, nor

 8     employed by any of the parties to the action in which

 9     this was taken; and, further, that I am not a relative

10     or employee of any counsel or attorney employed by the

11     parties hereto, nor financially or otherwise interested

12     in the outcome of this action.

13

14

15     HANNAH STOREY-GORE

16

17

18

19

20

21

22

23

24

25

                                              Page  264
```

## **EXHIBIT 99**

## **EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF PETER J. HILL**

```
 1              UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4    Goldwater Bank, N.A.,      )CASE NO. 5:21-cv-00616-JWH-SP
                                 )
 5             Plaintiff,        )
                                 )
 6         vs.                   )
                                 )
 7    ARTUR ELIZAROV; UNISON     )
      AGREEMENT CORP.; SCOTT     )
 8    HOWLETT; BANK OF THE WEST; )
      and ILYA ALEKSEYEFF,       )
 9                               )
               Defendants.       )
10    _____)

11

12

13                      --oOo--

14            DEPOSITION OF PETER J. HILL

15              September 9, 2022

16         ***TAKEN VIA VIDEOCONFERENCE***

17                      --oOo--

18

19

20

21

22

23

24

25

                                            Page 1
```

```
 1            BE IT REMEMBERED THAT, pursuant to the Federal
 2     Rules of Civil Procedure, the deposition of PETER J.
 3     HILL, was taken before Maureen Kelly, OCSR No. 00-0364,
 4     WCSR No. 3401, on Friday, September 9, 2022, commencing
 5     at the hour of 9:59 a.m., the proceedings being reported
 6     via Zoom videoconference.
 7                           --oOo--
 8
 9                         APPEARANCES
10            (ALL APPEARING VIA VIDEOCONFERENCE)
11     Attorneys for Plaintiff Goldwater Bank, N.A.:
                Joseph A. LeVota, Esq.
12              HILBERT & SATTERLY, LLP
                409 Camino Del Rio South, Suite 104
13              San Diego, CA 92108
                jlevota@hscallaw.com
14
       Pro Hac Vice Attorneys for Plaintiff Goldwater Bank,
15     N.A.:
                Sean C. Wagner, Esq.
16              Derek M. Bast, Esq.
                WAGNER HICKS, PLLC
17              831 East Morehead Street, Suite 860
                Charlotte, NC 28202
18              sean.wagner@wagnerhicks.law
                derek.bast@wagnerhicks.law
19
       Attorneys for Defendant and Cross-Complainant SCOTT
20     HOWLETT and Defendant BANK OF THE WEST:
                Jeremy T. Katz, Esq.
21              Ryan C. Thomason, Esq.
                HALL GRIFFIN LLP
22              1851 East First Street, 10th Floor
                Santa Ana, California 92705-4052
23              jkatz@hallgriffin.com
                rthomason@hallgriffin.com
24
25     (Continued on next page.)
```

Page  2

```
 1                  APPEARANCES (CONTINUED)
 2            (ALL APPEARING VIA VIDEOCONFERENCE)
 3    Attorneys for Defendant Artur Elizarov and Defendant
      Ilya Alekseyeff (in Pro Per):
 4             Ilya Alekseyeff, Esq.
               LOIA, INC. (APLC)
 5             8721 Santa Monica Blvd., #119
               West Hollywood, CA 90069
 6             ilya@loia.legal
 7    Attorneys for Defendant Unison Agreement Corp.:
               Nabil Bisharat, Esq.
 8             ORSUS GATE, LLP
               16 N. Marengo Ave., Suite 316
 9             Pasadena, CA 91101
               nbisharat@orsusgate.com
10
11
      Also Present: (None.)
12
                        --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page  3
```

```
 1      /////
 2                      PETER J. HILL,
 3      having been first duly sworn, was examined and testified
 4      as follows:
 5      /////
 6                      EXAMINATION
 7      BY MR. THOMASON:
 8          Q.   Good morning, Mr. Hill.  Thank you for
 9      joining us.  We do appreciate it.  If you could just
10      state and spell your name for the record?
11          A.   Peter Hill; P-E-T-E-R; Hill, H-I-L-L;
12      middle initial J.
13          Q.   Thank you.  My name is Ryan Thomason.  I am
14      an attorney that is representing both Scott Howlett and
15      Bank of the West.  When I refer to Howlett, I'm
16      referring to Defendant Scott Howlett, who purchased the
17      property at issue here that is named as a defendant in
18      the first-amended complaint.  Do you understand?
19          A.   Yes.
20          Q.   Okay.  And when I refer to Bank of the
21      West, I'm referring to Mr. Howlett's lender who is also
22      named as a defendant in the first-amended complaint.  Do
23      you understand?
24          A.   I do, yes.
25          Q.   I'm joined with counsel Jeremy Katz, who
```

<div align="right">Page 6</div>

```
 1    also represents Mr. Howlett and Bank of the West, and
 2    I'll allow the other counsels to introduce themselves
 3    and who they represent.
 4              MR. WAGNER:  Good morning.  This is Sean
 5    Wagner.  I represent Goldwater Bank, and we'll be
 6    defending Mr. Hill's deposition.
 7              MR. ALEKSEYEFF:  And good morning,
 8    Mr. Hill.  My name is Ilya Alekseyeff.  I represent
 9    Mr. Artur Elizarov in this deposition and this case.
10              MR. BISHARAT:  Good morning, Mr. Hill.  My
11    name is Nabil Bisharat.  I am counsel for Unison
12    Agreement Corp in this matter.
13              MR. KATZ:  Joe, do you want to introduce
14    yourself?
15              MR. LEVOTA:  This is Joseph LeVota for
16    Goldwater.  I'll also be defending the deposition of
17    Mr. Hill.
18              MR. KATZ:  And this is Jeremy Katz.  Again,
19    my audio is going to be showing up through a common
20    conference line with Mr. Ryan Thomason, but also with us
21    in the room is our law clerk Kasandra Goldberg.
22              MR. BAST:  And this is Derek Bast.  I'm
23    also counsel for Plaintiff Goldwater Bank today.
24    BY MR. THOMASON:  (Continuing)
25              Q.   Mr. Hill, are you comfortable speaking
```

Page 7

Omnibus Joint Exhibit Part H, page 1796

```
 1    English?
 2           A.    Yes.
 3           Q.    And have you been deposed before?
 4           A.    I have.
 5           Q.    How many times?
 6           A.    Three times.
 7           Q.    Were they within the last few years?
 8           A.    Over 10 years ago.
 9           Q.    Okay.  All right.  And do you recall what
10    the depositions were for -- what the cases were for?
11           A.    I do, yes.
12           Q.    What were they?
13           A.    Collection matters on bank loans.
14           Q.    And we do have a court reporter here.  We
15    would just ask that you speak clearly and give audible
16    responses.  So if we ask you a question, not to just nod
17    your head but to give us a verbal response.  You do
18    understand that you took an oath, so you are to testify
19    truthfully and accurately as if you were in court?  Do
20    you understand that?
21           A.    I do.
22           Q.    Okay.  We're going to go over some
23    definitions that we're going to use just so that we all
24    understand.  So when I say "the property," it's going to
25    refer to the real property located at 291 West Overlook
```

Page 8

```
 1    Road, Palm Springs, California 92264.  "Elizarov" refers
 2    to Artur Elizarov, who sold the property to Howlett.  Do
 3    you understand that?
 4            A.   I do, yes.
 5            Q.   "Goldwater" will refer to Goldwater Bank.
 6            A.   Correct.
 7            Q.   "Unison" refers to Unison Holdings, LLC.
 8            A.   Correct.
 9            Q.   When we say "the transaction," it's going
10    to refer to the sale of the property from Elizarov to
11    Howlett using Escrow of the West as escrow.
12            A.   Okay.
13            Q.   "Cross" refers to Andrea Cross, the escrow
14    officer with Escrow of the West.
15            A.   Correct.
16            Q.   And if we refer to "Melendez," we are
17    referring to Melissa Melendez, the payoff manager for
18    Weststar Mortgage Corporation.
19            A.   Right.
20            Q.   As far as your answers, don't answer unless
21    you fully understand the question.  It's all right to,
22    you know, ask for it to be rephrased or clarified.  If
23    you don't, I will assume that you understood the
24    question as asked.  We are entitled to your best
25    recollection.  Please don't guess.  Estimating is fine.
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part H, page 1798

```
 1    But if you don't know the answer, it is fine to say I

 2    don't know.

 3              A.    Okay.

 4              Q.    Please wait until I ask the entire question

 5    before answering because Zoom is very odd, so we don't

 6    want to over speak each other and it's easier for the

 7    court reporter.  As we said before, you must answer

 8    verbally.  You know, don't nod your head or shake your

 9    head.  Give us a verbal answer.

10              If you do need to take a break, please let

11    me know, and we will try to accommodate you the best

12    that we can.  However, if we are in the middle of a

13    question, we would ask that you answer the question, and

14    then we will go ahead and proceed on to the break.

15              Is there anyone in the room with you right

16    now?

17              A.    I'm in the same conference room with our

18    attorney.

19              Q.    Okay.

20              MR. WAGNER:  Ryan, Pete and I are in the

21    same conference room.  We are using his collective audio

22    kind of like you guys are.

23              MR. THOMASON:  Okay.  Perfect.

24    BY MR. THOMASON:  (Continuing)

25              Q.    Do you have your cell phone with you?
```

Page 10

Omnibus Joint Exhibit Part H, page 1799

```
 1              A.    I don't, no.

 2              Q.    Okay.  All right.  And, you know, because

 3     your attorney is in the room, we -- if there was anyone

 4     else, we would ask you not to communicate with them, but

 5     communicating with your attorney is fine.

 6                    As far as your health, are you taking any

 7     medications or under the influence of any drugs or

 8     alcohol that would affect your testimony today?

 9              A.    No, I'm not.

10              Q.    And do you believe there's any reason why

11     this deposition cannot go forward?

12              A.    No.

13              Q.    And do you have any questions for us before

14     we begin?

15              A.    I don't, no.

16              Q.    All right.  So let's begin.  We're going to

17     do the deposition notice.

18                    MR. THOMASON:  We are going to mark it as

19     Exhibit 41.  So Jeremy is going to bring that up right

20     now.

21                        (EXHIBIT marked: Exhibit No. 41.)

22                    MR. THOMASON:  Jeremy will scroll through

23     this so we can all look at it.

24                    MR. KATZ:  (Complying.)

25     BY MR. THOMASON:  (Continuing)
```

                                                    Page 11

Omnibus Joint Exhibit Part H, page 1800

```
 1                    THE WITNESS:  I am, yes.

 2                    MR. KATZ:  Okay.  It is a one-page exhibit.

 3                    THE WITNESS:  Correct.

 4       BY MR. THOMASON:  (Continuing)

 5            Q.   And do you recognize this email?

 6            A.   I do.

 7            Q.   This was the email that you sent to

 8       Ms. Pfeifer.  Correct?

 9            A.   Correct.

10            Q.   The next exhibit will be an email between

11       you, Jaime Johnson, Lynette Suina-Cole, Shelley Thurlow,

12       Jami Donnelly, Matt Teskey and Julie Merhege regarding

13       problems with the Elizarov deed of trust dated

14       March 25th, 2021, and March 26th, 2021.

15                    MR. THOMASON:  And we are going to mark

16       this as Exhibit 51.

17                        (EXHIBIT marked: Exhibit No. 51.)

18                    MR. KATZ:  Are you able to see Exhibit 51?

19                    THE WITNESS:  I am, yes.

20                    MR. KATZ:  It's a two-page document.  I'm

21       just going to briefly scroll both pages.  This is the

22       second and final page.

23       BY MR. THOMASON:  (Continuing)

24            Q.   And do you recognize this email chain?

25            A.   I do.
```

<div align="right">Page 26</div>

<div align="right">Omnibus Joint Exhibit Part H, page 1801</div>

```
 1            Q.    And this was the email that you sent to
 2   those parties and further correspondence with Ms. -- am
 3   I saying her name -- is it Mer-harsh?  I can't -- I'm
 4   sorry.
 5            A.    Mer-hersh.
 6            Q.    Mer-hersh.  Between you and Ms. Merhege?
 7            A.    Correct.
 8            Q.    So the next one will be an email between
 9   you, Mr. Hill; Theo Haugen and Matt Teskey regarding the
10   insufficient sale funds to pay all parties dated
11   March 25th, 2021.
12                  MR. THOMASON:  We will mark this as
13   Exhibit 52.
14                       (EXHIBIT marked: Exhibit No. 52.)
15                  MR. KATZ:  It is a one-page document.  Are
16   you able to see Exhibit 52?
17                  THE WITNESS:  Yes, I am.
18   BY MR. THOMASON:  (Continuing)
19            Q.    Okay.  And do you recognize this email?
20            A.    I do, yeah.
21            Q.    And this was the email you sent to
22   Mr. Haugen and Mr. Teskey.  Correct?
23            A.    Correct.
24            Q.    The next exhibit we have will be an email
25   between you, Mr. Hill, and Lynette Suina-Cole regarding
```

Page 27

```
 1    the missing Elizarov deed of trust dated March 26th,

 2    2021.

 3                  MR. THOMASON:  We are going to mark this as

 4    Exhibit 53.

 5                      (EXHIBIT marked: Exhibit No. 53.)

 6                  MR. KATZ:  Are you able to see Exhibit 53?

 7                  THE WITNESS:  I am.

 8                  MR. KATZ:  It's a two-page document.  I'm

 9    going to briefly scroll through it.  What you're seeing

10    is the second and final page.

11    BY MR. THOMASON:  (Continuing)

12         Q.   Do you recognize this email, Mr. Hill?

13         A.   I do.

14         Q.   And was this email exchange between you and

15    Ms. Suina-Cole?

16         A.   Correct.

17         Q.   Next we will have an email between you and

18    Lynette Suina-Cole regarding sending Elizarov's deed of

19    trust to you, which was dated on March 26th, 2021.

20                  MR. THOMASON:  We are going to mark this as

21    Exhibit 54.

22                      (EXHIBIT marked: Exhibit No. 54.)

23                  MR. KATZ:  Are you able to see Exhibit 54?

24                  THE WITNESS:  I am.

25                  MR. KATZ:  It's a one-page document.
```

Page 28

Omnibus Joint Exhibit Part H, page 1803

1          A.   He had made me aware earlier that -- and I

2    was also aware from some estimated settlement statements

3    from Andrea Cross that we were short of funds.  I was

4    discussing with Mr. Elizarov seeking to get details on

5    the contractor's lien to verify that amount.  I got the

6    payoff information from Unison to verify that amount, so

7    that I could justify seeking an approval internally to

8    accept a short payoff.  So Mr. Elizarov and I had

9    reached an agreement as to how much that would be -- how

10   much we would accept in order to allow the sale to

11   close.

12          Q.   So, now, did you inform Mr. Elizarov that

13   your deed of trust was unrecorded or do you believe that

14   Mr. Elizarov knew that your deed of trust was

15   unrecorded?

16          A.   I did not inform him of that but he did

17   clearly know.

18          Q.   And what did -- why do you think he clearly

19   knew?

20          A.   Because he had instructed Andrea Cross to

21   not honor our payoff demand because we were not of

22   record and to cease communication with me.

23          Q.   What payoff -- when you say not to honor

24   your payoff demand, what payoff demand?

25          A.   The letter that we had sent -- had intended

Page 62

 1    to send, although we sent the incorrect one and the

 2    attachment didn't get put on that follow-up email.  It

 3    was a payoff letter from Weststar Mortgage, our

 4    servicer.

 5            Q.    So the payoff letter was -- was not sent to

 6    Ms. Cross?

 7            A.    Yeah.

 8            Q.    Now, I imagine this would be a tough

 9    position as a bank to be in.  Why didn't you try to

10    secure your position instead?  You talk about you were

11    negotiating with Elizarov.  But why did -- why didn't --

12    why didn't you focus on getting your deed of trust

13    recorded so that you could -- you could protect the

14    bank's position?

15            A.    I was doing both.

16            Q.    I guess we're -- we're a little -- we're a

17    little confused because the bank's ultimate security was

18    in jeopardy.  So why were you still trying to negotiate

19    with Elizarov?

20            A.    He was seeking a concession from me with

21    the intent to pay me off at a negotiated lower amount.

22            Q.    And you had Mr. Howlett's realtor's contact

23    information as well as you could have -- you could have

24    sent the unrecorded deed of trust to Mr. Howlett.  Why

25    didn't you?

                                              Page 63

1          A.    I was focused on seeking a settlement with

2     Mr. Elizarov and seeking -- locating our unrecorded deed

3     of trust so that I could get it recorded.

4          Q.    Okay.  All right.  Now, did you -- did you

5     send the unrecorded deed of trust to anyone associated

6     with the sale of the property, be it Escrow of the West,

7     Howletts, brokerages?  Anybody associated with the sale?

8          A.    I -- no.  Not associated with the sale, no.

9     That sale had closed by the time I located the

10    unrecorded deed of trust.

11         Q.    We understand your reason, but what

12    about -- you had a copy of the unrecorded deed of trust.

13    Why didn't you send a copy of the -- a copy of that?

14         A.    I can't really explain that.  As I said

15    earlier, I was focused on a cooperative borrower with

16    Mr. Elizarov on accepting a short payoff, which we had

17    agreed to do, and just get the sale closed for his

18    benefit and ours.

19         Q.    And did you ever reach an agreement with

20    Elizarov on a short payoff?

21         A.    I did.

22         Q.    And what was the amount?

23         A.    $60,000 discount.

24         Q.    Was that in writing or was that a verbal

25    agreement?

Page 64

1            A.    It is contained in an email chain with

2      Mr. Elizarov.

3            Q.    And do you remember when that agreement was

4      reached?  What date?

5            A.    I would -- I would have to confirm that by

6      reaching back to one of the exhibits, but it was

7      probably the evening of the 24th or the morning of the

8      25th of March.

9            Q.    Okay.  Why don't we move on?  We are going

10     to move to Exhibit 51.

11            All right.  So this was the email from you

12     on March 25th to a number of people at Goldwater Bank.

13     It basically looks like it's assessing the situation.

14     It says here, "All, Matt and I need a bit of help on an

15     urgent matter with our bank held mortgage for Arthur

16     Elizarov #909-216931."  It says here, "We are trying to

17     get the sale of this home closed, it has been in

18     forbearance for a year.  This is also a Unison loan.

19     Our payoff on the loan is $730,000 plus."

20            Then you bullet point a number of items.

21     The first one being, "Our Deed of Trust did not get

22     recorded.  We only have a copy of the signed unrecorded

23     Deed of Trust in our scanned files."  "We do not have a

24     title policy, only a prelim issued to Silver Bay Escrow

25     that does not reference our mortgage.  Our scanned files

                                                    Page 65

Omnibus Joint Exhibit Part H, page 1807

1          Q.    Is the loan sold or just the servicing

2     rights sold?

3          A.    In this case the -- we retained the loan in

4     our portfolio and Weststar held servicing rights, which

5     would include the billings going forward.  Everything

6     that Mr. Elizarov would have seen, would be coming from

7     Weststar Mortgage as our servicing company.

8          Q.    Okay.  Are there any procedures at

9     Goldwater Bank to confirm that a deed of trust has been

10    recorded once a sale closes?

11         A.    There are, yes.

12         Q.    Are you familiar with them?  Do you know

13    them?

14         A.    I don't know them.  I am aware of them.

15    That would be a standard post-closing item to review.

16         Q.    Who does that at Goldwater?

17         A.    I don't know.  It would be done at

18    Weststar, and I don't know who does it.

19         Q.    So if I'm understanding correctly, Weststar

20    Mortgage Corporation would be responsible for verifying

21    if a deed of trust has been recorded?  It would be under

22    their purview to do so; is that correct?

23         A.    That's correct, yes.

24         Q.    And they didn't do it here?

25         A.    I don't know what they did in this case.

                                              Page 70

 1          Q.   Did Weststar ever tell Goldwater at the

 2     time of closing that the deed of trust was recorded?

 3          A.   No.

 4          Q.   Did Weststar ever tell Goldwater Bank that

 5     the deed of trust was unrecorded?

 6               MR. WAGNER:  Objection.  I just want to

 7     confirm that to your knowledge did Weststar ever tell

 8     Goldwater.

 9               MR. THOMASON:  That's fair.  To his

10     knowledge.

11               THE WITNESS:  No.

12     BY MR. THOMASON:  (Continuing)

13          Q.   Is Goldwater Bank affiliated with Weststar

14     Mortgage Corporation?

15          A.   Only by common ownership by one individual,

16     but, otherwise, they are not related.

17          Q.   Okay.  And who has the common ownership?

18          A.   Kent Wiechert, our CEO.

19          Q.   All right.  Let's move on to Exhibit 52.

20     So here we have an email from you to Theo Haugen with

21     Matt Teskey CCed on it basically talking about the

22     Elizarov issue.  You have attached the Weststar payoff

23     statements as well as some estimated settlement

24     statements and talking about the contractor mechanic's

25     lien.  Was this email in connection with trying to

                                        Page 71

1    create a -- to deal with the insufficient payoff for

2    everyone with this part of that process for you?

3            A.    Part of that process and also verification

4    on the calculation of Unison's payoff.

5            Q.    Now, dealing with this contractor

6    mechanic's lien, we have seen a number of things but we

7    never saw anything saying that there was -- what do you

8    know about the contractor mechanic's lien?

9            A.    I first learned of it when it appeared on

10   a -- an estimated settlement statement that I received

11   from Andrea Cross.

12           Q.    Okay.  But to your knowledge there was --

13   there was never a recorded mechanic's lien; is that

14   correct?

15           A.    I don't know.  It was represented as a

16   mechanic's lien on this estimated settlement statement.

17           Q.    Okay.  And the mechanic's lien was part of

18   the drive to try to figure out a settlement that would

19   work for everyone; is that correct?

20           A.    That's right, yes.

21                 MR. WAGNER:  Sorry.  I think you broke up

22   there, Ryan.

23                 MR. THOMASON:  Huh?

24                 MR. WAGNER:  Sorry.  We missed the last --

25   I don't know if you meant for that to be off the record

                                              Page 72

```
 1    or not, but we -- I saw your lips move but I didn't see

 2    the -- I didn't hear it come through.

 3                    MR. THOMASON:  Oh, okay.  Thank you.

 4    BY MR. THOMASON:  (Continuing)

 5          Q.   All right.  Why don't we move on to

 6    Exhibit 53?  So it looks like this is an email exchange

 7    between you, Mr. Hill, and Lynette Suina-Cole.  Who is

 8    Lynette Suina-Cole and what's her position at Goldwater

 9    Bank?

10          A.   She's not an employee of Goldwater.  She is

11    an employee of Weststar Mortgage.

12          Q.   Okay.  And what does she do?

13          A.   Her title on this email refers to her as a

14    government ensuring manager, but I was given her name by

15    Matt as somebody that could do the search for me for

16    that original deed of trust.

17          Q.   Okay.  And she says here that she's

18    searching in BlitzDocs.  I would assume BlitzDocs is

19    your -- is Goldwater or Weststar's internal system or

20    database for managing documents or whatnot?

21          A.   Imaging system, yes.

22          Q.   So at least as of the morning of

23    March 26th, 2021, no one at Goldwater Bank had any idea

24    where the original deed of trust was.  Correct?

25          A.   That's correct, yes.
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part H, page 1811

1    I declare under penalty of perjury that the

2 foregoing is true and correct.  Subscribed at

3 _____, California, this_____day of

4 _____, 2022.

5

6

7

8

9    _____

10      PETER J. HILL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            Page  233

```
1              C E R T I F I C A T E
2         I, Maureen Kelly, Oregon CSR No. 00-0364,
   Washington CSR No. 3401, do hereby certify that
3  prior to the commencement of the examination, PETER J.
   HILL, was duly remotely sworn by me to testify to the
4  truth, the whole truth and nothing but the truth.
5         I DO FURTHER CERTIFY that the foregoing is a
   verbatim transcript of the testimony as taken
6  stenographically by me at the time, place and on the
   date hereinbefore set forth, to the best of my
7  ability.
8         I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel of
9  any of the parties to this action, and that I am
   neither a relative nor employee of such attorney or
10 counsel, and that I am not financially interested in
   the action.
11
         Witness my hand at Portland, Oregon, this 15th
12 day of September, 2022.
13
14         Maureen Kelly
15
           MAUREEN KELLY - RPR
16         Certified Shorthand Reporter
           Oregon CSR No. 00-0364
17         Washington CCR No. 3401
18
19
20
21
22
23
24
25
                                       Page  234
```

## EXHIBIT 100

## EMAIL FROM PETER HILL TO THEO HAUGEN RE UNION INFORMATION (EXHIBIT 146)

| | |
|---|---|
| **From:** | Peter Hill |
| **To:** | Theo Haugen |
| **Cc:** | Matt Teskey |
| **Subject:** | Arthur Elizarov |
| **Date:** | Thursday, March 25, 2021 5:16:00 PM |
| **Attachments:** | Unison Information - Arthur Elizarov.pdf |

Theo,

We have an unusual situation on Elizarov that is quite time sensitive.  I have attached a spreadsheet, the Weststar payoff statement, and an estimated settlement statement on a sale that is expect to close as soon as we can figure this out.

The issue is that net proceeds are insufficient to payoff Weststar, Unison, and a contractor mechanic's lien for improvements that were done after Mr. Elizarov acquired the home.

In reviewing this with Matt Teskey, he explained that the Unison agreement has a provision by which the cost of improvements are to be netted against the payoff/gain calculation.  I have some verification to be done but the spread sheet lays out the situation as I understand it at this point this afternoon.

Please give me a call.


Pete


*Peter Hill*
*EVP - Chief Credit Officer*
**Goldwater Bank, N.A.**
2525 E Camelback Road Suite 1100
Phoenix, Arizona 85016
(O) 480.281.8207
(C) 602-291-5444
(F) 480.281.8222
www.goldwaterbank.com


**Confidentiality Notice:** The contents of this email communication are confidential and may contain information that is privileged and/or exempt from disclosure under applicable law. It is intended solely for use of the individual or entity to which this email is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and immediately delete this message and any attachments. Any unauthorized use, retention, dissemination, forwarding, printing, or copying of this email is strictly prohibited.

GOLDWATER001666

EXHIBIT
15   146

**Elizarov Payoff Worksheet**
**909--216931**

| | |
|---|---|
| Sales Price | **1,355,000.00** |
| Weststar Payoff | 729,354.80 |
| Unison Payoff | 491,000.00 |
| Mechanics Lien | 107,270.00 |
| Sales Costs | 79,655.47 |
| Net Proceeds | **(52,280.27)** |

**Elizarov Payoff Worksheet - Adjusted**
**909--216931**

| | |
|---|---|
| | **1,355,000.00** |
| | 729,354.80 |
| | 383,730.00 |
| | 107,270.00 |
| | 79,655.47 |
| | **54,989.73** |

**Unison Payoff Reconcilation**

| | |
|---|---|
| Cost Basis in Home | 915,000.00 |
| Sales Price | 1,355,000.00 |
| Gain @ 70% | **308,000.00** |
| Unison 20% Equity Contribution | **183,000.00** |
| Unison Payoff | **491,000.00** |
| Less Cash Improvements | 107,270.00 |
| Adjusted Unison Payoff | **383,730.00** |



9440 Santa Monica Blvd., #310
Beverly Hills, CA 90210

Phone: (310) 402-5555
Fax: (310) 402-5556
www.escrowofthewest.com

### SELLER'S ESTIMATED SETTLEMENT STATEMENT

| | |
|---|---|
| **PROPERTY:** 291 W. Overlook Road<br>Palm Springs, CA 92264 | **DATE:** March 25, 2021 |
| **SELLER:** Artur Elizarov | **CLOSING DATE:** March 30, 2021<br>**ESCROW NO.:** 02-035523-AC |

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 1,355,000.00 |
| | | |
| **PAYOFF CHARGES - Unison Milgard Holdings LLC**<br>**[Total Payoff $491,000.00]** | | |
| Principal Balance | 491,000.00 | |
| | | |
| **PAYOFF CHARGES - Mechanic Lien**<br>**[Total Payoff $107,270.00]** | | |
| Principal Balance | 107,270.00 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| County Taxes at $5,819.60/semi-annually from 03/30/2021 to 07/01/2021 | | 2,942.13 |
| | | |
| **COMMISSION CHARGES** | | |
| Keller Williams | 33,875.00 | |
| Compass | 33,875.00 | |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Rudy's Termite and Pest Control for Termite Report/Work | 95.00 | |
| Old Republic Home Protection Inc. Home Warranty | 900.00 | |
| Property ID for Natural Hazard Disclosure Report | 99.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Orange Coast Title** | | |
| Title - Owner's Title Insurance (optional) | 2,761.00 | |
| Title - Reconveyance Fee | 10.00 | |
| Title - Sub Escrow Fee | 62.50 | |
| Recording Grant Deed | 50.00 | |
| Transfer Tax - County to Riverside County | 1,490.50 | |
| Property Taxes (2nd Install) to Riverside County Tax Collector | 5,819.60 | |
| | | |
| **ESCROW CHARGES - Escrow of the West** | | |
| Title - Escrow Fee | 3,060.00 | |
| Title - Wire Fee | 25.00 | |
| Title - Overnight Fee | 75.00 | |
| Title - Admin Fee | 250.00 | |
| Title - Archive Fee | 50.00 | |
| Title - Messenger/Handling Fee | 100.00 | |
| | | |
| **Net Proceeds** | 677,074.53 | |
| | | |
| **TOTAL** | $ 1,357,942.13 | $ 1,357,942.13 |

### THIS IS AN ESTIMATE ONLY AND FIGURES ARE SUBJECT TO CHANGE

_____
Artur Elizarov

# WestStar
## Mortgage Corporation

**PAYOFF CALCULATIONS**

| Prepared for: | Andrea Cross<br>Escrow of the West | Request Date : | 03/24/21 |
|---|---|---|---|
| | | Payoff Date : | 04/23/21 |
| | | Telephone : | 310 402-5555 |
| | | FAX : | 310 402-5556 |

**Account Data :**

| | |
|---|---|
| Account | 909-21693-1 Artur Elizarov |
| Legal | LOT 8 OF BLOCK 7 PALM CANYON<br>MESA TRACT, RECORDED IN BOOK 12, PAGE 52<br>THROUGH 56, |
| Remarks | Conventional Loan |

**Detail Data :**

| | | | |
|---|---|---|---|
| Current Balance | 679,565.53 | Interest Paid To | 03/01/20 |
| Unpaid Interest | .00 | Payoff To | 04/23/21 |
| Interest | 41,802.72 | Number of Days | 412 |
| Recording/Recon Fee | 201.00 | Annual Int Rate | 5.3750% |
| MIP/PMI | .00 | Regular Payment | 4,944.11 |
| Advanced GWB Funds | 1,968.95 | | |
| Negative Escrow Funds | 5,816.60 | | |
| Statement fee | | | |
| Certified Mail Fee | | | |

| | | | |
|---|---|---|---|
| **Payoff Amount :** | 729,354.80 | **Daily Interest** | 101.46 |

PAYMENTS RECEIVED IN THE OFFICE AFTER 3:00pm MST WILL BE CREDITED THE NEXT BUSINESS DAY.

Weststar reserves the right to demand additional funds to correct any error or omission in the above payoff figure that was calculated in good faith, whether the error or omission is mathematical, clerical, typographical, or for any transactions that occurred on or after the date of this payoff quote.  Payoff funds must be paid through Weststar

**FUNDS SHOULD BE MADE PAYABLE TO WESTSTAR AND TENDERED IN THE FORM OF MONEY ORDER, CASHIER'S CHECK, OR TITLE COMPANY CHECK.  ALL OTHER CHECKS WILL BE HELD 10 (ten) CALENDAR DAYS TO CLEAR. **

Issuance of this statement does not suspend the requirement to make mortgage payments when due.

Omnibus Joint Exhibit Part H - page 1016

<u>**EXHIBIT 101**</u>

<u>**EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF CORY BEARDEN**</u>

```
 1                UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION
 3
 4      _____
                                               )
 5      GOLDWATER BANK, N.A.,                   )
                                               )
 6                      Plaintiff,              ) CASE NUMBER:
                                               ) 21-cv-00616-
 7            vs.                               ) JWH-SP
                                               )
 8      ARTUR ELIZAROV; UNISON AGREEMENT CORP.; )
        SCOTT HOWLETT; BANK OF THE WEST; AND ILYA )
 9      ALEKSEYEFF,                             )
                                               )
10                      Defendants.             )
        _____)
11
12
13
14          REMOTE ZOOM VIDEOTAPED DEPOSITION OF PERSON MOST
                KNOWLEDGEABLE AT GOLDWATER BANK, N.A.
15                        CORY BEARDEN
16                  Wednesday, May 31, 2023
17                         Volume I
18
19
20
21
22      REPORTED BY:
        JESSICA HONG
23      CSR No. 13776
24      Job No. 5941237
25      PAGES 1 - 364
```

                                                        Page 1

```
 1              UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4    _____

                                            )
 5    GOLDWATER BANK, N.A.,                 )
                                            )
 6                    Plaintiff,           ) CASE NUMBER:
                                            ) 21-cv-00616-
 7             vs.                          ) JWH-SP
                                            )
 8    ARTUR ELIZAROV; UNISON AGREEMENT CORP.;  )
      SCOTT HOWLETT; BANK OF THE WEST; AND ILYA )
 9    ALEKSEYEFF,                          )
                                            )
10                    Defendants.          )
      _____)

11

12

13

14         Remote Zoom videotaped deposition of PERSON MOST

15    KNOWLEDGEABLE AT GOLDWATER BANK, N.A., CORY BEARDEN,

16    Volume I, taken on behalf of Defendants beginning at

17    10:10 a.m. and ending at 8:26 p.m. on Wednesday, May 31,

18    2023, before JESSICA HONG, Certified Shorthand Reporter

19    No. 13776.

20

21

22

23

24

25

                                               Page  2
```

```
 1      APPEARANCES (ALL PARTIES APPEARING REMOTELY):
 2      FOR PLAINTIFF:
 3          HILBERT & SATTERLY LLP
            BY:  JOSEPH A. LEVOTA, ESQ.
 4          409 Camino Del Rio South, Suite 104
            San Diego, California 92108
 5          (619) 795-0300
 6          WAGNER HICKS PLLC
            BY:  ABBEY M. KRYSAK, ESQ.
 7               SEAN C. WAGNER, ESQ.
            831 East Morehead Street, Suite 860
 8          Charlotte, North Carolina 28202
            (704) 705-7538
 9
        FOR DEFENDANT AND CROSS-COMPLAINANT SCOTT HOWLETT AND
10      DEFENDANT BMO HARRIS BANK N.A., SUCCESSOR BY MERGER TO
        BANK OF THE WEST:
11
            HALL GRIFFIN LLP
12          BY:  JEREMY T. KATZ, ESQ.
                 KASANDRA C. GOLDBERG, ESQ.
13          1851 East First Street, 10th Floor
            Santa Ana, California 92705
14          (714) 918-7000
15      FOR DEFENDANT AND CROSS-DEFENDANT ARTUR ELIZAROV, AND
        DEFENDANT ILYA ALEKSEYEFF (IN PRO PER):
16
            LOIA, INC.(APLC)
17          BY:  ILYA ALEKSEYEFF, ESQ.
            727 West 7th Street, PH 1-13
18          Los Angeles, California 90017
            (213) 537-4592
19
20
21      ALSO PRESENT:
22          JENNIFER MCKAY - VIDEOGRAPHER
23
24
25
                                              Page  3
```

Omnibus Joint Exhibit Part H, page 1822

```
1                    Zoom, Wednesday, May 31, 2023

2                         10:10 a.m.

3

4           THE VIDEOGRAPHER:  Good morning.  We are on the

5    record at 10:10 on May 31st, 2023.  This is media unit     10:10

6    one in the video-recorded deposition of Goldwater PMK,

7    Cory Bearden, in the matter of Goldwater Bank, N.A.

8    versus Elizarov, et al., filed in the United States

9    District Court, Central District of California, Eastern

10   Division.  Case Number is 21-cv-00616.  This deposition    10:10

11   is being conducted remotely using virtual technology.  My

12   name is Jennifer McKay representing Veritext and I am the

13   videographer.  The court reporter is Jessica Hong, also

14   from Veritext.  Counsel, please introduce yourselves and

15   state whom you represent.                                  10:11

16           MR. KATZ:  Good morning, my name is Jeremy Katz.

17   I represent defendants, Scott Howlett and Bank of the

18   West.  And with me in the room and off camera is my

19   associate, Kasandra Goldberg.

20           MR. ALEKSEYEFF:  And good morning -- am I on?      10:11

21   Yes.  Good morning, my name is Ilya Alekseyeff.  I

22   represent the defendant, Artur Elizarov, as well as

23   myself who is also a defendant.  Good morning.

24           MR. LEVOTA:  Good morning, Joseph LeVota for

25   Goldwater Bank.                                            10:11
```

Page 6

Omnibus Joint Exhibit Part H, page 1823

1              MS. KRYSAK:  Good morning, Abbey Krysak for

2      Goldwater Bank.

3              MR. WAGNER:  Good morning, Sean Wagner for

4      Goldwater Bank.

5              THE VIDEOGRAPHER:  Thank you.  Will the court     10:11

6      reporter please swear in the witness?

7

8                          CORY BEARDEN,

9               having been administered an oath,

10             was examined and testified as follows:

11

12                          EXAMINATION

13     BY MR. KATZ:

14         Q    Good morning, Mr. Bearden.

15         A    Good morning.                                    10:12

16         Q    Can you please state and spell your name for the

17     record?

18         A    My name is Cory Bearden.  It's spelled C-o-r-y,

19     last name Bearden, B-e-a-r-d-e-n.

20         Q    Are you employed by Goldwater Bank?             10:12

21         A    I am.

22         Q    What's your current role?

23         A    My position at Goldwater Bank is the Mortgage

24     Division President.

25         Q    How long have you been the Mortgage Division     10:12

                                                        Page 7

1    President?

2       A    Since January of 2021.

3       Q    And what did you do before January of 2021?

4       A    I was the senior vice president of the Mortgage

5    Division for Goldwater Bank.                   10:13

6       Q    And when did you start being the Senior Vice

7    President of the Mortgage Division of Goldwater Bank?

8       A    It would have been in approximately March of

9    2020.

10       Q    And what did you do before March of 2020?    10:13

11       A    I was the Specialty Products Division Manager

12    for Goldwater Bank.

13       Q    And when did you start doing that?

14       A    December of 2015.

15       Q    Do you understand that today you are testifying   10:13

16    under oath the same as if you were in a court of law

17    sitting in front of a jury?

18       A   I do.

19       Q    Is there any reason why you'd be unable to give

20    honest and truthful testimony here today?         10:13

21       A    Not that I'm aware of.

22       Q    Do you have any health issues that would affect

23    your ability to either testify or recall information?

24       A    Not that I'm aware of.

25       Q    Are you feeling well today?           10:14

Page 8

```
 1        Q    Are there any agreements between Goldwater and

 2   Weststar allocating the responsibility to make sure that

 3   its deed of trust is recorded?

 4             MS. KRYSAK:  Objection, form, scope.

 5             THE WITNESS:  As we discussed previously, I      02:30

 6   don't have any written policies or procedures or anything

 7   in place that would confirm recording of the deed of

 8   trust that I'm aware of.

 9   BY MR. KATZ:

10        Q    Are there any agreements between Goldwater and   02:30

11   Weststar regarding who is supposed to maintain the

12   original loan documents?

13             MS. KRYSAK:  Objection, form, scope.

14             THE WITNESS:  When you say "maintain," sir, what

15   do you mean by "maintain"?  Please provide a definition.   02:30

16             MR. KATZ:  Maintain custody of.

17             THE WITNESS:  Okay.  As the owner of the loan,

18   we maintain the loan documents as executed as defined by

19   closing instructions and they are sent to the respective

20   locations as identified on there that we've reviewed       02:30

21   previously.

22   BY MR. KATZ:

23        Q    What responsibilities did Goldwater transfer to

24   Weststar when Weststar began servicing the loan?

25        A    Weststar is a full servicer so they would        02:31
```

Page 145

Omnibus Joint Exhibit Part H, page 1826

```
 1      maintain the responsibilities of full servicing of the

 2      principle and the interest loan payments and taxes and

 3      interests in escrow accounts to see if they're

 4      applicable.

 5           Q     Any other responsibilities?                    02:31

 6           A     They are responsible to provide payoff requests

 7      when requested as such as happened in this case being

 8      that they're the servicer of the loan.

 9           Q     Are they responsible for enforcing the note and

10      security instrument for the loan?                         02:32

11           A     I would say as the servicer of this -- of that,

12      they would be responsible for enforcing those documents.

13           Q     And by "security instrument," I was referring to

14      the deed of trust.  Does that match your understanding of

15      "security instrument"?                                    02:32

16           A     It does in this case, yes, sir.

17           Q     All right.  I'm going to share my screen again.

18      I'm going to show you a document that we've previously

19      marked as 146 and we'll do it again for this deposition.

20      It's a four-page document starting with the Bates number   02:33

21      Goldwater000166.

22                 (Exhibit 146 was marked for identification.)

23           A     Would you share the topic, sir?

24           Q     Sorry, say that again?

25           A     Would you share your topic, please, number?      02:33

                                                        Page 146
```

Omnibus Joint Exhibit Part H, page 1827

```
1          Q     Communications with Unison.

2          A     Yes, sir.

3                MS. KRYSAK:  Objection, form, scope.  I

4     apologize.  Objection, scope.

5     BY MR. KATZ:                                          02:33

6          Q     Have you ever seen this document before?  I can

7     scroll through it if you need.

8          A     No, it's fine.  I have -- I have -- I've seen

9     this document.

10         Q     Okay.  When have you seen this document before?  02:34

11         A     In my preparation for the deposition.

12         Q     Do you know who Mr. Theo Haugen works for?

13         A     I believe he works for Unison.

14         Q     Now, in this document -- have you seen the

15    attachments to this -- to this email before?            02:34

16         A     I have.

17         Q     I'm just going to scroll through them for a

18    moment.  Three boxed spreadsheet calculations, a seller's

19    estimated closing statement dated March 25th, and a

20    payoff calculation from Weststar listing Mr. Elizarov's  02:35

21    name.  Do you know why Mr. Hill didn't send that payoff

22    quote listing Mr. Elizarov's name to Escrow of the West

23    when he was in communication with Ms. Cross?

24               MS. KRYSAK:  Objection, form, scope.

25               THE WITNESS:  I do not.  I cannot speak for    02:35
```

Page 147

Omnibus Joint Exhibit Part H, page 1828

```
 1      Mr. Peter Hill and his decisions.

 2      BY MR. KATZ:

 3          Q    And you have not spoken to Mr. Hill about his

 4      communications with Escrow of the West between March 1,

 5      2021 and April 15, 2021?                           02:35

 6          A    I have had -- I have not spoken to Mr. Hill

 7      about -- about this -- about that.

 8          Q    Does Goldwater have any policies and procedures

 9      about taking less than the full amount that it's owed on

10      a loan when Goldwater is in the first lien position?  02:36

11              MS. KRYSAK:  Objection, form, scope.

12              THE WITNESS:  I am not aware of any written

13      policies or procedures in regards to that topic.

14      BY MR. KATZ:

15          Q    Other than perhaps with this loan with       02:36

16      Mr. Elizarov's loan, are you aware of any other loans in

17      which Goldwater was in the first lien position and in

18      which there was sufficient equity in the property or its

19      proceeds from the potential sale of the property for

20      Goldwater to be paid in full as the first lien holder and  02:36

21      Goldwater agreed to take less than the full amount owed?

22              MS. KRYSAK:  Objection, form, scope.

23              THE WITNESS:  I am not aware of that situation

24      or any situation like that.

25      BY MR. KATZ:                                        02:36
```

Page 148

1          Q    Based on your experience in the lending world,

2     is it unusual for a first lien holder to take less than

3     the full amount owed when there are sufficient proceeds

4     from the sale of the property to pay that first lien

5     holder in full?                                          02:37

6               MS. KRYSAK:  Objection, form, scope.

7               THE WITNESS:  Please repeat your question,

8     Mr. Katz.

9               MR. KATZ:  Can you read it back, please?

10              (Record read.)                                 02:37

11              THE WITNESS:  Based on my experiences, I don't

12    have any experience with -- with that type of situation.

13    BY MR. KATZ:

14         Q    That would be unusual?

15              MS. KRYSAK:  Objection, form, scope.           02:37

16              THE WITNESS:  Again, not having any experience

17    with that situation, I can't comment if that's unusual or

18    not usual.

19    BY MR. KATZ:

20         Q    Just to be able to quantify that, approximately    02:37

21    how many loan transactions have been across your desk in

22    your career?

23              MS. KRYSAK:  Objection, scope.

24    BY MR. KATZ:

25         Q    And you can give me an order of magnitude like    02:38

Page 149

```
 1    100, 1,000, 10,000.

 2         A    So to clarify the question, are you speaking of

 3    loans that I'm directly involved with or loans that are

 4    just a part of the organization in general?  Could you

 5    help me with that definition?                            02:38

 6         Q    Let's start with loans that you have been

 7    personally been involved in.

 8         A    Well, years ago, I was an originator, so at that

 9    point in time, loans that I personally originated, that

10    would be what I would be personally involved with.       02:38

11         Q    Okay.  And then the number of those loans, are

12    we talking tens, hundreds, thousands, ten thousands?

13         A    From my time --

14              MS. KRYSAK:  Objection, form.

15              THE WITNESS:  From my time of origination, maybe 02:38

16    hundreds.

17    BY MR. KATZ:

18         Q    Okay.  And then now loans in the portfolio that

19    you are responsible for at Goldwater, how many loans are

20    in that portfolio?                                       02:39

21              MS. KRYSAK:  Objection, form, scope.

22              THE WITNESS:   I can't comment on that because I

23    don't know the number of the loans in the portfolio.

24    BY MR. KATZ:

25         Q    Do you have any approximation like, again, an   02:39
```

Page 150

Omnibus Joint Exhibit Part H, page 1831

1     BY MR. KATZ:

2          Q    Is there anyone other than a member of the

3     Goldwater post-closing team who would have the

4     responsibility for labeling the Elizarov deed of trust as

5     being recorded or not in the BlitzDocs system?          03:06

6               MS. KRYSAK:   Objection, form, scope.

7               THE WITNESS:   Not that I'm aware of.

8     BY MR. KATZ:

9          Q    And just so that can I button up a couple of my

10    questions, you did not read Mr. Hill's dep -- Peter      03:07

11    Hill's deposition testimony as part of your preparation

12    for today?

13         A    That is correct.

14         Q    So do you know -- do you know whether there are

15    any factual errors in his deposition testimony?         03:07

16              MS. KRYSAK:   Objection, scope.

17              THE WITNESS:   I would not know that.   I didn't

18    review any of Mr. Hill's deposition.

19    BY MR. KATZ:

20         Q    And is it correct that you did not review       03:07

21    Brittany Shaw's deposition testimony as part of your

22    preparation for today?

23         A    That is correct.

24         Q    So I assume, and correct me if I'm wrong, you

25    would not know where is any factual errors in Ms. Shaw's  03:08

Page 169

```
 1    deposition testimony?

 2            MS. KRYSAK:  Objection, scope, form.

 3            THE WITNESS:  I would not have any information

 4    to that.  I would have to rely on counsel to identify

 5    that.                                              03:08

 6    BY MR. KATZ:

 7       Q    What -- what efforts has Goldwater undertaken to

 8    mitigate the damages at issue in its first amended

 9    complaint particularly relating to its claims against

10    Mr. Elizarov?                                      03:08

11            MS. KRYSAK:  Objection, form, scope.

12            THE WITNESS:  Mr. Katz, can you be more specific

13    in your questioning so I can understand fully and try to

14    answer it the best way?

15            MR. KATZ:  Sure.  Did Goldwater contact Mr. How  03:08

16    -- any of Mr. Howlett's brokers or agents -- realtor

17    agents to tell them that Goldwater had a lien on the

18    property that Mr. Howlett was about to buy?

19            MS. KRYSAK:  Objection, form, scope.

20            THE WITNESS:  I cannot confirm that that         03:08

21    happened.  Again, as a party to the escrow, we would rely

22    on the escrow company to disseminate that information to

23    the parties involved in the transaction.

24    BY MR. KATZ:

25       Q    And Goldwater was fully capable of providing     03:09
```

Page 170

```
 1     Escrow of the West with a copy of Goldwater's unrecorded

 2     deed of trust prior to the March 29th, 2021 close of the

 3     sale from Mr. Elizarov to Mr. Howlett; right?

 4              MS. KRYSAK:  Objection, form, scope.

 5              THE WITNESS:  Define "fully capable" for me        03:09

 6     because I'm not understanding exactly what your question

 7     means.

 8     BY MR. KATZ:

 9         Q    Was there anything stopping Goldwater from

10     sending a copy of its unrecorded deed of trust to escrow   03:09

11     prior to March 29th, 2021 when the sale of the property

12     from Mr. Howlett to Mr. Elizarov -- from Mr. Elizarov to

13     Mr. Howlett closed?

14         A    Other than the timing of obtaining the deed of

15     trust, having it sent to Goldwater Bank, have the          03:10

16     original to attempt to have it recorded, there's timing

17     involved in there with weekend days as well, so there

18     was --

19         Q    How about anything -- sorry, I didn't mean to

20     cut you off.  Go ahead and please finish.                  03:10

21         A    No, go ahead.

22         Q    All right.  Was there anything stopping

23     Goldwater from sending Escrow of the West a copy of the

24     unrecorded deed of trust -- not an original, but a copy

25     of the unrecorded deed of trust?                           03:10
```

Page 171

Omnibus Joint Exhibit Part H, page 1834

```
 1

 2

 3

 4              I, CORY BEARDEN, do hereby declare under penalty

 5      of perjury that I have read the foregoing transcript;

 6      that I have made any corrections as appear noted, in ink,

 7      initialed by me, or attached hereto; that my testimony as

 8      contained herein, as corrected, is true and correct.

 9              EXECUTED this _____ day of _____,

10      2023, at _____, _____.

11                        (City)                    (State)

12

13

14

15

16              _____

17                        CORY BEARDEN

18                        VOLUME I

19

20

21

22

23

24

25

                                                    Page 360
```

Omnibus Joint Exhibit Part H, page 1835

```
 1              I, the undersigned, a Certified Shorthand

 2      Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken before

 4      me at the time and place therein set forth; that any

 5      witnesses in the foregoing proceedings, prior to

 6      testifying, were administered an oath; that a record of

 7      the proceedings was made by me using machine shorthand

 8      which was thereafter transcribed under my direction;

 9      further, that the foregoing is a true record of the

10      testimony given.

11              Further, that if the foregoing pertains to the

12      original transcript of a deposition in a Federal Case,

13      before completion of the proceedings, review of the

14      transcript [ X ] was [ ] was not requested.

15              I further certify I am neither financially

16      interested in the action nor a relative or employee of

17      any attorney or any party to this action.

18              IN WITNESS THEREOF, I have this date subscribed

19      my name:  June 15, 2023.

20

21

22

23

24              JESSICA HONG

25              CSR No. 13776
```

                                                Page 361

<div style="border:1px solid black; text-align:center;">

# EXHIBIT 102

# EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF VICKIE ROBIN CRESTANI

</div>

```
 1                UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4   GOLDWATER BANK, N.A.,            ) CASE NO.
                                      ) 5:21-cv-00616-JWH-SP
 5          Plaintiff,               )
                                      )
 6   vs.                             )
                                      )
 7   ARTUR ELIZAROV; UNISON AGREEMENT)
     CORP.; SCOTT HOWLETT; BANK OF   )
 8   WEST; and ILYA ALEKSEYEFF,      )
                                      )
 9          Defendants,              )
     _____)
10                                    )
     AND RELATED CROSS-ACTIONS        )
11   _____)

12

13

14

15            DEPOSITION OF VICKIE ROBIN CRESTANI

16                 SAN DIEGO, CALIFORNIA

17               TUESDAY, DECEMBER 6, 2022

18

19

20

21

22

23   REPORTED BY:
     KATHLEEN M. ALONA
24   CSR NO:  14219
     JOB NO:  5603295
25   Pages 1 - 224

                                              Page 1
```

Omnibus Joint Exhibit Part H, page 1838

```
 1                  UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION
 3
 4   GOLDWATER BANK, N.A.,            ) CASE NO.
                                      ) 5:21-cv-00616-JWH-SP
 5          Plaintiff,               )
                                      )
 6   vs.                              )
                                      )
 7   ARTUR ELIZAROV; UNISON AGREEMENT)
     CORP.; SCOTT HOWLETT; BANK OF   )
 8   WEST; and ILYA ALEKSEYEFF,      )
                                      )
 9          Defendants,              )
     _____)
10                                    )
     AND RELATED CROSS-ACTIONS       )
11   _____)
12
13
14
15
16         The deposition of VICKIE ROBIN CRESTANI, taken
17   on behalf of the Defendant and Cross-Complainant SCOTT
18   HOWLETT and Defendant BANK OF THE WEST, beginning at
19   10:08 a.m., and ending at 4:51 p.m., on Tuesday,
20   December 6, 2022, before Kathleen M. Alona, Certified
21   Shorthand Reporter, No. 14219.
22
23
24
25
                                                    Page  2
```

```
 1                              INDEX
 2                           EXAMINATION
 3    Witness Name                                        Page
 4    VICKIE ROBIN CRESTANI
 5         BY MR. KATZ ..................................... 8
                                                           204
 6                                                         224
                                                           233
 7
           BY MR. ALEKSEYEFF ............................. 177
 8
           BY MS. HAIDAR ................................. 190
 9
           BY MR. LA VOTA ................................ 194
10                                                         217
                                                           233
11
12
                            EXHIBITS
13
      Exhibit     Description                             Page
14
      EXHIBIT 128 VICKIE CRESTANI'S EXPERT REPORT          69
15
      EXHIBIT 127 DEPOSITION NOTICE                        69
16
      EXHIBIT 129 EMAIL CHAIN WITH ATTACHMENTS            216
17
      EXHIBIT 130 EMAIL CHAIN                             221
18
      EXHIBIT 131 TWO-PAGE DOCUMENT                       226
19                BATES NO. BOTW 0002331 AND BOTW 0002332
20
                      Previously Marked Exhibits
21
                                                         Page
22
      EXHIBIT 24                                           30
23
      EXHIBIT 7                                            87
24
      EXHIBIT 6                                           104
25
      EXHIBIT 11                                          163

                                               Page  3
```

```
 1    APPEARANCES (ALL APPEARING REMOTELY VIA ZOOM):

 2

 3          FOR PLAINTIFF GOLDWATER BANK N.A.:

 4                HILBERT & SATTERLY LLP

 5                BY:  JOSEPH A. LA VOTA, ESQ.

 6                409 CAMINO DEL RIO SOUTH

 7                SUITE 104

 8                SAN DIEGO, CA 92108

 9                PHONE NUMBER (619) 795-0300

10                JLEVOTA@HSCALLAW.COM

11

12          PRO HAC VICE ATTORNEYS FOR PLAINTIFF

13          BOLDWATER BANK N.A.:

14                WAGNER HICKS PLLC

15                BY:  ABBY KRYSAK, ESQ.

16                831 EAST MOREHEAD STREET

17                SUITE 860

18                CHARLOTTE, NC 28202

19                PHONE NUMBER (704) 705-7538

20                ABBY.KRYSAK@WAGNERHICKS.LAW

21

22

23

24

25

                                     Page  4
```

```
 1    APPEARANCES CONTINUED (ALL APPEARING REMOTELY VIA ZOOM):

 2

 3           FOR DEFENDANT/CROSS-COMPLAINANT SCOTT HOWLETT

 4      AND DEFENDANT BANK OF THE WEST:

 5                HALL GRIFFIN LLP

 6                BY:  JEREMY T. KATZ, ESQ.

 7                1851 EAST FIRST STREET

 8                10TH FLOOR

 9                SANTA ANA, CA 92705-4052

10                PHONE NUMBER (714) 918-7000

11                JKATZ@HALLGRIFFIN.COM

12

13           FOR DEFENDANT UNISON AGREEMENT CORP.:

14                ORSUS GATE LLP

15                BY:  JENNIFER HAIDER, ESQ.

16                16 N. MARENGO AVENUE

17                SUITE 316

18                PASADENA, CA 91101

19                PHONE NUMBER (213) 973-2052

20                JHAIDER@ORSUSGATE.COM

21

22

23

24

25

                                          Page 5
```

```
 1   APPEARANCES CONTINUED (ALL APPEARING REMOTELY VIA ZOOM):

 2

 3            FOR DEFENDANT ARTUR ELIZAROV

 4            AND DEFENDANT ILYA ALEKSEYEFF (IN PRO PER):

 5                 LOIA, INC. (APLC)

 6                 BY:  ILYA ALEKSEYEFF, ESQ.

 7                 8721 SANTA MONICA BOULEVARD

 8                 #119

 9                 WEST HOLLYWOOD, CA 90069

10                 PHONE NUMBER (213) 537-4592

11                 ILYA@LOIA.LEGAL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  6
```

```
 1            SAN DIEGO, CALIFORNIA; TUESDAY, DECEMBER 6, 2022

 2                          10:08 a.m.

 3

 4            MR. KATZ:  Let's go on to the record.

 5            MR. LA VOTA:  This is Joseph LaVota, and I'm in the

 6    same office as the deponent, Vickie Crestani.  I am not on

 7    camera.  I am off camera, but we are in the same room.

 8            MR. KATZ:  Good morning.  This is Jeremy Katz,

 9    counsel for Scott Howlett and Bank of the West in this

10    matter.  I'm the party noticing the deposition.

11            MS. HAIDAR:  This is Jennifer Haidar, counsel for

12    Unison Agreement Corp.

13            MS. KRYSAK:  And this is Abby Krysak, counsel for

14    Goldwater Bank.

15            MR. KATZ:  And as we discussed off the record,

16    Mr. Alekseyeff is logged in but not present.  He will be

17    rejoining us soon, and he's authorized us to proceed in his

18    absence.

19

20                          EXAMINATION

21

22    BY MR. KATZ:

23        Q    Good morning, Ms. Crestani.

24        A    Good morning.

25        Q    Am I pronouncing that correctly?
```

Page 7

Omnibus Joint Exhibit Part H, page 1844

```
 1    there's no dispute.  Personal and actual your situation.
 2    BY MR. KATZ:
 3        Q    Do you have an understanding between personal --
 4    sorry -- between actual notice and constructive notice?
 5        A    I do.
 6        Q    What is your understanding of the difference?
 7        A    Well, in the contents of real estate, our
 8    constructive notice is the recordation documents, that gives
 9    us constructive notice.  However, actual is knowing someone
10    took a loan out; knowing personally that somebody received
11    funds to buy a piece of property; knowing personally that
12    there was a deed of trust that was recorded; actually having
13    that deed of trust in your possession, that's actual
14    knowledge.
15        Q    And constructive knowledge is from the recorded
16    chain of title?
17        A    I'm so sorry.  I missed your question.
18        Q    Constructive knowledge would be from the recorded
19    chain of title?
20        A    Yes.  The recorded chain of title gives us
21    constructive knowledge.  And then, you know, for me having
22    actual to telling somebody about it, then, you know, that's
23    constructive knowledge.  I'm spreading that.  So the
24    inquiry --
25        Q    That was my next question.  Are you familiar with
```

Page 34

Omnibus Joint Exhibit Part H, page 1845

1    the term "inquiry notice"?

2        A    I am vaguely but -- and that was my definition I

3    just tried to give.  The inquiry notice, constructive notice

4    too, and that's about all I know about it.

5        Q    I'm going to ask the question a little different.

6    Can you please define for me your -- what inquiry notice is

7    based on your understanding?

8        A    Well -- so the inquiry notice is basically when

9    you -- how do I explain it?  Because we don't use it often.

10           So an inquiry notice is when someone is inquiring to

11   you that they -- or they have knowledge of something and

12   you're inquiring about it.

13           So with that -- that's what I know about it.

14       Q    It involves a question --

15       A    Yes.

16       Q    -- of inquiry?

17       A    You inquire.  You know, is there -- you know, is

18   there a recorded deed of trust?  Is there a deed of trust?

19   You know, yes, there's a deed of trust.  We have a secured

20   lien.  These are the kind of things that would be inquiry

21   because there's a question that asks -- that is asked and

22   then the answer so then you have constructive notice.

23       Q    So if there's a inquiry and response to the inquiry

24   you get information, it's your contention that the response

25   provides constructive knowledge and possibly even actual

                                                        Page 35

1    notice?

2        A    Well, I don't know if it's actual, because the

3    person asking that question doesn't have that knowledge to

4    begin with.

5            They're making the inquiry and then they're told,

6    but they don't have the actual knowledge, so that makes it

7    constructive.  Maybe I have my definitions wrong.

8        Q    This is -- the definitions you're giving  me are

9    based on your approximately 45 years of experience in the

10   escrow industry?

11       A    Yeah.  And we do an awful lot questioning in the

12   escrow industry.  We inquire a lot.

13       Q    What usually -- in your experience, what triggers an

14   inquiry?

15       A    There are, you know, flags that you take note when

16   you're -- again, I'm coming from an escrow stance.  But there

17   are flags within a transaction that you note, and then you

18   try to see if the dots are connected with the reports that

19   you received and information that you gather from the parties

20   to the transaction.  And if dots don't connect, then you have

21   to ask questions.

22       Q    Now, how many questions do you have to ask?  I mean,

23   that -- I don't mean that in the rhetorical -- really the

24   rhetorical sense.  But if you get -- if your -- if you see

25   dots that don't connect and you start asking questions and

                                              Page 36

Omnibus Joint Exhibit Part H, page 1847

1   you get an answer that explains and connects those dots, do

2   you keep asking or at some point you stop asking and you're

3   satisfied with a response that connects the dots?

4       A    Well, once you ask the right questions and the dots

5   are then connected, you should feel comfortable in the

6   knowledge that you have obtained.   You do make sure, always

7   make sure, that if you have a question as an escrow provider,

8   you make sure that once dots are connected the parties are

9   aware of what has taken place.      Now, that being said, I

10  need to emphasize that as an escrow officer you have a duty

11  to know what you need to be asking for.   You need to be

12  specific in your questions.

13      Q    So if you ask questions -- I just want to -- I'm

14  just asking at a very high level here.

15           If you ask -- if you see unconnected dots and you

16  ask questions and you get a response that connects the dots

17  for you, is that enough to stop asking further questions, or

18  do you have to keep asking question after question after

19  question even though in your mind the dots are connected?

20      A    Well, once the dots are connected, you probably have

21  a duty as an escrow holder so you carry out that duty for the

22  benefit of the parties to the transaction.

23      Q    And is the duty to connect the dots?

24      A    That's one of the duties.

25      Q    What are the other duties that you're aware of?

Page 37

Omnibus Joint Exhibit Part H, page 1848

1        A     I think in the context that we're talking about if

2   there's unknown or these red flags or dots that are not

3   connected, again, there's the duty to ask the question.  You

4   stop.  That's a very important thing in escrow.  You stop,

5   and you get clarification.  Undeniable clarification that --

6   that you understand now, and you can close the transaction

7   knowing that you are meeting all of the conditions of the

8   escrow process.

9        Q     So I'm going to run you through a hypothetical in

10  this scenario.  An escrow officer is going about their normal

11  course of business, and they see on the preliminary report

12  that there's a recorded deed of trust; is the escrow officer

13  supposed to find out whether that lien holder of record still

14  has a claim on the property --

15       A     Yes.

16       Q     -- on the property?

17       A     Yes.

18       Q     And is that typical inquiry usually initiated with a

19  request for a demand of the payoff statement?

20       A     It is requested, yes, for the demand statement.  You

21  receive that information from the borrower on that loan so

22  that you can obtain a proper demand request from the lender

23  that has recorded deed of trust on the property.

24       Q     Escrow gets information from the -- I don't want to

25  use borrower, because that sort of affects things.

Page 38

```
 1        Q     And here on March 25 an email from Andrea Cross:

 2              "Seller has instructed we are not to make

 3     payoff to Goldwater."

 4        A     Right.   That's what she's telling Pete on the

 5     25th.

 6              MR. LA VOTA:  You are representing statements are

 7     from Elizarov to Andrea Cross and saying that he was saying

 8     certain things which are not consistent with the record.

 9              MR. KATZ:   That's debatable.   And you're welcome to

10     present whatever evidence you want when it's your turn to ask

11     questions, Joe.

12     BY MR. KATZ:

13        Q     So I'm asking if Elizarov had told -- the seller had

14     told escrow, Andrea Cross, not to pay Goldwater, and if he

15     had said, in whatever capacity, that he doesn't believe that

16     they're a lien holder or that they have an interest in the

17     property, does this March 26 email support a conclusion that

18     Goldwater is merely a creditor seeking payment knowing that

19     its borrower -- unsecured borrower is about to come into a

20     large sum of money?

21              MR. LA VOTA:  I'm objecting to your question as

22     assuming facts not evidence, that are inconsistent with

23     the -- there's no evidence that he said that they are not a

24     secured lender.   There's nowhere -- you can present that and

25     you can ask her a question about that, but otherwise there's
```

                                                        Page 112

Omnibus Joint Exhibit Part H, page 1850

```
 1    no evidence of that.

 2              MR. KATZ:  Are you instructing her not to answer?

 3              MR. LA VOTA:  Goldwater Bank is -- is Goldwater Bank

 4    on the title report?  If not this may --

 5              MR. KATZ:  Joe, stating objections are not proper.

 6              Are you instructing her not to answer?

 7              MR. LA VOTA:  If you're not going to give her

 8    accurate facts to consider, then yes.

 9              MR. KATZ:  I can present her every hypothetical I

10    want to.

11              MR. LA VOTA:  Well, if you're going to ask

12    irrelevant hypotheticals, then sure.  Then pose it as a

13    hypothetical.

14              MR. KATZ:  Great.  You can answer the question.

15    MR. LA VOTA:  Can you reask the question as a hypothetical?

16              Do you even know the question that's pending?

17              THE WITNESS:  I'm kind of confused.

18    BY MR. KATZ:

19         Q    Could -- could the March 26 email be interpreted as

20    an unsecured creditor seeking -- letting escrow know that

21    they're willing to take a haircut on the unsecured loan and

22    that there's some deal that they're negotiating with their

23    unsecured borrower, especially since at this point there's

24    been no

25    indication that Goldwater is a lien holder of record, and at
```

<div align="right">Page 113</div>

1    this point, not withstanding every piece of information

2    conveyed to Goldwater, Goldwater has not come forward and

3    presented documentation to escrow that substantiates its lien

4    interest in the property?

5            From escrow's prospective could this be interpreted

6    as an unsecured creditor talking about ongoing negotiations

7    with the borrower -- with its unsecured borrower?

8        A    So I'm going to -- I believe I understand, but I'm

9    going to have to answer that two ways for you.

10           First of all, we did think this was going to be a

11   hypothetical, and then we turnaround and we talk about the

12   March 26, 11:06 a.m. email from Peter Hill to Andrea as a

13   standalone email, without the benefit of the chain of title

14   or what has already happened in the transaction via phone

15   calls.

16           And so I'm going to say:   Yes.   This email in and of

17   itself, all by itself, coming out of left field to Andrea

18   Cross, I wouldn't know what to think of it.   Okay?   And I

19   would have to then start an investigation.

20           The second part I think of your question -- you

21   started asking about with what you know and with the title

22   that I have, with the emails back and forth, with the phone

23   conversations that appears from the seller to Andrea, with

24   the authorization to obtain a payoff demand, this is not out

25   of left field.

                                                        Page 114

Omnibus Joint Exhibit Part H, page 1852

1          This is right up the alley of saying Peter Hill and

2    the seller, Mr. Elizarov, have continued to discuss this

3    transaction, this payoff, even after the seller says --

4    basically he says quote/unquote is Goldwater Bank on the

5    title report?  If not this makes it easier to close.

6          This Unison thing is a mess.  I don't understand if

7    it's the total -- if that is a total payoff.  That's a huge

8    statement coming from the seller.  I don't understand if that

9    is the total payoff.

10         So I'm going to say this email is very important to

11   her, that there is still something to be dealt with.

12         MS. HAIDAR:  Counsel, I'd like to suggest that we

13   break for lunch.

14         MR. KATZ:  This is a good time for lunch.  Why don't

15   we take a half hour, if that's okay with everyone.

16   Any objections?

17         Joe, any objections?

18         MR. LA VOTA:  No.

19         MR. KATZ:  Okay.  Let's go off the record we'll come

20   back at 1:30.

21         (Whereupon, at 12:57 p.m., a luncheon recess was

22   taken.)

23

24

25

                                            Page 115

Omnibus Joint Exhibit Part H, page 1853

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15    APPEARANCES OF (ALL APPEARING REMOTELY VIA ZOOM):

16

17              JOSEPH A. LA VOTA, ESQ.

18              ABBY KRYSAK, ESQ.

19              JEREMY T. KATZ, ESQ.

20              JENNIFER HAIDER, ESQ.

21              ILYA ALEKSEYEFF, ESQ.

22

23

24

25

                                        Page 116

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12   REPORTED BY:

13   KATHLEEN M. ALONA

14   CSR NO. 14219

15    (The deposition of VICKIE ROBIN CRESTANI was reconvened at

16                          12:57 p.m.)

17

18          MR. KATZ:  We're back on the record at, by my clock,

19   1:41 p.m. Pacific.

20

21                     EXAMINATION CONTINUED

22

23   BY MR. KATZ:

24       Q    Ms. Crestani, during the break, did you have -- feel

25   you need to change any of the testimony that you had
```

Page 117

```
 1    working.  So I don't know why this escrow officer chose not
 2    to put down Goldwater as a placeholder, but she did not.
 3    And, again, she didn't have clarity so she was confused.  She
 4    did not put this together correctly.
 5             MR. KATZ:  So let's -- if there's no further
 6    questions, you guys want to go off the record staying for a
 7    brief second staying on video to discuss stipulations for the
 8    transcript?
 9             MR. LA VOTA:  Sure.
10             MR. KATZ:  Let's go off the record.
11             (Off the record.)
12             MR. KATZ:  Jeremy Katz coming back on the record.
13    Off the record we had been discussing stipulations for the
14    transcript.  We're going to do it per Code, but we are
15    stipulating that a certified copy of the transcript can be
16    used for lieu -- in lieu of the original for all purposes.
17             MR. LA VOTA:  Stipulated.
18             (Whereupon, at 4:51 p.m., the examination of VICKIE
19    ROBIN CRESTANI was concluded.)
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part H, page 1856

```
 1            I, VICKIE ROBIN CRESTANI, hereby declare that I am

 2    the witness in the within matter, that I have read the

 3    foregoing deposition and know the contents thereof, and I

 4    declare that the same is true of my own knowledge except as

 5    to those matters which are therein stated upon my information

 6    and belief, and as to those matters, I believe them to be

 7    true.

 8            I declare under penalty of perjury that the

 9    foregoing is true and correct.

10            Executed on this _____ of _____, 20_____, at

11    _____, California.

12

13

14            _____

15            VICKIE ROBIN CRESTANI

16

17

18

19

20

21

22

23

24

25

                                                      Page  220
```

Omnibus Joint Exhibit Part H, page 1857

1          I, KATHLEEN M. ALONA, CSR NO. 14219, do hereby

2    certify:

3          That prior to being examined, the witness named in

4    the foregoing deposition was by me duly sworn to testify the

5    truth, the whole truth, and nothing but the truth under the

6    penalty of perjury.

7          That said deposition was taken remotely at the time

8    and place herein set forth and was taken down by me in

9    shorthand and thereafter was transcribed into typewriting

10   under my direction and supervision.

11         I hereby certify the foregoing transcript is a full,

12   true and correct transcript of my shorthand notes so taken.

13         I further certify that I am neither counsel for nor

14   related to any party to said action, nor in any way

15   interested in the outcome thereof.

16         The dismantling, unsealing, unbinding of, or

17   tampering with the original transcript will render this

18   reporter's certificate null and void.

19         IN WITNESS WHEREOF, I have hereunto subscribed my

20   name this 29th day of December, 2022.

21

22

23

24        KATHLEEN M. ALONA, CSR NO. 14219

25

Page 221

**<u>EXHIBIT 103</u>**

**<u>DECLARATION OF JACQUELINE M. SCYDICK IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

1  HALL GRIFFIN LLP
   HOWARD D. HALL, State Bar No. 145024
2    *hdhall@hallgriffin.com*
   JEREMY T. KATZ, State Bar No. 267361
3    *jkatz@hallgriffin.com*
   KASANDRA C. GOLDBERG, State Bar No. 345364
4    *kgoldberg@hallgriffin.com*
   1851 East First Street, 10th Floor
5  Santa Ana, California 92705-4052
   Telephone: (714) 918-7000
6  Facsimile: (714) 918-6996

7  Attorneys for Defendant and Cross-
   Complainant SCOTT HOWLETT;
8  Defendant BMO HARRIS BANK N.A.,
   Successor by Merger to BANK OF THE
9  WEST

10              **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

12  Goldwater Bank, N.A.                | CASE NO. 21-cv-00616-JWH-SP

13            Plaintiff,               | JUDGE:  Hon. John W. Holcomb
                                       | CTRM.:  9D
14       vs.
                                       | **DECLARATION OF JACQUELINE
15  ARTUR ELIZAROV; UNISON             | M. SCYDICK IN SUPPORT OF
    AGREEMENT CORP.; SCOTT             | OPPOSITION TO PLAINTIFF'S
16  HOWLETT; BANK OF THE WEST;         | MOTION FOR SUMMARY
    and ILYA ALEKSEYEFF,               | JUDGMENT**
17
            Defendants.
18  _____

19  AND RELATED CROSS-ACTIONS

20  _____

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

HALL GRIFFIN

---
1
DECLARATION OF JACQUELINE SCYDICK

I, Jacqueline M. Scydick, declare as follows:

1.     I am an employee of BMO HARRIS BANK N.A., Successor by Merger to BANK OF THE WEST ("BOTW"), a party in the above-entitled action. I am over the age of eighteen (18), and I have knowledge of the facts set forth in this Declaration and would and could testify to these facts if called upon to do so based upon my own independent knowledge or based upon my review of the files and records maintained by BOTW during the regular course of its business. In my role as Director, Retail Lending Operations, SVP, I manage the mortgage division that originates residential home loans, which includes processing, underwriting, closing, and funding of the loans. I make this declaration in support of BOTW's Opposition to Plaintiff's Motion for Summary Judgment.

2.     I am familiar with the systems of record that BOTW uses to create and record information related to the residential mortgage loans that it issues, including the processes by which BOTW employees enter information into those systems. I am aware that BOTW employees enter, or cause to be entered, information relating to loans and escrows at a time when they have personal knowledge of that information. The records contained in those systems were made at or near the time of the occurrence of the matters set forth therein, and were maintained in the regular course of business. It was BOTW's regular practice to make such records, and BOTW relies on these records in the ordinary course of business.

3.     In March 2021, BOTW loaned money to Scott Howlett, with repayment secured by a Deed of Trust encumbering real property commonly known as 291 W. Overlook Road, Palm Springs, CA 92264 (the "Property").

4.     Between March 25, 2021 and March 26, 2021, BOTW and Escrow of the West exchanged emails regarding BOTW's preparation of closing disclosures ("CD") for Mr. Howlett's loan.

5.     On March 26, 2021, BOTW sent an email to Escrow of the West attaching a document named "Combined Estimate.pdf." The attachment was a

HALL GRIFFIN

DECLARATION OF JACQUELINE SCYDICK
04431.0103/16590415.1                    Omnibus Joint Exhibit Part H, page 1861

1  document on Escrow of the West letterhead dated March 25, 2021, and styled as a

2  "Master Estimated Settlement Statement" (the date appears on the second page of

3  that document).  Attached hereto as **Exhibit A** is a Bates-numbered version of that

4  March 26, 2021 email, including its attachment.

5       6.     In the March 26, 2021 email, BOTW referenced the portion of the

6  Master Estimated Settlement Statement dated March 25, 2021 showing what BOTW

7  described as "a credit of $5,000 from compass to the buyer."   BOTW's March 26

8  email to Escrow of the West asked: "Is that correct?"

9       I declare under penalty of perjury under the laws of the United States of

10 America that the foregoing is true and correct.  Executed on this _29th_ day of

11 August 2023, at _Imperial_ [City], _Missouri_ [State]

13                          Jacqueline M. Scydick for
14                          BMO HARRIS BANK N.A., Successor
15                          by Merger to BANK OF THE WEST

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HALL GRIFFIN

3
DECLARATION OF JACQUELINE SCYDICK

04431.0103/16590415.1

Omnibus Joint Exhibit Part H, page 1862

*Scydick Declaration, Exhibit A*

| | |
|---|---|
| **From:** | "Bauer, Keena" |
| **Sent:** | Fri, 26 Mar 2021 21:12:26 +0000 |
| **To:** | "'Andrea Cross'" <andrea@escrowofthewest.com> |
| **Cc:** | "Merrill, Aida" <Aida.Merrill@bankofthewest.com> |
| **Subject:** | RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994 |
| **Attachments:** | Combined Estimate.pdf |

I have that listed in section H.   There is also a credit of $5,000 from compass to the buyer.  Is that correct?

*If you are not 100% satisfied with my service or your experience with Bank of the West at any time, please let me or my manager know right away. Our contact information is below. Thank you for choosing Bank of the West.*

**Keena Bauer**

**CRES Loan Ops Specialist**
**Consumer Real Estate Services (CRES)**
**Regular Hours M-F 8:00 AM Central Time- 5:00 PM Central Time**

Bank of the West
13505 California Street
Omaha, NE 68154
T (402) 918-2718  **|** F (402) 445-6634
**keena.bauer@bankofthewest.com**



Toni Zaiser, Controls & Governance, Mgr, Vice President
T (402) 918-2811   C (402) 968- 4491   F (402) 918-6818
**toni.zaiser@bankofthewest.com**

**CRES Mission Statement**
**"CRES provides our clients and communities with the best home lending product values in the market, leading digital capabilities and service that builds lasting relationships."**

**From:** Andrea Cross [mailto:andrea@escrowofthewest.com]
**Sent:** Friday, March 26, 2021 3:49 PM
**To:** Bauer, Keena <Keena.Bauer@bankofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994

**Caution:** This email originated from an external sender. Do not click on links or open attachments unless you were expecting this message from this sender.

Omnibus Joint Exhibit Part H, page 1863

BOTW 0002324

I see a credit to the buyer for $2000.00 from the listing agent ?

When will we have loan docs?

**WARNING!** WIRE FRAUD ADVISORY
Before sending funds, always call your Escrow team to verify wire information





**Andrea Cross**
Senior Escrow Officer

9440 Santa Monica Blvd. Suite 310, Beverly Hills, CA. 90210
**P**. (310) 402-5555 ext. 2071 | **E-Fax**. (310) 402-5556
**Direct**. (310) 402-5470
www.escrowofthewest.com

 

click here for disclosure

We are always looking for ways to improve our service. Please take a moment to complete
this short survey about your recent experience.

Rate Your Experience

**From:** Bauer, Keena [mailto:Keena.Bauer@bankofthewest.com]
**Sent:** Friday, March 26, 2021 1:06 PM
**To:** Andrea Cross <andrea@escrowofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994

Hi Andrea.

Attached is my revised CD.  We are off $4,000.   Looks like it's not the purchase price so let me know if
you see it.

Thanks.

*If you are not 100% satisfied with my service or your experience with Bank of the West at any time, <u>please let me or my manager know right away</u>. Our contact information is below. Thank you for choosing Bank of the West.*

**Keena Bauer**

**CRES Loan Ops Specialist**

**Consumer Real Estate Services (CRES)**
**Regular Hours M-F 8:00 AM Central Time- 5:00 PM Central Time**

Bank of the West
13505 California Street
Omaha, NE 68154
T (402) 918-2718  |  F (402) 445-6634
**keena.bauer@bankofthewest.com**



Toni Zaiser, Controls & Governance, Mgr, Vice President
T (402) 918-2811    C (402) 968- 4491    F (402) 918-6818
**toni.zaiser@bankofthewest.com**

**CRES Mission Statement**
**"CRES provides our clients and communities with the best home lending product values in the market, leading digital capabilities and service that builds lasting relationships."**

**From:** Andrea Cross [mailto:andrea@escrowofthewest.com]
**Sent:** Thursday, March 25, 2021 3:17 PM
**To:** Bauer, Keena <Keena.Bauer@bankofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994

<mark>**Caution:** This email originated from an external sender. Do not click on links or open attachments unless you were expecting this message from this sender.</mark>

Revised attached –

Seller is paying the 2nd install taxes and buyer pays prorated portion only

Thanks

**WARNING!** WIRE FRAUD ADVISORY
Before sending funds, always call your Escrow team to verify wire information





**Andrea Cross**
Senior Escrow Officer

_____

9440 Santa Monica Blvd. Suite 310, Beverly Hills, CA. 90210
**P**. (310) 402-5555 ext. 2071 | **E-Fax**. (310) 402-5556
**Direct**. (310) 402-5470
www.escrowofthewest.com



click here for disclosure

We are always looking for ways to improve our service. Please take a moment to complete this short survey about your recent experience.

Rate Your Experience

---

**From:** Bauer, Keena [mailto:Keena.Bauer@bankofthewest.com]
**Sent:** Thursday, March 25, 2021 1:10 PM
**To:** Andrea Cross <andrea@escrowofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994

Hi Andrea.

Attached is my revised CD with signing on 3/27 and funding on 3/29.

Can you confirm that borrower is paying the 2nd installment taxes and there is a tax proration debit for them?

Thanks!

Omnibus Joint Exhibit Part H, page 1866

BOTW 0002327

*If you are not 100% satisfied with my service or your experience with Bank of the West at any time, <u>please let me or my manager know right away</u>. Our contact information is below. Thank you for choosing Bank of the West.*

**Keena Bauer**

**CRES Loan Ops Specialist**

**Consumer Real Estate Services (CRES)**
**Regular Hours M-F 8:00 AM Central Time- 5:00 PM Central Time**

Bank of the West
13505 California Street
Omaha, NE 68154
T (402) 918-2718  |  F (402) 445-6634
**keena.bauer@bankofthewest.com**



Toni Zaiser, Controls & Governance, Mgr, Vice President
T (402) 918-2811   C (402) 968- 4491   F (402) 918-6818
**toni.zaiser@bankofthewest.com**

**CRES Mission Statement**
**"CRES provides our clients and communities with the best home lending product values in the market, leading
digital capabilities and service that builds lasting relationships."**

---

**From:** Andrea Cross [mailto:andrea@escrowofthewest.com]
**Sent:** Thursday, March 25, 2021 11:01 AM
**To:** Bauer, Keena <Keena.Bauer@bankofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994
**Importance:** High

**Caution:** This email originated from an external sender. Do not click on links or open
attachments unless you were expecting this message from this sender.

---

Hi Keena, please see estimate attached for review –
Can we have docs today for signing? Buyer would prefer to fund and record tomorrow, 3/26, is that
possible?

**WARNING!** WIRE FRAUD ADVISORY
Before sending funds, always call your Escrow team to verify wire information

Omnibus Joint Exhibit Part H, page 1867



**Andrea Cross**
Senior Escrow Officer

———————————————

9440 Santa Monica Blvd. Suite 310, Beverly Hills, CA. 90210
**P**. (310) 402-5555 ext. 2071 | **E-Fax**. (310) 402-5556
**Direct**. (310) 402-5470
www.escrowofthewest.com

click here for disclosure

We are always looking for ways to improve our service. Please take a moment to complete this short survey about your recent experience.



**From:** Bauer, Keena [mailto:Keena.Bauer@bankofthewest.com]
**Sent:** Thursday, March 25, 2021 7:13 AM
**To:** Andrea Cross <andrea@escrowofthewest.com>
**Cc:** Merrill, Aida <Aida.Merrill@bankofthewest.com>
**Subject:** RE: HOWLETT- YOUR FILE NO. 02-035523-AC / OUR LOAN NO. X117994

Hello.

Attached are the preliminary Closing Disclosure, lender instructions and HOI for the **HOWLETT** loan tentatively signing on **3/26** Bank of the West will utilize our Closing Disclosure for closing.  Please review and confirm all title/escrow fees, proration, taxes and/or any miscellaneous fees associated with the transaction are present and correct.

My wire amount for funding on **3/29** is **$1,077,883.49.**  We will have a 15 page DOT to record along with a 2 page 2nd home rider.

Thanks.

*If you are not 100% satisfied with my service or your experience with Bank of the West at any time, <u>please let me or my manager know right away</u>. Our contact information is below. Thank you for choosing Bank of the West.*

**Keena Bauer**

**CRES Loan Ops Specialist**

**Consumer Real Estate Services (CRES)**
**Regular Hours M-F 8:00 AM Central Time- 5:00 PM Central Time**

Bank of the West
13505 California Street
Omaha, NE 68154
T (402) 918-2718  **|** F (402) 445-6634
**keena.bauer@bankofthewest.com**



Toni Zaiser, Controls & Governance, Mgr, Vice President
T (402) 918-2811   C (402) 968- 4491   F (402) 918-6818
**toni.zaiser@bankofthewest.com**

**CRES Mission Statement**
**"CRES provides our clients and communities with the best home lending product values in the market, leading digital capabilities and service that builds lasting relationships."**

---

**IMPORTANT NOTICE: This message is intended only for the addressee and may contain confidential, privileged information. If you are not the intended recipient, you may not use, copy or disclose any information contained in the message. If you have received this message in error, please notify the sender by reply e-mail and delete the message.**

---

**IMPORTANT NOTICE: This message is intended only for the addressee and may contain confidential, privileged information. If you are not the intended recipient, you may not use, copy or disclose any information contained in the message. If you have received this message in error, please notify the sender by reply e-mail and delete the message.**

---

**IMPORTANT NOTICE: This message is intended only for the addressee and may contain confidential, privileged information. If you are not the intended recipient, you may not use, copy or disclose any information contained in the message. If you have received this message in error, please notify the sender by reply e-mail and delete the message.**

BOTW 0002330



9440 Santa Monica Blvd., #310
Beverly Hills, CA 90210

Phone: (310) 402-5555
Fax: (310) 402-5556
www.escrowofthewest.com

## MASTER ESTIMATED SETTLEMENT STATEMENT

| | |
|---|---|
| **PROPERTY:** | 291 W. Overlook Road<br>Palm Springs, CA 92264 |
| **BUYER:** | Scott Howlett |
| **SELLER:** | Artur Elizarov |

**CLOSING/RECORD DATE:** March 30, 2021

**ESCROW NO.:** 02-035523-AC

| SELLER | | | BUYER | |
|---|---|---|---|---|
| DEBITS | CREDITS | | DEBITS | CREDITS |
| | | **FINANCIAL CONSIDERATION** | | |
| | 1,355,000.00 | Total Consideration | 1,355,000.00 | |
| | | Deposit from Mr Scott J Howlett | | 40,650.00 |
| | | New 1st Trust Deed - Bank of the West | | 1,084,000.00 |
| | | | | |
| | | **PAYOFF CHARGES - Unison Milgard Holdings LLC**<br>**[Total Payoff $491,000.00]** | | |
| 491,000.00 | | Principal Balance | | |
| | | | | |
| | | **PAYOFF CHARGES - Journeyman Construction (Mechanic Lien)**<br>**[Total Payoff $107,270.00]** | | |
| 107,270.00 | | Principal Balance | | |
| | | | | |
| | | **LOAN INFORMATION - Bank of the West**<br>**[Charges $6,116.51]** | | |
| | | Appraisal Fee | 605.00 | |
| | | Credit Report | 22.65 | |
| | | Discount Fee | 4,065.00 | |
| | | Tax Service Fee | 175.00 | |
| | | Verification Fees | 47.35 | |
| | | Admin Fee | 895.00 | |
| | | MERS Registration Fee | 11.95 | |
| | | Flood Certification | 5.00 | |
| | | Interest at $96.5200/day from 03/29/2021 to 04/01/2021 | 289.56 | |
| | | | | |
| | | **PRORATIONS/ADJUSTMENTS** | | |
| | 2,942.13 | County Taxes at $5,819.60/semi-annually from 03/30/2021 to 07/01/2021 | 2,942.13 | |
| | | | | |
| | | **COMMISSION CHARGES** | | |
| 33,875.00 | | Keller Williams | | |
| | | Credit from Keller Williams for Credit to Buyer for Closing Costs | | 2,000.00 |
| 33,875.00 | | Compass | | |
| | | Credit from Compass for Credit to Buyer for Closing Costs | | 5,000.00 |
| | | | | |
| | | **OTHER DEBITS/CREDITS** | | |
| | | State Farm for Homeowner's Insurance | 2,090.00 | |
| | | Notary Public for Signing Service | 300.00 | |
| 95.00 | | Rudy's Termite and Pest Control for Termite Report/Work | | |
| 900.00 | | Old Republic Home Protection Inc. Home Warranty | | |
| 99.00 | | Property ID for Natural Hazard Disclosure Report | | |
| | | | | |
| | | **TITLE/TAXES/RECORDING CHARGES - Orange Coast Title** | | |
| 2,761.00 | | Title - Owner's Title Insurance (optional) | | |
| | | Title - Lender's Title Insurance | 1,232.00 | |
| 10.00 | | Title - Reconveyance Fee | 10.00 | |
| 62.50 | | Title - Sub Escrow Fee | 62.50 | |

Omnibus Joint Exhibit Part H, page 1870

BOTW 0002331

Closing Date:  March 30, 2021
Date:  March 25, 2021

Escrow No.:  02-035523-AC
Printed: March 25, 2021   01:16pm

Page 2 of 2:

| SELLER | | | BUYER | |
| DEBITS | CREDITS | | DEBITS | CREDITS |
|---|---|---|---|---|
| | | Title - Endorsement Fees | 100.00 | |
| 50.00 | | Recording Grant Deed | | |
| | | Recording Trust Deed | 150.00 | |
| 1,490.50 | | Transfer Tax - County to Riverside County | | |
| 5,819.60 | | Property Taxes (2nd Install) to Riverside County Tax Collector | | |
| | | **ESCROW CHARGES - Escrow of the West** | | |
| 3,060.00 | | Title - Escrow Fee | 3,060.00 | |
| | | Title - Loan Tie-In Fee | 250.00 | |
| 25.00 | | Title - Wire Fee | | |
| 75.00 | | Title - Overnight Fee | 75.00 | |
| 250.00 | | Title - Admin Fee | 250.00 | |
| 50.00 | | Title - Archive Fee | 50.00 | |
| 100.00 | | Title - Messenger/Handling Fee | 100.00 | |
| 677,074.53 | | **Net Proceeds** | | |
| | | **Funds required** | | 240,138.14 |
| $ 1,357,942.13 | $ 1,357,942.13 | **TOTAL** | $ 1,371,788.14 | $ 1,371,788.14 |

**THIS IS AN ESTIMATE ONLY AND FIGURES ARE SUBJECT TO CHANGE**

Omnibus Joint Exhibit Part H, page 1871

**EXHIBIT 104**

**EMAIL FROM PETER HILL TO THEO HAUGEN RE UNION INFORMATION (EXHIBIT 52)**

| | |
|---|---|
| **From:** | Peter Hill |
| **To:** | Theo Haugen |
| **Cc:** | Matt Teskey |
| **Subject:** | Arthur Elizarov |
| **Date:** | Thursday, March 25, 2021 5:16:00 PM |
| **Attachments:** | Unison Information - Arthur Elizarov.pdf |

Theo,

We have an unusual situation on Elizarov that is quite time sensitive.  I have attached a spreadsheet, the Weststar payoff statement, and an estimated settlement statement on a sale that is expect to close as soon as we can figure this out.

The issue is that net proceeds are insufficient to payoff Weststar, Unison, and a contractor mechanic's lien for improvements that were done after Mr. Elizarov acquired the home.

In reviewing this with Matt Teskey, he explained that the Unison agreement has a provision by which the cost of improvements are to be netted against the payoff/gain calculation.  I have some verification to be done but the spread sheet lays out the situation as I understand it at this point this afternoon.

Please give me a call.


Pete


***Peter Hill***
***EVP - Chief Credit Officer***
**Goldwater Bank, N.A.**
2525 E Camelback Road Suite 1100
Phoenix, Arizona 85016
(O) 480.281.8207
(C) 602-291-5444
(F) 480.281.8222
www.goldwaterbank.com


**Confidentiality Notice:** The contents of this email communication are confidential and may contain information that is privileged and/or exempt from disclosure under applicable law. It is intended solely for use of the individual or entity to which this email is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and immediately delete this message and any attachments. Any unauthorized use, retention, dissemination, forwarding, printing, or copying of this email is strictly prohibited.

CONFIDENTIAL

EXHIBIT
73    52

Omnibus Joint Exhibit Part H, page 1873

# EXHIBIT 105

# Jay Hibert Expert Report

DocuSign Envelope ID: 51761138-B608-408E-8246-EBD2191A3D97

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT Of CALIFORNIA

GOLDWATER BANK, N.A. )
)  Civil Action No. 5:21-cv-00616-JWH-SP
Plaintiff, )
)
v. )
)
ARTUR ELIZAROV; UNISON AGREEMENT )
CORP.; SCOTT HOWLETT; )
BANK OF THE WEST; and ILYA )
ALEKSEYEFF, )
Defendants; )
)
AND RELATED CROSS-ACTIONS )

---

## EXPERT REPORT OF JAY HIBERT

---

*Goldwater Bank, N.A. v. Artur Elizarov, et al.*

4888-5242-2192.3

1.      I am Jay Hibert.  I am an expert witness, real estate and lending consultant at JBH

Real Estate Experts.  I have experience in commercial and real estate loans, hard money loans,

and bank operations, and I have provided expert testimony in these areas in a wide range of cases.

My business address is 2600 La Costa Ave., Carlsbad, California 92009.  JBH Real Estate

Experts is a firm providing expert witness testimony, commercial and real estate lending, and

consultation services.

## I.  **ASSIGNMENT**

2.      I and JBH Real Estate Experts have been retained by the law firm of Hall Griffin

LLP on behalf of Scott Howlett ("Howlett") and Bank of the West ("BOTW") to testify

regarding (1) the standard of care for a lending institution regarding mortgage loan origination,

recording its security instrument, and the safe keeping of the security instrument; (2) what

triggers inquiry notice of a lender's unrecorded interest in real property: (3) the conduct that

satisfies and/or discharges the inquiry notice recipient's obligation to inquire; (4) what triggers

constructive notice of a lender's interest of in real property; and (5) whether a recorded

subordination agreement provides constructive notice of a lender's interest in real property when

the subordination agreement is incomplete and omits the lender's name and contact information.

## II.  **SUMMARY OF OPINIONS**

3.      My overall opinion in this matter is that:

(1)     Goldwater Bank, N.A. ("Goldwater") was negligent, failing to meet the

standard of care for lending institutions by not ensuring its Deed of Trust

was recorded against the property after it funded Artur Elizarov's

("Elizarov") mortgage loan, and by failing to timely and properly act when

it discovered its DOT had not been recorded.

(2)    Assuming without conceding that Goldwater put Escrow of the West ("EOW") on inquiry notice, any obligation to inquire was satisfied and discharged because: (i) Goldwater did not expressly tell EOW that Goldwater had a deed of trust for the subject real property; (ii) EOW's escrow officer, Andrea Cross ("Cross") asked Goldwater for a payoff demand and Goldwater sent Cross a payoff demand listing a different borrower in a different state for a different property; (iii) Cross told Goldwater that Goldwater had sent an incorrect payoff demand, and Cross never received a corrected or updated payoff demand listing Mr. Elizarov as Goldwater's borrower or listing the subject real property in connection with Goldwater's loan; (iv) Cross confirmed that Goldwater had not recorded any instrument disclosing Goldwater's interest in the subject real property; (v) Goldwater failed to tell EOW (or Howlett, or BOTW) that Goldwater was the beneficiary on any deed of trust, whether recorded or not; and (vi) Cross told Goldwater that Mr. Elizarov had instructed EOW to stop communicating with Goldwater, and thereafter Goldwater did not provide any further payoff demands or a copy of Goldwater's unrecorded deed of trust to EOW. [*See*, e.g., Goldwater's response to Howlett's Request for Admission Nos. 22-32.]

(3)    Goldwater could have provided actual notice to EOW or Howlett or BOTW by sending them a copy of Goldwater's unrecorded deed of trust, but Goldwater failed to perform this simple protection for its own interest.

Omnibus Joint Exhibit Part H, page 1877

(4)     A lender provides constructive notice of its interest in a real property by

recording a document into the real property's chain-of-title that expressly

discloses the lender's interest in the real property; and

(5)     The existence of a recorded subordination agreement was not sufficient to

provide EOW, Howlett, or BOTW with constructive notice of Goldwater's

interest in the real property because the subordination agreement (i) did

not identify Goldwater as a lienholder;  (ii) did not contain Goldwater's

name or contact information; (iii) did not contain a loan number that

matched Goldwater's loan number; (iv) did not contain a cross-reference

to any other recorded document which revealed Goldwater's interest in the

real property.   [*See*, e.g., Goldwater's FAC, ¶ 19-20 and Exhibit C (copy

of the recorded Subordination Agreement); Goldwater's FAC Exhibit D

(listing a different loan number than the one disclosed in the

Subordination Agreement; Goldwater's response to Howlett's Request for

Admission No. 3 and 4 (admitting that Goldwater's name and contact

information are not listed anywhere in the Subordination Agreement).]

I explain the bases of these opinions in the sections below.

## III.    <u>QUALIFICATIONS</u>

4.     I have been in the banking, finance, lending, investment and brokerage business

for 37 years.  My background includes real estate and commercial lending, investment,

brokerage and consulting positions at large financial institutions such as Bank of America, Union

Bank of California and Mellon Bank.  I have served in independent and correspondent banking

positions where I was responsible for analyzing, underwriting and managing real estate loans and assets.

5.      My experience includes real estate brokerage, commercial lending, real estate lending, hard money lending and consulting positions in the banking, finance, lending and brokerage industries. In addition, I have been a part of well over a thousand real estate mortgage, purchase and sale transactions as either a lender, principal, broker or consultant.

6.      In 2001, I joined the founding team of a San Diego business bank as Senior Vice President and shareholder of the privately held banking company.  I was responsible for developing and managing the Bank's real estate department, which included, but was not limited to, credit underwriting, training, management, and administration of real estate loans and transactions.  In addition, I opened and managed a new branch office for the bank.

7.      In 2009, I left the banking industry and founded my own direct lending, brokerage and real estate consulting business, Market Street Consulting Group, Inc., now known as JBH Real Estate Experts, Inc.  My company specializes in real estate lending and consulting, hard money lending, consulting for banks and investors, and providing expert witness and litigation support services.  We provide loan placement and consultation for all real estate asset types.  I am the officer of record for my corporation's Department of Real Estate ("DRE") Broker's license as well as a member of the California Association of Realtors, and the National Association of Realtors.

8.      Over the course of my career, I have been directly involved in well over a thousand real estate related transactions.  My involvement has been as a lender, broker, representative of a lender, a principal, and/or an advisor.  Many of my litigation support engagements have involved issues surrounding real estate loan transactions, related title issues,

brokers' and lenders' responsibilities, and valuation.  I continue to advise on most types of real estate lending and other transactions, including placing and underwriting debt.  Among many others, I have advised Bank of America, Zions Bank, and Wells Fargo.  I am familiar with the mortgage industry standards, customs and practices, including but not limited to, mortgage origination, funding, monitoring and disposition.  I have served as an expert witness in arbitration, state and federal cases.  I have provided deposition testimony 48 times, trial testimony 19 times, and arbitration testimony as an expert 14 times.

9.      A copy of my curriculum vitae is attached hereto as **Exhibit A**.  A list of publications that I authored in the previous 10 years is attached hereto as **Exhibit B**.  A list of all of the cases which, during the previous 4 years, I have testified as an expert at trial or at deposition is attached hereto as **Exhibit C**.

10.      I am being compensated for my services in this matter at my usual rate of $500 per hour.

11.      I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

**IV.**      **DOCUMENTS REVIEWED**

12.      As part of my assignment, I have reviewed the complaint and first amended complaint filed by Goldwater in this case.  I have reviewed Howlett and BOTW's answers.  I have reviewed the deposition transcript of Andrea Cross, escrow officer at Escrow of the West. Additionally, I have reviewed a number of documents produced in discovery by Goldwater, Elizarov, and First American Title Insurance Company.  A complete list of the documents reviewed by me or by members of my staff at my direction for this report is shown in **Exhibit D**.

## V.    **FACTS AND ALLEGATIONS**

13.     My understanding of the following facts is based on my review of the above-referenced documents (including those identified in **Exhibit D**).

14.     This action involves real property commonly known as 291 W. Overlook Road, Palm Springs, California 92267-8934 ("Property").

15.     In or around July 2019, Goldwater loaned $686,250 to Elizarov, and Elizarov signed a Deed of Trust listing Goldwater as beneficiary in connection with that loan.

16.     Goldwater requested but did not receive a lender's policy of title insurance for its loan to Elizarov, and Goldwater's post-closing procedures did not detect the lack of a title policy.

17.     Goldwater did not record its Deed of Trust into the Property's chain of title until after April 1, 2021 [*See*, Goldwater's response to Howlett's Request for Admission No. 3].

18.     On August 7, 2019, Unison Agreement Corporation ("Unison") recorded a Subordination Agreement in which Unison agreed to be in second lien priority position.

19.     Unison's recorded Subordination Agreement did not identify the first lien lender, nor did it list Goldwater's name or contact information, nor did it reference any other recorded instrument in which Goldwater had claimed an interest in the Property.

20.     In February 2021, Howlett agreed to purchase the Property from Elizarov.

21.     On or about February 4, 2021 Elizarov notified Goldwater that he intended to sell the Property, and Elizarov provided Goldwater with the contact information for the sale transaction's escrow agent, EOW.

22.     EOW assigned Cross as the escrow officer for the sale transaction.

23.     In connection with the sale of the Property, Elizarov prepared a Statement of Information and gave it to EOW.  Elizarov's Statement of Information did not specify who the existing first trust deed loan lender was, instead stating "see provided."  [*See*, EOTW_000325].

24.     On March 22, 2021, EOW provided Goldwater with the Purchase And Sale Agreement ("PSA") for Elizarov's sale of the Property to Howlett.  This PSA including identification and contact information for Howlett and Howlett's real estate agent.

25.     On March 22, 2021, EOW sent a request for payoff demand addressed to Unison care of Goldwater, to solicit a payoff demand.  [*See*, EOTW_000181].

26.     On March 24, 2022, Cross told Goldwater's representative, Peter Hill, that the sale of the Property from Elizarov to Howlett was proceeding.

27.     On March 25, 2021, Goldwater sent EOW a payoff quote for a different borrower, and a different real property, located in a different state.  [*See*, EOW0185].

28.     Later on March 25, 2021, EOW notified Goldwater that Goldwater had sent an incorrect payoff demand.

29.     Also on March 25, 2021, EOW notified Goldwater that Goldwater's Deed of Trust had not been recorded against the Property.

30.     Goldwater did not send EOW or Howlett or BOTW a corrected payoff demand for Elizarov's loan prior to the close of escrow.  [*See*, EOTW_000571].

31.     As of March 25, 2021, Peter Hill of Goldwater had access to an unrecorded copy of Goldwater's Deed of Trust for Elizarov's loan.  [*See*, GOLDWATER_001209].

32.     Goldwater did not provide a copy of its unrecorded Deed of Trust to EOW or Howlett or BOTW prior to the close of escrow, nor did Goldwater record a copy of its Deed of Trust prior to the close of escrow.

8
HIBERT EXPERT REPORT

33.     Escrow closed on March 26, 2022.  Howlett funded his purchase of the Property using a new loan from BOTW.

34.     On March 29, 2021, a new grant deed and new deed of trust were recorded against the Property vesting title for Howlett (as the new owner) and BOTW (as the new first position lender of record).

35.     On April 6, 2021, Goldwater filed this instant action.

36.     On April 20, 2021, Goldwater finally recorded its Deed of Trust for its 2019 loan to Elizarov.

37.     I understand that Plaintiff Goldwater has sued Howlett to have Goldwater's Deed of Trust take first lien position against the Property.

38.     My understanding is that, prior to the close of escrow, Goldwater did not expressly inform EOW or Howlett or BOTW that Goldwater had a lien interest in the Property.

39.     It is my understanding that Goldwater contends that Howlett and BOTW had inquiry notice of Goldwater's interest in the Property because of Goldwater's communications with Andrea Cross and EOW regarding a payoff demand.  Further, it is my understanding that Goldwater contends that the Unison Subordination Agreement provided constructive notice of Goldwater's lien interest in the Property.

## VI.     GOLDWATER FAILED TO MEET THE STANDARD OF CARE FOR A LENDING INSTITUTION BY NOT RECORDING ITS DEED OF TRUST

40.     There are many steps in the origination of a mortgage loan, most of which occur prior to the loan closing and/or funding. The steps can be summarized as follows: 1) Application is submitted with all supporting documents; 2) Lender will review the information and issue a conditional approval containing requests for additional information; 3) Lender will order an

9

HIBERT EXPERT REPORT

appraisal; 4) Underwriting will continue (the process of reviewing all of the application information to determine if a final approval can be issued).  During the final underwriting phase a lender will order and review a preliminary title report.  The preliminary title report gives the information that the lender and title company need in order to ensure that the security for the loan is clear and the lender's lien position can be insured; 5) Documents are prepared; 6) Documents are sent to escrow for review with the borrower and signing; and 7) The loan is funded and documents for recording are sent to the title company—namely the Deed of Trust.

41.    Residential mortgage loans are secured by the properties borrowers acquire with the loan.  While there are many important steps in the origination, underwriting and funding of a mortgage loan, a very (if not the most) important step is to ensure that the collateral for the loan is properly documented so that the lender's lien position can be insured.  Put simply, the lender needs to send the signed DOT to the title insurance company, and then make sure it is recorded.  The monitoring of collateral for a mortgage loan is so important that it is an area that is regulated and audited by the FDIC.  [*See,* RMS Manual of Examination Policies, Federal Deposit Insurance Corporation 3.2.]

42.  Once a DOT is recorded at the recorder's office, confirmation of the recording is shared with the title company.  The standard in the industry is that the title and/or escrow company then contacts the lender to confirm that the DOT has been recorded.  This practice has developed in the industry due to the length of time it takes to receive the original recorded document back from the title company.  It can take 30 days to receive the original DOT, and in some cases even longer.

HIBERT EXPERT REPORT

43.     I did not see anything in the documents that I reviewed acknowledging that the DOT was recorded when Goldwater funded the subject loan.  There was no evidence in the file of communication or confirmation that the DOT was recorded.  In fact, I saw no communication on the part of Goldwater inquiring about the status of the signed DOT after the loan funded to check on the status of the recording.

44.     Goldwater Bank failed to meet the standard of care for mortgage lenders when it did not ensure that its Deed of Trust was recorded for the subject loan transaction.  The standard of care for the mortgage lending business has been established over the years due to the many regulations that must be followed by consumer mortgage lenders that are regulated by the FDIC and/or other federal and state authorities.  This standard of care has developed to ensure that mortgage loans are uniformly processed so that consumers and other lenders are protected when loans are made, sold, and transferred.

## VII.   GOLDWATER SHOULD HAVE CAUGHT THE ERROR WHEN IT TRANSFERRED ELIZAROV'S LOAN TO WESTSTAR MORTGAGE CORPORATION FOR SERVICING

45.     Once a mortgage loan is funded the lender will "board" the loan.  Loan boarding is the process of setting up the borrower and the new loan onto the lender's servicing system.  If the lender transfers the servicing, then all of the necessary loan information (including documents) will be sent to, and boarded at the servicing company.  The boarding and servicing process put simply, means inputting and storing the critical information regarding the loan onto a system so that the loan and borrower performance can be tracked for the life of the mortgage.  For example, payment statements can be issued and payments can be recorded when received.

46.     According to Paragraph 37 of Goldwater's verified First Amended Complaint, as of May 2020, Goldwater had transferred the servicing of the loan to an affiliated entity, WestStar Mortgage Corporation.  When a loan is transferred for servicing, or assigned or sold to another lender, the complete loan and legal document file is a part of the transfer.  In order to comply with representations and warranties that are a part of a loan servicing transfer, the lender conducts an audit of the file being transferred to ensure its completeness.  This means all necessary documents that are a part of the origination, underwriting, closing and monitoring of the loan being transferred.

47.     As stated previously, Goldwater failed to meet the industry standard of care by not recording its Deed of Trust.  Further, Goldwater failed to note that the Deed of Trust contained in its file had not been recorded, and that the file did not contain a title insurance policy.  These two items are critical to the collateral management of a consumer mortgage loan and Goldwater should have caught these errors when the file was assembled and reviewed for transfer. As noted above, collateral monitoring is a requirement of the FDIC for all real estate secured loans.

## VIII.   GOLDWATER FAILED TO MEET THE STANDARD OF CARE FOR A LENDING INSTITUTION BY FAILING TO DETECT DURING POST-CLOSING PROCEDURES THAT IT HAD NOT RECEIVED THE RECORDED DEED OF TRUST AND TITLE POLICY THAT GOLDWATER HAD REQUESTED

48.     After all loan documents are signed by the borrower in a mortgage loan transaction, the next and most important step in the closing phase is to ensure that the DOT is recorded, and to comply with the title company's requirements in order to receive a title insurance policy.  Once the loan is funded and the Deed of Trust is recorded, the title company

issues their policy. The standard time frame for the title policy to be received by the lender is approximately 30 days, but not usually under two weeks. For this reason, the standard in the mortgage industry is for the lender to set a calendar tickler (in its monitoring system) for a 30 day review specifically to check for receipt of the title policy.

49.    The same process discussed above is followed in order to track the receipt of the recorded DOT. If the recorded DOT is not received in timely manner, then a post closing loan operations employee would be tasked with contacting the title company to inquire. I do not see any evidence in the file documents that I reviewed showing that an employee of Goldwater made an inquiry regarding the status of the DOT or the title policy. Moreover, Goldwater's response to Howlett's Request for Admission No. 3 admits that Goldwater's 2019 DOT was not recorded until after April 1, 2021. A mortgage lender is required to monitor the collateral that is being used to secure its loans. It is not only a failure to meet the standards for the mortgage lending industry by not following prudent post closing steps, it is a failure to adhere to the FDIC's policies, rules and procedures.

## IX.    GOLDWATER'S OWN NEGLIGENCE IN FAILING TO RECORD ITS DEED OF TRUST, AND FAILURE TO PROPERLY FOLLOW INDUSTRY STANDARDS POST CLOSING CAUSED ITS DAMAGES

50.    As discussed previously in this report, Goldwater was the originator, underwriter and the lender that funded and established servicing of the subject loan. Servicing of the loan was transferred to WestStar no later than May 2020. Therefore, the responsibility to ensure that all documents are properly executed, and the loan is boarded was Goldwaters (it should be noted that at the Deposition of Peter Hill, President and Chief Credit Officer of Goldwater, he alleged that the service transfer to Weststar was immediate upon origination in 2019, not in May 2020 as

alleged the complaint). Also, regardless of whether the servicing of the loan was transferred to WestStar immediately after the loan originated in 2019 or later as of May 2020, WestStar (as servicing agent) was also responsible for ensuring that all documents were properly executed and the loan is properly boarded. This would include the very, if not the most important step, of ensuring that the DOT had been properly recorded. Goldwater and its servicing agent WestStar failed to perform this step and therefore was the cause of the loan being maintained without a recorded DOT in its collateral file.

## X.    **GOLDWATER'S OWN NEGLIGENCE IN FAILING TO TIMELY PROVIDE EOW WITH AN UNRECORDED COPY OF GOLDWATER'S DEED OF TRUST COMPOUNDED GOLDWATER'S ALLEGED DAMAGES**

51.    On or about March 8, 2021 Goldwater knew or should have known that its DOT was not recorded. [*See*, GOLDWATER_001209]. Further on March 25, 2021, Goldwater stated in an internal email that, "our Deed of Trust did not get recorded." [*See*, GOLDWATER_001149]. It is not clear from my review of the file, what if anything, took place between March 8, 2021 when Brittany Shaw received a copy of the unrecorded DOT until March 25, 2021. As soon as Goldwater knew its DOT was not recorded, it would be incumbent on them to act with urgency and notify the title and escrow company of its status as the beneficiary of an unrecorded DOT.

52.    Goldwater knew as early as February 3, 2021 that Elizarov was selling the property. [*See* GOLDWATER_001301].

53.    The minimum standard in the mortgage lending industry when learning that real property used as collateral is not properly recorded, is to immediately contact the title insurance

DocuSign Envelope ID: 51761138-B608-408F-82A6-EBD2191A3D97

company.  In this case, however, Goldwater knew that there was a pending sale in escrow and yet no one from Goldwater ever informed EOW that it had an unrecorded DOT in its possession.

54.     Had Goldwater followed the very minimum standard in the mortgage industry to ensure that title and escrow for the pending transaction was notified and given a copy of the unrecorded DOT, the pending sale would have been stopped.  Had Cross known there was an unrecorded DOT she would have had a responsibility to notify the title company, Howlett, and BOTW.

55.     When Goldwater chose to not contact EOW, Howlett, and BOTW regarding the unrecorded DOT, Goldwater further placed itself in a position jeopardizing Goldwater as a possible secured lender.  Peter Hill of Goldwater testified at his deposition that he did nothing to secure Goldwater's position because he wanted to help Elizarov with the sale of the property. Additionally, Mr. Hill testified that he was working on a way to receive a short pay against its Note.  [*See*, EOTW_000568].  It is also unclear to me, as a lending expert with 37 years of industry experience, why a lender would work towards a short payoff when claiming to be in a senior secured position.  In fact, I cannot think of a time where I have seen that type of strategy used.  This would be especially true when a lender believes a borrower is trying "to close without paying.." [*See*, GOLDWATER_001149].

## XI.   THE INQUIRY NOTICE STANDARD WAS SATISFIED AND DISCHARGED WHEN CROSS REQUESTED A PAYOFF DEMAND FROM GOLDWATER, AND GOLDWATER NEVER PROVIDED A PAYOFF DEMAND FOR ELIZAROV'S LOAN OR A COPY OF GOLDWATER'S DEED OF TRUST.

56.     While it is beyond the scope of my assignment to provide legal definitions of Inquiry, Constructive and Actual notice, it is within my expertise, based on my 37 years of

professional experience in the real estate lending industry, to opine on what the customs and practices would be. Additionally, what would be expected to provide such notice is within the scope of my expertise and professional experience.

57.     Based on my review of the file which included, but was not limited to, communication between Cross and Goldwater, Cross had inquired and requested a loan payoff. Cross had no way of knowing, based on the documents an escrow officer would review for a mortgage loan transaction, that Goldwater was supposed to be, or claiming to be, in a secured position. Cross asked for a payoff, but never received one. Had Goldwater simply communicated with Cross that it had an unrecorded DOT, Cross would have known and could have halted the transaction.

## XII.   THE RECORDED UNISON SUBORDINATION AGREEMENT DID NOT PROVIDE CONSTRUCTIVE NOTICE OF GOLDWATER'S UNRECORDED DEED OF TRUST

58.     Unison's Subordination Agreement was recorded which means, based on my professional experience, that constructive notice of its lien position has been given. However, the Subordination Agreement that I reviewed did not list Goldwater as a lender, it did not identify any recorded document in which Goldwater disclosed its interest in the Property, and the senior lender's loan number in the Subordination Agreement [FAC, Exhibit C] did not match Goldwater's loan number for Elizarov's loan [FAC, Ex. D.]

59.     Subordination Agreements are common in the mortgage lending industry, and in many cases they are executed prior to Senior DOT's. This is because Senior note holders require evidence that any proposed Junior lenders are willing to subordinate, thus ensuring the Senior note lender's position in the transaction. It is the responsibility of the Senior lender to review the

documents for accuracy as part of their pre and post closing diligence in order to protect their lien position.

60.    Goldwater failed to follow the industry standard to ensure that Unison's Subordination Agreement was properly completed.  If Goldwater noted the errors such as I discussed above, it could have taken action to have the document corrected which would have provided constructive notice to any future secured lender that there may be a Senior lender with an unrecorded position.

61.    Goldwater did not take any steps to correct the Subordination Agreement, and therefore, as recorded, it did not provide constructive notice to EOW, Howlett, or BOTW.

**XIII.   <u>CONCLUSIONS</u>**

62.    Based on my review as discussed in this report, it is my opinion that Goldwater failed to meet the standard of care for lending institutions when it did not verify that the Deed of Trust was recorded against the Property.  Further, Goldwater failed to catch the error during its own post-closing procedures or when Goldwater transferred servicing of Elizarov's loan to Weststar Mortgage Corporation.  Goldwater would have had to transfer Elizarov's entire loan file to Weststar Mortgage Corporation, which would have included the unrecorded Deed of Trust.  All of Goldwater's alleged damages were caused by Goldwater's own failure to timely record its Deed of Trust.  Those damages were compounded by the fact that Goldwater failed to timely provide EOW or Howlett or BOTW with a copy of Goldwater's unrecorded Deed of Trust prior to the close of escrow for Howlett's purchase of the Property.

63.    Cross and EOW satisfied the inquiry notice standard when Cross requested Goldwater to send her the payoff demand for the Property.  At that point it was incumbent on Goldwater to send the correct payoff demand which it did not (or at minimum to expressly state

that Goldwater was a beneficiary of a deed of trust).  Further, Unison's Subordination Agreement could not give constructive notice to Cross, EOW, Howlett, and/or BOTW because Goldwater was not listed as a lender, the Subordination Agreement did not identify any recorded document in which Goldwater disclosed its interest in the Property, and the senior lender's loan number in the Subordination Agreement did not match Goldwater's loan number for Elizarov's loan.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and, if called as a witness, could and would competently testify to such facts under oath.

Executed on this 15th  day of September, 2022, at Carlsbad, CA

9/15/2022

DocuSigned by:

*Jay Hibert*

92A3F53B1C984C0...

Jay Hibert

# EXHIBIT A



## Curriculum Vitae and Expert Witness Qualifications
## Jay Hibert

**Business Address:**     2600 La Costa, Ave., Carlsbad, CA 92009

**Contact Information:**    Mobile Ph: (760) 518-2310  Email: jay@jbhrex.com

**Educational Background:**

    **High School:**    Point Loma High School, San Diego, CA, 1981

    **College:**    Pomona College, Claremont, CA, B.A. Areas of concentration; Philosophy, Economics and Accounting

**Licenses:**    Licensed California Real Estate Broker (DRE#01523075)

**Relevant Courses:**    
Realtor Code of Ethics, 2018
Elder Financial Abuse ABA course, 2018
Continuing Education to maintain licenses above, 2019
Allied Real Estate School, 2010-2011
Annual Banker Compliance Courses from 1985 through 2009
UCLA School of Business Courses 1986-1987

**Trade Associations Past and/or Present:**    
RMA
Biocom
USD Family Business Forum
American Electronics Association
Chairman's Roundtable
UCSD Economics Roundtable
Association for Corporate Growth
San Diego Downtown Partnership
Carlsbad Chamber of Commerce
North County Association of Realtors
California Association of Realtors
National Association of Realtors

### Background Summary

Mr. Hibert has been in the banking, finance, investment and brokerage business for 37 years. His background includes corporate officer roles at large financial institutions such as Bank of America, Union Bank of California and Mellon Bank, as well as Correspondent bank positions. He has extensive experience in commercial loans, hard money loans, bank operations, and consulting

positions in the finance, lending and brokerage industries. In addition, he has served as a Chief Financial Officer during his career. Prior to forming Market Street Consulting Group, Inc., and JBH Real Estate Experts, he was part of the founding team of a San Diego Business Bank. He was responsible for branch operations, credit underwriting, training and administration of real estate and commercial loans. Mr. Hibert's responsibilities included the formation of the bank's real estate department, credit underwriting, recruiting and training operations officers, loan officers and related staff. He now operates his own lending and brokerage company that specializes in providing loans in the bank, hard money, private money and institutional areas. He is licensed with the California Department of Real Estate.

**Relevant Experience:**
**Bank of America Corporate Banking -** Los Angeles, CA 3 years. Responsibilities included managing a portfolio of business clients with annual revenues that exceeded $50,000,000.

**Union Bank of California Corporate Banking -** San Diego and Los Angeles, CA, 5 years. Responsibilities included portfolio management of clients with annual revenues from $20,000,000 to $750,000,000. Additional responsibilities included the opening of a new branch location in San Diego, CA.

**Bank of the West -** San Diego, CA, 3 years. Responsibilities included branch office management, business development and portfolio management of clients with annual revenues from $10,000,000 to $250,000,000. Additional responsibilities included real estate development loans.

**Engineered Equipment Company -** Corona, CA, 3 years. Served as the Chief Financial Officer. Responsible for all decisions related to the company's finance and administration. Negotiated contracts related to disputes including those where litigation was necessary.

**Mellon First Business Bank -** San Diego, CA, 3 years. Responsible for managing a client portfolio of private companies. Duties included real estate loan underwriting and administration. Was responsible for establishing the new San Diego branch location.

**Regents Bank -** San Diego, CA, 8 years. Member of the Founding Team and Shareholder. Opened a new branch location in Carlsbad, CA. as well as the Manager of the Bank's Real Estate Department including Construction lending, SBA 504 and 7a loans, participation loans and loan brokering.

**Market Street Consulting Group, Inc. -** May, 2009 to December, 2019. Founding partner of a licensed and bonded direct lender with the California Department of Business Oversight. Provided corporate and bank consulting services. Additionally, we provide Commercial real estate loans for all asset classes.

Omnibus Joint Exhibit Part H, page 1895

**Market Street Homes -** February 2015 to 2020. Primary focus was residential redevelopment in San Diego, CA and Portland, OR.

**Market Street Realty Group -** February 2015 to 2019. A full service brokerage representing buyers, sellers and real estate investors.

**Endeavor Bank Real Estate Solutions -** October 2019 to March 2021. Assist Endeavor Bank customers in obtaining real estate financing.

**JBH Real Estate Experts -** February 2020 to present. Provide expert witness and consulting services in bank operations, commercial and real estate lending, institutional finance, hard money loans, SBA lending, real estate valuation, brokerage and other related cases.

### Testimony/Designations

Mr. Hibert has been providing expert witness and consulting services since 2010. He has been designated over 160 times as an expert in 16 different states concerning matters relating to commercial and real estate loans, real estate, house flipping, construction finance, SBA loans, mortgage lending, general banking and operations, brokerage, valuation, hard money loans and investment issues. His experience includes both Federal and State court cases where he has provided deposition testimony, trial testimony and arbitration testimony more than 80 times.

| | |
|---|---|
| **Other Experience:** | Treasurer - Pacific Southwest Conference of the Evangelical Covenant Church, Walnut Creek, CA 2001-2003<br>Chairman of the Board - Pacific Southwest Conference of the Evangelical Covenant Church, Walnut Creek, CA 2004-2006 |
| **Seminar presentations**<br>**And Courses taught:** | Financial Management for Treasurers of non-profit organizations<br>Expert panel member for CPA continuing education courses<br>Fundamentals of financial accounting<br>Expert panel member consulting business owners regarding banking relationships<br>Guest presenter multiple times for commercial brokerage companies in the area of finance and investment opportunities |
| **Relevant Expert**<br>**Designations:** | **Case list available upon request** |

**Representative Client List:**

- **Fatima Satya**, Law office of Y. Jessie Shaw, Pasadena, CA
- **Alpert Family Trust**, Kirby Noonan Lance & Hoge, LLP., San Diego, CA
- **Won Ki Kim**, Law Office of Charles C. Song, Los Angeles, CA
- **Tomato Bank**, Neufeld Marks, Los Angeles, CA
- **Farmer Boys Produce Market, Inc.**, Law office, John Thomas Dzialo, Orange, CA
- **Eric and Craig Sterling**, Dan Johnson Law Group, San Francisco, CA
- **Old Republic Title Co.**, Early Sullivan Wright Gizer & McRae LLP, Los Angeles, CA
- **Southeast Properties, LLC.**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Fred Sacher.**, Bohm Wildish, LLP, Costa Mesa, CA
- **All California Mortgage**, Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **George Fiegl**, Goode Hemme Peterson, San Diego, Baker & McKenzie, San Francisco, CA
- **David Stebbins**, Simone & Associates, San Diego, CA
- **Selby Corporation**, Law Office of Kenneth E. Chyten, Oxnard, CA
- **Stewart Title Company**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Ticor Title Company**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Victor and Sandra Solano**, Patrick E. Herman, Esq. San Diego, CA
- **Kenmore Villas, LLC**. Western Law Connection, Los Angeles, CA
- **Danny Ho**, Law Offices of Edward C. Tu, Pasadena, CA
- **United Central Bank**, Chuhak & Tecson, Chicago, IL
- **Kamran Banayan**, Scott Kennedy, Attorney at Law, San Diego, CA
- **Fort McDowell Yavapai Nation**, Poindexter & Doutre, Inc., Los Angeles, CA
- **Farmers and Merchants Bank**, Law Offices of Michael Leight, Long Beach, CA
- **William J. Smith, Jr.**, Law Office of Thomas K. Eckhardt, Indio, CA
- **CIT Small Business Lending Corporation**, Troy Gould Attorneys, Los Angeles, CA
- **Sheryl Briggs and Atomic Design, LLC**. Coronado Katz, LLC Kansas City, MO
- **Real Estate Acquisition Leaders, Inc**. Vakili & Leus, LLP, Los Angeles. CA
- **Cynthia Espino**, Law Office of Kenneth E. Chyten, Oxnard, CA
- **Barry McCown, Chula Vista Physicians** Mazzarella & Mazzarella, Esq., San Diego, CA
- **Community Valley Bank**, Lewis Brisbois, Palm Desert, CA
- **Richard Meruelo**, Neufeld Marks, Los Angeles, CA
- **Purefitness**, Bradley L. Jacobs Attorney at Law APC, San Diego, CA
- **Deanna Boll**, Denbeaux & Denbeaux, Westwood, NJ
- **Robert D. Voit**, et. al,, Grant, Genovese, & Baratta, LLP, Irvine, CA
- **California Furnishing, Inc**., The Onu Law Firm, Redwood City, CA
- **Lauren Smith-Hams Dressler**, Baker & McKenzie, LLP, San Francisco, CA
- **Healthcare Finance Partners Corporation**, Kaplan Law Firm, San Diego, CA
- **Heeyoung Kim**, LTL Attorneys LLP, Los Angeles, CA
- **EMM Realty of Utah**, Humphrey's Law, Salt Lake City, UT
- **Nationwide Title Insurance**, Jampol Zimet, LLP, Los Angeles, CA
- **Momentum Business Capital,** Global Legal Law Firm, Carlsbad, CA
- **Universal Bank**, Dykema Gosset, LLP, Los Angeles, CA
- **Hugh Douglas Bek**, Avila Law Firm, APC, Torrance, CA
- **John Whang, et. al,,** Willenken Wilson Loh & Delgado, LLP, Los Angeles, CA
- **North Island Financial Credit Union**, Cooley LLP, San Diego, CA
- **Arrowhead Credit Union**, Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Veridian Credit Union**, Pettit Kohn Ingrassia Lutz & Dolin, San Diego, CA
- **Patrick Kealy**, Hua Gallai, LLP, Beverly Hills, CA

- **Fidelity National Title Group**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **LJ 6309, LLC.,** Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Dreien Opportunity Partners LLC**, Jackson Walker LLP, Dallas TX
- **Riverwalk Petroleum, Inc**. William D. Chapman Law Offices, Irvine, CA
- **Thomas W. McNamara**, McNamara Smith LLP, San Diego, CA
- **Bohm Wildish, LLP**, Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Surgeet Sohal,** Law Offices of Heather Gibson, P.C. Santa Clara, CA
- **Debbie Emmer,** Leinoff & Lemos, P.A., South Miami, FL
- **Kevin and Laurie Walton**, Abir Cohen Treyzon Salo, LLP, Los Angeles, CA
- **ANJ Holding LLC,** Law Offices of Stephen R. McLeod, Sherman Oaks, CA
- **Ramon Rahimi,** McFarlin, LLP, Irvine, CA
- **Sylvania, L.P.,** La Jolla Law Group, La Jolla, CA
- **Kashian Enterprises, LP,** Procopio, San Diego, CA
- **Computershare, Inc.** Ogletree, Deakins, Nash, Smoak & Stewart San Francisco, CA
- **Christine Chui,** Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Global Premier Development, Inc.,** Mark Butler & Associates, Newport Beach, CA
- **Daniel Johnson Jr. Attorney in fact.,** Dan Johnson Law Group, San Francisco, CA
- **Richard Brodowski,** David Axelrod, Sierra Law Group, Sonora, CA
- **Cuong Van Tran,** Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **First American Title Company,** Hilbert & Satterly, LLP, San Diego, CA
- **William L. Roy,** Law Offices of Shun C. Chen, Irvine, CA
- **JPMorgan Chase**, Massey & Gail LLP, Chicago, IL
- **KBC Capital, LLC**, Finch, Thornton & Baird, LLP, San Diego, CA
- **California Marketplace**, Fisher & Wolfe, LLP, Beverly Hills, CA
- **Wells Fargo Bank**, Hemar, Rousso & Heald, LLP, Encino, CA
- **New Power, Inc.,** Kunzler Bean & Adamson, Salt Lake City, UT
- **Donald and Lynn Southard,** Ulwelling Law, APC, Costa Mesa, CA
- **Stewart Title.,** Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Sweet, et al.,** Stone & Sallus, LLP, Manhattan Beach, CA
- **Valbridge Property Advisors, Inc.,**  Olson Cannon Gormley & Stoberski, Las Vegas, NV
- **Dave Freeman,** Jamison Law Firm, PC, Pasadena, CA
- **Star Mobilehome Park Management,** Rudderow Law Group, Newport Beach, CA
- **Fidelity National Title Group,** Meylan Davitt Jain Arevian & Kim, Los Angeles, CA
- **WFG National Title Insurance Company,** Ablon, Lewis, Bass & Gale LLP, Los Angeles, CA
- **Muayad Kassab,** Ogletree, Deakins, Nash, Smoak & Stewart, P.C., San Diego, CA
- **Angelica Gardner,** Skane Mills, San Francisco, CA
- **Tamra Perdomo,** Wagner, Zemming Christensen, Riverside, CA
- **Richard Anderson,** Bradley L. Jacobs, Attorney at Law APC, San Diego, CA
- **Deborah Evenchik,** Law Office of Lynn Eric Goar, P.C. Tucson, AZ
- **Cheers Development, LLC,** Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **Crosspointe Church,** Von Esch Law Group, ALC, Fullerton, CA
- **Rhonda Drakeford, et al.,** Law Office of Peter Fredman, PC, Berkeley, CA
- **Pamela Redmond Satran,** Law Offices of Brad Snyder, Woodland Hills, CA
- **David Brewer and Dennise Murdock,** Kelsey Law Group, Henderson, NV
- **Ken Madhvani,** Law Offices of Martin Deutsch, Los Gatos, CA
- **Alia Salem Al-Sabah, The State of Kuwait,** Venable LLP, Baltimore, MD
- **Desert Mountain Luxury Homes, LLC,** Burdman Willis, LLLP, Phoenix, AZ
- **Hilton & Hyland Real Estate, Inc.,** Tuchman & Associates, Los Angeles, CA
- **Waleid Shousha,** Anthony J. Vignier, Esquire, Kearny, NJ
- **American Appraisers Corporation,** Keeney Waite & Stevens, San Diego, CA

Omnibus Joint Exhibit Part H, page 1898

- **Russel Myrick,** RDM Legal Group, La Jolla, CA
- **Erick and Michael Diaspro,** Ford, Walker, Haggerty & Behar, LLP, Long Beach, CA
- **Pinnacle Bank,** Hill Wallack, LLP, Princeton, NJ
- **Ramiro Hinojosa,** Ruiz Law Firm PLLC, Pearland, TX
- **Fidelity National Title,** Fidelity Law Group, Irvine, CA
- **Paula Gilbert-Bonnaire,** Leslie W. Westmoreland, Esq., Fresno, CA
- **Presidio Collins, LLC,** Kaufman Dolowich Voluck, San Francisco, CA
- **Christopher Sun,** Robert J. Anderson, Attorney at Law, San Jose, CA
- **Roberto Morelli,** Hanson Law Office, San Francisco, CA
- **Gabriel Michel,** Robert J. Anderson, Attorney at Law, San Jose, CA
- **Verbree Land Holdings, LLC,** Bush Kornfeld LLP, Seattle, WA
- **Residential Bancorp,** Wright, Finlay, & Zak, LLP, Newport Beach, CA
- **F. Anthony Bushman,** Flicker, Kerin, Kruger & Bissada, LLP, Menlo Park, CA
- **Davis,** The Goodell Law Firm, San Francisco, CA
- **Kenneth Dean Patterson,** Buchalter, San Diego, CA
- **Eighteen Capital,** Sbaiti & Company PLLC, Dallas, Texas
- **Silvergate Bank,** Buchalter, San Diego, CA
- **Kimberly M. Jones,** Gibson Lowry, LLP, Las Vegas, NV
- **Karlene Keller,** Sollertis, Rancho Santa Fe, CA
- **Zuniga,** Law Offices of Robert Mills, Glendora, CA
- **Nadine Falbo,** La Jolla Law Group, La Jolla, CA
- **Roger Miles,** Kaufman Dolowich Voluck, San Francisco, CA
- **Sandra Tucceri,** Law offices of Maurizio Mangini, Oceanside, CA
- **Team View Player Associates, LLC,** Vakili & Leus, LLP, Los Angeles, CA
- **Wing Lung Bank,** Kaufman Dolowich Voluck, Los Angeles, CA
- **The Yoga Connection,** Trachtman & Trachtman, LLP, Irvine, CA
- **Brandon Hintz,** Law Office of Eric Andrew Mercer, Sacramento, CA
- **Kirk & Company,** Morrison Mahoney, LLP, Boston, MA
- **David Oas, Co-Trustee of The Ludvigson Trust,** The Yocca Law Firm, LLP, Irvine, CA
- **New Millennium Business,** Engstrom, Lipscomb & Lack, PC, Los Angeles, CA
- **Baruck Bros. Investments,** Boren, Osher & Luftman LLP, El Segundo, CA
- **Brian Burns,** Burns Law Firm, Granada Hills, CA
- **Rendler Val Verde Ranch, LLC,** Lucas & Haverkamp Law Firm, Encinitas, CA
- **Irene Tritz,** Bohm Wildish & Matsen LLP, Costa Mesa, CA
- **TSG Financial Corp.,** The Coleman Firm PC, Newport Beach, CA
- **Jacob Koo,** Vakili & Leus, LLP, Los Angeles, CA
- **Sean Lee, DDS,** Stream Kim Hicks Wrage & Alfaro, PC, Riverside, CA
- **Sunny Acre LLC,** Meylan Davitt Jain Arevian & Kim, Los Angeles, CA
- **Sweeney,** Stone & Sallus, LLP, Manhattan Beach, CA
- **Donald Kunkle,** Law Offices of Michael Bisson, Las Vegas, CA
- **Eshelman Realty, Inc.,** White and Bright, LLP, Escondido, CA
- **Ridec, LLC,** Law Offices of James W. Bates, Pasadena, CA
- **Bush Street Apartment Group, LLC,** Kaufman Dolowich Voluck, San Francisco, CA
- **Johnnie Lee Brown Living Trust,** Majors & Fox, La Mesa, CA
- **Golden Bank,** Law Offices of James W. Bates, Pasadena, CA
- **Ann Petta, Trustee of the Kroon Family Trust,** CA Business Law Group, San Diego, CA
- **TBG Group,** Jones & Associates, New York, NY
- **Laura Blue,** The Goodell Law Firm, San Francisco, CA
- **Sir Winston Enterprises,** Bradley L. Jacobs, Attorney at Law APC, San Diego, CA
- **Martin Foigelman,** The Goldberg Legal Group, Newport Beach, CA

Omnibus Joint Exhibit Part H, page 1899

- **JAL, LLC,** Michael J. Harker, Esq., Las Vegas, NV
- **Judith Dollaga,** Law Offices of Andrew J. Christensen, Oakland, CA
- **American Heritage Capital,** Law Offices of Salar Atrizadeh, Beverly Hills, CA
- **iBorrow Finance Loan Fund I, L.P.,** Freedman + Taitelman, LLP, Los Angeles, CA
- **Webcor Construction, LP** Rutan & Tucker, LLP Palo Alto, CA
- **Stewart Title Company,** Fennemore Wendel, Oakland, CA
- **Good Tidings Baptist Church,** Krieger & Krieger, Long Beach, CA
- **Hillcrest Investments, Ltd.,** Law Offices of Michael Bisson, Las Vegas, CA
- **Fee Title, Inc.,** Kaufman Dolowich & Voluck, LLP, San Francisco, CA
- **Mary M. Woodward Trust,** Siddiqui Law, Costa Mesa, CA
- **University Campus Hotel Fund,** Ecoff Campain Tilles & Kay, LLP, Beverly Hills, CA
- **UMRO Realty, Inc.,** Elms Erlich & Mack, Woodland Hills, CA
- **North American Title Insurance,** Early Sullivan Wright Gizer & McRae, LLP, Los Angeles
- **Key Realty, LLC,** Thorndal Armstrong Delk Balkenbush & Eisinger, Las Vegas, NV
- **Bank of the West,** Hall Griffin, Santa Ana, CA
- **Susan L. Sullivan,** Siddiqui Law, Costa Mesa, CA
- **Amram Yahalom,** Davidovich Stein Law Group, LLP, North Hollywood, CA
- **Orange Coast Title Company,** Hall Griffin, Santa Ana, CA

Omnibus Joint Exhibit Part H, page 1900

# EXHIBIT B

DocuSign Envelope ID: 51761138-B608-408F-8246-EBD2191A3D97

## **Articles Publications and Interviews last 10 years**

1. "Expert insights: Stocks and investing." The Diego Daily Transcript, 2012.

2. "How to Make a Good Deal from A Bad Investment." Lawyer Monthly, 2017.

3. "City Optimistic about finding replacement for Centene complex; commercial expert says it could be tough." WBTV, Charlotte NC, 2022.

4. Miscellaneous Blogs regarding lending.

DocuSign Envelope ID: 51761139-B603-408F-8246-EBD2191A3D97

# EXHIBIT C

Omnibus Joint Exhibit Part H, page 1903

DocuSign Envelope ID: 51761138-B608-408F-8246-EBD2191A3D97

## Expert witness testimony by trial or deposition the past 4 years

1. *Surjeet Sohal v. Bhupindar Dhillon, Superior Court of California, County of Santa Clara, Case No. 115CV284698*

2. *AGCS Marine Insurance Company, et. al., v. EMM Realty of Utah, LLC., In the Eighth Judicial District Court Uintah County, State of Utah, Case No. 150800020*

3. *Darren Ferrara and Renee Pina v. Ramon Rahimi, Superior Court of the State of California for the County of Orange, Case No. 30-2017-00944669-CU-OR-CJC*

4. *The Estate of King Wah Chui v. Christine Chui, et al., Superior Court of California County of Los Angeles - Central District, Case No. BP154245*

5. *Barzal & Scotti Real Estate Corporation, v. Sylvania, L.P., Judicate West, Alternative Dispute Resolution, Case No. A238569-46*

6. *Margaret and Richard Brodowski v. Carrington Mortgage Services, LLC, Superior Court of California for the County of Tuolumne, Case No. CV60533*

7. *Kashian Enterprises vs. David Fisher, et al., Superior Court of the State of California for the County of Fresno, Case No. 15CECG03807*

8. *Clearcapital.com, Inc., v. Computershare Inc., United States District Court for the District of Colorado, Case No. 18-cv-00817-RBJ*

9. *Pennymac Holdings, LLC v. Fidelity National Title Insurance Company, District Court, Clark County, Nevada, Case No. A-16-746790-C*

10. *Gainquick LLC, v. Val-Chris Investments, Inc., et al.,Superior Court of the State of California County of Orange, Central Justice Center Case No. 30-2016-00881410-CU-OR-CJC*

11. *Bohm Wildish, LLP v. Teresa Roebuck, et. al., Superior Court of the State of California in the County of Orange Case No. 30-2016-00862253-CU-CL-CJC*

12. *Bonita M. McPherson v. Donald L. Southard, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2018-00964601-CU-BT-CJC*

13. *500 Wisconsin LLC and Seneca Insurance Company, Inc. v. JPMorgan Chase Bank, N.A., United States District Court for the Eastern District of Wisconsin Milwaukee Division, Case No. 18-cv-1845*

14. *Wells Fargo Bank NA v. California Custom Bottles, Inc., American Arbitration Association, County of Riverside, AAA Case No. 01-18-0001-2336*

15. *Arletha Mae Johnson v. Milestone Financial, LLC., et al., Judicial Arbitration and Mediation Service, Silicon Valley, CA, Case No. 32-2018-00243733-CU-FR-GDS*

16. *Cuong Van Tran v. Ramon Paras-Nisce., JAMS Mediation, Arbitration Services, San Francisco, Ref. No. 1100104863*

17. *Tamra Perdomo v. Thomas Lakin, Annkin Business Services, et al., Superior Court of the State of California for the County of Orange, Case No.30-2019-01055684-CU-BC-CJC*

18. *Calvary Chapel, Yorba Linda, vs. Crosspointe Church, Superior Court of California for the County of Orange, Central Justice Center, Case No. 30-2018-01017271-CU-OR-CJC*

19. *Cheers Development, LLC, vs. Marrion Obannon, et al., JAMS Mediation, Arbitration Services, San Francisco, File No. 1100106747*

20. *Kevin and Angela Massoni-Blaine vs. Pamela Redmond Satran, ADR Services, Century City/West Los Angeles, Case No. 20-3149-GSR*

21. *Cosis, LLC, et al., vs. Ken Madhvani, Superior Court of California, County of Sacramento, Case No. 34-2018-00244868*

22. *Paula Boyd v. David Freeman, Superior Court for the State of California for the County of Los Angeles, Case No. BC588216*

23. *David Brewer and Dennise Murdock v. Beazer Homes Holdings, LLC and Fairway Independent Mortgage Corporation, et al., District Court Clark County, Nevada, Case No. A-20-815729-C*

24. *Roberto Morelli, et al., vs. Annette Traylor, et al., Superior Court of California County of San Luis Obispo, Case No. 17CVP-0239*

25. *Katalyst Development, LLC vs. Gabriel Michel, Superior Court of the State of California for the County of Santa Clara, Case No. 17-CV-316096*

26. *Eymi Rosalba Martinez, et al., vs. Residential Bancorp, et al., Superior Court of California County of Los Angeles - Central District, Case No. BC620793*

27. *Christopher Sweet v. Jonathan Sweet, Superior Court of the State of California for the County of Los Angeles, Case No. YC 072334*

28. *HomeStreet Bank v. Pham & Mauseth DDS, Inc. et al., ADR Services, Inc., Los Angeles, CA Case No. 21-0049-ERF*

29. *Eighteen Capital, et al., v. FPA Multifamily, LLC., et al., JAMS Reference No. 1410008753, Atlanta, GA*

30. *Roger Miles, v. Elaine Yang and Tiffany Wang, Judicial Arbitration and Mediation Services - San Francisco, JAMS Ref No.: 1100110043*

31. *Alia Salem AI-Sabah, The State of Kuwait Qurtaba Area, vs. World Business Lenders, LLC. et al., United States District Court for the District of Maryland, Case No. 1:18-cv-2958*

32. *Peter Starflinger v. William Luke Gaskins and KBC Capital, LLC, Superior Court of the State of California for the County of San Diego Central Division, Case No. 37-2017-00023394-CU-CO-CTL*

33. *Kenneth and Lana Rayburn, et. al., v. Sean Lee, DDS, et. al., Superior Court of California County of San Bernardino-Central District, Case No. CIV-DS 1927705*

34. *Andres Moya vs. Waleid Shousha, Superior Court of New Jersey Law Division:Union County, Docket No. UNN-L-3968-20*

35. *Kimberly Moffatt Jones, et al., v. Ronald Soderling, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2018-01037445-CU-FR-CJC*

36. *Rhonda Drakeford, et al., vs. Capital Benefit, Inc., et al., United States District Court Northern District of California, Case No. 20-cv-04161-WHO*

37. *A/SL DF V, LLC, vs. Minute Man Inc., et al., Superior Court of the State of California for the County of Los Angeles - East District, Case No. KC070437*

38. *Dean Kim v. Jacob Koo, Superior Court of California, County of Orange, Central Justice Center, Case No. 30-2021-01178855-CU-CL-CJC*

39. *Gary Abrams, et al., v. Angelica Gardner, et al., United States District Court for the Central District of California, Case No. 2:19-cv-06947-CAS-AS*

40. *Leigh E. Payne, Successor in Interest to Petitioner, Robert Erle Payne, In Re: The Barbara Bek Payne Trust, Superior Court, County of Los Angeles, Case No. 16STPB01383*

41. *William L. Rendler, et al., v. Brian W. Strange, et al., JAMS Arbitration Case No. 1240024758, San Diego, CA*

42. *AME Zion Church of Palo Alto, Inc., v. AME Zion Western Episcopal District, et al., United States Bankruptcy Court, Eastern District of California, Sacramento Division, Case No. 20-23726*

43. *Webcor Construction, LP, v. Lendlease (US) Construction, Inc., et al., Superior Court of California, County of Los Angeles, Central District, Case No. 19STCV03357*

# EXHIBIT D

Omnibus Joint Exhibit Part H, page 1907

# <u>Documents Reviewed</u>

- Complaint
- First Amended Complaint
- Howlett Answer to First Amended Complaint
- Bank of the West Answer to First Amended Complaint
- Goldwater_000615-617
- Residential Purchase Agreement dated 2-12-2021
- Supplemental Escrow Instructions dated 2-17-2021
- Goldwater Bank claim to FATCO
- FATCO Claim Acceptance Letter
- Deposition Transcript of Andrea Cross
- EOTW_0119-120
- EOTW_000164-180
- Goldwater_000676-677
- FATCO001200-1203
- Text messages between Eliazrov and Greg Hill
- Goldwater_001148-1149
- Goldwater_001151-1152
- Goldwater_001209-1279
- Goldwater_000882-931
- Goldwater_001058-1091
- Goldwater_001016
- Goldwater_001300-1303
- Goldwater_001293
- Goldwater_001012-1014
- Goldwater_001099
- Goldwater_001386
- Goldwater_001393
- Goldwater_001020
- Goldwater_001395
- EOW0185-0186
- Unison Subordination Agreement
- Orange Coast Title Preliminary Report dated February 18, 2021
- Orange Coast Title Preliminary Report dated March 3, 2021
- Goldwater Response to Howlett RFAs
- RFA Set 1 to Goldwater
- Goldwater Response to Howlett and BOTW RFA #1
- Peter Hill Rough Draft Deposition Transcript

## EXHIBIT 106

## EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF SCOTT HOWLETT

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3    _____

 4    GOLDWATER BANK, N.A.,

 5             Plaintiff,

 6         v.                          Case No.

 7    ARTUR ELIZAROV, UNISON AGREEMENT    5:21-cv-00616-

 8    CORP., SCOTT HOWLETT, BANK OF       JWH-SPx

 9    THE WEST, and ILYA ALEKSEYEFF,

10             Defendants,

11    _____

12    SCOTT HOWLETT,

13             Cross-complainant,

14         v.

15    ARTUR ELIZAROV, ET AL.,

16             Cross-defendants.

17    _____

18              VIDEOCONFERENCE DEPOSITION OF

19                   SCOTT HOWLETT

20    DATE:          Thursday, September 15, 2022

21    TIME:          1:38 p.m.

22    LOCATION:      Remote Proceeding

23                   San Francisco, CA

24    REPORTED BY:   Jess Wakefield, Notary Public

25    JOB NO.:       5382189

                                           Page 1
```

```
 1                    A P P E A R A N C E S

 2      ON BEHALF OF PLAINTIFF GOLDWATER BANK, N.A.:

 3            JOSEPH A. LEVOTA, ESQUIRE (by videoconference)

 4            Hilbert & Satterly LLP

 5            409 Camino Del Rio South, Suite 104

 6            San Diego, CA 92108

 7            jlevota@hscallaw.com

 8            (619) 795-0300

 9

10      ON BEHALF OF PLAINTIFF GOLDWATER BANK, N.A.:

11            DEREK M. BAST, ESQUIRE (by videoconference)

12            Wagner Hicks PLLC (NC)

13            831 East Morehead Street, Suite 860

14            Charlotte, NC 28202

15            derek.bast@wagnerhicks.law

16            (704) 705-7538

17

18      ON BEHALF OF DEFENDANT UNISON AGREEMENT CORP.:

19            JENNIFER HAIDER, ESQUIRE (by videoconference)

20            Orsus Gate

21            388 Market Street, Suite 1300

22            San Francisco, CA 94111

23            jhaider@orsusgate.com

24            (213) 674-9042

25

                                              Page  2
```

```
 1              A P P E A R A N C E S (Cont'd)

 2   ON BEHALF OF DEFENDANT AND CROSS-DEFENDANT ARTUR

 3   ELIZAROV:

 4       ILYA ALEKSEYEFF, ESQUIRE (by videoconference)

 5       Loia, Inc. (APLC)

 6       8721 Santa Monica Boulevard, Suite 119

 7       West Hollywood, CA 90069

 8       ilya@loia.legal

 9

10   ON BEHALF OF DEFENDANT AND CROSS-COMPLAINANT SCOTT

11   HOWLETT AND DEFENDANT BANK OF THE WEST:

12       JEREMY KATZ, ESQUIRE (by videoconference)

13       Hall Griffin LLP

14       1851 East First Street, 10th Floor

15       Santa Ana, CA 92705

16       jkatz@hallgriffin.com

17       (714) 918-7000

18

19       RYAN C. THOMASON, ESQUIRE (by videoconference)

20       Hall Griffin LLP

21       1851 East First Street, 10th Floor

22       Santa Ana, CA 92705

23       rthomason@hallgriffin.com

24

25

                                              Page  3
```

Omnibus Joint Exhibit Part H, page 1912

```
 1                    I N D E X

 2  EXAMINATION:                                  PAGE

 3       By Mr. Levota                            8

 4       By Ms. Haider                            50

 5

 6                    E X H I B I T S

 7  NO.              DESCRIPTION                   PAGE

 8  Exhibit 5        Amended Preliminary Notice    29

 9  Exhibit 12       Supplemental Escrow Instructions  32

10  Exhibit 13       Amended Escrow Instructions   34

11  Exhibit 14       Page 10 of 10, Purchase and

12                   Sale Agreement               25

13  Exhibit 15       Lender's Closing Instructions  33

14  Exhibit 23       Preliminary Report           27

15  Exhibit 72       Uniform Residential Loan

16                   Application                  30

17  Exhibit 73       Note                         36

18  Exhibit 74       Deed of Trust                39

19  Exhibit 75       Buyer's Final Settlement

20                   Statement                    40

21                   (Exhibits retained by counsel.)

22

23

24

25

                                        Page  4
```

Omnibus Joint Exhibit Part H, page 1913

```
 1                    E X H I B I T S (Cont'd)

 2         P R E V I O U S L Y   M A R K E D   E X H I B I T S

 3      NO.                DESCRIPTION                      PAGE

 4      Exhibit 2       Purchase Agreement                  23

 5      Exhibit 38      Email Chain                         42

 6                   (Exhibits retained by counsel.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  5
```

```
 1                  P R O C E E D I N G S

 2                  THE REPORTER:  Good afternoon.  We're on

 3       the record at 1:38 p.m. Pacific Daylight Time.  My name

 4       is Jess Wakefield; I am the reporter assigned by

 5       Veritext to take the record of this proceeding.

 6                  This is the deposition of Scott Howlett

 7       taken in the matter of Goldwater Bank, N.A., vs. Artur

 8       Elizarov, et al., on September 15, 2022.

 9                  Mr. Howlett, what city and state are you

10       in right now?

11                  MR. HOWLETT:  San Francisco, California.

12                  THE REPORTER:  Thank you.

13                  I'm a notary authorized to take

14       acknowledgments and administer oaths in Washington

15       state.  Parties agree that I will swear in witness

16       remotely outside of his or her presence.

17                  Additionally, absent an objection on the

18       record before the witness is sworn, all parties and the

19       witness understand and agree that any certified

20       transcript produced from the recording virtually of this

21       proceeding:

22                      - is intended for all uses permitted

23                        under applicable procedural and

24                        evidentiary rules and laws in the same

25                        manner as a deposition recorded by
```

                                                    Page  6

Omnibus Joint Exhibit Part H, page 1915

```
 1                    stenographic means; and

 2                    - shall constitute written stipulation

 3                    of such.

 4               At this time will everyone in attendance

 5     please identify yourself for the record, beginning with

 6     the taking attorney.

 7                    MR. LEVOTA:  Joseph LeVota for Goldwater

 8     Bank.

 9                    MR. BAST:  Derek Bast also on behalf of

10     Goldwater Bank.

11                    MS. HAIDER:  Jennifer Haider from Orsus

12     Gate representing Unison Agreement Corp.

13                    MR. ALEKSEYEFF:  And good afternoon.

14     Ilya Alekseyeff for Artur Elizarov.

15                    MR. KATZ:  Jeremy Katz for Defendants

16     Scott Howlett and Bank of the West.

17                    MR. THOMASON:  And Ryan Thomason for

18     Defendants Scott Howlett and Bank of the West.

19                    THE WITNESS:  And I'm Scott Howlett, I

20     guess.  I guess I'm next.

21                    THE REPORTER:  Thank you.

22               Hearing no objection, I'll now swear in

23     the witness.

24               Please raise your right hand.

25     //
```

Page 7

```
 1    WHEREUPON,

 2                        SCOTT HOWLETT,

 3    called as a witness, and having been first duly sworn to

 4    tell the truth, the whole truth, and nothing but the

 5    truth, was examined and testified as follows:

 6                        THE REPORTER:  Thank you.

 7                        Counsel, you may proceed.

 8                        MR. LEVOTA:  Thank you.

 9                        EXAMINATION

10    BY MR. LEVOTA:

11        Q    And good afternoon, Mr. Howlett.  Would you

12    please state and spell your name?

13        A    Sure.  Scott Howlett, S-C-O-T-T.  And last

14    name is H-O-W-L-E-T-T.

15        Q    Good afternoon.  As I mentioned earlier, my

16    name is Joseph LeVota, and I represent Goldwater Bank in

17    these proceedings.  I guess I'd like to ask, have you

18    ever had your deposition taken before?

19        A    No.

20        Q    Okay.  Since not, we'll go over a few of the

21    admonitions, kind of the ground rules for the

22    proceeding.

23        A    Okay.

24        Q    Now, you were administered an oath.  That's

25    the same oath that you would take if we were in a court
```

<div align="right">Page 8</div>

<div align="right">Omnibus Joint Exhibit Part H, page 1917</div>

```
 1    You call your real estate agent, and your real estate
 2    agent says, "Email escrow."
 3         A    Yes, in my recollection.
 4         Q    And then, this is you emailing escrow.
 5         A    Correct.
 6         Q    And then after your initial email, you sent
 7    this follow-up.  "How do I file a claim with the policy
 8    immediately?"  And then that's, again, you responding to
 9    being served with papers; correct?
10         A    Correct.
11         Q    And then, let's see.  Andrea Cross responded,
12    it appears, at 12:04 p.m. on April 13th; do you see
13    that?
14         A    I do.
15         Q    Do you have any information that that's not
16    the time and date that she sent her response?
17         A    It looks normal to me.
18         Q    Okay.  And so, she gives you the contact
19    information for the title company; correct?
20         A    Correct.
21         Q    And then you're responding pretty quickly at
22    12:16 asking for some more guidance on this; correct?
23         A    Correct.
24         Q    And then she's responding, again, pretty
25    quickly here at 12:59.  And she's just trying to tell
```

                                              Page 45

```
 1    you how to get in touch with your title company; right?
 2         A    Correct.  I -- I mean, roughly.  She's telling
 3    me to contact them, yeah.
 4         Q    And did you contact your title company?
 5         A    Yes.
 6         Q    And did you make a claim based upon the
 7    lawsuit that you were served with?
 8         A    Yes.
 9         Q    Okay.  And then, here, just at the top of the
10    email thread, then it's Andrea Cross to you and your
11    real estate agent attaching a copy of the title policy.
12    Do you recall her sending you a copy of your title
13    policy?
14         A    I don't recall, but this makes it, you know,
15    clear she did.
16         Q    Okay.  And then, I guess there's an email
17    address here for your real estate agent, mariasells, S-
18    E-L-L-S, Cali, C-A-L-I, @gmail.com.  Is that your
19    understanding of her email address?
20         A    I have no reason to think it's not.
21         Q    Okay.  I'm not trying to be redundant.  I just
22    want to make sure that I've established this clearly,
23    that prior to your partner being served with the
24    lawsuit, or the papers, in April of 2021, you had never
25    heard of Goldwater Bank; correct?
```

<div align="right">Page 46</div>

```
 1        A      That's correct.
 2        Q      And you're not aware of your partner having
 3   any communications with anyone involved in this
 4   transaction where he learned information about Goldwater
 5   Bank; correct?
 6        A      Absolutely no -- absolutely not.
 7        Q      And other than pleasantries maybe exchanged as
 8   part of your visit after the contract had been entered
 9   into, you don't recall having any substantive
10   conversation with the seller or the seller's husband or
11   the seller's agent; correct?
12        A      100% correct.
13        Q      And then lastly, prior to this litigation --
14   so the initiation of this litigation and anything you
15   may have learned through that, so prior to that -- have
16   you ever heard of Unison Agreement Corp.?
17        A      No.
18               MR. LEVOTA:  Okay.  I'm going to take a
19   ten-minute break.  And then I'm going to come back.  I'm
20   going to probably ask one, maybe two more questions.
21   Maybe not.
22               THE WITNESS:  Sounds good.  Okay.
23               MR. LEVOTA:  I want to make sure that
24   I've gone over everything and make sure that I'm done
25   before I'm done.  And then, once I'm done, other counsel
```

Page 47

Omnibus Joint Exhibit Part H, page 1920

```
 1    may have questions for you.
 2                    THE WITNESS:  Okay.
 3                    MR. LEVOTA:  And that may lead to more
 4    questioning, but I think we're moving along.
 5                    THE WITNESS:  Okay.  Great.  So a quarter
 6    to three -- or quarter to -- yeah, quarter to three.
 7                    MR. LEVOTA:  Quarter to three, we'll meet
 8    back up, and we'll be off the record until then.  Thank
 9    you.
10                    THE WITNESS:  Okay.  Sounds good.
11                    THE REPORTER:  We are off the record at
12    2:35 p.m.
13                    (Off the record.)
14                    THE REPORTER:  We are back on the record
15    at 2:47 p.m.
16                    MR. LEVOTA:  My fault.
17    BY MR. LEVOTA:
18        Q    We're back on the record, and you're still
19    under oath, Mr. Howlett.  I had just a couple more
20    questions.  Were you aware of any construction at the
21    property prior to your purchase?
22        A    I remember seeing a Google Street View image
23    from some unknown date when I went -- when I went onto
24    Google Maps.  And I remember seeing that there was a
25    fence kind of like -- that looked different.  But I'm
```

                                                    Page 48

Omnibus Joint Exhibit Part H, page 1921

```
 1     not familiar with any projects or anything like that.

 2          And that's still on -- I think it's still on

 3     Google Maps, like, the old image or something like that.

 4     Street View.  I guess they call it that.

 5        Q    Okay.  But as part of your purchase, you

 6     weren't made aware of any construction projects that had

 7     occurred at the property prior to your purchase?

 8        A    I -- not that I'm aware of.  I don't know if

 9     there was any, like, thing in the disclosures that said

10     this project -- I don't know what was in there.  But I

11     don't remember construction being a part of any kind of

12     conversation that we had.

13               MR. LEVOTA:  Okay.  Well, that's all the

14     questions I have for you, Mr. Howlett.

15               THE WITNESS:  Okay.

16               MR. LEVOTA:  Other counsel here today may

17     have some questions for you.  And so, unfortunately,

18     you're not done yet.

19               THE WITNESS:  It's all right.

20               MR. KATZ:  Who wants to go next?

21               MR. ALEKSEYEFF:  This is Ilya.  I don't

22     have any questions for Mr. Howlett.  Thank you so much.

23               THE REPORTER:  Thank you, Ilya.

24               MS. HAIDER:  This is Jennifer

25     representing Unison.  I just have a few questions.
```

Page 49

```
 1                    THE WITNESS:  Sure.

 2                    EXAMINATION

 3      BY MS. HAIDER:

 4           Q     So thank you, first of all, for taking the

 5      time.  I know it's been a long day, and you'd probably

 6      like to have this over sooner rather than later.  But

 7      again, I just have a few questions.

 8           A     Sure.

 9           Q     So earlier, you testified to Mr. LeVota that

10      you don't remember Unison coming up before everything

11      was recorded on March 29, 2021.  Is that correct?

12           A     I believe that -- I want to make sure I'm

13      really clear.  I think the name Unison showed up in the

14      settlement page that -- it was one of the last documents

15      that Mr. LeVota showed.  And I think -- well, at some

16      point, I heard of the name Unison, but I'm not -- I

17      don't have prior knowledge to this transaction of the

18      name Unison.

19                  Goldwater, I've never heard of until then,

20      until the lawsuit.  Unison, I think, is listed somewhere

21      or it came up in the papers that were served.  I don't

22      know when I heard about it first.

23           Q     Okay.  Thank you.

24           A     Sure.

25           Q     Were you aware, when you were looking at the
```

Page 50

Omnibus Joint Exhibit Part H, page 1923

```
 1   escrow documents, that Unison had a lien on the

 2   property?

 3        A    I believe I remember seeing there was a

 4   lien --

 5                  MR. KATZ:  I'm going to object just for a

 6   second.

 7                  I'm sorry.  It's a little vague as to

 8   time, as to when Unison put a lien on the property.

 9   BY MS. HAIDER:

10        Q    So before you entered into escrow, when the

11   property wasn't yours and it was Mr. Elizarov's, that is

12   the time period that I'm speaking of.  So were you aware

13   that, during that time period, that Unison had a lien on

14   the property?

15        A    I either learned about Unison because it was

16   in that payout sheet that was shown a few minutes before

17   we went on break or when it was in the lawsuit documents

18   that were served to my partner.  I cannot remember

19   exactly when I did see the name Unison for the first

20   time.  It's not a name I've ever heard of before this

21   transaction, though.

22        Q    Okay.

23        A    I hope that I was clear with everyone on -- on

24   that.

25        Q    Then is it your understanding that the
```

<div align="right">Page 51</div>

Omnibus Joint Exhibit Part H, page 1924

1    that.  And, no, thank you.  I do not need a copy.

2                    THE REPORTER:  I apologize.

3                    MR. ALEKSEYEFF:  No worries.  I did not

4    mean to make you feel bad.

5                    MR. LEVOTA:  Probably not the first time.

6                    MR. ALEKSEYEFF:  I always want to know,

7    how will people butcher my name?  Yours is a very

8    typical one, so I'm not upset.  I've had worse.

9                    THE REPORTER:  All right.  Well, then,

10   we're off the record at 2:55 p.m.

11                   (Signature reserved.)

12                   (Whereupon, at 2:55 p.m., the proceeding

13                    was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 55

Omnibus Joint Exhibit Part H, page 1925

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, JESS WAKEFIELD, the officer before whom the
 3      foregoing proceedings were taken, do hereby certify that
 4      any witness(es) in the foregoing proceedings, prior to
 5      testifying, were duly sworn; that the proceedings were
 6      recorded by me and thereafter reduced to typewriting by
 7      a qualified transcriptionist; that said digital audio
 8      recording of said proceedings are a true and accurate
 9      record to the best of my knowledge, skills, and ability;
10      that I am neither counsel for, related to, nor employed
11      by any of the parties to the action in which this was
12      taken; and, further, that I am not a relative or
13      employee of any counsel or attorney employed by the
14      parties hereto, nor financially or otherwise interested
15      in the outcome of this action.
16
17      JESS WAKEFIELD
18      Notary Public in and for the
19      State of Washington
20
21      [X] Review of the transcript was requested.
22
23
24
25
                                                    Page 56
```

Omnibus Joint Exhibit Part H, page 1926

```
 1              CERTIFICATE OF TRANSCRIBER

 2              I, SARAH COSTA, do hereby certify that this

 3     transcript was prepared from the digital audio recording

 4     of the foregoing proceeding, that said transcript is a

 5     true and accurate record of the proceedings to the best

 6     of my knowledge, skills, and ability; that I am neither

 7     counsel for, related to, nor employed by any of the

 8     parties to the action in which this was taken; and,

 9     further, that I am not a relative or employee of any

10     counsel or attorney employed by the parties hereto, nor

11     financially or otherwise interested in the outcome of

12     this action.

13

14
```



```
15     SARAH COSTA

16

17

18

19

20

21

22

23

24

25

                                              Page  57
```

## EXHIBIT 107

## EXCERPTS FROM TRANSCRIPT OF DEPOSITION OF ANDREA CROSS

```
 1                 UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3                          - - -

 4      GOLDWATER BANK, N.A.,        )
                                     )
 5              Plaintiff,           )
                                     )
 6              vs.                  ) No. 5:21-cv-00616-JWH-SP
                                     )
 7      ARTUR ELIZAROV; UNISON       )
        AGREEMENT CORP.; SCOTT       )
 8      HOWLETT; BANK OF THE WEST;   )
        and ILYA ALEKSEYEFF,         )
 9                                   )
                Defendants.          )
10                                   )
        AND RELATED CROSS-ACTIONS.

11

12

13

14

15                      DEPOSITION OF

16                      ANDREA CROSS

17              Wednesday, June 29, 2022

18

19

20

21

22      Reported By:

23      MICHELLE K. BAILEY
        RPR, CSR No. 10713

24      Job No. 5294007

25      Pages 1 - 172

                                              Page 1
```

Omnibus Joint Exhibit Part H, page 1929

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION
 3                         - - -
 4    GOLDWATER BANK, N.A.,        )
                                   )
 5            Plaintiff,           )
                                   )
 6            vs.                  ) No. 5:21-cv-00616-JWH-SP
                                   )
 7    ARTUR ELIZAROV; UNISON       )
      AGREEMENT CORP.; SCOTT       )
 8    HOWLETT; BANK OF THE WEST;   )
      and ILYA ALEKSEYEFF,         )
 9                                 )
              Defendants.          )
10                                 )
      AND RELATED CROSS-ACTIONS.
11
12
13
14
15           Deposition of ANDREA CROSS, taken on behalf of
16    the Defendants, beginning at 10:03 a.m., and ending at
17    4:05 p.m., on Wednesday, June 29, 2022, before MICHELLE
18    K. BAILEY, RPR, CSR No. 10713.
19
20
21
22
23
24
25
                                              Page  2
```

```
 1      APPEARANCES:
 2
        For the Plaintiff Goldwater Bank, N.A.:
 3
            HILBERT & SATTERLY LLP
 4          BY:  JOSEPH A. LEVOTA, ESQ.
            409 Camino Del Rio South
 5          Suite 104
            San Diego, California  92108
 6          619.795.0300
            jlevota@hscallaw.com
 7
            -and-
 8
            WAGNER HICKS, PLLC
 9          BY:  DEREK M. BAST, ESQ.
            831 East Morehead Street
10          Suite 860
            Charlotte, North Carolina  28202
11          704.705.7538
            derek.bast@wagnerhicks.law
12
13      For the Defendants Scott Howlett and Bank of the West:
14          HALL GRIFFIN
            BY:  RYAN C. THOMASON, ESQ.
15               JEREMY KATZ, ESQ.
            1851 East First Street
16          10th Floor
            Santa Ana, California  92705
17          714.918.7000
            rthomason@hallgriffin.com
18
19      For the Bank of the West:
20          KRISHEL LAW FIRM
            BY:  DANIEL KRISHEL, ESQ.
21          4500 Park Granada
            Suite 202
22          Calabasas, California  91302
            818.883.8759
23
24
25
                                                  Page  3
```

```
 1    APPEARANCES (continued):
 2

      For the Defendant Artur Elizarov
 3    And Ilya Alekseyeff (in pro per):
 4        LOIA, INC. (APLC)
          BY:  ILYA ALEKSEYEFF, ESQ.
 5        8721 Santa Monica Boulevard
          Suite 119
 6        West Hollywood, California  90069
          213.537.4592
 7        ilya@loia.legal
 8

      For the Defendant Unison Agreement Corp.:
 9

          ORSUS GATE LLP
10        BY:  NABIL BISHARAT, ESQ.
          16 N. Marengo Avenue
11        Suite 316
          Pasadena, California  California
12        213.973.2052
          nbisharat@orsusgate.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                          I N D E X
 2
        WITNESS:  ANDREA CROSS
 3                                                        PAGE
 4      EXAMINATION BY MR. THOMASON                          9
 5      EXAMINATION BY MR. LEVOTA                           58
 6      EXAMINATION BY MR. BAST                            145
 7      EXAMINATION BY MR. ALEKSEYEFF                      155
 8      EXAMINATION BY MR. BISHARAT                        163
 9      EXAMINATION BY MR. KATZ                            166
10
11
12                       E X H I B I T S
13      EXHIBIT NO.         DESCRIPTION                   PAGE
14      Exhibit 1       Notice of Deposition               15
15      Exhibit 2       California residential             17
                        purchase and sale agreement
16                      and joint escrow instructions
                        between Elizarov and Howlett
17
        Exhibit 3       Escrow of the West                 18
18                      supplemental escrow
                        instructions
19
        Exhibit 4       Preliminary Report, dated          19
20                      2/18/2021
21      Exhibit 5       Amended Preliminary Report,        19
                        dated 3/3/2021
22
        Exhibit 6       E-mail string, dated 3/22/2021     20
23                      through 3/26/2021
24      Exhibit 7       Request for Demand, dated          21
                        3/3/21
25
                                                       Page 5
```

Omnibus Joint Exhibit Part H, page 1933

```
 1                    WEDNESDAY, JUNE 29, 2022

 2                         10:03 A.M.

 3

 4                      ANDREA CROSS,

 5                having first been duly sworn

 6                by the reporter, was examined

 7                  and testified as follows:

 8

 9                        EXAMINATION

10    BY MR. THOMASON:

11         Q.  Good morning, Andrea.  How are you doing?

12         A.  I'm well.  Thank you.

13         Q.  Thank you for joining us.  I'm just going to

14    kind of go through some housekeeping here at the

15    beginning.  If you could, just please state and spell

16    your name for the record.

17         A.  My name is Andrea Cross.  First name Andrea,

18    A-n-d-r-e-a; last name Cross, C-r-o-s-s.

19         Q.  My name is Ryan Thomason.  I am an attorney for

20    Scott Howlett and Bank of the West.  Jeremy Katz is also

21    counsel for Scott Howlett and Bank of the West.

22              Because we have so many parties here, we're

23    going to kind of shorten names.  When I refer to

24    Howlett, I'm referring to Scott Howlett, who is a

25    defendant in this action, where the property that he
```

<div align="right">Page 9</div>

Omnibus Joint Exhibit Part H, page 1934

```
 1    purchased is at issue.

 2              Do you understand that?

 3         A.   Yeah.

 4              MR. KATZ:   Why don't we have a -- just for the

 5    sake of a straightforward transcript, let's have all

 6    counsel check in for record.  Mr. Thomason checked in.

 7    This is Jeremy Katz, also for Howlett and Bank of the

 8    West.

 9              Mr. Krishel, do you want to state an official

10    appearance?

11              MR. KRISHEL:   Yes.  Daniel Krishel for Escrow

12    of the West and Andrea Cross.

13              MR. LEVOTA:   Joseph LeVota for Goldwater Bank.

14              MR. BISHARAT:   And this is Nabil Bisharat

15    appearing for Unison Agreement, Corp.

16              Good morning, Ms. Cross.

17              THE WITNESS:   Good morning.

18              MR. ALEKSEYEFF:   And good morning.  This is

19    Ilya Alekseyeff for Artur Elizarov and also representing

20    myself.  Good morning.

21              MR. BAST:   And my name is Derek Bast.  And I'm

22    also appearing today on behalf of plaintiff, Goldwater

23    Bank.

24    BY MR. THOMASON:

25         Q.   And would you prefer Andrea, or do you prefer
```

Veritext Legal Solutions
866 299-5127

Omnibus Joint Exhibit Part H, page 1935

1      BY MR. THOMASON:

2           Q.  Okay.

3                MR. Let's go on to the preliminary report, which is

4      dated February 18th, 2021.

5                MR. KATZ:  This is a five-page document,

6      Bates-numbered Howlett 00615 through 619.

7                (Exhibit 4 marked)

8      BY MR. THOMASON:

9           Q.  And do you recognize this document?

10          A.  Yes.

11          Q.  And was this part of the escrow file for the

12     transaction?

13          A.  Yes.

14               MR. KATZ:  Let's mark that as deposition

15     Exhibit 4.

16     BY MR. THOMASON:

17          Q.  And the next document we're going to pull up is

18     the amended preliminary report, which was dated

19     March 3rd, 2021.

20               This one came from the production of documents

21     that Goldwater produced.  It will have an Escrow of the

22     West Bates stamp, but it was what we received from

23     Goldwater Bank.

24               (Exhibit 5 marked)

25               MR. KATZ:  I'm just going to scroll down.  It's

                                                    Page 19

Omnibus Joint Exhibit Part H, page 1936

```
 1    a four-page document.  EOTW 55 through 58.

 2    BY MR. THOMASON:

 3         Q.  And do you recognize this document?

 4         A.  Yes.

 5         Q.  And was this document a part of the escrow file

 6    for the transaction?

 7         A.  Yes.

 8         Q.  Now we're going to pull up -- basically, what

 9    was an e-mail chain between you, Peter Hill of Goldwater

10    Bank, and Melissa Melendez of Weststar Mortgage

11    Corporation March corporation, between March 22nd, 2021,

12    through March 26, 2021.  This came from Goldwater's

13    production of documents from Escrow of the West.  It's a

14    rather long one.  But let me just go through this --

15              MR. KATZ:  Hold on.

16              It's a 17-page document starting at EOTW 164.

17    And I'm going to scroll all the way to the bottom.

18    Through EOTW 180.  And let's mark this as deposition

19    Exhibit 6.

20              (Exhibit 6 marked)

21    BY MR. THOMASON:

22         Q.  And so do you recognize this document, the

23    e-mail chain, basically?

24         A.  Yes.

25              MR. KATZ:  I'll scroll -- this is Jeremy Katz.
```

                                             Page 20

Omnibus Joint Exhibit Part H, page 1937

```
 1    I'm going to scroll down through it so you have a chance
 2    to review it.  We'll get more into the specifics on it
 3    later.  I just want you to look through the actual
 4    e-mail chain.
 5            Final page.  And I'll scroll back up to the
 6    top.
 7    BY MR. THOMASON:
 8        Q.  And your e-mail address is
 9    andrea@escrowofthewest.com; correct?
10        A.  Yes.
11        Q.  And Peter Hill's e-mail, as we see here, is
12    phill@goldwaterbank.com.  Is that who you were e-mailing
13    to?
14        A.  Yes, I believe so.
15        Q.  So here we also have Melissa Melendez's e-mail,
16    melissa.melendez@westloan.com.  As far as you know, that
17    was her e-mail that you were e-mailing to?
18        A.  Yes.
19        Q.  Now we are going to pull up the request for
20    demand, which was attached to an e-mail to Peter Hill,
21    dated on March 22nd, 2021, at 11:47 a.m.
22            MR. KATZ:  Make it a full page so you can see
23    it.  It's a one-page document, EOTW 181.  Go ahead and
24    mark this as deposition Exhibit 7.
25            (Exhibit 7 marked)
```

Page 21

```
 1    BY MR. THOMASON:

 2         Q.  And do you recognize this document?

 3         A.  Yes.

 4         Q.  Was it a part of the escrow file?

 5         A.  Yes.

 6         Q.  Now we are going to pull up a specific e-mail

 7    from you to Melissa Melendez of Weststar Mortgage

 8    Corporation and Peter Hill of Goldwater Bank, dated

 9    March 22nd, 2021, at 12:46 p.m., which included the

10    borrower authorization from Elizarov.

11              MR. KATZ:  It's a two-page document,

12    Bates-numbered EOW 0119 through 01206.

13    BY MR. THOMASON:

14         Q.  This was from our production of documents that

15    we received from Escrow of the West.  We Bates stamped

16    it the way.  The difference between Goldwater's Bates

17    stamping and ours is Goldwater Bank's has an underscore

18    between the EOW and the numbering in ours does not.

19    That's the difference between the two Bate stamping.

20              Do you recognize this document, the e-mail and

21    the document?

22         A.  Yes.

23         Q.  And was this document part of the escrow file

24    for the transaction?

25         A.  Yes.
```

                                                    Page 22

1      Q.   Next we are going to pull up the Unison payoff

2   demand letter, which was attached to the e-mail to

3   Mr. Hill, dated March 25th, 2021, at 10:45 a.m.   This

4   was from Mr. Howlett's production of documents from

5   Escrow of the West?

6           MR. KATZ:   And this is Jeremy Katz.   It's a

7   two-page documents, Bates-numbered EOW 0172 through

8   EOW 0173.   Let's mark it deposition Exhibit 9.

9           (Exhibit 9 marked)

10  BY MR. THOMASON:

11     Q.   Do you recognize this document?

12     A.   I believe so.   I would have to look at my file

13  just to confirm it is the exact same.   Should I do that?

14  I can take a second and look through.

15     Q.   Yes.   Go ahead.   You can do that.

16     A.   Okay.

17          Yes.   This is the document.

18     Q.   And was this a document part of the escrow file

19  for the transaction?

20     A.   Yes.

21     Q.   And right now, do you have access to the escrow

22  file for the transactions?

23     A.   Yes.

24     Q.   So you can access the escrow file if you need

25  to verify anything or look at anything?

                                        Page 23

1          And, now, here's my question.  So then Peter

2     Hill responds to you, and he says:  "I have forwarded

3     your request to Melissa Melendez to handle this for our

4     mortgage company.  She is copied on this e-mail."

5          What is your understanding of what a mortgage

6     company is?

7          A.  The mortgage company worked sort of as a

8     settlement company for a lender.  So they'll provide

9     servicing documents.  But the actual lender is the

10    company that lends the funds.

11         Q.  Okay.

12         What is your understanding of what a mortgage

13    is?

14         A.  The mortgage is a loan secured by a deed of

15    trust instrument on chain of title.

16         Q.  So when Peter Hill is telling you that he's

17    from a mortgage company, was there anything in your mind

18    to think, well, is he a secured lender because he had a

19    mortgage?

20         A.  At this point, I was still thinking he was

21    probably affiliated with the Unison.

22         Q.  Why?  He's telling you that he doesn't handle

23    that.  He's asking you to get a separate request from

24    them.  Why do you think they're affiliated?

25         A.  Because Mr. Elizarov had given permission to

Page 75

```
 1    correspond with him, and Mr. Hill was asking for the
 2    payoff statement.  And he never corrected saying, you
 3    know, specifically anything about they're a separate
 4    lienholder or that they have no affiliation with Unison.
 5    So I would not have assumed that he was not affiliated.
 6         Q.  So when he said:  "We don't handle that portion
 7    of this," then you just felt like that meant that --
 8    what does that mean to you?  When Peter Hill told you:
 9    "We don't handle the Unison portion of this"?
10         A.  I don't know.  Perhaps there's two different
11    payments.  Sometimes we receive payoff demands
12    separately from a servicing company for their fees and
13    separate from a lender.  That's not uncommon that there
14    will be two different payees on a payoff for a
15    particular lender.
16         Q.  How often does that happen?
17         A.  I'm not sure.  To give like a percentage, maybe
18    10 percent of the time.
19         Q.  In the last six months of handling escrows,
20    have you had a lender submit a payoff demand and then a
21    servicer submit a separate payoff demand?
22         A.  I can't recall specifically a case for that.
23         Q.  Okay.
24             So we're still looking at Exhibit 16.  And
25    we're now looking at the e-mail at the top of page 13.
```

Page 76

1    It actually begins on page 12 at the bottom, and it's an

2    e-mail from Peter Hill to Melissa Melendez and you.

3    That's your e-mail address at the bottom of page 12 of

4    Exhibit 16?

5        A.   Yes.

6        Q.   And it says:   "Melissa" -- and then it

7    continues on the next page -- "this is an unusual

8    situation that I am directly involved with because of

9    Unison being filed in behind us."

10            What does that statement mean to you?

11       A.   That he is affiliated with Unison in some way.

12       Q.   What does it mean that "Unison being filed in

13   behind us"?  What does that mean to you?

14       A.   I'm not sure, to be honest.

15       Q.   Did you ever ask him what he meant by that?

16       A.   No, I did not.

17       Q.   "We need to move forward with this."  And then

18   he says:   "I'm in direct contact with Unison and the

19   borrower."

20            And he's telling you he's in contact with these

21   two separate entities.  And at this point, you're

22   continuing to believe that Goldwater and Unison are

23   affiliated; is that correct?

24       A.   Yes.

25       Q.   Just to make sure, you're not asking Unison or

                                             Page 77

```
 1    Goldwater if they're affiliated with each other, though;
 2    correct?
 3         A.  Correct.
 4         Q.  And now we're going to go to page 11.  And
 5    we're looking at the bottom of this page.  And it's from
 6    you to Peter Hill and Melissa Melendez and Matt Teskey.
 7            Do you see that?
 8         A.  Yes.
 9         Q.  T-e-s-k-e-y.
10            And you say:  "Good morning.  Following up for
11    the payoff demand.  Can we expect to receive it today?"
12            Now, by that point, on March 24th, you've
13    already received the Unison payoff; correct?
14         A.  I think so.  I'm not sure at the time of
15    sequence of events.
16            MR. LEVOTA:  Let's go ahead and we'll pull up
17    what I previously distributed as Goldwater Z.  We'll be
18    marking it as Exhibit 17.
19            (Exhibit 17 marked)
20    BY MR. LEVOTA:
21         Q.  And this is an e-mail chain, seven pages.
22            Do you recognize your e-mail within this e-mail
23    chain?
24         A.  Yes.
25         Q.  Okay.
```

Page 78

 1       A.   It's not showing on the preliminary title

 2   report.

 3       Q.   Did you ever ask Goldwater if they had a trust

 4   deed?

 5       A.   No.   I did not ask them for a trust deed.

 6       Q.   How come?

 7       A.   Initially, like I said, I thought they were

 8   affiliated with Unison, who is secured as a lienholder

 9   on the preliminary title report.   So I did not question

10   them to provide a deed of trust.

11       Q.   So on March 25th, when you've been no longer

12   authorized to speak with Goldwater, do you still believe

13   that they're affiliated with Unison?

14       A.   No.   Since the seller has stated that we're not

15   to communicate with them, that's when I understand that

16   they are, in fact, not affiliated with Unison.

17       Q.   And then back to Exhibit 16.   Peter Hill

18   responds and says:   "Is she familiar with the matter?"

19           And you respond saying:   "I have let her know."

20           And we've gone over what you let her know about

21   this?

22       A.   Yes.

23       Q.   And when you were letting her know, then you

24   were describing Goldwater as an entity that was once a

25   party to the escrow transaction but is no longer because

                                                Page 94

Omnibus Joint Exhibit Part H, page 1945

1    the seller has removed authorization; is that correct?

2        A.   Yes.

3        Q.   And that Goldwater, to your understanding, did

4    not have a trust deed of record because it was not

5    listed on the preliminary report?

6        A.   Yes.

7        Q.   And so now we're going to what's been

8    previously marked as Exhibit 6.  As we said before, this

9    is a similar e-mail chain that we just went through.

10   But it has a different e-mail at the top.  And here

11   there's an e-mail from Peter Hill to you on March 26th.

12          Did you receive this e-mail?

13       A.   I don't have that copy in my records here, but

14   I'm not sure if it's -- I'm not sure, to be honest.

15       Q.   You don't know if you received this e-mail?

16       A.   Yeah.  I don't have this in my document copies.

17       Q.   Well, we received this in response to a

18   subpoena of Escrow of the West.

19       A.   Okay.  Then we must -- it must have been

20   received in that case.  I just don't recall it.

21       Q.   So in this e-mail that he's saying:  "Andrea,

22   just to keep new the loop, I spoke with Mr. Elizarov

23   last night about accepting a short payoff of $675,000 of

24   our loan, which he agreed to, subject to final approval

25   here at Goldwater/Weststar."

Page 95

```
 1              Do you have any understanding of what that
 2    sentence means?
 3         A.   I'm not privy to any conversations between
 4    Mr. Elizarov and Mr. Hill.
 5         Q.   Do you know what he means when he says that we
 6    talked about accepting a short payoff of $675,000?
 7         A.   Yes.   I know what a short pay off is.   That's
 8    receiving funds for a loan short of what is actually
 9    owed.
10         Q.   And so here then they're saying that they're
11    owed $675,000 that they're going to accept as part of a
12    short payoff.   Is that your understanding of the
13    sentence?
14         A.   Yes.
15         Q.   Do non-lienholders ever part of a short payoff?
16              MR. THOMASON:   Objection; calls for
17    speculation, lacks foundation.
18    BY MR. LEVOTA:
19         Q.   You can go ahead.
20         A.   I don't understand if I'm supposed to answer
21    when there's an objection.
22         Q.   So when attorneys make objection, and that's
23    for the record.   Unless Mr. Krishel, your attorney here,
24    instructs you not to answer, then you are to answer the
25    question.
```

Page 96

1              MR. KRISHEL:  That's correct, Andrea.  So you

2    can literally ignore the objections so you don't lose

3    your train of thought.  If you hear me say, don't answer

4    that question, only then will you not answer it.

5    Otherwise, you can completely disregard the objection

6    and focus on the question.

7              THE WITNESS:  Okay.  So it was do

8    non-lienholders request a short payoff?  Is that what

9    the question was?

10   BY MR. LEVOTA:

11        Q.  I can ask you a different question.

12             Have you ever been involved in an escrow that

13   involved a short payoff aspect that was not connected to

14   a lienholder?

15        A.  No.

16        Q.  So from this e-mail, would you have any

17   suspicion that Goldwater thought they had a lien?

18             MR. ALEKSEYEFF:  Objection; calls for

19   speculation, misstates testimony.  The witness said

20   testified that she has not seen this e-mail.

21   BY MR. LEVOTA:

22        Q.  Go on.

23        A.  I would agree that Goldwater believed they had

24   a lien, yes.

25        Q.  And you never asked Goldwater if they believed

                                         Page 97

1     they had a lien; correct?

2         A.   Right.

3         Q.   Did anybody stop you -- while you had

4     authorization from Art to speak with Goldwater, did

5     anybody stop you from asking Goldwater if they believed

6     they had a lien against the property?

7         A.   No.

8         Q.   Do you have a reason for not asking them?

9         A.    Initially, I thought they were part of Unison.

10    So I did not ask them for documents pertaining to their

11    lien.  And then around the same time when Mr. Elizarov

12    advised not to communicate with them anymore is when I

13    realized they were not affiliated with Unison.  And,

14    therefore, since they did not have a secured lien, I no

15    longer communicated with them.

16              MR. LEVOTA:  I'm going to show you what

17    distributed as Goldwater H, but what we will mark as

18    Exhibit 20.

19              (Exhibit 20 marked)

20              MR. LEVOTA:  And I will put this on the

21    right-hand side of the screen because I want -- I want

22    to compare it with something we looked at earlier.

23    BY MR. LEVOTA:

24        Q.   So on the left-hand side of the screen is

25    Exhibit -- what's been previously marked as Exhibit 7,

                                              Page 98

1    deposition transcript.

2           The parties to this action all stipulated that

3    a certified copy of the deposition transcript can be

4    used in lieu of the original for all purposes.  Other

5    than that, we will follow the procedures per code for

6    the handling of the deposition transcript.

7           Everyone please confirm.

8           MR. LEVOTA:  Confirmed.

9           MR. BISHARAT:  Confirmed on behalf of Unison.

10          MR. ALEKSEYEFF:  Yes for Art Elizarov and

11   myself.

12          MR. LEVOTA:  Thank you very much.

13          MR. KATZ:  With that, we'll conclude the

14   deposition.

15          (The deposition concluded at 4:05 p.m.)

16                          *  *  *

17

18

19

20

21

22

23

24

25

                                              Page 169

```
1              DECLARATION UNDER PENALTY OF PERJURY

2

3         I, ANDREA CROSS, do hereby certify under penalty

4    of perjury that I have read the foregoing transcript of

5    my deposition taken June 29, 2022; that I have made such

6    corrections as appear noted herein, in ink, initialed by

7    me; that my testimony as contained herein, as corrected,

8    is true and correct.

9

10        DATED this        day of                  , 2022,

11   at                            , California.

12

13

14

15

16                                      ANDREA CROSS

17

18

19

20

21

22

23

24

25

                                            Page 170
```

REPORTER'S CERTIFICATION

I, Michelle K. Bailey, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this day of July 19, 2022.
Signature was requested.

Michelle K. Bailey

RPR, CSR No. 10713

Page 171

Omnibus Joint Exhibit Part H, page 1952

# EXHIBIT 108
# 3/30/21 Email between Shaw and First American (Shaw Depo Ex. 79)

**From:** Brittany Shaw <BShaw@goldwaterbank.com>
**Sent:** Tuesday, March 30, 2021 4:14 PM
**To:** Vicki Reeves <vreeves@firstam.com>
**Cc:** Peter Hill <PHill@goldwaterbank.com>
**Subject:** [External] 291 W Overlook / Elizarov

Hi Vicki,

I'm Brittany Shaw, the Loan Operations Manager, here at Goldwater Bank.  I am working with Pete Hill to correct the recording situation on the Artur Elizarov deal.

We need to order title insurance for the below property:

Amount: $686,250.00

Lien Holder: Goldwater Bank, N.A.

Borrower: Artur Elizarov

Address: 291 W. Overlook Road, Palm Springs, CA 92262

APN#: 513-363-023-2

I have sent you Fed Ex, to be received at your office by 8:00am tomorrow morning, the original Deed of Trust – for recording.

In confirmation of your conversations with Pete Hill, Goldwater Bank is requesting the recording of our Deed of Trust. We understand that we may be in 3rd Lien Position.

Can you please send your title fee invoice and wiring instructions, with the title report?

I have also attached "draft" lenders instructions.

Thank so much for your assistance with this matter – we appreciate it!

*Brittany Shaw*
**Loan Operations Manager**
**Goldwater Bank, N.A.**
2525 E Camelback Road Suite 1100
Phoenix, Arizona 85016
Phone: 480.281.8211
Fax: 480.281.8222
www.goldwaterbank.com

CONFIDENTIAL

Omnibus Joint Exhibit Part H, page 1954

EXHIBIT
79

# **EXHIBIT 109**
# **3/22/21 Email between Cross and Melendez with Attachment (Cross Depo Ex. 8)**

## RE: Request for Payoff Demand: Unison Agreement Corp./291 W. Overlook Road

Andrea Cross <andrea2@escrowofthewest.com>

Mon 3/22/2021 12:46 PM

To: Melissa Melendez <Melissa.Melendez@westloan.com>; Peter Hill <PHill@goldwaterbank.com>

Hi, please see attached signed by borrower.

Thank you,

**WARNING!** WIRE FRAUD ADVISORY

Before sending funds, always call your Escrow team to verify wire information





**Andrea Cross**

Senior Escrow Officer

_____

9440 Santa Monica Blvd. Suite 310, Beverly Hills, CA. 90210

**P**. (310) 402-5555 ext. 2071 | **E-Fax**. (310) 402-5556

**Direct**. (310) 402-5470

www.escrowofthewest.com



click here for disclosure

We are always looking for ways to improve our service. Please take a moment to complete this short survey about your recent experience.

Rate Your Experience

---

**From:** Melissa Melendez [mailto:Melissa.Melendez@westloan.com]
**Sent:** Monday, March 22, 2021 12:44 PM
**To:** Andrea Cross <andrea@escrowofthewest.com>; Peter Hill <PHill@goldwaterbank.com>
**Subject:** RE: Request for Payoff Demand: Unison Agreement Corp./291 W. Overlook Road

Hello all,

I received the request. We will need a borrower's authorization to complete the payoff.



EXHIBIT
8



9440 Santa Monica Blvd., #310
Beverly Hills, CA 90210

Phone: (310) 402-5555
Fax: (310) 402-5556
www.escrowofthewest.com

ESCROW NO.: 02-035523-AC

PROPERTY ADDRESS: 291 W. Overlook Road, Palm Springs, CA  92264

**EXISTING FIRST TRUST DEED LOAN:**
Name of Lender: _unison_ _____ Current Balance: _same_ _____
Address: _____
Loan No.: _same_ _____ Phone No.: _same_ _____

**EXISTING SECOND TRUST DEED LOAN, IF ANY**
Name of Lender: _____ Current Balance: _____
Address: _____
Loan No.: _____ Phone No.: _____

**HOMEOWNER'S ASSOCIATION INFORMATION**
Name of Association: _____
Management Company, if any _____
Address: _____
Account No.: _____ Phone No.: _____
Dues per Month: $ _____ Paid to: _____

**WATER STOCK COMPANY**
Water Stock No. Shares: _____
Water Company: _____
Address payment sent to: _____

**NEW CONSTRUCTION  [  ] YES   [  ] NO**
Work Commences on: _____
Work Completed on: _____
Notice of Completion Recorded on: _____

**PLEASE PROVIDE US WITH A COPY OF THE CERTIFICATE OF OCCUPANCY.**


**MAILING ADDRESS AFTER CLOSE OF ESCROW:**

_sama as above_ _____

_____

USE REVERSE FOR ANY ADDITIONAL LOANS.
**PLEASE COMPLETE AND RETURN THIS FORM WITH YOUR SIGNED ESCROW INSTRUCTIONS.**

THANK YOU.

As may be specifically and properly required to complete my transaction described in the Escrow Instructions, you are hereby instructed to obtain and comply with pay-off "demands" from the Lenders or parties named above and to make payment(s) in full from funds accruing to my account at close of escrow including but not limited to, forwarding/service/transfer fees/payments/reconveyance fees, interest or prepayment charges as demanded by such instructions without my further approval. The above referenced Lender, Homeowner's Association, and Mutual Water Company may  accept a copy of this signed notice as authorization to release information requested by ESCROW OF THE WEST.

DocuSigned by:

_Artur Elizarov_
Artur Elizarov _____A7B94E0...

Omnibus Joint Exhibit Part H, page 1957

EOW0520